Transcript of the Testimony of

# JOHN SPEARS

January 30, 2024

MSHA vs MOSenecaManufacturer, LLC

CENT 2023-0251



Alpha Reporting & Video
1911 S. National Ave., Suite 405
Springfield, MO 65804
Phone: 417-887-4110
transcripts@alphareportingservice.com
www.alphareportingservice.com

**Exhibit P-44, Page001**

Page 1

```
 1              UNITED STATES OF AMERICA
   FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
 2         OFFICE OF ADMINISTRATIVE LAW JUDGES


 3


 4  ACTING SECRETARY OF LABOR,) JUDGE MORAN
    MINE SAFETY AND HEALTH    )
 5  ADMINISTRATION (MSHA) and ) DISCRIMINATION
    ROBERT BAUMANN,           ) PROCEEDINGS
 6             Petitioner,    )
                              ) DOCKET NO. CENT 2023-0251
 7        vs.                 ) MSHA No. MADI-CD-2023-03
                              )
 8  MOSENECAMANUFACTURER      ) Mine: MOSenecMFR LLC dba
    LIMITED LIABILITY COMPANY,) American Tripoli
 9  d/b/a AMERICAN TRIPOLI,   ) Mine ID: 23-00504
               Respondent.    )
10


11


12           DEPOSITION OF MR. JOHN SPEARS,

13  produced, sworn, and examined on Tuesday,
    January 30, 2024, at 9:29 a.m. of that day, pursuant
14  to Notice to Take Deposition, at the Joplin Public
    Library, 1901 East 20th Street, Joplin, Missouri,
15  before ABBY LYNN WASSON, Registered Professional
    Reporter, Certified Court Reporter #1048, in a
16  certain cause now pending in the United States of
    America, Federal Mine Safety and Health Review
17  Commission, Office of Administrative Law Judges,
    wherein the parties are as above set forth; taken on
18  behalf of the Petitioner.

19

20

21

22

23

24            ALPHA REPORTING & VIDEO
           1911 South National, Suite 405
25            Springfield, Missouri 65804
                 (417) 887-4110
```

## Page 2

```
 1              A P P E A R A N C E S
 2   For Petitioner:    MS. LAURA M. O'REILLY
                        MS. ELAINE SMITH
 3                      MR. QUINLAN B. MOL (VIA ZOOM)
                        U.S.DEPARTMENT OF LABOR
 4                      Office of the Solicitor
                        2300 Main Street, Suite 10100
 5                      Kansas City, MO 64108
                        oreilly.laura.m@dol.gov
 6                      smith.elaine.m@dol.gov
                        moll.quinlan.b@dol.gov
 7
     For Respondent:    MR. RUSSELL TIDABACK, (VIA ZOOM)
 8                      Managing Member (PRO SE)
                        2701 East Grauwyler Road
 9                      Building 1, Department 1008
                        Irving, TX 75061
10                      rtidaback@deedyco.com
11   Also Present:      Mr. Robert Baumann*
12
                        I N D E X
13
14   Witness:  MR. JOHN SPEARS              Page
15   Examination by Ms. O'Reilly ............ 4
16
17   Reporter's Certificate.................. 96
18
19
20
21
22
23   * Not continuously present
24   Exactly as stated:  (sic)
25   Phonetic spelling:  (ph.)
```

## Page 3

```
 1   EXHIBIT     DESCRIPTION              IDENTIFIED
 2   Ex. 1       "Production Lead Duties" document    30
 3   Ex. 2       4/17/23 termination letter from      35
                 Russell Tidaback to Robert Baumann
 4
     Ex. 3       Operator's Position Statement        36
 5               from Russell Tidaback to MSHA
 6   Ex. 4       American Tripoli's                   48
                 Employee Handbook
 7
     Ex. 5       Representative of Miners             75
 8               Designation Form - Reset Form
 9   Ex. 6       Photograph of text communication     86
                 between Rob Baumann and
10               John Spears
11   Ex. 7       Compilation of disciplinary records  89
                 provided by American Tripoli
12
     Ex. 8       Compilation of termination letters   91
13               produced by American Tripoli
14   Ex. 9       11/21/23 letter from John R. Spears  92
                 to Whom it May Concern
15
16
     (Original Deposition Exhibits 1 through 9 were
17   attached to the original transcript.  Scans sent
     to Ms. O'Reilly.)
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                   MR. JOHN SPEARS,
 2   being first duly sworn to testify the truth, the
 3   whole truth, and nothing but the truth, testified as
 4   follows:
 5                    EXAMINATION
 6   BY MS. O'REILLY:
 7   Q.  Could you please state your full name for the record.
 8   A.  John Robert Spears.
 9   Q.  Okay.  My name is Laura O'Reilly.  I'm an attorney
10       representing the Acting Secretary of Labor for the
11       Department of Labor in this case, and I'm here along
12       with Elaine Smith who is also representing the Acting
13       Secretary of Labor.  We also have Robert Baumann here
14       who's a complainant in this case, and then we have
15       Russell Tidaback who is on -- joining us remotely via
16       Zoom.
17           This is a deposition that we are taking in the
18       case of Acting Secretary of Labor vs. -- and
19       Robert Baumann vs. MO Seneca Manufacturer Limited
20       Liability Company doing business as American Tripoli
21       in the Federal Mine Safety and Health Review
22       Commission, Docket No. 2023-0251.
23           Do you have an attorney in this case?
24   A.  No, I do not.
25   Q.  If you --
```

## Page 5

```
 1   A.  Not other than the attorney that represents the
 2       company.
 3   Q.  And it's my understanding that that attorney does not
 4       represent the company in this case.
 5   A.  Okay.  Very good.
 6   Q.  Do you have a different understanding?
 7   A.  No.
 8   Q.  Okay.
 9           I'm just going to kind of go over the background
10       rules for a deposition.  If you don't understand a
11       question, please tell me and I'll attempt to answer
12       it.  I mean, I'll attempt to rephrase it.  Sorry.  If
13       you answer a question, I'm going to assume you
14       understood it and meant to give the answer that you
15       gave.  Do you agree to let me know when you do not
16       understand a question?
17   A.  Yes.
18   Q.  If at any time you need a break, please let me know.
19       We can take breaks.  I just ask that you finish the
20       question -- finish answering whatever question is
21       pending --
22   A.  Yes.
23   Q.  -- before we do that.  We also need to be careful not
24       to talk over one another.  The court reporter here is
25       taking down what we're saying, so it's hard for her
```

Page 6

1     to do that if we're speaking over each other.
2          Do you understand that you are under oath?
3  A.  Yes.
4  Q.  Is there any reason today why you cannot give full
5     and truthful answers to my questions?
6  A.  Not that I'm aware.
7  Q.  Are you under the influence of any substance or
8     suffering from any condition or illness that would
9     impair your ability to give full and truthful answers
10    to my questions?
11 A.  No.
12 Q.  Did you do anything to prepare for today's
13    deposition?
14 A.  We just -- Mr. Russell and I -- I mean, Mr. Tidaback
15    and I just discussed it a little bit.
16 Q.  Okay.  What did you guys discuss?
17 A.  Just the forum, mostly.
18 Q.  What do you mean by "forum"?
19 A.  The questioning.
20 Q.  Did you go over any questions that might be asked?
21 A.  No.
22 Q.  Did you review any documents?
23 A.  No.
24 Q.  Could you provide your address?
25 A.  10396 Reindeer Drive, Granby, Missouri 64844.

Page 7

1  Q.  And I mentioned earlier that we're here in the case
2     of Acting Secretary and Robert Baumann vs. American
3     Tripoli.  Do you know what this case is about?
4  A.  Yes, as far as I -- you know, what I've been told.
5  Q.  And what have you been told?
6  A.  Just that Mr. Baumann has a discrimination case
7     against American Tripoli MO Seneca Manufacturing.
8  Q.  And where did you learn that information?
9  A.  From the information that we've received from MSHA,
10    Mining Safety and Health Administration.
11 Q.  Could you let me know what education you've had, if
12    any, after high school?
13 A.  I have a bachelor's degree in industrial technology
14    education.
15 Q.  And where did you get that?
16 A.  Missouri Southern State College, now University, here
17    in Joplin.
18 Q.  Any other education after high school?
19 A.  I went to grad school for a while.
20 Q.  And where was that?
21 A.  University of Missouri, Lincoln University, and now
22    it's Missouri State University in Springfield.
23 Q.  And what were you studying there?
24 A.  My master's in education.
25 Q.  Were you formerly a teacher?

Page 8

1  A.  Yes.
2  Q.  When did you do that?
3  A.  From '89 until '97.
4  Q.  And are you currently employed?
5  A.  Yes.
6  Q.  Who are you employed by?
7  A.  American Tripoli MO Seneca Manufacturing.
8  Q.  And what is your job title?
9  A.  The operations manager.
10 Q.  And when did you start working for American Tripoli?
11 A.  August of 2022.
12 Q.  And has your job title been the same since then?
13 A.  Yes.
14 Q.  And have you held any other positions at the company?
15 A.  No.
16 Q.  And what would you say are your job duties?
17 A.  I oversee the -- the company there that is located in
18    Seneca, Missouri.
19 Q.  And are you employed anywhere else right now?
20 A.  No.
21 Q.  Is American Tripoli your only source of income right
22    now?
23 A.  Me personally?  Yes.
24 Q.  Why do you say "me personally"?  Do you have a
25    company?

Page 9

1  A.  Well, I mean, I -- you know, I'm married.
2  Q.  Oh, okay.
3  A.  But for me personally, I don't receive any other
4     income.
5  Q.  Do you own any companies?
6  A.  No, I do not.
7  Q.  Do you have an ownership stake in American Tripoli?
8  A.  No.
9  Q.  And is Russell Tidaback your boss?
10 A.  Yes.
11 Q.  Is anyone else your boss?
12 A.  Not that I'm aware.  Well, other than Ms. Jordan,
13    Jordan Tidaback.  She's the managing partner.
14 Q.  And are you an hourly employee?
15 A.  No, ma'am.
16 Q.  Are you salary?
17 A.  Yes, ma'am.
18 Q.  Who hired you to work for American Tripoli?
19 A.  Mr. Tidaback and Ms. Tidaback, Ms. Jordan.
20 Q.  Did you interview with them?
21 A.  Yes, I did.
22 Q.  Was that in person?
23 A.  In person, yes.
24 Q.  And how did you find out about the job?
25 A.  I found it on Indeed.

Appellate Case: 25-1349     Page: 4     Date Filed: 04/07/2025 Entry ID: 5503844

Page 10

1   Q.   And where did you work at prior to working at
2        American Tripoli?
3   A.   Specialty Foods.
4   Q.   What was your role there?
5   A.   I was, like, inventory, shipping.
6   Q.   How long did you work there?
7   A.   Three years.
8   Q.   Where did you work before that?
9   A.   United States Postal Service.
10  Q.   And how long did you work there?
11  A.   More than 18 years.
12  Q.   What was your role there?
13  A.   Postmaster was my final role.
14  Q.   And where were you the postmaster?
15  A.   Goodman, Missouri, was my final office.
16  Q.   As part of your role as postmaster, did you do
17       anything with regard to safety for the Post Office?
18  A.   Oh, yes, ma'am.
19  Q.   Did you have to take any, like, OSHA training
20       classes?
21  A.   I don't know about an OSHA-conducted class, but we
22       had -- we had training sessions through the Postal
23       Service.
24  Q.   You were familiar with OSHA standards through that?
25  A.   Yes.

Page 11

1   Q.   Do you -- in your role with American Tripoli, do you
2        supervise employees?
3   A.   Yes, ma'am.
4   Q.   And who do you supervise?
5   A.   Well, I'm the last person on the -- I'm the head
6        person of the entire mill there and of the company
7        there.
8   Q.   So would you say every employee --
9   A.   Every employee that's there, yes.
10  Q.   You would be their supervisor?
11  A.   Yes.
12  Q.   Their direct supervisor?
13  A.   I'm the direct supervisor for the quarry employee
14       and, of course, the production supervisor. And then
15       the mill crew is under the production supervisor.
16  Q.   Okay. And who is the current production supervisor?
17  A.   Don Hale, H-A-L-E.
18  Q.   Did you -- were you Rob Baumann's supervisor?
19  A.   Yes, ma'am.
20  Q.   As a supervisor, is it your job to make sure
21       employees are doing their jobs?
22  A.   Yes, ma'am.
23  Q.   And how do you go about doing that?
24  A.   I observe their -- their technique, I guess you could
25       say, and we, you know, keep an eye on production

Page 12

1        quotas and how the mill is being conducted.
2   Q.   If you notice an employee that is not doing their job
3        correctly, what would you do?
4   A.   We'd have a conversation concerning it.
5   Q.   Anything else?
6   A.   Well, at first it would just be a conversation
7        concerning it.
8   Q.   Would you notify anybody about having that
9        conversation?
10  A.   Not necessarily.
11  Q.   Would you notify Russell?
12  A.   Not necessarily.
13  Q.   Have you ever notified Russell when you had to talk
14       to an employee about not performing their job?
15  A.   Yes.
16  Q.   How often would you say you do when -- how often
17       would you say -- like, what percentage of time are
18       you notifying Russell about an issue that you have
19       with an employee versus not notifying him?
20  A.   Well, you know, if it's -- if it's an extemporaneous
21       type of situation, I would notify Mr. Tidaback. But
22       otherwise, you know, it's -- you know, it's kept
23       right there at the mill.
24  Q.   What do you mean by "extemporaneous"?
25  A.   Well, if -- you know, if they're -- because he'll --

Page 13

1        he sees the same production schedule and production
2        amounts that I do, and he would ask me -- he would
3        begin the conversation, ask me about it as to how
4        come we didn't meet that particular day's quota. And
5        so I would then explain to him that we -- you know, I
6        had spoke with the production supervisor.
7   Q.   So how often would you say that Russell finds out or
8        knows before at some point that you'd spoken to an
9        employee about an issue?
10  A.   Well, he sees the production schedule every day.
11  Q.   I'm not asking about the production schedule. Just
12       generally if an employee is not doing their job
13       correctly and you speak to them, what percentage of
14       time would Russell find out about that?
15  A.   Oh, probably 50 percent of the time.
16  Q.   What was Rob Baumann's job title?
17  A.   The production supervisor.
18  Q.   And what were his job duties?
19  A.   His job duties were to conduct safety exams
20       throughout the mill, make sure the mill crew was
21       there when, you know, on time and had proper
22       attendance, make sure that production quotas were met
23       to the best of the mill's ability, the safety exams
24       of the mill. And that's -- that's a walk-around and
25       a visual inspection. Inventory. That was -- that's

Page 14

1    the production manager's -- supervisor's duty.
2  Q.  What you described, is that all the duties he had?
3  A.  All that I can think of right now.
4  Q.  Okay.  You can't think of any other duties he might
5      have had right now?
6  A.  Not as of yet.
7  Q.  If you do think of any throughout this deposition,
8      let me know.
9  A.  I sure will.
10 Q.  That you didn't already include.
11      Did Rob Baumann supervise any employees?
12 A.  Yes, he did.
13 Q.  Who did he supervise?
14 A.  Just the ones that I knew of then or --
15 Q.  Is there a job title that he supervised?  Like all
16     the whatever employees or --
17 A.  Mill associates.
18 Q.  Okay.  And is that it?  He would just be the
19     supervisor over the mill associates?
20 A.  Yes.
21 Q.  So whoever was a mill associate at the time, that
22     would have -- he would have been their supervisor?
23 A.  Yes.
24 Q.  Did you consider Baumann to be part of management at
25     American Tripoli?

Page 15

1  A.  Yes.
2  Q.  When you said that he had job duties including safety
3      exams, what does that mean?
4  A.  The Mine Safety and Health Administration part of the
5      CFR, Code of Federal Regulations, says that the
6      quarry job site, which includes the mill or the --
7      what we have is drying sheds and the quarry itself --
8      is required to do a safety exam each -- each day to
9      look for safety hazards.
10 Q.  And did Rob receive any task training on how to do
11     that?
12 A.  Yes.
13 Q.  Who did that training?
14 A.  I would say it would be Mr. Tidaback because he was
15     hired before I came to the company.
16 Q.  So you don't know if he got that training?
17 A.  I do not know.
18 Q.  Was there any documentation of that task training?
19 A.  Yes.
20 Q.  And where would that have been?
21 A.  That was -- it's a 5000-23, 5000 dash 23.
22 Q.  Are you talking about a new miner training
23     certificate?
24 A.  Well, all of the -- any kind of training that takes
25     place is placed upon a 5000-23, and then entered into

Page 16

1      their -- the record.
2  Q.  So if I didn't see task training on safety exams on a
3      5000-23, would you assume it did not happen?
4  A.  If it's not on a 5000-23, then it -- then according
5      to what MSHA would say, it didn't happen.
6  Q.  What would you say?
7  A.  I would say that if it's not on a 5000-23, that it
8      didn't happen.
9  Q.  And you had mentioned that his job is to meet
10     production quotas.  I think you said something "to
11     the best of the mine's ability" -- or the mill's
12     ability?
13 A.  Yes.
14 Q.  What did you mean by that?
15 A.  The mill is -- that particular structure there was
16     built after World War II.  It is almost 80 years old,
17     and the equipment that is in there is anywhere
18     between 25 and 50 to 60 years old.  It is -- it's
19     very usable, but it requires a lot of maintenance to
20     stay ahead of it.
21 Q.  So did maintenance issues ever cause issues with
22     meeting production quotas?
23 A.  Oh, yes.
24 Q.  And who was in charge of maintenance when Rob was
25     employed?

Page 17

1  A.  I don't remember at that particular time.  We've had
2      nine different maintenance people since I've been
3      there.
4  Q.  So would you say the person in charge of maintenance
5      when Rob was employed --
6  A.  When I first started there, his name was Jesse Hodge.
7  Q.  And was that -- is that a specific job title, like a
8      maintenance --
9  A.  Yes.  Maintenance -- maintenance personnel, yes.
10 Q.  Maintenance personnel.  So whoever was in maintenance
11     personnel would have been in charge of maintenance at
12     the time that Baumann was employed?
13 A.  Yes.
14 Q.  But that might have been different people?
15 A.  Might have been different people, yes.
16 Q.  Okay.  And while Rob was employed, was he in charge
17     of safety at the mine?
18 A.  Well, the -- everyone has a role in safety there at
19     the mill.  That's where -- that was the main part
20     that Mr. Baumann was in charge of, was the mill, not
21     necessarily the drying sheds or the quarry.
22 Q.  Who would you say was -- like at the top in charge of
23     safety at the mine while Baumann was employed?
24 A.  In charge of safety?
25 Q.  Mm-hmm.

Appellate Case: 25-1349    Page: 6    Date Filed: 04/07/2025 Entry ID: 5503844

Page 18

1   A.   Well, for the mill, doing the -- doing the safety
2        exams would be the production supervisor.
3   Q.   Would you say that there was anyone overall in charge
4        of safety in the mill while Baumann was employed?
5   A.   Well, it'd be myself or Mr. Tidaback.
6   Q.   And who was in charge of making sure the mine was in
7        compliance with MSHA safety standards while Rob was
8        employed?
9   A.   Well, it would fall to myself or Mr. Tidaback.
10  Q.   How -- how many hours a week would you say that Rob
11       worked while he was employed?
12  A.   Forty hours.
13  Q.   And how do you know that?
14  A.   By the records that we have.
15  Q.   And what records do you have that would show how many
16       hours he worked?
17  A.   Well, I believe it'd be the payroll, what we call,
18       that's kept track on shifts.
19  Q.   How does payroll get information about how many hours
20       people actually worked?
21  A.   They are -- they're input.
22  Q.   Who inputs that?
23  A.   Mr. Baumann was in charge of inputting through
24       shifts.
25  Q.   Was there a time clock?

Page 19

1   A.   No.
2   Q.   How did employees keep track of their hours worked?
3   A.   By the production supervisor input those into the
4        shifts program.
5   Q.   And how was that?  Like, if somebody walked in at
6        8:05, was somebody supposed to write down 8:05?  Or
7        how did that work?
8   A.   No.  American Tripoli has -- as far as I know from
9        speaking with past employees has never had a -- had
10       never had a time clock.
11  Q.   So I guess I'm asking how do you know what to input?
12       Like, how would the production supervisor know what
13       to input into that system for how many hours an
14       employee worked?
15  A.   When the employee showed up to work and when they
16       left.
17  Q.   And how does he know when they showed up and when
18       they left?
19  A.   Well, as far as I know, as soon as they seen them.
20  Q.   And is there like a clock that they're supposed to
21       look at and write something down, or how do they kind
22       of keep track of that?
23  A.   Well, there was a clock in what we call the control
24       room.
25  Q.   So would you say the payroll records, like,

Page 20

1        accurately reflected somebody got in at 8:10 and left
2        at 4:35?  Like, was it that detailed or was it just
3        an assumption that people worked eight hours?
4   A.   It's usually an assumption.
5   Q.   And was that assumption that people worked
6        eight hours?
7   A.   Yes.
8   Q.   What type of employee was Baumann?
9   A.   He was a -- he was a good -- he was a good employee.
10       You know, he was punctual and, you know, did take an
11       interest in what he was doing.
12  Q.   And did he do the work that you asked of him?
13  A.   For the most part there towards the beginning, you
14       know, from my association with him.
15  Q.   And when you say "for the most part," are there times
16       that he didn't do what was asked of him?
17  A.   Towards -- towards the end of his employment.
18  Q.   Could you give me examples of times that he didn't do
19       the work that was asked of him?
20  A.   That when -- when he was purposely not wanting to
21       meet the production schedule.
22  Q.   Why do you say he was purposely not wanting to meet
23       the production schedule?
24  A.   He told me so.
25  Q.   And did he have a reason?

Page 21

1   A.   He said it was too hard on the mill associates.
2   Q.   Was he concerned about the mill associates' safety?
3   A.   Well, I guess person- -- their personal well-being, I
4        guess.
5   Q.   Well, when he said it was hard on the associates, was
6        he concerned that there was a safety risk to the
7        associates to meet the production quota?
8   A.   I guess in his opinion.
9   Q.   And did he say that to you?
10  A.   Yes.
11  Q.   So he told you he was concerned about the safety of
12       the associates with regard to meeting the production
13       schedule that was asked of him?
14  A.   Explain that again, your question.
15  Q.   You said that he told you that it was hard to meet
16       the production schedule and it was too hard on the
17       associates; correct?
18  A.   Yes.
19  Q.   And it was hard on the associates because there was a
20       concern about the associates' safety?  Is that
21       correct?
22  A.   I'm not so sure about safety or any kind of --
23       anything other than a personal opinion to it.
24  Q.   But did you believe that he had that personal
25       opinion?

Page 22

1  A.  Yes.  He said he did.
2  Q.  So he told you he was concerned about employee safety
3      in meeting the production schedule; correct?
4  A.  Yes.
5  Q.  And when did that happen?
6  A.  There within the last month of his employment.
7  Q.  So sometime maybe in March or April --
8  A.  Yes.
9  Q.  -- of '23?  Did that happen more than once?
10 A.  Yes.
11 Q.  How many times?
12 A.  Five or six.
13 Q.  All within that last month?
14 A.  Yes.  I would say yes.
15 Q.  And what was your response to that?
16 A.  My response to it was that the -- the mill associates
17     were aware of their duties and that they were to
18     continue with what needed to be done so that we would
19     be able to do our best to meet that production quota
20     for the -- you know, for the day that Mr. Tidaback
21     had set forth to us.
22 Q.  Notwithstanding the concern about safety to the
23     employees?
24 A.  Well, the employees were given -- it's not exactly a
25     continual working through whatever.  There was plenty

Page 23

1      of breaks that were able -- for the employees to take
2      in order to remain in a -- to meet a safety standard,
3      I would say.
4  Q.  The breaks are what allowed them to be safe in doing
5      this work?
6  A.  Well, I believe that Mr. Baumann's idea was that it
7      was -- that we -- that hand-stacking our product was
8      too hard on the employees and that -- and that he
9      didn't wish to injure them in any way.
10 Q.  Were there any other instances of Baumann not doing
11     what you asked of him?
12 A.  Yes.
13 Q.  What are those?
14 A.  Since we had received so many citations from MSHA,
15     that -- that the safety exams of the mill were not
16     being conducted in a proper -- in a proper manner.
17 Q.  Are you saying that you blame Baumann for the
18     citations from MSHA?
19 A.  Not necessarily, no.  It's just that, you know, there
20     should have -- you know, that some of the things that
21     the MSHA inspectors found were, you know, something
22     that through a safety exam, through the daily exam,
23     that should have been found.
24 Q.  Is that something you could have also found?
25 A.  I don't do safety exams.  Only when -- you know, just

Page 24

1      every now and then as I go through.
2  Q.  Well, you did say that safety ultimately fell on you.
3      So did you -- were those issues that you could have
4      found if you had walked around?
5  A.  I found issues at the times that I had walked around,
6      did the mill.
7  Q.  I'm saying it seems like the issues that you might
8      have been cited for that you're saying Baumann should
9      have found, it seems that also you could have found
10     them; correct?
11 A.  If I was -- I would say yes, I could have found them.
12 Q.  Did you have any other issues with Baumann not
13     following your directions?
14 A.  No.
15 Q.  Did Baumann have a good attitude while he was working
16     at American Tripoli?
17 A.  Not necessarily, no.
18 Q.  What makes you say that?
19 A.  Just -- to me, he just didn't have a very good
20     attitude about it.
21 Q.  And what makes you say that?
22 A.  He just always felt what I would characterize as
23     being angry.
24 Q.  Do you know what he was angry about?
25 A.  No.

Page 25

1  Q.  Did he ever express to you being upset or angry about
2      anything in particular?
3  A.  Yes.
4  Q.  What?
5  A.  He just was -- he was upset about the way the mill
6      was being managed by Mr. Tidaback.
7  Q.  In what ways?
8  A.  As far as production or maintenance.
9  Q.  Did he have concerns about safety?
10 A.  Not that he really had brought forth that I can
11     remember.
12 Q.  Well, you mentioned that he had brought forth
13     concerns about safety with stacking; correct?
14 A.  Yes.
15 Q.  Anything else?
16 A.  As far as?
17 Q.  Did he ever raise any concerns to you about safety
18     with regard to anything other than about stacking
19     concerns?
20 A.  No, not that I can remember.
21 Q.  Did he ever raise any concerns to you about dust?
22 A.  Dust?
23 Q.  Yes.
24 A.  I wouldn't necessarily consider that a -- it is a
25     safety concern and we do take those precautions with

Page 26

1     our proper PPE, but the material that we produce
2     is -- is a dust, and there's dust all over the plant,
3     all over the mill.
4  Q.  Did Rob express concerns about dust to you?
5  A.  The -- all mill associates and the production
6     supervisor and myself and the maintenance people are
7     aware of the proper PPE that needs to be used, and
8     that is what they -- they went through the training
9     before they became employees there.
10  Q.  That doesn't really answer my question.  I'm asking
11     did Rob ever express concerns about dust to you while
12     he was employed?
13  A.  Not that I'm aware of.
14  Q.  Did you ever do a performance review of Rob while he
15     was working for the company?
16  A.  No.
17  Q.  Do you know if anyone else did?
18  A.  No.  I don't -- I don't know.
19  Q.  Would you have known if somebody did a performance
20     review of the employees you supervise?
21  A.  No.
22  Q.  You might not -- someone might have done it without
23     you?
24  A.  Someone might have done it before I became employed
25     there.

Page 27

1  Q.  While you were employed there, did anyone do a
2     performance review for Rob?
3  A.  Not that I'm aware of.
4  Q.  Did you ever discipline Rob?
5  A.  No.
6  Q.  Do you know if Russell Tidaback ever disciplined Rob?
7  A.  Not that I'm aware.
8  Q.  Do you know if Jordan Tidaback ever disciplined Rob?
9  A.  Not that I'm aware.
10  Q.  Did you ever counsel Rob about his work?
11  A.  Yes.
12  Q.  When?
13  A.  When we were not meeting production schedule.
14  Q.  About anything else?
15  A.  Not that I'm -- not that I can think of.
16  Q.  Did anyone else ever counsel Rob while you were
17     working there?
18  A.  Not that I can -- not that I'm aware of.
19  Q.  Do you know if any of that counseling was ever
20     documented?
21  A.  Not that I'm aware of.
22  Q.  Did you consider that Rob was competent to do his
23     job?
24  A.  Yes.
25  Q.  Did Rob get along with the other employees?

Page 28

1  A.  Sure.
2  Q.  Was he well-liked by the employees?
3  A.  I would say, you know, they were -- they were all
4     well-acquainted.  You know, they -- as far as liked
5     or -- I don't -- I don't know their personal
6     feelings.
7  Q.  Do you know if anyone disliked Rob?
8  A.  No.
9  Q.  You're not aware of anyone that disliked him?
10  A.  No, I'm not aware of anyone.
11  Q.  Do you believe Rob had a good work ethic?
12  A.  He was a -- he was punctual, I would -- you know.
13  Q.  Did he work hard?
14  A.  I don't understand.
15  Q.  Was he a hard worker?
16  A.  I believe that he worked at their -- you know, was
17     conscientious of what needed to be done.  But as far
18     as -- you know, I don't -- you know, I don't know
19     what -- you know, being a hard worker is kind of an
20     ambiguous term, you know.
21  Q.  What would you consider hard worker to mean?
22  A.  For me per- -- for me personally, you know, it's
23     someone that is engaged in what they're doing and
24     looks for ways to improve it and tries to always make
25     adjustments, you know, in order to increase any kind

Page 29

1     of productivity.
2  Q.  Did Rob meet that definition of hard worker?
3  A.  No.
4  Q.  In what ways did he not?
5  A.  Just -- just kind of went along with the flow.
6  Q.  What do you mean by that?
7  A.  Just -- just did -- just did the minimum of what
8     needed to be done.
9  Q.  In what ways did he do the minimum?
10  A.  I guess just not -- there toward the end of his
11     employment, that he, you know, just didn't want to
12     meet the -- did not want to meet the production quota
13     that we had.
14  Q.  So it sounds like overall you didn't have a lot of
15     complaints about Rob.  Would you say your only
16     complaint about him had to deal with meeting
17     production quotas?
18  A.  Yes.
19  Q.  Did you ever hire anyone to replace Rob prior to his
20     termination?
21     Did I hire someone before he was terminated?
22  Q.  Yeah.
23  A.  No.
24  Q.  What was Kensley Brewer's job?
25  A.  She was the -- my administrative assistant.

Appellate Case: 25-1349     Page: 9     Date Filed: 04/07/2025 Entry ID: 5503844

Page 30

1   Q.   Was she hired to replace Rob?
2   A.   No.
3   Q.   I'm going to show you -- I'm going to show you an
4        exhibit, if I can find it.
5            MS. SMITH:  Can I make one note for the
6        record?  I just wanted to note that Mr. Baumann is no
7        longer with us.  He -- he stepped out and probably
8        left for the rest of the day.  So he won't be here
9        for the rest of the testimony.
10           MS. O'REILLY:  Thank you.
11  Q.   (By Ms. O'Reilly) I'm going to -- she's going to find
12       that exhibit, and I'll just kind of keep going on
13       until we find that.  Oh.  She's much better at
14       finding things than I am.
15           All right.  I'm going to mark this document as
16       Exhibit 1.
17           (Deposition Exhibit 1 marked for identification.)
18  Q.   Do you know what that document is?
19  A.   Yes.
20  Q.   And what is this?
21  A.   Production lead duties.
22  Q.   And who created this document?
23  A.   Mr. Tidaback.
24  Q.   Do you know if this -- well, would this have been
25       Rob's job title?  Production lead?

Page 31

1   A.   Yes.
2   Q.   And do you know if this document accurately reflects
3        his job duties while he was employed by
4        American Tripoli?
5   A.   To the best of my knowledge, yes.
6   Q.   And do you know, did you ever provide this document
7        to Rob?
8   A.   I did not personally, no.
9   Q.   Do you know if he ever saw it?
10  A.   Not that I'm aware.
11  Q.   And were all of these duties duties that were solely
12       on the production lead, or do you know if any of
13       these were shared duties?
14  A.   I would say that they were for the production lead
15       duties.
16  Q.   Did you have any of the duties on this list while
17       Baumann was employed also?  Like, are any of these
18       duties that overlap with your duties that you had at
19       the time that he was employed?
20  A.   There are some that overlap, yes.
21  Q.   What would those be?
22  A.   I guess the ones that are marked there with the
23       operations manager.
24  Q.   Could you point to one of those?  I don't know.
25  A.   "Mill product and production supply inventory,

Page 32

1        (operations manager)."
2   Q.   So does that mean that was primarily your job but he
3        assisted?  Or what does that mean, do you know?
4   A.   That was to let the operations manager know that if
5        there was -- that there was -- you know, the product
6        needs to be -- raw product needs to be brought and
7        the supply inventory of items that we needed to know
8        about.
9   Q.   Did Rob ever bring any complaint -- concerns to you
10       or complaints about concerns with complying with MSHA
11       standards?
12  A.   Not -- not that I can really think of.  Mr. Baumann
13       and I didn't really -- didn't really converse, you
14       know, that much other than just what we -- than what
15       we were looking for as for the production schedule.
16  Q.   So you can't think of any time that he raised a
17       concern with you about complying with MSHA standards?
18  A.   No.
19  Q.   Did Rob ever complain to you about concerns about,
20       like, electrical issues?
21  A.   No.
22  Q.   Did Rob ever make any complaints to MSHA that you're
23       aware of?
24  A.   Not that I'm aware of.
25  Q.   Did you ever think he did?

Page 33

1   A.   There -- anybody in town can make a complaint to
2        MSHA, so I -- you know, I'm not aware of anything.
3   Q.   Who made the decision to terminate Rob?
4   A.   Mr. Tidaback.
5   Q.   Were you part of that decision?
6   A.   No.
7   Q.   Were you consulted?
8   A.   Yes.
9   Q.   When were you consulted?
10  A.   That -- maybe the day before.
11  Q.   And what were you consulted about?
12  A.   Mr. Tidaback let me know that he had drafted a
13       termination letter and that the title was to
14       terminate Mr. Baumann.
15  Q.   So you weren't involved in the -- the decision had
16       already been made by the time you were consulted
17       about his termination?
18  A.   I believe so, yes.
19  Q.   Do you know why Baumann was terminated?
20  A.   For his lack of production and just an overall -- him
21       just as being not a productive employee.
22  Q.   Earlier you had mentioned that your only issue with
23       Baumann was him not meeting, like, production quotas.
24       So did you have any other issues with him?
25  A.   Not other -- just -- I was just interested in just

Appellate Case: 25-1349    Page: 10    Date Filed: 04/07/2025 Entry ID: 5503844

Page 34

1    making sure that we made -- that we met production.
2 Q. So are you aware, was he terminated for any reason
3    other than production issues?
4 A. Production issues. And I would say that his attitude
5    and demeanor did not meet what Mr. Tidaback or myself
6    would say would be a target employee.
7 Q. And what -- what about his attitude and demeanor was
8    the issue there?
9 A. Disrespectful at times and just a -- just a poor
10   attitude towards, you know, wanting to -- wanting to
11   perform his duties.
12 Q. Can you give me an example of a time when he was
13   disrespectful?
14 A. That -- the times that he told me he wasn't going to
15   push the mill associates and -- with trying to meet
16   the daily production.
17 Q. So the attitude and demeanor issues also are kind of
18   wrapped up in the production issues that we discussed
19   earlier, would you say?
20 A. Sure.
21 Q. Were there any additional attitude or demeanor issues
22   other than related to that production issue?
23 A. Not that I can think of.
24 Q. Who did Rob's job after he left?
25 A. I was -- I took over most -- for the most part of

Page 35

1    that position to make sure things were being done.
2    Then we had a mill associate that ran the control
3    room.
4 Q. Did you agree with the decision to terminate Rob?
5 A. Sure.
6 Q. If you were the person in charge of making the
7    decision, would you have terminated Rob?
8 A. Yes.
9 Q. And why?
10 A. Same reasons.
11 Q. Why was the decision made to terminate Baumann, like,
12   on April 17th? Why -- why then versus any other
13   time?
14 A. I don't know.
15 Q. I'm going to mark this next document as Exhibit
16   No. 2.
17      (Deposition Exhibit 2 marked for identification.)
18 Q. Do you know what this document is?
19 A. Yes.
20 Q. And what is this document?
21 A. It is the termination letter for -- from Mr. Tidaback
22   to Mr. Baumann.
23 Q. I believe earlier you mentioned you were told to give
24   this letter to Baumann; is that correct?
25 A. Yes.

Page 36

1 Q. And did you give this letter to Baumann?
2 A. Yes.
3 Q. When did you do that?
4 A. I guess on April 17th.
5 Q. Did you participate in drafting this letter?
6 A. No.
7 Q. Were you the one that informed Rob that he was being
8    terminated?
9 A. Yes.
10 Q. And when did you do that?
11 A. I guess on April 17th.
12 Q. Did you do that in person?
13 A. Yes.
14 Q. And what did you say to him?
15 A. I just -- I handed him the letter there and told him
16   of the contents.
17 Q. I'm going to hand you another document. I'm going to
18   hand you another document which I'm going to mark as
19   Exhibit 3.
20      (Deposition Exhibit 3 marked for identification.)
21 Q. Do you know what this document is?
22 A. No.
23 Q. Have you seen this document before?
24 A. No.
25 Q. In the third paragraph of this document -- let me

Page 37

1    see. One, two, three -- it says -- it says, "We have
2    provided documentation and evidence. See my personal
3    notes regarding Mr. Baumann." Do you see that?
4 A. Yes.
5 Q. And then if you turn the page, page 2, you see a
6    document that starts out with "Rob Baumann," and then
7    it has some dates and then some written notes of
8    yours?
9 A. Yes.
10 Q. Have you ever seen this document before?
11 A. No.
12 Q. On page 2?
13 A. No.
14 Q. Do you know where this document is maintained or who
15   prepared it?
16 A. I do not know who prepared it.
17 Q. So you didn't participate in creating this document?
18 A. No.
19 Q. If you go to an entry on the third page of this
20   exhibit, it says about -- towards the top it says,
21   "2 November 2022 - John mentioned Rob showing his
22   poor attitude again." Do you know what that is in
23   reference to?
24 A. Not in particular, no.
25 Q. You don't have any specific memory of something

Page 38

1    happening on November 2nd?
2  A.  No.
3  Q.  On -- a little ways further it says, "26DEC2022."
4      Then it says, "Discussion with Rob."  Then a little
5      bit further down it says "that he just gets angry and
6      stomps around like a child."  Do you see that?
7  A.  Yes.
8  Q.  Did you ever see Rob get angry and stomp around like
9      a child?
10 A.  Yes.
11 Q.  When?
12 A.  At different times.
13 Q.  And why was he doing that?
14 A.  I don't -- I don't know any particular instance
15     that -- as to what made him want to do that.
16 Q.  Can you tell me about an instance where you saw that?
17 A.  The -- one of the pieces of machinery breaking down.
18 Q.  And that made him angry?
19 A.  Yes.
20 Q.  Why?
21 A.  Well, I would -- I don't know why it would make him
22     angry.  For me personally, it would be because I
23     wouldn't be able to produce product.  Everything in
24     the mill works -- the whole process works
25     symbiotically, and there are 38 different functions

Page 39

1      that have to take place.  If you shut down one
2      function, then you have to shut down the whole entire
3      process of the mill.  So it could be something big
4      that happened or something small that happened, but
5      you still have to shut it all down.
6  Q.  So that would be -- that'd be frustrating to you if
7      that had happened too.
8  A.  Yes.
9  Q.  So it's understandable that somebody would get angry
10     if you couldn't do your job because something broke
11     down.
12 A.  Yes.
13 Q.  And then a little further down it says, "25JAN2023."
14     It says, "Had to get onto Rob regarding keeping the
15     completed bag inventory up to date.  John and I
16     discussed Rob's attitude."  Do you see that?
17 A.  Yes.
18 Q.  Do you recall that happening?
19 A.  Sure.
20 Q.  What happened?
21 A.  Just trying to -- the bag -- the inventory of what we
22     call expendable material, we just -- we have to keep
23     track of.
24 Q.  Do you know what specifically you were talking
25     about --

Page 40

1  A.  No.
2  Q.  -- with Rob's issue there?
3  A.  No.
4  Q.  On the last page of this Exhibit No. 3, it says,
5      "7APR2023 - John, Jordan and I discussed letting Rob
6      go."  Do you see that?
7  A.  Yes.
8  Q.  Do you recall doing that on April 7th, 2023?
9  A.  No.
10 Q.  Earlier you testified that you did not participate in
11     the conversations about terminating Rob.  Do you --
12     does this refresh your memory that you did?  Or can
13     you explain that?
14 A.  Well, as far as we have our weekly meetings,
15     Ms. Jordan and Mr. Russell and I.  But I never made
16     the recommendation to let him go.
17 Q.  You recall them talking about it?
18 A.  I remember them talking about it.
19 Q.  But you were not participating?
20 A.  But I was not -- I was not the final say or anything
21     like that.  I didn't participate in that.
22 Q.  Did you say anything like, "Yeah, let's do it," or
23     offer any reason why you should or shouldn't do that?
24 A.  Not that I can remember.
25 Q.  On 14APR2023 it says, "Warned John about an MSHA

Page 41

1      complaint when we let Rob go."  Do you recall that
2      conversation?
3  A.  Yes.
4  Q.  Tell me about that conversation.
5  A.  Just that other individuals in the past have -- have
6      complained -- have filed a complaint of
7      discrimination and that we would probably see one
8      from Mr. Baumann as well.
9  Q.  Who else had filed a complaint of discrimination?
10 A.  Not anyone in particular that I -- that I knew of.
11 Q.  Anyone at American Tripoli while you were there that
12     had done that?
13 A.  Not before that time that I can think of.
14 Q.  So when you mentioned people in the past had done
15     that, what made you say that?
16 A.  Just other former, you know, employees that had
17     worked there before had said so.
18 Q.  Had said that that had happened --
19 A.  Yes.
20 Q.  -- to you?  Were you concerned about that?
21 A.  Not necessarily.
22 Q.  Why not?
23 A.  People just complained.
24         MS. O'REILLY:  We can go off the record for
25     a second.

Page 42

```
1              (Pause in proceedings.)
2         MS. SMITH:  Sorry, for those online.  We had
3    an overhead announcement.
4         MS. O'REILLY:  Are we back on the record?
5    Okay.  Thank you.
6    Q.  (By Ms. O'Reilly) What is -- what is your -- you keep
7        talking about production quota.  So what is the
8        production quota?
9    A.  We're trying to make -- we're trying to meet
10       40,000 pounds a day.
11   Q.  Have you ever met that?
12   A.  Yes.
13   Q.  How many times?
14   A.  Exactly how many times?  I don't know.
15   Q.  In the time that you've been at American Tripoli,
16       have you met that production quota five times?
17   A.  Yes.
18   Q.  Ten?
19   A.  Sure.
20   Q.  Twenty?
21   A.  Yeah, I'd say we've met it 20 times.
22   Q.  Thirty times?
23   A.  As -- not that I can think of.
24   Q.  So somewhere between 20 and 30 times you've met that?
25   A.  Well, yeah, sure.
```

Page 43

```
1    Q.  Would the production records show that?
2    A.  I'd say yes.
3    Q.  Other than those 20 to 30 times, you did not meet
4        that production quota, then; correct?
5    A.  Yes.
6    Q.  Regardless of who was in the production lead --
7    A.  Yes.
8    Q.  -- position.
9    A.  Yeah.
10   Q.  How many shifts does American Tripoli current run?
11   A.  One right now.
12   Q.  And how many did you run when Rob was employed?
13   A.  They -- Rob was -- Rob was working on a second shift
14       whenever I was employed.
15   Q.  Did he ever move to the day shift?
16   A.  Yes.
17   Q.  Is that because you got rid of the night shift?
18   A.  Yes.
19   Q.  And why did you get rid of the night shift?
20   A.  Having the -- it was our, I guess, opinion,
21       contention, whatever you want to call it, that
22       running the machines for 16, 17 hours a day was just
23       too much for them.
24   Q.  So you decided just to go to one shift and --
25   A.  Just go to one shift.
```

Page 44

```
1    Q.  Have you ran at night since going to the one shift?
2    A.  No.
3    Q.  What would you say is an average production amount?
4        It sounds like the 40,000 seems a little
5        aspirational.  You don't get to that all the time.
6        So what sort of -- like, where do you usually end up?
7    A.  Between 25,000 and 40,000, somewhere along in there.
8    Q.  Would you say you meet 25- to 40,000 over 50 percent
9        of the time?
10   A.  Yes.
11   Q.  Over 75 percent of the time?
12   A.  No.
13   Q.  Would it be right around 50 percent of the time?
14   A.  Right about 50 percent.
15   Q.  Do you know where the 40,000 production quota comes
16       from?
17   A.  From Mr. Tidaback.
18   Q.  Do you know if that's based on anything?
19   A.  No.
20   Q.  Did you ask?
21   A.  I saw records of past production from the previous
22       ownership of the mill, and they had ran, you know,
23       quite a bit over 40,000.  And that's just what we --
24       Mr. Tidaback kind of was hoping that we could be able
25       to make.
```

Page 45

```
1    Q.  Do you know if the previous owner ran two shifts?
2    A.  They did for a while there.
3    Q.  Are those records from when they were running two
4        shifts?
5    A.  It's possible.  I've only seen just a little bit of
6        any kind of previous -- from the previous ownership's
7        records.
8    Q.  Do you have authority to discipline employees?
9    A.  Yes.
10   Q.  Have you ever disciplined employees?
11   A.  Yes.
12   Q.  Have you ever disciplined employees for not complying
13       with safety rules?
14   A.  No, not that -- you know, everyone tries to be -- you
15       know, conduct themselves in a safe manner.
16   Q.  So you've never disciplined an employee specifically
17       for not following safety rules?
18   A.  Not that I can -- not that I can think of right now.
19   Q.  Have you ever given an employee written discipline?
20   A.  Yes.
21   Q.  Does American Tripoli have a disciplinary policy?
22   A.  Yes.
23   Q.  And what is that?
24   A.  There's -- we just have -- you just have to look at
25       it.  I mean, I can't -- you know, I can't -- I can't
```

Page 46

```
 1        tell you verbatim, you know, by rote whatever it's --
 2        you know, what it is, but it's mostly about your
 3        attendance and meeting -- you know, being --
 4        making -- you know, trying to be a part of making
 5        production standards.  Just, you know, a general try
 6        to be a good employee.
 7   Q.   Do you know if the disciplinary policy has any, like,
 8        specific steps you're supposed to follow?
 9   A.   I don't know what you mean by "steps."
10   Q.   Is there any, like, specific procedure on how you're
11        supposed to discipline employees?
12   A.   Yes.
13   Q.   What is that?
14   A.   A verbal.  You know, have a verbal.  And then they --
15        and then a private -- private verbal.  Then --
16        Mr. Russell calls it a counseling session, you know.
17        And then it's a written counseling.
18   Q.   Is there any other steps?
19   A.   Well, you could do another written counseling if
20        you -- if you wish.  And then, you know, it depends
21        on how far you wanted to take it or what -- how
22        egregious the act was.  That, you know, it could
23        lead -- it says -- you know, it does say that it
24        could lead up to termination, suspension or
25        termination.
```

Page 47

```
 1   Q.   And so it sort of sounds like there's some steps of,
 2        like, verbal and then written and then potential
 3        termination; correct?
 4   A.   Yes.
 5   Q.   Do you follow that?
 6   A.   Yes.
 7   Q.   Do you always start with a verbal and then go to
 8        written?
 9   A.   Yes.
10   Q.   So if somebody has had one verbal discipline, should
11        the next one be written?
12   A.   If you wanted to do it that way, sure.
13   Q.   Are you allowed to do it a different way?
14   A.   Well, you know, Mr. Russell kind of leaves it up
15        to -- you know, up to my discretion.
16   Q.   So you don't have to strictly comply with the policy?
17   A.   I don't strictly comply with the policy and neither
18        does -- neither would anybody else.  Because trying
19        to hire people to be able to work there is a very
20        difficult process.  And so I -- you know, I don't
21        just want to terminate people just willy-nilly.
22   Q.   So would you say that the disciplinary policy is
23        followed at American Tripoli?
24   A.   It is followed.
25   Q.   Just not to a tee?
```

Page 48

```
 1   A.   Not too -- I wouldn't say not too aggressively.  You
 2        know, I -- I wouldn't because, you know -- and
 3        Mr. Tidaback knows as well it's very difficult to get
 4        somebody rehired.  You know, the number of employees
 5        has never really been, in the mill, any more than
 6        seven, eight, or nine throughout its -- throughout
 7        its history anyway.
 8   Q.   I'm going to show you a document.  We're going to
 9        mark this one as Exhibit 4.
10             (Deposition Exhibit 4 marked for identification.)
11   Q.   Do you know what this document is?
12   A.   Employee handbook.
13   Q.   Have you seen this document before?
14   A.   I have read -- I have read through it, what we have
15        on -- what we have online.
16   Q.   Do you know who prepared this document?
17   A.   I would say it would be Mr. Tidaback.
18   Q.   And where -- is this something that employees
19        receive?
20   A.   They do not receive a printed copy of it.  It is made
21        available to them on the website.
22   Q.   And what do you mean by "website"?  Like, is it a
23        public website?  Is there like an internal website?
24   A.   The internal company website.
25   Q.   Okay.  And all employees have access to that?
```

Page 49

```
 1   A.   Yes.
 2   Q.   Could you turn to page 43 of this Exhibit 4?
 3   A.   43 of 46?
 4   Q.   Yes.
 5   A.   Okay.
 6   Q.   And do you see on page 43 it says "Progressive
 7        Discipline"?
 8   A.   Yes.
 9   Q.   Is this American Tripoli's disciplinary policy?
10   A.   Yes.
11   Q.   And had you seen this before?
12   A.   Yes.
13   Q.   Had you read this part before?
14   A.   Yes.
15   Q.   Was this policy followed with regard to Rob's
16        termination?
17   A.   Yes.
18   Q.   In what way?
19   A.   We had had a discussion.  We had several discussions.
20        We had a -- as far as having a formal meeting, you
21        know, I met with him in private and then, I guess,
22        you know, as far as then as his termination.
23   Q.   Did he ever receive a written reprimand?
24   A.   I don't remember.
25   Q.   Did you ever give him a written reprimand?
```

Page 50

1  A.  I don't remember.
2  Q.  If he had gotten a written reprimand, would there be
3      a record of that?
4  A.  Yes.
5  Q.  If there is no record of that, would that mean he did
6      not get a written reprimand?
7  A.  I would -- I guess that's safe to assume.
8  Q.  Would you assume that?
9  A.  I don't -- I don't peruse people's -- their -- their
10     human resource file. Mr. Tidaback asks us not to.
11 Q.  Yeah. So I'm asking a little bit different. If
12     there was no written record of a reprimand of
13     Baumann, regardless of whether you've seen it or
14     not -- like, it just doesn't exist. Let's say it
15     doesn't exist. Would that mean it didn't happen?
16     That he didn't have a written reprimand?
17 A.  I don't understand what you're -- what you're getting
18     at.
19 Q.  What do you do with written reprimands?
20 A.  Well, they're entered into their employee file.
21 Q.  So if there is no written reprimand in Baumann's
22     employee file, does that mean he did not have a
23     written reprimand?
24 A.  I don't remember him receiving one from me. But if
25     he received one before, it -- it would be -- it would

Page 51

1      be in his file.
2  Q.  Okay. So hypothetically if there wasn't one in his
3      file, did he -- would that mean that he did not
4      receive a written reprimand if there's no written
5      reprimand his file?
6  A.  I guess so, sure.
7  Q.  Have you ever been disciplined at American Tripoli?
8  A.  Anything according to this (indicating)?
9  Q.  Just in general. Have you been disciplined?
10 A.  No.
11 Q.  Do you have authority to fire employees?
12 A.  Yes.
13 Q.  Have you ever fired an employee?
14 A.  Not me personally.
15 Q.  You've never personally made the decision to fire
16     someone at American Tripoli?
17 A.  No.
18 Q.  Did you ever recommend that someone should get fired
19     at American Tripoli?
20 A.  Yes.
21 Q.  Who was that?
22 A.  Jim Hoover.
23 Q.  And you made that decision on your own?
24 A.  No.
25 Q.  Oh. Have you ever -- you've never made the decision

Page 52

1      solely on your own --
2  A.  No.
3  Q.  -- to terminate someone? Okay.
4  A.  I've only been there less than 18 months.
5  Q.  Okay.
6          What does a typical day look like for you working
7      at American Tripoli? Once you get to work, what
8      happens then?
9  A.  I, you know, go through my emails and any kind of
10     Teams messages that we have. I look over the
11     production schedule of what we're going to work on
12     that day. I let the production supervisor know of
13     any concerns that I might have, and I want to know if
14     they have any concerns or what -- do you see anything
15     going on with the mill? Is there anything through
16     your exam of the mill that needs to be addressed?
17     You know, do we have everything out there, you know,
18     proper, you know, for us to begin -- to begin
19     production? Who's here?
20         Then I, you know, will take care of my office
21     duties that I have. You know, then I tour the mill.
22     Then that's -- but if there's -- if we have two
23     people, more than one person absent, then that
24     usually means that I have to work in the mill that
25     day as well.

Page 53

1          If -- I also -- I also -- I'm in contact with
2      our -- with our quarryman, you know, as to what -- as
3      to what he's taken -- you know, taken care of at the
4      quarry. Are we -- is he bringing material over to
5      the drying sheds? Do we need to -- brought down from
6      the drying sheds? You know, there's a whole lot of
7      things that I have to take care of.
8  Q.  When you mentioned you tour the mill, is that
9      something you do every day?
10 A.  Sure, mm-hmm.
11 Q.  And what does that entail?
12 A.  I -- I go over and look around and, you know, see if
13     there's any kind of -- anything that I might see that
14     needs to be worked on or addressed. Say hello to the
15     guys, you know, the mill crew.
16 Q.  Would you say you walk through the entire mill every
17     day?
18 A.  Mm-hmm.
19 Q.  Do you have a desk there or, like, an office?
20 A.  I have an office in the admin building.
21 Q.  Is the admin building separate from the mill?
22 A.  Yes, it is.
23 Q.  Is it, like, across is street or where is it in
24     relation?
25 A.  It's on the same block.

Appellate Case: 25-1349    Page: 15    Date Filed: 04/07/2025 Entry ID: 5503844

Page 54

1  Q.  Okay.
2  A.  You know, it's -- you can come right out the back
3      door of the admin building, and then 25 feet you're
4      in -- you're into the -- you're into the mill, the
5      maintenance shop, and then you can go on into the
6      mill.
7  Q.  So you have to go outside from the mill?
8  A.  You have to go outside, yes.
9  Q.  Okay. How often are you in the admin building in a
10     typical day? Like what would you say -- what
11     percentage of time do you spend in the admin
12     building?
13 A.  Not very much. My desk is a mess.
14 Q.  Would you say you spend, like, less than 5 percent of
15     the day there or -- could you give it kind of an
16     estimate?
17 A.  It just all depends on -- some days -- some days I
18     could be in the admin building 60 percent of the
19     time. Some days I come in and turn my computer on,
20     check my messages, and I'm in there 30 minutes. And
21     then I'm the rest of the day in the mill.
22 Q.  So it sounds like it just varies a lot.
23 A.  It varies a lot.
24 Q.  Okay.
25         When Rob was employed, when you would get to

Page 55

1      work, did you guys usually get to work around the
2      same time or was he usually there first or after you?
3  A.  About the same time.
4  Q.  And then did you guys usually leave around the same
5      time or --
6  A.  Mm-hmm.
7  Q.  So you usually worked, like, kind of the same shift?
8      Like, you were working together most of the time?
9      Other than, I guess, when he was on night shift?
10 A.  Yes.
11 Q.  Okay. Did -- did Rob work in the admin building
12     much?
13 A.  No.
14 Q.  Did he have a desk or an office?
15 A.  The control room. There's a desk in the control room
16     in the mill.
17 Q.  In the mill. Okay. And what's -- is there like a
18     computer there?
19 A.  Yes.
20 Q.  And that's something that his position can use?
21 A.  Yes.
22 Q.  Okay.
23         Do you do any maintenance as part of your job?
24 A.  No.
25 Q.  Do you have any maintenance background?

Page 56

1  A.  As far as being a maintenance man somewhere? No.
2  Q.  Have you ever received any training on maintenance?
3  A.  Yes.
4  Q.  Where?
5  A.  Through -- through my -- through my education when I
6      was going to college.
7  Q.  That -- remind me. What did you get a degree in?
8  A.  Industrial technology education.
9  Q.  And that dealt with maintenance of, like, machinery?
10 A.  Mm-hmm.
11 Q.  Have you ever had any jobs, other than working with
12     American Tripoli, that involve maintenance?
13 A.  No.
14 Q.  Did you receive any task training on maintenance at
15     American Tripoli?
16 A.  No.
17 Q.  Do you provide any safety training to employees at
18     American Tripoli?
19 A.  Yes.
20 Q.  What safety training do you provide?
21 A.  We -- you know, we have training videos that we
22     watch, which is mostly what the -- with the 24 hours
23     beginning -- you know, beginning training is, and
24     then we have some refresher training: electrical,
25     forklift, slip-trips-and falls, PPE.

Page 57

1  Q.  Do you personally provide any of the training?
2  A.  Well, I mean, the company does. I mean, we have a
3      safety manager also that we -- that he and I
4      coordinate and put things together.
5  Q.  Yeah. So I guess I'm asking are you a safety trainer
6      for American Tripoli?
7  A.  I am not, no.
8  Q.  Okay. So you -- you might pop on the video or
9      whatever, but you're not the guy who's getting up and
10     explaining the safety rules and doing all of that at
11     these trainings you're talking about?
12 A.  Yes.
13 Q.  Is that somebody else -- is that usually videos or do
14     you have someone else who does safety training?
15 A.  Usually it's a video.
16 Q.  Okay.
17         Did you have any experience in mining prior to
18     working at American Tripoli?
19 A.  No.
20 Q.  Do you have any experience or education in geology?
21 A.  Not any more than what my -- college courses.
22 Q.  You took college courses in geology?
23 A.  Not geology in particular.
24 Q.  What about your college courses had to do with
25     geology?

Page 58

1  A.  Some of our -- some of my biology ones, you know,
2      when we went talking about biology things, you know,
3      that -- how they were -- how older plants and animals
4      were prehistoric that were found in the strata
5      layers.  You know, that's just about all that I --
6      you know, that we went over.
7  Q.  Just sort of like basic level geology --
8  A.  Yes.
9  Q.  -- concepts?
10 A.  Mm-hmm.
11 Q.  Okay.  Do you have a background in manufacturing
12     other than working at American Tripoli?
13 A.  Yes.
14 Q.  And what places did you work that did that?
15 A.  That was Sunbeam Outdoor Products.
16 Q.  Any other experience with manufacturing?
17 A.  No.  I don't -- I don't think I've worked --
18 Q.  When you mentioned -- I think you mentioned you were
19     a teacher.  What classes did you teach?
20 A.  Industrial arts and drafting.  Well, I mean,
21     industrial arts is a whole -- that's a conglomerate
22     of several different, you know, model rocketry, small
23     engines, welding, you know, wood- -- woodworking,
24     drafting.  You know, there's a whole bunch of items
25     that's within industrial education.

Page 59

1  Q.  Was that like a high school class?
2  A.  High school, junior high.
3  Q.  Okay.
4      Do you know if any of the employees that you've
5      worked with at American Tripoli have any background
6      in mining?
7  A.  Not that I'm aware of.
8  Q.  Did -- have you personally hired any employees since
9      working at American Tripoli?
10 A.  Not me personally.  I always, you know, run it
11     through Mr. Tidaback as well.
12 Q.  So do you have authority to hire on your own?
13 A.  Yes.
14 Q.  But you -- do you ever -- but you always consult with
15     Russell first?
16 A.  Yes.
17 Q.  Okay.
18     Do you think it's important for employees to
19     understand MSHA and MSHA standards to do their jobs
20     at American Tripoli?
21 A.  I know through their -- through their 24 hours of
22     training in order to be able to come to -- you know,
23     to be employed, you know, they're responsible for
24     knowing the -- you know, part of -- you know, the
25     parts of it.  As far as knowing the 30 CFR by rote,

Page 60

1  no.  It's good that they all, you know -- and that's
2  all made available.  You know, it's all -- it's all
3  online.  If they have any kind of questions, you
4  know, they can look it up themselves.
5  Q.  Do you feel like you have a good understanding of
6      what is required by MSHA standards?
7  A.  Probably a little bit now more than the average
8      person would.
9  Q.  Do you rely on anyone at the mine to ensure that MSHA
10     standards are being followed?
11 A.  The safety -- you know, safety individual and I, we
12     try to coordinate and keep an eye on items.
13 Q.  Who is the current safety person?
14 A.  Joshua Townsend.
15 Q.  And who is the safety person when Rob was employed,
16     do you know?
17 A.  I'm trying to remember if Jessie Molessi was still
18     there.  Jessie Molessi.
19 Q.  Okay.
20 A.  Yeah.
21 Q.  Was there ever a time when there wasn't somebody in
22     that safety position while Rob was employed?
23 A.  Yes.
24 Q.  For about how long was that?
25 A.  Two or three months, maybe, at a time.

Page 61

1  Q.  And then who would be in charge in that kind of time
2      period?
3  A.  Me.
4  Q.  You?  Okay.
5      How often are you communicating with Russell
6      during a day?
7  A.  We communicate off and on.  You know, I -- you know,
8      we communicate about everything about the mill.
9  Q.  Would you say you communicate to him, you know, every
10     hour while you're working?
11 A.  Some days it's like that, and some days it's maybe
12     only four times that day.
13 Q.  And how are you often communicating?  Like what
14     means?  Are you on the phone?  Are you emailing?  Are
15     you texting?  Are you Teams message- --
16 A.  A Teams application.
17 Q.  Teams.  Okay.  So primarily you're communicating with
18     Teams?
19 A.  Teams, yes.
20 Q.  And are you doing that through, like, group chats?
21     Do you have, like, individual chats with him?  How do
22     you do that mostly?
23 A.  We have individual chats and then through the --
24     through the safety chat, through the mill -- through
25     the mill chat, you know.

Page 62

1  Q.  So you might do it in a group or sometimes you might
2      just message Russell directly through the Teams too?
3  A.  Yes.
4  Q.  When -- and that would include nobody else?  It would
5      just be the two of you?
6  A.  Yes.
7  Q.  Okay.  How often do you have phone calls with Russell
8      during a day?
9  A.  Not very often.
10  Q.  So it's mostly these Teams messages?
11  A.  Just Teams messages, yes.
12  Q.  Okay.  Is Teams message the main way that you
13      communicate with employees throughout the mill too?
14  A.  I try to.  We try to.  You know, that's the way
15      Mr. Russell prefers it.
16  Q.  When you say you try to, are there other ways that
17      you communicate, then, with employees?
18  A.  A call through -- a call through Teams or, you know,
19      just the face-to-face verbal.
20  Q.  Do you know if Russell thinks you're doing a good job
21      at your job?
22  A.  I'd like to think he does.
23  Q.  Would you say you keep Russell up to date on what's
24      going on on a daily basis at the mine?
25  A.  Mm-hmm, sure.

Page 63

1  Q.  Is there any sort of expectation about what you
2      should keep him informed about versus, like, what you
3      maybe don't need to inform him about?
4  A.  Mostly it's, you know, how are we doing on
5      production.
6  Q.  Is production kind of the main thing that he's
7      keeping track of --
8  A.  Yes.
9  Q.  -- on a daily basis?
10  A.  Yes.
11  Q.  How much autonomy do you have to make kind of your
12      own decisions on a day-to-day basis at the mine?
13  A.  The -- I guess the progression through my employment
14      is that Mr. Russell would like for me to be the --
15      you know, 98 percent of it, being responsible for
16      everything at the mill, you know, at
17      American Tripoli.  That's -- that's our goal.
18  Q.  What are you at now?
19  A.  Oh, probably 60 percent.
20  Q.  60 percent you'll kind of make your own call --
21  A.  Mm-hmm.
22  Q.  -- and 40 percent you'll elevate it?
23  A.  Yes.
24  Q.  Is there any specific things that you know you need
25      to elevate versus things that you can just kind of do

Page 64

1      on your own?
2  A.  Financial items, purchases, things like that.
3  Q.  Those need to go through Russell?
4  A.  Mm-hmm.
5  Q.  All of them or is there a certain threshold?
6  A.  There's a threshold.  If I need to get hydraulic oil
7      for the loader, I just go to O'Reilly's and get it
8      with the -- you know, with the company paying the
9      card.
10  Q.  Would you say there's like a dollar amount where
11      you -- you'd be like, "I'm going to talk to Russell
12      about it" if it's over X dollars?
13  A.  Yes.
14  Q.  What would that be?
15  A.  You know, something around -- something over $400.
16  Q.  How many times have you met Russell in person?
17  A.  Oh, it's probably been at least 12 times.
18  Q.  In the 18 months you've been there, he's been down to
19      the mine about 12 times?
20  A.  Well, you know, not just for a day.  I mean, he's
21      come, you know, and we've spent two weeks -- you
22      know, two weeks together, you know, that he's been
23      there and we've worked on items.  Some days he's just
24      been there for a day, you know.  I mean, it's -- as
25      far as individual times, I don't know.  I guess it's

Page 65

1      probably more than a dozen times.
2  Q.  So in about the 18 months that you've been working
3      there, how many, like, separate trips has he been
4      there?  I know sometimes it might be for two weeks.
5      It might be for a day.  But how many separate times
6      has he come?
7  A.  Oh, like I said, at least a dozen.
8  Q.  At least a dozen times?
9  A.  I haven't kept track.
10  Q.  Okay.  Would you say it's been, like, about once a
11      month or every other month?
12  A.  No.  I --
13  Q.  You just don't really have a --
14  A.  I don't.
15  Q.  Okay.  Is there every month?  Would you say that?
16  A.  No.
17  Q.  No.  Is there every other month?
18  A.  No.  Sometimes it -- you know, it could be longer.
19      It's just very intermittent.
20  Q.  Okay.  So there's no set schedule for when he's --
21  A.  No.  No.
22  Q.  What is Jordan Tidaback's role with the company?
23  A.  Managing partner.
24  Q.  And how often is she at the mine?
25  A.  They're there usually at the same time.

Appellate Case: 25-1349   Page: 18   Date Filed: 04/07/2025 Entry ID: 5503844

Page 66

1  Q.  And do you know what -- what does she do at the mine?
2      What sort of work does she do for the mine?
3  A.  I guess the same as Mr. Russell does, you know.
4      Just -- you know, they work together on any -- you
5      know, the finances, the shipping.  She, you know,
6      just -- you know, they kind of all work together, the
7      same thing that Mr. Russell does.
8  Q.  Is there anything that you would specifically go to
9      her about versus Russell?
10  A.  No.
11  Q.  Do you know if anyone else owns American Tripoli at
12      the time?  Right now?
13  A.  I don't -- I don't -- I don't know.  I just know of
14      Mr. Russell and Ms. Jordan.
15  Q.  Who would you consider to be in American Tripoli's
16      management?
17  A.  Just there at the -- just there at the operations
18      or -- you know, it all starts with -- from what I
19      know of American Tripoli, it just -- it starts with
20      Mr. Russell and Ms. Jordan.  And then it comes to me.
21  Q.  Okay.  So you'd say you three are the ones in
22      management?
23  A.  Yes.
24  Q.  Is anyone else currently?
25  A.  I haven't met anybody, you know.

Page 67

1  Q.  Would anyone that you work -- like, that works in
2      Seneca, would you consider any of those people to be
3      in management?
4  A.  Not a -- no, not other than the production -- than
5      the production lead who takes care of -- takes care
6      of the mill.
7  Q.  So you'd consider the production -- whoever is in the
8      production lead role would also be part of
9      management?
10  A.  Mm-hmm.
11  Q.  Okay.
12        Do you know how much money American Tripoli makes
13      during, like, a regular day of production?
14  A.  No.
15  Q.  Is that -- finances is not something you deal with?
16  A.  No.
17  Q.  Okay.  Do you have any role in making sure, like,
18      American Tripoli's bills get paid or payroll gets
19      made or anything like that?
20  A.  I -- you know, if it's a -- if it's anything we have
21      a ticket or an invoice on, I send it to AP.
22  Q.  Okay.  So somebody else is issuing --
23  A.  Somebody else takes care of that.
24  Q.  -- the money and doing all of that?  Okay.
25  A.  Yeah.

Page 68

1  Q.  How many hours a week would you think that Russell is
2      spending working on American Tripoli matters?
3  A.  I couldn't tell you.
4  Q.  Based on your interactions, how many would it be per
5      week based on just you knowing what you're doing with
6      him?
7  A.  I work with him more than 50.
8  Q.  How much time are you spending with him working on
9      it?
10  A.  You know, we communicate throughout the day.  You
11      know, some days more, some days less.  You know,
12      we -- I don't know.  I don't -- I don't know.
13  Q.  How many -- what would you consider, like, a fully
14      staffed American Tripoli?  Like, what's the number of
15      employees you would have if you were -- for you to
16      say, "Yeah, we're fully staffed right now"?
17  A.  I would -- because -- because -- it's hard to do --
18      it's hard to do maintenance -- it's hard to do
19      maintenance when we're -- when we're doing production
20      because we can't shut anything down, like I explained
21      before.
22  Q.  Mm-hmm.
23  A.  I would like to have -- I'd like to have two
24      maintenance people.  I'd like to have two maintenance
25      people, four mill associates, the production

Page 69

1      supervisor.  I'd like to have a crush room truck
2      driver person and somebody at the -- you know, the
3      safety and then a mill -- a quarry -- and a quarry
4      person.
5  Q.  Have you ever had that in the time you've worked at
6      American Tripoli, that full set of people you've just
7      described?
8  A.  Yes.
9  Q.  At the same time?
10  A.  Yes.
11  Q.  And when did you have that?
12  A.  It's been off and on since I've been there.
13  Q.  Did you ever have that full set while Rob was
14      employed?
15  A.  No.  No.
16  Q.  Has there been a lot of turnover at American Tripoli
17      in your time since working there?
18  A.  Yes.
19  Q.  And why do you believe that is?
20  A.  Honestly?
21  Q.  Yes.
22  A.  I think a lot of people are just lazy.
23  Q.  Are most of the employees quitting or being fired
24      or --
25  A.  They quit.  Some of them don't make it through --

Appellate Case: 25-1349    Page: 19    Date Filed: 04/07/2025 Entry ID: 5503844

Page 70
1    don't make it through the MSHA training. Some people
2    don't last a week. You know, it's just different.
3    It just -- it varies.
4  Q. Okay. How many employees have been terminated since
5    you've been working at American Tripoli?
6  A. Three that I can remember.
7  Q. And who are those?
8  A. Gage Wheeler, Jim Hoover, and Rob Baumann.
9  Q. Is there any specific new hire training that's
10   provided to new employees other than the MSHA
11   training? Like, is there anything just
12   American Tripoli training that they do other than new
13   miner training?
14 A. Well, we have the new miner training. Then before
15   they're -- they work in the mill, we -- you know, we
16   task train them on the forklift, the packer. If
17   there's -- if we -- if we -- just any kind of a task.
18   Any kind of task that -- you know, that's come up.
19   Even assisting maintenance that we do a task training
20   on.
21 Q. Who does the task training?
22 A. Myself and the production supervisor, safety manager.
23 Q. Do you currently have any, like, admin employees that
24   you work with like in the admin building, or are you
25   just the only person that works in there?

Page 71
1  A. It's just me and Joshua.
2  Q. Who's Joshua again?
3  A. The safety manager.
4  Q. Okay. So the safety -- does the safety manager have
5    a desk or an office --
6  A. Yes.
7  Q. -- in the admin building? You don't have any, like,
8    administrative assistants right now?
9  A. No.
10         MS. O'REILLY: Do we want to take, like, a
11   short break? Maybe like ten minutes? That's fine?
12   And then we shouldn't have too much longer after
13   that.
14         THE WITNESS: Sure.
15         MS. O'REILLY: Okay. Maybe another, like,
16   30 minutes or an hour after that.
17         THE WITNESS: Sure.
18         MS. O'REILLY: Okay. We can go off the
19   record.
20         (Break in proceedings.)
21         MS. O'REILLY: We can go back on the record.
22 Q. (By Ms. O'Reilly) We are back on the record. Do you
23   understand you are still under oath?
24 A. Yes, ma'am.
25 Q. Did you talk to anyone about this deposition during

Page 72
1    the break?
2  A. No, ma'am.
3  Q. Earlier we had talked about how Rob started on second
4    shift and then came to first shift. Was he still on
5    second shift when you started --
6  A. Yes.
7  Q. -- at the company? And are there any difference in
8    the duties between, like, the second shift production
9    lead and the first shift production lead?
10 A. No.
11 Q. Okay. And earlier -- I think it's Exhibit 1, maybe,
12   over in that stack. Could you pull out Exhibit 1?
13   Yes. That's -- and that's the production lead
14   duties?
15 A. Yes.
16 Q. Do you know when this document was created?
17 A. No.
18 Q. Do you know if it was around when Baumann was in that
19   role?
20 A. Yes.
21 Q. You know it was around then?
22 A. It was, yes.
23 Q. Okay.
24         Have you ever participated in any MSHA
25   inspections?

Page 73
1  A. I walked around with the inspectors.
2  Q. Did you always walk around with the inspectors?
3  A. I try to, yes.
4  Q. Did you walk around with the inspectors during the
5    inspections that took place during Rob's employment?
6  A. Yes.
7  Q. Did you miss any of those inspections, do you know?
8  A. Did I miss --
9  Q. Did MSHA conduct an inspection while Rob was employed
10   that you were not there for?
11 A. Not that I can recall.
12 Q. So you were always walking around with the MSHA
13   inspectors?
14 A. Mm-hmm. I try to, yes.
15 Q. Did Rob Baumann walk around during the MSHA
16   inspections while he was employed?
17 A. I know he was -- I know he was there. As far as
18   tag-along specifically, I don't -- I don't remember
19   if he did or not.
20 Q. Did you ever see him talking to an MSHA inspector?
21 A. Yes.
22 Q. Did he talk to an MSHA inspector during each of the
23   inspections?
24 A. It's possible. MSHA inspectors could, you know,
25   speak to any of the mill -- any of the mill

Appellate Case: 25-1349     Page: 20     Date Filed: 04/07/2025 Entry ID: 5503844

Page 74

1      associates, employees.
2  Q.  Were you aware that Rob Baumann was the -- elected as
3      the miners' representative for MSHA?
4  A.  I know that he mentioned it to me.  But as far as any
5      paperwork that I ever saw, no.
6  Q.  And when did he mention that to you?
7  A.  I don't have a -- I don't remember a specific date or
8      anything like that.
9  Q.  When you say "he" mentioned it to you, you're
10     speaking about Rob?
11  A.  Yes.  Mr. Baumann, yes.
12  Q.  And that was during his employment he mentioned that?
13  A.  Yes.
14  Q.  And were you ever told that Rob was a miners'
15     representative by anyone from MSHA?
16  A.  No.
17  Q.  Do you understand what a miners' representative is?
18  A.  Yeah.  Pretty much, yes.
19  Q.  And were you of aware of that while Rob was employed?
20  A.  Did I have a --
21  Q.  When did you become aware of what a miner
22     representative is?
23  A.  Whenever I did the MSHA training.
24  Q.  And you did the MSHA training before Rob was
25     terminated?

Page 75

1  A.  Oh, yes.  Mm-hmm.
2  Q.  And what do you understand a miners' representative
3     to be?
4  A.  That they're -- they -- they're supposed to have a
5     knowledge of miners' rights and what all they -- what
6     all they entail.  And if the -- if another miner,
7     mill associate, if you will, has any questions, they
8     could -- you know, they could usually ask the miner
9     representative.
10  Q.  And do you know if a miners' representative has any
11     rights with regard to MSHA inspections?
12  A.  I -- I don't -- I do not know.
13  Q.  Okay.  Do you know if American Tripoli currently has
14     a miners' representative?
15  A.  Not that I'm aware of.
16  Q.  I'm going to mark this as Exhibit 5.
17       (Deposition Exhibit 5 marked for identification.)
18  Q.  Do you know what this document is in Exhibit 5 that I
19     just handed you?
20  A.  I've never seen this one before.
21  Q.  Have you ever seen a form like this before?
22  A.  No.
23  Q.  Were you ever shown this document by an MSHA
24     inspector?
25  A.  No.

Page 76

1  Q.  Do you know if Keith Markeson ever showed you this
2     document?
3  A.  Not that I'm aware of.
4  Q.  Do you know if any MSHA inspector talked to you about
5     whether or not Rob had been made a miners'
6     representative?
7  A.  No.
8  Q.  Are you saying that it didn't happen or you don't
9     remember?
10  A.  They've -- MSHA inspectors have asked me, "Do you
11     have a mine representative," a miners' rep, you know,
12     and I told them no.  That's all I can remember about
13     an MSHA inspector, you know, having -- you know,
14     saying "miners' rep" to me.
15  Q.  So if MSHA believed that they gave you this document,
16     what would be your response to that?  Or showed you
17     this document, I guess.
18  A.  I've never seen it.
19  Q.  Do you know, did miners ever walk around with MSHA
20     during the inspections while Rob was employed?
21  A.  No.
22  Q.  Were they allowed to?
23  A.  To walk around with them?
24  Q.  Mm-hmm.
25  A.  I would say not necessarily not allowed to, but there

Page 77

1     was no reason for them to, you know.  They still had
2     their -- you know, we don't just shut everything off
3     when they do an inspection.  They still have their
4     duties to perform.
5  Q.  Were miners ever told whether or not they're allowed
6     to walk around with MSHA?
7  A.  To walk around with them?
8  Q.  Mm-hmm.
9  A.  Not that I'm aware of.
10  Q.  Not one way or the other?
11  A.  Not one way or the other.
12  Q.  Were miners -- do you know if miners ever made
13     complaints to MSHA during inspections?
14  A.  During the inspection?  Not that I'm -- not that I
15     can think of.
16  Q.  Did you ever tell miners that they shouldn't speak to
17     MSHA?
18  A.  No.
19  Q.  Did Russell ever tell miners they shouldn't speak to
20     MSHA?
21  A.  No.
22  Q.  Was there any expectation that if a miner wanted to
23     speak to MSHA, that they should loop in someone?
24  A.  No.
25  Q.  Did you ever have any issues or concerns with any of

Page 78

1   the MSHA inspectors that came out during Rob's
2   employment?
3 A. Yes.
4 Q. Who?
5 A. Who was the inspector?
6 Q. Yes. Sure. Yes.
7 A. A specific inspector?
8 Q. Well, you answered yes, so what did you mean by
9   "yes"?
10 A. His name -- last name was Licklider.
11 Q. And what was your concern?
12 A. My concern was that he was interjecting his opinion
13   on what was according to the CFR.
14 Q. Do you believe MSHA inspectors shouldn't be giving
15   their opinions?
16 A. No. They -- to me it needs to be, you know, a very
17   factual, you know, absolute kind of an item. The
18   CFR, in my opinion, is very ambiguously written.
19 Q. So do you expect MSHA to assist you in understanding
20   that?
21 A. Yes, I do.
22 Q. And in offering an opinion, was he doing that? Was
23   he assisting you in understanding it by offering an
24   opinion?
25 A. No. He was being dictatorial towards his -- by his

Page 79

1   opinion. Mr. Licklider was.
2 Q. In what ways? Could you describe that?
3 A. The -- our tube mill that we have, the lubrication
4   end of it used to have a holding trough for oil. And
5   in order -- you know, in over the last 120 years,
6   that lubricant -- that trough has corroded and the
7   oil would -- you know, would leak -- would come out
8   of it and onto the floor. They were able to place an
9   absorbent -- I don't know what you call them. You
10   see them on the highways. Those round, straw-stuffed
11   bags or whatever there and then produce -- build a
12   dam to withhold -- to withhold the oil that leaked
13   out. It had been there for better than 10 years like
14   that. Mr. Licklider, in his opinion, as opposed to
15   the past inspectors that had come through -- he said
16   that needs to -- that needs to be gone, and he wrote
17   a citation for it.
18 Q. So you didn't like that he wrote you a citation?
19 A. I didn't like that he wrote a citation based upon his
20   opinion.
21 Q. Did you have any other issues with him other than
22   writing a citation based on his opinion?
23 A. Well, I didn't like that he said if I fired it up, he
24   would contact the local federal marshal's office and
25   have me arrested.

Page 80

1 Q. You're saying that Mr. Licklider said that to you?
2 A. Yes.
3 Q. When?
4 A. It was sometime in January of '23. Whenever he was
5   there. I don't remember the exact date. I think it
6   was January when he was there.
7 Q. Did you have any other issues with either him or any
8   other MSHA inspector?
9 A. Mr. Markeson.
10 Q. What's your issue with him?
11 A. I just thought that he was, again, using -- you know,
12   was basing his findings upon opinion and not
13   necessarily a -- you know, a concrete kind of
14   evidential thing.
15 Q. What sort of concrete evidential thing would you
16   expect him to present to you during an inspection?
17 A. Well, you know, the -- he didn't write a citation,
18   but he did say that -- about how far -- how high we
19   could stack the bags onto a pallet.
20 Q. Was that based on an MSHA standard?
21 A. It was a -- we looked -- we looked it up, and it --
22   all it said was -- that I can recall, was that it
23   was just how we felt safe about being able to do so.
24 Q. So did you disagree with his opinion?
25 A. Yes.

Page 81

1 Q. Did you continue to stack bags in the ways that you
2   guys thought was better?
3 A. Well, it wasn't really stacking them. It was the
4   height of them, how high you could stack them.
5 Q. So did you continue to do it the way that you thought
6   versus the opinion of the MSHA inspector?
7 A. No. We just -- no. We have some orders -- we have
8   some orders that the customer wants the -- wants them
9   stacked ten high so they don't have to pay for
10   another pallet. My question was, you know, how
11   high -- how high can we -- how high can we stack
12   them? And there were just -- there were other --
13   other things about Mr. Markeson that we didn't
14   particularly care for.
15 Q. Did he ever, like, raise his voice with you?
16 A. Oh, no. No. No. None of them ever did.
17 Q. No one ever raised their voice with you?
18 A. No. No.
19 Q. Did anyone ever threaten you? Did any MSHA inspector
20   ever threaten you?
21 Q. In what way?
22 Q. In any way.
23 A. Other than Mr. Licklider.
24 Q. That was the only instance that you would consider --
25 A. Mm-hmm.

Appellate Case: 25-1349      Page: 22      Date Filed: 04/07/2025 Entry ID: 5503844

Page 82

1  Q.  Okay.  Did you ever warn miners about being careful
2      what they say around MSHA?
3  A.  No.
4  Q.  Did you ever warn miners about your kinds of opinions
5      about your concerns that you had with Licklider or
6      Markeson?
7  A.  No.
8  Q.  Was Russell ever present for any MSHA inspections,
9      like, while they were ongoing?
10 A.  Not that I can remember.
11 Q.  Did you always notify him if there was an inspection
12     going on?
13 A.  Yes.
14 Q.  Is complying with MSHA standards a priority at
15     American Tripoli?
16 A.  Well, it has to be.
17 Q.  Why do you say that?
18 A.  Because that's what we're governed under.  We're not
19     governed under necessarily OSHA.  We're governed
20     under MSHA.
21 Q.  What resources are you given to help the mine comply
22     with MSHA standards?
23 A.  We have some -- we have some guarding guideline
24     books, the 30 CFR, the -- a couple of other items
25     that was given to us for the quarry, you know.  And

Page 83

1      then -- you know, and then our MSHA training.
2  Q.  If you had a question about how to do something to
3      comply with an MSHA standard, who would you go to?
4  A.  Who or what?
5  Q.  Who, I guess.  Is there anyone you would go to?
6  A.  If I -- if I had a question that I couldn't answer
7      myself through the 30 CFR, I would -- I would contact
8      the Rolla MSHA office.
9  Q.  Have you ever done that?
10 A.  I have not personally, but the safety manager has.
11 Q.  Why do you think American Tripoli has had so many
12     MSHA inspections in the last couple of years?
13 A.  I think that, me personally, they -- they're
14     looking -- they're looking for things just to write
15     citations on.
16 Q.  Do you think it's any one employee's fault --
17 A.  No.
18 Q.  -- for why the MSHA citations --
19 A.  No.
20 Q.  -- were issued?  And I'm speaking specifically about
21     American Tripoli employees.  You don't think it's any
22     one American Tripoli employee's fault --
23 A.  No.
24 Q.  -- that there were -- that MSHA has issued as many
25     citations as it has?

Page 84

1  A.  No.
2  Q.  Have you ever received training about miners' rights
3      under MSHA?
4  A.  No.
5  Q.  Are employees at American Tripoli encouraged to raise
6      safety concerns?
7  A.  Yes.
8  Q.  And who would they raise those to?
9  A.  The mill associates would bring it to their
10     production lead.
11 Q.  And are they made aware of that?
12 A.  Yes.
13 Q.  How?
14 A.  They -- with their -- with their MSHA training and
15     then what we've -- what we've discussed with them.
16 Q.  What happens when an employee makes a safety
17     complaint?
18 A.  We address it as quickly as we can.
19 Q.  Are employees told that they're allowed to make
20     safety complaints to MSHA?
21 A.  Yes.
22 Q.  Who has told them that?
23 A.  Through the MSHA training.
24 Q.  Have you ever told them that?
25 A.  I've told them that "If you wish to make a complaint

Page 85

1      through MSHA, that would be your decision.  We can't
2      keep you from it."
3  Q.  Have you ever told any employees at American Tripoli
4      that they shouldn't trust MSHA?
5  A.  Shouldn't trust them?
6  Q.  Mm-hmm.
7  A.  Not any more than what they could find -- you know,
8      any information they could find on their own through
9      the CFR.
10 Q.  But have you ever said that to them specifically?
11     That maybe they shouldn't trust MSHA?
12 A.  I don't trust them.
13 Q.  Have you ever told employees that they shouldn't
14     trust MSHA?
15 A.  Yes.
16 Q.  Who?
17 A.  Just in general.
18 Q.  So you've said it multiple times?
19 A.  That they need to be careful with what -- with what
20     they say because they're not really -- MSHA people
21     are not your friend, and whatever -- whatever you
22     say can be used against you or the company, you
23     know.  So if you -- if they ask you questions,
24     just -- you know, just ask them -- just answer them
25     honestly and -- but just, you know, don't -- don't

Appellate Case: 25-1349     Page: 23     Date Filed: 04/07/2025 Entry ID: 5503844

Page 86

1  say anything false or anything like that.
2  Q.  You said it could be used against them.  What do you
3      mean by that?
4  A.  Well, they take -- they take notes.  If there's a
5      citation written, all that information is in the
6      citation that can be used, you know, if you contest a
7      citation.
8  Q.  Do you use Teams Chats to talk to other employees
9      other than Russell in the group chats?
10 A.  Yes.
11 Q.  Okay.  I am going to show you -- I'm going to show
12     you what I'm going to mark as Exhibit 6.
13      (Deposition Exhibit 6 marked for identification.)
14 Q.  Do you know what this document is?
15 A.  Yes.
16 Q.  What is this document?
17 A.  I guess that's a screenshot from -- from my phone.  I
18     don't -- I don't remember.  But I remember seeing
19     that message.
20 Q.  Do you -- so it looks like it's actually like a
21     picture of a phone.
22 A.  Yes.
23 Q.  Would you agree with that?
24 A.  Yes.
25 Q.  Okay.  Do you know who took that picture?

Page 87

1  A.  I'm trying to see if that -- if that's my work phone.
2      I think I did.  I think that's the message that Rob
3      sent me.
4  Q.  Do you know if you took this picture?
5  A.  Again?
6  Q.  Do you know if you took this picture?
7  A.  I believe I did.
8  Q.  Do you believe that this is a true and accurate copy
9      of a picture of your phone and a text message --
10 A.  Sure.
11 Q.  -- between you and Rob?
12 A.  Sure.
13 Q.  Okay.  And "Rob" would be Rob Baumann?
14 A.  Yes.
15 Q.  And you would be the green?  Is that correct?
16 A.  Yes.
17 Q.  And then Rob's message would be what's in the gray?
18 A.  Yes.
19 Q.  And why did you take a picture of this?
20 A.  Mr. Russell asked me if we had any -- any -- what
21     communication that I had with Rob, and that's the
22     communication that I had.
23 Q.  Okay.  And what did you understand Rob to be asking
24     you for in this message?
25 A.  I think we were trying to figure out how we could get

Page 88

1  back in the building.
2  Q.  And do you believe -- there's an April 12th date.  Is
3      that the date you believe that this was -- these
4      messages occurred?
5  A.  Yes.
6  Q.  And that'd be April 12th of 2023?
7  A.  Mm-hmm.
8  Q.  Did you have a lot of text messages with Rob?
9  A.  No.
10 Q.  How did you usually communicate with Rob?
11 A.  We just -- we most normally just talked face to face.
12 Q.  And it looks like Rob is asking you about -- like at
13     the end of the message he says "since he has to pay
14     us anyway."  What did you understand that to mean?
15 A.  That particular time was a withdrawal order from
16     MSHA.  And that according to -- according to MSHA,
17     according to their standard that they are -- that the
18     miners are to be paid for the rest of that day and
19     the -- and the next day.  And then I think if I'm
20     saying -- if I'm thinking about it right, it's a
21     half -- half day's pay for the next week, workweek,
22     which was five -- five days.  That's -- that's in
23     the -- that's in the CFR.
24 Q.  And did you know that before Rob brought that up?
25 A.  Yes.

Page 89

1  Q.  When did you learn about that?
2  A.  From other inspectors.
3  Q.  Did you learn about it during that April inspection
4      or at some point before that?
5  A.  At some point before that.
6  Q.  Did you share this message with Russell at the time?
7  A.  No.
8  Q.  I'm going to mark another document as Exhibit 7.
9      (Deposition Exhibit 7 marked for identification.)
10 Q.  Go ahead and take a look through that.  And I'll
11     represent these -- my understanding is that these are
12     disciplinary records that were provided to us in
13     discovery by American Tripoli.  I've just kind of
14     compiled them all together --
15 A.  Sure.
16 Q.  -- so I don't believe it's just one individual
17     person.
18      Do you recall ever doing, like, a disciplinary
19     letter like some of the ones we're seeing in this
20     Exhibit 7?
21 A.  Yes.
22 Q.  And who would write those if you were to do those?
23     Did you write them?
24 A.  They're -- any kind of embellishments or whatever was
25     on -- was from a template.  All the ones that

Appellate Case: 25-1349     Page: 24     Date Filed: 04/07/2025  Entry ID: 5503844

Page 90

1      these -- any ones that I have, that I was a part of,
2      they're just embellishments from a template that
3      was -- that's available.
4  Q.  So you had a template, and then you would add to it?
5  A.  Yes.
6  Q.  I think we're both on the same page.  There's one to
7      Carson Allman.
8  A.  Mm-hmm.
9  Q.  It looks like it's dated October 13, 2022.
10  A.  Mm-hmm.
11  Q.  It's not signed.  Do you know why that is?
12  A.  No.
13  Q.  Do you know if you gave this to Carson?
14  A.  I don't -- I don't remember.  Mr. Allman wasn't in
15      our employ very long.
16  Q.  Okay.  And did you -- it looks like the next one is
17      to Patrick Lewis.
18  A.  Yes.
19  Q.  There's another one to R. J. Williams, and then I see
20      one to John Hoover and then Raneldon Williams and
21      then another one to Patrick Lewis.  Those all look
22      like they're either signed by you or have your name
23      at the bottom.  Do you see that?
24  A.  Yes.
25  Q.  Did you make the decision to issue these?

Page 91

1  A.  Yes.
2  Q.  Did you consult Russell before --
3  A.  Yes.
4  Q.  -- you did this?  Okay.
5      I'm going to show you another document, which --
6      and we're going to mark this as Exhibit 8.
7      (Deposition Exhibit 8 marked for identification.)
8      Go ahead and look through that.  And I'll just
9      represent to you these -- my understanding about
10      these is we were produced these termination letters
11      in discovery, and I just kind of compiled them all
12      together.
13  A.  Sure.
14  Q.  So this is not just one person's file.  But have you
15      seen any of these letters before?
16  A.  Yes, I've seen these.
17  Q.  Did you -- it looks like on -- I think -- let me
18      check.  All of them except for the first one your
19      name is listed at the bottom.  Do you see that?
20  A.  Mm-hmm.
21  Q.  But it doesn't look like you signed -- like
22      physically signed any of these; right?
23  A.  Yes.  Yeah.  No.
24  Q.  Did you draft any of these termination letters?
25  A.  No.

Page 92

1  Q.  Did you participate in putting any of the information
2      in any of these letters?
3  A.  Not that I can recall.
4  Q.  Do you know why your name is at the bottom of them?
5  A.  I guess because I'm the operations manager.
6  Q.  Would you have been the one who handed these to the
7      employees?
8  A.  Yes.
9  Q.  And you were -- would you have been provided these
10      letters by Russell?
11  A.  Yes.
12  Q.  Have you been asked to prepare a statement or a
13      letter for the company in this case?
14  A.  Not that I can recall.  I don't --
15  Q.  Have you provided any statements or letters in any of
16      American Tripoli's cases?
17  A.  Not that -- not that I can recall.  I mean, I'm -- I
18      read all kinds of stuff.  I don't -- I don't...
19  Q.  I'm going to mark this document as Exhibit 9.
20      (Deposition Exhibit 9 marked for identification.)
21  Q.  Have you seen this document before?
22  A.  Yes, I've seen this one.
23  Q.  Did you prepare this document?
24  A.  No.
25  Q.  Did you sign this document?

Page 93

1  A.  Yes.
2  Q.  Is that your signature there?
3  A.  Yes.
4  Q.  Did you read the document before you signed it?
5  A.  Yes, I did.
6  Q.  Did you participate in what was included in this
7      document?
8  A.  Participate in what way?
9  Q.  Did you say what should be included in this document?
10  A.  No.  I probably wouldn't have -- I wouldn't -- no.  I
11      didn't -- I didn't write this.  Mr. -- Mr. Russell,
12      you know, put it together for me.  He's better --
13      better at prose than I am.
14  Q.  Did you have a discussion with him about what would
15      go into this document?
16  A.  Yes.
17  Q.  How many hours a week do you -- would you say you
18      work at American Tripoli?
19  A.  Better than 50.
20  Q.  And has that been consistent your entire time or has
21      that changed at any point?
22  A.  My entire time.
23  Q.  Okay.
24      MS. O'REILLY:  I'm going to go off the
25      record.  Can we take just a five-minute break?  I

Page 94

```
1        think we're done, but I just want to make sure we're
2        done.
3                 (Break in proceedings.)
4   Q.   (By Ms. O'Reilly)  We are back on the record.  I just
5        have, like, one or two more questions.
6             Back to Exhibit 9.  When you said that was your
7        signature, is that like your electronic signature or
8        did you sign with a pen?
9   A.   I signed with a pen.
10  Q.   Okay.
11           MS. O'REILLY:  And then I think that's all
12       we have.  So we can -- we are done asking questions.
13          (The foregoing deposition was concluded at
14       11:38 a.m. on Tuesday, January 30, 2024.)
15
16
17
18
19
20
21
22
23
24
25
```

Page 95

```
1              WITNESS' SIGNATURE PAGE
2
3   In Re: Acting Secretary of Labor, Mine Safety and
           Health Administration (MSHA) and Robert
4          Baumann vs. Mosenecamanufacturer Limited
           Liability Company, d/b/a American Tripoli;
5          United States of America, Federal Mine Safety
           and Health Review commission, Office of
6          Administrative Law Judges, Docket No.
           2023-0251, MSHA No. MADI-CED-2023-03
7
    Taken: Tuesday, January 30, 2024
8
9                   - - - - -
10
11
                    _____
12
               John R. Spears
13
14
    Subscribed and sworn to before me this _____day of
15  _____ , 20 _____.
16
17                  _____
18               Notary Public
19
20
21
    My commission expires:
22
    _____
23
24
25
```

Page 96

```
1              REPORTER'S CERTIFICATE
2
3   I, ABBY LYNN WASSON, Registered Professional
    Reporter, Certified Court Reporter, do hereby certify
4   that the witness was duly sworn by me; that the facts
    stated me in the caption hereof are true; that the
5   said witness did make the above and foregoing answers
    in response to questions propounded as shown; that I
6   did, in stenotype, report said proceedings; and that
    the above and foregoing typewritten pages contain a
7   full, true, and correct transcription of my shorthand
    notes taken on such occasion; that the deposition
8   will be thereafter by the witness read over, signed,
    and sworn to on or before the date of trial; that
9   said deposition is now herewith returned.
10  I further certify that I am neither attorney for, nor
    counsel for, nor related to, nor employed by any of
11  the parties to the action in which this deposition
    was taken; and, further, that I am not a relative or
12  employee of any attorney or counsel employed by the
    parties hereto, or financially interested in the
13  action.
14
15               _____
16           ABBY L. WASSON, RPR, CCR #1048
17
18
19
20
21
22
23
24           ALPHA REPORTING & VIDEO
           1911 South National, Suite 405
25           Springfield, Missouri 65804
                 (417) 887-4110
```

Exhibit P-44, Page026
Appellate Case: 25-1349     Page: 26     Date Filed: 04/07/2025 Entry ID: 5503844

**Exhibits**

**Exhibit 01** 3:2 30:16,17 72:11,12

**Exhibit 02** 3:3 35:15,16, 17

**Exhibit 03** 3:4 36:19,20 40:4

**Exhibit 04** 3:6 48:9,10 49:2

**Exhibit 05** 3:7 75:16,17, 18

**Exhibit 06** 3:9 86:12,13

**Exhibit 07** 3:11 89:8,9,20

**Exhibit 08** 3:12 91:6,7

**Exhibit 09** 3:14 92:19,20 94:6

**$**

**$400** 64:15

**1**

**1** 30:16,17 72:11,12

**10** 79:13

**10396** 6:25

**11:38** 94:14

**12** 64:17,19

**120** 79:5

**12th** 88:2,6

**13** 90:9

**14APR2023** 40:25

**16** 43:22

**17** 43:22

**17th** 35:12 36:4,11

**18** 10:11 52:4 64:18 65:2

**2**

**2** 35:16,17 37:5,12,21

**20** 42:21,24 43:3

**2022** 8:11 37:21 90:9

**2023** 40:8 88:6

**2023-0251** 4:22

**2024** 94:14

**23** 15:21 22:9 80:4

**24** 56:22 59:21

**25** 16:18 54:3

**25,000** 44:7

**25-** 44:8

**25JAN2023** 39:13

**26DEC2022** 38:3

**2nd** 38:1

**3**

**3** 36:19,20 40:4

**30** 42:24 43:3 54:20 59:25 71:16 82:24 83:7 94:14

**38** 38:25

**4**

**4** 48:9,10 49:2

**40** 63:22

**40,000** 42:10 44:4,7,8,15, 23

**43** 49:2,3,6

**46** 49:3

**4:35** 20:2

**5**

**5** 54:14 75:16,17,18

**50** 13:15 16:18 44:8,13,14 68:7 93:19

**5000** 15:21

**5000-23** 15:21,25 16:3,4, 7

**6**

**6** 86:12,13

**60** 16:18 54:18 63:19,20

**64844** 6:25

**7**

**7** 89:8,9,20

**75** 44:11

**7APR2023** 40:5

**7th** 40:8

**8**

**8** 91:6,7

**80** 16:16

**89** 8:3

**8:05** 19:6

**8:10** 20:1

**9**

**9** 92:19,20 94:6

**97** 8:3

**98** 63:15

**A**

**a.m.** 94:14

**ability** 6:9 13:23 16:11,12

**absent** 52:23

**absolute** 78:17

**absorbent** 79:9

**access** 48:25

**accurate** 87:8

**accurately** 20:1 31:2

**act** 46:22

**Acting** 4:10,12,18 7:2

**add** 90:4

**additional** 34:21

**address** 6:24 84:18

**addressed** 52:16 53:14

**adjustments** 28:25

**admin** 53:20,21 54:3,9, 11,18 55:11 70:23,24 71:7

**Administration** 7:10 15:4

**administrative** 29:25 71:8

**aggressively** 48:1

**agree** 5:15 35:4 86:23

**ahead** 16:20 89:10 91:8

**Allman** 90:7,14

**allowed** 23:4 47:13 76:22,25 77:5 84:19

**ambiguous** 28:20

**ambiguously** 78:18

**American** 4:20 7:2,7 8:7, 10,21 9:7,18 10:2 11:1 14:25 19:8 24:16 31:4 41:11 42:15 43:10 45:21 47:23 49:9 51:7,16,19 52:7 56:12,15,18 57:6,18 58:12 59:5,9,20 63:17 66:11,15,19 67:12,18 68:2,14 69:6,16 70:5,12 75:13 82:15 83:11,21,22 84:5 85:3 89:13 92:16 93:18

**amount** 44:3 64:10

**amounts** 13:2

**angry** 24:23,24 25:1 38:5, 8,18,22 39:9

**animals** 58:3

**announcement** 42:3

**answering** 5:20

**answers** 6:5,9

**AP** 67:21

**application** 61:16

**April** 22:7 35:12 36:4,11 40:8 88:2,6 89:3

Appellate Case: 25-1349     Page: 27     Date Filed: 04/07/2025 Entry ID: 5503844

**arrested** 79:25

**arts** 58:20,21

**asks** 50:10

**aspirational** 44:5

**assist** 78:19

**assistant** 29:25

**assistants** 71:8

**assisted** 32:3

**assisting** 70:19 78:23

**associate** 14:21 35:2 75:7

**associates** 14:17,19 21:1,5,7,12,17,19 22:16 26:5 34:15 68:25 74:1 84:9

**associates'** 21:2,20

**association** 20:14

**assume** 5:13 16:3 50:7,8

**assumption** 20:3,4,5

**attempt** 5:11,12

**attendance** 13:22 46:3

**attitude** 24:15,20 34:4,7, 10,17,21 37:22 39:16

**attorney** 4:9,23 5:1,3

**August** 8:11

**authority** 45:8 51:11 59:12

**autonomy** 63:11

**average** 44:3 60:7

**aware** 6:6 9:12 22:17 26:7,13 27:3,7,9,18,21 28:9,10 31:10 32:23,24 33:2 34:2 59:7 74:2,19,21 75:15 76:3 77:9 84:11

**B**

**bachelor's** 7:13

**back** 42:4 54:2 71:21,22 88:1 94:4,6

**background** 5:9 55:25 58:11 59:5

**bag** 39:15,21

**bags** 79:11 80:19 81:1

**based** 44:18 68:4,5 79:19,22 80:20

**basic** 58:7

**basing** 80:12

**basis** 62:24 63:9,12

**Baumann** 4:13,19 7:2,6 14:11,24 17:12,20,23 18:4,23 20:8 23:10,17 24:8,12,15 30:6 31:17 32:12 33:14,19,23 35:11, 22,24 36:1 37:3,6 41:8 50:13 70:8 72:18 73:15 74:2,11 87:13

**Baumann's** 11:18 13:16 23:6 50:21

**begin** 13:3 52:18

**beginning** 20:13 56:23

**believed** 76:15

**big** 39:3

**bills** 67:18

**biology** 58:1,2

**bit** 6:15 38:5 44:23 45:5 50:11 60:7

**blame** 23:17

**block** 53:25

**books** 82:24

**boss** 9:9,11

**bottom** 90:23 91:19 92:4

**break** 5:18 71:11,20 72:1 93:25 94:3

**breaking** 38:17

**breaks** 5:19 23:1,4

**Brewer's** 29:24

**bring** 32:9 84:9

**bringing** 53:4

**broke** 39:10

**brought** 25:10,12 32:6 53:5 88:24

**build** 79:11

**building** 53:20,21 54:3,9, 12,18 55:11 70:24 71:7 88:1

**built** 16:16

**bunch** 58:24

**business** 4:20

**C**

**call** 18:17 19:23 39:22 43:21 62:18 63:20 79:9

**calls** 46:16 62:7

**card** 64:9

**care** 52:20 53:3,7 67:5,23 81:14

**careful** 5:23 82:1 85:19

**Carson** 90:7,13

**case** 4:11,14,18,23 5:4 7:1,3,6 92:13

**cases** 92:16

**certificate** 15:23

**CFR** 15:5 59:25 78:13,18 82:24 83:7 85:9 88:23

**changed** 93:21

**characterize** 24:22

**charge** 16:24 17:4,11,16, 20,22,24 18:3,6,23 35:6 61:1

**chat** 61:24,25

**chats** 61:20,21,23 86:8,9

**check** 54:20 91:18

**child** 38:6,9

**citation** 79:17,18,19,22 80:17 86:5,6,7

**citations** 23:14,18 83:15, 18,25

**cited** 24:8

**class** 10:21 59:1

**classes** 10:20 58:19

**clock** 18:25 19:10,20,23

**Code** 15:5

**college** 7:16 56:6 57:21, 22,24

**Commission** 4:22

**communicate** 61:7,8,9 62:13,17 68:10 88:10

**communicating** 61:5, 13,17

**communication** 87:21, 22

**companies** 9:5

**company** 4:20 5:2,4 8:14,17,25 11:6 15:15 26:15 48:24 57:2 64:8 65:22 72:7 85:22 92:13

**competent** 27:22

**compiled** 89:14 91:11

**complain** 32:19

**complainant** 4:14

**complained** 41:6,23

**complaint** 29:16 32:9 33:1 41:1,6,9 84:17,25

**complaints** 29:15 32:10, 22 77:13 84:20

**completed** 39:15

**compliance** 18:7

**comply** 47:16,17 82:21 83:3

**complying** 32:10,17 45:12 82:14

**computer** 54:19 55:18

**concepts** 58:9

**concern** 21:20 22:22 25:25 32:17 78:11,12

**concerned** 21:2,6,11 22:2 41:20

**concerns** 25:9,13,17,19, 21 26:4,11 32:9,10,19 52:13,14 77:25 82:5 84:6

**concluded** 94:13

**concrete** 80:13,15

**Exhibit P-44, Page028**

Appellate Case: 25-1349      Page: 28      Date Filed: 04/07/2025 Entry ID: 5503844

**condition** 6:8

**conduct** 13:19 45:15 73:9

**conducted** 12:1 23:16

**conglomerate** 58:21

**conscientious** 28:17

**consistent** 93:20

**consult** 59:14 91:2

**consulted** 33:7,9,11,16

**contact** 53:1 79:24 83:7

**contention** 43:21

**contents** 36:16

**contest** 86:6

**continual** 22:25

**continue** 22:18 81:1,5

**control** 19:23 35:2 55:15

**conversation** 12:4,6,9 13:3 41:2,4

**conversations** 40:11

**converse** 32:13

**coordinate** 57:4 60:12

**copy** 48:20 87:8

**correct** 21:17,21 22:3 24:10 25:13 35:24 43:4 47:3 87:15

**correctly** 12:3 13:13

**corroded** 79:6

**counsel** 27:10,16

**counseling** 27:19 46:16, 17,19

**couple** 82:24 83:12

**courses** 57:21,22,24

**court** 5:24

**created** 30:22 72:16

**creating** 37:17

**crew** 11:15 13:20 53:15

**crush** 69:1

**current** 11:16 43:10 60:13

**customer** 81:8

---

**D**

**daily** 23:22 34:16 62:24 63:9

**dam** 79:12

**dash** 15:21

**date** 39:15 62:23 74:7 80:5 88:2,3

**dated** 90:9

**dates** 37:7

**day** 13:10 15:8 22:20 30:8 33:10 42:10 43:15,22 52:6,12,25 53:9,17 54:10, 15,21 61:6,12 62:8 64:20, 24 65:5 67:13 68:10 88:18,19

**day's** 13:4 88:21

**day-to-day** 63:12

**days** 54:17,19 61:11 64:23 68:11 88:22

**deal** 29:16 67:15

**dealt** 56:9

**decided** 43:24

**decision** 33:3,5,15 35:4, 7,11 51:15,23,25 85:1 90:25

**decisions** 63:12

**definition** 29:2

**degree** 7:13 56:7

**demeanor** 34:5,7,17,21

**Department** 4:11

**depends** 46:20 54:17

**deposition** 4:17 5:10 6:13 14:7 30:17 35:17 36:20 48:10 71:25 75:17 86:13 89:9 91:7 92:20 94:13

**describe** 79:2

**desk** 53:19 54:13 55:14, 15 71:5

**detailed** 20:2

**dictatorial** 78:25

**difference** 72:7

**difficult** 47:20 48:3

**direct** 11:12,13

**directions** 24:13

**directly** 62:2

**disagree** 80:24

**disciplinary** 45:21 46:7 47:22 49:9 89:12,18

**discipline** 27:4 45:8,19 46:11 47:10 49:7

**disciplined** 27:6,8 45:10, 12,16 51:7,9

**discovery** 89:13 91:11

**discretion** 47:15

**discrimination** 7:6 41:7, 9

**discuss** 6:16

**discussed** 6:15 34:18 39:16 40:5 84:15

**discussion** 38:4 49:19 93:14

**discussions** 49:19

**disliked** 28:7,9

**disrespectful** 34:9,13

**Docket** 4:22

**document** 30:15,18,22 31:2,6 35:15,18,20 36:17, 18,21,23,25 37:6,10,14,17 48:8,11,13,16 72:16 75:18,23 76:2,15,17 86:14,16 89:8 91:5 92:19, 21,23,25 93:4,7,9,15

**documentation** 15:18 37:2

**documented** 27:20

**documents** 6:22

**dollar** 64:10

**dollars** 64:12

**Don** 11:17

**door** 54:3

**dozen** 65:1,7,8

**draft** 91:24

**drafted** 33:12

**drafting** 36:5 58:20,24

**Drive** 6:25

**driver** 69:2

**drying** 15:7 17:21 53:5,6

**duly** 4:2

**dust** 25:21,22 26:2,4,11

**duties** 8:16 13:18,19 14:2,4 15:2 22:17 30:21 31:3,11,13,15,16,18 34:11 52:21 72:8,14 77:4

**duty** 14:1

---

**E**

**earlier** 7:1 33:22 34:19 35:23 40:10 72:3,11

**education** 7:11,14,18,24 56:5,8 57:20 58:25

**egregious** 46:22

**Elaine** 4:12

**elected** 74:2

**electrical** 32:20 56:24

**electronic** 94:7

**elevate** 63:22,25

**emailing** 61:14

**emails** 52:9

**embellishments** 89:24 90:2

**employ** 90:15

**employed** 8:4,6,19 16:25 17:5,12,16,23 18:4,8,11 26:12,24 27:1 31:3,17,19 43:12,14 54:25 59:23 60:15,22 69:14 73:9,16 74:19 76:20

**employee** 9:14 11:8,9,13 12:2,14,19 13:9,12 19:14, 15 20:8,9 22:2 33:21 34:6

Appellate Case: 25-1349     Page: 29     Date Filed: 04/07/2025 Entry ID: 5503844

45:16,19 46:6 48:12
50:20,22 51:13 84:16

**employee's** 83:16,22

**employees** 11:2,21
14:11,16 19:2,9 22:23,24
23:1,8 26:9,20 27:25 28:2
41:16 45:8,10,12 46:11
48:4,18,25 51:11 56:17
59:4,8,18 62:13,17 68:15
69:23 70:4,10,23 74:1
83:21 84:5,19 85:3,13
86:8 92:7

**employment** 20:17 22:6
29:11 63:13 73:5 74:12
78:2

**encouraged** 84:5

**end** 20:17 29:10 44:6 79:4
88:13

**engaged** 28:23

**engines** 58:23

**ensure** 60:9

**entail** 53:11 75:6

**entered** 15:25 50:20

**entire** 11:6 39:2 53:16
93:20,22

**entry** 37:19

**equipment** 16:17

**estimate** 54:16

**ethic** 28:11

**evidence** 37:2

**evidential** 80:14,15

**exact** 80:5

**exam** 15:8 23:22 52:16

**EXAMINATION** 4:5

**examples** 20:18

**exams** 13:19,23 15:3 16:2
18:2 23:15,25

**exhibit** 30:4,12,16,17
35:15,17 36:19,20 37:20
40:4 48:9,10 49:2 72:11,
12 75:16,17,18 86:12,13
89:8,9,20 91:6,7 92:19,20
94:6

**exist** 50:14,15

**expect** 78:19 80:16

**expectation** 63:1 77:22

**expendable** 39:22

**experience** 57:17,20
58:16

**explain** 13:5 21:14 40:13

**explained** 68:20

**explaining** 57:10

**express** 25:1 26:4,11

**extemporaneous** 12:20,
24

**eye** 11:25 60:12

---

**F**

**face** 88:11

**face-to-face** 62:19

**factual** 78:17

**fall** 18:9

**falls** 56:25

**false** 86:1

**familiar** 10:24

**fault** 83:16,22

**federal** 4:21 15:5 79:24

**feel** 60:5

**feelings** 28:6

**feet** 54:3

**fell** 24:2

**felt** 24:22 80:23

**figure** 87:25

**file** 50:10,20,22 51:1,3,5
91:14

**filed** 41:6,9

**final** 10:13,15 40:20

**finances** 66:5 67:15

**Financial** 64:2

**find** 9:24 13:14 30:4,11,13
85:7,8

**finding** 30:14

**findings** 80:12

**finds** 13:7

**fine** 71:11

**finish** 5:19,20

**fire** 51:11,15

**fired** 51:13,18 69:23
79:23

**five-minute** 93:25

**floor** 79:8

**flow** 29:5

**follow** 46:8 47:5

**Foods** 10:3

**foregoing** 94:13

**forklift** 56:25 70:16

**form** 75:21

**formal** 49:20

**Forty** 18:12

**forum** 6:17,18

**found** 9:25 23:21,23,24
24:4,5,9,11 58:4

**friend** 85:21

**frustrating** 39:6

**full** 4:7 6:4,9 69:6,13

**fully** 68:13,16

**function** 39:2

**functions** 38:25

---

**G**

**Gage** 70:8

**gave** 5:15 76:15 90:13

**general** 46:5 51:9 85:17

**generally** 13:12

**geology** 57:20,22,23,25
58:7

**get along** 27:25

**give** 5:14 6:4,9 20:18
34:12 35:23 36:1 49:25

54:15

**giving** 78:14

**goal** 63:17

**good** 5:5 20:9 24:15,19
28:11 46:6 60:1,5 62:20

**Goodman** 10:15

**governed** 82:18,19

**grad** 7:19

**Granby** 6:25

**gray** 87:17

**green** 87:15

**group** 61:20 62:1 86:9

**guarding** 82:23

**guess** 11:24 19:11 21:3,
4,8 29:10 31:22 36:4,11
43:20 49:21 50:7 51:6
55:9 57:5 63:13 64:25
66:3 76:17 83:5 86:17
92:5

**guideline** 82:23

**guy** 57:9

**guys** 6:16 53:15 55:1,4
81:2

---

**H**

**H-A-L-E** 11:17

**Hale** 11:17

**half** 88:21

**hand** 36:17,18

**hand-stacking** 23:7

**handbook** 48:12

**handed** 36:15 75:19 92:6

**happen** 16:3,5,8 22:5,9
50:15 76:8

**happened** 39:4,7,20
41:18

**happening** 38:1 39:18

**hard** 5:25 21:1,5,15,16,19
23:8 28:13,15,19,21 29:2
68:17,18

Appellate Case: 25-1349     Page: 30     Date Filed: 04/07/2025 Entry ID: 5503844

**hazards** 15:9

**he'll** 12:25

**head** 11:5

**Health** 4:21 7:10 15:4

**height** 81:4

**held** 8:14

**high** 7:12,18 59:1,2 80:18 81:4,9,11

**highways** 79:10

**hire** 29:19,21 47:19 59:12 70:9

**hired** 9:18 15:15 30:1 59:8

**history** 48:7

**Hodge** 17:6

**holding** 79:4

**honestly** 69:20 85:25

**Hoover** 51:22 70:8 90:20

**hoping** 44:24

**hour** 61:10 71:16

**hourly** 9:14

**hours** 18:10,12,16,19 19:2,13 20:3,6 43:22 56:22 59:21 68:1 93:17

**human** 50:10

**hydraulic** 64:6

**hypothetically** 51:2

---

**I**

**idea** 23:6

**identification** 30:17 35:17 36:20 48:10 75:17 86:13 89:9 91:7 92:20

**II** 16:16

**illness** 6:8

**impair** 6:9

**important** 59:18

**improve** 28:24

**include** 14:10 62:4

**included** 93:6,9

**includes** 15:6

**including** 15:2

**income** 8:21 9:4

**increase** 28:25

**indicating** 51:8

**individual** 60:11 61:21, 23 64:25 89:16

**individuals** 41:5

**industrial** 7:13 56:8 58:20,21,25

**influence** 6:7

**inform** 63:3

**information** 7:8,9 18:19 85:8 86:5 92:1

**informed** 36:7 63:2

**injure** 23:9

**input** 18:21 19:3,11,13

**inputs** 18:22

**inputting** 18:23

**inspection** 13:25 73:9 77:3,14 80:16 82:11 89:3

**inspections** 72:25 73:5, 7,16,23 75:11 76:20 77:13 82:8 83:12

**inspector** 73:20,22 75:24 76:4,13 78:5,7 80:8 81:6, 19

**inspectors** 23:21 73:1,2, 4,13,24 76:10 78:1,14 79:15 89:2

**instance** 38:14,16 81:24

**instances** 23:10

**interactions** 68:4

**interest** 20:11

**interested** 33:25

**interjecting** 78:12

**intermittent** 65:19

**internal** 48:23,24

**interview** 9:20

**inventory** 10:5 13:25 31:25 32:7 39:15,21

**invoice** 67:21

**involve** 56:12

**involved** 33:15

**issue** 12:18 13:9 33:22 34:8,22 40:2 80:10 90:25

**issued** 83:20,24

**issues** 16:21 24:3,5,7,12 32:20 33:24 34:3,4,17,18, 21 77:25 79:21 80:7

**issuing** 67:22

**item** 78:17

**items** 32:7 58:24 60:12 64:2,23 82:24

---

**J**

**January** 80:4,6 94:14

**Jesse** 17:6

**Jessie** 60:17,18

**Jim** 51:22 70:8

**job** 8:8,12,16 9:24 11:20 12:2,14 13:12,16,18,19 14:15 15:2,6 16:9 17:7 27:23 29:24 30:25 31:3 32:2 34:24 39:10 55:23 62:20,21

**jobs** 11:21 56:11 59:19

**John** 4:1,8 37:21 39:15 40:5,25 90:20

**joining** 4:15

**Joplin** 7:17

**Jordan** 9:12,13,19 27:8 40:5,15 65:22 66:14,20

**Joshua** 60:14 71:1,2

**junior** 59:2

---

**K**

**keeping** 39:14 63:7

**Keith** 76:1

**Kensley** 29:24

**kind** 5:9 15:24 19:21 21:22 28:19,25 29:5 30:12 34:17 44:24 45:6 47:14 52:9 53:13 54:15 55:7 60:3 61:1 63:6,11,20,25 66:6 70:17,18 78:17 80:13 89:13,24 91:11

**kinds** 82:4 92:18

**knew** 14:14 41:10

**knowing** 59:24,25 68:5

**knowledge** 31:5 75:5

---

**L**

**Labor** 4:10,11,13,18

**lack** 33:20

**Laura** 4:9

**layers** 58:5

**lazy** 69:22

**lead** 30:21,25 31:12,14 43:6 46:23,24 67:5,8 72:9, 13 84:10

**leak** 79:7

**leaked** 79:12

**learn** 7:8 89:1,3

**leave** 55:4

**leaves** 47:14

**left** 19:16,18 20:1 30:8 34:24

**letter** 33:13 35:21,24 36:1,5,15 89:19 92:13

**letters** 91:10,15,24 92:2, 10,15

**letting** 40:5

**level** 58:7

**Lewis** 90:17,21

**Liability** 4:20

**Licklider** 78:10 79:1,14 80:1 81:23 82:5

Appellate Case: 25-1349    Page: 31    Date Filed: 04/07/2025    Entry ID: 5503844

**Limited** 4:19

**Lincoln** 7:21

**list** 31:16

**listed** 91:19

**loader** 64:7

**local** 79:24

**located** 8:17

**long** 10:6,10 60:24 90:15

**longer** 30:7 65:18 71:12

**looked** 80:21

**loop** 77:23

**lot** 16:19 29:14 53:6
54:22,23 69:16,22 88:8

**lubricant** 79:6

**lubrication** 79:3

───────────────

**M**

**machinery** 38:17 56:9

**machines** 43:22

**made** 33:3,16 34:1 35:11
38:15,18 40:15 41:15
48:20 51:15,23,25 60:2
67:19 76:5 77:12 84:11

**main** 17:19 62:12 63:6

**maintained** 37:14

**maintenance** 16:19,21,
24 17:2,4,8,9,10,11 25:8
26:6 54:5 55:23,25 56:1,2,
9,12,14 68:18,19,24 70:19

**make** 11:20 13:20,22
28:24 30:5 32:22 33:1
35:1 38:21 42:9 44:25
63:11,20 69:25 70:1
84:19,25 90:25 94:1

**makes** 24:18,21 67:12
84:16

**making** 18:6 34:1 35:6
46:4 67:17

**man** 56:1

**managed** 25:6

**management** 14:24

**manager** 8:9 31:23 32:1,
4 57:3 70:22 71:3,4 83:10
92:5

**manager's** 14:1

**managing** 9:13 65:23

**manner** 23:16 45:15

**Manufacturer** 4:19

**manufacturing** 7:7 8:7
58:11,16

**March** 22:7

**mark** 30:15 35:15 36:18
48:9 75:16 86:12 89:8
91:6 92:19

**marked** 30:17 31:22
35:17 36:20 48:10 75:17
86:13 89:9 91:7 92:20

**Markeson** 76:1 80:9
81:13 82:6

**married** 9:1

**marshal's** 79:24

**master's** 7:24

**material** 26:1 39:22 53:4

**matters** 68:2

**means** 52:24 61:14

**meant** 5:14

**meet** 13:4 16:9 20:21,22
21:7,15 22:19 23:2 29:2,
12 34:5,15 42:9 43:3 44:8

**meeting** 16:22 21:12 22:3
27:13 29:16 33:23 46:3
49:20

**meetings** 40:14

**memory** 37:25 40:12

**mention** 74:6

**mentioned** 7:1 16:9
25:12 33:22 35:23 37:21
41:14 53:8 58:18 74:4,9,
12

**mess** 54:13

**message** 62:2,12 86:19
87:2,9,17,24 88:13 89:6

**message-** 61:15

**messages** 52:10 54:20
62:10,11 88:4,8

**met** 13:22 34:1 42:11,16,
21,24 49:21 64:16 66:25

**mill** 11:6,15 12:1,23
13:20,24 14:17,19,21 15:6
16:15 17:19,20 18:1,4
21:1,2 22:16 23:15 24:6
25:5 26:3,5 31:25 34:15
35:2 38:24 39:3 44:22
48:5 52:15,16,21,24 53:8,
15,16,21 54:4,6,7,21
55:16,17 61:8,24,25 62:13
63:16 67:6 68:25 69:3
70:15 73:25 75:7 79:3
84:9

**mill's** 13:23 16:11

**mine** 4:21 15:4 17:17,23
18:6 60:9 62:24 63:12
64:19 65:24 66:1,2 76:11
82:21

**mine's** 16:11

**miner** 15:22 70:13,14
74:21 75:6,8 77:22

**miners** 76:19 77:5,12,16,
19 82:1,4 88:18

**miners'** 74:3,14,17 75:2,
5,10,14 76:5,11,14 84:2

**minimum** 29:7,9

**mining** 7:10 57:17 59:6

**minutes** 54:20 71:11,16

**Missouri** 6:25 7:16,21,22
8:18 10:15

**mm-hmm** 17:25 53:10,18
55:6 56:10 58:10 62:25
63:21 64:4 67:10 68:22
73:14 75:1 76:24 77:8
81:25 85:6 88:7 90:8,10
91:20

**MO** 4:19 7:7 8:7

**model** 58:22

**Molessi** 60:17,18

**money** 67:12,24

**month** 22:6,13 65:11,15,
17

**months** 52:4 60:25 64:18
65:2

**move** 43:15

**MSHA** 7:9 16:5 18:7
23:14,18,21 32:10,17,22
33:2 40:25 59:19 60:6,9
70:1,10 72:24 73:9,12,15,
20,22,24 74:3,15,23,24
75:11,23 76:4,10,13,15,19
77:6,13,17,20,23 78:1,14,
19 80:8,20 81:6,19 82:2,8,
14,20,22 83:1,3,8,12,18,
24 84:3,14,20,23 85:1,4,
11,14,20 88:16

**multiple** 85:18

───────────────

**N**

**necessarily** 12:10,12
17:21 23:19 24:17 25:24
41:21 76:25 80:13 82:19

**needed** 22:18 28:17 29:8
32:7

**night** 43:17,19 44:1 55:9

**note** 30:5,6

**notes** 37:3,7 86:4

**notice** 12:2

**notified** 12:13

**notify** 12:8,11,21 82:11

**notifying** 12:18,19

**Notwithstanding** 22:22

**November** 37:21 38:1

**number** 48:4 68:14

───────────────

**O**

**O'REILLY** 4:6,9 30:10,11
41:24 42:4,6 71:10,15,18,
21,22 93:24 94:4,11

**O'Reilly's** 64:7

**oath** 6:2 71:23

**observe** 11:24

occurred 88:4

October 90:9

offer 40:23

offering 78:22,23

office 10:15,17 52:20
53:19,20 55:14 71:5 79:24
83:8

oil 64:6 79:4,7,12

older 58:3

on- 48:15

ongoing 82:9

online 42:2 48:15 60:3

operations 8:9 31:23
32:1,4 66:17 92:5

opinion 21:8,23,25 43:20
78:12,18,22,24 79:1,14,
20,22 80:12,24 81:6

opinions 78:15 82:4

opposed 79:14

order 23:2 28:25 59:22
79:5 88:15

orders 81:7,8

OSHA 10:19,24 82:19

OSHA-CONDUCTED
10:21

Outdoor 58:15

overhead 42:3

overlap 31:18,20

oversee 8:17

owner 45:1

ownership 9:7 44:22

ownership's 45:6

owns 66:11

                P

packer 70:16

paid 67:18 88:18

pallet 80:19 81:10

paperwork 74:5

paragraph 36:25

part 10:16 14:24 15:4
17:19 20:13,15 33:5 34:25
46:4 49:13 55:23 59:24
67:8 90:1

participate 36:5 37:17
40:10,21 92:1 93:6,8

participated 72:24

participating 40:19

partner 9:13 65:23

parts 59:25

past 19:9 41:5,14 44:21
79:15

Patrick 90:17,21

pause 42:1

pay 81:9 88:13,21

paying 64:8

payroll 18:17,19 19:25
67:18

pen 94:8,9

pending 5:21

people 17:2,14,15 18:20
20:3,5 26:6 41:14,23
47:19,21 52:23 67:2
68:24,25 69:6,22 70:1
85:20

people's 50:9

per- 28:22

percent 13:15 44:8,11,13,
14 54:14,18 63:15,19,20,
22

percentage 12:17 13:13
54:11

perform 34:11 77:4

performance 26:14,19
27:2

performing 12:14

period 61:2

person 9:22,23 11:5,6
17:4 35:6 36:12 52:23
60:8,13,15 64:16 69:2,4

70:25 89:17

person's 91:14

person- 21:3

personal 21:3,23,24 28:5
37:2

personally 8:23,24 9:3
28:22 31:8 38:22 51:14,15
57:1 59:8,10 83:10,13

personnel 17:9,10,11

peruse 50:9

phone 61:14 62:7 86:17,
21 87:1,9

physically 91:22

picture 86:21,25 87:4,6,9,
19

pieces 38:17

place 15:25 39:1 73:5
79:8

places 58:14

plant 26:2

plants 58:3

plenty 22:25

point 13:8 31:24 89:4,5
93:21

policy 45:21 46:7 47:16,
17,22 49:9,15

poor 34:9 37:22

pop 57:8

position 35:1 43:8 55:20
60:22

positions 8:14

Post 10:17

Postal 10:9,22

postmaster 10:13,14,16

potential 47:2

pounds 42:10

PPE 26:1,7 56:25

precautions 25:25

prefers 62:15

prehistoric 58:4

prepare 6:12 92:12,23

prepared 37:15,16 48:16

present 80:16 82:8

Pretty 74:18

previous 44:21 45:1,6

primarily 32:2 61:17

printed 48:20

prior 10:1 29:19 57:17

priority 82:14

private 46:15 49:21

procedure 46:10

proceedings 42:1 71:20
94:3

process 38:24 39:3 47:20

produce 26:1 38:23
79:11

produced 91:10

product 23:7 31:25 32:5,
6 38:23

production 11:14,15,16,
25 13:1,6,10,11,17,22
14:1 16:10,22 18:2 19:3,
12 20:21,23 21:7,12,16
22:3,19 25:8 26:5 27:13
29:12,17 30:21,25 31:12,
14,25 32:15 33:20,23
34:1,3,4,16,18,22 42:7,8,
16 43:1,4,6 44:3,15,21
46:5 52:11,12,19 63:5,6
67:4,5,7,8,13 68:19,25
70:22 72:8,9,13 84:10

productive 33:21

productivity 29:1

Products 58:15

program 19:4

progression 63:13

Progressive 49:6

proper 13:21 23:16 26:1,
7 52:18

prose 93:13

Alpha Reporting & Video
www.alphareportingservice.com

Exhibit P-44, Page033

Appellate Case: 25-1349     Page: 33     Date Filed: 04/07/2025 Entry ID: 5503844

**provide** 6:24 31:6 56:17, 20 57:1

**provided** 37:2 70:10 89:12 92:9,15

**public** 48:23

**pull** 72:12

**punctual** 20:10 28:12

**purchases** 64:2

**purposely** 20:20,22

**push** 34:15

**put** 57:4 93:12

**putting** 92:1

**Q**

**quarry** 11:13 15:6,7 17:21 53:4 69:3 82:25

**quarryman** 53:2

**question** 5:11,13,16,20 21:14 26:10 81:10 83:2,6

**questioning** 6:19

**questions** 6:5,10,20 60:3 75:7 85:23 94:5,12

**quickly** 84:18

**quit** 69:25

**quitting** 69:23

**quota** 13:4 21:7 22:19 29:12 42:7,8,16 43:4 44:15

**quotas** 12:1 13:22 16:10, 22 29:17 33:23

**R**

**raise** 25:17,21 81:15 84:5, 8

**raised** 32:16 81:17

**ran** 35:2 44:1,22 45:1

**Raneldon** 90:20

**raw** 32:6

**read** 48:14 49:13 92:18 93:4

**reason** 6:4 20:25 34:2 40:23 77:1

**reasons** 35:10

**recall** 39:18 40:8,17 41:1 73:11 80:22 89:18 92:3, 14,17

**receive** 9:3 15:10 48:19, 20 49:23 51:4 56:14

**received** 7:9 23:14 50:25 56:2 84:2

**receiving** 50:24

**recommend** 51:18

**recommendation** 40:16

**record** 4:7 16:1 30:6 41:24 42:4 50:3,5,12 71:19,21,22 93:25 94:4

**records** 18:14,15 19:25 43:1 44:21 45:3,7 89:12

**reference** 37:23

**reflected** 20:1

**reflects** 31:2

**refresh** 40:12

**refresher** 56:24

**regard** 10:17 21:12 25:18 49:15 75:11

**regular** 67:13

**Regulations** 15:5

**rehired** 48:4

**Reindeer** 6:25

**related** 34:22

**relation** 53:24

**rely** 60:9

**remain** 23:2

**remember** 17:1 25:11,20 40:18,24 49:24 50:1,24 60:17 70:6 73:18 74:7 76:9,12 80:5 82:10 86:18 90:14

**remind** 56:7

**remotely** 4:15

**rep** 76:11,14

**rephrase** 5:12

**replace** 29:19 30:1

**reporter** 5:24

**represent** 5:4 89:11 91:9

**representative** 74:3,15, 17,22 75:2,9,10,14 76:6, 11

**representing** 4:10,12

**represents** 5:1

**reprimand** 49:23,25 50:2,6,12,16,21,23 51:4,5

**reprimands** 50:19

**required** 15:8 60:6

**requires** 16:19

**resource** 50:10

**resources** 82:21

**response** 22:15,16 76:16

**responsible** 59:23 63:15

**rest** 30:8,9 54:21 88:18

**review** 4:21 6:22 26:14,20 27:2

**rid** 43:17,19

**rights** 75:5,11 84:2

**risk** 21:6

**Rob** 11:18 13:16 14:11 15:10 16:24 17:5,16 18:7, 10 26:4,11,14 27:2,4,6,8, 10,16,22,25 28:7,11 29:2, 15,19 30:1 31:7 32:9,19, 22 33:3 35:4,7 36:7 37:6, 21 38:4,8 39:14 40:5,11 41:1 43:12,13 54:25 55:11 60:15,22 69:13 70:8 72:3 73:9,15 74:2,10,14,19,24 76:5,20 87:2,11,13,21,23 88:8,10,12,24

**Rob's** 30:25 34:24 39:16 40:2 49:15 73:5 78:1 87:17

**Robert** 4:8,13,19 7:2

**rocketry** 58:22

**role** 10:4,12,13,16 11:1 17:18 65:22 67:8,17 72:19

**Rolla** 83:8

**room** 19:24 35:3 55:15 69:1

**rote** 46:1 59:25

**round** 79:10

**rules** 5:10 45:13,17 57:10

**run** 43:10,12 59:10

**running** 43:22 45:3

**Russell** 4:15 6:14 9:9 12:11,13,18 13:7,14 27:6 40:15 46:16 47:14 59:15 61:5 62:2,7,15,20,23 63:14 64:3,11,16 66:3,7,9, 14,20 68:1 77:19 82:8 86:9 87:20 89:6 91:2 92:10 93:11

**S**

**safe** 23:4 45:15 50:7 80:23

**safety** 4:21 7:10 10:17 13:19,23 15:2,4,8,9 16:2 17:17,18,23,24 18:1,4,7 21:2,6,11,20,22 22:2,22 23:2,15,22,25 24:2 25:9, 13,17,25 45:13,17 56:17, 20 57:3,5,10,14 60:11,13, 15,22 61:24 69:3 70:22 71:3,4 83:10 84:6,16,20

**salary** 9:16

**schedule** 13:1,10,11 20:21,23 21:13,16 22:3 27:13 32:15 52:11 65:20

**school** 7:12,18,19 59:1,2

**screenshot** 86:17

**Secretary** 4:10,13,18 7:2

**sees** 13:1,10

**send** 67:21

**Seneca** 4:19 7:7 8:7,18 67:2

**separate** 53:21 65:3,5

**Service** 10:9,23

**session** 46:16

**sessions** 10:22

**set** 22:21 65:20 69:6,13

**share** 89:6

**shared** 31:13

**sheds** 15:7 17:21 53:5,6

**shift** 43:13,15,17,19,24,25 44:1 55:7,9 72:4,5,8,9

**shifts** 18:18,24 19:4 43:10 45:1,4

**shipping** 10:5 66:5

**shop** 54:5

**short** 71:11

**show** 18:15 30:3 43:1 48:8 86:11 91:5

**showed** 19:15,17 76:1,16

**showing** 37:21

**shown** 75:23

**shut** 39:1,2,5 68:20 77:2

**sign** 92:25 94:8

**signature** 93:2 94:7

**signed** 90:11,22 91:21,22 93:4 94:9

**site** 15:6

**situation** 12:21

**slip-trips-and** 56:25

**small** 39:4 58:22

**Smith** 4:12 30:5 42:2

**solely** 31:11 52:1

**sort** 44:6 47:1 58:7 63:1 66:2 80:15

**sounds** 29:14 44:4 47:1 54:22

**source** 8:21

**Southern** 7:16

**speak** 13:13 73:25 77:16, 19,23

**speaking** 6:1 19:9 74:10 83:20

**Spears** 4:1,8

**Specialty** 10:3

**specific** 17:7 37:25 46:8, 10 63:24 70:9 74:7 78:7

**specifically** 39:24 45:16 66:8 73:18 83:20 85:10

**spend** 54:11,14

**spending** 68:2,8

**spent** 64:21

**spoke** 13:6

**spoken** 13:8

**Springfield** 7:22

**stack** 72:12 80:19 81:1,4, 11

**stacked** 81:9

**stacking** 25:13,18 81:3

**staffed** 68:14,16

**stake** 9:7

**standard** 23:2 80:20 83:3 88:17

**standards** 10:24 18:7 32:11,17 46:5 59:19 60:6, 10 82:14,22

**start** 8:10 47:7

**started** 17:6 72:3,5

**starts** 37:6 66:18,19

**state** 4:7 7:16,22

**statement** 92:12

**statements** 92:15

**States** 10:9

**stay** 16:20

**stepped** 30:7

**steps** 46:8,9,18 47:1

**stomp** 38:8

**stomps** 38:6

**strata** 58:4

**straw-stuffed** 79:10

**street** 53:23

**strictly** 47:16,17

**structure** 16:15

**studying** 7:23

**stuff** 92:18

**substance** 6:7

**suffering** 6:8

**Sunbeam** 58:15

**supervise** 11:2,4 14:11, 13 26:20

**supervised** 14:15

**supervisor** 11:10,12,13, 14,15,16,18,20 13:6,17 14:19,22 18:2 19:3,12 26:6 52:12 69:1 70:22

**supervisor's** 14:1

**supply** 31:25 32:7

**supposed** 19:6,20 46:8, 11 75:4

**suspension** 46:24

**sworn** 4:2

**symbiotically** 38:25

**system** 19:13

- - - - - - - - - - - -
**T**
- - - - - - - - - - - -

**tag-along** 73:18

**takes** 15:24 67:5,23

**taking** 4:17 5:25

**talk** 5:24 12:13 64:11 71:25 73:22 86:8

**talked** 72:3 76:4 88:11

**talking** 15:22 39:24 40:17,18 42:7 57:11 58:2 73:20

**target** 34:6

**task** 15:10,18 16:2 56:14 70:16,17,18,19,21

**teach** 58:19

**teacher** 7:25 58:19

**Teams** 52:10 61:15,16, 17,18,19 62:2,10,11,12,18 86:8

**technique** 11:24

**technology** 7:13 56:8

**tee** 47:25

**template** 89:25 90:2,4

**ten** 42:18 71:11 81:9

**term** 28:20

**terminate** 33:3,14 35:4, 11 47:21 52:3

**terminated** 29:21 33:19 34:2 35:7 36:8 70:4 74:25

**terminating** 40:11

**termination** 29:20 33:13, 17 35:21 46:24,25 47:3 49:16,22 91:10,24

**testified** 4:3 40:10

**testify** 4:2

**testimony** 30:9

**text** 87:9 88:8

**texting** 61:15

**that'd** 39:6 88:6

**thing** 63:6 66:7 80:14,15

**things** 23:20 30:14 35:1 53:7 57:4 58:2 63:24,25 64:2 81:13 83:14

**thinking** 88:20

**thinks** 62:20

**Thirty** 42:22

**thought** 80:11 81:2,5

**threaten** 81:19,20

**threshold** 64:5,6

**ticket** 67:21

**Tidaback** 4:15 6:14 9:9, 13,19 12:21 15:14 18:5,9 22:20 25:6 27:6,8 30:23 33:4,12 34:5 35:21 44:17, 24 48:3,17 50:10 59:11

**Tidaback's** 65:22

**time** 5:18 12:17 13:14,15, 21 14:21 17:1,12 18:25 19:10 31:19 32:16 33:16 34:12 35:13 41:13 42:15

Exhibit P-44, Page035
Appellate Case: 25-1349    Page: 35    Date Filed: 04/07/2025 Entry ID: 5503844

44:5,9,11,13 54:11,19
55:2,3,5,8 60:21,25 61:1
65:25 66:12 68:8 69:5,9,
17 88:15 89:6 93:20,22

**times** 20:15,18 22:11 24:5
34:9,14 38:12 42:13,14,
16,21,22,24 43:3 61:12
64:16,17,19,25 65:1,5,8
85:18

**title** 8:8,12 13:16 14:15
17:7 30:25 33:13

**today** 6:4

**today's** 6:12

**told** 7:4,5 20:24 21:11,15
22:2 34:14 35:23 36:15
74:14 76:12 77:5 84:19,
22,24,25 85:3,13

**top** 17:22 37:20

**tour** 52:21 53:8

**town** 33:1

**Townsend** 60:14

**track** 18:18 19:2,22 39:23
63:7 65:9

**train** 70:16

**trainer** 57:5

**training** 10:19,22 15:10,
13,16,18,22,24 16:2 26:8
56:2,14,17,20,21,23,24
57:1,14 59:22 70:1,9,11,
12,13,14,19,21 74:23,24
83:1 84:2,14,23

**trainings** 57:11

**Tripoli** 4:20 7:3,7 8:7,10,
21 9:7,18 10:2 11:1 14:25
19:8 24:16 31:4 41:11
42:15 43:10 45:21 47:23
51:7,16,19 52:7 56:12,15,
18 57:6,18 58:12 59:5,9,
20 63:17 66:11,19 67:12
68:2,14 69:6,16 70:5,12
75:13 82:15 83:11,21,22
84:5 85:3 89:13 93:18

**Tripoli's** 49:9 66:15
67:18 92:16

**trips** 65:3

**trough** 79:4,6

**truck** 69:1

**true** 87:8

**trust** 85:4,5,11,12,14

**truth** 4:2,3

**truthful** 6:5,9

**tube** 79:3

**Tuesday** 94:14

**turn** 37:5 49:2 54:19

**turnover** 69:16

**Twenty** 42:20

**type** 12:21 20:8

**typical** 52:6 54:10

---

### U

**ultimately** 24:2

**understand** 5:10,16 6:2
28:14 50:17 59:19 71:23
74:17 75:2 87:23 88:14

**understandable** 39:9

**understanding** 5:3,6
60:5 78:19,23 89:11 91:9

**understood** 5:14

**United** 10:9

**University** 7:16,21,22

**upset** 25:1,5

**usable** 16:19

---

### V

**varies** 54:22,23 70:3

**verbal** 46:14,15 47:2,7,10
62:19

**verbatim** 46:1

**versus** 12:19 35:12 63:2,
25 66:9 81:6

**video** 57:8,15

**videos** 56:21 57:13

**visual** 13:25

**voice** 81:15,17

---

### W

**walk** 53:16 73:2,4,15
76:19,23 77:6,7

**walk-around** 13:24

**walked** 19:5 24:4,5 73:1

**walking** 73:12

**wanted** 30:6 46:21 47:12
77:22

**wanting** 20:20,22 34:10

**War** 16:16

**warn** 82:1,4

**Warned** 40:25

**watch** 56:22

**ways** 25:7 28:24 29:4,9
38:3 62:16 79:2 81:1

**website** 48:21,22,23,24

**week** 18:10 68:1,5 70:2
88:21 93:17

**weekly** 40:14

**weeks** 64:21,22 65:4

**welding** 58:23

**well-acquainted** 28:4

**well-being** 21:3

**well-liked** 28:2

**Wheeler** 70:8

**Williams** 90:19,20

**willy-nilly** 47:21

**withdrawal** 88:15

**withhold** 79:12

**wood-** 58:23

**woodworking** 58:23

**work** 9:18 10:1,6,8,10
19:7,15 20:12,19 23:5
27:10 28:11,13 47:19
52:7,11,24 55:1,11 58:14
66:2,4,6 67:1 68:7 70:15,
24 87:1 93:18

**worked** 18:11,16,20 19:2,
14 20:3,5 28:16 41:17
53:14 55:7 58:17 59:5
64:23 69:5

**worker** 28:15,19,21 29:2

**working** 8:10 10:1 22:25
24:15 26:15 27:17 43:13
52:6 55:8 56:11 57:18
58:12 59:9 61:10 65:2
68:2,8 69:17 70:5

**works** 38:24 67:1 70:25

**workweek** 88:21

**World** 16:16

**wrapped** 34:18

**write** 19:6,21 80:17 83:14
89:22,23 93:11

**writing** 79:22

**written** 37:7 45:19 46:17,
19 47:2,8,11 49:23,25
50:2,6,12,16,19,21,23
51:4 78:18 86:5

**wrote** 79:16,18,19

---

### Y

**years** 10:7,11 16:16,18
79:5,13 83:12

---

### Z

**Zoom** 4:16

Appellate Case: 25-1349     Page: 36     Date Filed: 04/07/2025 Entry ID: 5503844

## **Production Lead Duties**

- Oversee mill associates

  - Daily – assign and ensure completed start-up and shut-down tasks on board(s) in breakroom

  - Daily – Assign roles, rotation schedule, and tasks

  - Daily – track/add their worked hours, PTO, or unpaid leave to Shifts

  - As needed, remind mill associates to wear appropriate PPE; collaborate with the Environmental and Safety Specialist to ensure all associates are following all MSHA and company guidelines

  - Utilize MS Teams to collaborate with all team members

- Control Room backup assistance **(NEED TO KNOW IN 90 DAYS)**

  - Operate control room while Control Room Mill Associate is on PTO/absent

  - Startup and Shutdown procedures

  - Collaborate with Quarry Associate/Operations Manager regarding needing more material delivered, and crushed in holding tanks

- Mill product and Production supply inventory [OPERATIONS MANAGER] **(NEED TO KNOW IN 14 DAYS)**

  - Do a **daily** overrun count and add to the On Hand tab in the Daily Production Report

  - Monthly inventory count of unused paper bags for 50 lb and 100 lb individually

  - monthly inventory of retail bags, Full and empty

  - Monthly inventory count of unused pallets for the 48 x 40 (domestic pallets), Large Heat Treated pallets and Small Heat Treated pallets individually (export pallets)

  - Monthly inventory count on full stretch wrap rolls

  - Monthly inventory count on slip sheets

  - Monthly measurement on oil (oil room large container)

- Shipping / receiving paperwork [Shipping dept/OPERATIONS MANAGER] **(NEED TO KNOW IN 14 DAYS)**

  - Check daily production schedule : https://calendar.online/ShiftLead

  - Print bag labels for orders to be produced that day (Rollo Printer)

  - Print shipping paperwork for shipments going out each day

  - Verify paperwork is complete and appropriate documents are included

**EXHIBIT**

**Exhibit P-44, Page 037**

- Assist truck driver with paperwork (where to sign) and any questions
- Send pictures of trailer/container empty and full, trailer #, and signed BOL in mill group chat tagging @Julie (shipping dept)
- Mailing/preparing the easy-to-handle (retail bags) **(NEED TO KNOW IN 14 DAYS)**
- Quality Control / CILAS reports [OPERATIONS MANAGER] **(NEED TO KNOW IN 14 DAYS)**
  - Run a CILAS report after each grade of product is produced
- Preventive maintenance schedule [OPERATIONS MANAGER/MAINTENANCE TECHNICIAN] **(NEED TO KNOW IN 60 DAYS)**
  - Work with maintenance team to update the preventative maintenance schedule when certain tasks are completed or need to be added to the schedule
- Mill Parts / Supplies requests [OPERATIONS MANAGER/MAINTENANCE TECHNICIAN] **(NEED TO KNOW IN 30 DAYS)**
  - Work with maintenance team to search for parts/supplies online and submit the quote(s) to the operations manager for approval and purchasing
  - This includes mill bathroom supplies
- Any additional tasks requested across the departments
- Collaborate with Operations Manager regarding mill associate professional development counseling session (if not monthly, quarterly)


The Operations Manager is your direct supervisor, the Mill Associates direct supervisor, and the Quarry Associates direct supervisor.



# AMERICAN TRIPOLI

**Mailing Address:** 2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414
**Shipping/Receiving Address:** 5 Oneida Street, Seneca,
MO  64865

April17, 2023, 9:00 AM

Dear Robert Baumann,

I regret to inform you that your employment with American Tripoli will be terminated effective immediately due to poor performance, lack of leadership skills, and for failure to follow procedures and guidance given by your supervisor.

We have made several attempts to address these issues with you through coaching, feedback sessions and open communication channels, but unfortunately, we have not seen any improvement in your performance and the data reflects this.

Please note that you will receive your final paycheck, as scheduled, on the upcoming pay date, which will include any accrued benefits owed to you.

I am very disappointed that this opportunity did not work out as I had high hopes for you.

If you have any questions or concerns about this decision, please do not hesitate to contact me.

Sincerely,

*Russell Tidaback*

Russell Tidaback
Managing Member
American Tripoli

Ccd:
John Spears
Operations Manager
American Tripoli



EXHIBIT
2

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page039**



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

Reference – Re: Section 105 case Number MADI-CD-2023-03 Robert Baumann

Operator's Position Statement

Dear MSHA,

We are writing in response to the complaint filed against us regarding the termination of Mr. Robert Baumann for poor performance, lack of leadership skills, and for failure to follow procedures and guidance given by multiple supervisors during his short tenure. We would like to provide our side of the story and explain why we made the decision to terminate Mr. Baumann.

The miner in question had been with our company for less than one year and had been given multiple opportunities to improve his performance. Despite our efforts to help him improve, his performance continued to decline, which ultimately led to his termination.

We have provided documentation and evidence, see my personal notes regarding Mr. Baumann below, that supports our decision to terminate Mr. Baumann and are willing to answer any questions regarding our decision.

In conclusion, we believe that we made the right decision in terminating Mr. Baumann for performance related issues. We take safety very seriously and will continue to do everything in our power to ensure that our employees are working in a safe and productive environment.

Sincerely,

*Russell Tidaback*

Russell Tidaback
American Tripoli



EXHIBIT
3

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page040**
Appellate Case: 25-1349    Page: 40    Date Filed: 04/07/2025 Entry ID: 5503844

Rob Baumann -

26JUL2022 - Jeff states the shaker screen ripped because Rob didn't put bolts back in and just ran it like that. Rob told Miguel that he didn't care and that Miguel needed to get down. Rob shut things down sent everyone home early.

27JUL2022 - Christine states Rob is having the guys run straight 8 hours and bypassing the given break so they can go home earlier. I explained the break should be rotated so we can continue to produce for the 8.5 hours. The breaks are precautionary for employees dust exposure too. MO doesn't require breaks to be given. Plus they are only running bulk bags and that can be done with two people.

1AUG202 - Christine states If Rob cannot get it done, we just need to replace him.

5AUG2022 - Jessie states there is no emphasis for the guys to help him. When he brings it to Rob, he shruggs his shoulders and walks away.

8AUG2022 - Christine wants to bring Rob to first shift as she doesn't believe Rob is doing what he is suppose to be doing without someone overseeing him. We cannot put Jim on nights due to being a single father and a young child at home.

9AUG2022 - Christine thinks we should train someone to replace Rob on the night shift.

16AUG2022 - Advised Christine to counsel Rob regarding shutting down and letting people go earlier than scheduled.

25AUG2022 - Rob needs counseling on filling out the BOL correctly. A shipper complained that he did it wrong and wasted their time.

31AUG2022 - Had discussion with Rob on the importance of inputting the daily production information in the spreadsheet. He said he would log in and get it done.

3SEP2022 - Had discussion with Rob regarding the daily production numbers and updating the spreadsheet accurately. I don't know if he is incompetent or just lazy.

28SEPT2022 - Rob not doing the CILAS reports as required for orders produced.

8OCT2022 - Jessie and Carson were waiting for Rob to get there. Rob was late getting there.

12OCT2022 - Had discussion with Rob regarding notifying and working with Carson to address the maintenance issues. Carson said Rob gets mad at everything and is hard to work with. I explained that getting angry and combative with others is not going to solve the issue any quicker.

13OCT2022 - Had to counsel Rob on following the production schedule as it is presented. He was not producing what was on the schedule. Rob said he didn't like having to check the computer or phone to do his job. I explained that the computer work was part of the role.

17OCT2022 - Had to explain Rob about the flow of the system and asked him why he wasn't reviewing the operating documents in the maintenance team files. His excuse was he didn't like to read on a

Exhibit No 10 Pg No 2

computer.

26OCT2022 - Had to explain to Rob why the MAC vacuum system was spewing dust from the exhaust and that we had to shut the system down so DEQ doesn't get called. Jim states Rob doesn't know what he is doing.

2NOV2022 - John mentioned Rob showing his poor attitude again.

5NOV2022 - Had to get onto Rob about not properly keeping team shift hours correct in Shifts. He was writing them down on scratch paper and forgetting to update shifts. I don't know if he is just lazy or what. I explained that he can do this any time from the computer or his phone.

8NOV2022 - Had to inquire with Rob if he was shutting down early letting people go home early. The systems were showing shut down before the end of the shift.

1DEC2022 - While at AT had a discussion with Rob regarding his lack of attentiveness regarding ensuring the proper things were done with his team. The checklists werent being completed. The inspections werent being completed. The breakroom was a disaster. The fridge was disgusting. The trash wasn't taken out the day before, some of the windows were still open. The production floor was a mess. The back roll up door was off track. The bathroom was disgusting. The circuit breakers in Warehouse A was blocked by slip sheets.

16DEC2022 - Discussion regarding keeping the production team informed of what is expected to produce that day. Rob is lacking in managerial purpose for his team members.

26DEC2022 - Discussion with Rob regarding not meeting the daily production goals, team members complaining that he doesn't know what he is doing and that he just gets angry and stomps around like a child. He isnt a leader and allows his team to push him around. His response was just nodding his head. I stressed filling out the tasking board everyday and making sure the things get done. If he has problems with someone, take it to John and john will get it resolved. Jim blames Rob.

20JAN2023 - Kensley posted in the Ops chat group a pic of dust blowing out the back of the bldg. Again, had to stress to Rob that he needs to watch for any dust blowing out of the building. We cant have the Sheriff or DNR receiving complaints about us. We had to reiterate in the group that is was Robs responsibility to be inputting in the daily production worksheet what was produced each day before he leaves for the day. This wasn't been done.

25JAN2023 - Had to get onto Rob regarding keeping the completed bag inventory up to date. John and I discussed Robs attitude.

28FEB2023 - discussed with Rob about the task board. Starting to think we need to let Rob go. His attitude is one that he doesn't care about getting things done. He jokingly mentioned he liked being paid for not working.

20MAR2022 - Alex Snodgrass hired to eventually replace Rob.

24MAR2023 - Discussion with John regarding Robs push back on stacking the bags today. I believe Robs attitude is infectious. We need Alex to take over for Rob and just let Rob go for performance issues.

30MAR2023 - ATMO Safety discussion with Jessie about ensuring that Rob gets the tasks done. The tasks are established, just not getting enforced by Rob.

5APR2023 - Alex informed us regarding accepting a neurology position at a hospital in Little Rock. Neurology is his degree is in. John and I discussed just letting Rob go.

7APR2023 - John, Jordan and I discussed letting Rob go.

12APR2023 - Time to let Rob go. He is afraid to make the system work and cant meet the simple daily quotas. If Jim can get it done why cant Rob. Need to look at the mill structure again. Jim can run the Mill, we just need to get a manager of people to manage the team. Hopefully, Brian Edwards can do it. He can manage the people, QC, inventory and the reporting. Jim can run the mill. Brian will need to learn how to as a back up to Jim.

14APR2023 - Warned John about an MSHA complaint when we let Rob go. Robs termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associated by utilizing the proper controls, etc. Send John the termination letter.

16APR2023 - Ask Keith about miner pay and withdrawl order. Robs termination letter sent to John.

17APR2023 - Keith replied about withdrawl order pay. Brian Edwards was a no show for the MSHA training.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

## Employee's Handbook Table of Contents

1. Welcome
2. Getting To Know The Company
3. Employment Basics
    1. Employment Contract Types
    2. Equal Opportunity Employment
    3. Recruitment and Selection Process
        1. Background checks
        2. Referrals
    4. Attendance Policy
4. Workplace Policies
    1. Confidentiality and Data Protection
    2. Harassment and Violence
        1. Workplace harassment
        2. Workplace violence
    3. Workplace Safety and Health
        1. Preventative action
        2. Emergency management
        3. Smoking
        4. Drug-free workplace
    4. Expense Approval and Reporting Policy
        1. Purpose of Policy
        2. Scope of Policy
        3. Procedure
5. Associate Code of Conduct
    1. Dress Code
    2. Cyber Security and Digital Devices
        1. Internet usage
        2. Cell phone

CustomerService@AmericanTripoli.com



**Exhibit P-44, Page044**
Appellate Case: 25-1349     Page: 44     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

      3. Corporate email

      4. Social media

  3. Conflict Of Interest

  4. Associate Relationships

      1. Fraternization

      2. Gifts

      3. Employment of relatives

  5. Workplace Visitors

  6. Solicitation and Distribution

6. Compensation & Development

  1. Compensation Status

7. Departmant of Labor & Industrial Relation.

  1. Overtime

  2. Payroll

  3. Performance Management

      1. How we expect managers to lead associates

  4. Associate Training and Development

8. Required Training for certain roles:

9. Benefits And Perks

  1. Retirement

  2. Associate Health

  3. Workers' Compensation

  4. Work From Home

      1. Remote working

  5. Associate Expenses

  6. Company Car

  7. Parking

  8. Company-Issued Equipment

10. Position-Related Clothing Allowance

11. Time

  1. Working Hours

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page045**
Appellate Case: 25-1349      Page: 45      Date Filed: 04/07/2025 Entry ID: 5503844



12. Time Clock for Hourly Employees
    1. Paid Time Off (PTO)
    2. Holidays
    3. Bereavement Leave
    4. Jury Duty and Voting
13. Missouri Juror Info: https://www.courts.mo.gov/page.jsp?id=103118
    1. Parental Leave
        1. Paternity and maternity leave
14. Leaving The Company
    1. Progressive Discipline
    2. Resignation
        1. Tuition or relocation reimbursement
        2. Forced resignation
    3. Termination
    4. References
        1. Resources
15. Policy Revision

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page046**
Appellate Case: 25-1349    Page: 46    Date Filed: 04/07/2025 Entry ID: 5503844



# Welcome

Hello and welcome! Thank you for joining the American Tripoli team, where we strive to emphasize product quality, consistency, and excellent customer service. We can't wait to see what you will achieve with us.

This associate handbook defines who we are and how we work together. We will do everything possible to create a fair and productive workplace, but we need your help. We've created this handbook to guide you.

This handbook isn't a contract or a guarantee of employment. It's a collection of the expectations, commitments, and responsibilities. Please read this associate handbook carefully and consult it whenever you need to.

# Getting To Know The Company

American Tripoli has been in business since 1869. It has been sold and changed ownership numerous times throughout its history. The underlining purpose of the company has not changed through all of this. The company surrounds itself in the basic concept of open-pit mining, processing, manufacturing, advertising, selling, and distributing the product(s).

Make sure you utilize the company website to learn about the product(s) we manufacture and sell.

We are a growing company that will be using all available resources to make this company grow and multiple in not only in gross revenue but also global market share.

# Employment Basics

In this section, we explain the associate contract types and define the basic employment policies.

## Employment Contract Types

Full-time associates work at least 30 hours per week or 120 hours per month on average.

Independent Contractor - common situations may arise when we need for projects of short or specific

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

duration where specialize knowledge or expertise is required or exigent circumstances such as meeting the operational needs when an associate goes on an extended leave of absence. Part-time associates are those who work fewer than 30 hours per week.

Full-time and part-time associates can have either temporary or indefinite duration employment contracts. Full-time associates under an indefinite duration contract are entitled to the company's medical and dental benefits package after their first 90-day employment period.

We remind you that, in the U.S., employment is "at-will". This means that you or the company may terminate the employment relationship at any time and for any non-discriminatory reason(s).

# Equal Opportunity Employment

American Tripoli is an equal opportunity employer. We don't tolerate discrimination against protected characteristics (gender, age, sexual orientation, race, nationality, ethnicity, religion, disability, veteran status). We want all associates to treat others with respect and professionalism. In practice, this means that we:

- Hire and promote people based on skills, experience or potential and try to reduce bias in every process (e.g. through structured interviews.)

- Make accommodations to help people with disabilities move about safely on the premises and use the products, services, and equipment.

- Use inclusive, diversity-sensitive language in all official documents, signs and job ads.

- Conduct diversity and communication training.

Apart from those actions, we commit to penalizing every discriminatory, offensive, or inappropriate behavior. To do this properly, we ask you to report any discriminatory action against yourself or your colleagues to your manager. If it is your manager, report it to their manager. The company will not retaliate against you if you file a complaint or discrimination lawsuit. Any associate who retaliates or discriminates will face disciplinary action.

# Recruitment and Selection Process

The hiring steps might vary across roles, but we always aim for a process that is fair and effective in hiring great people. As a Department Manager, If you are hiring for an open role, you will likely go through these steps:

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

I.     Identify the need for a new job opening.

II.     Decide whether to hire externally or internally.

III.     Review job descriptions and write a job ad.

IV.     Get approval from Senior Management for your job ad.

V.     Select appropriate sources (external or internal) to post your job opening.

VI.     Decide on hiring stages and possible timeframes.

VII.     Review resumes in the company database.

VIII.     Source passive candidates.

IX.     Shortlist applicants.

X.     Screen and interview candidates.

XI.     Run background checks and check references.

XII.     Select the most suitable candidate.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page049**
Appellate Case: 25-1349    Page: 49    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457



XIII. Make an official offer.

Steps may overlap, so skip steps when appropriate. Each member of a hiring team might have different responsibilities (e.g. recruiters source and hiring managers interview candidates.)

Throughout this process, we aim to keep candidates informed, communicate well with each other, and give everyone an equal opportunity to work with us. Ask the recruiters for help whenever you need to enhance candidate experience or write an inclusive job description.

## Background checks

If you want to run background checks on candidates, ask the Operations Manager for guidance. This process is sensitive, and we must always abide by laws and ensure candidates understand the intentions. As a rule, commission a background check for finalists only. Use the contracted provider and ensure you have your candidates' permission.

## Referrals

If you know someone who you think would be a good fit for a position at the company, feel free to refer them. If we end up hiring your referred candidate, you are eligible for $600 referral bonus. The associate referral rewards may be higher if we hire your referred candidate in a hard-to fill role. For example, if we hire your referral for the position of Manager, you may receive $1200.

## Additional rules for rewards:

- Reward payout schedule is 1/3 within a month of the date we hired a referred candidate. Second 1/3 at the completion of the referred candidates first 180 days of employment. If Candidate quits, resigns, or is terminated for any reason before the completing first 180 days of employment the second ½ reward is provided. Final 1/3 at the completion of the referred candidates first 360 days of employment. If Candidate quits, resigns, or is terminated for any reason before the completing first 360 days of employment the second and or final 1/3 reward is provided

CustomerService@AmericanTripoli.com



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- There is no cap on the number of referrals an associate can make.
- If two or more associates refer the same candidate, only the first referrer will receive the referral incentives.
- Candidates can only be referred once; all referrals are recorded.
- Referrers are still eligible for rewards even if a candidate is hired later for same position. It is the referrers responsibility to keep a record of who they refer and when. Any discrepancy, results go to the company.

Who can be referred?

We have two conditions for candidates who can qualify you for the rewards. They should:

- Have not applied to the company before
- Be hired as permanent full- or part-time associates (not as temporary associates or contractors

The company may use an online form or a platform where associates may refer candidates. You can also reach out directly to your Manager with referrals. Generally, we encourage you to check the open positions and consider your social networks and external networks as potential resources for referred candidates. Keep in mind that rewards may be subject to taxation. Please contact your Manager for more information.

## Attendance Policy

Team Members' absence/ tardiness will be assessed using a points system. This points system starts after the first 90 days of employment. The occurrence of point 1 is forgiven, the occurrence of point 2 is a verbal warning, the occurrence of point 3 is a "written" warning, and the occurrence of point 4 results in termination. This point system resets every year, for example, if a Team Member started work on March 1st, their 90-day mark would be May 30th and they would begin the points system. Any points accrued between May 30th and May 29th of the following year would drop off, and the Team Member would restart with 0 points on May 30th that next year.

Absences count as points when they are non-approved and non-PTO. Unexpected absences still count as points, even if the Team Member notifies their manager prior to the start of the shift. Missed work without notification is a serious offense. More than 2 days in a row missed without giving notification will result in immediate termination.

Tardiness over 15 minutes will be counted as 0.5 points. Leaving work early or for some time during the day is also generally 0.5 points, but will be counted as 1 full point, if more than 2 hours of work are

CustomerService@AmericanTripoli.com



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

missed. Excessive tardiness where less than 15 minutes of work is missed can still be grounds for termination.

If an emergency occurs, Team Members are allotted 2 emergency days per year. These are days missed for good reason that will not count as points. The year for emergency days works the same as the year for points, starting at the 90th day of employment.

Overtime, not to exceed 50 hours per week, may be required. If overtime is required, Team Members will be given at least 2-day notice. Required overtime is considered working hours, and the points system will still apply. Volunteers may be taken for overtime work that comes up without a 2-day notification.

Absences within the first 90 days of employment are more serious. More than one absence within the first 90 days may be grounds for termination, depending on the situation.

# Workplace Policies

This section describes policies that apply to everyone at the company: associates, contractors, volunteers, vendors, and stakeholders alike. These policies help us build a productive, lawful, and pleasant workplace.

## Confidentiality and Data Protection

We want to ensure that private information about clients, associates, partners, and the company is well-protected. **Examples of confidential information are:**

- Associate records
- Unpublished financial information
- Data of customers/partners/vendors
- Customer lists (existing and prospective)
- Unpublished goals, forecasts and initiatives marked or unmarked

As part of the hiring process, we will ask you to sign non-compete and non-disclosure agreements (NDAs.) We are also committed to:

- Restrict and monitor access to sensitive data.
- Develop transparent data collection procedures.
- Train associates in online privacy and security measures.
- Build secure networks to protect online data from cyberattacks.
- Unpublished goals, forecasts and initiatives marked or unmarked

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page052**
Appellate Case: 25-1349     Page: 52     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

We also expect you to act responsibly when handling any company internal information and treat it all as confidential information.

**You must:**

- Lock or secure company information at all times.
- Make sure you view confidential information on secure devices only.
- Only disclose information to other associates when it's necessary and authorized.
- Keep confidential documents inside the company's premises unless it's necessary to move them.
- There should be NO or absolute minimal printing of anything. Printing is ONLY allowed for customer shipping documents or for MSHA documentation (since they like to have a hard copy on each inspection).
- If you acquire a receipt from a purchase, delivery, mail, etc., scan the document into the system. The easiest method to do this is by using your cellphone's camera to take a picture, then upload the picture straight into the respective folder in Teams or by using the scanner in the admin building. Once you have verified the receipt is scanned and stored online, throw the paper copy away.
- We do not want paper copies of anything. We want a digital copy of every document. We want the administration of the business to be as lean as we possibly can. We want all documentation stored online. 100% no paper office is the goal. This is very important, and we cannot stress this enough. We want the assurance that if something such as a flood, a fire, a tornado, or we build a new mill building we will not be lost or struggling to quickly break from the Seneca location.
- It is your responsibility to preserve, scan, verify and store the documentation in the approved file storage provided.

**You must not:**

- Use confidential information for your personal benefit or profit.
- Disclose confidential information to anyone outside of the company.
- Replicate confidential documents and files and store them on insecure devices.

This policy is important for the company's legality and reputation. We will terminate any associate who breaches the confidentiality guidelines for personal profit and seek legal recourse. We may also

CustomerService@AmericanTripoli.com

Exhibit P-44, Page053

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

discipline any unintentional breach of this policy depending on its frequency and seriousness. We will terminate associates who repeatedly disregard this policy, even when they do so unintentionally.

# Harassment and Violence

To build a happy and productive workplace, we need everyone to treat others well and help them feel safe. Each of us should do the part to prevent harassment and workplace violence.

**Workplace harassment**

Harassment is a broad term and may include seemingly harmless actions, like gossip. We can't create an exhaustive list, but here are some instances that we consider harassment:

- Sabotaging someone's work on purpose.
- Commenting derogatorily on a person's ethnic heritage, religious beliefs, or sexual preference.
- Train associates in online privacy and security measures.
- Starting or spreading rumors about a person's personal life.
- Ridiculing someone in front of others or singling them out to perform tasks unrelated to their job (e.g. bringing coffee) against their will.

Sexual harassment is illegal, and we will seriously investigate relevant reports. If an associate is found guilty of sexual harassment, they will be terminated immediately.

If you're being harassed, whether by a colleague, customer, or vendor, you can choose to talk to any of these people:

- Offenders. If you suspect that an offender doesn't realize they are guilty of harassment, you could talk to them directly to resolve the harassment. This tactic is appropriate for cases of minor harassment (e.g., inappropriate jokes between colleagues). It may not seem inappropriate to those in the conversation where it is being said but can be inappropriate to those overhearing the conversation).

- Your manager. If customers, vendors, or team members are involved in your claim, you may reach out to your manager. Your manager will assess your situation

**Exhibit P-44, Page054**
Appellate Case: 25-1349    Page: 54    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Senior Management. Feel free to reach out to Senior Management in any case of harassment no matter how minor it may seem. For your safety, Senior and may his/her manager if appropriate.
- Starting or spreading rumors about a person's personal life.
- Ridiculing someone in front of others or singling them out to perform tasks unrelated to their job (e.g. bringing coffee) against their will.

Management as soon as possible in cases of serious harassment (e.g., sexual advances) or if your manager is involved in your claim. Anything you disclose will remain confidential.

**Workplace violence**

Violence in the workplace is a serious form of harassment. It includes physical and sexual assault, destruction of property, threats to harm a person or property and verbal and psychological abuse. We want to avoid those incidents altogether, but we also want to be ready to respond if needed.

For this reason, we ask you to:

- Report to Senior Management if you suspect or know that someone is being violent. Your report will be confidential, and we will investigate the situation with discretion
- Call 911 if you witness incidents of severe physical violence (e.g., ones that involve a lethal weapon.) For your safety, avoid getting involved.

We will treat associates who verbally threaten others as high risk and they will receive an appropriate penalty. If Senior Management finds that an associate commits an act of violence, we will terminate that associate and seek to press criminal charges. Associates who damage property deliberately will be solely responsible for paying for it.

Supporting victims:

**Exhibit P-44, Page055**
Appellate Case: 25-1349     Page: 55     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

To support victims of workplace violence, we may, provide victims with the lawyer's services to help them file lawsuits.

Get help early on :

Seek help from others early on to mitigate conflicts. For example:

- If you experience conflicts with a colleague, ask your manager for advice before tensions escalate. If these conflicts persist, ask Senior Management whether you could attend conflict resolution seminars with your colleague.

- If you are experiencing personal or work troubles, ask for help from a mental health professional. Check with your insurance provider to determine whether cover any mental health services. Your discussions will remain confidential.

The workplace is founded on mutual respect, and we won't allow anyone to compromise this foundation.

## Workplace Safety and Health

The company is committed to creating a hazard-free workplace. To this end, we will ensure workplace safety through preventative action and emergency management.

**Preventative action**

Preventative actions are any actions we take to avoid injuries or illnesses related to the workplace. We will periodically conduct risk assessments and job hazard analyses through a workplace safety committee to uncover health risks to associates. And we will establish preventative measures to address risks accordingly

At a minimum, we will:

- Hold associate training sessions on safety standards and procedures

CustomerService@AmericanTripoli.com



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

- Make sure associates who work in dangerous locations are safe.

- Provide protective gear like gloves, protective uniforms and goggles.

- Direct inspectors and quality control associates to evaluate equipment and infrastructure regularly.

We also expect you to take safety seriously. Always use protective equipment and follow standards whenever necessary. If you deliberately disregard the guidelines, we may terminate you for your own and others' safety.

### Emergency management
Emergency management refers to the plan to deal with sudden catastrophes like fire, floods, earthquakes, or explosions. The emergency management provisions include:

- Functional smoke alarms and sprinklers that are regularly inspected.

- Technicians (external or internal) available to repair leakages, damages, and blackouts quickly.

- Fire extinguishers and other fire protection equipment that are easily accessible. An evacuation plan posted on each floor and online.

- Fire escapes and safety exits that are clearly indicated.

### Smoking
American Tripoli is a smoke-free workplace. You can smoke in designated smoking areas and outer premises, like sidewalks. Any other area in the workplace (like restrooms, lobby, offices, staircases, warehouses) is strictly smoke-free to protect non-smokers.

### Emergency management
Emergency management refers to the plan to deal with sudden catastrophes like fire, floods, earthquakes, or explosions. The emergency management provisions include:

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page057**
Appellate Case: 25-1349    Page: 57    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

We also advise you to:

- Extinguish your cigarettes and discard them appropriately.

- Avoid smoking when you have scheduled meetings.

- Avoid smoking near flammable objects and areas.

Setting off fire alarms and causing fires by smoking are serious offenses. If you are found responsible, you may face disciplinary action up to and including termination.

**Drug-free workplace**

American Tripoli is a drug-free workplace. Whether you are an associate, contractor, or visitor, you must not bring, use, give away or sell any drugs on company premises. If you are caught with illegal drugs or show that you are under the influence of substances, you will face disciplinary action up to and including termination.

A list of prohibited drugs and substances includes, but isn't limited to, in any form:

- Heroin .

- Cocaine

- Methamphetamine

Alcohol:

We prohibit associates from consuming alcohol during working hours, but they may consume alcoholic drinks in moderation at company events.

Prescription drugs:

If you feel that a prescription drug (e.g. an anxiety mediation) unexpectedly affects your senses, thinking or movement, ask for the rest of your day off. If your manager suspects substance abuse, you may face disciplinary action.

You MUST NOT use medical marijuana in the workplace. We have the right to terminate you if your off duty use of medical marijuana makes you unable to complete your job duties correctly.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page058**

Appellate Case: 25-1349     Page: 58     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

We expect associates who hold safety-sensitive jobs (e.g., machine operators or drivers) to be fully alert and capable of always performing their duties. We may terminate you if we conclude your prescription drug use creates severe safety risks. If you need to use prescription drugs for a limited time and you think they may impair your abilities, use your PTO.

If your job includes secondary tasks that are safety-sensitive and your prescribed drugs affect your ability to perform these tasks, we can make reasonable accommodations to ensure you and your colleagues' safety. If your job includes secondary tasks that are safety-sensitive and your prescribed drugs affect your ability to perform these tasks, we can make reasonable accommodations to ensure you and your colleagues' safety.

Dealing with addiction :
Being sober is a prerequisite to thriving at the company and we want to help you as much as possible.

We won't tolerate substance addiction that results in violent, offensive, or inappropriate behavior.

# Expense Approval and Reporting Policy

**Purpose of Policy**
This policy outlined applies to all employees who spend money on work-related activities. It is used to standardize the procedure for getting pre-approval, making payments, and submitting documentation for work-related expenses.

**Scope of Policy**
**This policy applies to the following expense types:**

- Immediate expenses necessary for daily operations.

- Procurement for non-immediate needs

- Service providers and other specific expenses

- Expenses needing reimbursement

**Procedure**

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page059**
Appellate Case: 25-1349    Page: 59    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

**The approval process for immediate expenses necessary for daily operations:**

- Expenses under $50 may be purchased without pre-approval.

- Expenses over $50 should be submitted to the Operations Manager via Teams direct message for approval BEFORE purchase.

- The Operations Manager will then submit the expense request to a Managing Member.

- The Managing Member will communicate the approval or denial of the request to the Operations Manager, who will share it with the team member who requested the expense.

**The approval process for non-immediate procurement needs:**

- Expenses of this type require a quote from THREE DIFFERENT VENDORS.

- All vendor quotes and the selected vendor should be submitted to the Operations Manager via Teams..

- The Operations Manager will communicate with the Manager Member for approval of these expenses.

- The Operations Manager will share the approval or denial of the expense with the requesting team member. The Managing Member may also be a part of this communication..

CustomerService@AmericanTripoli.com



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

## Documentation process for all expenses once approved:

- The requestor should communicate the approved requests to the Front Desk Team Member who will create a PO.

- Receipts for expenses purchased via credit card, including those under $50, should be signed and submitted to the Front Desk Team Member within 24 hours.

- Receipts or invoices with PO numbers will be scanned or saved by the Front Desk Team Member and added to Teams in the appropriate folder.

## Service providers and other specific expenses:

- Service providers that require payment at the time of service should be approved BEFORE BOOKING to ensure payment is available at that time.

- Using service providers for non-immediate needs should follow the same process as the other non-immediate expenses. Therefore, three quotes are needed..

- Immediate need service providers charging via invoice will be documented by the Front Desk Team Member.

- Non-immediate expenses of goods that cannot be purchased from more than one location still need approval and to follow the same process, but only one quote is required.

## Expenses needing reimbursement:

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page061**
Appellate Case: 25-1349     Page: 61     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Expenses needing reimbursement may include expenses purchased before receiving a company-issued credit card or mileage reimbursement, among other things.

- All vendor quotes and the selected vendor should be submitted to the Operations Manager via Teams..

- Expenses of this kind require PRE-APPROVAL, following the same approval process as other expenses.

- Documentation of these expenses, which must have receipts, should be documented by the team member responsible for the charges and submitted to the Front Desk Team Member for reimbursement via check once per month.

# Associate Code of Conduct

As an associate, all company policies mentioned above apply to you. We have some additional expectations about your behavior at work, which we outline here. We can't cover every single case of conduct, but we trust you to always use your best judgement. Reach out to your manager if you face any issues or have any questions.

## Dress Code

The company's official dress code is casual. This includes shoulder covered t-shirts, shorts no shorter than mid-thigh and open toed shoes (admin staff only). However, an associate's manager may also inform how they should dress. If you frequently meet with clients or prospects, conform to a more formal dress code. If you work in the Mill/Plant or the Quarry you are required to wear appropriate clothing with safety first in mind and as directed by your manager. We expect you to be clean when coming to work and avoid wearing clothes that are unprofessional (e.g., workout clothes, holes in clothing, tank tops, revealing or dirty, smelly clothing.) Dress code is ultimately the responsibility of the department manager.

## Cyber Security and Digital Devices

This section deals with all things digital at work. We want to set some guidelines for using computers, phones, the internet connection, and social media to ensure security and protect the assets.

### Internet usage

The corporate internet connection is primarily for business. But you can occasionally use the connection for personal purposes as long as they don't interfere with your job responsibilities. Also, we expect you to temporarily halt personal activities that slow down the internet connection (e.g., uploading photos) if you're asked to.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page062**
Appellate Case: 25-1349     Page: 62     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

You MUST NOT use the internet connection to:

- Stream music or videos.

- Make or receive personal video calls.

- Send confidential information to unauthorized recipients.

- Invade another person's privacy and gain access to sensitive information.

- Download or upload pirated movies, music, material, or software.

- Visit potentially dangerous websites that can compromise the network and computers' safety.

- Perform unauthorized or illegal actions, like hacking, fraud or buying/selling illegal goods.

## Cell phone

We allow use of cell phones at work. But we also want to ensure that your devices won't distract you from your work or disrupt the workplace. We ask you to follow a few simple rules:

- Use your cell phone in a manner that benefits your work (business calls, productivity apps, calendars).

- Keep personal calls brief and use an empty meeting room or common area so as not to disturb your colleagues.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page063**
Appellate Case: 25-1349     Page: 63     Date Filed: 04/07/2025 Entry ID: 5503844



- Avoid playing games on your phone or texting excessively.

- Avoid using your phone for any reason while driving a company vehicle.

- Don't use your phone to record confidential information.

Also, you must not use your phone in areas where cell phone use is explicitly prohibited (e.g. laboratories, meetings, driving company vehicles, or operating company equipment.)

**Corporate email**
Email is essential to the work. You should use your company email primarily for work, but we allow some uses of your company email for personal reasons.

- Work-related use. You can use your corporate email for work-related purposes without limitations. For example, you can sign up for newsletters and online pservices that will help you in your job or professional growth.

- Personal use. You can use your email for personal reasons if you keep it safe and avoid spamming and disclosing confidential information. For example, you can send emails to friends and family and download eBooks, guides, and other safe content for your personal use.

The general expectations
No matter how you use your corporate email, we expect you to avoid:

- Signing up for illegal, unreliable, disreputable, or suspect websites and services.

- Sending unauthorized marketing content or emails.

- Registering for a competitor's services, unless authorized.

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Sending insulting or discriminatory messages and content.

- Intentionally spamming other people's emails, including your coworkers.

In general, use strong passwords and be vigilant in catching emails that carry malware or phishing attempts. If you are not sure that an email you received is safe, ask the IT support team.

**Social media**

We want to provide practical advice to prevent careless use of social media in the workplace.
We address two types of social media uses: using personal social media at work and representing the company through social media.

**Using personal social media at work**

You are permitted to access your personal accounts at work. But we expect you to act responsibly, according to the policies and ensure that you stay productive. Specifically, we ask you to:

- Discipline yourself. Avoid getting sidetracked by your social platforms.

- Ensure others know that your personal account or statements don't represent the company. For example, use a disclaimer such as "opinions are my own."

- Avoid sharing intellectual property (e.g. trademarks) or confidential information. Ask your manager first before you share company news that's not officially .

- Avoid any defamatory, offensive, or derogatory content. You may violate the company's anti-harassment policy if you direct such content towards colleagues, clients, or partners.

**Representing the company through social media**

If you handle the social media accounts or speak on the company's behalf, we expect you to protect the company's image and reputation. Specifically, you should:

- Be respectful, polite, and patient.

- Avoid speaking on matters outside your field of expertise when possible."

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page065**
Appellate Case: 25-1349    Page: 65    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Follow the confidentiality and data protection policies and observe laws governing copyrights, trademarks, plagiarism, and fair use.

- Coordinate with the Marketing department when you're about to share any major-impact content.

- Avoid deleting or ignoring comments for no reason.

- Correct or remove any misleading or false content as quickly as possible

## Conflict Of Interest

When you are experiencing a conflict of interest, your personal goals are no longer aligned with your responsibilities towards us. For example, accepting a bribe may benefit you financially, but it is illegal and against the business code of ethics. If we become aware of such behavior, you will lose your job and may face legal trouble.

For this reason, conflicts of interest are a serious issue for all of us. We expect you to be vigilant to spot circumstances that create conflicts of interest, either to yourself or for your direct reports. Follow the policies and always act in the company's best interests. Whenever possible, do not let personal or financial interests get in the way of your job. If you are experiencing an ethical dilemma, talk to your manager and we will try to help you resolve it.

## Associate Relationships

We want to ensure that relationships between associates are appropriate and harmonious. We outline the guidelines, and we ask you to always behave professionally.

### Fraternization

Fraternization refers to dating or being friends with your colleagues. In this policy, "dating" equals consensual romantic relationships and sexual relations. Non-consensual relationships constitute sexual violence, and we prohibit them explicitly.

### Dating colleagues

If you start dating a colleague, we expect you to maintain professionalism and keep personal discussions outside of the workplace.

You are also obliged to respect your colleagues who date each other. We won't tolerate sexual jokes,

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

malicious gossip, and improper comments. If you witness this kind of behavior, please report it your Manager or Senior Management.

## Dating managers

To avoid accusations of favoritism, abuse of authority and sexual harassment, supervisors must not date their direct reports. This restriction extends to every manager above an associate.

Also, if you act as a hiring manager, you aren't allowed to hire your partner to your team. You can refer them for employment to other teams or departments where you don't have any managerial or hiring authority.

## Friendships at work

Associates who work together may naturally form friendships either in or outside of the workplace. We encourage this relationship between peers, as it can help you communicate and collaborate. But we expect you to focus on your work and keep personal disputes outside of the workplace.

## Gifts

Nothing valued at more than $25 from a customer, vendor, or other third party can be accepted by an associate. Gifts are allowed but "significantly expensive ones, greater than $25" must be reported to HR. Guidelines say no gifts can be solicited, and only gifts of minimal value can be accepted.

## Employment of relatives

Everyone in the company should be hired, recognized, or promoted because of their skills, character, and work ethic. We would not like to see phenomena of nepotism, favoritism, or conflicts of interest, so we place some restrictions on hiring associates' relatives.

To the company, a "relative" is related by blood or marriage within the third degree to an associate. This includes parents, grandparents, in-laws, spouses or domestic partners, children, grandchildren, siblings, uncles, aunts, nieces, nephews, stepparents, stepchildren and adopted children.

As an associate, you can refer your relatives to work with the company. Here are the only restrictions:

- You must not be involved in a supervisory/reporting relationship with a relative.

- You cannot be transferred, promoted, or hired inside a reporting relationship with a relative.

- You cannot be part of a hiring committee, when your relative is interviewed for that position.

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

If you become related to a manager or direct report after you both become employed by the company, we may have to transfer one of you or transfer report responsibility.

## Workplace Visitors

If you want to invite a visitor to the offices, please ask for permission from your manager first. Your manager will need to notify the Operations Manager. Also, inform the front office/reception area of your visitor's arrival. Visitors are required to sign in and show identification. You will be asked to return your visitors to front office and have them sign out once their visit is complete.

When you have office visitors, you also have responsibilities. You will be responsible for:

- Always tend to your visitors, especially when they are underage, Never leave a visitor unattended, anywhere on company property, inside or outside the building

- Keep your visitors away from areas where there are dangerous machines, chemicals, confidential records, or sensitive equipment.

- Prevent your visitors from proselytizing your colleagues, gathering donations, or requesting participation in non-company related activities while on the premises.

Anyone who delivers orders, mail or packages for associates should remain at the admin building's reception area. If you are expecting a delivery, the front office will notify you so you may collect it.

## Solicitation and Distribution

Solicitation is any form of requesting money, support or participation for products, groups, organizations or causes which are unrelated to the company (e.g. religious proselytism, asking for petition signatures.) Distribution means disseminating literature or material for commercial or political purposes.

We don't allow solicitation and distribution by non-associates in the workplace. As an associate, you may solicit from your colleagues only when you want to:

- Ask colleagues to help organize events for another associate (e.g., adoption/birth of a child, promotion, retiring).

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Seek support for a cause, charity or fundraising event sponsored, funded, organized, or authorized by the company.

- Invite colleagues to associate activities for an authorized non-business purpose (e.g., recreation, volunteering.)

In all cases, we ask that you do not disturb or distract colleagues from their work.

# Compensation & Development

In this section, we outline the guidelines for compensating associates according to their employment status. We also describe the performance management and associate development policies.

## Compensation Status

Department of Labor & Industrial Relation.

General for further details.

There are two types of associates under FLSA guidelines:

- Non-exempt associates, who are covered by the FLSA's minimum wage and overtime provisions.

- Exempt associates, who aren't covered by the FLSA because they meet three exemption criteria: (a) they are paid at least $23,600 per year ($455 per week), (b) they are paid on a salary basis, and (c) they perform exempt job duties ("executive," "professional" and "administrative.") Most associates must meet all three criteria to be exempt.

If you are unsure as to whether you should be exempt or not, please ask your manager to clarify your status.

The FLSA excludes some types of jobs (e.g. railroad workers, truck drivers) because they are covered by other federal laws. Some other workers, like outside salespeople, are excluded. Feel free to ask your manager for clarifications any time.

CustomerService@AmericanTripoli.com

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

## Overtime

Occasionally, we may need you to work more than your regular working hours. The US Fair Labor Standards Act (FLSA) states unless exempt, employees must receive overtime (OT) pay for hours worked over 40 in a workweek at a rate not less than time and one-half their regular rates of pay.

It is a supervisory responsibility to justify and reduce costs everywhere possible. Therefore, it is at the supervisor's discretion to offer the opportunity for an associate to work for overtime pay. The supervisor should be managing the workload across the team members to avoid burnout.

No overtime is automatically authorized. Any requested overtime is required to get written prior approval with both the requesting department manager and senior management signatures. Any department manager submitting a timesheet with OT on it will need to provide the admin office team with the signed authorized OT letter.

If you are an exempt associate, you are not entitled to overtime pay by federal law. If an exempt associate must work overtime, we will set a cap for overtime hours at 10 hours per week to prevent overworking and burnout.

If you are a non-exempt associate, you are entitled to overtime pay of one and a half times your wage. Please record your overtime hours accurately, so we can calculate your pay correctly. We also ask you to work overtime only after its authorized by your supervisor to make the record-keeping easier.

Am I an exempt employee? In summary, to be an exempt employee must (a) be paid at least $23,600 per year, and (b) be paid on a salary basis, and also (c) perform exempt job duties. These requirements are outlined in the FLSA Regulations (promulgated by the U.S. Department of Labor).

## Payroll

For hourly and salary associates, wages are paid biweekly by direct deposit. Please notify your manager if your banking information has changed.

## Performance Management

**We have built the performance management practices to:**

- Ensure you understand your job responsibilities and have specific goals to meet.

- Provide you with actionable and timely feedback on your work.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page070**
Appellate Case: 25-1349    Page: 70    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Invest in development opportunities that help you grow professionally.

- Recognize and reward your work in financial or non-financial ways (e.g. associate awards.)

**To meet these objectives, we have:**

- Established quarterly performance reviews. During these reviews, your manager will fill out your performance report and arrange a one-on-one meeting with you to discuss it. Through these discussions, managers aim to recognize associates who are good at their jobs, identify areas of improvement and talk about career moves. Pay increases or bonuses are not guaranteed. But we encourage managers to recommend rewards for their team members when they deserve them. There won't be any forced ranking or other comparison between associates, as the goal is to help all associates improve and develop their careers.

- All managers have been instructed to meet with their team members once per month to provide feedback and talk about their work and motivations. These usually are informal and unscheduled. This way, you can receive feedback in a timely manner and avoid surprises during your quarterly performance preview. If an associate feels that they need feedback they should ask their manager for additional feedback.

**How we expect managers to lead associates**

If you manage a team, you are responsible for your team members' performance. To conduct effective regular meetings and performance evaluations, we expect you to:

- **Set clear objectives**. Your team members should know what you expect of them. When you first hire someone to your team, ensure they understand their job duties. Set

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page071**

Appellate Case: 25-1349     Page: 71     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

specific goals for each team member (and team-wide if applicable.) Revisit those goals during quarterly performance reviews.

- **Provide useful feedback**. During scheduled meetings with your team members, give them both guidance and praise, as appropriate. Be fair and specific to help them understand and implement your feedback.

- **Keep your team members involved**. There should be two-way communication between you and your team. Make your expectations clear, but always take your team members' motivations and aspirations into account. Discuss training and development opportunities that may interest your team members.

- **Keep detailed online notes with important incidents about each one of your team members**. These notes help you evaluate your team, but may also prove useful when rewarding, promoting, or terminating your team members.

## Associate Training and Development

We owe the success to the associate's. To show the gratitude, we want to invest in the associate's professional development. We want associates to feel confident about improving their efficiency and productivity. We also want to help the associates achieve personal growth and success.

We will match up to $500 annually for each associate to spend on educational activities or material. Talk with your manager about this as the educational activity or material must be beneficial to your position and/or development plan. E.g., if you are a quarry associate it would not be beneficial for your position to be requesting history or art classes.

**Apart from online courses, we offer these training opportunities:**

- Formal training sessions

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page072**
Appellate Case: 25-1349    Page: 72    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Associate coaching and mentoring.

- Seats at industry conferences.

- On-the-job training

- Job shadowing

- Job rotation

Development is a collective process. Team members and managers should regularly discuss learning needs and opportunities. And it is your managers responsibility to facilitate any development activities and processes.

Required Training for certain roles:
MSHA CFR 30 Part 48(b) Training and Retraining of Miners

# Benefits And Perks

In this section, we describe what we offer to the associates. We provide information on the health insurance plans and benefits like work from home options and company issued equipment.

## Retirement

The company wants to help you invest in your future as you grow with the company. You can join the American Tripoli 401(k) plan once you work 90 days during a 12 month period with the company. Additionally, the company offers employer matching on your 401(k) contributions up to 5%. The company will make a matching contribution in an amount equal to a percentage of your salary deferrals, the specified matching percentage for the corresponding level of your salary deferrals as shown in the following table. However, any salary deferrals that are "catch-up contributions" will not be matched. Please speak with your manager about enrolling in the 401(k) plan or scheduling time with our plan administrator to discuss how much to contribute or how to invest.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page073**
Appellate Case: 25-1349     Page: 73     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

| Salary Deferral Tier | Match |
|---|---|
| First 4 | |
| Next 2 | |

## Associate Health

American Tripoli offers medical and dental insurance. Eligible employees may participate in either plan or both plans subject to all terms and conditions of the agreement between American Tripoli and the insurance carrier. A change in employment classification that would result in loss of eligibility to participate in the plan(s) may qualify an employee for benefits continuation under the Consolidated Omnibus Budget Reconciliation Act (COBRA).

<u>Dental Plan – Mutual of Omaha</u>

<u>Medical Plan – Anthem</u>

American Tripoli currently offers the following insurance premium coverage. This is for the total premiums, not for each insurance premium. For additional questions about the insurance package, talk with your manager.

| Contribution | Single Coverage |
|---|---|
| Employer Premium Contribution | 83% |
| Employee Premium | 17% |

You must submit your insurance enrollment form(s) for before your 90th day of employment with American Tripoli to join the insurance plans. Once you have reached your 90th day, your insurance should become effective on that date, unless notified otherwise. Failure to submit the appropriate

CustomerService@AmericanTripoli.com

Exhibit P-44, Page074

Appellate Case: 25-1349     Page: 74     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

forms before your 90th day will require you to wait until the open enrollment period to enroll on the insurance plans.

If you need health insurance before your 90th day or need it before the open enrollment period, please contact Natalie Miller, Natalie.Miller@HealthMarkets.com, (816) 868-6350. She will be able to discuss individual plan options available to you.

American Tripoli will annually review employee/employer contributions against the Kaiser Family Foundation Employer Health Benefits Report[1] for the physical year to provide employees the best benefits.

## Workers' Compensation

We strive to keep the workplace safe, but accidents may happen occasionally. Associates who are injured at work can receive wage replacement, medical care, and rehabilitation benefits according to workers' compensation laws, when appropriate. Please inform your manager of your injury as soon as possible. Ask your manager for forms that you need to file a claim or contact your state agency for workers' compensation.

The company has a workers' compensation policy according to guidelines of the state of Missouri.

## Work From Home

If your position doesn't require you to be present at the premises, you can occasionally work from home (WFH). We normally allow one day per week, with manager approval. If you need to telecommute for more days per week, talk to your manager.

Please inform your manager that you want to work from home at least one week in advance. You can also set a recurring WFH day per week. If there's a rare emergency, you may work from home without having received prior approval but call or email your manager as soon as possible.

When you are working from home, please use an internet connection and devices that are fast and secure. Choose a place without loud noises or distractions. And check in with your manager frequently to make collaboration easier.

If there is inclement weather (e.g., a blizzard) please check your Teams account to see if the office is officially closed. If you judge that your commute during inclement weather is dangerous, let your manager know. We will not force you to come to work if your safety is at stake or if there is an official travel warning.

### Remote working

Remote working refers to working from a non-office location on a temporary or permanent basis.

If you're an office-based associate, you may work remotely for a maximum of two consecutive weeks per year. You may arrange this if you are a new parent or suffer from a short-term disability. If you have another reason, talk to your manager. Submit your remote working requests through your

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page075**
Appellate Case: 25-1349    Page: 75    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

manager at least one week in advance.

If you're an office-based associate, you may work remotely for a maximum of two consecutive weeks per year. You may arrange this if you are a new parent or suffer from a short-term disability. If you have another reason, talk to your manager. Submit your remote working requests through your manager at least one week in advance.

If you work remotely permanently, we ask that you adhere to the security, confidentiality, and equal opportunity policies just like your office-based colleagues.

## Associate Expenses

There are some expenses that we will pay directly on your behalf (e.g., hotel rooms for work-related travel.) But we ask you to keep track and report on those reimbursable expenses that you pay yourself. We reimburse associate expenses that are related to:

- Business travel

- Relocation

- Education and training

- Upon approval, outings with business partners or colleagues

- We use the General Services Administration (GSA) per diem rates, excluding incidentals.

To review rates: **https://www.gsa.gov/travel/plan-book/per-diem-rates**

Not all travel expenses are reimbursable. For example, we will pay for your transportation to an airport for work-related travel, but not to a museum for a personal visit. Before traveling for business, ask your manager to clarify which expenses are reimbursable within your trip.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page076**
Appellate Case: 25-1349    Page: 76    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Please keep an online copy of receipts for all reimbursable expenses. You can submit them to your manager within 5 business days after the date of each expense. If your manager approves your expenses, you will receive your reimbursement within two pay periods by check.

Remote working refers to working from a non-office location on a temporary or permanent basis.

If you're an office-based associate, you may work remotely for a maximum of two consecutive weeks per year. You may arrange this if you are a new parent or suffer from a short-term disability. If you have another reason, talk to your manager. Submit your remote working requests through your manager at least one week in advance.

If you work remotely permanently, we ask that you adhere to the security, confidentiality, and equal opportunity policies just like your office-based colleagues.

## Company Car
**You may drive a company car if you:**

- Need it as an indispensable part of your job (e.g., truck drivers and delivery drivers).

- Receive it as a benefit attached to your position.

Either way, your car belongs to the company. You may use your company vehicle for personal reasons as the policy permits. You will get reimbursed only for approved, business-related expenses.

To get a company car, you should have a valid driver's license and a clean driving record for at least two years. Drive safe and sober and respect traffic laws and fellow motorists. You should also check your car regularly to ensure gas, tire pressure and all car fluids are at appropriate levels.

**We expect you to avoid:**

- Smoking in a company vehicle.

- Leasing, selling or lending a company car.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page077**
Appellate Case: 25-1349    Page: 77    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Using a company car to teach someone how to drive.

- Leaving your company car unlocked, unattended or parked in dangerous areas.

- Allowing unauthorized people to drive a company car unless an emergency mandates it.

On the part, we will ensure that the cars are safe and in good condition, as well as appropriately insured.

### Accidents

If you are involved in an accident with a company car, contact your manager immediately, so we can get in touch with the insurance provider. You shouldn't accept responsibility or guarantee payment to another person.

Follow this policy's guidelines to avoid disciplinary action. For minor offenses, like allowing unauthorized people to drive a company car, we will reprimand you or reclaim your car. But for more serious offenses, like causing an accident while intoxicated, we may terminate you.

## Parking

We will prioritize parking spaces on a first-come, first-served basis. If you want to receive a reserved parking spot, file your request with your manager to start the approval process.

We expect you to keep the parking lot clean and not park in assigned spaces. Please behave responsibly to avoid causing damage, injury, or loss of property.

We will not assume any liability for theft, vandalism, fire, or damage regarding an associate's vehicle in the parking lot.

## Company-Issued Equipment

As an associate, you may receive a company cell phone, a laptop, or other device. Unless otherwise mentioned in your contract, any equipment we offer belongs to the company and you may not sell it or give it away. You are also responsible for keeping the equipment safe and in as good condition as possible. If your equipment breaks or malfunctions, let your manager know so they can arrange to get it repaired.

If you are part of the corporate cell phone plan, please use your phone within the plan's restraints. You may have to pay any extra charges yourself.

CustomerService@AmericanTripoli.com



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

**Theft and damage of company equipment**

The equipment is insured for theft and damage. We ask you to inform us within 24 hours if your equipment is stolen or damaged. We might be able to trace stolen laptops and cell phones. Please also file a theft statement (affidavit) with the police and submit a copy to us.

**Security of company issued devices**

We advise you to keep your company-issued computer, tablet, and cell phone secure. **You can do this if you:**

- Keep all devices password protected.

- Ensure you do not leave your devices unattended.

- Install security updates for browsers and other systems as soon as updates are available.

- Log into company accounts and systems through secure and private networks only.

- Follow all instructions for disk encryption, anti-malware protection and password management that you received along with your equipment.

# Position-Related Clothing Allowance

If an associate is a quarry or mill associate, they are required to wear steel toe boots while working. We want to ensure they have the appropriate high quality protective footwear for their position. Per OSHA rule 1917.96 - Payment for protective equipment, An employer is not required to pay for non-specialty safety-toe protective footwear (including steel-toe shoes or steel-toe boots) and non-specialty prescription safety eyewear, provided that the employer permits such items to be worn off the job-site.

**Exhibit P-44, Page079**
Appellate Case: 25-1349     Page: 79     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

With this regulation noted, the company will reimburse the associate for one pair of boots up to $200.00 annually. The only brand of reimbursed steel-toe boots is Red Wings, no exceptions unless prescribed by a doctor and get this prescription gets preapproved by their manager.

Once the associate signs the steel-toe boot reimbursement agreement they will be required to not wear these boots home or leave the worksite with them. If the associate decides to wear the boots home, they are forfeiting the reimbursement agreement and will not be allowed to participate in the reimbursement program at any future date. This is an annual agreement. The agreement states the associate is responsible for the care and security of his/her work boots. Lockable storage lockers are provided in the Mill and the Maintenance shop; the associate will need to provide the lock.

After your 90-day probationary period, you will receive a digital voucher to present at the Red Wing store. If the associate resigns or is terminated prior to the annual agreement completion date the reimbursement will be prorated over the 12 month period and the remaining balance will be withheld from the associates last paycheck. If you need to purchase boots before your 90th day and wish to be reimbursed, submit your Red Wing boot purchase receipt to the Safety Manager. After your 90th day, the Safety Manager will submit your receipt to the finance department for reimbursement on your following paycheck for up to the reimbursable limit.

# Time
## Working Hours
The company operates between 8:00 a.m to 4:30 p.m on Monday through Friday. We try our best to not work evenings or weekends.
Some departments may work after hours(e.g., customer support, shipping, marketing). If you work in these departments, you will follow a shift schedule as needed.

### Time Clock for Hourly Employees
Hourly employee are required to clock in and clock out for their shifts and lunch break. Here are the instructions listed in the picture below.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page080**
Appellate Case: 25-1349    Page: 80    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

## Clock in

1. In Shifts, tap ⏲ **Time clock**, and then select the shift you want to clock in for.

2. Press and hold down ▶ under ⏲ **Shift**, and you'll be clocked in.

> **Note:** GPS locations are approximate. Occasionally you may be inaccurately marked as off location. Notify your manager if this happens.

## Take a break

- Press and hold down ▶ under ☕ **Break**, and you'll be clocked out to start your break.

From there, you can end your break by pressing and holding down ■ under ☕ **Break**.

## Clock out

- Press and hold down ■ under ⏲ **Shift** when you're ready to clock out.

## Time sheet

You can view previous time clock activity or correct your information using the time sheet.

- In Shifts, select **Time clock**, tap ▤ at the upper right corner to open your time sheet.

From here, you can view your time sheet, add missing clock-in and clock-out information using the + button at the top right corner, and edit or confirm existing time clock activity from up to a month earlier.

> **Note:** Any changes you make using Time Sheet will be recorded on your manager's exported time clock report.

## Paid Time Off (PTO)

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page081**
Appellate Case: 25-1349    Page: 81    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

PTO means just that, paid/personal time off. PTO accrual begins on your 90th day of employment, after the probationary period. Your PTO will increase on your work anniversary based on the corresponding years described below.

| Years of Service | 0-3 * | 4-10 | 11-20 |
|---|---|---|---|
| Hours Accumulated Per Pay Period | 3.08 | 4.62 | 6.15 |
| Maximum Hours Allowed | 80 | 120 | 160 |
| Maximum Days Allowed | 10 | 15 | 20 |

*PTO accrual begins on 90th day of employment, after probationary period.

We highly encourage every associate to use earned PTO as they see fit throughout the year. PTO is accrued per pay period. Associates and their manager are responsible to ensure they successfully utilize the associates' PTO throughout the year and not all at once or all at the end of the year. Associates cannot transfer any remaining PTO to the next year. There is no cash out of unused PTO. It is a use-or-lose policy.

If an associate leaves the company, any unused accrued PTO will be pro-rated and the company may compensate accrued PTO to associates who were not terminated for cause. Missouri state law does not require payment of earned PTO time at the time of termination. It is at the company's discretion to provide vacation pay, holiday pay, or severance pay benefits.

We advise every associate to properly utilize their earned PTO. Everyone will abide by the Handbook PTO allotment.

To request time off, please submit a request to your manager via the Shifts app in your Microsoft Teams mobile or desktop app. **Click here for the instructions**

## Working Remotely vs PTO

Some positions have the capability to work remotely. Remote work is approved at the senior managers' discretion.

**Exhibit P-44, Page082**
Appellate Case: 25-1349    Page: 82    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

A couple of questions the senior manager will need to be answered first would be:

When and how many business days are you planning on being away from the office?

What is the Operations/Mill/Quarry department schedule for that timeframe?

Are all issues and processes foreseeably covered?

Are you going to be "remote working" or taking PTO?

# Holidays
**The company observes the following holidays:**

- New Year's Day

- Memorial Day

- Independence Day

- Labor Day

- Veterans Day

- Thanksgiving Day

- Day before or Day after Thanksgiving depending on where the long weekend falls

- Christmas Eve

- Christmas Day

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page083**

Appellate Case: 25-1349     Page: 83     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

If you want to observe a religious holiday that isn't included in the list, we may allow you to take unpaid time off for that day. Or you may use your PTO. Coordinate the approval through your manager.

### Holiday pay

- Exempt associates are entitled to their normal compensation without any deductions.

- Permanent, non-exempt associates may receive their regular hour rate for their normal workday hours as a benefit after they have worked with us for more than 90 days.

### Working on a holiday

These holidays are considered "off-days" for most associates. [Managers] If you need a team member to work on a holiday, inform them at least three days in advance.

Holiday pay rate is 1.5 times regular hour rate for hourly associates. We will not count hours you worked on a holiday to decide whether you are entitled to overtime pay.

## Bereavement Leave

Losing a loved one is traumatizing. If this happens to you while you work with us, we want to support you and give you time to cope and mourn.

**For this reason, we offer three days of paid bereavement leave. You may take your bereavement leave on consecutive days to:**

- Arrange a funeral or memorial service.

- Attend a funeral or memorial service.

- Resolve matters of inheritance.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page084**
Appellate Case: 25-1349    Page: 84    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- Fulfill other family obligations.

- Mourn

If you must travel long-distance for a funeral or service, you can take two additional unpaid days off. If you require more time, please use your PTO.

## Jury Duty and Voting

As an exempt associate, if you are called for Jury Duty, you can take one day off without deduction from your salary. Anything beyond one day should be through PTO or unpaid leave.

As an hourly associate, at the discretion of your manager, if you are called for Jury Duty, if Jury duty is less than 4 hours and you were able to put in 4 hours of work that day, you will be paid for the full 8-hour day. If you are not able to put in 4 hours of work that day, due to Jury duty and all full days missed should be considered unpaid leave or at managers discretion, use of PTO.

To keep good records, all associates need to provide the company a copy of your summons for jury duty and a document that proves you served.

One election day, Managers will try to schedule the workload for the day to end one hour early so everyone has the opportunity to vote. If you need to travel a distance greater than one hour to vote, request to use your PTO.

Missouri Juror Info: **https://www.courts.mo.gov/page.jsp?id=103118**

## Parental Leave

**Paternity and maternity leave**
The company does not offer paid maternity and paternity leave. We ask you to be proactive in your use of PTO. If timing of end of year PTO carry over becomes an issue, please discuss with your manager.

If you are about to be a new mother or father (either through childbirth or adoption), talk with your manager to arrange your leave. Please give at least three months' notice before your leave begins.

If you suffer complications during childbirth or have other issues, you can ask for an unpaid leave extension of up to two months. Contact your manager as soon as possible to arrange this.

# Leaving The Company

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page085**
Appellate Case: 25-1349    Page: 85    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

In this section, we describe the procedures regarding resignation and termination of the associates. We also refer to the progressive discipline process that may sometimes result in termination.

We remind you that in the U.S. employment is "at-will." This means that you or the company may terminate the employment relationship at any time and for any non-discriminatory reason.

## Progressive Discipline

The progressive discipline process has three steps of increasing severity. **These steps are:**

Here we outline steps we will take to address associate misconduct. We want to give associates a chance to correct their behavior when possible and assist them in doing so. We also want to ensure that we thoroughly investigate and handle serious offenses.

     i.    Verbal warning

     ii.    Formal meeting with supervisor and written reprimand

     iii.    Termination

If you manage associates, inform them when you launch a progressive discipline process. Be direct that you are giving them a verbal warning reprimand. Pointing out a performance issue is not necessarily a verbal warning and may be part of your regular feedback. If you judge that progressive discipline is appropriate, let your team member know and ask your manager to help you explain the full procedure.

Managers may skip or repeat steps at their discretion. The company may treat circumstances differently from that described in this policy. But we are always obliged to act fairly and lawfully and document every stage of the progressive discipline process.

Keep in mind that the company isn't obliged to follow the steps of the progressive discipline process. As you are employed "at-will" in the U.S, we may terminate you directly without launching a progressive discipline process. For serious offenses (e.g., sexual harassment), we may terminate you without warning.

## Resignation

You resign when you voluntarily inform your manager that you will stop working for the company. We also consider you resigned if you don't come to work for two consecutive days without notice.

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page086**
Appellate Case: 25-1349    Page: 86    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

You are not obliged to give us advance notice before resigning. But, for efficiency's sake, and to make sure the workplace runs smoothly, we ask that you give at least two weeks' notice, if possible. If you hold a highly specialized or managerial position, we ask that you give us at least a month's notice, when possible.

We accept verbal resignations, but we prefer that you submit a written and signed notice of resignation for the HR records. We will reply with an acceptance of resignation letter within two days. Whether you want to announce your resignation to your team is up to you, but we encourage you to be open. Doing so helps squelch the rumor mill.

**Tuition or relocation reimbursement**
If you have relocated or studied at the company's expense, you are bound by your contract to remain with us for at least two years or year for year of expense. If you resign before that period, you may have to reimburse us for all these expenses.

**Forced resignation**
You can resign anytime at your own free will and nobody should force you into resignation. Forcing someone into resigning (directly or indirectly) is constructive dismissal and we won't tolerate it. Specifically, we prohibit associates from:

- Creating a hostile or unpleasant environment.

- Demanding or coaxing an associate to resign.

- Victimizing, harassing, or retaliating against an associate.

- Forcing an associate to resign by taking unofficial adverse actions (e.g. demotions, increased workload).

# Termination

Terminating an associate is always unpleasant but sometimes necessary. If that happens, we want to ensure we act lawfully and respectfully.

**We may terminate an associate either for cause or without cause**

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page087**
Appellate Case: 25-1349     Page: 87     Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457



- For cause termination is justified when an associate breach their contract, engages in illegal activities (e.g., embezzlement), disrupts the workplace (e.g. harasses colleagues), performs below acceptable standards or causes damage or financial loss to the company.

- Without cause termination refers to redundancies or layoffs that may be necessary if we cease some of the operations or re-assign job duties within teams. We will follow applicable laws regarding notice and payouts.

We will offer severance pay to eligible associates. We may also help associates who were terminated without cause to find work elsewhere, if possible.

We may also compensate accrued vacation and sick leave upon termination, depending on local law. Whenever local law doesn't have relevant stipulations, we will pay accrued leave only to those who weren't terminated for cause.

If you manage team members, avoid wrongful dismissal. When you terminate an associate for cause, we expect you to be certain you made the right choice and keep accurate performance and/or disciplinary records to support your decision.

## References

When we terminate associates, we may provide references for those who leave in good standing. This means that associates shouldn't have been terminated for cause. If you are laid off, you may receive references. Please ask your manager.

If you resign, you may ask for references and your manager have a right to oblige or refuse.

## Resources

Managing your 401(k): https://www.finra.org/investors/learn-to-invest/types-investments/retirement/401k-investing/managing-your-401k

Dept. of Labor – Mine Safety & Health Administration: https://www.msha.gov/

Missouri Labor Laws: https://labor.mo.gov/

CustomerService@AmericanTripoli.com

**Exhibit P-44, Page088**
Appellate Case: 25-1349    Page: 88    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

IRS W4 info: https://www.irs.gov/forms-pubs/about-form-w-4

US Healthcare.gov: https://www.healthcare.gov/

1Kaiser Family Foundation 2021 Employer Health Benefits Survey, https://www.kff.org/health-costs/report/2021-employer-health-benefits-survey/

# Policy Revision

We will always strive for fairness and equal opportunity and penalize offensive and illegal behaviors But, as laws and the environment change, we may revise and modify some of the policies.

We have established an annual revision of the handbook to bring it up to date with legislation and employment trends. We also ask you to notify your manager if you recognize any inconsistencies or mistakes. And, if you have any ideas about how to improve the workplace, we are happy to hear them. Please relay these ideas through your manager.

CustomerService@AmericanTripoli.com

**Representative of Miners Designation Form**

**U.S. Department of Labor**
**Mine Safety and Health Administration**



Approved OMB Control Number 1219-0042, is approved for use through 12/31/2023

Purpose: 30 CFR 40.3 authorizes a written declaration of any person or organization which represents two or more miners at a coal or other mine.

Public reporting burden for this collection of information estimated to average 45 minutes per response; including the time for reviewing instructions, searching existing data sources, gathering and maintaining the date need, and completing and reviewing the collection of information. Persons are not required to respond to this collection of information of unless it displays a current OMB Control Number. The DOL offers no pledge of confidentiality in association with these information collections unless Item 2 is checked and DOL will keep the miners' names and contact information confidential (Item 7) if Item 2 is checked. Section 103(f) and (g) of the Federal Mine Safety and Health Act, as amended, (30 U.S.C. § 813(f) and (g)) and 43 FR 29508, 29509. As a practical matter, the DOL would only release this information in accordance with provisions of the Freedom of Information Act (5 U.S.C. § 552); the Privacy Act (5 U.S.C. § 552a); and attendant regulations, 29 C.F.R. parts 70 and 71. Send comments regarding this burden estimate or any other aspect of this collection of information. Including suggestions for reducing this burden, to: **Office of Standards, Regulation and Variances, Mine Safety and Health Administration, 201 12th Street South, Suite 401, Arlington, VA 22202-5452. DO NOT SEND COMPLETED FORMS TO THIS ADDRESS.** Instructions for this form contain further information on the need and use of this form. **A false or representation is punishable under Section 110(a) and (f) of the Federal Mine Safety and Health Act, as amended (30 U.S.C. §820 (a) and (f)).**

**Item 1:** [X] Initial Filing    [ ] Update    [ ] Unknown

**Item 2:** [X] Confidential

**Item 3:** Designation Type: [X] Individual    [ ] Organization

Representative Name: Rob Baumann    Title: Production Superviso
Address: 939 S. Park Dr
City: Columbus    State: KS    Zip Code 66725
Telephone ( 417 ) 356   0770    Email: baumanr24@Gmail.com

**Item 4:** Mine Operator's or Contractor's Name American Tripoli
Mine Address 222 Oneida St., Seneca, MO 64865
Mine MSHA ID No.: 23-00504

**Item 5:** Scope of Designation:   [X] The person or position named as the representative of miners is the representative for all purposes of the Act.

[ ] The representative's authority is limited to: [ ] 101 (c)
[ ] 103 (c)
[ ] Other _____

**Item 6:** Additional or Alternate Representatives: [ ]

1. Name: _____
Address: _____
City: _____   State: _____   Zip Code _____
Telephone: ( ___ ) ____ _____   Email: _____

2. Name: _____
Address: _____
City: _____   State: _____   Zip Code _____
Telephone: ( ___ ) ____ _____   Email: _____

**EXHIBIT 5**

**Item 7.** Designated By: (Name of two or more miners who work at the mine)

[redacted]

I certify that I have been designated as representative by at least two miners who work at the mine. I certify that all information being filed is true and correct. A copy of this form has been delivered to the mine operator of the affected mine prior to or concurrently to the filing of this statement.

Signed: Robert Baumann    Date: 3-21-2023

MSHA Form 2000-238, Aug. 2015 rev. (Mailing Address)

**Exhibit P-44, Page090**



RB

Rob

Thanks man.

Wed, Apr 12, 9:00 PM

No work tomorrow. We're trying to get us back in the building.

👍 to "No work tomorrow. We're trying to get us back in the building. "

Ok we can go into the building just no electric and we can load trucks and he would probably let us turn the wrapper on if I call him to finish that order for shipment if they don't figure crap out I can check and work at least getting that ready Friday if he would at least like that done since he has to pay us anyway

Text Message

EXHIBIT



# AMERICAN TRIPOLI
P.O. BOX 489 – SENECA, MISSOURI 64865
TEL.NO.+1.417.776.2216
EMAIL: Info@AmericanTripoli.com

To: Jena Turner
From: Russell Tidaback
Date: April 26, 2022
Re: Letter of Reprimand

This letter is a formal reprimand for the performance you have exhibited on the job. Your work, despite encouragement and guidance given, is not improving. In the employee hand book it outlines the 3-step progressive discipline process.

We have expressed on numerous occasions that we are a collaborative and team work based company. As part of this collaborative and team work based environment it is the management teams responsibility to provide tasking/responsibility direction and assistance and then to hold employees accountable for the tasks/responsibilities given. We strive to create a healthy, positive environment and do everything we can to help you succeed.

When your manager, or one of the company owners, specifically task you with something you need to ensure the task(s) are completed efficiently and effectively in a timely manner. We will address a few instances where this type of incident has come up.

- The natural gas contract. You were tasked to reach out to vendors and when asked the status you stated you hadn't heard anything and would follow up. This occurred numerous times. We eventually had to resolve this tasking at the management level.

- Having Teams on your phone for collaboration. This has been an ongoing issue since October. The last response from you when inquired is that you just didn't want to as it caused you to check it all the time. Having Teams on your phone and being collaborative is part of the job responsibilities and team work.

- Preparing the smaller retail bags for inventory. This was asked of you for more than a month. We had to do this at the management level to get it done.

- Taking the provided company laptop home with you each evening. We have been discussing the purpose of taking the company laptop home each evening since June 2021. Now that the company has provided a laptop, when asked why you are not taking the laptop home each night, the response from you was that you just didn't want to.

All of these incidents are taken as either not understanding the company hierarchy, tasks and responsibilities, what being a team player is, or blatant disrespect.

You have approximately thirty days, although if we don't see early progress, you will not get the full thirty days, to demonstrate that you can perform this job, effectively complete the tasks given, and participate as a company team player. If you don't demonstrate immediate progress, we will terminate your employment.

We will place a copy of this formal, written reprimand in your personnel file in Human Resources.



EXHIBIT
7



# AMERICAN TRIPOLI
P.O. BOX 489 – SENECA, MISSOURI 64865
TEL.NO.+1.417.776.2216
EMAIL: Info@AmericanTripoli.com

Please take this advice seriously as our preference is always to see employees succeed.

Signature:

Supervisor Name: Russell Tidaback (Owner)

Date: 26APR2022

Acknowledgment of Receipt

I acknowledge that I have received this written reprimand. My acknowledgment does not mean that I agree with its contents. I understand that you will place a copy of this reprimand in my official personnel file. I also acknowledge that I have the right to prepare a written response that you will attach to the original letter of reprimand.

Signature:

Employee Name: Jena Turner

Date: 4/26/22

**Exhibit 26**

**Exhibit P-44, Page093**

Appellate Case: 25-1349    Page: 93    Date Filed: 04/07/2025 Entry ID: 5503844



# AMERICAN TRIPOLI

P.O. BOX 489 – SENECA, MISSOURI 64865
TEL.NO.+1.417.776.2216
EMAIL: Info@AmericanTripoli.com

To: Camrin Bindel
From: Christine Schreiber
Date prepared: 06/06/2022
Letter of Termination

This letter is formal documentation of the poor performance you have exhibited on the job leading to termination. Your work, despite the encouragement and guidance given, is not improving.

We have expressed on numerous occasions that we are a collaborative and teamwork-based company. As part of this collaborative and teamwork-based environment, it is the management team's responsibility to provide tasking/responsibility direction and assistance and then to hold associates accountable for the tasks/responsibilities given. We strive to create a healthy, positive environment and do everything we can to help you succeed.

Specific areas of complaint include:

- Not finishing tasks in a timely manner
- Talking back when directions are given
- Spending extended periods of time in your supervisor's office despite signage stating not to and being told not to multiple times
- Looking through your supervisor's computer when he was not present, and permission was not given
- Using a pair of needle-nose pliers to stab other employees' legs while they were in the restroom
- Harassing other employees to look through their phones to see if they said negative comments about you
- Asking your supervisor to look through his phone to see if he said negative comments about you

Your termination is effective immediately due to your behavior. Your behavior continues to happen despite several warnings, including a written warning given via message from Russell Tidaback on 05/31/2022.

Signature: _(signature)_

Manager Name: _Christine Schreiber_

Date: _6/7/22_

Acknowledgment of Receipt

I acknowledge that I have received this written termination. My acknowledgment does not mean that I agree with its contents. I understand that you will place a copy of this letter in my official personnel file.

Signature:

Associate Name: _refused to sign_

Date: _6/7/22_

Appellate Case: 25-1349    Page: 94    Date Filed: 04/07/2025 Entry ID: 5503844



# AMERICAN TRIPOLI

P.O. BOX 489 – SENECA, MISSOURI 64865
TEL.NO.+1.417.776.2216
EMAIL: Info@AmericanTripoli.com

Camrin Bindle
Mill Associate
201 N. Vine St.
Commerce, OK 74339

Date: 6/7/2022

Dear Camrin Bindel,

This is regarding your resignation notice on 6/7/2022 wherein you requested to be relived of your services immediately. We want to inform you that your resignation is accepted, and you're relieved from your position as Mill Associate with American Tripoli with the effective date 6/7/2022.

We sincerely appreciate your contributions to American Tripoli for the following time period 3/28/2022 – 6/7/2022. To receive a professional recommendation will require a more personal relationship with someone within the company.

Respectfully,


Christine Schreiber
Operations Manager

**Exhibit 26**

**Exhibit P-44, Page095**

Appellate Case: 25-1349    Page: 95    Date Filed: 04/07/2025 Entry ID: 5503844



# AMERICAN TRIPOLI
### SENECA STANDARD

To: Carson Allman

From: John Spears

Date: 13OCT2022

RE: Letter of Reprimand

This letter is to inform you that your performance is not meeting the expected requirements for your position as a maintenance technician. We're concerned and want to see you succeed.

You are officially failing to perform for the following reason(s):
- Understand the priority of maintenance needs for production
- Complying with responding to maintenance calls
- Demonstrating lack of sense of urgency
- Demonstrating lack of maintenance experience as represented on resume

Based on position description, role discussions, verbal, and written communications, you are failing to meet the performance measurements for your role. These performance requirements affect not only the success of American Tripoli's operations but also the success of our customer which rely on our products to be produced and delivered so they can support their employees and customers.

As a result, If we do not see improvements immediately, additional disciplinary action will occur up to and including termination of employment. This letter will be added to your personnel file.

What can we do to support you in your role? Comment below.

_____

John Spears - Operations Manager

_____

Carson Allman - Maintenance Technician

Comments:

_____

_____

_____

_____

_____

_____

**Exhibit 26**

**Exhibit P-44, Page096**

Appellate Case: 25-1349    Page: 96    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

To: PATRICK LEWIS
From: JOHN SPEARS, RUSSELL TIDABACK
Date: 5/12/2023
Re: Letter of Reprimand for performance & ATTENDENCE    4/21/2023  5/8/2023
                                                        4/22/2023  5/9/2023

This letter is an official written reprimand for your failure to perform the functions of your mill associate position appropriately. Your consistency and dependability are a problem when we are trying to fill customer orders. We can't count on you to do your part.

You have received verbal counseling before this letter. There is a daily performance production goal and tasks that must be completed by you. By not following the instructions and guidance given by your supervisor or a teammate placed in position to make things happen you are jeopardizing operations and the safety of all. This cannot be tolerated.

You have approximately two weeks, although if we don't see early progress, you will not get the full two weeks, to demonstrate that you are fully trying to improve on your performance of this job. If you don't demonstrate immediate progress, we will be forced to terminate your employment. We do not want this.

Please take this advice seriously as our preference is always to have you succeed and be happy while at work.

We will place a copy of this formal, written reprimand in your personnel file.

Signature: *John Spears*
Supervisor Name: JOHN SPEARS
Date: 5/12/2023

Acknowledgement of Receipt:

I acknowledge that I have received this written reprimand. My acknowledgement does not mean that I agree with its contents. I understand that you will place a copy of this reprimand in my official personnel file. I also acknowledge that I have the right to prepare a written response that you will attach to the original letter of reprimand, if I chose to do so.

Signature: *Patrick Lewis*
Employee Name: PATRICK LEWIS
Date: 5/12/2023

**Exhibit 26**

**Exhibit P-44, Page097**

Appellate Case: 25-1349    Page: 97    Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

To: RJ WILLIAMS
From: JOHN SPEARS, RUSSELL TIDABACK
Date: 5/10/2023

Re: Letter of Reprimand for performance & ATTENDANCE

This letter is an official written reprimand for your failure to perform the functions of your mill associate position appropriately. Your consistency and dependability are a problem when we are trying to fill customer orders. We can't count on you to do your part.

You have received verbal counseling before this letter. There is a daily performance production goal and tasks that must be completed by you. By not following the instructions and guidance given by your supervisor or a teammate placed in position to make things happen you are jeopardizing operations and the safety of all. This cannot be tolerated.

You have approximately two weeks, although if we don't see early progress, you will not get the full two weeks, to demonstrate that you are fully trying to improve on your performance of this job. If you don't demonstrate immediate progress, we will be forced to terminate your employment. We do not want this.

Please take this advice seriously as our preference is always to have you succeed and be happy while at work.

We will place a copy of this formal, written reprimand in your personnel file.

Signature: John Spears
Supervisor Name: JOHN SPEARS
Date: 5/10/2023

Acknowledgement of Receipt:

I acknowledge that I have received this written reprimand. My acknowledgement does not mean that I agree with its contents. I understand that you will place a copy of this reprimand in my official personnel file. I also acknowledge that I have the right to prepare a written response that you will attach to the original letter of reprimand, if I chose to do so.

Signature: _____
Employee Name:
Date: 5/10/2023

**Exhibit 26**

**Exhibit P-44, Page098**

Appellate Case: 25-1349     Page: 98     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 7-17-2023
To: Jim Hoover
From: John Spears, Operations Manager
Re: Failure to communicate and follow planned instructions

Dear Jim Hoover,

This is a warning letter that your failure to adhere to Standard Communication practices and planned instructions will no longer be tolerated. The management team has been closely monitoring your performance over the past few months and it has been concluded that you have failed to meet the standards expected of you.

In our last meeting you and I discussed your failure to communicate your intentions as they pertain to production in the mill. These include leaving your work station, leaving company property, not following planned maintenance, et al. You were also informed that due to frequent absenteeism, you are unable to manage the workload and as a result, you are unable to meet the standards. Considering your situation, you were numerous opportunities to correct these actions which has caused serious loss to the company and still the production was behind schedule.

You must understand that this kind of poor performance adversely affects the company and individual employee performance affects the company financially.

Reminder, our standard of conduct and disciplinary process is a 3-step process. 1st offense is a verbal warning. The 2nd offense is a written warning letter and the 3rd offense is termination.

We are hopeful that you will be more sincere and dedicated in your job and will meet all your standards within the given time frame or else we will have to the next step disciplinary actions. You will have 10 business days to correct the unsatisfactory performance noted in this letter. If you fail to improve despite everything then this can even lead to your termination. In case, you have any doubts on being able to complete your taskings within the standards then please let me know.

John Spears
Operations Manager
American Tripoli

I Agree / Disagree (Circle one) with the issue as state above and agreeing to remediate the behavior as stated above. If I disagree with the statement above, I will provide a written statement to the Operations Manager before the close of the next business day. This written statement can be on the back side of this letter.

Jim Hoover / Date signed

Note: One copy of this letter given to employee and one copy place in employee personal HR file.

Page 1 of 1

CustomerService@AmericanTripoli.com

**Exhibit 26**

**Exhibit P-44, Page099**

Appellate Case: 25-1349    Page: 99    Date Filed: 04/07/2025 Entry ID: 5503844

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 7-17-2023
To: Raneldon Williams
From: John Spears, Operations Manager
Re: Failure to communicate and follow planned instructions

Dear Raneldon Williams,

This is a warning letter that your failure to adhere to Standard Communication practices and planned instructions will no longer be tolerated. The management team has been closely monitoring your performance over the past few months and it has been concluded that you have failed to meet the standards expected of you.

Last week, you had stated that were not going to perform the tasks as asked due to you not getting paid a maintenance wage. The taskings of your position include assisting maintenance. You are not trained or experience to perform maintenance tasks alone or without instruction and supervision from a maintenance team member. Failure to comply with directions from your supervisor is a dereliction of duty and will not be tolerated. Also you and I discussed your failure to communicate your intentions as they pertain to production in the mill. These include leaving your work station, leaving company property, et al. You were also informed that due to frequent tardiness and or absenteeism, you are unable to manage the workload and as a result, you are unable to meet the standards. Considering your situation, you were numerous opportunities to correct these actions.

You must understand that this kind of poor performance adversely affects the company and individual employee performance affects the company financially.

Reminder, our standard of conduct and disciplinary process is a 3-step process. 1st offense is a verbal warning. The 2nd offense is a written warning letter and the 3rd offense is termination.

We are hopeful that you will be more sincere and dedicated in your job and will meet all your standards within the given time frame or else we will have to the next step disciplinary actions. You will have 10 business days to correct the unsatisfactory performance noted in this letter. If you fail to improve despite everything then this can even lead to your termination. In case, you have any doubts on being able to complete your taskings within the standards then please let me know.

John Spears
Operations Manager
American Tripoli

I Agree / Disagree (Circle one) with the issue as state above and agreeing to remediate the behavior as stated above. If I disagree with the statement above, I will provide a written statement to the Operations Manager before the close of the next business day. This written statement can be on the back side of this letter.

Raneldon Williams / Date signed          7-19-23

Note: One copy of this letter given to employee and one copy place in employee personal HR file.

Page **1** of **1**

CustomerService@AmericanTripoli.com

**Exhibit 26**

**Exhibit P-44, Page100**

Appellate Case: 25-1349     Page: 100     Date Filed: 04/07/2025 Entry ID: 5503844



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 7-17-2023
To: Patrick Lewis
From: John Spears, Operations Manager
Re: Failure to communicate and follow planned instructions

Dear Patrick Lewis,

This is a warning letter that your failure to adhere to Standard Communication practices and planned instructions will no longer be tolerated. The management team has been closely monitoring your performance over the past few months and it has been concluded that you have failed to meet the standards expected of you.

Last week, you had stated that were not going to perform the tasks as asked due to you not getting paid a maintenance wage. The taskings of your position include assisting maintenance. You are not trained or experience to perform maintenance tasks alone or without instruction and supervision from a maintenance team member. Failure to comply with directions from your supervisor is a dereliction of duty and will not be tolerated. Also you and I discussed your failure to communicate your intentions as they pertain to production in the mill. These include leaving your work station, leaving company property, et al. You were also informed that due to frequent tardiness and or absenteeism, you are unable to manage the workload and as a result, you are unable to meet the standards. Considering your situation, you were numerous opportunities to correct these actions.

You must understand that this kind of poor performance adversely affects the company and individual employee performance affects the company financially.

Reminder, our standard of conduct and disciplinary process is a 3-step process. 1st offense is a verbal warning. The 2nd offense is a written warning letter and the 3rd offense is termination.

We are hopeful that you will be more sincere and dedicated in your job and will meet all your standards within the given time frame or else we will have to the next step disciplinary actions. You will have 10 business days to correct the unsatisfactory performance noted in this letter. If you fail to improve despite everything then this can even lead to your termination. In case, you have any doubts on being able to complete your taskings within the standards then please let me know.

John Spears
Operations Manager
American Tripoli

I Agree / Disagree (Circle one) with the issue as state above and agreeing to remediate the behavior as stated above. If I disagree with the statement above, I will provide a written statement to the Operations Manager before the close of the next business day. This written statement can be on the back side of this letter.

Patrick Lewis / Date signed

Note: One copy of this letter given to employee and one copy place in employee personal HR file.

Page **1** of **1**

CustomerService@AmericanTripoli.com

**Exhibit 26**



# AMERICAN TRIPOLI

P.O. BOX 489 – SENECA, MISSOURI 64865
TEL.NO.+1.417.776.2216
EMAIL: Info@AmericanTripoli.com

To: Camrin Bindel
From: Christine Schreiber
Date prepared: 06/06/2022
Letter of Termination

This letter is formal documentation of the poor performance you have exhibited on the job leading to termination. Your work, despite the encouragement and guidance given, is not improving.

We have expressed on numerous occasions that we are a collaborative and teamwork-based company. As part of this collaborative and teamwork-based environment, it is the management team's responsibility to provide tasking/responsibility direction and assistance and then to hold associates accountable for the tasks/responsibilities given. We strive to create a healthy, positive environment and do everything we can to help you succeed.

Specific areas of complaint include:

- Not finishing tasks in a timely manner
- Talking back when directions are given
- Spending extended periods of time in your supervisor's office despite signage stating not to and being told not to multiple times
- Looking through your supervisor's computer when he was not present, and permission was not given
- Using a pair of needle-nose pliers to stab other employees' legs while they were in the restroom
- Harassing other employees to look through their phones to see if they said negative comments about you
- Asking your supervisor to look through his phone to see if he said negative comments about you

Your termination is effective immediately due to your behavior. Your behavior continues to happen despite several warnings, including a written warning given via message from Russell Tidaback on 05/31/2022.

Signature: _(signed)_

Manager Name: _Christine Schreiber_

Date: _6/7/22_

Acknowledgment of Receipt

I acknowledge that I have received this written termination. My acknowledgment does not mean that I agree with its contents. I understand that you will place a copy of this letter in my official personnel file.

Signature:

Associate Name: _refused to sign_

Date: _6/7/22_

**EXHIBIT**
_8_



Date: 11-4-2022

Dear Mr. Carson Allman,

Re: Termination of Employment

It is with deep regret that I must inform you that your employment with American Tripoli is terminated, effective 11/4/2022, in accordance with our standard employee practices and after careful consideration by the management team.

Over the past few months, your performance has been closely monitored, and it has been observed that you have consistently failed to meet the standards and expectations set forth by the company. We have had multiple discussions and interventions to address various concerns related to your conduct and performance. Specifically, we have discussed your failure to communicate your intentions effectively, particularly in relation to production matters within the mill. These concerns encompass actions such as leaving your workstation without authorization, leaving company property without notice, and neglecting planned maintenance tasks, among others.

It is essential to highlight that you were provided with numerous opportunities and guidance to rectify these issues, as our standard of conduct and disciplinary process is designed to be a fair and progressive system. This process consists of three steps:

1. Verbal Warning: As a first step, employees are provided with a verbal warning to address any behavioral or performance issues. This serves as an initial opportunity to understand and rectify the concerns raised.
2. Written Warning Letter: Following the initial verbal warning, if the issues persist, a written warning letter is issued to formally document the concerns and expectations. This step is intended to emphasize the seriousness of the situation and to provide clear guidance on the necessary improvements.
3. Termination: Regrettably, despite the verbal and written warnings provided and the numerous opportunities for improvement, your actions and conduct have not met the company's expectations. As a result, we are left with no alternative but to proceed with your termination, effective 11/4/2022.

Please be aware that this decision is not taken lightly, and it is made in the best interest of the company and its employees. We genuinely regret that it has come to this point and sincerely hope that you will find success in your future endeavors.

You are required to return all company property, keys, hardhat, and any other company materials or equipment in your possession by 11/4/2022. Your final paycheck, including any accrued but unused PTO days, will be provided to you as per our standard payroll schedule.

If you have any questions or need clarification regarding the termination process or any related matters, please do not hesitate to contact me.

Sincerely,


John Spears
Operations Manager

Note: One copy of this letter given to employee and one copy place in employee personal HR file.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 10-29-2022

Dear Mr. Jessie Hodge,

Re: Termination of Employment

It is with deep regret that I must inform you that your employment with American Tripoli is terminated, effective 10/30/2022, in accordance with our standard employee practices and after careful consideration by the management team.

Over the past few months, your performance has been closely monitored, and it has been observed that you have consistently failed to meet the standards and expectations set forth by the company. We have had multiple discussions and interventions to address various concerns related to your conduct and performance. Specifically, we have discussed your failure to communicate your intentions effectively, particularly in relation to production matters within the mill. These concerns encompass actions such as leaving your workstation without authorization, leaving company property without notice, and neglecting planned maintenance tasks, among others.

It is essential to highlight that you were provided with numerous opportunities and guidance to rectify these issues, as our standard of conduct and disciplinary process is designed to be a fair and progressive system. This process consists of three steps:

1. Verbal Warning: As a first step, employees are provided with a verbal warning to address any behavioral or performance issues. This serves as an initial opportunity to understand and rectify the concerns raised.
2. Written Warning Letter: Following the initial verbal warning, if the issues persist, a written warning letter is issued to formally document the concerns and expectations. This step is intended to emphasize the seriousness of the situation and to provide clear guidance on the necessary improvements.
3. Termination: Regrettably, despite the verbal and written warnings provided and the numerous opportunities for improvement, your actions and conduct have not met the company's expectations. As a result, we are left with no alternative but to proceed with your termination, effective 10/30/2022.

Please be aware that this decision is not taken lightly, and it is made in the best interest of the company and its employees. We genuinely regret that it has come to this point and sincerely hope that you will find success in your future endeavors.

You are required to return all company property, keys, hardhat, and any other company materials or equipment in your possession by 10/30/2022. Your final paycheck, including any accrued but unused PTO days, will be provided to you as per our standard payroll schedule.

If you have any questions or need clarification regarding the termination process or any related matters, please do not hesitate to contact me.

Sincerely,


John Spears
Operations Manager

Note: One copy of this letter given to employee and one copy place in employee personal HR file.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 11-4-2022

Dear Mr. Terry Newborn,

Re: Termination of Employment

It is with deep regret that I must inform you that your employment with American Tripoli is terminated, effective 11/4/2022, in accordance with our standard employee practices and after careful consideration by the management team.

Over the past few months, your performance has been closely monitored, and it has been observed that you have consistently failed to meet the standards and expectations set forth by the company. We have had multiple discussions and interventions to address various concerns related to your conduct and performance. Specifically, we have discussed your failure to communicate your intentions effectively, particularly in relation to production matters within the mill. These concerns encompass actions such as leaving your workstation without authorization, leaving company property without notice, and neglecting planned maintenance tasks, among others.

It is essential to highlight that you were provided with numerous opportunities and guidance to rectify these issues, as our standard of conduct and disciplinary process is designed to be a fair and progressive system. This process consists of three steps:

1. Verbal Warning: As a first step, employees are provided with a verbal warning to address any behavioral or performance issues. This serves as an initial opportunity to understand and rectify the concerns raised.
2. Written Warning Letter: Following the initial verbal warning, if the issues persist, a written warning letter is issued to formally document the concerns and expectations. This step is intended to emphasize the seriousness of the situation and to provide clear guidance on the necessary improvements.
3. Termination: Regrettably, despite the verbal and written warnings provided and the numerous opportunities for improvement, your actions and conduct have not met the company's expectations. As a result, we are left with no alternative but to proceed with your termination, effective 11/4/2022.

Please be aware that this decision is not taken lightly, and it is made in the best interest of the company and its employees. We genuinely regret that it has come to this point and sincerely hope that you will find success in your future endeavors.

You are required to return all company property, keys, hardhat, and any other company materials or equipment in your possession by 11/4/2022. Your final paycheck, including any accrued but unused PTO days, will be provided to you as per our standard payroll schedule.

If you have any questions or need clarification regarding the termination process or any related matters, please do not hesitate to contact me.

Sincerely,

John Spears
Operations Manager

Note: One copy of this letter given to employee and one copy place in employee personal HR file.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 8-30-2023

Dear Mr. Ryan Closser,

Re: Termination of Employment

It is with deep regret that I must inform you that your employment with American Tripoli is terminated, effective 8/30/2023, in accordance with our standard employee practices and after careful consideration by the management team.

Over the past few months, your performance has been closely monitored, and it has been observed that you have consistently failed to meet the standards and expectations set forth by the company. We have had multiple discussions and interventions to address various concerns related to your conduct and performance. Specifically, we have discussed your failure to communicate your intentions effectively, particularly in relation to production matters within the mill. These concerns encompass actions such as leaving your workstation without authorization, leaving company property without notice, and neglecting planned maintenance tasks, among others.

It is essential to highlight that you were provided with numerous opportunities and guidance to rectify these issues, as our standard of conduct and disciplinary process is designed to be a fair and progressive system. This process consists of three steps:

1. Verbal Warning: As a first step, employees are provided with a verbal warning to address any behavioral or performance issues. This serves as an initial opportunity to understand and rectify the concerns raised.
2. Written Warning Letter: Following the initial verbal warning, if the issues persist, a written warning letter is issued to formally document the concerns and expectations. This step is intended to emphasize the seriousness of the situation and to provide clear guidance on the necessary improvements.
3. Termination: Regrettably, despite the verbal and written warnings provided and the numerous opportunities for improvement, your actions and conduct have not met the company's expectations. As a result, we are left with no alternative but to proceed with your termination, effective 8/30/2023.

Please be aware that this decision is not taken lightly, and it is made in the best interest of the company and its employees. We genuinely regret that it has come to this point and sincerely hope that you will find success in your future endeavors.

You are required to return all company property, keys, hardhat, and any other company materials or equipment in your possession by 8/30/2023. Your final paycheck, including any accrued but unused PTO days, will be provided to you as per our standard payroll schedule.

If you have any questions or need clarification regarding the termination process or any related matters, please do not hesitate to contact me.

Sincerely,


John Spears
Operations Manager

Note: One copy of this letter given to employee and one copy place in employee personal HR file.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Date: 9-14-2023

Dear Mr. Jim Hoover,

Re: Termination of Employment

It is with deep regret that I must inform you that your employment with American Tripoli is terminated, effective 9/14/2023, in accordance with our standard employee practices and after careful consideration by the management team.

Over the past few months, your performance has been closely monitored, and it has been observed that you have consistently failed to meet the standards and expectations set forth by the company. We have had multiple discussions and interventions to address various concerns related to your conduct and performance. Specifically, we have discussed your failure to communicate your intentions effectively, particularly in relation to production matters within the mill. These concerns encompass actions such as leaving your workstation without authorization, leaving company property without notice, and neglecting planned maintenance tasks, among others.

It is essential to highlight that you were provided with numerous opportunities and guidance to rectify these issues, as our standard of conduct and disciplinary process is designed to be a fair and progressive system. This process consists of three steps:

1. Verbal Warning: As a first step, employees are provided with a verbal warning to address any behavioral or performance issues. This serves as an initial opportunity to understand and rectify the concerns raised.
2. Written Warning Letter: Following the initial verbal warning, if the issues persist, a written warning letter is issued to formally document the concerns and expectations. This step is intended to emphasize the seriousness of the situation and to provide clear guidance on the necessary improvements.
3. Termination: Regrettably, despite the verbal and written warnings provided and the numerous opportunities for improvement, your actions and conduct have not met the company's expectations. As a result, we are left with no alternative but to proceed with your termination, effective 9/14/2023.

Please be aware that this decision is not taken lightly, and it is made in the best interest of the company and its employees. We genuinely regret that it has come to this point and sincerely hope that you will find success in your future endeavors.

You are required to return all company property, keys, hardhat, PAPR, half-mask, and any other company materials or equipment in your possession by 9/14/2023. Your final paycheck, including any accrued but unused PTO days, will be provided to you as per our standard payroll schedule.

If you have any questions or need clarification regarding the termination process or any related matters, please do not hesitate to contact me.

Sincerely,


John Spears
Operations Manager

Note: One copy of this letter given to employee and one copy place in employee personal HR file.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

21NOV2023

Dear To whom it may concern,

Re: MSHA No. MADI-CD-2023-05
Re: Jimmy Lee Hoover – Complainant

On September 13, 2023 the Complainant reported to work at the mine. The operation began as normal. The airlock mentioned by the Complainant had been experiencing difficult startups. The Complainant, whom had been employed by the mine for several years, worked through the malfunction/s on each occurrence and the machinery began to function properly just as it did in the past.

On the aforementioned date the Complainant was not ordered to perform any task that would be considered dangerous. I, the Operations Manager, never said or would I ever say (paraphrasing) "we need the product to make Russell Tidaback some money".

The Complainant on several occasions demonstrated a "lone wolf" attitude and therefore had established a pattern of behaviors inconsistent with the current owner's Policy Handbook as well as the policies and procedures of the former owner. Both have been documented.

Being upset that the breaker was not functioning (but not a danger to operate) and with Don Hale (Production Supervisor) the Complainant later went to lunch at his prescribed time. The Complainant was upset with the Production Supervisor because he thought the mill needed to be shut down until the breaker could be replaced. The Production Supervisor knew that the Complainant had worked on all of the machinery in the past and this malfunction was not new. The Production Supervisor also agreed that there was no danger in continuing the use of the machine. The breaker has only been a nuisance not a danger. The Complainant returned approximately one hour and ten minutes later. This is forty minutes longer than the assigned thirty minutes. The Production Supervisor confronted the Complainant concerning his tardiness and the Complainant responded by saying "write me up then" and walked away. The Production Supervisor did so. Russell Tidaback was informed of the situation and he made the decision to terminate the Complainant due to his pattern of policy violations. The Complainant had been verbally warned, counseled and written warned several times by both the current ownership and previous owners of the mine. On September 14, 2023 I, the Operations Manager, informed the Complainant that he was terminated immediately.

Sincerely,

*John R Spears*

John R. Spears
Operations Manager
American Tripoli
John.Spears@AmericanTripoli.com

**EXHIBIT**

9

CustomerService@AmericanTripoli.com

## Dillingham, Michael E - MSHA

| | |
|---|---|
| **From:** | Russell Tidaback <RTidaback@deedyco.com> |
| **Sent:** | Wednesday, May 10, 2023 5:51 PM |
| **To:** | Dillingham, Michael E - MSHA |
| **Cc:** | John Spears; Jordan Tidaback; Russell Tidaback |
| **Subject:** | FW: Request for Information |
| **Attachments:** | Robert Baumann Termination Letter (1).pdf |

**CAUTION:** This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.

Hello Mr. Dillingham.

Following 29 CFR 2700.43 Answer., I didn't know if it needed to be on company letterhead or if an email response would suffice.

Respondent Answer:

Mr. Rob Baumann was terminated with cause;
poor performance, lack of leadership skills, and failure to follow procedures and guidance given by his supervisor(s), as stated in the termination letter given to him at his last counseling session. (attached)

His work history performance does not correlate to any relatable discussions that we were made aware of between him and MSHA representatives. Plus, this isn't a one-time event/issue, and we have been working on his performance issues for many months.

Regarding "everyones pay" is covered in the Miners Rights and Responsibilities handbook, and every miner is paid accordingly.

We are unaware of any miner not receiving pay or having pay issues at this time.

I believe Mr. Baumann is simply striking out in anger, which is one reason why he was terminated.

**Russell Tidaback**
Managing Member



**AmericanTripoli.com**

**From:** Russell Tidaback <RTidaback@deedyco.com>
**Sent:** Monday, May 8, 2023 11:45 AM
**To:** Larkins, Adam S - MSHA <Larkins.Adam@DOL.GOV>
**Cc:** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>; Russell

1

Exhibit No 8 Pg No 1

| | |
|---|---|
| **From:** | Russell Tidaback <RTidaback@deedyco.com> |
| **Sent:** | Sunday, May 14, 2023 12:43 PM |
| **To:** | Dillingham, Michael E - MSHA |
| **Cc:** | Boyd, Randall L. - MSHA; Larkins, Adam S - MSHA; West, David R - MSHA; John Spears; Jordan Tidaback; Russell Tidaback |
| **Subject:** | RE: Request for Information |
| **Attachments:** | Daily Safety Workplace Inspections Results.pdf; Leaving The Company section in the company employee handbook.pdf; MSHA requested TEAMs chat 1APR- 30APR23.pdf; MAR-APR 2023 ON-SHIFTS REPORT.pdf; 24APR2023 Rob Baumann MSHA discrimination report claim filed.pdf; Rob Baumann - Notes.pdf |
| **Importance:** | High |

**CAUTION:** This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.

Hello Mr. Dillingham.

So, we can efficiently and effectively assist you with this investigation, please follow up on the FIVE (5) questions below.

**1.** If MSHA Procedural rules 29 CFR states, "2700.43 Answer. Within 30 days after service of a discrimination complaint, the respondent shall file an answer responding to each allegation of the complaint." (https://arlweb.msha.gov/SOLICITOR/FMSHRC/RULES/RULES.htm#43) and according to the UPS tracking number, we received the packet Thursday, May 04 at 9:57 A.M. **Why are we being held to a different standard and not given the 30 days to file an answer responding to each allegation?**

**2.** Referring to your statement below, "From looking at the response it doesn't have any reprimands for Mr. Baumann to relate to the allegations we received ." The only allegation I see in the attached discrimination report is "terminated without cause" (24APR2023 Rob Baumann MSHA discrimination report claim filed.pdf). **Please elaborate on what allegations you have received?**

**3.** Referring to your statement below, "From looking at the response it doesn't have any reprimands for Mr. Baumann to relate to the allegations we received .", I have attached a copy of the employee notes journal (Rob Baumann – Notes.pdf) that I maintain on each employee. It will give you a timeline of the counseling and professional development conversations that I have personally had with Mr. Baumann and regarding Mr. Baumann with others. This information is above and beyond what you were asking for.
We have worked with Mr. Baumann for many months trying to guide and mentor him. Also, attached (Leaving the Company section in the company employee handbook.pdf) is the section in our employee handbook discussing our progressive disciplined approach and outline the steps we will take to address associate misconduct. Mr. Baumann's termination had to do with his performance, the timing being at the end of pay period for payroll purposes, and successfully hiring a competent replacement. It is our statement that he was terminated with cause due to his poor performance. **Are you stating as an employer we are required to provide written reprimands to our miners?**

**4.** Referring to your statement below, "#4 is and Excel Spreadsheet, is there a company form that should be submitted also.", I don't see this as relevant to the allegation/complaint filed but we didn't see the need to give a written termination letter to Mr. Andrew Wasson as it was assumed during our last discussion with Mr. Wasson the police report of him being arrested on company property for damage and theft of company

Exhibit No 8 Pg No 2

Date Filed: 04/07/2025 Entry ID: 5503844 Page: 110 Appellate Case: 25-1349

property was sufficient enough ~~termination~~ cause. In reference to Mr. ~~Baumann~~, his termination letter is in his provided HR file. **Is there a specific "company form" you are looking for?**

**5.** Referring to your statement below, "I f you read the #6 request it is not the same as #3.". Again, I do not see this as relevant to the allegation/complaint but the attached MAR-APR 2023 ON-SHIFT REPORT.pdf, is what we used for payroll purposes. **Is this what you are looking for?**

**6.** Referring to your statement below, "MSHA is requesting a copy of the On-shift workplace examinations whether it be a paper version or an electronic version." Again, I do not see this as relevant to the allegation/complaint but attached (Daily Safety Workplace Inspections Results.pdf) is the workplace examinations.

**7.** Referring to your statement below, "#8 specifically request for the Microsoft Teams correspondence whether it be a paper version or an electronic version." , Please see the attached (MSHA requested Teams chat 1APR-30APR23.pdf). You will see numerous occasions where myself, Mr. Spears, and even Mr. Molesi have to communicate to the Mill associates about issues in the Mill where if Mr. Baumann was performing his duties successfully, we would not have had to communicate the information ourselves. Simple signs that he was not effectively managing his team, he didn't communicate effectively with anyone, he didn't give feedback, he didn't lead by example, and he didn't care about the development of his team. Every person we have hired in the mill has had something negative to say about Rob. A good example of this poor leadership is with Mr. Ronnell Fondren, during his short tenure with us, as you can see in the chat history, he struggled with Mr. Baumanns lack of leadership skills.

Please let me know if there is any additional information you need so we can work with you to diligently resolve this complaint/allegation.


**Russell Tidaback**
Managing Member



**AmericanTripoli.com**

**From:** Dillingham, Michael E - MSHA <Dillingham.Michael@DOL.GOV>
**Sent:** Friday, May 12, 2023 8:24 AM
**To:** Russell Tidaback <RTidaback@deedyco.com>
**Cc:** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>; Boyd, Randall L. - MSHA <Boyd.Randall@DOL.GOV>; Larkins, Adam S - MSHA <Larkins.Adam@DOL.GOV>; West, David R - MSHA <West.David@DOL.GOV>
**Subject:** RE: Request for Information

Thank you for your responses. From looking at the response it doesn't have any reprimands for Mr. Baumann to relate to the allegations we received . #4 is and Excel Spreadsheet, is there a company form that should be submitted also. I f you read the #6 request it is not the same as #3. MSHA is requesting a copy of the On-shift workplace examinations whether it be a paper version or an electronic version. Also #7 request specifically request maintenance records whether

Exhibit No 8 Pg No 3

it be a paper version or an electronic version. #8 specifically request for the Microsoft Teams correspondence whether it be a paper version or an electronic version. These requests are specific to the ongoing 105 (c) investigation. Due to the nature of the case and the stringent timelines without compliance of these request impedes our investigation. Please submit these requests to the investigator promptly as we are working diligently to resolve. Thanks.

**From:** Russell Tidaback <RTidaback@deedyco.com>
**Sent:** Thursday, May 11, 2023 9:03 PM
**To:** Dillingham, Michael E - MSHA <Dillingham.Michael@DOL.GOV>
**Cc:** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>; Russell Tidaback <RTidaback@deedyco.com>
**Subject:** RE: Request for Information

CAUTION: This email originated from outside of the Department of Labor. Do not click (select) links or open attachments unless you recognize the sender and know the content is safe. Report suspicious emails through the "Report Phishing" button on your email toolbar.

Hello Mr. Dillingham,

Attached are 1., 2., 4., and 5. of the list of items you are requesting.

3. We don't have different shifts other than our operating hours, 8am-430 pm.

6. This is the same as #3.

7. At this time, our maintenance crew is new and we havent implemented a Maintenance Management System.

8. Any web site maintenance is handled off site by a Microsoft contractor. Employees have access to the employee handbook via the website.

9. Russell Tidaback

**From:** Russell Tidaback <RTidaback@deedyco.com>
**Sent:** Wednesday, May 10, 2023 5:51 PM
**To:** dillingham.michael@dol.gov
**Cc:** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>; Russell Tidaback <RTidaback@deedyco.com>
**Subject:** FW: Request for Information

Hello Mr. Dillingham.

Following 29 CFR 2700.43 Answer., I didn't know if it needed to be on company letterhead or if an email response would suffice.

Respondent Answer:

Mr. Rob Baumann was terminated with cause;
poor performance, lack of leadership skills, and failure to follow procedures and guidance given by his supervisor(s), as stated in the termination letter given to him at his last counseling session. (attached)

His work history performance does not correlate to any relatable discussions that we were made aware of between him and MSHA representatives. Plus, this isn't a one-time event/issue, and we have been working on his performance issues for many months.

Regarding "everyones pay" is covered in the Miners Rights and Responsibilities handbook, and every miner is paid accordingly.

Exhibit No 8 Pg No 4

Appellate Case: 25-1349     Page: 112     Date Filed: 04/07/2025     Entry ID: 5503844

We are unaware of any miner not receiving pay or having pay issues at this time.

I believe Mr. Baumann is simply striking out in anger, which is one reason why he was terminated.

**Russell Tidaback**
Managing Member



**AmericanTripoli.com**

**From:** Russell Tidaback <RTidaback@deedyco.com>
**Sent:** Monday, May 8, 2023 11:45 AM
**To:** Larkins, Adam S - MSHA <Larkins.Adam@DOL.GOV>
**Cc:** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>; Russell Tidaback <RTidaback@deedyco.com>
**Subject:** RE: Request for Information

Hello Mr. Larkins.

Following 29 CFR 2700.43 Answer., I didn't know if it needed to be on company letterhead or if an email response would suffice.

Respondent Answer:

Mr. Rob Baumann was terminated with cause;
poor performance, lack of leadership skills, and failure to follow procedures and guidance given by his supervisor(s), as stated in the termination letter given to him at his last counseling session. (attached)

His work history performance does not correlate to any relatable discussions that we were made aware of between him and MSHA representatives. Plus, this isn't a one-time event/issue, and we have been working on his performance issues for many months.

Regarding "everyones pay" is covered in the Miners Rights and Responsibilities handbook, and every miner is paid accordingly.

We are unaware of any miner not receiving pay or having pay issues at this time.

I believe Mr. Baumann is simply striking out in anger, which is one reason why he was terminated.

**Russell Tidaback**
Managing Member

Date Filed: 04/07/2025   Entry ID: 5503844    Page: 113    Appellate Case: 25-1349

Exhibit No 8 Pg No 5



# AMERICAN TRIPOLI

**Mailing Address:** 2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414
**Shipping/Receiving Address:** 5 Oneida Street, Seneca,
MO 64865

April17, 2023, 9:00 AM

Dear Robert Baumann,

I regret to inform you that your employment with American Tripoli will be terminated effective immediately due to poor performance, lack of leadership skills, and for failure to follow procedures and guidance given by your supervisor.

We have made several attempts to address these issues with you through coaching, feedback sessions and open communication channels, but unfortunately, we have not seen any improvement in your performance and the data reflects this.

Please note that you will receive your final paycheck, as scheduled, on the upcoming pay date, which will include any accrued benefits owed to you.

I am very disappointed that this opportunity did not work out as I had high hopes for you.

If you have any questions or concerns about this decision, please do not hesitate to contact me.

Sincerely,

*Russell Tidaback*

Russell Tidaback
Managing Member
American Tripoli

Ccd:
John Spears
Operations Manager
American Tripoli

Appellate Case: 25-1349    Page: 114    Date Filed: 04/07/2025    Entry ID: 5503844

Exhibit No 8 Pg No 6

CustomerService@AmericanTripoli.com

Rob Baumann -

26JUL2022 - Jeff states the shaker screen ripped because Rob didn't put bolts back in and just ran it like that. Rob told Miguel that he didn't care and that Miguel needed to get down. Rob shut things down sent everyone home early.

27JUL2022 - Christine states Rob is having the guys run straight 8 hours and bypassing the given break so they can go home earlier. I explained the break should be rotated so we can continue to produce for the 8.5 hours. The breaks are precautionary for employees dust exposure too. MO doesn't require breaks to be given. Plus they are only running bulk bags and that can be done with two people.

1AUG202 - Christine states if Rob cannot get it done, we just need to replace him.

5AUG2022 - Jessie states there is no emphasis for the guys to help him. When he brings it to Rob, he shruggs his shoulders and walks away.

8AUG2022 - Christine wants to bring Rob to first shift as she doesn't believe Rob is doing what he is suppose to be doing without someone overseeing him. We cannot put Jim on nights due to being a single father and a young child at home.

9AUG2022 - Christine thinks we should train someone to replace Rob on the night shift.

16AUG2022 - Advised Christine to counsel Rob regarding shutting down and letting people go earlier than scheduled.

25AUG2022 - Rob needs counseling on filling out the BOL correctly. A shipper complained that he did it wrong and wasted their time.

31AUG2022 - Had discussion with Rob on the importance of inputting the daily production information in the spreadsheet. He said he would log in and get it done.

3SEP2022 - Had discussion with Rob regarding the daily production numbers and updating the spreadsheet accurately. I don't know if he is incompetent or just lazy.

28SEPT2022 - Rob not doing the CILAS reports as required for orders produced.

8OCT2022 - Jessie and Carson were waiting for Rob to get there. Rob was late getting there.

12OCT2022 - Had discussion with Rob regarding notifying and working with Carson to address the maintenance issues. Carson said Rob gets mad at everything and is hard to work with. I explained that getting angry and combative with others is not going to solve the issue any quicker.

13OCT2022 - Had to counsel Rob on following the production schedule as it is presented. He was not producing what was on the schedule. Rob said he didn't like having to check the computer or phone to do his job. I explained that the computer work was part of the role.

17OCT2022 - Had to explain Rob about the flow of the system and asked him why he wasn't reviewing the operating documents in the maintenance team files. His excuse was he didn't like to read on a



computer.

26OCT2022 - Had to explain to Rob why the MAC vacuum system was spewing dust from the exhaust and that we had to shut the system down so DEQ doesn't get called. Jim states Rob doesn't know what he is doing.

2NOV2022 - John mentioned Rob showing his poor attitude again.

5NOV2022 - Had to get onto Rob about not properly keeping team shift hours correct in Shifts. He was writing them down on scratch paper and forgetting to update shifts. I don't know if he is just lazy or what. I explained that he can do this any time from the computer or his phone.

8NOV2022 - Had to inquire with Rob if he was shutting down early letting people go home early. The systems were showing shut down before the end of the shift.

1DEC2022 - While at AT had a discussion with Rob regarding his lack of attentiveness regarding ensuring the proper things were done with his team. The checklists werent being completed. The inspections werent being completed. The breakroom was a disaster. The fridge was disgusting. The trash wasn't taken out the day before, some of the windows were still open. The production floor was a mess. The back roll up door was off track. The bathroom was disgusting. The circuit breakers in Warehouse A was blocked by slip sheets.

16DEC2022 - Discussion regarding keeping the production team informed of what is expected to produce that day. Rob is lacking in managerial purpose for his team members.

26DEC2022 - Discussion with Rob regarding not meeting the daily production goals, team members complaining that he doesn't know what he is doing and that he just gets angry and stomps around like a child. He isnt a leader and allows his team to push him around. His response was just nodding his head. I stressed filling out the tasking board everyday and making sure the things get done. If he has problems with someone, take it to John and john will get it resolved. Jim blames Rob.

20JAN2023 - Kensley posted in the Ops chat group a pic of dust blowing out the back of the bldg. Again, had to stress to Rob that he needs to watch for any dust blowing out of the building. We cant have the Sheriff or DNR receiving complaints about us. We had to reiterate in the group that is was Robs responsibility to be inputting in the daily production worksheet what was produced each day before he leaves for the day. This wasn't been done.

25JAN2023 - Had to get onto Rob regarding keeping the completed bag inventory up to date. John and I discussed Robs attitude.

28FEB2023 - discussed with Rob about the task board. Starting to think we need to let Rob go. His attitude is one that he doesn't care about getting things done. He jokingly mentioned he liked being paid for not working.

20MAR2022 - Alex Snodgrass hired to eventually replace Rob.

24MAR2023 - Discussion with John regarding Robs push back on stacking the bags today. I believe Robs attitude is infectious. We need Alex to take over for Rob and just let Rob go for performance issues.



30MAR2023 - ATMO Safety discussion with Jessie about ensuring that Rob gets the tasks done. The tasks are established, just not getting enforced by Rob.

5APR2023 - Alex informed us regarding accepting a neurology position at a hospital in Little Rock. Neurology is his degree is in. John and I discussed just letting Rob go.

7APR2023 - John, Jordan and I discussed letting Rob go.

12APR2023 - Time to let Rob go. He is afraid to make the system work and cant meet the simple daily quotas. If Jim can get it done why cant Rob. Need to look at the mill structure again. Jim can run the Mill, we just need to get a manager of people to manage the team. Hopefully, Brian Edwards can do it. He can manage the people, QC, inventory and the reporting. Jim can run the mill. Brian will need to learn how to as a back up to Jim.

14APR2023 - Warned John about an MSHA complaint when we let Rob go. Robs termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associated by utilizing the proper controls, etc. Send John the termination letter.

16APR2023 - Ask Keith about miner pay and withdrawl order. Robs termination letter sent to John.

17APR2023 - Keith replied about withdrawl order pay. Brian Edwards was a no show for the MSHA training.





# AMERICAN TRIPOLI
### P.O. BOX 489 – SENECA, MISSOURI 64865
### TEL. NO. +1.417.776.2216
### EMAIL: Info@AmericanTripoli.com

MOSenecaManufacturer LLC
dba American Tripoli
222 Onieda Street
Seneca, MO 64865
August 24, 2022

Dear Will Shallenburger:

American Tripoli is excited to bring you on board as Production Shift Manager.

We're just a few formalities away from getting down to work. Please take the time to review our offer. It includes important details about your compensation, benefits and the terms and conditions of your anticipated employment with American Tripoli.

American Tripoli is offering a full-time position for you as Production Shift Manager, reporting to the Operations Manager starting on August 24, 2022 at 222 Onieda Street, Seneca, MO 64865. Expected hours of work are Monday – Friday, 8am – 430pm.

In this position, American Tripoli is offering to start you at a pay rate of $45,000 per year. You will be paid on a semi-monthly basis.

As part of your compensation, as a full-time employee of American Tripoli you will be eligible for health insurance, dental insurance, boot allowance post the 90-day probationary period.

Please indicate your agreement with these terms and accept this offer by signing and dating this agreement.

Sincerely,

*Russell Tidaback*

Russell Tidaback
Owner / Managing Member

*W. H. Shallenburger*
Will Shallenburger (Aug 26, 2022 13:54  CDT)

Will Shallenburger

Appellate Case: 25-1349     Page: 118     Date Filed: 04/07/2025     Entry ID: 5503844



**AMERICAN TRIPOLI**
P.O. BOX 489 – SENECA, MISSOURI 64865
TEL. NO. +1.417.776.2216
EMAIL: Info@AmericanTripoli.com

MOSenecaManufacturer LLC
dba American Tripoli
222 Oneida Street
Seneca, MO 64865
November 4, 2022


Richard McClelland
105 N Delaware St
Grove, OK 74344


Dear Richard McClelland:

American Tripoli is excited to bring you on board as a Production Lead.

We're just a few formalities away from getting down to work. Please take the time to review our offer. It includes important details about your compensation, benefits and the terms and conditions of your anticipated employment with American Tripoli.

American Tripoli is offering a full-time position for you as a Production Lead, reporting to John Spears starting on November 14, 2022 at 222 Onieda Street, Seneca, MO 64865. Expected hours of work are Monday through Friday, 8:00 – 4:30 pm central time.

In this position, American Tripoli is offering to start you at a salary of $41,600 per year. You will be paid on a biweekly basis, starting November 18, 2022.

As part of your compensation, we're also offering PTO, health insurance and 401(k) matching, steel-toed boot allowance.
After your 90-day probationary period, you will begin accruing 3.08 hours of PTO per pay period for the first 3 years. You may enroll for medical and dental insurance before your 90th day, in which it will become effective on your 91st day, or you may wait until the Open Enrollment Period in June. You may contribute immediately to the 401(k) plan, in which the company will match up to 5%. After your 90-day probationary period, you may request a Red Wing Boot voucher for up to $200. If you purchase Red Wing steel-toed boots before your 90th day, bring in your receipt and you may be reimbursed for up to $200 after your 90th day.


Sincerely,


Russell Tidaback
Owner / Managing Member



# AMERICAN TRIPOLI

2701 East Grauwyler Road,
Bldg 1, Dept# 1008,
Irving, TX 75061-3414
Email: HR@AmericanTripol

MOSenecaManufacturer LLC
dba American Tripoli
222 Oneida Street
Seneca, MO  64865

Alex Snodgrass
Street Address:
City:          State:          Zip code:

Dear Alex

American Tripoli is excited to bring you on board as a Production Coordinator .

We're just a few formalities away from getting down to work. Please take the time to review our offer. It includes important details about your compensation, benefits, and the terms and conditions of your anticipated employment with American Tripoli.

American Tripoli is offering a full-time position for you as a Production Coordinator, reporting to John Spears, starting on 20MAR2023      , at 222 Oneida Street, Seneca, MO 64865. Expected work hours are Monday through Friday, 8:00 am – 4:30 pm central time.

In this position, American Tripoli is offering to start you at an hourly wage of $20.00 per hour. You will be paid biweekly. Our next payroll cycle is 7APR2023    .

As part of your compensation, we're also offering PTO, health insurance, 401(k) matching, and a Red Wing boot reimbursement.
**PTO:** After your 90-day probationary period, you will begin accruing 3.08 hours of PTO per pay period for the first three years.
**Health Insurance:** You may enroll in the American Tripoli medical and dental insurance plan before your 90th day, which will become effective on your 91st day, or you may wait until the Open Enrollment Period in June.
**401(k):** After your 90-day probationary period, you may enroll and contribute to the 401(k) plan, in which the company will match up to 5% of your contribution.
**Steel-Toed Boots:** After your 90-day probationary period, you may request a Red Wing boot voucher, in which we will cover up to $200 of the boot cost. You may purchase Red Wing (steel-toed) boots before your 90th day and submit the receipt on your 90th day to be reimbursed for up to $200 of the boot cost.

Please indicate your agreement with these terms and accept this offer by signing and dating this agreement on or before  21MAR2023       .

Sincerely,

_____         21MAR2023            _____         3/22/23

RUSSELL TIDABACK                 Date              Alex Snodgrass                    Date
Owner / Managing Member



## ON YOUR FIRST DAY, YOU NEED TO MAKE SURE TO BRING WITH YOU:

**1.** YOUR **DRIVERS LICENSE** OR STATE APPROVED PHOTO ID

**2. SOCIAL SECURITY CARD** OR ACCEPTABLE DOCUMENTS LISTED ON THE USCIS I-9 FORM

**3.** YOUR **BANK ROUTING NUMBER AND ACCOUNT NUMBER** (for Direct Deposit of your paycheck)


You will receive a digital copy of this document, emailed to you upon verification of your ID.

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| Respondent. | ) | Mine Id No. 23-00504 |


### ACTING SECRETARY'S POST-TRIAL BRIEF

Seema Nanda
Solicitor of Labor

Christine Z. Heri
Regional Solicitor

Evert H. Van Wijk
Associate Regional Solicitor

U.S. Department of Labor          /s/ Laura O'Reilly
Office of the Solicitor           Laura O'Reilly
2300 Main Street, Suite 10100     Elaine Smith
Kansas City, MO 64108             Quinlan Moll
(816) 285-7260
(816) 285-7287 facsimile
Oreilly.laura.m@dol.gov
Smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov           Attorneys for the Acting Secretary

## <u>TABLE OF CONTENTS</u>

**PROPOSED FINDINGS OF FACT** ....................................................................... **1**

    A.    American Tripoli is a Mine Under the Act and Baumann is a Miner ............................... 1

B. Important Communications at the Mine were Accomplished and Preserved through Microsoft Teams Messages ................................................................... 3

    C.    AT Inadequately Trained Baumann .................................................................. 4

    D.    Baumann Was a Good and Conscientious Employee ....................................... 5

    E.    Baumann Increasingly Raised Safety Issues to Management and MSHA in the Last Two Months of His Employment ........................................................ 5

        i.    AT tells Baumann and other Miner not to Cooperate with MSHA during February 2023 Inspections ................................................................... 9

        ii.    Baumann Becomes Miner's Representative and Reports Safety Hazards to AT and MSHA during March 2023 ....................................................... 12

        iii.    In April 2023, Baumann Participates in MSHA Inspection that Results in 104(b) Order Shutting Down Mine, Asks About Pay During Shut Down Causing AT to Terminate his Employment ................................................. 16

    F.    Baumann is Terminated for Protected Activity but is Given a Reason that is Pretext.... 19

    G.    Baumann Files a Complaint With MSHA ....................................................... 20

    H.    After April 17, 2023, AT Expresses Hostility to Baumann's Protected Activity and Begins Making up Reasons for Baumann's Termination ........................................... 20

    I.    AT Did Not Follow Its Disciplinary Process with Baumann Demonstrating Reasons Given for Termination were Pretext .................................................... 22

    J.    AT's Reference to Production is Pretext ......................................................... 24

    K.    AT is Hostile to Safety .................................................................................. 25

    L.    As a Result of His Wrongful Termination, Baumann Suffered Financial Losses.......... 28

    M.    The Court Should Assess Civil Penalties Against AT .................................... 33

**ARGUMENT** ..................................................................................................... **33**

    A.    AT Violated Section 105(c) of the Act When it Terminated Baumann ........................ 33

        i.    Baumann Engaged in Protected Activity......................................................... 34

        ii.    Baumann Suffered an Adverse Action ............................................................ 36

        iii.    Baumann's Termination was Motivated by Protected Activity .................................. 36

Appellate Case: 25-1349   Page: 123   Date Filed: 04/07/2025 Entry ID: 5503844

    1.   AT Knew About Baumann's Protected Activity ............................................ 38

    2.   AT was Hostile to Baumann's Protected Activity ...................................... 39

    3.   There is a Close Coincidence in Time Between Baumann's Protected Activity and His

    Termination ...................................................................................................... 41

    4.   AT Treated Baumann Disparately by Not Following its Own Disciplinary Policy ..... 43

B.    AT Has Failed to Prove Any Defense ........................................................ 44

  i.   AT Did Not Rebut the Secretary's *Prima Facie* Case .................................... 44

  ii.   AT Did Not Establish an Affirmative Defense ........................................ 45

  iii.   AT has Provided No Credible Reason for Terminating Baumann .............................. 46

  iv.   AT Was Motivated by Nothing More than Baumann's Protected Activity ................. 47

C.    The Court Should Award Back Wages and Back Pay to Baumann ................................ 49

D.    AT Interfered with Baumann's and Other Miners' Rights at the Mine .......................... 52

  i.   AT's Actions Interfered with Protected Activity ........................................ 53

  ii.   AT Has Failed to Set Forth Justification for its Interfering Conduct .............................. 54

E.    The Court Should Assess a Civil Penalty for Each Violation ........................................ 55

**CONCLUSION** ...................................................................................................... **57**

Appellate Case: 25-1349   Page: 124   Date Filed: 04/07/2025   Entry ID: 5503844

## INTRODUCTION

This case arises out of a discrimination complaint Robert Baumann ("Baumann") made to MSHA alleging that he was discriminated against when he was terminated by Respondent, MoSenecaManufacturer Limited Liability Company dba American Tripoli ("Respondent" or "AT") after participating in multiple MSHA inspections, making safety complaints to management and MSHA, becoming a miners' representative, and inquiring about miners' rights to pay during an MSHA shut down order. The Acting Secretary of Labor ("Acting Secretary") investigated the complaint and found that not only had AT discriminated against Baumann in violation of Section 105(c) of the Federal Mine Safety and Health Act of 1977 (the "Act") when AT terminated him on April 17, 2023, but that AT also interfered with miners' rights, including Baumann's, in violation of Section 105(c) of the Act by intimidating miners from engaging in their protected right to speak to and make safety complaints to MSHA.

## PROPOSED FINDINGS OF FACT

### A. American Tripoli is a Mine Under the Act and Baumann is a Miner

1) The MOSenecaMfr LLC dba American Tr mine ("Mine") is a mine as defined in 30 U.S.C. § 802(h). (P-39 at p. 33, Request for Admission ("RFA") No. 1).

2) The Mine is a nonmetal surface mine. (Trial Transcript, Vol. 2 ("Vol.")[1], 316:8-10; P-17 at p.1). The products of the Mine enter commerce or the operations or products thereof affect commerce within the meaning and scope of the Act. (P-39 at p. 34, RFA response No. 2). The Mine has a quarry in Oklahoma and the material excavated at the quarry, tripoli, is transported across state lines to the Mine's mill located in Seneca, Missouri. (Vol. 1, 65:5-16; Vol. 2, 357:19-358:5). Tripoli is made of mostly silica. (Vol. 1, 57:9-15, Vol 2, 136:4-6, 220:6-8).

---

1 The trial transcript was provided in three volumes, each starting with a new page number 1. As such, the citations to the transcript are listed by volume and then page number.

Appellate Case: 25-1349     Page: 126     Date Filed: 04/07/2025 Entry ID: 5503844

3)   Respondent is the operator of the Mine and was the operator of the Mine from at least June 1, 2022 to April 17, 2023. (P-39 at p.34, RFA No. 3; Vol. 2, 316:6-7).

4)   Baumann was employed by AT from June 16, 2022 through April 17, 2023 as a production supervisor. (Vol. 1, 47:10-13, 52:21-53:6; Vol. 2, 99:1-20; P-1). Baumann worked in the mill at the Mine, which processes tripoli rock with a crusher, resulting in a ground powder of tripoli. (Vol. 1, 53:7 to 54:5). Baumann's duties included feeding the rock out of the tanks into the dryer and through the system and putting the final product into a bag. (Vol. 1, 96:19-98:3). Baumann was a miner as defined in Section 3(g) of the Act, 30 U.S.C. § 802(g). (P-39 at p. 35, RFA No. 4).

5)   AT employed 34 other miners during Baumann's ten-month employment, and 26 of these 35 employees were terminated or quit during Baumann's employment. (P-39 at p. 10-18). Employees who worked at AT, including the three former AT employees who testified at the trial—Gage Wheeler, Carson Allman, and Kensley Brewer—were miners under the Act as they worked regular shifts in and around the Mine's mill engaged in tasks to support production and maintenance. (Vol. 2, 129:3-21, 130:6-9, 218:8-21, 270:9- 271:11).

6)   Russell Tidaback ("Tidaback"), Jordan Tidaback ("Ms. Tidaback"), and John Spears ("Spears") were in management at AT when Baumann was terminated. (Vol. 1, 67:10-14; Vol. 2, 359:5-13). Baumann considered these three individuals to be management at AT. (Vol. 1 67:10-14).

7)   Tidaback is an owner and managing member of AT via his ownership of Omphalos LLC, which owns MoSenecaManfaucturer Limited Liability Company. (P-43 at Depo. Tr. 10:15-20; P-17 at p. 2-3). Tidaback did not regularly work at the Mine, and Baumann only met Tidaback 6-8 times during his 10-month employment. (Vol. 1 67:18 to 68:4; Vol. 2 142:21 to 143:1). Tidaback was at the Mine for five days in 2023, and approximately ten days in 2022. (P-43 at Depo. Tr. 21:3-24). Ms. Tidaback is also an owner of AT through her ownership of Omphalos LLC. (P-43 at Depo. Tr.

2

12:15-25).

8) Spears is the Operations Manager for AT and was Baumann's supervisor as of August 2022. (Vol. 1 47:5-9; Vol. 3, 91:20 to 92:1, 144:5-10). Spears was in charge of the day-to-day operations at AT. (Vol. 1, 69:13-15).

**B. Important Communications at the Mine were Accomplished and Preserved through Microsoft Teams Messages**

9) Employees of AT communicated regularly and frequently via Microsoft Teams ("Teams") chats, including communicating with Tidaback. (Vol. 1, 91:20 to 92:5; P-43 at 76:11 to 77:1). On Teams, there were various groups, which included employees and management. (Vol. 1, 92:10 to 93:17). Only AT employees and the owners of AT participated in the Teams chats, and Teams was used to communicate about work at the Mine. (Vol. 1, 93:18 to 94:9).

10) AT, via Tidaback, provided multiple Teams messages to the Acting Secretary during discovery in this case. (*See* P-9, P-10, P-11, P-12, P-13, P-31 – 34). Because Tidaback produced the Teams messages, the "you" in the messages refer to Tidaback and the purple/blue boxes also indicate messages from Tidaback. (Vol. 1, 160:8-17; P-43 at Depo. Tr. 78:11-13 (Tidaback shows up as "you" in a chat because he was the one who did the search), 89:10-13, 91:15-16, 92:3 to 93:14, 97:12-14). Teams messages with a "sent date" containing only the day and month were sent in 2023, because these messages were pulled by Tidaback in the year 2023, and the search criteria was limited to Baumann's employment from June 2022 through April 2023. (P-43 at Depo. Tr. 78:11 to 79:4).

11) Spears kept Tidaback regularly updated about what was going on at the Mine, primarily through Teams. (Vol. 3, 144:14-21). Spears ran everything through Tidaback, including telling Tidaback whenever there was an MSHA inspection at the Mine. (Vol. 2, 148:6-14; Vol. 3, 148:13-15). Spears would tell miners he was reporting to Tidaback and that he had to check with Tidaback

to get approvals regarding decisions affecting the Mine, and he would report back to miners how Tidaback wanted them to proceed. (Vol. 1, 69:16 to 70:19; Vol. 2, 148:15-21, 225:1-14, 228:12-20, 301:16-302:1). Baumann observed Spears on the computer messaging Tidaback and believed Spears and Tidaback communicated with each other multiple times per day. (Vol. 1, 69:20 to 70:8). Inspector Markeson also noticed that Spears would call or message Tidaback during MSHA inspections. (Vol. 2, 387:11 to 388:3).

**C. AT Inadequately Trained Baumann**

12) Prior to working at AT, Baumann did not have any mining experience, had no experience with MSHA, and did not know about MSHA's training requirements. (Vol. 1, 81:9-16).

13) About two weeks after Baumann started working at AT, on July 5, 2022, Baumann received a 30–45-minute safety training from AT and was then told to sign his New Miner Training Certificate. (Vol. 1, 81:17-21; P-40). Baumann was not closely supervised while he worked in the Mine either before or after this 30–45-minute training. (Vol. 1, 89:1-7). Baumann never received the full 24 hours of new miner training during his employment with AT. (Vol. 1, 87:22 to 89:3; 88:16-22). Baumann did not realize until months later, when he got an annual refresher training from a third party, that 24 hours of new miner training was required. (Vol. 1, 333:14-20). Similarly, former AT employees, Wheeler and Allman, were put immediately to work without close supervision prior to new miner training, and Allman did not receive the training until about a month after he started working at the Mine. (Vol. 2, 137:6-22, 220:9-221:10).

14) Baumann also did not receive any task training while working at AT, nor did he see anyone else do task training. (Vol. 1, 99:8-15). Baumann only learned that task training was required after he began walking around with MSHA inspectors more than 6 months after he started working at AT. (Vol. 1, 89:16-90:3). Maintenance personnel also did not receive task training. (Vol. 2, 138:1-3.

4

222:6-224:5). AT never provided Baumann with any training on safety expectations at the Mine, and Baumann was never given enough information to know what MSHA standards required at the Mine. (Vol. 1, 134:19-22; 135:5-8). Baumann was never provided with written safety procedures during his employment and was not aware of any written safety procedures at the Mine. (Vol. 1, 139:7-20). Baumann also was never told which machines needed guards, and no one walked through the mill to show him where guards were needed. (Vol. 1, 386:6-17, 393:22-394:13).

### D. Baumann Was a Good and Conscientious Employee

15) Baumann initially began work on the night shift but was switched to the day shift when AT discontinued the night shift, in part, because the machinery was having trouble running all day and night. (Vol. 1, 71:21-72:3; 72:14 to 73:6). AT was behind on production of the bulk bag orders when Baumann started at AT, and Baumann was able to catch up production through his work on the night shift. (Vol 1, 72:16-21). Baumann was told he was doing a good job while working on night shift and got "atta boys" for his work from Tidaback, Spears, and Schreiber[2], who was his direct supervisor until August 2022. (Vol. 1, 65:19 to 66:3, 73:7-12).

16) According to his co-workers, Baumann performed his job at AT well, was a dedicated worker, was on-time or early, helped other miners, cared about the safety of miners, was a good leader, and had a good attitude at work. (Vol. 2, 152:5-155:12, 234:8-235:12, 247:16 to 248:15, 252:15 to 253:1, 273:2-5, 275:20-22). Likewise, according to Baumann's direct supervisor Spears, Baumann got along well with Spears, was never disrespectful to Spears, was conscientious about getting product produced, competent at his job, punctual, and Spears did not know of anyone that disliked Baumann. (Vol. 3, 109:14-10; P-44 at Depo. Tr. 27:22-28:12).

### E. Baumann Increasingly Raised Safety Issues to Management and MSHA in the Last

2 Schreiber, who hired Baumann at AT, was Baumann's former boss for a year at Schreiber Foods before coming to AT. (Vol. 1, 65:17-66:18).

Appellate Case: 25-1349     Page: 130     Date Filed: 04/07/2025 Entry ID: 5503844

### Two Months of His Employment

17) Baumann started to learn about safety through participation in MSHA inspections in February 2023 and became more aware of safety issues at the Mine. (Vol. 1, 138:4-9, 183:4-19 268:9-269:13). As a result, Baumann raised more safety complaints to AT management, including Spears and Tidaback. *Id.* There was no formal process at AT for making safety complaints, including no forms or written notification process, but miners, including Baumann, were expected to bring concerns to Spears first, who would then relay the information to Tidaback. (Vol. 1, 186:8 to 187:1, 269:2-270:6). Miners testified that Baumann raised safety complaints to Spears quite a bit, including through Teams and in person. (Vol. 2, 245:5-17, 273:6-17). Baumann explained issues with the machinery and raised safety concerns to Spears multiple times a day during Kensley Brewer's employment. (Vol. 2, 245:5-17, 273:6-17, 278:8-22; 279:17-280:7). Spears admits that Baumann brought complaints and issues about the equipment to his attention. (Vol. 3, 110:11-19).

18) Of particular concern to Baumann were the dangerous silica dust exposure issues at the Mine, which he raised to Spears at least 15-20 times during his employment, and at least ten times in the two months before he was terminated, through Teams and in person. (Vol. 1, 58:15 to 59:1, 184:10-185:11; 186:2-7; Vol. 2, 167:6-22). Baumann did not learn about the hazards of silica dust, which he was regularly exposed to at AT, until February or March 2023, when he started participating in MSHA inspections. (Vol. 1, 59:2-19; 183:20-184:7).

19) Baumann also made other safety complaints, including multiple electrical complaints. (Vol. 2, 79:16-80:12). For example, Baumann raised a complaint about the bagger which had regular problems with a limit switch, and a temporary solution was to use a jump wire at the electrical box and a manual toggle switch. (Vol. 1 198:11-199:1). Baumann raised this safety complaint to Spears and Tidaback multiple times because this task required miners to work near this open electrical box

and use a manual toggle switch to run the bagger. (Vol. 1, 198:13 to 200:3). Spears told Baumann to put caution tape around it, but the miners were still told to break the barrier to run the bagger. *Id.* These are just instances of the approximately four to six other electrical safety complaints Baumann made to Spears and Tidaback in the last two months of his employment. (Vol. 1, 197:1-22). These electrical safety issues, along with other safety complaints raised by Baumann were usually ignored, in that management would not respond to issues he raised. (Vol. 1, 197:20-198:6).

20) AT management regularly refused to fix safety issues pointed out by MSHA and Baumann. (Vol. 1, 277:5-277:4). For example, in the last two months of Baumann's employment, there was a citation issued by MSHA for an oil dam underneath the tube mill, and Baumann made a complaint about this issue and attempted multiple times to clean up the oil in this area, but he was told by management that "we're not doing that". (Vol. 1, 189:3-190:5, 277:9-20; Vol. 2, 79:16-80:12).

21) Baumann also noted safety issues on workplace exams, which he started doing in December 2022 or January 2023, without receiving any training. (Vol. 1, 100:17-102:12). Baumann did not learn about daily workplace exams until after MSHA started asking about them, and no one at AT said anything about workplace exams to him prior to the MSHA inspections. (Vol. 1, 365:3-11). Baumann would note issues on the workplace exams, but they would not get fixed for multiple reasons, including a lack of maintenance personnel or management's refusal to do the maintenance work if the repair required shutting down production. (Vol. 1, 100:17-102:12). Baumann was told to wait for a maintenance day, rather than fixing the safety issues when they were found. *Id.* Further, there was not enough space on the electronic workplace exam forms to write down all the issues Baumann found. (Vol. 1, 101: 5-7). Baumann noted a live wire coming through the floor, every day in the workplace exams until it was finally fixed, as well as noting issues with putting rags in the bearings, which was a fire hazard. (Vol. 2, 80:19 to 81:2). Another example of an issue raised in

workplaces exams was a "Broken conduit outside by lil mac" and safety issues about a ramp gate being left open which Baumann closed and locked. (Vol. 2, 83:9-22; P-14 at p. 9-10). Some of these safety issues are seen in P-14, which contains the workplace exams produce by AT in discovery; however, Baumann testified P-14 appeared to have been changed, and he did not recognize the document to be the same as it was when he was an employee. (Vol. 2, 81:3-11, 82:3-21, 120:17-20).

22) All of the safety complaints and concerns that Baumann raised to AT management would not have shown up on the workplace examinations, like the dust issues, because Baumann was only told to perform the workplace exams when the Mine was running, and the Mine was not running the majority of the time he was performing workplace exams. (Vol. 2, 85:2-16). Baumann was also not the only person conducting workplace exams; there are multiple miners who conducted workplace exams during Baumann's employment. (P-14 at p. 1).

23) In addition to raising safety complaints, Baumann started participating in MSHA inspections because he was concerned for miners' safety. (Vol. 1, 150:3-7). In the two months leading up to Baumann's termination, he walked around with MSHA during inspections at least ten different times, including each time they came to inspect the Mine during this time. (Vol. 1, 251:18-252:6, 253:8- 254:18; Vol. 2, 358:9-18). Spears saw Baumann speaking to MSHA inspectors and knew Baumann walked around with MSHA during inspections. (Vol. 3, 148:3-8). Tidaback also saw Baumann talking with an MSHA inspector and walked around with Baumann during at least one inspection. (Vol. 2, 359:14 to 360:17; Vol. 3, 199:3-8). As a result of these inspections, MSHA shut down the Mine multiple times because citations had to be terminated. (Vol. 1, 113:22-114:14, 117:20 to 118:5).

24) During MSHA inspections, Baumann pointed out safety issues to MSHA, including one instance when he raised a concern about a miner who had fallen through the top floor of the Mine,

which AT had not reported to MSHA. (Vol. 2, 361:16 to 362:10). In addition, Baumann raised safety concerns to Inspector Markeson that Baumann was being directed to leave guards out of place to get back to production faster. (Vol. 2, 361:1-10).

25) While concerned about safety, Baumann was not in charge of safety, was never told he was in charge of safety at the Mine, was never provided training on any expectations AT had with regard to safety at the Mine, and was never tasked with ensuring the Mine complied with MSHA standards. (Vol. 1, 134:8-135:8, 140:7-18; Vol. 3, 231:11-232:1).

### i. AT tells Baumann and other Miner not to Cooperate with MSHA during February 2023 Inspections

26)  MSHA opened an inspection of AT on February 13, 2023 which lasted until April 10, 2023 and was based on a complaint that had multiple allegations (the "February Inspection"). (P-21; Vol. 2, 381:1-18). The February Inspection resulted in the issuance of 58 citations and 16 orders to AT. (P-21). Baumann participated in this inspection by walking around with MSHA on multiple different days during the inspection. (Vol. 1, 149:7-9; 150:8-11).

27) During the February Inspection, Baumann learned that MSHA issued multiple citations in 2022 that AT did not tell the miners about and that management did not abate many of those citations. (Vol. 1, 91:1-19; 119:10-22, 172:16-176:8). This caused Baumann concern, and he started getting more involved with MSHA because of this. (Vol. 1 173:10-175:7). For example, the MSHA inspector pointed out to Baumann that AT had not started cleaning up product from in front of the electrical box that AT had been cited for previously. (Vol. 2, 61:9-62:12). Baumann told management that this area needed to be cleaned, and he was told "we're not doing that". (Vol. 1 189:3-7, 190:3-17, 277:21-278:4).

28) At 6:35am, on February 14, 2023, Spears sent a Teams message to Wheeler, the AT maintenance employee, and Baumann stating "Gage Wheeler do not answer any questions about the

9

that the [sic] MSHA inspector may have. Do not go into the mill. I'll be the person who talks to me [sic] inspector." (P-8, P-9[3], Vol. 1, 151:8-152:19). Baumann understood this message to mean that they should not speak to MSHA inspectors, and this was not the first message like this that Baumann had received at AT. (Vol. 1, 154:21-155:1). Wheeler understood this message to mean do not interact with MSHA and stay away from MSHA. (Vol. 2, 175:2-176:1).

29) At around 7:30am, on February 14, 2023, Inspector Licklider began an inspection at the Mine and spoke to Spears, Baumann and Wheeler in the office about the complaint that prompted the inspection. (Vol. 3, 73:21-74:17; P-26 at 6 (noting a citation that was issued at 8:10am by Inspector Licklider on February 14, 2023).

30) At 10:13am, on February 14, 2023, well after Inspector Licklider had begun his inspection, Spears sent another message to Wheeler and Baumann stating "I understand. I should have been more specific about not volunteering information. I will escort the inspector." (P-9; Vol. 1, 155:10-160:5; 163:9-14; 164:12-14). Wheeler responded to Spears and Tidaback that he was not volunteering information, and Tidaback responded stating "Oh well, thanks for just nodding and agreeing with the inspectors. That's all we can do." (P-9; Vol. 1, 164:15-165:3). Wheeler responded in this way to reiterate he was not volunteering information because he feared if he did not, he would get fired. (Vol. 2, 178:14-179:18). Baumann understood that "not volunteering information" meant not to speak to the MSHA and not to point out issues to the MSHA inspectors and understood the expectation at AT was that miners would just nod and agree with MSHA inspectors and not offer up additional information. (Vol. 1, 163:22-165:17).

31) Continuing this string of Teams messages on February 14, 2023, Ms. Tidaback responded to

---

3 The "unknown user" is Wheeler and the blue responses in P-9 are Tidaback. (Vol. 2, 175:2 to 178:11). Respondent does not dispute this as their own Exhibit R-DD contains commentary that the "unknown user" is Gage Wheeler and that these conversations are between John Spears and Gage Wheeler. (Ex. R-DD).

Appellate Case: 25-1349    Page: 135    Date Filed: 04/07/2025 Entry ID: 5503844

Wheeler and Baumann at 11:49am stating "I think John may have meant don't just go up to him and point out everything under the sun. We've had people doing that, knowing very well its [sic] an issued being worked on." (Vol. 1, 165:21-166:7; P-10). Baumann understood this to be a reference to Carson Allman and Terry Newburn, former AT miners, who walked around during a 2022 MSHA inspection and were terminated within a short period of time after participating in the inspection. (Vol. 1 168:7-169:5).[4]

32) Later in the day, on February 14, 2023, Baumann sent a Teams message to Tidaback stating that an "MSHA inspector told [him] to lock the doors and no one was allowed in until he okayed it." (Vol. 1 172:8-15, P-13 at p. 55[5]).

33) On February 18, 2023, Tidaback asked Baumann to make notes about what happened with MSHA because he knew Baumann was involved in the inspection. (Vol. 1, 176:9-22; P-13 at p. 55).

34) On February 22 and 23, 2023, Baumann accompanied Inspector Markeson, along with Spears, on inspections of the Mine. (P-26 at 2-3).

35) On February 27, 2023, Inspector Markeson walked around with Tidaback, Spears and Baumann together during an inspection. (Vol. 2, 359:14-360:17). During most of Inspector Markeson's time inspecting AT, Inspector Markeson was accompanied by Baumann with Spears and/or Tidaback. (Vol. 2, 369:7-21). During the February Inspection, Spears walked around with Baumann and the inspectors multiple times. (Vol. 1, 150:12-20).

36) During the February Inspection, three miners told Inspector Markeson that they were not

---

4 Allman also reported that he and Terry Newburn were terminated from AT a day or two after they walked around with an MSHA inspector, and in Allman's opinion, there was a very good chance he was terminated for participating in the MSHA inspection. (Vol. 2, 244:15-19, 250:1-251:22).
5 Exhibit P-13 is the same as Exhibit 3 from Russell Tidaback's Deposition which is located a P-43 starting on page 121. Tidaback created this document at P-13 by copying and pasting messages from Microsoft Teams that Tidaback had access to. (P-43 at Depo. 70:15 to 74:23). The search criteria for this document searched for documents through April 2023, so when a year is missing, the year is 2023. (P-43 at Depo. 78:17 to 79:5).

Appellate Case: 25-1349     Page: 136     Date Filed: 04/07/2025 Entry ID: 5503844

supposed to talk to MSHA and two of those miners showed Markeson a message on their phone indicating these statements. (Vol. 2, 373:15-374:11).

### ii. Baumann Becomes Miner's Representative and Reports Safety Hazards to AT and MSHA during March 2023

37) On March 1, 2023, Baumann reported a safety hazard to an MSHA inspector, in front of Tidaback, regarding a guard that broke off, fell 40 feet, and nearly landed on Baumann. (Vol. 1, 179:6-180:19). Prior to this incident, Baumann raised a concern about this guard to Spears, and Spears said they would look at the guard on the next maintenance day, but consistent with other safety complaints, it was never fixed resulting in this near-miss incident. (Vol. 1, 182:8-183:3).

38) On March 15, 2023, Baumann raised a safety complaint in Teams to the Mill Group Chat, which included Spears and Tidaback, stating "we have live wires coming thru [sic] the floor. Sparked through the broom, shutting this area off." (Vol. 1, 191:2-9, P-13 at p. 31). A miner had been sweeping with a broom, and the live wire burnt up through the broom and sparked. (Vol. 1, 193:1-14). Baumann said, "John Spears I wonder how long it's been like that? I will cut power to the whole building in the morning and solve the issue I'm just thankful no one stepped on it." (Vol. 1, 192:10-16; P-13 at p. 31). Baumann was concerned someone would get hurt and wanted to shut the power off because the breakers were not labeled, so they didn't know which breaker was energizing the wire. (Vol. 1 192:19-193:11). Tidaback responded stating "[w]e don't need to shut the building down. Tape off the area so no one can step on it or near it." (Vol. 1 194:21-195:9; 195:19-196:1; P-13 at p. 30). Baumann complied, then it took about two weeks for maintenance to fix the issue. (Vol. 1, 195:10-18).

39) On March 21, 2023, Baumann became a miners' representative at AT. (P-2; Vol. 1 201:3-14). Baumann became a miners' representative to make sure that he knew the citations the Mine was receiving, and he thought he could advance miner safety through this role. (Vol. 1 204:9-19). The

12

miners who elected Baumann as a miners' representative elected to remain confidential from AT, telling Baumann they wanted to be confidential because they did not want to get fired. (Vol. 1, 201:15-202:2; P-2).

40) On March 21, 2023, Inspector Markeson explained to Spears that Baumann was the miners' representative and that Baumann had a right to accompany MSHA during their inspections. (Vol. 2, 90:21-91:12, 364:10-365:8). Inspector Markeson showed Spears the top half of the miners' representative form, keeping the bottom half with the names of the miners confidential. (Vol 2, 365:4-8). Spears knew Baumann was a miners' representative testifying that Baumann told him he was a miners' representative during Baumann's employment with AT. (Vol. 1, 90:21-91:21; Vol. 3, 103:22-104:6, 148:9-12). All of the mill associates knew that Baumann was the miners' representative. (Vol. 2 92:13-16). After March 21, 2023, Baumann started participating in MSHA inspections as a miners' representative. (Vol. 1, 203:18-21). MSHA made a point to contact Baumann when they arrived for an inspection so he could participate in the inspection. (Vol. 1, 255:2-6). After becoming a miners' representative, Baumann brought other miners' concerns to Inspector Markeson during MSHA's inspections. (Vol. 2, 359:18-361:7).

41) On March 21, 2023, Baumann walked around during an MSHA inspection with John Spears. (P-26 at p. 4).

42) Also, on March 21, 2023, Baumann sent a message to the Mill Group Chat (including Spears and Tidaback) stating "so msha seen the 10 stacking and said absolutely no so we will move to next order continuing 5 high unless Russell Tidaback has a better option." (Vol. 1, 207:19-209:16; P-13 at p. 27). This was not the only time Baumann raised this issue to management. (Vol. 1, 209:1-3). AT required miners to stack 100-pound bags, ten bags high to a height of six feet, meaning miners were lifting 100-pound bags over their heads. (Vol. 1, 187:4-9; 188:6-15). Baumann brought this issue up

13

to Spears who responded "that's just what the order calls for. We gotta do what we gotta do." (Vol. 1, 187:13-21). Baumann was concerned because a miner got hurt stacking these 100-pound bags 10-high, and Baumann had previously filled out an incident report for that injury. (Vol. 1 209:7-14).

43) On March 24, 2023, Tidaback sent a Teams message to Spears saying: "maybe they will want to come in and work some hours over the weekend to get these repaired. We don't want to use production schedule time to do maintenance." (Vol. 1, 210:1-12; P-13 at p. 314). Baumann heard statements like this while working at AT multiple times regarding not shutting down production to do maintenance. (Vol. 1, 210:18-211:3).

44) On March 28, 2023, MSHA opened another inspection of AT, during the ongoing February Inspection. (Vol. 1, 211:11-17; P-21). This inspection lasted until April 10, 2023 and was initiated by a complaint Baumann made to MSHA about stacking 100-pound bags of product over miners' heads (the "March Inspection"). (Vol. 1, 211:15-20; P-21; Vol. 2, 385:15-386:10). Baumann also participated in this inspection with MSHA. (Vol. 1, 211:18-20).

45) On March 28, 2023, Tidaback sent a message to a miner, Jim Hoover, stating: "MSHA inspectors are NOT your friend. They can and will us [sic] anything and everything against you in a court of law." (Vol. 1, 220:15-221:22; P-12 at p. 19[6]). Baumann was concerned that miners would be afraid to talk to MSHA because of statements like these and that he would be retaliated against for his participation in MSHA inspections. (Vol. 1, 221:15-222:6).

46) On March 30, 2023, MSHA issued citations to the Mine for a failure to control hazardous silica dust after dust sampling results revealed that miners were overexposed to dangerous silica dust. (Vol. 1, 58:7-11; 60:3-7; Vol. 2, 377:10-378:11). Baumann was sampled; however, when his

---

6 Exhibit P-12 is the same as Russell Tidaback's Deposition Exhibit 12 at p. 784 of Exhibit P-43. Tidaback confirmed during his deposition that he prepared the document, Exhibit P-12, by pulling the Teams chats from Microsoft Teams. (P-43 at Depo. Tr. 101:18 to 103:17).

14

dust cassette got to the lab, it was so full of dust that dust fell out of the cassette, so they could not get an accurate weight on his sample. (Vol. 2, 384:8-22). The Mine was given until April 7, 2023 to terminate this citation for overexposure to silica dust. (Vol. 2, 377:10-378:11).

47) On March 31, 2023, Baumann, along with Jessie Molesi, AT safety specialist, discussed the dust citations with Inspector Markeson, including the expectations for what needed to be done the following week to terminate the citations. (P-26 at p. 5; P-25 at p.1, P-17 at p. 2).

48) After the citation for over-exposure was issued on March 30, 2023, Baumann raised concerns every day with management about getting into compliance with the silica dust exposure issues. (Vol. 1, 60:3-14). Baumann asked Spears and Molesi, about ordering PAPR (Powered Air Purifying Respirator) masks for the mill associates and whether they had called anyone to work on the air system in the mill. (Vol. 1, 60:3-14). Spears told Baumann that he had to get with Tidaback about those issues, and Molesi told Baumann he sent emails to Tidaback about the issues. (Vol. 1, 60:5-20). The silica dust issues were not abated before Baumann's termination. (Vol. 1, 60:21-61:1).

49) On March 31, 2023, Baumann accompanied MSHA during their inspection of the Mine along with Spears. (P-26 at p. 4-5).

50) On March 31, 2023, Baumann raised a safety concern in Teams to the Mill Group Chat, including Spears and Tidaback, about a greased rag that had been shoved into a bearing because it was a fire hazard. (Vol. 1, 278:5-20). Baumann pulled the rag out and called the maintenance person to look at the bearing, but the maintenance person could not get approval to replace the bearings because it was going to cost down time and money. (Vol. 1, 278:11- 279:5).

51) On March 31, 2023, Tidaback sent a Teams message to the AT safety group, including Baumann, Molesi and Spears, which stated: "I will stress with you....any MSHA inspector is not your friend. Anything you say to or in their presence can AND WILL be used against you in a court

15

of law. Hopefully, this will never be needed BUT just be well aware." (Vol. 1, 214:11- 217:17; P-12 at p. 8, 18).[7] Baumann took this message as a warning not to speak to MSHA and that MSHA was coming after employees. (Vol. 1, 217:21 to 218:13). Tidaback had previously told Baumann that MSHA could give citations to miners. (Vol. 1, 218:14-219:7).

### iii. In April 2023, Baumann Participates in MSHA Inspection that Results in 104(b) Order Shutting Down Mine, Asks About Pay During Shut Down Causing AT to Terminate his Employment

52) On April 4, 2023, Spears sent a message to the Mill Group Chat on Teams which went to all employees of AT, including Tidaback, stating "Good job today everyone. I realize we were a man short but y'all stepped up and we had a good day." (P-13 at p. 220, Vol. 1, 222:7-223:4)

53) In early April, AT's production numbers were good, and the Mine was meetings its average production amounts between 25,000 to 40,000 pounds. (P-44, Depo. Tr. 44:3-12) On April 4, the Mine produced 33,200 pounds of product. (Vol. 1, 130:2-16; P-28 at p. 21). On April 6, the Mine produced 37,800 pounds of product. (Vol. 1, 130:17-131:5; P-28 at p. 21).

54) On April 11, 2023, Spears sent a message to the Mill Group Chat stating "Everyone did very well yesterday with pallets, impeller bearing and staging product. Thank you." (P-13 at p. 211; Vol. 1, 227:5-228:5). On April 10, 2023, the date Mr. Spears was praising the employees for their work, the Mine produced 18,000 pounds of product. (P-28 at p. 21). On April 11, 2023, the last day the Mine ran production during Baumann's employment, the Mine produced 22,700 pounds of product. (Vol. 1, 131:6-12; P-28 at p. 21).

55) An MSHA inspection began on April 11, 2023 ("April Inspection"). (Vol. 1, 223:8-16).

56) On April 12, 2023, MSHA issued two 104(b) orders (Order Nos. 9539789 and 9539790)

---

7 Request No. 24 in Exhibit P-12 asks Respondent for documents "reflecting any communications, including Microsoft Teams chats, text messages, emails, to employees of Respondent at the mine" and this chat was included in that response on page 18.

Appellate Case: 25-1349   Page: 141   Date Filed: 04/07/2025   Entry ID: 5503844

("104(b) Orders"), which shut down Mine production, because the Mine had failed to terminate the March 30 citation related to silica dust exposure at the Mine. (Vol. 1, 57:16-58:6, 223:8-16, P-21; Vol. 2, 378:4-11, 385:5-13; P-25 at p. 4). Baumann participated in this inspection. (P-25 at p.1, P-17 at. P. 2). Inspector Markeson held the closing conference regarding the 104(b) Orders with Molesi and Baumann. (P. 25 at p. 4).

57) Due to the 104(b) Orders, April 12, 2023 was the last day that Baumann worked at the Mine. (Vol. 1, 64:13-16). On April 12, Baumann sent Spears a text message saying he could try to work on getting an order ready for shipment "since he has to pay us anyway." (Vol. 1, 224:13-225:15; 226:2-4; P-31). Baumann was referring to the shut down and how AT was required to pay them even though they were shut down. (Vol. 1, 225:16-20).

58) Between April 12 and April 14, 2023, Baumann sent Spears a Teams message with the picture of the MSHA handbook which showed that miners were entitled to the rest of the day's pay and four hours of pay the next day during the 104(b) Orders. (Vol. 1, 61:2-62:4, 228:12-230:6; 239:18-240:12, P-7). In addition to sending a screenshot of the handbook, Baumann stated "Looks like we are in titled [sic] to up to a week pay because nothing was done about the safety situation until we were under the withdrawal" and then "legally have to pay us for the 12 hours" and "we ran illegal on Monday and Tuesday. Don't really want to have to file with msha [sic] but we the mine workers were not at fault" (Vol. 1 230:7-21; P-7). Spears did not respond to this message. (Vol. 1, 62:2-4; 63:11-16; 231:2-4).

59) On April 13 and 14, Baumann spoke to Molesi about getting respiratory protection in and to also see if they had a plan to work on the air cleaner system, and Molesi told Baumann he spoke to Tidaback via email about these issues. (Vol. 1, 246:18-250:7).

60) While Baumann was trying to fix the silica dust issues, on April 13, 2023, Tidaback and

17

Spears were discussing on Teams ways to influence the dust sampling, including keeping people who "attract" the dust away from being sampled, having the "maintenance guy sit[] in the maint. office" and always running OGR material for sampling because "it's the largest particle size and the heaviest material". (P-13 at p. 392). Tidaback stated in this conversation about dust sampling, they "just have to play it smart". (P-13 at p. 392).

61) On April 14, 2023, Markeson responded to an email from Tidaback, who was expressing frustration about the 104(b) Orders, wherein Markeson explained that Baumann had been in communication with Markeson about the 104(b) Orders and that Baumann participated in the inspection that resulted in the 104(b) Orders. (R-H at p. 8-11). Markeson stated "I did discuss the issue with Rob Baumann, Jessie Molesi, and the maintenance man" and "The 104(b) order applies to the area of the mill building and the related dust producing activities. This was discussed with Jessie Molesi and Rob Baumann and it was explained to them that the order prohibits all activity in the mill building..." (R-H at p. 10-11). Inspector Markeson further stated "When I left the plant, it was clearly stated, and Jessi[e] and Rob stated that they understood, that the 104(b) orders prohibit all activity in the mill building"… "Baumann called me after I left the mine site and asked if the stacked and palletized bags could be wrapped for shipment, and I agreed that could be done manually." (Ex. R-H at p. 11).

62) The Teams message, in Exhibit P-7, that Baumann sent to Spears asking about miner pay during the shutdown was copied and sent to Tidaback by Spears on April 14, 2023 at 8:18am. (Vol. 1, 237:1-19; 239:18-240:20; 244:14-19, P-32 at p. 1).[8] Tidaback's response to Spears was that "we need them to be productive towards production." (Vol. 1, 240:21-242:2; P-32 at p. 1). At 9:14am,

---

[8] These messages in P-32 were the same as Exhibit 8 in Tidaback's Deposition at P-43, page 706. Tidaback testified during his deposition confirming that the messages in the purple are from Tidaback. (P-43 at Depo. Tr. 92:21 to 93:14).

18

less than an hour after receiving Baumann's message about miner's pay during the 104(b) Orders, Tidaback messaged Spears stating "expect a MSHA complaint when Rob is let go…the writing is on the wall." (Vol. 1, 244:20-245:4; P-32 at p.2). At 9:18am, Tidaback states "Rob's termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associated [sic] by utilizing the proper controls, etc. He doesn't have to sign it. We just need to have a document of why he was let go." (Vol. 1, 245:5-22; P.-32 at p. 3).

63) On April 14, 2023, at 2:07pm, Spears sent a Teams message to the AT safety group that Baumann was part of, stating "…Im telling you guys… Keith is a snake… be cautious on what you say to and around him. Any MSHA inspector really." (Vol. 1, 274:12-276:12; P-11 at p. 2).

64) On Sunday, April 16, 2023, Baumann received a text message from Spears telling Baumann to be in the office the following day at 8:00am. (Vol. 1, 47:17-22).

**F. Baumann is Terminated for Protected Activity but is Given a Reason that is Pretext**

65) On Monday, April 17, 2023, Spears informed Baumann that he was being terminated and handed him a termination letter. (Vol. 1 47:17-48:3; 49:9-11; P-1). The termination letter, which was the only explanation Baumann received for his termination, alleged that Baumann was being terminated for poor performance, lack of leadership skills and for failure to follow procedures and guidance given by his supervisor. (Vol. 1, 50:21-51:2; Ex. P-38).

66) At trial, Respondent never once said why it terminated Baumann. *See* Vol. 1-3.

67) Spears, Ms. Tidaback and Tidaback participated in the decision to terminate Baumann. (Vol. 3, 250:18-251:6; P-39 at p. 3-5; P-12 at p. 4-5). The decision to terminate Baumann was made collectively by these management personnel, and Spears spoke to Tidaback about terminating Baumann. (Vol. 3, 152:15-18; P-39 at p. 10). Spears stated that Baumann was terminated for production issues, and Spears' only complaint about Baumann dealt with Baumann meeting

production quotas. (Vol. 3, 146:7-10, 154:7-156:19; P-44 at Depo. Tr. 29:14-18, 33:19-34:1).

### G. Baumann Files a Complaint With MSHA

68) Baumann filed a discrimination complaint with MSHA on April 25, 2023. (Vol. 2, 310:11-13; P-1).

69) As part of MSHA's inspection into Baumann's complaint, MSHA Special Investigator Dillingham, requested various documents from AT. AT did not provide all requested documents, including Baumann's personnel file and multiple Teams chats that were later produced during discovery. (Vol. 2, 324:15-19, 331:1-16). After Inspector Dillingham, finished his investigation, the Acting Secretary's investigation continued in MSHA's investigation and compliance division and with the Acting Secretary's Solicitor's Office. (Vol. 2, 308:13-16, 333:21-334:17).

### H. After April 17, 2023, AT Expresses Hostility to Baumann's Protected Activity and Begins Making up Reasons for Baumann's Termination

70) On April 17, 2023, Tidaback sent a message to mill associate Hoover saying they let "Rob" go that day. (Vol. 1, 257:16-259:8). Two days later, Tidaback sent a message to Hoover stating "MSHA just compounds the problem 10x but [sic] not working with us and being fucking dicks." (Vol. 1 257:16-260:15; P-34 at p. 19[9]). Tidaback continues the conversation stating "This Keith jackass…he gets his jolly off handing out citations….this fucker is a snake. When he's around, you'd better watch what you say and do…..he is out to fuck you or anyone else he can." (Vol. 1, 260:20-261:15, P-34 a p. 19). Tidaback continues by saying "Keith is a jackass…" and "I personally…would just stay away from that guy. Intentionally, stay away". (P-34 at p. 27; Vol. 1,

---

[9] These Teams messages in P-32 are between Hoover and Tidaback, where the blue messages are the messages from Tidaback. (Vol. 1, 257:16-259:8, 261:16-263:16). Theses messages were provided in discovery in response to a request for an unredacted copy of the message between Hoover and Tidaback from April 17, 2023 to May 7, 2023, Respondent states "please see the following chat" in response to this request. (P-34 at p. 15). P-34 is also the same document as Exhibit 11 from Tidaback's deposition which is set forth on page 727 of Exhibit P-43. Tidaback confirmed these were chats between Hoover and Tidaback. (P-43 at Depo. Tr. 100:20-23).

265:14-266:4). No one at AT is named Keith; however, the MSHA Inspector who issued the 104(b) Orders and who Baumann walked around with during inspections from February through April 2023 was Inspector Keith Markeson. (Vol. 1, 264:8-19, P-39 at p.10-18).

71) This April 19, 2023, conversation continues with Tidaback stating to Hoover "EVERYONE needs to stop calling MSHA." (P-34 at p. 24; Vol. 1, 264:20-265:6). Hoover responded "No shit. Pisses me off" to which Tidaback responded "Me too!" (P-34 at p. 24).

72) Baumann's discrimination Complaint was sent to Ms. Tidaback, Tidaback, and Spears, and it was delivered to them on April 27, 2023. (Vol. 2, 310:18-311:17).

73) On April 27, 2023, at 7:13pm, Tidaback created a document to outline false grievances with Baumann during his employment. (R-B). These after-the-fact notes about Baumann were provided in one version, R-B, at the hearing of this matter, and another version of these notes with notable differences was provided to MSHA during their inspection, as shown in P-45. (R-B, P-45, Vol. 3, 224:16-225:10, 227:19-228:13; 236:17-243:12; 245:6-246:15). The notes in R-B contain a Teams message in an entry for February 14, 2023, and in the version provided to MSHA, there are no Teams messages and no entry for February 14, 2023. (P-45, R-B, Vol. 3, 246:20-249:7). In R-B, there is a date at the top of the document and in the version provided to MSHA, the April 27, 2023 date is missing at the top of the page. *Id.* Tidaback testified that the dates appearing on the document are not the dates the events described actually occurred. (Vol. 3, 248:12-249:3). Although there was no testimony about these notes, the notes themselves are factually unreliable. For example, there are multiple references to Baumann sending employees home early or skipping breaks. Baumann testified that these decisions were approved by Spears. (Vol. 1, 143:15-144:19). Further, the notes claim miner, Carson Allman told Tidaback that Baumann was a hard to work with and got angry at everything. (R-B). Carson Allman testified at the hearing that Rob did not get mad about everything,

he never told Tidaback that Baumann was hard to work and never complained to Tidaback about Baumann's attitude. (Vol. 2, 237:8-20).

74) On April 28, 2023, at 8:51am, Tidaback tries to create a justification for terminating Baumann, by telling Hoover: "We need you to make that place rock and roll. I need the justification since Robs [sic] complained to MSHA about being let go…just need you to put the cherry on the cake that's all." (Vol. 1, 266:20-267:9; P-34 at page. 28).

75) On May 7, 2023, Tidaback discussed with Hoover Baumann's participation in MSHA inspections in February 2023, saying "Then the whole MSHA thing in February" and Hoover responded: "Oh he fucked us over on that deal sorry for cussing" to which Tidaback responded: "Oh I know…" (P-34 at p. 39). Tidaback further stated "thats [sic] when Rob started to really buck back against what John was telling him to do." (Vol. 1 267:10-268:3; P-34 at p. 39). Tidaback stated Baumann thought he made a friend at MSHA and "Robs [sic] a fool to think Keith is his friend…." (Vol. 1, 270:7-22; P-34 at p. 40). MSHA Inspector Keith Markeson walked around with Baumann frequently and received safety complaints from Baumann, including during the February, March and April Inspections. (Vol. 1, 270:17-271:9).

## I. AT Did Not Follow Its Disciplinary Process with Baumann Demonstrating Reasons Given for Termination were Pretext

76) AT had a three-step disciplinary process that was used with other AT miners. (Vol. 2, 324:20 to 325:17, 329:14-21; P-16 at p. 43). AT produced records of written discipline letters provided to other miners at AT. (P-35). No such written discipline was ever provided to Baumann. (Vol. 2, 327:5-10; P-12 at p. 7).

77) Baumann was never disciplined while working at AT, never received any sort of verbal warning about his work and never received any sort of written discipline or reprimand from anyone at AT. (Vol. 1 51:6-12, 255:7-17; 327:5-10). Baumann was also never counseled by Tidaback or Ms.

Tidaback and never spoke to Ms. Tidaback or Tidaback about any shortcomings with regard to the performance of his job. (Vol. 1, 256:1-11). Baumann never received a warning, oral or written, from Spears, Tidaback or any other person in management that his job was inadequate. (Vol. 2, 100:5-16). Baumann was never given a warning, written or oral, that he was on any sort of probation or that if his job performance did not improve, he would be terminated. (Vol. 2, 100:17-101:4). Management also never called to Baumann's attention any deficiencies with the performance of his job. (Vol. 2, 101:5-10). Baumann never received a performance review while working at AT. (Vol. 1, 255:18-20).

78) Even more specifically, Baumann was never told that he failed at using Teams effectively; neither Spears nor Tidaback ever told Baumann they had issues with how he was doing workplace examinations; Baumann was never told that he was failing at keeping track of employee hours worked; Baumann was never told that there were any issues with his work related to handling shipping and receiving paperwork; Baumann was never told that he was having any issues with performing the task of collaborating with maintenance on a preventative maintenance schedule. (Vol. 1, 94:10-13, 102:19-103:6; 141:19-142:12). Baumann was also never disciplined for failing to guard machinery. (Vol. 2, 117:20-22).

79) Spears, who was in charge of Mine operations, and was Baumann's supervisor, had authority to discipline employees at AT. (Vol. 3, 144:22 to 145:2). Spears confirmed that he never disciplined Baumann while he was an employee of AT, including never giving Baumann any kind of counseling notice, write-up "or anything like that." (Vol. 3, 145:3-15). However, Spears has given written discipline to other miners at AT. (Vol. 3, 145:17-22).

80) Spears was never disciplined at AT. (Vol. 3, 146:3-6). Spears walked around the Mine on a daily basis and admits he could have found the safety issues cited by MSHA when he walked around the mill. (Vol. 3, 149:2-9). Spears was responsible for monitoring production goals and was the

23

person ultimately in charge of production at AT. (Vol. 1, 109:11-21, Vol. 3, 101:2-4).

**J. AT's Reference to Production is Pretext**

81) Baumann was never counseled for not meeting production demands and was given positive feedback from Spears for the amount of production he was able to get while working at AT. (Vol. 1, 106:18-107:4). Although AT claims they had a production demand of 40,000 pounds per day, no one ever told Baumann directly he had to meet this production demand, and this was not something that was stressed to him by AT. (Vol. 1, 105:18-11; Vol. 2, 30:8-12). The Mine was lucky to run about 15,000 pounds in product if the Mine was running well. (Vol. 2, 235:13-236:14). The Mine has only met the alleged production demand of 40,000 pounds 20-30 times during Spears' 18-month employment with AT, regardless of who was the production supervisor. (Vol. 3, 147:15 to 148:2).

82) Within the last month to six weeks of Baumann's employment, AT ran close to 40,000 pounds, more than once, even though the Mine probably only ran production 14 days in the last two months of Baumann's employment due to multiple equipment breakdowns and MSHA shutdowns. (Vol. 1, 106:21-107:17; 113:22-114:21). Production records show that production regularly went up and down, before, during and after Baumann's employment at AT. (Vol. 1, 124:14-125:1, 126:13-129:17; P-27, production records from November 2022 to March 2023; P-28, production records from January 2022 to November 2022 and April 2023 to August 2023)[10] Spears stated that he would never get "onto" Baumann for not producing 40,000 pounds if the mill was shut down on that day, and Tidaback stated he would not hold production against someone if the Mine were shut down by MSHA. (Vol. 3, 102:8-18, 233:5-13).

83) Baumann's work alone could not have ensured production demands were met. (Vol. 1,

---

10 Production records list significant "downtime events" which set forth the reasons that production was shut down and multiple days are missing from the production spreadsheet indicating that there was no production on those dates. (Vol. 1, 115:2-121:1; P-27; P-28).

Appellate Case: 25-1349     Page: 149     Date Filed: 04/07/2025 Entry ID: 5503844

109:18-110:4). There were multiple factors that caused lower production on any given shift, including employee shortages, having no maintenance people or only a single maintenance person on staff, old equipment, and MSHA shutdowns. (Vol. 1, 104:9-105:12, 110:2-113:21). The equipment had holes in it, causing a lot of product to fall on the floor, and much of the equipment at the mill was not functional. (Vol. 2, 236:16-237:7). Baumann explained equipment issues multiple times to Spears and attempted to find a balance to not overtax the system and to reduce dust. (Vol. 2, 38:22-40:2). However, Spears was only interested in production "at any cost." (Vol. 2, 40:14-18).

84) During some weeks, they ran into maintenance issues which would cause production to stop on a daily basis. (Vol. 1, 108:3-22). Baumann does not recall ever running a week straight without running into maintenance issues. (Vol. 1, 109:7-10). Maintenance issues were outside of Baumann's control as Baumann did not work in maintenance, did not supervise maintenance employees, and did not have authority to direct the work of the maintenance personnel. (Vol 1, 103:13-21, 105:3-8). Tidaback agrees that maintenance issues are the biggest production problem, the Mine needs a good maintenance person to meet production goals, and that AT has never had a good maintenance person. (P-43 at Depo. Tr. 55:21-56:15).

**K. AT is Hostile to Safety**

85) The safety culture at AT was non-existent, and miners had to look out for themselves. (Vol. 2, 238:2-4; 277:14-20).

86) Allman, a maintenance employee for AT, stated there were not guards on the machinery, and it was not until MSHA started issuing citations toward the end of his employment that AT started to put guards back on the machines. (Vol. 2, 239:13-240:16). Spears was in the mill frequently and knew it was the practice to take the guards off daily to keep the plant running. (Vol. 2, 239:4-16).

87) This disregard for safety extended to lockout/tagout. On one occasion, Allman was working in the bottom of the bag house near an auger and locked out the equipment, but Spears came by and cut off Allman's lock and the auger turned back on *while he was still working in the bag house*. (Vol. 2, 242:13-244:11). AT also did not provide locks to miners to perform lockout/tagout. (Vol. 2, 139:15-21; 223:18- 224:5).

88) Compliance with MSHA standards was not a priority at AT. (Vol. 1 90:20-22; 136:21-137:14; Vol. 2, 246:17-247:1). Inspector Licklider found a total disregard for safety at AT and had never seen a mine, in all of his experience inspecting mines in 11 different states, that had such a disregard for safety. (Vol. 3, 80:1-12). An example of this disregard is when Wheeler was asked by Spears to "jimmy rig" or "mock up" what appeared to be a fix to an MSHA citation. (Vol 2, 128:3-21, 172:3-173:22). Afterward, Spears would take a photograph to send to MSHA; however, the "fix" served no real purpose, other than making it appear like something was fixed when it was not. (Vol. 2, 172:3-173:22). Allman recalled instances in which they would only run at night because the MSHA inspector wanted to observe the mill running during the day, and the police department told them not to run. (Vol. 2, 233:6-234:4). During Baumann's employment, the Mine was told to stop running by multiple different entities, including the Police Department and the Missouri Department of Natural Resources, but Spears and Tidaback would run the mill anyway. (Vol. 1, 183:7-18; 185:1-14).

89) AT also refused to provide miners with the tools and equipment they needed to do their jobs safely. For example, Wheeler, was not provided with a ladder, including when he was tasked with fixing an overhead door that was about 18 feet high, requiring him to be lifted on a forklift pallet to fix the door. (Vol. 2, 128:2-21, 132:8-15; 133:15-17). Wheeler explained that Spears and Tidaback would not buy material to make guards, so he was asked to cut apart old guards to make

new ones, and there was not enough to completely fix the citations they were being issued on guarding. (Vol. 2, 181:14-182:10). Allman reported that he would ask Spears for needed parts, and Spears would say he had to go through Tidaback; most of the time, Allman would be told that the equipment he needed was too expensive. (Vol. 2, 230:5-231:7). For example, the filters for the bag house, which were supposed to filter clean air into the mill, were old, brittle, full of tripoli, and 36 of them were ripped. (Vol. 2, 231:8-232:21). Allman requested new filters, but instead was told to use old filters to replace the ripped ones, despite the old filters being in just as rough of condition. (Vol. 2, 231:8-232:21).

90) As far as personal protective equipment, miners were not provided with gloves, and Wheeler believed there may have been masks, but he did not know where they were located. (Vol. 2 163:22-164:22). Allman said he was provided a disposable mask for the dust, but Spears told them to make one disposable mask last a week, and they would get so much tripoli packed in them it was hard to use the same one for a week. (Vol. 2, 240:21-241:20).

91) If fixing a safety issue would take away from production, miners were not allowed to stop production to try and fix safety issues, unless it was a dire need. (Vol. 1, 137:11-14). Spears told Baumann he was not allowed to stop production and fix an issue on multiple occasions. (Vol. 1, 138:4-139:6). When Baumann raised safety issues that required maintenance, he "always got told the same thing… unless it was something that would not let you run the system, it was not going to be fixed." (Vol. 1, 103:1-12). Baumann expressed this concern to Inspector Markeson, telling him that Spears would not allow Baumann to shut the plant down long enough to fix some of the issues. (Vol. 2, 362:15-22). Spears told Inspector Licklider that he did not have time to fix anything because he needed to be running production. (Vol. 3, 83:22-84:7). Baumann also said a typical response to his safety complaints was to be told to do something that did not actually fix the issue at hand. (Vol. 1,

Appellate Case: 25-1349    Page: 152    Date Filed: 04/07/2025 Entry ID: 5503844

196:12-19).

92) Part of the safety culture at AT involved trying to keep miners from speaking to MSHA and disparaging MSHA inspectors to miners. For example, on July 13, 2022, Tidaback sent a Teams message to the Mill Group Chat, including Baumann, stating "and if you are asked a question by the inspector keep your answer short and simple. Don't be 'that guy', Camrin lol, that thinks he knows it all and starts point out of [sic[] all the faults etc. (I only name drop Camrin since he doesnt [sic] work with us any longer.)" (Vol. 1, 272:10-273:11; P-12 at p. 23). Statements like these made Baumann nervous to speak to MSHA, and he was concerned that other miners would be deterred from speaking to MSHA. (Vol. 1, 273:17-22).

93) Spears, Schreiber, and Bonnie Bainter, a prior safety specialist, told Baumann that he was not allowed to speak to MSHA in that he was not to offer any extra information to MSHA inspectors and that if they asked a question, make the answer short. (Vol. 2, 103:9-104:13). Spears told Wheeler, verbally, to "steer clear" from MSHA during inspections, which Wheeler understood meant do not talk to MSHA, do not interact with MSHA, and do not engage with MSHA in any way, shape, or form. (Vol. 2, 170:3-171:15). Wheeler received this message from Spears more than once while he worked at AT. (Vol. 2, 171:18-172:1). Tidaback told Allman not to tell any stories about the mill to the inspectors. (Vol. 2, 221:21-222:5). Spears also told Brewer that she was not to talk to MSHA and told her that Tidaback said they were not supposed to talk to MSHA inspectors. (Vol. 2, 283:11-15, 285:14-17). Inspector Licklider stated that AT miners appeared more nervous than miners at other mines around MSHA inspectors. (Vol. 3, 77:6-17).

**L. As a Result of His Wrongful Termination, Baumann Suffered Financial Losses**

94) Bauman engaged in a job search immediately upon being terminated. (Vol. 1, 279:18-20).

95) Baumann was unemployed from April 17, 2023 through June 13, 2023. (Vol. 1, 284:7-12).

Baumann worked for Schaeffler Group from June 13, 2023 through June 20, 2023. (Vol. 1, 284:10-14). Baumann quit his job with Shaeffler Group because he needed special glasses to perform the required work, which would have cost approximately $830. (Vol. 1, 281:2-12, 284:15-20). Baumann could not afford to purchase the glasses because he had been out of work in the weeks before he got the job at Shaeffler Group. (Vol. 1, 284:21-285:14). Baumann could have afforded the glasses if he had not been fired from AT. (Vol. 1, 295:15-286:1). Baumann's inability to afford the necessary glasses for the job was the only reason he quit his job at Shaeffler Group. (Vol. 1 286:2-5).

96) After leaving the Shaeffler Group, Baumann got a job with Cherokee County Road and Bridge, which he started on July 24, 2023. (Vol. 1, 286:6-12). Baumann is still employed with Cherokee Country Road and Bridge. (Vol. 1, 286:13-14).

97) Baumann is seeking back wages for the period of time that he was unemployed as a result of his termination from AT, which occurred from April 17, 2023 through June 13, 2023, and then again from June 21, 2023 through July 23, 2023. (Vol. 1 287:15-288:13). During these two periods of time, there were 62 days which Baumann would have worked had he still been employed by AT.[11] (Vol. 1, 288:5-10).

98) Baumann frequently worked more than 8 hours per day, about once or twice per pay period while he worked the night shift and at least once a week when he was working the day shift; however, they were not allowed to put in hours that reflected overtime, so those hours were unpaid. (Vol. 1, 71:16-72:13; 73:16-75:1). Despite working multiple hours of overtime, he was only paid for three hours of overtime while employed at AT. (P-4; Vol. 1, 77:5-15).

99) Baumann was paid $20.00 per hour during his entire employment with AT. (Vol. 1, 75:11-16; Exhibit P-4)

---

11 This excludes weekends and two holidays during this time period, Memorial Day and Fourth of July. (Vol. 1, 299:5-10).

Appellate Case: 25-1349    Page: 154    Date Filed: 04/07/2025 Entry ID: 5503844

100)     Based on his work and payment history with AT, Baumann is seeking 8 hours of pay for each of the 62 days he was out of work as a result of his termination, at a rate of $20.00 per hour. (Vol. 1, 288:14-21). Accordingly, Baumann is seeking $9,920 in back wages, plus interest. (Vol. 1, 288:22-289:4).[12]

101)     Interest on this award of back wages through February 27, 2024, the first date of trial equals $632.60, which is derived by using the following formula: Amount of interest = The quarter's net back pay x number of accrued days of interest (from the last day of that quarter to the date of payment) x daily adjusted prime rate interest factor.[13] The prime rates, which are derived from the IRS, were applied as follows: For the second and third quarters of 2023 the interest rate was 7%, for the fourth quarter of 2023 the interest rate was 8%, and for the first quarter of 2024 the interest rate was 8%.[14] The number of accrued days of interest is as follows: Quarter 2 for 2023: 74, Quarter 3 of 2023: 94, Quarter 4 of 2023: 94, and Quarter 1 of 2024: 58.

102)     Baumann also suffered other personal financial losses as a result of his termination and subsequent period of unemployment. To pay for the insurance on his home, Baumann was required to sell some of his personal fishing gear and a flatbed trailer, resulting in a personal financial loss of approximately $1,200. (Vol. 1, 289:5-17).

103)     Baumann also incurred expenses associated with his active job search. Baumann testified he drove to several places, including to and from interviews, hiring companies that help you get jobs, including Manpower and Penmac, and the unemployment offices in Kansas and Missouri. (Vol. 1, 289:18-290:21).

---

12 This number is arrived at by taking 8 hours times 62 days, which equals 496 hours. Then, 496 hours was multiplied by Baumann's hourly rate of $20.00 per hour.
13 *Arkansas-Carbona Co.*, 5 FMSHRC 2042 (No. 81-13-D, 1983)
14 https://www.irs.gov/payments/quarterly-interest-rates.

104) Baumann lives in Columbus, Kansas 66725[15]. (P-39 at p. 16; P-2 at p. 1).

105) Baumann drove to the Kansas unemployment office in Pittsburg, Kansas twice. (Vol. 1, 290:16-19). The State of Kansas unemployment office in Pittsburg, Kansas is located at 216 North Broadway, Suite K, Pittsburg, Kansas 66762. Kansasworks, *Kansasworks Pittsburg*, http://www.kansasworks.com/office_contracts/8101 (last visited March 24, 2024). This office is 25.2 miles away from Baumann's home. (www.google.com/maps). Two round trips to this location resulted in 100.8 miles driven.

106) Baumann drove to the State of Missouri unemployment office in Joplin, Missouri once. (Vol. 1, 290:16-291:2). The Missouri unemployment office in Joplin, Missouri, the Joplin Job Center, is located at 730 S. Wall Ave., Joplin, Missouri 64801. Jobs.Mo.Gov, *Joplin Job Center*, https://jobs.mo.gov/job-center/joplin-job-centers/jop (last visited March 24, 2024). This office is located 24.1 miles from Baumann's home. (www.google.com/maps). One roundtrip drive to this office resulted in 48.2 miles driven.

107) Baumann also drove to the Penmac location in Miami, which is a hiring company that helps people get jobs. (Vol. 1, 290:3-21). Penmac Staffing is located at 707 E. Steve Owens Blvd, Miami, Oklahoma 74354. Penmac, *Penmac Staffing in Miami, Oklahoma*, https://www.pennmac.com/locations/miami-ok/, (last visited March 24, 2024). This office is located 22.2 miles from Baumann's home. (www.google.com/maps). One roundtrip drive to this office resulted in 44.4 miles driven.

108) Baumann also drove one time to the Manpower office in Joplin, which is another hiring company that helps people get jobs. (Vol. 1 289:21-290:21). Manpower's office is located at 2660 East 32ⁿᵈ Street, Suite 103, Joplin, Missouri 64804. Manpower, *Manpower Staffing Solutions in*

---

15 Baumann's home address was used for these calculations of distance and the full address is located in the records cited, but it is being withheld from this brief for privacy concerns.

*Joplin, MO*, https://www.manpowergroupusa.com/manpower/locations/joplin, (last visited March 24, 2024). This office is located 27.9 miles from Baumann's home. (www.google.com/maps). One roundtrip drive to this office resulted in 55.8 miles driven.

109) The federal IRS standard mileage rate for 2023 for business was 65.5 cents per mile. Internal Revenue Service, *Standard mileage rates*, https://www.irs.gov/tax-professionals/standard-mileage-rates (last visited April 15, 2024). Driving to the four locations above, which Baumann testified about during trial, resulted in 249.2 miles driven to search for jobs and/or get unemployment assistance, resulting in mileage costs in the amount of $163.23.

110) In addition, Baumann drove to the Joplin County Courts Building, located at 601 S. Pearl Ave, Joplin, Missouri 64801 for all three days of the hearing in this matter (February 27-29, 2024). This is located 24.1 miles from Baumann's home. (www.google.com/maps). Three round trip drives to this location resulted in 144.6 miles driven. The federal IRS standard mileage rate for 2024 is 67 cents per mile. Internal Revenue Service, *Standard mileage rates*, https://www.irs.gov/tax-professionals/standard-mileage-rates (last visited April 15, 2024). Thus, Baumann's mileage costs for attending the hearing in this matter were $96.88.

111) In addition to back wages, interest, and the expenses incurred as a result of Baumann's termination, Baumann is seeking to have his termination removed from his personnel file and for AT to only give a neutral reference about his employment. (Vol. 1, 291:8-18).

112) Baumann is not seeking reinstatement as he now has a job that he likes. Baumann was never offered reemployment at AT, even though Baumann may have accepted reinstatement at some point before he got his current job, if the offer had been made. (Vol. 1, 291:21-292:11).

113) Baumann felt unsafe working for AT, and he would fear for his safety if he returned to AT. (Vol. 1, 292:17-22). Baumann also fears that he would not be treated fairly if he returned to AT

and that he would be discriminated against if he returned to AT. (Vol. 1, 293:1-7).

**M. The Court Should Assess Civil Penalties Against AT**

114)    MSHA issued a penalty to AT for discriminating against Baumann in the amount of $15,000.00 and issued a separate penalty for interfering with miners' rights in violation of 105(c) in the amount of $17,500, for total proposed penalties in this case of $32,500. (P-42).

115)    The Mine runs one shift per day. (P-17 at p.5). The Mine had on average 9 mill operation employees, 2 quarry/pit employees and 3 office workers employed during 2022. (P-19). The Mine's annual hours of production was 23,301 in 2022. (P-19). The Mine's hours/tonnage in 2022 was 17,509 (P-42 and P-23 at p.1). The Mine's hours/tonnage was 7,092 in 2023. (P.23 at p. 1).

116)    In 2023, the Mine was issued ninety-five 104(a) citation, five 104(b) citations, twenty-one 104(d)(2) citations, two 104(g)(1) citations and one 107(a) citation. (P-20). From May 15, 2022 through August 14, 2023, the Mine was issued 41 significant and substantial citations with a total of 129 citations/orders. (P-22 at p. 5).

117)    At the time that MSHA assessed the 105(c) penalties against AT, the company did not have a history of Section 105(c) violations. However, MSHA assessed a subsequent penalty against AT for terminating another miner in violation of Section 105(c) in a case still pending with the Court. *See Hoover v. AT*, 2024 WL 402253 (CENT 2024-0024, January 19, 2024).

## ARGUMENT

**A.  AT Violated Section 105(c) of the Act When it Terminated Baumann**

Section 105(c) of the Act encourages miners' active participation in matters related to mine safety and health by prohibiting any discrimination against a miner for exercising any right under the Act. *See id.* This section states, in relevant part:

> No person shall discharge or in any manner discriminate against or cause to be
> discharged or cause discrimination against or otherwise interfere with the exercise

33

of the statutory rights of any miner, representative of miners … in any coal or other mine subject to this chapter … because of the exercise by such miner, representative of miners … on behalf of himself or others of any statutory right afforded by this chapter." 30 U.S.C. § 815(c)(1).

Under the *Pasula-Robinette* framework, the Acting Secretary establishes a *prima facie* case of discrimination when she proves by a preponderance of the evidence that the miner (1) engaged in protected activity, (2) suffered an adverse action, and (3) the adverse action was motivated in any part by that protected activity. *Pasula v. Consol. Coal. Co.*, 2 FMSHRC 2786, 2799 (Oct. 1980), *rev'd on other grounds*, *sub nom. Consol. Coal Co. v. Marshall*, 663 F.2d 1211 (3rd Cir. 1981); *Robinette v. United Castle Coal Co.*, 3 FMSHRC 803, 817-18 (Apr. 1981).

Section 105(c) of the Act applies to the Mine which is a mine under the Act that is engaged in commerce. (¶ 1-2 [16]) Respondent, AT, is the operator of the Mine and was at all relevant times, including since at least June 1, 2022. (¶ 3). Baumann was a miner at all relevant times, as under the Act, a "miner" is "any individual working in a coal or other mine." 30 U.S.C. § 802(g). (¶ 4). Baumann is also covered under the Act as a miners' representative, starting on March 21, 2023. (¶ 39).

### i.  Baumann Engaged in Protected Activity

"Protected activity" under the Act may take several different forms, including making safety complaints to MSHA or the Mine operator and its agent or the exercise "of any statutory right afforded" by the Act. 30 U.S.C. § 815(c). Making a safety-related complaint to management at the mine and making safety complaints to MSHA are protected activity. 30 U.S.C. § 815(c)(1). Serving as a miners' representative, walking around with MSHA during inspections, and discussing safety issues with MSHA are all rights afforded by the Act, and thus, also protected activities. 30 U.S.C. § 813(f) (a miners' representative "shall be given an opportunity to accompany" MSHA during the

---

16 "¶" refers to the paragraph of the Proposed Findings of Fact.

34

inspection of the Mine). Miners also have the statutory right to be paid during an MSHA 104(b) withdrawal order pursuant to 30 U.S.C. § 821 of the Act and seeking to exercise such statutory right is also protected activity. 30 U.S.C. § 815(c).

During his time at American Tripoli, Baumann made multiple and repeated safety complaints to Spears and Tidaback in person and via Teams, including increasingly more safety complaints in the last two months of his employment. (¶ 17-24, 37-38, 42, 48, 50, 59). The safety issues Baumann raised, as set forth above, included complaints about the dangerous silica dust that was not being properly controlled, concerns about a guard that nearly fell on Baumann, multiple electrical issues including a live wire Baumann found while sweeping that sparked a miners' broom, rags being stuffed into bearings, and concerns about manually stacking 100-pound bags over six feet high. *Id.*

The unrefuted evidence also shows that Baumann walked around with MSHA during inspections and made safety complaints to MSHA, including a complaint to MSHA that triggered a new inspection on March 28, 2023, and participated in MSHA inspections by walking around with MSHA inspectors and pointing out and discussing safety issues with MSHA inspectors during those inspections. (¶ 23-24, 26-30, 32-35, 37, 41-42, 44, 46-47, 49, 56). Baumann also became a miners' representative on March 21, 2023, and in that role exercised his right under the Act to walk around with MSHA during their inspections, raised his safety concerns to MSHA, and brought the safety concerns of other miners to MSHA. (¶ 39-41).

Finally, Baumann also exercised his and other miners' statutory right to be paid during the 104(b) Orders. (¶ 57-58, 62). Baumann sent a text and Teams message to Spears informing Spears of the miners' rights to be paid during the 104(b) Orders in order to make sure that all miners, including himself, would get paid during the 104(b) Orders in accordance with the Act.[17] *Id.* Baumann also

_____

17 While Baumann does not know if he was paid for the days the Mine was shut down as he was

Appellate Case: 25-1349     Page: 160     Date Filed: 04/07/2025 Entry ID: 5503844

asserted his right to make a complaint to MSHA about miners' pay by telling Spears that he did not want to have to make a complaint to MSHA about this issue but that the miners were entitled to the payment under the Act. (¶ 58).

### ii. Baumann Suffered an Adverse Action

It is undisputed that Baumann suffered an adverse action when he was terminated on April 17, 2023. (¶ 65). After his termination, Baumann timely filed a discrimination complaint with MSHA on April 25, 2023. (¶ 68).

### iii. Baumann's Termination was Motivated by Protected Activity

While direct evidence of motivation is rarely found in a discrimination case, this is the rare case where direct evidence of motivation exists. Teams messages from Tidaback clearly articulate that Baumann was terminated for engaging in protected activity.

On April 14, 2023, approximately one hour after Tidaback learned that Baumann had raised miners' pay with Spears, Tidaback was already plotting how they would make Baumann's termination appear to be for reasons other than protected activity by stating to Spears that they would terminate Baumann and "just need to have a document of why he was let go." (¶ 62). Then, on April 27, 2023, Tidaback, Spears, and Ms. Tidaback received copy of Baumann's discrimination complaint. (¶ 72). That same day, Tidaback began coming up with reasons to make it look like he terminated Baumann for reasons other than his protected activity by creating false "notes" about his alleged "issues" with Baumann. (¶ 73). These notes have taken two forms, one copy that was provided to MSHA during its inspection at P-45 and one copy that was provided at the hearing with new entries at R-B, which is dated April 27, 2023 at 7:13pm. *Id.*

---

never provided his final paycheck stub, he is not seeking any remuneration under the Act for the 104(b) Orders shutdown. This is merely being provided as another example of Baumann asserting his rights under the Mine Act to Mine management and informing Spears that he would file a complaint with MSHA if he had to.

In addition to crafting a defense to Baumann's discrimination complaint by creating these "notes," Tidaback also explicitly told Hoover on April 28, 2023 that he needed Hoover to over perform to support a justification for Baumann's termination, just one day after receiving notice of Baumann's discrimination complaint. (¶ 74). Tidaback told Hoover: "We need you to make that place rock and roll. I *need the justification* since Robs complained to MSHA about being let go…just need you to put the cherry on the cake that's all." *Id.* (emphasis supplied). This message is a blatant admission that there was no justification for Baumann's termination, so 11 days after Baumann was terminated, it was important for AT to start creating a defense to the complaint.

Tidaback continues these messages with Hoover, which plainly reveal the true reason Baumann was terminated, by stating that it was the February 2023 MSHA inspections where "Rob started to really buck back against what John[18] was telling him to do," and Tidaback agrees with Hoover's statement that Baumann "fucked us over on that deal." (¶ 75). Tidaback further states that "Rob" was a "fool to think Keith is his friend," which indisputably refers to Inspector Keith Markeson, who Baumann walked around with and made safety complaints to multiple times during his employment and in the days before he was terminated. (¶ 35, 40, 61,75). In these messages, Tidaback also tells Hoover that "EVERYONE needs to stop calling MSHA" and Tidaback agrees with Hoover when he says this "pisses him off." (¶ 71).  These messages make it clear Baumann was terminated because he was speaking to MSHA inspectors about safety issues, making complaints to John Spears about safety issues, and participating in the MSHA inspections that ultimately led to the Mine being shut down and asking for pay during the shutdown.

The Court can and should find direct evidence of motivation in this case. However, if the Court

---

[18] Baumann started raising more safety complaints to John Spears after the February Inspection. (Vol. 1, 267:21-269:18). John Spears is the only "John" employed at AT during this timeframe. (P-39 at p. 10-18).

Appellate Case: 25-1349     Page: 162     Date Filed: 04/07/2025   Entry ID: 5503844

declines to find direct evidence of motivation, there is also ample circumstantial evidence which shows a causal nexus between Baumann's termination and his protected activity.

### 1. AT Knew About Baumann's Protected Activity

The "operator's knowledge of the miner's protected activity is probably the single most important aspect of a circumstantial case" and such "knowledge can be proved by circumstantial evidence and reasonable inferences." *Baier v. Durango Gravel*, 21 FMSHRC 953, 958 (Sept. 1999). The undisputed evidence shows that AT knew about Baumann's protected activity and received information about this protected activity in multiple ways, including via Teams, verbal conversations, and by Spears and Tidaback directly witnessing Baumann's protected activity.

In reviewing the multiple Teams messages Tidaback exchanged with Hoover about Baumann speaking to MSHA and participating in MSHA inspections alone, there can be no question that Tidaback had knowledge of Baumann's protected activity with MSHA. (¶ 70-71, 74-75). Tidaback also knew about Baumann's participation in MSHA inspections and complaints to MSHA, as Tidaback walked around with Baumann during at least one MSHA inspection, and Baumann reported his discussions with MSHA inspectors in Teams to Tidaback on multiple occasions. (¶ 32-33, 35, 37, 42). Tidaback was also directly notified by Inspector Markeson on April 14, 2023 that Baumann participated in the April Inspection where the 104(b) Orders were issued. (¶ 61). On this same day, April 14, 2023, Tidaback also learned about Baumann asserting his and other miners' rights to pay during the 104(b) Orders. (¶ 62). Furthermore, Tidaback knew about the safety complaints that Baumann made to him, including the complaint about the guard that fell nearly 40 feet and almost hit Baumann (which was made to Tidaback and an MSHA Inspector at the same time), the safety complaint about the live wire on the floor, and the safety complaint about stacking 100-pound bags. (¶ 37-38, 42, 50).

38

Spears had direct knowledge of the multiple safety complaints Baumann made to him, which Baumann communicated both in person and via Teams. (¶ 17-19, 21, 27, 38, 42, 48, 50). Spears also walked around with Baumann and the MSHA inspectors on multiple occasions and participated in the Teams chats where Baumann discussed his conversations with MSHA during inspections and raised safety complaints. (¶ 23, 30, 32, 34-35, 41, 48-49). Spears also knew Baumann was a miners' representative and was informed of this on March 21, 2023. (¶ 40-41). [19] As Operations Manager, Spears acts as an agent of AT and was involved in the decision to terminate Baumann along with Tidaback, and therefore his knowledge of Baumann's protected activity imputes to AT. (¶ 8, 67). *See Pappas v. Calportland Co.,* 38 FMSHRC 137, 146 (Feb. 2016) ("a supervisor's knowledge of the protected activity may be imputed to the operator where knowledgeable supervisors are consulted regarding the miner's employment."). In addition to imputing Spear's knowledge to the company, the Court should also find that Tidaback knew or learned about any protected activity that Spears knew because the undisputed evidence shows, through multiple witnesses, that Spears was in constant communication with Tidaback about all things going on at the Mine, especially with regard to MSHA inspections and getting approval to do any sort of maintenance to fix safety issues raised. (¶ 11).

### 2. AT was Hostile to Baumann's Protected Activity

"Hostility towards protected activity—sometimes referred to as 'animus'—is another circumstantial factor pointing to discriminatory motivation. The more such animus is specifically directed towards the alleged discriminatee's protected activity, the more probative weight it carries."

---

19 Although it is unnecessary for the Court to find that Tidaback also knew about Baumann's status as a miners' representative, based on Spears knowledge, the knowledge of all of the mill associates, and MSHA's practice of asking for the miners representative and working with Baumann as a miners representative on all inspections after March 21, 2023, it is not credible that Tidaback denies knowledge that Baumann was a miners' representative. (¶ 39-40).

Appellate Case: 25-1349     Page: 164     Date Filed: 04/07/2025 Entry ID: 5503844

*Chacon v. Phelps Dodge Corp.,* 3 FMSHRC 2508, 2511 (Nov. 1981), *rev'd on other grounds, Donovan v. Phelps Dodge Corp.,* 709 F.2d 86 (D.C. Cir. 1983)). There is ample evidence of AT's hostility not only to Baumann's protected activity specifically, but also hostility to safety and MSHA generally at the Mine. *See Durango Gravel*, 21 FMSHRC at 959 (finding hostility toward MSHA and safety generally helped support a finding of animus toward the complainant's protected activity).

AT displayed specific hostility to Baumann's protected activity, including hostility about making safety complaints, speaking to MSHA, and participating in MSHA inspections, as shown by the multiple and frequently occurring messages to Baumann to not speak to MSHA. (¶ 28-31, 51, 92-93). AT regularly ignored Baumann's safety complaints and refused to fix safety issues raised by Baumann. (¶ 19-20, 27). Tidaback was hostile to Baumann working with Inspector Keith Markeson, as demonstrated by multiple Teams messages sent by Tidaback, including one message saying that Baumann was "bucking back" as a result of participating in the February Inspection with Inspector Keith Markeson. (¶ 70, 75).

AT's animus towards protected activity is further substantiated by evidence that AT was generally hostile to safety and MSHA. AT lacked a safety program, refused to provide the proper tools and equipment to comply with safety standards, including PPE, and did not provide the required safety training to miners. (¶ 85-91). Furthermore, AT was especially hostile to complying with MSHA's silica dust control standards, a safety complaint which Baumann repeatedly raised to Spears and which AT was cited for failing to fix in the 104(b) Orders. (¶ 18, 48, 60-61). In particular, AT plotted ways to influence air sampling results and ignored Baumann's requests to order proper PPE and fix the dust issues at the Mine. (¶ 60). AT also prioritized production over fixing safety issues at the Mine. (¶ 20-21, 43, 91). As more fully discussed below regarding interference with miners' rights, Spears and Tidaback also directly and purposefully characterized

40

MSHA and MSHA inspectors as villains and the enemy of AT, creating a culture of fear and intimidation which discouraged miners from trying to improve safety at the Mine or communicate with MSHA. (¶ 28-31, 36, 45, 51, 63, 70-71, 75, 92-93). Spears and Tidaback repeatedly told miners to not be "that guy" that provides information to MSHA inspectors. *Id.* AT's disregard for safety and animus to MSHA standards was evident to both the miners who worked at AT and to the MSHA inspectors who inspected the Mine. (¶ 88). This overall attitude and disregard for safety further underscores AT's animus towards Baumann's protected activity.

### 3. There is a Close Coincidence in Time Between Baumann's Protected Activity and His Termination

On April 12, 2023, Baumann participated in an MSHA inspection as the miners' representative, following which the Mine was issued the 104(b) Orders for not controlling dangerous silica dust. (¶ 56). Baumann had repeatedly raised this very issue to Spears and Tidaback in the two months before his termination, to no avail. (¶ 18, 48). Due to the 104(b) Orders, the Mine was shut down on April 12, 2023, and the miners, including Baumann, were sent home. (¶ 57). The next day Baumann returned to the Mine was April 17, 2023, the date he was terminated. (¶ 57, 65).

In the days leading up to Baumann's termination, while not physically at the Mine from Thursday, April 13 to Friday, April 14, 2023, Baumann made complaints about the dust safety issues related to the 104(b) Orders to safety specialist Molesi, who raised those concerns to Tidaback via email. (¶ 59). Between April 12 and April 14, 2023, Baumann asserted his miners' rights to be paid during the 104(b) Orders to Spears over text message and Teams and indicated that he would make a complaint to MSHA if necessary. (¶ 58, 62). Spears shared these messages with Tidaback on April 14, 2023. (¶ 62). Further, on April 14, 2023, Tidaback sent several emails to MSHA complaining about the 104(b) Orders, and Tidaback was informed during those emails about Baumann's close involvement in the 104(b) Order investigations with Inspector Keith Markeson. (¶ 61). The

41

occurrence of these protected activities, of which Respondent had full knowledge, within five days of Baumann's termination, two of which were weekend days, provides overwhelming evidence that Baumann was terminated for engaging in protected activity.

In addition, Baumann increasingly engaged in protected activity in the two months prior to his termination. Baumann was terminated two months after he first started walking around with MSHA during inspections and raising safety issues to MSHA and progressively more to Spears and Tidaback; 1.5 months after reporting a safety issue to Tidaback in front of an MSHA inspector about a guard nearly falling on him; one month after raising a safety complaint about live wires coming through the floor to Tidaback and Spears; less than four weeks after becoming a miners' representative, and on that same date participating in an MSHA inspection and making a safety complaint to management and MSHA about stacking bags too high; approximately three weeks after being sampled for dust exposure by MSHA; five days after participating in the MSHA 104(b) Order inspection, and a couple of days after raising continued safety complaints to Mine management about getting the proper PPE for the dangerous silica dust exposure at the Mine. (¶ 17, 37, 38, 39-42, 46, 48, 56, 59). The close proximity in time between these protected activities and Baumann's termination supports a finding of a causal nexus. *See Baier*, 21 FMSHRC at 959 (concluding that two weeks between protected activity and adverse action "supports the judge's finding of a discriminatory motive"); *Pero v. Cyprus Plateau Mining Corp.,* 22 FMSHRC 1361, 1365 (2000) (an adverse employment action four months after a protected activity constituted close temporal proximity).

Baumann's termination, just days after he accompanied MSHA during an inspection of the Mine as a miners' representative which resulted in the issuance of the 104(b) Orders, and just days after he complained to management about silica dust safety issues, was a culmination of two months' worth

of protected activity. Baumann's role in the 104(b) Orders inspection and his request for pay as a result of the 104(b) Orders, which forced AT to finally take action on the dust safety issues Baumann had been raising and actually *cost the company money*, were the final straw. *See Carter v. Kino Aggregates, Inc.*, 34 FMSHRC 417, 428 (Feb. 2012) (ALJ) (finding temporal proximity where the operator believed complainant complained to MSHA resulting in an inspection "which produced numerous citations and orders" forcing the mine to fix safety issues that complainant had been complaining about over the past 2.5 years); *Hyles v. All American Asphalt*, 21 FMSHRC 34 (1999) (15 month delay between protected activity and adverse action showed sufficient nexus especially when, four days before the termination, the operator received a $45,000 MSHA penalty assessment related to the protected activity, which was the "straw that broke the camel's back"); *Turner v. Nat'l Cement Co.*, 33 FMSHRC 1059, 1070-71 (2011) (making safety complaints for six months, with the last complaint occurring four days before termination, could have been the "last straw" showing the operator was improperly motivated).

### 4. AT Treated Baumann Disparately by Not Following its Own Disciplinary Policy

The unrefuted evidence also shows that Baumann was treated differently from other miners in that Baumann was terminated even though he was never once disciplined while employed by AT. (¶ 76-79). AT does not dispute this fact and has not presented any evidence of a single instance of discipline, verbal or written, given to Baumann during his employment. (¶ 76, 79). Although AT had a disciplinary policy, had used that disciplinary policy for other miners, and had given out written discipline to other miners, Baumann was never put on notice that his performance was lacking and was never told that he needed to improve his work or he would be fired. (¶ 76-79). In addition, while Baumann was allegedly terminated for production, Spears, the individual who had ultimate responsibility for production, was never disciplined and never terminated. (¶ 80).

43

The overwhelming and undisputed evidence shows that Complainants have proven their *prima facie* case that Baumann was terminated from AT because he engaged in protected activity. This protected activity was known to AT, AT was hostile to it, and Baumann, as the miners' representative, had increasingly engaged in it during the two months before his termination, including just a few days before his termination. *See Phelps Dodge Corp.*, 3 FMSHRC at 2511 ("Adverse action under circumstances of suspicious timing taken against the employee who is the leading figure in protected activity casts doubt on the legality of the employer's motive since such conduct is the classic method of undermining protected activity.").

### B. AT Has Failed to Prove Any Defense

#### i. AT Did Not Rebut the Secretary's *Prima Facie* Case

A mine operator may rebut the prima facie case by showing either that no protected activity occurred or that the adverse action was not in any part motivated by protected activity. *Eastern Associated Coal Corp.*, 7 FMSHRC 2015, 2019 (Dec. 1985). AT did not rebut any part of the Acting Secretary's prime facie case.

First, the overwhelming evidence establishes Baumann's overt and repetitive engagement in protected activity, and AT did not introduce any evidence to the contrary.

Second, AT did not introduce any evidence that Baumann's termination was not motivated, *in any part*, by that protected activity. Rather, AT nearly concedes it terminated Baumann *because of* his protected activity. Baumann's termination letter stated he was terminated, in part, because of poor performance[20]. (¶ 65). Spears testified "poor performance" was entirely related to whether Baumann was meeting the production demand Tidaback set for the mill, a demand which was unrealistic and regularly unattained. (¶ 67). A primary reason the mill could not reach any alleged

---

[20] Respondent failed to introduce any evidence of specific "poor performance" by Baumann.

Appellate Case: 25-1349     Page: 169     Date Filed: 04/07/2025 Entry ID: 5503844

production quota was because the mill was shut down by an enforcement agency. (¶ 81-83). Baumann participated in both the February Inspection and March Inspections which led to Mine shut downs in order to terminate citations, and the April Inspection that led to the 104(b) Orders, again shutting down the Mine. (¶24, 26, 56). There can be no doubt that these shutdowns affected Baumann's ability to reach any sort of production quota, and Tidaback and Spears exhibited animus to Baumann's participation in the MSHA inspections which led to these shutdowns. (¶ 81-84, 92-93). Tidaback testified that he would not hold it against someone for poor production when the Mine was shut down. (¶ ). As such, it simply cannot be true that Baumann was terminated for production issues *during an MSHA shutdown*. American Tripoli's attempt to back into a reason why Baumann was terminated by selecting "production" issues only points to AT's animus to Baumann's participation in the MSHA inspections which halted mill production.

Respondent also alleged in the termination letter, but notably not at trial, that it terminated Baumann because he lacked leadership skills and failed to follow procedures and guidance given by his supervisor.[21] (¶ 65). AT failed to present any evidence on these points at trial. Thus, there is no evidence that AT can rely on to prove that Baumann's termination was motivated by anything other than his protected activity.

### ii. AT Did Not Establish an Affirmative Defense

When a mine operator fails to rebut the *prima facie* case, it may affirmatively defend against it by proving that, although part of its motive was unlawful, (1) it was also motivated by the miner's unprotected activities, and (2) it would have taken adverse action against the miner in any event for the unprotected activities alone. *Robinette*, 3 FMSHRC at 817. It is the operator's burden to prove

---

21 AT provided interrogatory responses, signed under penalty of perjury, by Tidaback outlining the alleged reasons for Baumann's termination setting forth that Baumann was terminated for poor performance, lack of leadership skills, failure to follow procedures and guidelines, and safety concerns. (P-12 at p. 3-4; Vol. 3, 250:1-13).

Appellate Case: 25-1349      Page: 170      Date Filed: 04/07/2025 Entry ID: 5503844

such a defense by a preponderance of the evidence and requires a showing that the operator "did in fact consider the employee deserving of discipline for engaging in the unprotected activity alone and that [it] would have disciplined him in any event." *Id.*

AT failed to meet its burden. AT has not shown that any alleged unprotected activity was considered deserving of termination, as AT failed to present a single instance of any discipline for any alleged unprotected activity that it had issues with during Baumann's ten-month long employment. (¶ 76-79). More specifically, AT wholly failed to point to any reason why Baumann was terminated at the hearing, leaving only the evidence that AT was purely motivated by Baumann's protected activity. All the reasons given by Respondent in the termination letter, but not proved at trial—production, leadership, failure to follow instructions—relate back to Baumann's protected activity, including making safety complaints to management, refusing to perform unsafe work, participating in MSHA inspections that led to citations and orders, acting as a miners' representative, and requesting miners' pay during an MSHA shutdown.

Respondent tried to argue, without presenting evidence, that Baumann's termination was related to MSHA's citations for missing guards or failure to conduct workplace exams. These arguments have no basis in fact. AT did not train Baumann on machine guarding or workplace exams and the Secretary's evidence unequivocally established AT had no interest in proper machine guarding or workplace exams. (¶ 13-14). Moreover, the Secretary's evidence established Baumann was a safety advocate who tried his best to bring safety issues to AT's attention. (¶ 17-24, 39-40). AT never brought any of these allegations to Baumann's attention while he worked there. (¶ 77-78). Instead, the evidence establishes that AT made them up after the fact to justify his termination.

### iii. AT has Provided No Credible Reason for Terminating Baumann

Justifications for termination "should not be 'examined superficially or be approved

automatically once offered,'" and "the judge must 'determinate whether they are credible and, if so, whether they would have motivated the particular operator as claimed.'" *Turner*, 33 FMSHRC at 1072. The Commission has held that "pretext may be found . . . where the asserted justification is weak, implausible, or out of line with the operator's normal business practices." *Price v. Jim Walter Res., Inc.*, 12 FMSHRC 1521, 1534 (1990) (citations omitted). The Commission has described the array of evidence that may show pretext: a complainant may demonstrate "either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." *Turner*, 33 FMSHRC at 1073.

At trial, Respondent never once said why it fired Baumann. (¶ 66). Rather, in an attempt to justify the firing, Respondent alluded to performance issues that are refuted by the evidence. They are also refuted by Respondent's failure to follow its disciplinary plan, neither giving Baumann notice of any performance problems nor following the three-step process the plan requires. (¶ 76-79). The evidence firmly establishes that Respondent fired Baumann because he cooperated with MSHA, stood up for his and other miner's right to have a safe workplace, and insisted that he and other miners be paid according to law. Respondent's attempts to refute this lack credibility and are not supported by any evidence.

### iv.  AT Was Motivated by Nothing More than Baumann's Protected Activity

AT has pointed to no event, no failure, and no production or performance issue that occurred in the days or weeks leading up to Baumann's termination to permit the Court to find any reason, other than Baumann's protected activity, as the reason for Baumann's termination. Additionally, AT failed to introduce any reliable evidence of any conduct by Baumann that would warrant discipline, let alone termination, in the days leading up to his termination. The only evidence introduced by Respondent was a set of "personal notes" made by Tidaback. *See* R-B. These notes are a completely

47

unreliable source of information for Baumann's performance at AT, and AT failed to even explain why or how these notes, if true, would justify terminating Baumann the day he returned to work after participating in an MSHA inspection and making safety complaints about dust issues at the Mine.

First, these notes were not produced in the form seen in R-B during MSHA's investigation. Rather, Respondent provided a different version of these notes, P-45.[22] In R-B, an entirely *new* entry, that was not provided to MSHA, was added, dated, February 14, 2023, which was the date Baumann started walking around with MSHA and pointed out certain safety concerns he had to MSHA and AT. (¶ 73). There is no reason why, if this entry was made contemporaneously with the event, it would not appear in the version of the document provided to MSHA.[23] Another indication that these notes are not reliable is the date of the document. R-B is dated not only after Baumann was terminated, but on the *same day* Tidaback was served with Baumann's discrimination complaint. (¶ 72-73). These inconsistencies solidify that these "notes" are not a reliable or credible source of information and are nothing more than AT backfilling into a reason to terminate Baumann, *after* he was terminated.

Not only are there issues on the face of R-B, but the substance of the document was not supported by the testimony at trial. There are multiple references to Baumann sending employees home early or skipping breaks in R-B. Baumann testified that these decisions were approved by Spears. (¶ 73). The reference on August 8, 2022 that Baumann was moved to first shift so he could be more closely supervised is not supported by the testimony presented at the hearing that Baumann was moved to first shift because second shift was being discontinued since the machinery could not run all day and moreover that Baumann was performing well on second shift and had caught AT up

---

22 P-45 was admitted for the limited purpose of impeaching R-B.
23 In addition to the entry on February 14, contains a copy of a Teams message that was "pasted" into this notes document. However, Tidaback testified that these were his "handwritten" notes, so it would not have been possible to "paste" Teams messages into handwritten notes. (R-B).

Appellate Case: 25-1349     Page: 173     Date Filed: 04/07/2025 Entry ID: 5503844

on production. (¶ 15). Further, Allman testified at the hearing that he did not get mad at Baumann and never said Baumann was difficult to work with, as the notes dated October 12, 2022 state. (¶ 73). There is also a reference, on March 20, to hiring an employee to replace Baumann, which Spears testified did not occur during Baumann's employment. (Vol. 2, 68:16-69:3, 76:16-77:10) Further, while the "notes" try to tell a different story, Spears, Baumann's direct supervisor, disputes the claim that Baumann was overall a poor employee, as he stated that Baumann got along well with Spears, was never disrespectful to Spears, was conscientious about getting product produced, competent at his job, punctual, and Spears did not know of anyone that disliked Baumann. (¶ 16). None of the evidence presented at trial corroborates the information in these notes. Tellingly, Tidaback didn't even testify under oath about the contents of the notes in R-B. The evidence shows these were created after the fact and are not reliable evidence of Baumann's performance.

Finally, in further support the notes are false, they defy commonsense. If Baumann was the poor performer the notes make him out to be, Respondent failed to produce any credible evidence why it would employ him for nearly 10 months in a lead role allegedly responsible for all mill activities. Tidaback stated he was hiring various individuals to replace Baumann, but that he wanted Baumann to train these individuals. It defies all reason why a business would want an individual it labeled as lazy and a poor performer to train anyone, let alone his own replacement.

Respondent has failed to rebut or defend against Complainants' *prima facie* case, and the Court should find Respondent in violation of Section 105(c) for discriminating against Baumann.

### C. The Court Should Award Back Wages and Back Pay to Baumann

As a result of Baumann's unlawful termination from AT, Baumann suffered significant financial losses. Baumann is seeking $9,920 in back wages for the 62 days he was unemployed as a result of

his termination from AT.[24] Baumann is entitled to back pay for the entire 62 days during which he was unemployed as a result of his termination from AT. (¶ 94-97). It was not until Baumann received his current job that he ultimately decided he would no longer accept reinstatement because he likes his current job and does not want to return to AT. (¶ 112-113). Baumann obtained his current job soon after he was terminated, which he held by the time the Acting Secretary filed the Complaint in this case in August 2023. (¶ 96).

Baumann was out of work for 62 days as a result of his unlawful termination, from April 17, 2023 to June 13, 2023, and from June 21, 2023 through July 23, 2023. (¶ 95-97). Baumann quickly got his first job at Schaeffler Group on June 13, 2023, but the job required that he purchase glasses that he could not afford because he had been out of work, so he was not able to keep that job. (¶ 95). However, had Baumann been still working at AT when he got the job at the Schaeffler Group, he would have been able to afford the glasses; not being able to afford the glasses was the only reason Baumann quit this job. *Id.* Shortly after quitting this job due to his financial circumstances caused by the termination, Baumann got his current job on July 24, 2023. Any back pay award should include the full 62 days, from the time Baumann was terminated on April 17, 2023 until June 13, 2023, and then from June 21, 2023 to July 23, 2023, after Baumann quit his job at Schaeffler Group up until he

---

24 During Baumann's unemployment, he collected unemployment benefits from the State of Kansas. (*See* Vol. 1, 285:11-14; 290:9-21). However, none of these amounts should be subtracted from an award of back wages to Baumann. The Commission has recognized that unemployment should not be deducted from the backpay awards of miners discharged in violation of Section 105(c). *See Secretary of Labor on behalf of Poddey v. Tanglewood Energy, Inc.*, 18 FMSHRC 1315, 1325 (August 1996) (citing the Fourth Circuit's decision in *Secretary of Labor on behalf of Wamsley v. Mutual Mining, Inc.*, 80 F.3d 110 (4th Cir. 1996) and reversing the judge's deduction of unemployment compensation from the Complainant's backpay award). In addition, the State of Kansas requires Baumann to pay back the unemployment he received if he receives any back wages award. *See* K.S.A. § 44-706(s)(1) ("For any such weeks that an individual receives remuneration in the form of a back pay award or settlement, an overpayment will be established in the amount of unemployment benefits paid and shall be collected from the claimant."). As such, subtracting unemployment benefits from the award would charge Baumann double for the unemployment benefits as he would still be required to pay back the State of Kansas.

got a job with Cherokee Road and Bridge, as it was his termination that put him in the unfortunate position of having to quit a job because he did not have enough money to pay for glasses.

Interest should also be awarded on top of Baumann's back pay. *Arkansas-Carbona Co.* 5 FMSHRC 2042 (1983) (the remedial goal of section 105(c) of the Act is to restore the victim "to the situation he would have occupied but for the discrimination," which includes "interest on an award of back pay."). According to Commission case law, interest is calculated by using the adjusted prime rate announced semi-annually by the Internal Revenue Service under 26 U.S.C. § 6621, which is to be computed by the "quarterly" method, meaning separate computations of interest for back pay are made for each calendar quarter involved in the back pay period and simple interest will be assessed at the adjusted prime rate or rates in effect. *Arkansas-Carbona*, 5 FMSHRC 2042 (setting out the formula for computing interest as: "Amount of interest = The quarter's net back pay x number of accrued days of interest (from the last day of that quarter to the date of payment) x daily adjusted prime rate interest factor."). Using this method of calculation, interest on top of this $9,920 in back wages is $632.60 through February 27, 2024, the first date of trial.[25]

Baumann is also seeking the expenses he incurred in searching for a job. The remedial goal of section 105(c) of the Act "is to return the miner to the status quo before the illegal discrimination." *Arkansas-Carbona*, 5 FMSHRC 2042. If Baumann had not been terminated, he would not have driven to the Kansas and Missouri unemployment offices and would not have driven to the agencies that assisted him in his job search; he would have had no need since he would have been employed. These expenses are therefore reimbursable, and the distances he drove have been determined using

[25] The Acting Secretary believes interest should continue to accrue until the date of payment, but since it is unknown when any such payment will be made, the interest calculation provided here is for demonstrative purposes.

Appellate Case: 25-1349     Page: 176     Date Filed: 04/07/2025 Entry ID: 5503844

maps[26] and applying the IRS's mileage rate for businesses. As such, Baumann is entitled to $163.23 for these mileage expenses incurred in his job search as a result of his wrongful termination. (¶ 103-109). Further, Baumann was unable to keep up with his bills, including paying for his home insurance due to his termination. As a result, he was forced to sell his possessions and lost out on approximately $1,200. (¶ 102). Baumann also incurred expenses driving to and from the hearing in this matter in Joplin, Missouri from February 27 to February 29, 2024, resulting in $96.88 in mileage expenses. (¶ 110). These are all expenses and losses Baumann would not have incurred had he not been wrongfully terminated, for which he should be compensated. *See Hicks v. Cobra Mining, Inc.*, 13 FMSHRC 1262 (Aug. 1991) (ALJ) (noting that the history of the Act indicates an intent to encompass "all relief that is necessary to make the complaining Party whole," and awarding lost mileage and lost equity in a vehicle).

Based on the foregoing, Baumann should be awarded a total of $12,012.71, which includes his back wages, interest, mileage incurred during his job search, mileage incurred to attend the hearing, and the loss he suffered by selling his possessions to pay his bills during the time he was out of work as a result of his termination. (¶ 94-110).

### D.  AT Interfered with Baumann's and Other Miners' Rights at the Mine

The Commission recognizes that under section 105(c) of the Act interference is a separate and distinct violation from discrimination. *McNary v. Alcoa World Alumina, LLC*, 39 FMSHRC 433, 449 (2017) ("Section 105(c)(3) permits an individual to file a complaint charging 'discrimination or interference' in violation of section 105(c)(1)."). The Acting Secretary interprets the Act as prohibiting acts that reasonably tend to interfere with protected rights, the motive for those acts notwithstanding. *See, e.g. Marshall Cnty. Coal Co. v. FMSHRC*, 923 F.3d 192, 198-99 (D.C. Cir.

---

26 A court can take judicial notice of the distance between two places. *See Ryno v. City of Waynesville*, 58 F.4th 995, at n. 2 (8th Cir. 2023).

Appellate Case: 25-1349     Page: 177     Date Filed: 04/07/2025 Entry ID: 5503844

2019); *Franks v. Emerald Coal Res., LP*, 36 FMSHRC 2088, 2108 (2014). The Court should find a violation of the interference provision of Section 105(c) of the Act if: "(1) a person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and (2) the person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights." *Franks*, 36 FMSHRC at 2108.

### i. AT's Actions Interfered with Protected Activity

The evidence at trial established it was part of the cultural fabric at AT to interfere with miners' rights.[27] Management at AT, including Tidaback, Ms. Tidaback, and Spears, repeatedly and regularly told miners not to talk to MSHA, not to participate in MSHA inspections, and even made veiled threats that if a miner did speak to MSHA they would be terminated. (¶ 28-31, 36, 45, 51, 63, 70-71, 75, 92-93). The evidence at trial introduced numerous Teams chats from management consistently reminding miners to not speak to MSHA, many of which were sent during or after MSHA inspections, including inspections which were initiated based on miner complaints. The messages sent, which were also reinforced during repeated verbal conversations to multiple miners, could not be more clear: "do not talk to MSHA," "MSHA inspectors are NOT your friend," anything you say to MSHA "can AND WILL be used against you in a court of law" and "EVERYONE needs to stop calling MSHA." (¶ 28-31, 36, 45, 51, 63, 70-71, 75, 92-93). Further, miners testified at the trial that it was a pattern and practice at AT to avoid any contact with the inspectors, and miners were told by Spears and Tidaback that their participation and speaking to MSHA could cause them to personally be issued citations. (¶ 51). These statements, when viewed from a miner's perspective, would tend to interfere with miners' rights to raise safety issues to MSHA. Indeed, the miners at AT

27 It is undisputed the workers at AT are miners and are covered by the Mine Act, and as such, the Mine Act protects them from interference with their rights. (¶ 5).

Appellate Case: 25-1349    Page: 178    Date Filed: 04/07/2025   Entry ID: 5503844

interpreted these messages from Spears and Tidaback as interfering with their rights, as they were fearful of speaking to MSHA because of these statements. (¶ 30-31, 92-93). Inspector Licklider testified that the miners at AT appeared nervous when MSHA was there, and their behavior was out of the ordinary from the miners at other mines. (¶ 93). In addition, Baumann was fearful to speak to MSHA, other miners told him they were fearful to speak to MSHA, and Wheeler testified he was concerned he would be terminated if he volunteered information to MSHA after being told not to by Spears. (¶ 30-31, 92-93). Any reasonable miner would have taken these multiple, ongoing statements about not speaking to MSHA and not volunteering information to MSHA from AT management as preventing them from exercising the right to speak to MSHA about safety concerns at the mine. This is particularly true when AT management's comments directly referenced prior miners who spoke to MSHA and then were swiftly terminated. (¶ 31, 92). Thus, from the perspective of the miners, AT directly interfered with the miners' rights to engage in protected activity.

### ii.  AT Has Failed to Set Forth Justification for its Interfering Conduct

Respondent failed to introduce any evidence to provide any justification for telling miners not to speak to MSHA and for speaking disparagingly about MSHA inspectors precisely because there is no rational justification for these statements.

AT merely made passing references by saying miners should be aware that MSHA would read them something akin to the "Miranda rights." In addition to being completely inaccurate, this does not provide any sort of justification for telling miners to "stop calling MSHA" and speaking disparagingly about MSHA inspectors. AT also attempted to explain away just *one* instance of interfering conduct by claiming that the statements Spears made on February 14 to Wheeler and Baumann were made in haste during a police investigation at the Mine. Being in a rush does not provide a legitimate justification to tell miners not to speak to MSHA, especially when Spears'

statement was reinforced by Tidaback and Ms. Tidaback later on during that same day, making it clear information should not be volunteered, miners should only nod and agree with inspectors, and with references to examples of miners who have volunteered information and were then terminated.[28] (¶ 31, 92). The Court is left with only one available conclusion, that AT interfered with miners' rights and there was no justification for interfering with miners' rights.

Even if Respondent could come up with some sort of legitimate business justification, they could not possibly argue that comments like calling the MSHA inspectors "snakes" and "jackasses" or claims that MSHA inspectors were "out to fuck you" were narrowly tailored to *any* legitimate goal. *See Marshall County Coal Co.*, 38 FMSHRC 2006 (2016) ("Even when an employer establishes a justification under the second step, the operator's actions must be 'narrowly tailored' to promote that justification as part of the balancing of the operator's interests with the protected rights of employees."). The Acting Secretary has shown that AT interfered with miners' rights, and the Court should find Respondent in violation of Section 105(c).

### E. The Court Should Assess a Civil Penalty for Each Violation

The Commission considers six statutory factors in its penalty assessment: (1) the operator's history of previous violations; (2) the appropriateness of such penalty to the size of the business of the operator charged; (3) whether the operator was negligent; (4) the effect on the operator's ability to continue in business; (5) the gravity of the violation; and (6) the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation. 30 U.S.C. § 820(i). The Court should award a separate penalty for the discrimination violation and the interference violation, as the Act requires a civil penalty for "each such violation" of the Act. 30 U.S.C. § 820(a). The Acting Secretary assessed a penalty of $15,000 for the discrimination violation

---

28 Further, Wheeler testified that he did not think the police were called on the same day Spears told him to not speak to MSHA. (Vol. 2, 203:22 to 204:5).

Appellate Case: 25-1349      Page: 180      Date Filed: 04/07/2025 Entry ID: 5503844

and $17,500 for the interference violation based on information gathered during MSHA's investigation. (¶ 114).

AT's violations of the Act by interfering with miners' rights and discriminating against Baumann are serious offenses which exhibit a lack of good faith and a high degree of negligence. AT discouraged miners from speaking to MSHA about the multiple safety issues at the Mine, putting miners in serious danger, as evidenced by the hazardous conditions miners testified to, like cutting off a lock while maintenance work was being performed, not having ladders, dangerous silica dust exposure, and electrical sparks. (¶ 28-31, 36, 45, 51, 63, 70-71, 75, 92-93). AT discouraged miners from speaking to MSHA during ongoing MSHA inspections, including MSHA inspections triggered by miner complaints and during inspections where Baumann was raising safety complaints to MSHA and participating in MSHA inspections as a miners' representative. (¶28-31, 44-45). AT went out of their way to ignore miner safety complaints, disregarded MSHA standards and miner safety, failed to provide training, and ultimately terminated Baumann, who was the miners' representative and was trying repeatedly, against strong resistance and constant interference and intimidation, to improve miner safety at the Mine. *See Highland Mining Co.*, 37 FMSHRC 2436, 2438 (Oct. 2015) (ALJ) (finding mine operator's interference with a miners' representative's rights was serious considering the important function that miners' representatives serve in ensuring a safe and healthy environment for miners). AT has not exhibited any good faith in complying with the Act and, subsequent to terminating Baumann, is also facing a second claim for discriminating against another miner. (¶ 117).

Although AT had no previous discrimination violations at the time the penalties were assessed, it has an extensive recent history of safety and health violations and these past violations must be considered as part of the penalty assessment. In 2023, the Mine was issued ninety-five 104(a)

56

citation, five 104(b) citations, twenty-one 104(d)(2) citations, two 104(g)(1) citations and one 107(a) citation. (¶ 116). From May 15, 2022 through August 14, 2023, the Mine was issued 41 significant and substantial citations with a total of 129 citations/orders. *Id.* As to the final two factors, the record establishes AT is a small employer, but AT did not present any evidence that any civil penalty assessed would cause the company to go out of business. The Mine has not taken any action by MSHA seriously, as shown by their complete disregard and hostility to safety at the Mine, and appropriate penalties should be assessed to deter AT from future interfering and discriminating conduct, which not only interferes with miners' rights but puts miners at serious risk when they are afraid to raise safety concerns to MSHA or risk termination.

MSHA penalties were assessed based on the facts and information set forth in the penalty assessment memo and gathered during the Acting Secretary's investigation, which did not include the multiple Teams chats revealed in discovery. (¶ 69). The facts of this case support, at a minimum, the penalties assessed by the Acting Secretary in this matter, but given the high degree of negligence and complete lack of good faith shown at the trial, higher penalties are also supported.

## <u>CONCLUSION</u>

For the reasons set forth herein and at the trial, the Court should find that AT violated Section 105(c) of the Act by terminating Baumann for engaging in protected activity, assess an appropriate civil penalty for this violation, award Baumann damages in the amount of $12,012.71, and require AT to expunge Baumann's termination from his personnel record and only provide a neutral reference. Additionally, the Court should find that AT interfered with Baumann's and other miners' rights by intimidating miners from speaking to MSHA about safety issues and assess a separate appropriate civil penalty for this violation.

57

Respectfully submitted,

                                        Seema Nanda
                                        Solicitor of Labor

                                        Christine Z. Heri
                                        Regional Solicitor

                                        Evert H. Van Wijk
                                        Associate Regional Solicitor

U.S. Department of Labor                 /s/ Laura O'Reilly
Office of the Solicitor                  Laura O'Reilly
2300 Main Street, Suite 10100            Elaine Smith
Kansas City, MO 64108                    Quinlan Moll
(816) 285-7260
(816) 285-7287 facsimile
Oreilly.laura.m@dol.gov
Smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov                   Attorneys for the Acting Secretary


# **CERTIFICATE OF SERVICE**

   This Post-Trial Brief has this date been filed with the electronic filing system and service has been made by email to: Russell Tidaback, RTidaback@deedyco.com and Robert Baumann Baumannr24@gmail.com this 24th day of April, 2024.

            /s/Laura O'Reilly

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

April 23, 2024

<u>**RESPONDENT'S INITIAL BRIEF**</u>

## I. INTRODUCTION

American Tripoli, through its managing member Russell Tidaback, who is not a licensed attorney but is representing the company due to his intimate knowledge of the operations and the case, submits this brief to address the allegations made by Complainants, Robert Baumann, and Secretary of Labor Julie A. Su. The claims of wrongful termination under Count I for discrimination and Count II for interference are baseless and vigorously contested by American Tripoli.

## II. FACTUAL BACKGROUND

Mr. Baumann's employment was terminated on legitimate, non-discriminatory grounds related solely to documented performance issues, which were persistent and detrimental to operational efficiency. Despite assertions, there is no credible evidence linking his termination to his safety complaints or MSHA interactions—activities that the Respondent acknowledges and supports as part of its commitment to safety.

1

## III. ARGUMENTS

### A. No Discrimination under Count I

**1. Performance-Related Termination:** Mr. Baumann's termination was strictly due to job performance and operational requirements, which were consistently communicated to him. Importantly, as detailed in our employee handbook (Exhibit P-16), American Tripoli maintains a policy that permits the company to exercise discretion in its disciplinary measures. This policy explicitly states that the company is not required to adhere to a fixed sequence of progressive discipline steps and may terminate employment without prior written warnings if operational exigencies or substantial performance failures warrant such immediate action. This approach allows American Tripoli the necessary flexibility to manage its workforce effectively and ensure operational integrity without being constrained by a rigid disciplinary procedure. Mr. Baumann's termination was a decision made in alignment with these documented policies, underscoring that it was driven by legitimate business considerations and not discriminatory motives.

**2. Lack of Evidential Support for Discrimination:** Exhibit RJJ confirms the absence of any MSHA record recognizing Mr. Baumann as an official miners' representative, and testimony from Mr. John Spears and Mr. Russell Tidaback revealed that they had not seen the Miners Representative Form (Exhibit P-2) prior to this case. The lack of formal recognition and the unfamiliarity of key company officials with any claimed status as a representative by Mr. Baumann further weaken any assertions that his termination was related to protected activities under the Mine Act. This absence of recognition and the application of flexible disciplinary policies that comply with the company's handbook are consistent with a lawful, non-discriminatory rationale for employment termination.

### B. No Interference under Count II

**1. Freedom to Report:** While it's asserted that internal communications, such as the message from Mr. Spears to Mr. Wheeler on February 14th, might imply interference, the context of this communication is crucial for a proper understanding. According to testimony, this message was intended to ensure that Mr. Spears, who was more knowledgeable about the specific issues MSHA was investigating, would speak to the inspectors. This was a logistical

2

decision aimed at providing clear and accurate information during the inspection, not at preventing employees from speaking to MSHA inspectors.

**2. Context of Communications:** The message was not an instruction to prevent employees from engaging with MSHA or expressing their concerns but was rather to centralize communication during a critical inspection moment. Such strategies are commonly employed in many industries to ensure that inspections are conducted efficiently and effectively without miscommunication.

**3. Supporting Testimony and Evidence:** Testimony from both Mr. Spears and Mr. Wheeler, as well as other employees, confirms that this communication strategy has been consistently applied and understood within the company as a practical measure, not as a means of interference. Further testimony indicated that Mr. Baumann and other employees had participated directly in past MSHA inspections, further demonstrating the non-restrictive nature of our communication policies.

**4. Proactive Engagement and Training:** Additionally, American Tripoli regularly conducts training sessions that include how to interact with regulatory bodies such as MSHA. These sessions emphasize the importance of clear, direct communication and encourage all employees to be forthcoming with any safety concerns or violations they observe. The company ensures that all employees are aware that they have the right and the responsibility to report directly to MSHA if they choose, regardless of the company's internal communication protocols during formal inspections.

## IV. LEGAL FRAMEWORK FOR DISCRIMINATION AND INTERFERENCE CLAIMS

### A. Legal Standards for Proving Discrimination under the Mine Act

It is our understanding that to establish discrimination under Section 105(c) of the Federal Mine Safety and Health Act of 1977, a complainant must demonstrate:

1. Engagement in protected activity.
2. Employer awareness of this activity.

3

**3.** Suffering an adverse action by the employer; and

**4.** A causal connection between the protected activity and the adverse action.

In the context of Mr. Baumann's case, although he was involved in safety-related activities, the evidence presented, including Exhibit RJJ and relevant testimonies, does not substantiate a direct link or causal connection between these activities and his termination.

**B. Legal Standards for Proving Interference under the Mine Act** Our understanding further extends to interference claims under the Mine Act, which require showing that an employer's actions could potentially hinder, restrain, coerce, or interfere with a miner's exercise of statutory rights. The burden is to demonstrate a plausible scenario where employer actions might have discouraged the exercise of rights related to mine safety and health.

The allegation centered around the message from Mr. Spears to Mr. Wheeler does not meet the threshold for interference. The context of this message, detailed in the testimony, shows it was operational in nature and aimed at ensuring effective communication during MSHA inspections. There was no evidence of intent to hinder or dissuade other employees from exercising their rights to report safety issues or communicate freely with MSHA inspectors.

**C. Application of Legal Standards to the Allegations** Given these interpretations, the allegations against American Tripoli do not appear to meet the rigorous criteria set forth for discrimination or interference:

- **Discrimination:** There is insufficient evidence linking Mr. Baumann's termination to his participation in protected activities. His termination was instead aligned with legitimate, non-discriminatory reasons related to performance.

- **Interference:** The established communication practices during MSHA inspections were intended to ensure thorough and precise exchanges with inspectors, not to restrict or intimidate employees from exercising their rights.

**V. CONCLUSION AND REQUEST FOR RELIEF**

4

In conclusion, American Tripoli respectfully requests that the Commission dismiss the complaint in its entirety due to the lack of substantive evidence supporting allegations of discrimination or interference. The Respondent maintains that its actions were in accordance with established company policies and were driven by legitimate business considerations.

Furthermore, American Tripoli wishes to emphasize its ongoing commitment to promoting mine safety and health. In response to the concerns raised during these proceedings, the company has implemented additional measures to enhance miners' awareness of their rights to communicate with MSHA. This includes incorporating information about these rights into new miner orientations, annual refresher training sessions, and on-the-job training announcements and communications.

By proactively addressing these concerns and continuing to prioritize safety, American Tripoli aims to create a workplace environment that is both compliant with regulatory standards and supportive of its employees' rights and well-being.

Respectfully submitted,

*Russell Tidaback*

Russell Tidaback
American Tripoli

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

May 8, 2024

**RESPONDENT'S REPLY BRIEF**

**I. INTRODUCTION**

American Tripoli respectfully submits this Reply Brief to address and refute the allegations
made by Complainants in the Acting Secretary's Post-Trial Brief. We assert that the claims of
discrimination and interference are not only baseless but are attempts to misconstrue operational
decisions as violations of statutory rights. This brief demonstrates with evidence and legal
argumentation that American Tripoli's actions were lawful, justified, and aligned with the
company's standards for safety and regulatory compliance. Accepting these claims without
robust and specific evidence risks setting a dangerous precedent that could unjustly penalize
well-intentioned operational decisions, potentially leading to unwarranted legal liabilities and
disrupting the lawful management practices essential for maintaining safe and efficient work
environments.

**II. ARGUMENTS**

**A. No Discrimination under Count I**

1

1. **Performance-Related Termination:** Mr. Baumann's termination was predicated on persistent performance issues that directly impacted operational efficiency. This decision was made in accordance with the company's discretionary disciplinary policies, which are detailed in Exhibit P-16 (Employee Handbook). These policies allow the company to terminate employment without prior written warnings if substantial performance failures warrant such immediate action, ensuring that operational integrity is not compromised by inadequate job performance.

2. **Absence of Evidential Support for Discrimination:** There is no credible evidence linking Mr. Baumann's termination to his engagement in protected activities. Exhibit JJ shows that even MSHA was not aware of any formal status of Mr. Baumann as a miners' representative, undermining claims that his termination was retaliatory. Furthermore, Mr. Baumann, as with others, had actively participated in numerous MSHA inspections and was never restricted from doing so, which demonstrates the company's commitment to maintaining an open line of communication between miners and MSHA.

**B. No Interference under Count II**

1. **Contextual Understanding of Communications:** The specific communication from Mr. Spears to Mr. Wheeler (Exhibit P-9 and P-10) during an MSHA inspection was operational, aimed at ensuring that accurate and relevant information was communicated to inspectors. This strategy is a standard industry practice during inspections and should not be misconstrued as interference.

2. **Proactive Company Policies and Training:** American Tripoli's commitment to open communication is underscored by its training programs and policies. Exhibits P-14 and P-16 illustrate that the company not only encourages but trains its employees on how to

2

effectively interact with MSHA inspectors, fostering an environment where safety concerns can be freely reported.

3. **Lack of Substantive Evidence of Interference:** Testimonies and internal communications reveal that the company's actions were consistently aimed at managing logistics during inspections and not at preventing employees from exercising their statutory rights.

## III. LEGAL ANALYSIS

**Preface:** As the Managing Member of American Tripoli, I am not a trained or licensed attorney. I present the following analysis based on our understanding of the relevant legal standards, relying on the court's expertise to interpret and apply these principles accurately. This approach is meant to aid the court's understanding of the facts from an operational perspective.

**A. Legal Standards for Proving Discrimination and Interference:** Discrimination under Section 105(c) of the Federal Mine Safety and Health Act of 1977, and similarly for interference, requires the complainant to demonstrate:

- Engagement in a protected activity,
- Employer awareness of this activity,
- An adverse action by the employer, and
- A causal connection between the protected activity and the adverse action.

**B. Insufficiency of Reliance on Analogous Case Scenarios:**

Appellate Case: 25-1349    Page: 191    Date Filed: 04/07/2025 Entry ID: 5503844

1. **Distinguishing Between Cases:** The Secretary's references to scenarios from other commission cases are scrutinized for actual relevance and direct applicability. While these cases can provide context or illustrate legal principles, they do not substitute for the concrete evidence required in the current case. Accepting such references as proof without direct applicability risks misinterpretation of the legal standards intended to protect employees and employers alike.

2. **Necessity for Specific Evidence:** Generalized scenarios from other cases do not satisfy the legal burden of proof, which demands clear and convincing evidence specific to the circumstances at hand. The absence of direct, concrete evidence linking Mr. Baumann's protected activities to the alleged adverse actions significantly undermines the Secretary's claims. Relying on such generalized scenarios could lead to unjust outcomes, where decisions are made based on conjecture rather than facts, potentially harming not just American Tripoli but setting a concerning precedent for the industry.

3. **Challenge to Speculative Linkages:** The Secretary's reliance on speculative linkages from other cases is highlighted as insufficient for establishing a causal connection in this case. Legal precedents are important for understanding interpretations of the law; however, they do not replace the need for specific evidence in proving individual claims of discrimination or interference. This practice, if validated, could encourage a flawed judicial approach where speculative links are deemed sufficient, thereby diminishing the rigorous standards of proof traditionally required in legal proceedings.

## IV. CONCLUSION AND REQUEST FOR RELIEF:

Given the detailed analysis and specifics of this case, there is a demonstrable lack of substantive evidence to support the allegations of discrimination or interference. Consequently, American Tripoli respectfully requests that the Commission dismiss the complaint in its entirety. Accepting

4

these allegations without sufficient evidence could not only undermine our operational decisions but also negatively impact our workforce and industry standards. We have further enhanced our training programs to underscore every miner's unequivocal right to interact with MSHA and its inspectors, reaffirming our unwavering commitment to promoting miner rights and safety.

Respectfully submitted,

*Russell Tidaback*

Russell Tidaback
American Tripoli
Managing Member

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| Respondent. | ) | Mine Id No. 23-00504 |

## ACTING SECRETARY'S REPLY BRIEF

## INTRODUCTION

The evidence set forth at the trial in this matter conclusively establishes that Respondent

violated Section 105(c) of the Federal Mine Safety and Health Act of 1977 (the "Act") by

terminating Robert Baumann ("Baumann") and interfering with miners' rights to engage in

protected activity under the Act. In its defense, Respondent claims that 1) Bauman's termination

was for legitimate, performance-related reasons, and 2) Respondent's communications regarding

protected activity did not constitute interference and were part of its established communications

practices. However, Respondent's Initial Brief, which is devoid of references to the trial record,

provides no evidentiary support for these arguments. Therefore, as described below, Respondent

has failed entirely to rebut both the discrimination and interference violations.

## ARGUMENT

**A. Respondent has Failed to Rebut the Showing of Discrimination**

    **i.    Respondent Cannot Identify any Performance-Related Reasons for Termination**

Appellate Case: 25-1349   Page: 194   Date Filed: 04/07/2025 Entry ID: 5503844

Respondent has failed to identify any facts rebutting the overwhelming evidence of discrimination introduced in this case. In support of its contention that Baumann's termination was not discriminatory, Respondent relies on the bare assertion that Baumann was terminated "strictly due to job performance and operational requirements." However, Respondent cites to no evidence in the record substantiating this claim. Moreover, Respondent is unable to provide a single specific issue with Baumann's performance that supposedly merited his termination.

Respondent's performance-based argument is further undermined by the testimony introduced at trial. Baumann's former co-workers testified that Bauman performed his job well, was a dedicated worker, was punctual, and was a good leader. (Vol. 2, 152:5-155:12, 234:8-235:12, 247:16 to 248:15, 252:15 to 253:1, 273:2-5, 275:20-22). Operations Manager John Spears ("Spears"), who ran the mine on a day-to-day basis and directly oversaw Baumann, stated that Bauman was conscientious about production, competent, and punctual. (Vol. 3, 109:14-10; P-44 at Depo. Tr. 27:22-28:12). Respondent has cited no evidence to refute this testimony.

Respondent also alleges that its decision to terminate Baumann was made in accordance with its documented policies, namely the disciplinary policy contained in its employee handbook. (P-16 at p. 43). Although the employee handbook contains a three-step progressive disciplinary policy, according to Respondent it is not required to adhere to these steps "and may terminate employment without prior written warnings if operational exigencies or substantial performance failures warrant such immediate action." (Respondent's Brief at p. 2) While Respondent claims that Baumann's termination was made in alignment with this policy, Respondent neglects to mention the specific operational exigency or substantial performance failure Baumann allegedly committed to warrant his immediate termination. In fact, if Respondent claims that Baumann's termination was for some unspecified performance failure

2

warranting immediate action, this further reinforces that Baumann was terminated due to his protected activity, as the activities Baumann engaged in immediately prior to his termination involved participating in an MSHA inspection which led to a shutdown of the Mine and then asserting miners' rights to pay during the shutdown. (Vol. 1, 61:2-62:4, 64:13-16, 228:12-230:6; 239:18-240:12, P-7, P-25 at p. 1, 4). As such, Respondent's vague assertions of Baumann having performance issues only further reinforces that "performance" is simply pretext for his protected activity.

Respondent's logic continues to unravel when considering Respondent's past disciplinary actions toward its employees. Significantly, Baumann was never subjected to discipline for his performance and never received a single warning or disciplinary letter. (Vol. 1 51:6-12, 255:7-17; 327:5-10; Vol. 2, 327:5-10; P-12 at p. 7). However, Respondent confirmed that it had in fact provided written discipline to other miners in the past. (P-35; Vol. 3, 145:17-22). Respondent has provided no explanation as to why it deviated from this practice with Baumann, because it cannot do so without revealing its discriminatory actions. As demonstrated by the overwhelming evidence in this matter, Baumann was terminated for engaging in protected activity, and Respondent has failed to set forth any evidence to the contrary.

ii.  **Respondent Cannot Claim Lack of Knowledge of Baumann's Protected Activity**

In attempting to justify its termination of Baumann as non-discriminatory, Respondent zeroes in on its claim that it did not know Baumann was a miner's representative. As proof of this, Respondent points to Exhibit R-JJ, which it claims "confirms the absence of any MSHA record recognizing Mr. Baumann as an official miners' representative." (Respondent's Brief at p. 2). As an initial matter, this contention holds no weight, as the referenced portion of Exhibit R-JJ merely contains an email thread in which owner Russell Tidaback ("Tidaback") asked MSHA Supervisor Randall Boyd whether anyone was listed as the miners' representative for American

3

Tripoli, to which Boyd responded that no one was listed when he checked that morning. Notably, these emails were sent on November 13, 2023, approximately seven months *after* Baumann had been terminated, and thus hold no probative value as to Respondent's knowledge of whether Baumann was a miners' representative when it terminated him on April 17, 2023.

Further, Respondent also alleges that testimony from Spears and Tidaback revealed they had not seen the Miners' Representative Form (P-2) prior to this case. Therefore, Respondent claims that "key company officials" were unfamiliar with Baumann's status as a miners' representative. Respondent once again fails to cite to the record in support of this claim. In actuality, the record firmly contradicts any implication that Respondent had no knowledge of Baumann's status as a miners' representative prior to his termination. Following his election on March 21, 2023, Baumann and MSHA Inspector Keith Markeson informed Spears that Baumann had been elected the miners' representative. (Vol. 2, 90:21-92:9, 364:10-365:8). Spears himself confirmed that he had been notified by Baumann prior to his termination that Baumann was a miners' representative. (Vol. 3, 148:9-12). Thus, Respondent's argument has no basis in fact and utterly fails to disprove Respondent's knowing and discriminatory motivation in terminating Baumann.

Finally, it should be noted that Respondent's misplaced focus on a single form of protected activity, Baumann's status as a miners' representative, is rendered inconsequential in light of evidence conclusively establishing that Baumann participated in *multiple* forms of protected activity prior to his termination, and Respondent was aware of such activity. (Vol. 1, 150:12-20, 176:9-22, 179:6-180:19, 182:8-183:3, 191:2-9; Vol. 2, 359:14-360:17, 369:7-21; P-26 at p. 2-3). Thus, Respondent's claim of ignorance regarding Baumann's status as a miners' representative is both wholly unsupported by the record and also fails to establish any defense to

the abundance of evidence demonstrating that Respondent had knowledge of Baumann's protected activity prior to terminating him.

## B. Respondent has Failed to Disprove or Justify its Interfering Conduct

In support of its contention that there was no interference with miners engaging in protected activity, Respondent alleges that the February 14, 2023 Teams message stating "Do not talk to MSHA" was merely a communication strategy, "a logistical decision aimed at providing clear and accurate information" by ensuring that only Spears spoke with MSHA about specific issues since he had more knowledge about those issues. (Respondent's Brief at p. 2-3). This argument is meritless, as the Act contains no exception allowing operators to prohibit miners from engaging in protected activity simply for the purpose of preventing mixed messages from being communicated to MSHA. This is simply not "a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights." *Franks v. Emerald Coal Res., LP*, 36 FMSHRC 2088, 2108 (2014).

Respondent claims that "[t]estimony from both Mr. Spears and Mr. Wheeler, as well as other employees, confirms that this communication strategy has been consistently applied and understood within the company as a practical measure, not as a means of interference." (Respondent's Brief at p. 3). Respondent, however, fails to cite to this alleged testimony. In reality, the testimony from Respondent's former employees at trial directly contradicts this claim, as employees understood Respondent's statements to mean exactly what was communicated, to not talk to MSHA. (Vol. 1, 154:21-155:1; Vol. 2, 170:3-171:15, 373:15-374:11). Furthermore, although Respondent attempts to explain away the message sent by Spears on February 14, 2023, Respondent ignores that this was not a single, isolated incident. Instead, employee testimony revealed that this message was consistent with Respondent's ongoing and

5

repeated interfering conduct, including numerous instances where Respondent again specifically told employees not to talk to MSHA or claimed that miners could face personal liability for things they said to MSHA. (Vol. 1, 214:11- 217:17, 218:14-219:7; Vol. 2, 103:9-104:13, 171:18- 172:1, 283:11-15, 285:14-17; P-12 at p. 8, 18). Respondent has provided no justification for this concerted attempt to deter miners from exercising their right to engage in protected activity.

Respondent also attempts to defend its interfering conduct by claiming that the participation of Baumann and other miners in past MSHA inspections demonstrates Respondent's communication policies were non-restrictive. This argument essentially boils down to the reasoning that because Respondent's conduct was not successful in deterring *all* protected activity, its interfering conduct should be excused altogether. This is illogical, and not a valid defense under the Act. Simply because Baumann and other miners may have made the decision to continue advocating for their safety despite Respondent's constant threats does not mean Respondent should be absolved of all responsibility for its conduct. Indeed, there is ample evidence that Respondent's actions caused miners to be fearful of engaging in protected activity. (Vol. 1, 221:15-222:6, 273:17-22; Vol. 2, 178:14-179:18; Vol. 3, 77:6-17). Moreover, Respondent ignores the fact that Baumann, and possibly other miners, suffered very real consequences, namely termination, following their participation in protected activity, which itself has a chilling effect on miners further exercising their rights to engage in protected activity.

Finally, Respondent claims that it regularly conducts training sessions discussing "how to interact" with MSHA and which encourage employees to report any safety concerns or violations they observe. (Respondent's Brief at p. 3). Respondent again offers no evidence in support of this assertion. Additionally, in determining whether an interference violation has occurred the action must be viewed from the perspective of members of the protected class. *Franks*, 36

6

FMSHRC at 2108. As made apparent at trial, from the perspective of miners at American Tripoli, Respondent was openly hostile towards protected activity and MSHA. (Vol. 1, 154:21-155:1, 163:22-165:17, 214:11-218:13; Vol. 2, 175:2-176:1, P-12 at p. 8, 18). This had a direct deterrent effect on miners exercising their rights. Furthermore, Respondent has not provided any legitimate justification for its interfering conduct. Despite claiming that its "communication practices" were intended only "to ensure thorough and precise exchanges with inspectors," the actions taken by Respondent, including directly telling employees not to speak with MSHA, claiming that employees could be personally liable for citations, making disparaging comments about MSHA inspectors, and firing employees who engaged in protected activity, are nowhere near being narrowly tailored so as to justify such conduct. *See Marshall County Coal Co.*, 38 FMSHRC 2006 (2016) ("Even when an employer establishes a justification under the second step, the operator's actions must be 'narrowly tailored' to promote that justification as part of the balancing of the operator's interests with the protected rights of employees."). Respondent blatantly and repeatedly interfered with miners' rights and has entirely failed to disprove or justify its interfering conduct.

## CONCLUSION

As detailed above, Respondent has not stated a valid argument in favor of its claims that it neither discriminated against Baumann nor interfered with miners' exercise of protected rights. Respondent's arguments lack any evidentiary support, do not address the breadth and numerosity of its violations, and are simply disingenuous. In sum, Respondent has wholly failed to rebut the discrimination and interference violations demonstrated at the trial in this matter. Therefore, the Court should find that Respondent violated Section 105(c) of the Act and grant the relief requested in the Acting Secretary's Post-Trial Brief.

Respectfully submitted,

Seema Nanda
Solicitor of Labor


Christine Z. Heri
Regional Solicitor


Evert H. Van Wijk
Associate Regional Solicitor

U.S. Department of Labor                    /s/Laura O'Reilly
Office of the Solicitor                     Laura O'Reilly
2300 Main Street, Suite 10100               Elaine Smith
Kansas City, MO 64108                       Quinlan Moll
(816) 285-7260
(816) 285-7287 facsimile
Oreilly.laura.m@dol.gov
Smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov                      Attorneys for the Acting Secretary


## CERTIFICATE OF SERVICE

This Reply Brief has this date been filed using the electronic filing system and service has been made by email to: Russell Tidaback, RTidaback@deedyco.com and Robert Baumann, Baumannr24@gmail.com this 8th day of May, 2024.

/s/Laura O'Reilly

8

# NOTICE

1.      Enclosed is a copy of a decision by an Administrative Law Judge of the Federal Mine
Safety and Health Review Commission. The issuance date of this decision appears on the
first page of the Decision.

   *THIS DECISION MUST BE POSTED ON THE MINE BULLETIN BOARD BY THE OPERATOR.*

2.      You may petition for review of this decision by the Commission. A PETITION FOR
DISCRETIONARY REVIEW must be <u>received</u> by the Commission within thirty (30)
calendar days after the <u>issuance date</u> of the decision to be considered [29 C.F.R. §
2700.5(f) and .70(a)]. If this decision is an ORDER OF TEMPORARY REINSTATEMENT,
the Petition for Review must be received within 5 days of the receipt of the order [29
C.F.R. § 2700.45(f)].

   If a party wishes to file a petition for discretionary review, you are encouraged to file it
within the Commission's electronic filing system (https://www.fmshrc.gov). Petitions are
not currently being accepted via fax during the Commission's pandemic related
operational changes (https://www.fmshrc.gov). If you mail the petition, you should
allow enough time for delivery by the thirtieth day. Petitions should be filed at:

**DOCKET OFFICE**
**FEDERAL MINE SAFETY AND HEALTH**
**REVIEW COMMISSION**
**1331 Pennsylvania Ave., N.W., Suite**
**520N WASHINGTON, D.C. 20004-1710**
**Telephone No. (202) 434-9950**

3.      The Federal Mine Safety and Health Review Commission's Rules of Procedure
specify that a petition may be filed only on one or more of the following grounds:

   A.     A finding or conclusion of material fact is not
          supported by substantial evidence.
   B.     A necessary legal conclusion is erroneous.
   C.     The decision is contrary to law or to the duly
          promulgated rules or decision of the Commission.
   D.     A substantial question of law, policy or discretion is involved.
   E.     A prejudicial error of procedure was committed.

   Each issue shall be separately numbered and plainly and concisely stated, and shall be
supported by detailed citations to the record when assignment of error are based on the
record. Statutes, regulations or principal authorities shall be relied upon. Except for
good cause shown, no assignment of error by any party shall rely on any question of
fact or law upon which the administrative law judge has not been afforded an
opportunity to pass. For further details on the filing of documents and the review
process, see 30 U.S.C. § 823{d} and Commission rules 5 through 9 and .70 through .78
[29 C.F.R. §2700.5-.9 and .70-.78].

4.      A Petition for Review must be served on the opposing party.

5.      If a petition is filed, each party will be notified of the Commission's action on the petition.

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
OFFICE OF THE ADMINISTRATIVE LAW JUDGES
1331 PENNSYLVANIA AVE., N.W., SUITE 520N
WASHINGTON, DC 20004-1710
TELEPHONE: 202-434-9933
FAX: 202-434-9949

May 23, 2024

| | |
|---|---|
| SECRETARY OF LABOR, MSHA<br>obo ROBERT BAUMANN,<br>        Complainant<br><br>    v.<br><br><br><br>MOSENECAMANUFACTURER<br>LIMITED LIABILITY COMPANY d/b/a<br>AMERICAN TRIPOLI,<br>        Respondent | DISCRIMINATION PROCEEDING<br><br>Docket No. CENT 2023-0251-DM<br>MSHA No. MADI-CD-2023-03<br><br><br><br><br>Mine: MOSenecaMfr LLC dba American Tr<br>Mine ID: 23-00504 |

## <u>DECISION AND ORDER</u>

Appearances:

For the Complainant:  Laura O'Reilly, Esq., Elaine M. Smith, Esq., Quinlan B. Moll, Esq., U.S. Department of Labor, Office of the Solicitor, Kansas City, Missouri.

For the Respondent, Russell Tidaback, pro se.

Before: Judge William B. Moran

      This case is before the Court on a complaint of discrimination pursuant to Section 105(c) of the Federal Mine Safety and Health Act of 1977, as amended, 30 U.S.C. § 815(c) ("Mine Act" or "Act"), brought by the Secretary of Labor on behalf of Robert Baumann, against MoSenecaManufacturer Limited Liability Company, d/b/a American Tripoli. ("Tripoli," "AT," "Respondent").  The mine involved is MOSenecaMfr LLC dba American Tr, which mine has the ID: 23-00504.

      Bringing two Counts against the Respondent, the Secretary alleges, in Count I, that Robert Baumann was discharged from his employment at the mine because he engaged in protected activity while so employed. Complaint at 2. In Count II, the Secretary alleges that the Respondent interfered in Mr. Baumann's rights and that of at least one other miner, essentially by telling miners not to communicate with MSHA during inspections. *Id.* at 3-4.

1

Appellate Case: 25-1349    Page: 203    Date Filed: 04/07/2025 Entry ID: 5503844

Respondent asserts that it terminated Baumann's employment for matters unrelated to any protected activity, contending that Baumann did not satisfactorily perform his job duties. Answer at 1.

A hearing was held in Joplin, Missouri from February 27 through February 29, 2024.

Based on the testimony and exhibits presented at the hearing, the Court's credibility determinations, and the post-hearing briefs of the parties, the Court finds that by the preponderance of the evidence the Secretary clearly established both Counts and that the Respondent failed to establish any credible evidence that Mr. Baumann was terminated for non-protected activity.

The Court further determines that for Count I, the Discrimination Count, the civil penalty proposed by the Secretary, in the amount of $15,000.00, is fully warranted and that, for Count II, the Interference Count, the amount proposed by the Secretary in the amount of $17,500.00 is also fully warranted. Accordingly, both fines are imposed by the Court. As described below, the Court also awards damages to Mr. Baumann and orders other corrective action to be taken by the Respondent.

**APPLICABLE LAW**

**The Source for Both Counts in this Matter Arises from 30 U.S.C. §815(c), which provides:**

> **No person shall discharge or in any manner discriminate against or cause to be discharged or cause discrimination against *or otherwise interfere* with the exercise of the statutory rights of any miner, representative of miners** or applicant for employment in any coal or other mine subject to this chapter because such miner, representative of miners or applicant for employment has filed or made a complaint under or related to this chapter, including a complaint notifying the operator or the operator's agent, or the representative of the miners at the coal or other mine of an alleged danger or safety or health violation in a coal or other mine, or because such miner, representative of miners or applicant for employment is the subject of medical evaluations and potential transfer under a standard published pursuant to section 811 of this title or because such miner, representative of miners or applicant for employment has instituted or caused to be instituted any proceeding under or related to this chapter or has testified or is about to testify in any such proceeding, or because of the exercise by such miner, representative of miners or applicant for employment on behalf of himself or others of any statutory right afforded by this chapter.

30 U.S.C. §815(c) (emphasis added).

Commission case law has addressed both causes of action: the discrimination count and the interference count.

Appellate Case: 25-1349     Page: 204     Date Filed: 04/07/2025 Entry ID: 5503844

**The Basics Regarding Discrimination Under the Mine Act**.

**Discrimination Claims**

A complainant alleging discrimination under the Mine Act establishes a prima facie case of prohibited discrimination by presenting evidence sufficient to support a conclusion that the individual engaged in protected activity and that the adverse action complained of was motivated in any part by that activity. *See Secretary of Labor on behalf of Pasula v. Consolidation Coal Co.,* 2 FMSHRC 2786, 2799 (Oct. 1980)*, rev'd on other grounds sub nom. Consolidation Coal Co. v. Marshall,* 663 F.2d 1211 (3d Cir. 1981)*; Secretary of Labor on behalf of Robinette v. United Castle Coal Co.*, 3 FMSHRC 803, 817-18 (Apr. 1981). The operator may rebut the prima facie case by showing either that no protected activity occurred or that the adverse action was in no part motivated by protected activity. *See Robinette*, 3 FMSHRC at 818 n.20. If the operator cannot rebut the prima facie case in this manner, it nevertheless may defend affirmatively by proving that it also was motivated by the miner's unprotected activity and would have taken the adverse action for the unprotected activity alone. *See id.* at 817-18; *Pasula*, 2 FMSHRC at 2799-800; *see also Eastern Assoc. Coal Corp. v. FMSHRC*, 813 F.2d 639, 642 (4th Cir. 1987) (applying *Pasula-Robinette* test).

*Secretary of Labor on behalf of Hyles,* 21 FMSHRC 34, 42 (Jan. 1999).

**A Change Occurs in one Circuit Court**[1]

In 2021, the United States Court of Appeals for the Ninth Circuit ruled that a "but for" analysis applies in discrimination claims under the Mine Act. *Thomas v. CalPortland Co*., 993 F.3d 1204, 1211 (9th Cir. 2021). The decision looked to the language in Section 105(c) of that Act, determining that section's text, prohibiting discrimination by a mine operator "because" the miner engaged in protected activity, means that, to prevail, the miner complainant must show that the discrimination would not have occurred "but for" the protected activity. *Id.* In holding that "because" means "but for," the decision held that "the word 'because' in a statutory cause of action requires a but-for causation analysis unless the text or context indicates otherwise."[2] *Id.*

---

[1] There are thirteen circuits for the United States Courts of Appeals. *About the U.S. Court of Appeals*, USCOURTS (May 9, 2024), https://www.uscourts.gov/about-federal-courts/court-role-and-structure/about-us-courts-appeals.

[2] This Court believes that a "but for" essentially existed under the Commission's *Pasula- Robinette* standard in that a mine operator could rebut the prima facie case by showing either that no protected activity occurred or that the adverse action was in no part motivated by protected activity. The difference, it would seem, is that under the "but for" approach, that burden is placed on the complainant. Even so, where a complainant, as in this case, presents a plethora of credible information in support of its position and a respondent's slate is empty, the burden is met.

Appellate Case: 25-1349     Page: 205     Date Filed: 04/07/2025 Entry ID: 5503844

**Then, Another Circuit Follows that Change, with the Secretary of Labor's Apparent Blessing**

Subsequently, the Eighth Circuit, in a separate Mine Act discrimination proceeding, noted that the Secretary of Labor took the position that the Mine Review Commission's traditional approach indeed requires but-for causation, and she proceeds to argue the case with that understanding. So we will, too." *Cont'l Cement v. Sec'y of Labor*, 94 F4ᵗʰ 729,733 (8ᵗʰ Cir. Feb. 28, 2024). The Eighth Circuit includes Missouri.

**The Commission Issues its Decision Upon Remand in *Calportland* on March 1, 2024.**

Speaking to "But-for Causation," the Commission noted that:

[a]ccording to the Ninth Circuit, the Supreme Court has instructed "that the word 'because' in a statutory cause of action requires a but-for causation analysis unless the text or context indicates otherwise." (citation omitted) … The Supreme Court has explained that the ordinary meaning of "because of" is that the protected activity or class was the "reason" the employer decided to act. (citation omitted) Under the but-for standard the plaintiff retains the burden of persuasion and must prove by a preponderance of the evidence (which may be direct or circumstantial), that the protected activity was the "but for" cause of the challenged employer decision.

*Calportland* 2024 WL 1012573 at * 3 (Mar. 2024).

**Interference Claims**

It is arguable that the proper test for analyzing section 105(c)(1) interference claims is the two-step framework adopted by two Commissioners in *UMWA on behalf of Franks and Hoy v. Emerald Coal Resources, LP,* 36 FMSHRC 2088, 2108 (Aug. 2014) (sep. op. of Chairman Jordan and Comm'r Nakamura) ("*Franks*"). 38 FMSHRC at 946-48. *Secretary of Labor on behalf of Greathouse*, 40 FMSHRC 679, 683 (June 2018) ("*Greathouse*").[3] The first step of the *Franks* test,

---

[3] In *Greathouse,* Administrative Law Judge Margaret Miller noted that "a majority of the Commission has recognized that 'the Mine Act establishes a cause of action for unjustified interference with the exercise of protected rights which is separate from the more usual intentional discrimination claims evaluated under the Pasula-Robinette framework.' … [and that] in interference cases the Commission has focused not on the employer's motive, but rather on whether the conduct would "chill the exercise of protected rights," either by the directly affected miner or by others at the mine. [citing] *Gray, 27 FMSHRC at 8; Moses, 4 FMSHRC at 1478-79.* Greathouse, 38 FMSHRC 941, at *947* (May 2016) (ALJ).

*Greathouse* was mentioned again in *McNary v. Alcoa*, 42 FMSHRC 9 (Jan. 2020) ("*McNary*") wherein it noted "[i]n Secretary of Labor on behalf of *Greathouse v. Monongalia Coal Co*., 40 FMSHRC 679 (June 2018), a four-member Commission divided evenly regarding the proper analytical framework for interference claims. Two Commissioners stated that they would apply a

4

asks whether a reasonable miner would view the operator's actions as tending to interfere with miners' protected rights. *Id.* The second step of this test requires identifying and weighing any legitimate and substantial business justification proffered by the operator for actions it takes that interfere with protected rights. *Id.*

In *Secretary on behalf of McGary,* 38 FMSHRC 2006 (Aug. 2016), under the heading "The Appropriate Test for Interference," the Commission remarked:

> In evaluating whether the miners here had established interference with their statutory rights, the Judge applied the two-step test articulated by Chairman Jordan and Commissioner Nakamura in their opinion in *UMWA on behalf of Franks and Hoy v. Emerald Coal Resources, LP*, 36 FMSHRC 2088, 2104-19 (Aug. 2014) (hereinafter *"Franks* interference opinion"). *See* 37 FMSHRC at 2603-08. The test, suggested by the Secretary in his amicus brief in that case and drawn from National Labor Relations Board precedent, provides that interference is established when (1) a person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and (2) the person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights.

*Id*. at 2011.

The decision by the United States Court of Appeals for the District of Columbia Circuit in *Marshall Cnty. Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n,* 923 F.3d 192 (D.C. Cir. 2019) ("*Marshall Cnty*"), is also useful when considering interference claims. There, the D.C. Circuit upheld the Commission's determination that the operator interfered with miners' statutory rights to raise anonymous health and safety complaints with MSHA. That case involved miners invoking their statutory rights under section 103(g)(1),[4] but the interference complaints can be based on any other statutory rights of miners.

---

test developed by two Commissioners in *UMWA on behalf of Franks and Hoy v. Emerald Coal Resources, LP*, 36 FMSHRC 2088 (Aug. 2014), in which protected activity need not cause the operator action giving rise to an interference claim. The other two Commissioners concluded they would apply *Secretary of Labor ex rel. Pasula v. Consolidation Coal Co.*, 2 FMSHRC 2786 (Oct. 14, 1980), rev'd on other grounds, 663 F.2d 1211 (3d Cir. 1981), and its progeny to claims of interference. Id. at 681, 708-16. *McNary* at n.8

[4] 30 U.S.C. §813(g)(1) affords the statutory right for a representative of miners or a miner, who has reasonable grounds to believe that a violation of a health or safety standard exists, or an imminent danger exists, to obtain an immediate inspection by giving notice to the Secretary or his authorized representative of such violation or danger. The notice is reduced to writing but the name of the person giving such notice and the names of individual miners referred to therein shall not appear in such copy or notification.

Appellate Case: 25-1349     Page: 207     Date Filed: 04/07/2025 Entry ID: 5503844

The D.C. Circuit noted that "Congress recognized that its national mine safety and health program would be most effective **if miners and their representatives** contributed to the enforcement of the Mine Act." *Marshall Cnty.* at 195(emphasis added). This includes "**the right to point out hazards**." *Id*. at 196 (emphasis added). Accordingly, the Mine Act "specifically protects miners and their representatives against retaliation and **interference.** *Id.* (emphasis added). As noted above, the Mine Act specifically provides for this protection. 30 U.S.C. §815(c).

The D.C. Circuit referred to the application of the *Franks* test, which was applied by the administrative law judge and later by two members of the Commission. In that regard, it noted that under *Frank:*

> an interference violation occurs if (1) a person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and (2) the person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights[.] *Franks,* 36 FMSHRC at 2108 (opinion of Jordan, Chairman, and Nakamura, Comm'r). **Unlike the test for discrimination claims under Section 105(c)(1), the *Franks* test for interference does not require a finding that the employer was motivated by miners' exercise of their protected rights**.

*Marshall Cnty* at 199 (emphasis added).[5]

In the case before this Court, *Sec. obo Baumann*, it is not necessary to determine if the alleged interference *was motivated* by Baumann's exercise of his protected rights, because, as described below, the Court finds several instances of substantial evidence supporting its conclusion that American Tripoli interfered with Baumann's statutory rights. Nevertheless, the Court does find that Tripoli *was* so motivated.

**Substantial Evidence**

Apart from the new "But for" approach, it is important to note that:

> [u]nder the Mine Act, an administrative law judge's findings of fact are to be affirmed if they are supported by substantial evidence. 30 U.S.C. § 823(d)(2)(A)(ii)(I); *Secretary of Labor on behalf of Price v. Jim Walter Resources,*

---

[5] Although the D.C Circuit declined to decide whether the *Franks* Test is the proper for interference claims in that case, any reasonable reading of that decision would conclude that it supported the test. It remarked "[i]t is beyond dispute that the Commission's finding of interference in this case was supported by substantial evidence **under *any* applicable test construing Section 105(c)(1)**." *Marshall Cnty* at 204 (emphasis added). It found that there was substantial evidence to show that the mine operator's actions were motivated by the miners' exercise of a statutory right, namely Section 103(g) in that instance. *Id.* As set forth below, this Court, as the undersigned in this Baumann decision, finds a wealth of substantial evidence to establish such motivation by American Tripoli.

Appellate Case: 25-1349    Page: 208    Date Filed: 04/07/2025 Entry ID: 5503844

*Inc.*, 14 FMSHRC 1549, 1555 (Sept. 1992). In addition, the Commission has held that "the substantial evidence standard may be met by reasonable inferences drawn from indirect evidence." *Mid-Continent Resources, Inc.*, 6 FMSHRC 1132, 1138 (May 1984). The "possibility of drawing either of two inconsistent inferences from the evidence [does] not prevent [the judge] from drawing one of them." *NLRB v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106 (1942). The Commission has emphasized that inferences drawn by the judge are "permissible provided they are inherently reasonable and there is a logical and rational connection between the evidentiary facts and the ultimate fact inferred. *Mid-Continent*, 6 FMSHRC at 1138.

*Secretary of Labor on behalf of Hyles,* 21 FMSHRC 34, 43 (Jan. 1999).

The Court finds that applying the "but for" test, Complainant Baumann, through the Acting Secretary, overwhelming established his discrimination. Further, the Respondent demonstrated nothing to show otherwise. To put it plainly, all as described below in the Findings of Fact, there was only one credible conclusion from the evidence in this matter: American Tripoli acted as it did because Mr. Robert Baumann exercised his statutorily protected rights against discrimination under the Mine Act. Equally clear, the Respondent interfered with Mr. Baumann's rights and that of at least one other miner, essentially by telling those miners not to communicate with MSHA during inspections, and otherwise intimidating its miners from free exchange with MSHA's inspectors.

**Findings of Fact and Related Conclusions of Law**.

Complainant, Robert Baumann, was called by the Secretary. Baumann's complaint alleges that he was terminated for participating in MSHA inspections and trying to stand up for the miners' rights. Complaint at 2-3. He asserts that Russell Tidaback, Jordan Tidaback[6], and John Spears were the individuals who discriminated against him. Vol. 1 Tr. 46. Baumann stated that Russell Tidaback is the owner of American Tripoli. *Id.* at 47. This is not disputed. Mr. Spears was identified as the mine's operations manager. *Id.* Baumann's employment was from June 16, 2022 to April 17, 2023. *Id.* (Ten months' employment)

Baumann was hired as production supervisor and was informed that the mine's computer system reflected that as his job designation. *Id.* at 53, 99. That remained his job title during his employment at the mine. *Id.* He worked in the mill at the mine.[7] The mine produces "tripoli" and

---

[6] Jordan Tidaback is the daughter of Russell Tidaback. Tr. 164.

[7] The mill is located in Seneca, Missouri. *Id.* at 65. Baumann described the operation generally, stating "[t]hey mine the rock out at the pit. They bring it into Seneca to the processing plant. They dump it in a pit. It goes through a crusher. Goes up into big holding tanks, and then when we were producing or trying to produce, it would come out of the tanks into a fluid bed dryer to dry the product and then into a tube mill, which actually crushed it up into a fine like powder. And then it went through a -- basically an air system type thing that classified what grain or whatever, you know, how fine the powder was, whether we were running once ground or double ground, and then it went through classifiers, shakers, up through a big system into the finished goods hopper to go into a bag." Vol. 1 Tr. 53-54. In response to an inquiry by the Court about the size of the

7

this explains the apt name for the company, American Tripoli. Baumann described the product as ground up rock, that ends up as powder. *Id.* at 57. Later in the hearing, during his testimony upon being sworn-in, Russell Tidaback elaborated that "Tripoli is a natural product. …[its] chemical makeup [ ] is … anywhere between 90 and 98 percent silicon dioxide, and the other particles could be numerous. …That's Tripoli in a whole. We don't add any chemicals. We don't change anything about the product. We just pulverize it." *Id.* at 175-176.

As noted, on April 17ᵗʰ, Baumann was terminated from American Tripoli. *Id.* at 47. On that day he received a text message to be at the mine office and, upon arriving, was given his termination letter. *Id.* at 47-48. Ex. P-38. According to Baumann, Spears told him at that time "Sorry. Russell [Tidaback] told me to let you go." *Id.* at 48. Baumann also spoke that day with the mine's safety director at that time, Jesse Molesi, who also informed that the mine had fired him. *Id.* Baumann added that he informed Molesi that he could still contact him, if needed, reminding that he was still the miners' representative. *Id.* at 48-49. Baumann stated that the letter asserted his termination was due to "poor performance, lack of leadership skills and for failure to follow procedures and guidance given to your supervisor -- by your supervisor." Vol. 1 Tr. 50-51.

Mr. Baumann denied that he was having any performance issues at the time he was terminated. *Id.* at 51. Importantly, Baumann affirmed that he had not been disciplined or told that his job performance was lacking prior to his termination. *Id.*

In the weeks before he was fired, Baumann informed that there had been an MSHA inspection at the mine. *Id.* Explaining the circumstances for MSHA's presence, Baumann stated that there had been air tests at the mine, and after receiving those results MSHA issued some citations based on those test results. *Id.* at 51-52. The mine was told to get PAPR[8] systems and to work on the clean air system in the building. *Id.* The MSHA inspector returned after that and learned that no PAPRs had been purchased and that no attempts to address the air cleaning systems had been achieved. *Id.* at 52. This resulted in the inspector issuing a 104(b) order. *Id.*

Baumann agreed that he participated in an MSHA inspection around April 12, 2023. *Id.* at 57-58. He also participated in an earlier MSHA inspection involving air sampling. *Id.* at 58. The dust issue involved silica dust. *Id.* Baumann stated that he had raised safety concerns to mine management about that dust. *Id.* He also stated that, following MSHA's issuance of a 104(b) order for the dust hazard, he raised concerns about the dust issue with management "[e]very day." *Id.* at 60. He raised these concerns with John Spears and Jesse Molesi. *Id.* The concerns were not addressed before his termination. *Id.* at 61.

---

operation, Baumann estimated that it had about 20 employees. *Id.* at 55. Though not testifying at that point in the hearing, Mr. Tidaback asserted that the number of employees was less than 12. *Id.* Either way, the Tripoli Mill is a small mine.

[8] The witness was unsure of the words for the acronym, but explained that it refers to respirators with filters. Tr. 247. PAPRs are identified as "Powered Air Purifying Respirator, … "PAPRs provide a constant flow of filtered air, which offers respiratory protection and comfort in hot working environments." *Petition Docket No. M-2022-040-C,* MSHA (Jul. 31, 2023), https://www.msha.gov/petition-docket-no-m-2022-040-c

Appellate Case: 25-1349    Page: 210    Date Filed: 04/07/2025 Entry ID: 5503844

Regarding the 104(b) withdrawal order and Baumann voicing his concern that miners were due to be paid as a consequence of the order, he spoke with both Spears and Molesi about this subject. *Id.* at 61-62. An MSHA inspector confirmed to Baumann that miners would be entitled to pay. *Id.* at 62. However, neither Spears nor Molesi responded to him on this matter. *Id.* at 62-64.

Baumann's last day working at the mine was April 12th, the day MSHA shut down the mine. *Id.* at 64. He returned to the mine on April 17th and was terminated that day. *Id.*

Baumann was hired at Tripoli by Christine Schreiber, who was then the operations manager. *Id.* at 66. Then, not long after he was hired, Schreiber left and John Spears became his supervisor at Tripoli. *Id.* at 67. According to Baumann, Spears was in charge of day-to-day operations at the mine. *Id.* at 69. Mr. Spears role at Tripoli is not contested.

Baumann communicated with Mr. Tidaback in person and through a messaging application, "Microsoft Teams." *Id.* at 67-68. (Hereinafter, Microsoft Teams Chats, or Teams Chats or Chats) Baumann also knew that Spears was communicating with Tidaback. *Id.* at 70. When Baumann raised safety or health issues, Spears told him that he, (i.e. Spears himself) would need to contact Tidaback. *Id.* at 69-70.

During his employment at Tripoli, Baumann was initially hired to work the second shift. *Id.* at 70-71. In that role, he was tasked with loading the 2,000 lb. bags of the tripoli product, while the day shift prepared 100 or 50 lb. bags. *Id.* at 71. This was part of production and his hours were from 4 p.m. to 11 p.m. *Id.* When he began the night shift there were three employees, but then a maintenance employee was fired, leaving two miners working. *Id.* at 72.

Thereafter, Baumann then moved to the day shift. *Id.* He asserted that the night shift work ended, as many of the bulk orders had been completed and because the machinery was breaking down from high use. *Id.* at 72-73. According to Baumann, Mr. Tidaback, Mr. Spears, and Ms. Christine Schreiber all gave him 'attaboys' for his night shift work. *Id.* at 73. Once moved to the day shift, his hours were then from 8 am to 4 pm. *Id.* Though he worked more than 8 hours with both the night and day shifts, he was never paid for the extra hours. *Id.* at 73-74. Mr. Spears informed that Mr. Tidaback would need to approve such overtime work. *Id.* at 74. Baumann was told there would be no overtime pay.[9] *Id.* He was an hourly, not salaried, employee, and was paid at $20.00 per hour. *Id.* at 75.

_____

[9] This was essentially true. Ex. P-4, a payroll record for the Complainant, reflects that Baumann was paid for only three hours of overtime during the period from July 1, 2022 through April 21, 2023, essentially ten months. Thus, that exhibit reflects that his overtime was miniscule. *Id.* and Tr. 76-77.

Appellate Case: 25-1349    Page: 211    Date Filed: 04/07/2025 Entry ID: 5503844

Asked about miner training, Baumann informed that Tripoli did provide some training, stating, "[a]bout two weeks after we started we had about a 30, 45 minutes, like, went through safety stuff." *Id.* at 81. Ex. P-40 is Baumann's record of his New Mining Training Certificate, dated July 5, 2022, which he signed while working at American Tripoli. *Id.* at 82. However, though he signed the certificate on July 5th, Baumann stated that in fact he had not received all the training listed on the certificate.[10] *Id.* at 85.

According to Baumann, he didn't know initially about MSHA inspections that occurred during November 2022 at the mine. Vol. 1 Tr. at 91. He only became aware of these around February 2023 when MSHA told him that the mine had not corrected the cited conditions. *Id.*

There was certainly ample means to communicate with one another at the mine. As Baumann informed, there were groups of American Tripoli employees communicating with each other on Teams. *Id.* at 92. There were multiple communication groups different categories such as a maintenance group, a general group, a mill management and a production group. *Id.* People could also communicate individually. *Id.* at 92-93. Baumann was able to communicate with John Spears this way too. *Id.* at 93. In contrast, he described his communication with Mr. Tidaback as occurring only "on occasion." *Id.* However, Baumann informed that Tidaback would be able to view messages sent through Teams. *Id.* Baumann used Teams and he stated that he was never told that he failed at using Microsoft Teams effectively while working at American Tripoli. *Id.* at 94.

---

[10] Mr. Tidaback objected, as Baumann's testimony conflicted with the certificate. The Court ruled that Respondent could raise this issue during cross-examination. Tr. 85-86. Baumann did check 'new miner training' on the certificate box, but he stated that at that time he did not know what new miner training entailed. *Id.* at 86-87. He stated that he did not know that the training encompassed all the topics checked off on this training list. *Id.* at 87. Baumann contended that he never received 24 hours of new miner training while working for Tripoli. *Id.* at 87-88. The point is that Baumann, at least by his testimony, which the Court found to be credible, did not receive all of the required training. Further, he stated that he never received any other additional training after July 5, 2022. *Id.* at 88. Elaborating, Baumann responded to the following inquiries from the Secretary's Counsel, affirming that he was never supervised closely prior to July 5, 2022, the date when he received his new miner training. *Id.* at 89. After that training, he never received close supervision by anyone while he was working at American Tripoli, and never received any task training on the jobs he would be performing while working at American Tripoli. *Id.* Nor did he ever observe task training being carried out, while he worked at American Tripoli. *Id.* He only became aware of these training requirements when so informed by MSHA inspectors during their inspections from December 2022 to February 2023. *Id.* Based on the credible testimony of other Tripoli employees, the Court concludes that Tripoli came up short in meeting its obligations for training its miners.

10

For background, the Court inquired of Baumann to describe his work at Tripoli.[11] He was hired to do production and was the lead over production from his first day to the day he was terminated. *Id.* at 96. Later, workplace exams became part of his job. Though expected to write down issues he found during an exam, initially the form did not provide sufficient space to describe problems found. *Id.* at 101. Baumann stated that workplace issues he identified could not be addressed right away because either there was no maintenance person at that time or because the fix would interfere with production. *Id.* at 102. He contended that only problems hindering production would be addressed immediately. *Id.* at 103. Baumann asserted that the maintenance issues impacted safety. *Id.* He also stated that he never received task training for maintenance or electrical work at Tripoli. *Id.* As for maintenance work, he asserted that during his employment at Tripoli, the mine had six or eight different people in that position and that there were times when there was no maintenance person. *Id.* at 104. These periods with no maintenance person occurred at least three times and one such gap lasted three or four weeks. *Id.* In those instances, mill employees fixed problems or Spears would work on the problem. *Id.* at 105. The inadequacy of maintenance people made it difficult to attend to safety issues. *Id.*

It is accurate to note that during the relatively short time of Baumann's employment there was a great deal of employee turnover for maintenance. This is instructive in understanding this operation.

Baumann asserted that no one at Tripoli ever told him he had to meet a certain production quota. *Id.* Specifically, Baumann denied that Mr. Tidaback ever told him he had to meet a 40,000 pound daily production quota. *Id.* at 106. Baumann maintained that he never spoke with Mr. Tidaback or Mr. Spears about meeting production quotas or goals and further that he was never counseled for not meeting production demands. *Id.* To the contrary, he was given positive feedback regarding the production he was able to achieve from John Spears. *Id.* at 106-107. Baumann stated that the praise came about a month before he was fired. *Id.* at 107. Baumann also stated that the 40,000 lbs. per day goal was not realistic due to equipment and weather issues, among

---

[11]In response, Mr. Baumann described his duties, generally. He informed that when on the second shift he would overlap the day shift by 30 minutes. Tr. 96. He would then find out if the day shift was having any problems, and anything like that for which he could provide assistance. *Id.* at 96-97. He would also get the bulk bags and other items, such as pallets, ready for his shift. *Id.* at 97. His duties were to feed the rock (i.e. the Tripoli) out of the tanks into the dryer, through the fluid bed dryer system and then into the bags. *Id.* He would then label the bags to identify the customers where they would be sent. *Id.* This was part of the process to get the orders ready. *Id.* The process would end with shutting down phase. *Id.* In sum, there was a start-up phase, running the material to fill orders and, last, a shut-down phase. Those were the phases on a good day, when things went smoothly. *Id.* On a bad day, if something broke, that would have to be addressed. *Id.* There were other factors impacting production. For example, the temperature, moisture and humidity could interfere with running the product. *Id.* Baumann would walk around about once an hour to make sure all the scrolls and all the pieces were moving in order to prevent backups or excessive dusting outside of the stacks and other issues like that.' *Id.* at 97-98. His duties encompassed the entire mill; they were not confined to a certain area of the mill. *Id.* at 98. He agreed that he interacted with all the employees at the mill. *Id.* at 98-99. Around December of 2022 or January 2023, he started doing workplace exams. *Id.* at 100. However, he never received any training how to do those exams. *Id.* at 101.

Appellate Case: 25-1349    Page: 213    Date Filed: 04/07/2025 Entry ID: 5503844

other reasons. *Id.* at 108.

Baumann informed that John Spears was the operations manager. *Id.* at 109. As such, Baumann asserted that Spears had the ultimate authority as to the amount of production at the mine. *Id.* Baumann also stated that to properly run the operation five employees were needed but there were many times when they had only three or four miners working. *Id.* at 112.

It is noteworthy that shutdowns occurred not simply due to operations problems. Baumann informed that the local Chief of Police for Seneca came to the mill due to mill dust reaching the city. *Id.* at 112-113. He claimed such shutdowns occurred on three or four occasions. *Id.* at 113. On one occasion, according to Baumann, the sheriff threatened to arrest everyone if the dust problem was not corrected. *Id.* Then too, MSHA shut down the mill multiple times, Baumann informed. *Id.* at 114.

On the issue of actual production at the mill, as opposed to goals, shown Ex. P-27, Baumann identified it as a production spreadsheet, covering from November of 2022 through March of 2023. *Id.* at 117. It shows production of 40,000 lbs. per day was never achieved during those dates. Ex. P-28 also reflects the same shortcoming for production. *Id.* at 121. The Mine only met the asserted production goal of 40,000 pounds 20-30 times during Spears' 18-month employment with AT, regardless of who was the production supervisor. Sec's Br. at 24.

The Secretary then inquired about Baumann's role, if any, regarding safety. *Id.* at 134. Baumann informed that he was never in charge of safety while at Tripoli, nor was he given any training on that subject by Tripoli. *Id.* Further, he was never tasked with ensuring that the mill was complying with MSHA standards. *Id.* at 135. Baumann informed that out of the 10 months of his employment for at least 3 or 4 of those months there was no one employed with the role of safety at Tripoli. Vol. 1 Tr. at 136. During those time when no one was employed for that, John Spears would be in charge of safety. *Id.*

Essentially, Baumann asserted that employees were inattentive to safety issues until MSHA started with its inspections and began issuing citations. He stated that when safety issues were raised, the Mill often did not have the material to repair items or were prevented from taking such action when production would be impacted. *Id.* at 137. When safety issues were raised to Spears, Baumann informed that, unless the issue would shut down operations, they were to keep running. *Id.* at 138-139. Baumann also contended that he was unaware of any written safety procedures and never provided with such. *Id.* at 139.

Baumann's duties did include keeping track of the hours that miners worked. *Id.* at 140. He was never told that he was failing at that task. *Id.* at 140-141. Handling shipping and receiving paperwork were also part of his job duties, and for this responsibility too, he was never told of issues with his performance for this duty. *Id.* at 141. In contrast, mill product and production supply inventory were not part of his duties. *Id.* Though on occasion Baumann sent employees home early, it was always after receiving approval from Christine Schreiber or John Spears. *Id.* at 143.

Appellate Case: 25-1349    Page: 214    Date Filed: 04/07/2025 Entry ID: 5503844

Questions then turned to MSHA inspections at Tripoli. *Id.* at 148. Ex. P-21 references the mine's ID: 2300504, and it lists several MSHA inspections at the mine. *Id.* Part of that exhibit refers to "verbal hazard complaints." *Id.* at 149. Baumann informed that during February through April 2023 MSHA inspections, he walked around with MSHA on multiple days. *Id.* at 150. Baumann confirmed that Spears was with him during some of those MSHA inspections and that Spears also observed him with MSHA inspectors. *Id.*

Ex. P-8 is a Microsoft Teams message sent from Spears to Gage Wheeler. Baumann took a screen shot of the message using his phone. *Id.* at 151. The exhibit, which is dated February 14, 2023, reflects that Spears and Mr. Tidaback were part of the message and that Gage Wheeler is also referenced in it. *Id.* at 152. The message states: **"Gage Wheeler, do not answer any questions about the -- that the MSHA inspector may have. Do not go into the mill. I'll be the person who talks to me [sic] inspector."** *Id.* at 154 (emphasis added). Baumann identified Wheeler as the maintenance person at that time. *Id.* Baumann, quite reasonably in the Court's view, understood the message to convey that the employees were not to speak with MSHA. *Id.* Baumann's recollection was that he and Wheeler walked around with the MSHA inspector on the February 14th inspection. *Id.* at 155. Ex. P-9 is a Teams Chat from the same time. Participants in that Chat would have been Baumann, Gage Wheeler,[12] Russell Tidaback, Jordan Tidaback, and John Spears. *Id.* at 156-157. The Secretary received the Teams messages from the Respondent during discovery. *Id.* at 161.

The Court finds that those messages were plainly to warn the employees, improperly, that they were not to speak to MSHA. Even a follow-up Teams message from Jordan Tidaback was improper, when she expressed "Hi, Gage. We spoke with John about that. You are absolutely allowed to answer questions the MSHA inspector has (obviously). I think John [Spears] may have meant don't just go up to him and point out everything under the sun. We've had people doing that, knowing very well it's an issue being worked on." *Id.* at 167; Ex. P-10.

Ex. P-13, consisting of 467 pages, reflects Team Chats. It was produced by the Respondent through MSHA's discovery. *Id.* at 170. Baumann was a participant in the February 14, 2023, MSHA inspection. *Id.* at 173. As part of messaging for that day, he wrote: "IDK. This guy is out for blood. We are removing product from the floor now." Ex. P-13 at page 54. Baumann explained his message, stating that the MSHA inspector was:

> very unhappy that nothing had been done that we were supposed to be doing. [Baumann] asked him, … what do we need to be doing to make this right … [and Baumann learned that the inspector … was talking about some product that was on the floor in front of an electrical box and then an oil dam that was underneath the tube mill.

*Id.* at 173-174.

---

[12] The message lists one participant as "UU." Baumann explained that stood for 'unknown user,' which he identified as Wheeler in that instance. Vol. 1 Tr. 156-157. Mr. Tidaback stated that Exhibits P -8 and P-9 contain the same information. *Id.* at 161.

Appellate Case: 25-1349     Page: 215     Date Filed: 04/07/2025 Entry ID: 5503844

For context, Baumann explained that the inspector was referring to prior citations that had not been abated. *Id.* at 174. However, Baumann told the inspector he was unaware of the prior citations. *Id.* at 174-176. The upshot was that the MSHA inspector shut the mill down. *Id.* at 177. However, on page 30 of that exhibit, Baumann was told it was unnecessary to shut down the whole building. *Id.* at 195. Instead caution tape was used around the affected area. Tr. 195. Baumann stated that the hazard was not remedied until about two weeks later. *Id.* This example epitomized Baumann's view that he was often told to do something in response to a safety concern that did not actually fix the issue at hand. *Id.* at 196. Baumann cited other examples of inadequate responses to his safety concerns.[13]

Baumann confirmed that his Chat message reflected there would have gone to all in the Mill group Chat. *Id.* at 191. Mr. Tidaback was part of that group. *Id.* The issue there was described as "[s]weeping up by palletizer and we have live wires coming through the floor. Sparked through the broom, shutting this area off." *Id.* at 192. Baumann wanted the power cut to the whole building for this issue because "none of the breakers were labeled, so we didn't know what was energizing that wire. You couldn't tell where it was going into what." *Id.* at 193; Ex. P-13, at page 31.

There were other, safety-related issues,[14] raised by Baumann. One such instance involved a safety-related concern involving stacking 100 lb. bags of product too high. Vol. 1 Tr. 187. Next was Ex. P-13 reflecting a message from Baumann which he sent to the Mill Group. *Id.* at 208. That Group included Mr. Tidaback and Mr. Spears. *Id.* Baumann's message stated: "Okay. So MSHA seen [sic] the ten stacking and said absolutely no. So we will move to next order continuing five high. Unless Russell Tidaback had a better option. They started without a platform -- they [then] stated without a platform nothing over waist high." Ex. P-13, at page 27; Vol. 1 Tr. 208.

In the same exhibit, P 13, at page 314, that page reflects a message from Tidaback, stating: "Did all the mill associates[15] get their 40 hours this week. If not, John Spears, maybe they will want to come in and work some hours over the weekend to get these repaired. **We don't want to use production schedule time to do maintenance.**" Vol. 1 Tr. 210 (emphasis added). Baumann's

---

[13] One involved the bagger for the tripoli product. "So the bagger, it bags. It shoots product into a hundred pound bags. They had had multiple problems. It started giving them problems, and Mr. Tidaback and Mr. Spears were telling … the mill associates to run it. The electrical box was open with a jump wire across it, and they were telling them to run it like that, running a little toggle manual switch. And I brought that up multiple times to both of them." Vol. 1 Tr. 198-199.

[14] Another instance Baumann cited involved a dam underneath the tube mill that was created by the tripoli. Vol 1. Tr. 189. The material, which had oil in it too, damned [sic] up underneath the tube mill. *Id.* MSHA wrote a citation for this condition, asserting that it was a fire hazard. *Id.* Though Baumann asserted that he tried to clean it up, he was told the mine was not doing that. *Id.* There was also an instance involving product on the floor in front of an electrical thing. *Id.* at 190. Though Baumann started sweeping it up, he was told not to do that as the product was going to be reused. *Id.* This was in spite of the MSHA inspector advising that it needed to be removed as it was covering an entranceway to an electrical box. *Id.*

[15] Tripoli refers to its employees as "associates." *See*, *for e.g.*, Vol. 1 Tr. 177- 178.

Appellate Case: 25-1349   Page: 216   Date Filed: 04/07/2025 Entry ID: 5503844

interpretation of the message, a very sound interpretation in the Court's estimation, was that Mr. Tidaback did not want maintenance issues to interfere with production. *Id.*

Ex. P-12 pertains to an MSHA inspection which began on March 28, 2023, and continued through April 10th, and for which Baumann participated. *Id.* at 211. Ex. P-12 is discovery American Tripoli produced.[16] At page 18 of this exhibit, a message dated March 31st from Mr. Tidaback states: "*I will stress with you -- any MSHA inspector is not your friend. Anything you say to or in their presence can," in all caps, "and will be used against you in court of law. Hopefully this will never be needed, but just be well aware.*" *Id.* at 216-217, (emphasis added). In that Group message were Russell Tidaback, Jordan Tidaback, John Spears, Baumann and Jesse Molesi. *Id.* at 217. Baumann agreed that the message was sent during the time of an MSHA inspection. *Id.* at 217-218. Baumann took the message as a warning not to speak to MSHA. *Id.* at 218. The Court finds that this is the only plausible interpretation. Management stated, specifically, Mr. Tidaback, according to Baumann, that MSHA would give citations *to miners* while they worked at American Tripoli. *Id.* at 218-219.

Continuing with page 19 of Ex. P-12, Baumann again identified the page as from Mr. Tidaback in a message dated March 28th to Jim Huber,[17] who was a mill associate. *Id.* at 220-221. Therein, Tidaback stated "Jim Huber, I get along with them great. *Remember... MSHA inspectors are not your friends.* They can and will us anything and everything against you in a court of law." *Id.* at 221, (emphasis added). Baumann stated that messages like this made him concerned that he would be subject to retaliation if he spoke with MSHA. *Id.* at 222.

Regarding an MSHA inspection that began on April 11th, six days before Baumann was fired, Baumann affirmed that he participated in that inspection. *Id.* at 223; Ex. P-21. A 104(b) order was issued that day. *Id.* Spears was aware that Baumann had participated in that inspection. *Id.* at 224. Ex. P-31, a screen shot, dated April 12th, mentions Baumann, and it is a screen shot sent to John Spears. *Id.* at 224-226. This communication refers to Baumann stating to Spears that employees would have to be paid because of the shutdown. *Id.* at 225. Respondent produced this information in response to a discovery request. *Id.* at 226. Baumann, sent home as a consequence of the withdrawal order, did not return to the mine until April 17th on which date he was terminated. *Id.* at 227.

For context, Baumann sent this message on April 12th, stating "Good morning crew. We will finish SO 325 this morning. Everyone did very well yesterday with pallets and color bearing and staging product. Thank you." *Id.* at 227. John Spears was included in the message. *Id.* The 11th of April was the last day Baumann worked at the mine before the MSHA shutdown. *Id.* at 228.

---

[16] Specifically, this pertained to Respondent's Third Interrogatories Answers and Responses for Production of Documents. Vol. 1 Tr. 213.

[17] It is noted that the Secretary, in her post-hearing brief, repeatedly incorrectly referred to Mr. Huber as Mr. Hoover. The pages cited by the Secretary refer to Mr. Huber, a mill employee; there is no mention of anyone named Hoover in the transcript. The mysterious reference to Hoover was solved by the Court. *See* footnote infra.

Ex. P-7 is a message Baumann sent to Spears, referring to the MSHA Handbook. *Id.* It was sent following the issuance of the 104(b) Order. *Id.* at 229. The portion sent from the Handbook referred to miners' pay when there is a shutdown. *Id.* at 230. Baumann never received a response to this. *Id.* at 231. Baumann sent the message following the April 12, 2023, withdrawal order. *Id.* at 232.

At any rate, the Secretary then returned to Ex. P-32, and April 14th within that exhibit, which was in the same time frame as the remark about miners being paid for work lost due to the (b) order, Mr. Tidaback states "Rob's termination *will*[18] be based on production performance. Not following guidance given by management. Not ensuring the safety of the mill associated by utilizing the proper controls, etcetera. He doesn't have to sign it. *We just need to have a document of why he was let go.*" *Id.* at 245, (emphasis added).

The Court finds this remark clearly displays that Tidaback was aware that he needed to create a basis to justify Baumann's firing, a basis he did not then have.

In light of that, Baumann was asked if he "[h]ad [ ] ever been told [he] w[as] having issues with production performance before [he was] terminated," to which he answered "No." *Id.* at 246. He also denied that he had ever been told he was "having issues with not following guidance given by management before [he was] terminated," and denied that he had ever been told that he was "not ensuring the safety of the mill associates before [he was] terminated." *Id.* at 246. In fact, Baumann affirmed that, regarding the safety issue, he had been trying to ensure the proper PPE would get purchased specifically for the dust issues going on at this time. *Id.* Baumann asserted that he "checked with the safety director, Jesse Molesi, every day to see if the systems had been ordered or if they were on their way, if they were there yet." *Id.* at 247-248.

In a sense, the following exchange by the Secretary with Mr. Baumann amounts to a summary, as Baumann affirmed that Tidaback was sending e-mails with different options on what kind of face filters the mine could get ordered, and that Molesi informed Baumann about those emails and all of this occurred on the Friday before Baumann was fired, April 14th, with his termination occurring on April 17th. *Id.* at 246-250. Further, it cannot be ignored that his firing occurred three weeks after he became the miners' rep, and within days of his raising the issue of miners' pay, following the MSHA withdrawal order. *Id.* at 250-251. It was only five days after he participated in an MSHA inspection which resulted in the mine being issued a 104(b) order regarding dangerous silica dust hazards. *Id.* at 250. Baumann concurred that the 104(b) order was issued for not controlling dangerous silica dust, a safety issue which he had repeatedly raised to management. *Id.* at 251. Also, Baumann agreed that his termination happened just two weekend days after he had been messaging with the safety person, Jesse Molesi, about his concerns with the dust. *Id.* Baumann asserted that every time MSHA inspectors were on the site he was with them. *Id.* at 254.

Ex. P-34 consists of additional discovery from the Respondent, involving some 56 pages. At page 15 of the exhibit are Teams Messages with Jim Huber from April 17-May 7, 2023. In the

---

[18] The Court notes the use of the future tense.

Appellate Case: 25-1349     Page: 218     Date Filed: 04/07/2025 Entry ID: 5503844

message for April 17th, Mr. Tidaback stated, "[u]nfortunately, we had to let Rob [Baumann] go today." Vol. 1 Tr. 259. On April 19th Tidaback's message states: "*MSHA just compounds the problem 10 X but not working with us and being fucking dicks.*" *Id.* at 260, (emphasis added). Baumann agreed that Tidaback made similar statements about MSHA. *Id.*

On the same date, Tidaback stated "*[t]his [MSHA Inspector] Keith [Markeson]*[19] *jackass... he gets his jolly off handing out citations... this fucker is a snake. When he is -- when he's around you better watch what you say and do... he is out to fuck you or anyone else he can.*" *Id.* at 261. And, in the same exhibit, Tidaback states: "*Everyone needs to stop calling MSHA.*" *Id.* at 265, (emphasis added).

Baumann affirmed that such remarks from Mr. Tidaback made him fearful about talking to MSHA. *Id.* at 265. However, in contrast, Baumann made clear that he was not scared of MSHA inspectors, nor did any inspector ever threaten him. *Id.* at 266.

In another message, this one on April 28th, from Tidaback to [Mill employee Jim] Huber, Tidaback stated: "We need you to make that place rock and roll. *I need the justification since Rob's complaint to MSHA about being let go... Just need you to put the cherry on the cake.* That's all." *Id.* at 267, (emphasis added).

Baumann affirmed that he started to raise more safety complaints in February 2023, which coincided with his walking around with MSHA during inspections. *Id.* at 268. Baumann stated that he raised such safety issues to Spears, the operations manager for the mill. *Id.* at 109, 269.

Ex. P-12, at page 23, pertains to a message, in July of 2022, from Tidaback to the group Teams Chat, wherein he states: "and if you are asked a question by the [MSHA] inspector, keep your answer short and simple. Don't be that guy Cameron LOL that thinks he knows it all and starts pointing out all the faults, etcetera. …I only named John Cameron since he doesn't work with us any longer." *Id.* at 272- 273 (quote edited by the Court to remove extraneous parts).

Ex. P-11 also involves Teams messages. Baumann affirmed that Spears made comments about not speaking to MSHA and not trusting their inspectors. *Id.* at 276. A message from Spears dated April 14th evidences this, with Spears remarking, "*I'm telling you guys... Keith [Markeson] is a snake... be cautious on what you say to and around him. **Any MSHA inspector really**.*" *Id.* at 276, (emphasis added).

Respondent's cross-examination of Mr. Baumann was conducted by Mr. Tidaback. Baumann agreed that the administrative building, providing offices for John Spears and a safety person, is a separate building from the mill but it's very close, separated just by probably 20 feet. *Id.* at 295. The mill itself consists of a four floors. *Id.*

---

[19] Baumann informed that there was no one named Keith working as an employee at the mine, but there was an MSHA inspector at the mine; Keith Markeson. Tr. 264. Markeson was the inspector who issued the 104(b) citation. *Id.*

Appellate Case: 25-1349     Page: 219     Date Filed: 04/07/2025 Entry ID: 5503844

Directed to Ex. R-I, titled, 'Production lead duties,' Baumann could not identify it as a document he had seen before. *Id.* at 300-301. With some differences as to the proper title for his position, Baumann stated he was hired a "production supervisor" when asked by Tidaback if he was the "production lead." *Id.* at 302. Baumann considered the terms to be roughly synonymous. *Id.* at 303. However, as to Ex. R-I, Baumann recognized some items within that exhibit as part of his duties, but not others. *Id.* He added that he never received training for those duties. *Id.* Referred to Ex. R-J, Baumann informed he had never seen that exhibit either.[20] *Id.* at 304.

Baumann denied reading the employee handbook, adding that he never got one. *Id.* at 315-316. He also denied any instructions or feedback about his work from his boss at Tripoli, Christine Schreiber. *Id.* at 320-323. Baumann did agree that there were instances where he had disagreements with Schreiber and Spears which led to raised voices by him, but this was an expression of frustration, "yelling about a situation with [his] boss." *Id.* at 323-324. He denied that anyone ever claimed he was creating a hostile work environment by, *in Mr. Tidabacks' words*, "screaming, getting mad or walking off."[21] *Id.* at 325.

When asked about receiving new miner training, Baumann stated "No. Not the full -- I didn't realize that it was supposed to be 24 hours or whatever, until months into my employment, until the lady came and did the refresher course." *Id.* at 333. The Respondent tried to make much of the fact that Baumann signed his training certificate, contending that he should not have signed it, given his testimony that he did not receive all the new miner training. *Id.*; Proposed Exhibit R-L; Ex. P-40.[22] Baumann did agree that he received annual refresher training. *Id.* at 335.

More importantly, Tidaback stated that the whole business about the training form certificate was *not* a basis for firing Baumann.[23] *Id.* at 340-341.

---

[20] The Court took a moment to explain to Mr. Tidaback that whether the correct name for Mr. Baumann's job title was 'production supervisor' or 'production lead,' does not really count for much as the focus is upon whether the complaining employee engaged in protected activity and had an adverse action associated with that, regardless of his job title. Vol. 1 Tr. 305-307.

[21] The Court commented that this question was plainly aimed as an attempt by Mr. Tidaback to establish an affirmative defense, that he would have fired Baumann anyway because of such *alleged* intemperate behavior. Vol. 1 Tr. 326. Mr. Tidaback agreed with the Court that was his intention behind those questions. *Id.* at 326. The problem, however, is that Respondent never established any credible testimony, or other evidence, to show this improper behavior occurred.

[22] Exhibits R-L and P-40 involve the same training certificate, but they are not identical, as Exhibit R-L is undated. Vol. 1 Tr. 338. Consequently, the Respondent was satisfied to have only P-40 admitted. *Id.* at 335.

[23] Mr. Tidaback informed that his questions were intended to contradict Baumann's assertion that he did not receive all of his new miner training. Tidaback's position, which was an assertion and not made as testimony, was that the training was available online and accessible for Baumann. Vol. 1 Tr. 342-343.

Appellate Case: 25-1349     Page: 220     Date Filed: 04/07/2025 Entry ID: 5503844

At that point in the hearing the Court spoke to what it identified as the central problem for the Respondent, namely that it seemed to the Court "that at the time that you decide[d] to discharge Mr. Baumann you would have, of necessity, had some sort of record established prior to discharging him as to the grounds for his discharge." *Id.* at 343. Mr. Tidaback concurred, stating "Correct." *Id.* The Court then noted that it didn't "know of any exhibit thus far that identifies [Baumann's] deficiencies such as that would warrant your [Mr. Tidaback] firing him, regardless of protected activity." *Id.*

One of Respondent's contentions, which was not testimony, but only Mr. Tidaback's assertion *before* he testified, was that Tripoli hired several people to replace Baumann. *Id.* at 345. The Respondent's theory was that Baumann "would have been fired in any event for his lack of adequate job performance, [but the Court noted] that would have had to have been detailed chapter and verse before [the Respondent made] the decision." *Id.*

The Court then commented that it seemed to it that there was, at that point in the hearing, no record that the Respondent had demonstrated, such inadequate performance by Baumann, adding that if the Respondent was trying to demonstrate that shortcoming by people it hired after Baumann was fired, that did not get Respondent there. *Id.* at 344-345.

Summing up its observation, the Court informed that the Respondent would need testimony or other evidence that Baumann would have been fired in any event for his lack of adequate job performance, and that would have had to be detailed, chapter and verse, *before* Respondent made the decision. *Id.* Mr. Tidaback agreed that Respondent's goal was to establish that, apart from any protected activity, it would have fired Baumann anyway. *Id.* at 346.

On the subject of daily safety inspections, Baumann stated that he didn't hear anything about doing those "until the MSHA inspector started asking for them. I never got trained. I never heard one -- not one word was ever said to me [about that] until it became an issue with MSHA." *Id.* at 365.

Respondent next brought up Exhibit R-P, about which the Court noted that exhibit has a "citation to MSHA['s] guide to equipment guarding tips. This is dated 2-14-23. So that's near the end of Mr. Baumann's employment." *Id.* at 366. Mr. Tidaback agreed with that description. *Id.* Attempting to testify, but not yet sworn in, Mr. Tidaback asserted the exhibit refers to refresher training. *Id.* at 367. However, the Court noted that there was nothing in that proposed exhibit indicating that there was prior guarding training. *Id.* at 368. The Court emphasized that there was nothing in that proposed exhibit to indicate that prior to 2-14-23 there were instructions from Tidaback to people about guarding.[24] *Id.* at 371-372.

---

[24] The Court explained its point about the deficiency with proposed Exhibit R-P further, stating "[f]or example, let's say that the three times in 2022 you said, hey, Mr. Baumann, I want you to pay attention to guarding, and then you give me dates through your Microsoft chat or whatever, Teams. You don't have that. The first time you have mention about this is in the wake of getting some citations from MSHA, so I find it difficult for you, if you're attempting to put the blame on Mr. Baumann on the issue of guarding, that the first time on this record that this shows up is after you got the citations from MSHA. And apparently, you're suggesting that would be on him, not doing his job properly because you had guarding citations." Vol. 1 Tr. 372.

19

Next was Respondent's Ex. R-C. Baumann agreed that he did daily workplace exams, and that part of his workplace exam responsibilities was to look for hazards before his shift started. *Id.* at 376-377. That proposed exhibit reflects dates from March 3, 2023, through April 7, 2023. *Id.* at 378. Baumann stated that he did not recognize the exhibit. *Id.* Baumann, it will be recalled was fired on April 17, 2023. *Id.* at 379.

Mr. Tidaback then referred to Exhibit R-D, which reflects a violation issued to Respondent during the time Baumann was an employee. *Id.* at 392. It pertains to guarding, housekeeping, and workplace exams. *Id.* Essentially, Tidaback was asserting that these were Baumann's responsibility and that, as MSHA issued citations on these subjects, it showed that Baumann wasn't doing his job. *Id.* at 392-394. However, it was then disclosed *that Respondent created the exhibit*, not MSHA. *Id.* at 395. As the Respondent had no witness at that time to identify Exhibit R-D, it was not admitted. *Id.* at 396. The Respondent never moved to have the exhibit admitted later in the proceeding.

Another problematic assertion from the Respondent is its claim that it hired *four* people so that Baumann could then be terminated. *Id.* at 400-401. The Court voiced its concerns about this claim stating:

> This doesn't -- to me this doesn't make sense that you're saying that you decide to terminate Mr. Baumann months before, and you hire four people to effectively do the job that he wasn't doing sufficiently, and yet there's no record of -- written record or Microsoft Teams even between just you and Mr. Spears or your daughter saying we got a real problem here. You haven't laid a foundation for what causes you to hire these other people, and of course, we haven't heard from those people, but this is not adding up. It sounds -- I know you blanch when I use the expression, but backfilling. It sounds like you're trying to look back and create reasons, from what I have heard so far, to discharge him as opposed to we had this problem and this problem and this problem, and then [you] hired four people but [you] had to keep Mr. Baumann on. Bad a job as he was doing, because someone had to teach him how to do it. Are you really suggesting that?

*Id.* at 401-402.

Amazingly, Mr. Tidaback agreed that he was keeping Mr. Baumann on for the purpose of having the replacement employees learn the job from him. *Id.* at 402. Tidaback agreed, stating, "[s]o we can terminate Mr. Baumann. Correct." *Id.* Thus, Respondent was claiming he wanted Baumann, who he is claiming was doing a poor job to stay on, while needing him to remain on the job so that he could train the replacement people. *Id.*

The Respondent's cross-examination of Mr. Baumann continued on the second day of the hearing. Baumann was directed to Ex. R-A, referring to the bottom of page 10, and Jim Huber, at 5-7- 2023 at 2:01 p.m. Vol. 2 Tr. 14, 16. Baumann noted that the message was made *after* he had been fired. *Id.* at 15.

20

According to Mr. Tidaback, Ex. R-A represents a communication between him and Mr. Huber. *Id.* at 16. The Secretary objected to its introduction, stating that it is a redacted version of Ex. P-34, at page 15. *Id.* at 17-18. Nevertheless, the Court admitted Ex. R-A. *Id.* Still, this exhibit was of no real moment, as Baumann agreed that Huber stated there was yelling and screaming going on among Huber, Spears and Baumann. *Id.* at 19. Baumann agreed that things got loud, arising out of issues such as the need for parts, but that he was never confrontational. *Id.* at 19. Baumann agreed that his manager was to make decisions about needs at the mill, but he added that no one ever spoke to him about raising his voice and, if that had occurred, he would never have raised his voice again. *Id.* at 22.

Mr. Tidaback tried, without success in the Court's view, to show indirectly that Baumann was not doing his job. Most of his questions pertained to matters not relevant to this discrimination matter.

The Court then addressed the evidentiary problem, explaining:

> what's missing is if [Mr. Baumann] were deficient, as you allege here, there would be a record of that. Not just through Team chats, but the normal course of business is when an employer is unhappy with their employees, those employees get notified of it. … [the employer has] to advise that [the employee has] to make certain corrections or something more serious will come down.

*Id.* at 51-52.

Mr. Tidaback conceded that nothing along that line had been presented up to that point in the hearing. *Id.* at 52.

After sustaining an objection to a question from Tidaback in which he asserted that Baumann never communicated safety concerns, the Court rephrased the question for him, inquiring of Baumann if he ever raised safety issues to Mr. Tidaback or to Mr. Spears. *Id.* at 79. Baumann identified safety concerns he raised to management. *Id.* at 79-80; Ex. P-14. It is noted that Baumann had mentioned these issues in earlier testimony.

Baumann asserted that he was being treated differently after raising safety concerns, stating:

> Just like I testified yesterday, I felt like I was being left out of Team chats, and any concerns that I brought up were, in my opinion, being blown off or ignored … [in that his] my name was not being tagged in any of the Team messages. If I brought a concern across, taking a picture of something, I never got answered, in my last two months … prior to being terminated [though he agreed that he was still in the group chat].

Vol. 2 Tr. 86.

21

The Court then inquired of Mr. Baumann, if he ever received a warning, oral or written, from Mr. Spears, that his job performance was inadequate, whether he ever received an oral or written warning from Mr. Tidaback or any other person in management that he was not performing his job adequately and whether he was ever given a warning that he was on some sort of probation. *Id.* at 100-101. The Court added that it wasn't using those terms "in a legal sense, but rather if he was advised that if his job performance did not improve he would be terminated." *Id.* at 100. Mr. Baumann answered "No" to each of those questions. *Id.* at 100-101. Further, when asked if management had ever called to his attention deficiencies in the performance of his job, he also answered "No." *Id.*

Mr. Gage Wheeler was then called by the Secretary. *Id.* at 126. Wheeler was employed by American Tripoli, beginning around December 26, 2022. *Id.* at 128. He left that employment around February 2023. *Id.* He was employed as a maintenance person, working in the mill. *Id.* at 128-129. Spears was his supervisor. *Id.* at 130. His duties were to keep and maintain everything in working order, to the best of his ability. *Id.* Wheeler stated that, not long after he began working for Tripoli, he was "pulled" from his job by an MSHA inspector because he lacked new miners training. *Id.* at 137. Wheeler stated that once his employment began, he was put right to work without any new miner training. *Id.* During this time he was not closely supervised by anyone, nor did he receive any task training from Tripoli. *Id.* at 137-138. Asked a series of questions about task training for welding, lockout/tagout, and use of a forklift, Wheeler stated he never received such training. *Id.* at 138-139. On the issue of lockouts, Wheeler stated that Tripoli did not provide locks, and consequentially, he used his own locks. *Id.* at 139. He used Teams Chat to communicate with Tripoli management and other employees there. Wheeler quit when the mill was shut down by MSHA. *Id.* at 145.

Asked about his relationship with John Spears, Wheeler answered "[t]urbulent I guess is the best word I can use in the company present." Vol. 2 Tr. 145. He explained further, "I'm sure he's a great feller, but I don't think he's competent and overall just kind of ignorant in some aspect. I think that's a fair word. Ignorant is a fair word." *Id.* He agreed that 'contentious' was an apt word to apply by his using the term ignorant. *Id.* at 145-146. In contrast, he described his interactions with Baumann as "pleasurable interactions" and in his view, Baumann was a "pretty decent" employee. *Id.* at 152. In his estimation, Wheeler believed that Baumann did his job adequately. *Id.* at 153.

Wheeler also expressed that, in his view, Baumann cared about safety and he expressed safety concerns to him. *Id.* at 154. As an example, he offered:

> One was the dryer downstairs. It was leaking gas real bad. Real bad. I mean, to the point, you know, you were a smoker, you know, the whole place might go up. It was really bad. There was, on the other couple of floors, there was some rotten spots in the floor that got brought up to me. Just kind of overall, you know, rust, sharp things, you know, about. Just kind of in general. I mean, you know, kind of a walking tetanus shot in there.

*Id.* at 154.

Appellate Case: 25-1349    Page: 224    Date Filed: 04/07/2025 Entry ID: 5503844

Wheeler also noted that fixing things was his responsibility, not Baumann's. *Id*.

Indicative of the problems at the Mill, Wheeler stated that it was often shut down, explaining "you know, most of the time we were shut down from whatever agency, you know, whether it be MSHA, the National Department of Natural Resources or the cops, for that matter." *Id.* at 157.

The Secretary then referred Wheeler to Ex. P-43, the deposition transcript of Russell Tidaback taken on January 22, 2024. *Id.* at 158. This was relevant because Mr. Tidaback asserted in his deposition that Wheeler said he did not like Baumann and that Baumann was lazy. *Id.* at 162. Mr. Wheeler denied he ever said such things. *Id*. Further, Wheeler denied that he told Tidaback that Baumann never helped him with maintenance. *Id*.

It is clear that Mr. Wheeler's overall description of the Mill's operation was not a positive one. Asked about his earlier remark about jagged edges, he stated "everything that's in there is just jagged, you know. The handrails, you got to be careful with them handrails, you slice your hand open on those. Short bits and bobs around every corner. Just in general." *Id.* at 163. Plainly, Wheeler was concerned about safety at the Mill in general. *Id.* at 164.

Wheeler confirmed that there were instances of conflict between Baumann and Spears, with dust being the number one contention. *Id.* at 167. He stated that, at times, the Mill ran in spite of the dust issue while at other times it did not run. *Id.* He informed that Spears told him to "steer clear" during an MSHA inspection. *Id.* at 170. Asked how he received that message, Wheeler stated "Don't talk to them. Don't interact with them. Don't engage with them in any way, shape or form." *Id.* at 171. And this message was delivered to Wheeler more than once. *Id*.

It is noted that Ex. P-9, a Teams Chat, dated February 14, 2023, involved a message from Spears to Wheeler advising that he not speak with MSHA. *Id.* at 175. In one Teams Chat message to Wheeler, on February 14, 2023, he was advised to not volunteer information to MSHA. Tr. 178-179. Wheeler also spoke of an instance when the Seneca Police came to the Mill and told them not to run the Mill, advising them that if the Mill continued to run the police would "tak[e]every one of you son's of bitches to jail." *Id.* at 185. To be clear, Wheeler quit, he was not fired. *Id.* at 196. Wheeler worked at Tripoli for three months. *Id.* at 194.

When Mr. Tidaback suggested that Wheeler's time at the Mill was too short for him to speak knowledgeably about it, Wheeler responded "I got eyes." *Id.* at 196.

Carson Allman was then called by the Secretary. *Id.* at 214. He worked at Tripoli, from September 13, 2022, through November of 2022, as a maintenance employee, primarily working in the Mill. *Id.* at 218. John Spears was his supervisor. *Id.* During some periods of that time, he was the only maintenance worker at the Mill. *Id.* at 219. He received new miner training about a month after his employment began. *Id.* at 220. When he received his new miner training, Mr. Tidaback told him "*[m]ostly just not to tell any stories about the mill itself to the inspectors.*" *Id.* at 221-225, (emphasis added). He never received any task training while at Tripoli. *Id.* at 222-223.

Appellate Case: 25-1349     Page: 225     Date Filed: 04/07/2025 Entry ID: 5503844

The Court notes that Allman's testimony was consistent with the prior witnesses – that Spears had to get approval from Tidaback before things were repaired, such as parts needed for repairs. *Id.* at 225. Sometimes requested parts were not received. *Id.* at 230-231. Allman stated that Spears told him "it was just too expensive. Something they couldn't do right now." *Id.* at 231. Allman informed about a request he made for new filters for the bag house. *Id.* Regarding that, he explained the nature of the bag house:

> The "[b]ag house [is] kind of like a ventilation system. The dust goes in and [its] supposed to separate the dust from the clean air, but the clean air, instead of pushing out a whole bunch of dust. When them filters go bad, instead of separating the air and dust, it just pushes out the dust with the air straight out of the stack.

*Id.*

Allman recommended new filters because "[t]he ones they would were plumb full of tripoli and old and brittle. A lot of them had rips in [them]. I think we counted 36 [ bags with rips]. *Id.* at 231-232. New bags were not ordered. *Id.* at 232. Instead, Spears had them use those from a "stockpile of old filters that they had pulled out and replaced beforehand. He had us sort through them to put back in the place of the ripped ones, but they were just as rough as condition because they had been sitting in the garage for who knows how long." *Id.*

According to Allman, the *day* shift was shut down most of the time he worked there. *Id.* at 233. He elaborated about the reasons for the shutdown, stating "[t]here was multiple reasons. On day shift they didn't want to run for -- one, the local police weren't happy with the dust. And then there was also an MSHA inspector that wanted to watch the plant run so we were running night shift instead." *Id.*

The Court takes note of that revealing remark, as Allman stated that the mill would run at night. Vol. 2 Tr. 233-234.

Allman's view of Baumann was, like Wheeler's, positive, informing that he was "one of the most helpful people I worked with while I was there." *Id.* at 234. Further, Allman expressed that Baumann was concerned about the workers' safety. *Id.* at 235. Distinct from safety, Allman spoke to the Mill's production demands, informing that "Russell [Tidaback] had mentioned several times that the plant was capable of running a hundred thousand pound of product, but I think when I was working there it was lucky to push out about 15,000, if that." *Id.*

In explaining why production fell short, Allman did not paint a pretty picture about the operation, stating:

> There were a lot of reasons why. Such as holes in the augers, holes in the bearings. A lot of their product was going on the floor. Like in the very lower floor there's several spots where the tripoli would just pile up at the machine [while it was] running. By [the] end of shift you'd have probably a couple hundred pounds worth of tripoli sitting on the floor. And half the equipment, when I started there, wasn't even working. A lot of it was just locked out, not running since I started.

Appellate Case: 25-1349     Page: 226     Date Filed: 04/07/2025 Entry ID: 5503844

*Id.* at 236-237.

Allman described the safety culture at American Tripoli thus: "[k]ind of nonexistent, for the most part. Kind of just look out for yourself." *Id.* at 238. As just one example, illustrating Allman's concern about his safety, he stated that his concern was:

> [q]uite a bit. Especially like working on that bag house, we were doing some air diaphragms on that, and we would [ ] do it from the roof of the building because it's on the back side of the bag house, so you have to stand on the roof and all the safety harnesses they had there were expired.

*Id.* at 242.

Also consistent with the previous witnesses, Allman stated that Spears' instruction to him was that he didn't want employees speaking with the MSHA inspector Van Horn, telling them "he [Spears] could handle it all." *Id.* at 246. Allman denied that Inspector Van Horn ever yelled or threatened him. *Id.* at 249. Allman also stated that he and employee [Terry] Newburn were terminated not long after they participated in an MSHA inspection. *Id.* at 250. Allman denied that he was ever verbally abusive and disrespectful to Spears and Baumann. *Id.* at 252.

During his cross-examination, Mr. Tidaback asked if Allman ever received a letter of reprimand from Tripoli. *Id.* at 255-256. Allman denied that. *Id.*

Ms. Kensley Brewer then testified for the Secretary**.** *Id.* at 266. She was identified as a miner witness. *Id.* at 264. Her employment at Tripoli was brief, as she worked there just over a month, from December 19, 2022 through January 24, 2023. *Id.* at 289; Ex. P-39, at page 15. Though she had applied for a safety position, she "ended up being like a secretary and I did, like I did the production part. Did inventory and shipping and receiving a lot of the times, or helped with that." Vol. 2 Tr. 270.

She informed that she worked with Mr. Baumann on a daily basis. *Id.* at 272. Her impression of him was "[he] was always really dedicated to his job and wanted everything to go right and be safe [and that he did the work he was asked to do], stating "yes, he did." *Id.* at 273. She added,

> [b]ut sometimes things would be unsafe, and he [Baumann] would come and report to John [Spears] in the administration building that I was in, and you know, he would tell John [Spears], you know, more than one time, and then finally, you know, he would have to stand up for what was right as far as safety went. And he was just always trying to make sure that everything was as safe as possible, even though a lot of the times [he] was being told to do otherwise.

*Id.* at 273.

Appellate Case: 25-1349    Page: 227    Date Filed: 04/07/2025  Entry ID: 5503844

In sum, Brewer described Baumann as one who was always at work early, had a good attitude, and cared about safety. *Id.* at 275-276. Brewer asserted that Baumann complained about safety concerns to Spears "[c]onstantly." *Id.* at 278. Brewer described the MSHA inspectors as "always friendly." *Id.* at 282- 283. As with other witnesses, Brewer asserted that Spears stated that "Russell said we [i.e. employees, such as Brewer] [were not] supposed to talk to the MSHA inspectors." *Id.* at 283. No MSHA inspectors ever yelled or threatened Brewer. *Id.* at 287.

On cross-examination, Brewer stated that she worked with Baumann every day. *Id.* at 294. She clarified that her testimony was not about Baumann's job performance; she did not watch him perform his job. *Id.* at 295. She acknowledged that there were instances when Spears and Baumann raised their voices, but that this was when safety was in issue. *Id.* at 301. She expressed that Spears would not listen to Baumann, informing that he [Spears] had been told by Tidaback how things were to be done. *Id.*

Following Mr. Brewer, Michael Dillingham then testified for the Secretary. *Id.* at 306. Dillingham is a special investigator for MSHA. *Id.* at 307. He has more than 49 years of experience working in mines, with 17 of those years working for MSHA. *Id.* at 308. He conducted the section 105(c) investigation for Baumann's discrimination complaint. *Id.*; Ex. P-1. The complaint was delivered to the mine operator on April 27, 2023. *Id.* at 311. Mr. Baumann's complaint of discrimination was based upon his claim of raising safety concerns and also by being selected as the miners' representative. *Id.* at 316. Dillingham requested Baumann's personnel file from the Respondent three times, but it was never given to him. *Id.* at 324. Later, Dillingham stated he received, "bits and pieces" of the personnel file. *Id.* at 326.

Investigator Dillingham did receive a copy of American Tripoli's employee handbook, which includes its disciplinary policy. *Id.* at 325. He described that policy, stating "it says right in there that it's a three step process. No. 1, if they have got an issue, they converse with you about it. They talk to you about it. No. 2, you get some kind of written form, and then after that, the next thing would be -- would be potential termination or disciplinary action, you know, whatever they could warranted to do." *Id.* at 325; Ex. P-16 at page 43. The penalty MSHA is seeking for the alleged violations are reflected in Exhibit P-42.

After Investigator Dillingham's testimony, MSHA Inspector Keith Markeson testified. Vol. 2 Tr. 356. It is noted that Tripoli asserted that it filed a complaint against Markeson regarding his behavior during his inspections. *Id.* at 352. However, the Secretary advised that there is no active complaint regarding the Inspector. *Id.* at 354.

Inspector Markeson has been an MSHA inspector for sixteen plus years. *Id.* at 356. He has inspected Tripoli many times.[25] *Id.* at 357. These inspections included times in the past when the mine was under different ownership. *Id.* at 375. He has interacted with Baumann on every inspection he performed at the Seneca Mill. *Id.* at 358. He described the management members of Tripoli as follows: "John Spears was the operations manager. Rob Baumann was the production

---

[25] The Inspector briefly described the mine's operation: "They quarry their material over in Oklahoma. That material is then trucked over to drying sheds on the Missouri side. Dries for a period of time there, and then it is trucked again to the plant in Seneca, Missouri, where it is crushed and ground and sized and then packaged for sale." Vol. 2 Tr. 357-358.

Appellate Case: 25-1349   Page: 228   Date Filed: 04/07/2025 Entry ID: 5503844

supervisor, and then Jordan and Russell Tidaback were in the ownership roles." *Id.* at 359.

He first met Russell Tidaback on February 27, 2023. *Id.* On that date he was conducting a complaint investigation. *Id.* at 359-360. Mr. Baumann and Mr. Tidaback were present during his investigation. *Id.* at 360. Markeson stated that during the first day of that inspection Baumann "brought some concerns to my attention when we were on the top floor of the mill building that needed to be addressed." *Id.* at 361. For context, the inspector stated that "[a] miner had gotten hurt at the mine. He had fallen through some floor grating and gotten hurt, and he didn't want anybody else to get hurt. And during some of the repairs that were conducted at the mine, he was directed to leave guards out of place to get back into production faster, and he thought that was a concern that needed to be addressed." *Id.* at 362.

Markeson informed that during inspections he would discuss miners' rights, including their right to elect a representative. *Id.* at 363. He did so at Tripoli and shortly thereafter provided Mr. Baumann with the paperwork to become a miners' representative. *Id.* at 363-364. Thereafter, on March 21, 2023, Baumann was elected as the miners' representative. *Id.* at 364. At that point, Markeson went to the mine's office, informing them of the miners' representative and the rights that person had in that capacity. *Id.* at 365.

During his inspections at Tripoli, Markeson spoke to all the miners employed there. *Id.* at 366. There were five miners, but one of them didn't talk much. *Id.* The big concern raised by those miners was the dust at the mill, and that they were exposed to it without proper protection. *Id.* at 366-367. The miners also spoke of other safety issues. *Id.* at 367. He described these as "[g]uards being left off, which left moving machine parts exposed. Some electrical issues and general condition of walkways and work areas, whether it be sturdiness of the area or housekeeping of the areas." *Id.*

Inspector Markeson denied ever threatening miners at Tripoli, nor for that matter, did he threaten anyone at Tripoli. *Id.* Instead, he asserted that he explained the MSHA enforcement process. *Id.* at 368. But this was never done in a threatening or harsh manner. *Id.*

Regarding Markeson's inspections at the Mill, although there were one or two times when he and Baumann were alone, most of the time either Spears or Tidaback were present with them. *Id.* at 369. It is noteworthy that Inspector Markeson always had another MSHA inspector with him when he was at American Tripoli. *Id.* at 372. Markeson stated that no one from MSHA ever threatened anyone at Tripoli during those inspections. *Id.* Shortly after his inspection in February 2023, three miners told him they were told not to speak with MSHA and they showed him text messages supporting that claim. *Id.* at 373-374.

In comparison to his inspections when Tripoli was under previous ownership, Markeson's impression in February and onward in 2023, was that the mine was "lacking in upkeep." *Id.* at 375. Among the inspector's concerns, he stated that:

> [t]he biggest thing that comes to mind is there was a dust citation issued on, what was it, March 30th, 2023 for overexposure to dust. I had sampled all the miners that worked -- that were working that day at the plant, and they were all overexposed.

Appellate Case: 25-1349     Page: 229     Date Filed: 04/07/2025 Entry ID: 5503844

Four of them were overexposures that was citable. One was an overexposure that was not citable. I set the termination due date for April 7th, which was a week later, which is standard because none of the miners had been enrolled in a respiratory protection program, and normally when we cite dust that doesn't have a respiratory program, we give them a week to get that program in place, get the miners wearing respirators, fit tested, that type of thing.

And then I returned to the mine on April 12th, so the termination due you was on the 7th. I came back the following Wednesday on April 12th and no action had been taken. Respirators hadn't been ordered. The respiratory protection program hadn't been put into place. Miners hadn't been fit tested or medically evaluated. Nothing had been done yet.

*Id.* at 377-378; Ex. P-21.

The Court makes note that this testimony from Inspector Markeson is considered in a limited fashion because this proceeding is not for the purpose of adjudicating any citations or orders at Tripoli. Rather, it is mentioned for context only, in support of the finding that Mr. Baumann's safety concerns were not invented or fabrications.

On the third day of the hearing Inspector Markeson's testimony resumed, with Mr. Tidaback starting his cross-examination. Vol. 3 Tr. 8. Markeson stated that he had more than ten inspection visits at Tripoli. *Id.* at 9-10.[26] The inspector denied that he has ever been disciplined for his performance as an inspector. *Id.* at 17.

The Court also takes note that much of Mr. Tidaback's questions to Inspector Markeson were irrelevant to this matter, as they related to that inspector's actions during an inspection. *See, Id.* at 21-22, for example, relating to the speed of an inspection. That said, employing its discretion, the Court did admit Ex. R-H. Vol. 3 Tr. 24. It is a chain email, introduced by the Respondent to show, allegedly, that Inspector Markeson was disrespectful or showed some other negative attribute with his behavior. *Id.* at 24. The email is a message from Tidaback to MSHA District Manager Simms. *Id.* at 28. The Court had issues, to put it mildly, with the Respondent's use of this email, noting "[t]he extent of the camaraderie or disagreements between MSHA's inspection team does not advance at all in my perspective the determinations that I have to make in this case." *Id.* at 27. Tidaback stated that the Respondent's purpose for this exhibit was "to establish the basis that Mr. Markeson influenced and coerced Mr. Baumann in filing a complaint," but that is something which is also completely irrelevant to this case. *Id.* at 32. Markeson did say to Baumann, upon learning of the circumstances of Baumann's firing, that he might have a discrimination action. *Id.* at 34.

The Court would remark that there is nothing improper about so advising a miner of such a right. Inspector Markeson denied having tried to influence Baumann; he only provided the information for the procedure to file such a complaint, if he chose to do so. *Id.* at 35.

---

[26] The Court made note that this discrimination case is not about trying the citations issued by any MSHA inspector to American Tripoli. Vol. 3 Tr. 11.

28

As Mr. Tidaback frequently tried to establish that Mr. Baumann was deficient in his job, in one instance by attempting to have the inspector comment on machine guarding, the Court informed that:

> that's not how you're going to establish that Mr. Baumann was deficient. The way that the American Tripoli can potentially do that is to have someone like Mr. Spears or some other witness testify that Mr. Baumann's duties included making sure that guards were in place and that on one or more occasions this was noted by such individual and that there was -- to demonstrate the veracity of that, that there was a record made on the part of American Tripoli which would have noted this deficiency, alleged deficiency, on the part of Mr. Baumann. So this would all be part of American Tripoli's affirmative defense to the extent that they can show that.

*Id.* at 40-41.

The Secretary then called MSHA Inspector, Bryan Licklider. *Id.* at 67. He has conducted an inspection at Tripoli. *Id.* at 69. Ex. P-26 at page 9, represents Licklider's field notes. The inspector alleged that the mine had a fire extinguisher that did not have an annual inspection on it. *Id.* at 73. Instead, the last inspection sticker was dated 2021 and his inspection was carried out on February 14, 2023. *Id.* On that date Licklider was present because of a hazard complaint. *Id.* at 74. An inspection ensued and the inspector asserted that multiple violations were found. *Id.* Licklider's opinion was that Tripoli had "a total disregard for safety." *Id.* at 80. He denied ever telling personnel at Tripoli that he would call the U.S. Marshalls on them. *Id.* He also denied that he threatened anyone, and similarly denied that he told anyone he would take them to jail. *Id.* at 80-81.

Subject to any rebuttal witnesses, the Secretary then rested. *Id.* at Tr. 86.

The Respondent's defense then began. Mr. Tidaback called John Robert Spears as his first witness. *Id.* at 88. Spears confirmed he is employed at American Tripoli at its Seneca, Missouri location, where he is the operations manager for the mill. *Id.* at 91. His employment began in August 2022. *Id.* at 92. His duties are broad, as he informed that he "oversee[s] the activities of the processing mill as well as the drying shed area and the quarry itself. *Id.* at 92. Spears agreed that the operation experienced high turnover in several jobs including maintenance, the shift lead, the safety and environmental job, and the administrative assistant positions. *Id.* at 96-97.

Essentially, all of Spears prior work was with US Postal Service. *Id.* at 98-99. For some of those years with the post office, he helped conduct training. *Id.* at 99. It must be said that much of Mr. Spears testimony was not helpful to the Respondent's defense. For example, Mr. Tidaback asked if Mr. Baumann had expressed to Spears multiple times that more Tripoli should not be fed into the system. *Id.* at 100. Spears agreed, but only in part, as he expressed recalling "[o]nly one particular instance, you know, with the weather being hot and having to hand stack our -- our product." *Id.*

Appellate Case: 25-1349     Page: 231     Date Filed: 04/07/2025 Entry ID: 5503844

Tidaback continued, asking whether Spears "ever provide[d] reasoning why [the mine] should provide more feed to the mill?" *Id.* Spears response was "to meet our production goals." *Id.* at 100-101.

Spears denied ever instructing Baumann not to speak with MSHA. *Id.* at 102. He acknowledged that Baumann did inform him that he was a miners' representative. *Id.* at 104. He denied ever cutting off a lock that wasn't his own. *Id.* at 105. He denied creating an atmosphere where miners would be fearful of speaking with MSHA. *Id.* Though it is irrelevant to the issues in this matter, Spears did agree that a miner expressed concern about his job in connection with MSHA inspectors, and fear of MSHA inspectors, identifying Inspector Markeson in particular. *Id.* at 107-108.

As for Spears relationship with Baumann, Spears believed they "got along pretty well." *Id.* at 109. On the issue of whether Baumann ever raised his voice, cursed at him, or was basically disrespectful to him as his subordinate, Spears answered, "[n]ot to me personally, no." *Id.* As to whether Baumann "ever showed anger, haste, stomp his feet, g[o]t mad at anything you directed him that we needed to do," Spears responded "[y]es, sir." *Id.* at 109-110.

In describing the mill operations with Baumann as the shift lead, Spears stated he, "felt that [Baumann] was conscientious about trying to -- you know, trying to get our product produced." *Id.* at 110. Asked if Baumann ever had issues or complaints that he brought to Spears, he answered "[w]ell you know, there was always issues with -- with the equipment, you know, needing to be repaired, looked after, you know." *Id.*

Thus, Spears agreed that Baumann brought those issues to his attention. *Id.* at 109-110.

Spears asserted that he addressed any maintenance-related or safety-related issues that were brought to his attention. *Id.* at 111. He acknowledged that there were instances when guards were removed for lubrication and then the guards were not reinstalled. *Id.* at 112. Responsibility for reinstalling the guards, he said, was the person doing the workplace exam. *Id.* at 112-113. This person would be the shift lead, i.e. the production supervisor. *Id.*

When Spears was asked about hazards and keeping employees safe, he expressed a view that put the burden on employees, not on the mine's compliance, stating: "I would like to think that people's personal initiative, that they would want to -- to not be in a position to be in danger of any -- of any type of equipment that we have." *Id.* at 115.

Spears affirmed that there were issues with Baumann's performance when he was the shift lead and that he discussed those performance issues with him. *Id.* at 118-119. Spears stated that he knew of and was familiar with, the mine's employee handbook, including the progressive discipline aspect of it. *Id.* at 119-120.

Appellate Case: 25-1349     Page: 232     Date Filed: 04/07/2025 Entry ID: 5503844

At that point, Mr. Tidaback posed a revealing question, asking if Spears knew that Missouri is an "at-will work state." *Id.* at 120. Spears affirmed he knew that. *Id.* Spears then described its application, expressing "[i]t just means that at any point, the employer may terminate an employee's employment with the company. And, therefore, the employee can also terminate at any time, you know, for no -- you know, without giving any reason." *Id.*

The Court would note that such an unfettered ability to fire an employee may be true in a right to work state, but if the Respondent is suggesting that overrides the protections of the Mine Act, that is incorrect.

Spears did state that it was not his intention to interfere with an MSHA inspection, asserting that there was a swirl of activity ongoing at that time. *Id.* at 131. Instead, he asserted that, as Gage Wheeler was a new employee, his motivation was he didn't want "any kind of wrong information" given by him. *Id.* This was offered, Tidaback asserted, to show that Tripoli had no intention to interfere with an MSHA inspection. *Id.* at 132; Ex. R-DD. February 14th group chat material. The Court concludes that this explanation is not credible. The Court asked Spears if he had seen the document, to which he responded "[n]ot that I can remember." Vol. 3 Tr. 127. That same day, February 14th, Spears agreed that he was also dealing with the Seneca Police who were arresting a Tripoli employee. *Id.* at 128.

In cross-examination by the Secretary, Spears agreed that he is the operations manager at Tripoli and that he has the authority to discipline employees. *Id.* at 144-145. He then agreed that he *never disciplined Baumann* while he was an employee at Tripoli. *Id.* at 145. Spears added "I don't remember ever doing any kind of a counseling notice or a write-up or anything like that." *Id.*

In notable contrast, Spears informed that he has given written discipline to other miners at American Tripoli. *Id.*

Further, Spears stated that Baumann was fired for production issues. *Id.* at 146. The record shows that the claim that Baumann was fired for production issues is unsupported. Spears also agreed that Baumann told him that meeting production quotas was too hard on the mill associates. *Id.* However, Spears stated that he did not know if this was related to safety concerns on Baumann's part. *Id.*

On the issue of production, Spears agreed that the demand of 40,000 lbs. per day has only been met 20 to 30 times during the entire time he has been employed at Tripoli. *Id.* at 147. Thus, Tripoli rarely met its production issues and the record show that this claim was aspirational, and infrequently met.

Spears also admitted that he walked around with the MSHA inspectors and that he observed Baumann speaking with the inspectors. *Id.* at 148. Further, he agreed that Baumann informed him that he was a miners' rep before he was terminated. *Id.* In addition, Spears acknowledged that he never hired anyone to replace Baumann before he was fired. *Id.*

31

On re-direct, Spears repeated that Baumann was fired for performance issues. *Id.* at 150. However, Spears blurred that meaning of that term, calling it "performance/production." *Id.* at 151. He considered production to be the key element, stating "[i]f your production's not showing what it's supposed to be, then it would be your performance toward that goal." *Id.*

The Court inquired further. Spears stated that meeting production goals would be part of his 'performance,' elaborating that "it was his, Mr. Baumann's, reluctance to -- to try to meet that production goal due to whatever circumstances in the mill that he thought was relevant at the time." *Id.* at 152.

When asked if conversations between Tidaback and Spears discussing firing Baumann occurred months before Baumann was fired, Spears answered "No." *Id.*

On recross examination, Spears was directed to Ex. P-44, from his January 30, 2024, deposition at p. 29. There, in response to the question that "it sounds like overall, you [Spears] didn't have a lot of complaints about Rob [Baumann]. Would you say your only complaint about him had to deal with meeting production quotas?" *Id.* at 156. Spears answer was "Yes." *Id.*

On redirect, Mr. Tidaback referred Spears to Ex. P-44 at page 10, when Spears was asked why Baumann was fired, Spears responded "for his lack of production and just an overall him just not being a productive employee." *Id.* at 158-159.

Mr. Tidaback then testified. *Id.* at 164. Questions to Russell Tidaback were posed to him by his daughter Jordan Tidaback.[27] When asked how he coordinates between himself, Spears and Jordan Tidaback "to provide support and ensure that the company's operations run smoothly," Tidaback stated that "everything in American Tripoli [is] run through [Microsoft] Teams. *Id.* at 175.

Tidaback stated that Baumann's correct job title was production lead or shift lead. *Id.* at 203. He described the roles and responsibilities of the shift lead as follows:

> The shift lead is responsible for the mill operations. That position is -- monitors the production schedule which the sales team builds for them. They -- They are the ones that control the inventory flow through the mill. They are the ones that also control the quality control of it leaving. They create the product. They ensure that it goes out properly. That's -- That's really it for that role. They manage the workload of the mill associates. They're in there. That's their role. That's their primary role, to make sure that things get done in the mill.
>
> On top of that, they're also responsible for the safety and -- of the mill associates. They're in that senior leadership position because it would be the senior person because the progression -- and this may help, your Honor, the progression of every mill associate is they start as a mill associate. Then they move to the shift lead. And then after the shift lead is when you come into a manager role where you can either

---

[27] Jordan Tidaback, Russell Tidaback's daughter, did not testify. All references to testimony from Tidaback refer to Mr. Tidaback, not his daughter.

Appellate Case: 25-1349    Page: 234    Date Filed: 04/07/2025 Entry ID: 5503844

become safety, the operations manager, the quarry manager, that stuff.  So there is
progression moving up and that's one of the things that we had for Mr. Baumann,
and that's -- that's -- that's why this is bothering me, so --

Vol. 3 Tr. 177-179.

Tidaback agreed that he had to remind Baumann to add mill Teams hours and shifts, so
that too many days didn't go by. *Id.* at 179.  He maintained that he shouldn't have had to remind
Baumann about that task but he had to do that numerous times. *Id.* at 180.  He asserted that, by
Baumann's failure to do that task, it impaired the production scheduled for the next day.  *Id.* at
181.  Tidaback also asserted that he had to remind Baumann to do the shift lead close-out at the
end of each day. *Id.*

In speaking to Tripoli's disciplinary process, Tidaback emphasized, as did Spears, that
Missouri is a "right-to-work state, [one] can be fired at any time without any notification." *Id.* at
182.  Then, he described Tripoli's disciplinary process, stating "First is a verbal, okay. Second is
a written. Third, if there is one, is immediate termination.  No explanation is needed or anything
like that.  By that time, you know that you're going to be terminated." *Id.*

He then added that, per its policy, the process "can go in any order. We don't have to follow
that [disciplinary process] order." *Id.* at 183.  Thus, he asserted Tripoli can terminate anyone at
any time just for any reason.  *Id.*

Tidaback asserted that he hired people to replace Mr. Baumann. *Id.* at 186. The Court tried
to clear up testimony about this claim.  *Id.* at 186-187.  Tidaback contended that, if he remembered
correctly, that four people were hired for that purpose. *Id.* at 187.   None of them are still employed
by Tripoli. *Id.* at 188.  None worked for Tripoli for more than one month. *Id.* at 189.  Respondent
referred to Ex. R-X regarding this issue. *Id.* at 190.  That exhibit refers to a hiring document for
one such employee, Will Shellenberger.  *Id.* at 192.  It is dated August 24, 2022.  *Id.* at 193.
Exhibits R-X, R-Y, and R-Z were admitted previously.  *Id.* at 194.  Among those exhibits, Richard
McCullen was another employee hired by Tripoli.  *Id.* at 195.  According to Tidaback, that hiring
was for production shift lead.  *Id.* at 196.  A third such hiring was for Alex Nigrass, who started
work for Tripoli on March 20, 2023.  *Id.* at 195. Tidaback asserted that all three of these hirings
were for the purpose of replacing Baumann. *Id.* at 196.

Tidaback contended that Tripoli never stopped any employee from speaking with MSHA.
*Id.* at 199.   Tidaback then veered into irrelevant material, asserting that inspector Markeson in
taking notes during an inspection, asserted that operator's statements can be used against them. *Id.*
at 201-202. Tidaback took that to mean that Markeson was effectively giving him Miranda rights.
*Id.*   The Court reminded Tidaback about the subject of this hearing – Mr. Baumann's
discrimination claim. *Id.* at 203.

On the issue of whether Tidaback ever received any safety concerns from Baumann in any
fashion, whether it be a phone call or a chat, Tidaback responded, "[t]hat I recall, no." *Id.* at 204.
When the Court inquired further about this, he reiterated that "[i]n the numerous communications
that we had, I do not recall any specific safety-relatable concerns from Mr. Baumann, no." *Id.* at

33

205. Further, on the issue of safety concerns, Tidaback stated that such concerns should be voiced through the hierarchy and that Baumann did not follow that procedure. *Id.*

Given the small management group- three people – the Court did not find Mr. Tidaback's lack of recollections to be credible.

On the subject of appropriate procedure for terminating an employee, Tidaback informed that no written counseling statements are required by Missouri law and that verbal statements are sufficient and beyond that no counseling statements of any sort are required. *Id.* at 207. Though in the Court's view it is inconsequential, Tidaback denied that he ever knew that Baumann was a miners' representative until he was fired. *Id.* at 214-216. Nor, he contended, did Spears inform him of Baumann's miners' rep status. *Id.* at 216.

The Court did not find the denial to be credible.

The Respondent then turned to Ex. P-38, Baumann's termination letter. *Id.* at 222. Tidaback stated that on numerous occasions he gave Baumann counseling sessions about reading training files as he was "starting to have issues in his role." *Id.* at 223. This led to questions for Tidaback about Ex. R-B. *Id.* at 224. He identified it as notes regarding Baumann from June 26, 2022, through April 17, 2023. *Id.* at 224. The Court attempted to clarify the nature of Ex. R-B. *Id.* at 224-227. It is, Tidaback agreed, a three-page exhibit, *dated April 27, 2023,* and it reflects Teams notes. *Id.* at 226. Tidaback also agreed that the exhibit reflects his personal notes about Baumann. *Id.* at 227. There are three entries within the exhibit: The first entry, on page 1, is dated July 26, 2022, and the last is April 17, 2023. *Id.*

The Secretary had significant objections to the admission of the exhibit, noting "the document was not provided to the Secretary, adding that:

> A version of this document was provided to MSHA during their inspection. However, the document *has been modified since then* that they're offering here as an exhibit. Also, Mr. Tidaback puts in his cover page to his exhibit binder that this document is … an ongoing journal. And so it's not clear when this document was last updated or even the date here at the top here. It was [created] after Mr. Baumann's termination, and so we object to the reliability and authenticity of this document and that it does vary from what was provided to the MSHA inspector during the investigation.

*Id.* at 228, (emphasis added).

Despite these legitimate concerns, the Court admitted the exhibit, Ex. R-B. *Id.* at 229. However, the Court stated that the Secretary would be able to cross-examine about the exhibit and in doing so to have the original document, which was sent to the Secretary from Tripoli, entered in the record. *Id.*

On cross-examination, the Secretary first referred to Exhibit R-JJ. *Id.* at 235. Tidaback agreed that the last page of that exhibit, which involves an email, is dated November 13, 2023. *Id.*

Appellate Case: 25-1349     Page: 236     Date Filed: 04/07/2025 Entry ID: 5503844

at 235-236. The Secretary then presented Ex. P-45, which Tidaback acknowledged that "[i]t appears to be an e-mail from myself to Mr. Dillingham, cc'ing John Spears, Jordan Tidaback and myself …" *Id.* at 236-237. Tidaback then corrected himself stating that "it does appear to be the correspondence between myself and Mr. Dillingham." *Id.* at 237.

Michael Dillingham, it will be recalled, was the special investigator for the Baumann Complaint. Tidaback, was asked to identify page 2 of Exhibit P-45 and whether it was in response to documents that Mr. Dillingham had requested during his investigation of Mr. Baumann's complaint. *Id.* at 238-239. At that location of the exhibit, Tidaback's email states "I have attached a copy of the employee notes journal paren Rob Baumann space hyphen space notes dot PDF closed paren that I maintain on each employee." Vol. 3 Tr. 240. Stated more succinctly, the email states "I have attached a copy of the employee notes journal [for] Rob Baumann … that I maintain on each employee." *Id.*

Turning to page 7, 8, and 9 from that exhibit, Tidaback expressed uncertainty when asked "[i]s there anything about the document attached on pages 7, 8 and 9 that you do not recognize as the notes regarding Rob Baumann that you provided to Mr. Dillingham during his investigation of this matter." *Id.* at 242. Tidaback didn't deny such recognition, but insisted that he would need to verify the attachments to agree with certainty to the question. *Id.* at 242. The Secretary then moved to admit Exhibit P-45 and it was admitted. *Id.* at 243.

The Court then inquired of Tidaback about Exhibit R-B, asking if he agreed that it is not identical to those pages within Exhibit P-45. *Id.* at 246. Tidaback agreed they were not identical. *Id.* The Secretary then asked if Exhibit R-B, contains an entry for February 14, 2023, and Tidaback agreed that was true. *Id.* at 246-247. Further, Tidaback agreed that P 45 at pages 7 through 9, *does not have an entry for February 14, 2023*. *Id.* at 247. Further, Tidaback agreed that his Exhibit R-B includes an image of some Teams chat messages. *Id.* He also agreed that those notes are generated based on his [i.e. Tidaback's] writing in a wipeable notebook and then that text being uploaded into one note and that the Teams chat messages are not something that he wrote in a wipeable notebook. *Id.* at 247-248. Regarding the November 5, 2022, entry within Exhibit R B, Tidaback stated that entry "would be the date that [he] added the entry, *not the actual specific date.*" *Id.* at 248-249 (emphasis added).

Tidaback was then referred to the April 27, 2023, entry in Exhibit R-B and to Exhibit P-12, with the latter involving answers to interrogatories from the Secretary. *Id.* at 249-250. Interrogatory No. 5 asks for Tidaback to "set forth the reasons Mr. Baumann was terminated, who participated in the decision and when that date of that decision was made." *Id.* at 250. To that very basic question, Tidaback answered "[t]hat's what it states, yes, ma'am." *Id.* He was then asked, referring to page 4 of the interrogatories, whether his response identified three individuals who participated in the decision to terminate Mr. Baumann. *Id.* at 250-251. Those individuals were Russell Tidaback, Jordan Tidaback and John Spears. *Id.* Tidaback admitted the three are "in the decision-making process." *Id.* at 251. On re-direct, Tidaback stated that he makes the final decision on terminations. *Id.* at 252.

The testimony concluded at that point.

**Analysis:[28] For the Discrimination Count**

Complainant, Secretary of Labor, MSHA obo Robert Baumann has alleged that he engaged in protected activity while employed by Respondent by his making safety complaints and raising safety concerns to Respondent; by walking around with MSHA inspectors during MSHA inspections at Respondent's mine and discussing safety concerns and hazards with those inspectors during those inspections and by his participation in those inspections as the elected representative of miners and, following an MSHA withdrawal order, by inquiring of MSHA inspectors about the rights of miners to compensation in connection with withdrawal orders. Complaint at 2-3. As noted in the Findings of Fact, Inspector Markeson informed that on March 21, 2023, Baumann was elected as the miners' representative and thereafter Markeson went to the mine's office, informing them of the miners' representative and the rights that person had in that capacity. Spears admitted that Baumann told him he was the miners' representative.

Robert Baumann was hired as the production supervisor at the mine. He was employed to do production and he was the lead over production from his first day on the job to the day he was terminated. Later, workplace exams became part of his job. Though expected to write down issues he found during an exam, initially the form did not provide sufficient space to describe problems found. Baumann stated that the workplace issues he identified could not be addressed right away because either there was no maintenance person at that time or because the fix would interfere with production. He contended that only problems hindering production would be addressed immediately.

His employment was for a period of ten months, from June 16, 2022, to April 17, 2023. He was fired on April 17, 2023. Baumann stated that, per his termination letter, he was fired, allegedly, due to **poor performance, lack of leadership skills and for failure to follow procedures and guidance given to him by his supervisor.** As noted, Baumann denied that he was having any performance issues at the time he was terminated, and he affirmed that he had not been disciplined or told that his job performance was lacking prior to his termination. The Court takes note of its determination that *none* of the trio of reasons for Baumann's firing were established with any credibility. This is because virtually all of the evidence Respondent offered to support those claims were developed *after* the firing. The Court noted this deficiency during the hearing, characterizing the claimed reasons as backfilling. Vol. 1 Tr. 401.

Baumann participated in an MSHA inspection around April 12, 2023, and in an earlier MSHA inspection involving air sampling. There was an issue involving silica dust at the mine. Baumann stated that he had raised safety concerns to mine management about that dust. Further, following MSHA's issuance of a 104(b) withdrawal order for a dust hazard, Baumann stated that he raised concerns about the dust issue with management every day with operations manager John Spears and the mine's safety director, Jesse Molesi. The concerns were not fixed prior to his termination. Baumann raised the issue of miners' entitlement to pay following the withdrawal order with Spears and Molesi, but neither responded to him about the issue. The withdrawal order was issued on April 12, 2023. That order shut down the mill and it would be the last day Baumann worked at the mill. When he returned to the mill on April 17, 2023, he was fired.

_____

[28] The analyses' portions in this Decision are derived from the Court's determinations of those findings of fact, which were found to have been credible.

Appellate Case: 25-1349     Page: 238     Date Filed: 04/07/2025 Entry ID: 5503844

The subject of miners' training was brought up during the hearing. Based on the testimony of Baumann, Gage Wheeler and Carson Allman, all of whom the Court found to be credible witnesses, the Court finds that, based on their credible testimony during the hearing, the Respondent came up short in terms of meeting the required MSHA training. Baumann agreed that he received annual refresher training, but he never received task training for maintenance or electrical work at Tripoli. There is no evidence of record to contradict Baumann's claim on the issue of task training. While the Court does not find that the Respondent violated MSHA training requirements, that is because such citations which may have been issued were not part of the Secretary's case, which is limited to discrimination and interference claims. However, the Respondent did not refute those claims of insufficient training and the Court finds that, based on the credible testimony, such shortcomings were emblematic of the overall poor operations at the mine.[29]

Another instructive evidentiary finding by the Court is the unrefuted remark by Baumann that during his employment there was a great deal of employee turnover for mill maintenance. This is instructive in understanding this operation.

On the subject of communication, the mine employed Microsoft Teams, as the messaging system at the mine. It was referred interchangeably at the hearing as "Microsoft Teams Chats," or as "Teams Chats," or "Teams." At bottom, it was simply an email messaging system for the mine's employees.[30]

**The Respondent's claim that Baumann had poor performance.** Baumann stated that no one at Tripoli ever told him he had to meet a certain production quota and he denied that Mr. Tidaback ever told him he had to meet a 40,000 lbs. daily production quota. He added that the 40,000 lbs. per day goal was not realistic due to equipment problems and weather issues, among other reasons. Baumann maintained that he never spoke with Mr. Tidaback or Mr. Spears about meeting production quotas or goals and further that he was never counseled for not meeting production demands. To the contrary, he was given positive feedback regarding the production he was able to achieve from John Spears with such praise coming about a month before he was fired.

---

[29] Instead of showing that all training was conducted, the Respondent tried to make an issue that Baumann had signed the initial new miner training certificate as having been completed. Baumann credibly responded that, when he signed the form, he did not know what that training actually required. See the Court's earlier footnote 10 on this issue in the Findings of Fact.

[30] As noted in the findings of fact, there were certainly ample means to communicate with one another at the mine. As Baumann informed, there were groups of American Tripoli employees communicating with each other on Teams. There were multiple, different, categories such as a maintenance group, a general group, a mill management and a production group. People could also communicate individually. Baumann was able to communicate with John Spears in this way too. In contrast, Baumann described his communication with Mr. Tidaback as only "on occasion." However, Baumann informed that Tidaback would be able to view messages sent through Teams. Significantly, Baumann stated he was never told that he failed at using Microsoft Teams effectively while working at American Tripoli. The Court notes there is no record evidence contradicting Baumann' statement about his effective use of Teams Chat.

Appellate Case: 25-1349    Page: 239    Date Filed: 04/07/2025 Entry ID: 5503844

The mine's own production records make it clear that output of 40,000 lbs. per day was aspirational, a fiction, not a fact.[31]

The claim of Baumann's alleged poor performance was never documented, such as through Teams or through some disciplinary remark.

Baumann maintained that operations problems were a source of diminished production. Equipment problems and an insufficient number of employees were contributors to this. Not to be overlooked, on one occasion, dust emanating from the mill was so serious an issue, as it was reaching the city, that it prompted the local police to come to the site. MSHA too impacted production by its shutting down the mill operation.

As Spears admitted, debunking Tripoli's claim that Baumann was deficient in performing his job, he never disciplined Baumann while he was an employee at Tripoli. Spears added "I don't remember ever doing any kind of a counseling notice or a write-up or anything like that." Vol. 3 Tr. 145. Spears asserted that Baumann was fired for 'production issues' but the record shows that production at the mill was irregular, rarely meeting the aspirations. Beyond that, there was simply no record evidence to support the claim that Baumann was failing in meeting those illusory goals. Spears himself admitted that the goal of producing 40,000 lbs. per day of product has only been met 20 to 30 times during the entire time he has been employed at Tripoli. That's a span beginning in August 2022 to the date of the hearing. The record, overall, shows that goals were not met because there were multiple equipment problems, and inadequate repair to address those problems and hazards, such as dust, making the Mill unsafe to operate.

Spears also blurred the distinction between performance and production. As he said, "[i]f your production's not showing what it's supposed to be, then it would be your performance toward that goal." *Id.* at 151.

Critically, and strong evidence refuting Tripoli's claims that it had issues with the quality of Baumann work before firing him, when Spears was asked if he had conversations with Tidaback discussing terminating Baumann months before he was fired, Spears' answer was plain and direct: "No." *Id.* at 152. Though Spears answer left no doubt, when asked if it was correct to state that, overall, he did not have a lot of complaints about Baumann and that his only complaint had to deal with meeting production quotas, again Spears answered succinctly, responding "Yes." *Id.* at 156.

Very clearly, Mr. Spears honest testimony augmented the Secretary's case.

---

[31] If the mine was running well, the mine would run about 15,000 pounds in product and during Spears 18 months of employment the 40,000 lbs. of product goal was only met 20-30 times. Ironically, during the last six weeks of Baumann's employment, Tripoli approached the 40,000 lbs. goal more than once. Sec. Br. at 24.

Appellate Case: 25-1349     Page: 240     Date Filed: 04/07/2025 Entry ID: 5503844

**Baumann's Role in Safety**

Baumann contended that he was never in charge of safety while at Tripoli, nor was he given any training on that subject at Tripoli. Further, he was never tasked with ensuring that the mill was complying with MSHA standards. He asserted that during the 10 months of his employment for at least 3 or 4 of those months there was no one employed with the role of safety at Tripoli. When no one was employed for safety, John Spears would be in charge of safety. When safety issues were raised to Spears, Baumann informed that, unless the issue would shut down operations, they were to keep running. No testimony from the Respondent contradicted Baumann's assertions on this issue.

In contrast, Baumann's duties did include keeping track of the hours that miners worked. As with every other task he acknowledged to be within his duties, he was never told that he was failing at that task. Handling shipping and receiving paperwork were also part of his job duties, and for this responsibility too, he was never told of issues with his performance for that duty. Every contention of Baumann's alleged failures arose after he was fired. The Court concludes that, as it stated at the hearing, this was an attempt to backfill the claim of Baumann's shortcomings, and as such the Court can only conclude that the reasons were contrived.

**Baumann's Presence During MSHA Inspections**

Baumann's testimony is uncontested that, during MSHA inspections in the time frame of February through April 2023, he walked around with MSHA inspectors on multiple days and that Spears was with Baumann during some of those times and observed Baumann with the MSHA inspectors. In fact, a Teams message to Tripoli employee Wheeler from Spears on February 14, 2023, informed "Gage Wheeler, do not answer any questions about the -- that the MSHA inspector may have. Do not go into the mill. I'll be the person who talks to me [sic] inspector." Vol. 1 Tr. 154. The participants in that Teams chat included Baumann, Wheeler, Spears, Russell Tidaback, and Jordan Tidaback.

This is an indisputable example of Tripoli management's animus towards its employees involvement with MSHA inspections and, as discussed below, it also constitutes interference with its employees exercising their protected rights. As noted above, the Court finds that those messages were plainly and expressly warning the employees, improperly, that they were not to speak to MSHA. The Court views Jordan Tidaback's follow-up message as simply an attempt to repair the plain import of that message, a failed attempt to put an innocuous gloss on the warning. There were serious results from that February 14, 2023, inspection, as MSHA then shut down an area of the Mill.

The record shows that maintenance was a step-child to production at the Mill. For example, Tidaback, referring to employees working less than 40 hours that week may want to do weekend work to attain those hours. What is more instructive about the remark is Tidaback's remark that "[w]e don't want to use production schedule time to do maintenance." *Id.* at 210.

**Tripoli's Animus Towards MSHA**

The record is replete with examples showing Tripoli's animus, misguided as it was, towards MSHA. A March 31, 2023, Teams message from Tidaback says it all: "I will stress with you -- any MSHA inspector is not your friend. Anything you say to or in their presence can," in all caps, "and will be used against you in court of law. Hopefully this will never be needed, but just be well aware." *Id.* at 216-217. This remark alone sinks Tripoli both with regard to the discrimination and interference counts. The Findings of Fact identify other such inappropriate remarks. A few examples make this abundantly clear:

On April 19th Tidaback's messaged: "MSHA just compounds the problem 10 X but not working with us and being *fucking dicks*." *Id.* at 260, (emphasis added).

On the same date, Tidaback stated:

This [MSHA Inspector] Keith [Markeson] jackass... he gets his jolly off handing out citations... *this fucker is a snake*.[32] When he is -- when he's around you better watch what you say and do... *he is out to fuck you* or anyone else he can.

*See* Findings of Fact, *supra*. (emphasis added).

The testimony of Gage Wheeler is in line with this observation. Wheeler was hired as a maintenance person. Overall, as noted in the Findings of Fact, his testimony did not paint a safety conscious picture of the operation. Spears telling him to "steer clear" during an MSHA inspection evidences this animus towards MSHA. Wheeler understood the messages, quite reasonably in the Court's view, that he was not to talk with MSHA. As noted below regarding the interference count, Spears "steer clear" message amounts to interference as well.

It is noted that Ex. P-9, a Teams Chat, dated February 14, 2023, involved a message from Spears to Wheeler advising that he not speak with MSHA. Vol. 2 Tr. 175. In one Teams Chat message to Wheeler, on February 11, [2023] he was advised to not volunteer information to MSHA.

The testimony of Carson Allman reinforced the testimony of other witnesses. As noted, when he received his new miner training, Tidaback told him mostly just not to tell any stories about the mill itself to the MSHA inspectors. His testimony too is tantamount to interference, effectively an attempt to silence employees from exercising their rights when MSHA inspectors were on the site. Ms. Kensley Brewer, another former Tripoli employee, told the same story, reporting that Spears told her that Tidaback said they were not supposed to talk to the MSHA inspectors.

---

[32] Spears displayed the same animus to MSHA earlier when, on April 14th, on the Teams message he made this virulent remark, "I'm telling you guys... [MSHA inspector] Keith [Markeson] is a snake... be cautious on what you say to and around him. *Any MSHA inspector really*." Vol 1. Tr. 276, (emphasis added).

40

**Baumann Raises More Safety Complaints in February 2023**

Baumann started raises more safety complaints in February 2023. He raised these safety issues with Spears. These coincided with his walking around with MSHA inspections at the mill.

**Tripoli's Attempt to Show it Fired Baumann Because MSHA Issued Citations to the Mill Fails**

Tidaback tried to show that by virtue of MSHA's issuance of citations, this meant Baumann was not doing his job. Even if, for the sake of argument, the citations could be placed at Baumann's doorstep, there is no record that Tripoli ever stated anything to Baumann about this claim prior to firing him. Thus, Tidaback was left with nothing more than his claim, at the hearing, that Baumann's alleged shortcomings were responsible for those citations being issued. Such mere assertions are insufficient.

**The Testimony of Russell Tidaback**

As mentioned earlier, when testifying about Tripoli's disciplinary process, Mr. Tidaback placed emphasis that Missouri is a right-to-work state and as such that he can fire anyone without any notification. And, while he acknowledged that the process had an order to it – verbal, written and then immediate termination, he stated that order could be ignored, or be applied in any order. Thus, he affirmed, Tripoli does not need to follow the order of its process.

Also, as mentioned earlier, he asserted that he hired people to replace Baumann, contending that four were hired for that purpose. None of them worked out, with none working for more than one month. But a greater oddity was that Tidaback needed Baumann, the allegedly deficient employee, to stay on to train the replacements.

On the issue of whether Tidaback ever received ever received any safety concerns from Baumann in any fashion, whether through a phone call or a Teams chat, as the Court noted, supra, Tidaback responded, "[t]hat I recall, no." Vol. 3 Tr. 204. When the Court inquired further about this, he reiterated that "[i]n the numerous communications that we had, I do not recall any specific safety-relatable concerns from Mr. Baumann, no." *Id.* at 205. Regrettably, the Court, observing Mr. Tidaback closely during those answers, concluded that he was not credible.

Mr. Tidaback also denied that he ever knew that Baumann was a miners' representative until he was fired. Nor, he contended, did Spears inform him of Baumann's miners' rep status. Given the extremely small management group at Tripoli, essentially Tidaback, his daughter, Jordan, and Spears, the Court finds that it is highly unlikely that this assertion was true.

Appellate Case: 25-1349    Page: 243    Date Filed: 04/07/2025 Entry ID: 5503844

In terms of Baumann's termination letter, it is noted that Tidaback asserted, on numerous occasions, that he gave Baumann counseling sessions about reading training files. To say the least, there were problems with Tidaback's effort to substantiate that claim, as the exhibit offered, Ex R-B, was dated April 27, 2023, a date *after* Baumann was fired. There were several other problems with that Exhibit, as set forth in the Findings of Fact. While the Court admitted the exhibit, the weight given to it is nil, for the reasons set in forth in the Findings of Fact.[33]

**An Important Event Just Before Baumann is Fired; a Nexus Writ Large**

As noted in the Findings of Fact, an MSHA inspection that began on April 11th, was just six days before Baumann was fired. Baumann participated in that inspection and Spears knew that. A 104(b)-withdrawal order was issued that day. Baumann told Spears that, as a consequence of the shutdown resulting from the (b) order, Mill employees would have to be paid. Baumann, like the other employees, was sent home. He returned to the mine on April 17th on which date he was terminated.

**Tripoli's First Attempt in Point of Time to Justify Baumann's Firing**

On April 14, 2023, Tidaback stated "Rob [Baumann] 's termination will be based on production performance. Not following guidance given by management. Not ensuring the safety of the mill associated by utilizing the proper controls, etcetera. He doesn't have to sign it. We just need to have a document of why he was let go." Vol. 1 Tr. 245.

Tidaback's remark shows the reason for firing Baumann was pretextual and invented. Baumann denied each of these alleged deficiencies and Tripoli presented no earlier evidence demonstrating them. Though the remark above is more than sufficient, Tidaback's message to Huber on April 28, 2023, a date after Baumann's firing, states "I need the justification since Rob's complaint to MSHA about being let go... *Just need you to put the cherry on the cake*. That's all." *Id.* at 267 (emphasis added).

As the Secretary notes, protected activity may take several different forms. These include

---

[33] As the Secretary notes and the Court so finds, regarding Respondent's Exhibit: R-B, Tidaback's personal notes, that exhibit is quite suspect and is disregarded by the Court as a failed attempt to justify Baumann's termination. As the Secretary correctly remarks, those "notes were not produced in the form seen in R-B during MSHA's investigation. Rather, Respondent provided *a different version* of those notes than in P-45. In Ex. R-B, an entirely new entry, dated February 14, 2023, that was not provided MSHA, was the date Baumann started walking around with MSHA pointing out certain safety concerns he had to MSHA and AT. [ ] There is no reason why, if this entry was made contemporaneously with the event, it would not appear in the version of the document provided to MSHA. Another indication that these notes are not reliable is the date of the document. R-B is dated not only after Baumann was terminated, but on the same day Tidaback was served with Baumann's discrimination complaint. [ ]. These inconsistencies solidify that these "notes" are not a reliable or credible source of information and are nothing more than AT backfilling a reason to terminate Baumann, after he was terminated. Not only are there issues on the face of R-B, but the substance of the document was not supported by the testimony at trial. Sec's Br. at 48.

making safety complaints to MSHA or the mine operator, and acting as the miners' representative, which includes walking around with MSHA inspectors during an inspection. Sec. Br. at 35. As reflected in the Findings of Fact, Baumann made multiple safety complaints directly to Spears, and Tidaback and through Teams Chat. The events very close in time to Baumann's firing, all as set forth in the Findings of Fact, demonstrate the attempt by Tidaback to contrive reasons to justify that action. One does not speak idly of putting the "cherry on the cake," as Tidaback expressed, for terminating an employee.

With no choice but to express it bluntly, the Court concludes that Tripoli presented no credible defense. If anything, Spears' testimony supported Baumann's claim. Further, as the Court noted during the hearing, Mr. Tidaback's claims, almost all of which arose after Baumann was fired, amounted to backfilling and, as such, were not credible.

**Additional Observations.**

**Mr. Baumann's Discrimination Complaint**

Mr. Robert Baumann engaged in multiple instances of protected activity. The adverse action is undisputed: Baumann was fired on April 17, 2023. The termination was motivated by Baumann's protected activity, clearly meeting the "but for" test, as described above. Per the discussion above, Baumann made several safety-related complaints to management at the mine and made safety complaints to MSHA. He also served as the miners' representative, walked around with MSHA during inspections, and discussed safety issues with MSHA, all of which are protected rights afforded by the Act. He would not have been fired but for his safety complaints. No other legitimate basis for Baumann's termination was presented by Respondent Tripoli.

As the Secretary accurately summarized,

During his time at American Tripoli, Baumann made multiple and repeated safety complaints to Spears and Tidaback in person and via Teams, including increasingly more safety complaints in the last two months of his employment. … The safety issues Baumann raised, … included complaints about the dangerous silica dust that was not being properly controlled, concerns about a guard that nearly fell on Baumann, multiple electrical issues including a live wire Baumann found while sweeping that sparked a miners' broom, rags being stuffed into bearings, and concerns about manually stacking 100-pound bags over six feet high. … Baumann walked around with MSHA during inspections and made safety complaints to MSHA, including a complaint to MSHA that triggered a new inspection on March 28, 2023, and [he] participated in MSHA inspections by walking around with MSHA inspectors and pointing out and discussing safety issues with MSHA inspectors during those inspections. … Baumann also became a miners' representative on March 21, 2023, and in that role exercised his right under the Act to walk around with MSHA during their inspections, raised his safety concerns to MSHA, and brought the safety concerns of other miners to MSHA. … Baumann also exercised his and other miners' statutory right to be paid during the 104(b) Orders.

43

Sec's Post-Trial Brief at 35.

**Tripoli's Initial Brief**, consisting of five pages, began with the assertion that Baumann "was terminated on legitimate, non-discriminatory grounds related solely to documented performance issues, which were persistent and detrimental to operational efficiency. … there is no credible evidence linking his termination to his safety complaints or MSHA interactions—activities that the Respondent acknowledges and supports as part of its commitment to safety." Tripoli Brief at 1.

Succinctly stated, the Court finds otherwise with each of those assertions, findings amply supported in the record.

Tripoli maintained that Baumann was fired "strictly due to job performance and operational requirements." *Id.* at 2. It then immediately turned to its right "exercise discretion in its disciplinary measures." *Id.* It is revealing that Tripoli emphasizes its unfettered discretion regarding discipline. That discretion, Tripoli advises, means that it "is not required to adhere to a fixed sequence of progressive discipline steps and may terminate employment without prior written warnings if operational exigencies or substantial performance failures warrant such immediate action." *Id.*

Tripoli, through Tidaback, justifies its right to sidestep its own disciplinary procedures to provide "the necessary flexibility to manage its workforce effectively and ensure operational integrity without being constrained by a rigid disciplinary procedure." *Id.*

That disciplinary procedure, it must be said, is Tripoli's creation. That is to say, it was not foisted upon it by some outside force.

Tripoli then turns to its assertion that its Exhibit R-JJ establishes "the absence of any MSHA record recognizing Mr. Baumann as an official miners' representative." *Id* at 2. Tripoli combines this claimed absence with its "application of flexible disciplinary policies that comply with the company's handbook." *Id.*

There are problems with this contention. To begin, it is not necessary to be a miners' representative to have the Mine Act's protections against discrimination. Further, the Court finds that Tripoli did in fact know of Baumann's status as a miners' rep. As noted above, and during the hearing itself, the Court identified problems with Tripoli's claim that its termination procedure is within its complete discretion, a view which it somehow ties to Missouri being a right-to-work state.

As for the Interference claim, Tripoli acknowledges that its "internal communications, such as the message from Mr. Spears to Mr. Wheeler on February 14th, might imply interference," but that, in context, those communications were simply to ensure that the most knowledgeable person, i.e. Mr. Spears, speak with MSHA. *Id.* Thus, Tripoli maintains that the messages were simply "operational in nature and aimed at ensuring effective communication during MSHA inspections." *Id.* at 4.

44

The Court finds that the words in the Teams messages, and the credible hearing testimony, clearly refute this assertion.

**Tripoli's Reply Brief**

Tripoli continued the theme of its Initial Brief, to wit, there was no discrimination or interference, contending that its actions were simply "well-intentioned operational decisions." Reply at 1. Tripoli essentially repeats the claim in its Initial Brief that Baumann was fired due to "persistent performance issues that directly impacted operational efficiency." *Id.* at 2. Thus, it reiterates its position that those "policies allow the company to terminate employment without prior written warnings if substantial performance failures warrant such immediate action, ensuring that operational integrity is not compromised by inadequate job performance." *Id.*

Similarly, Tripoli repeats the contentions it made in its Initial Brief that there was no interference, as its concern "was operational, aimed at ensuring that accurate and relevant information was communicated to inspectors." *Id.* It then touts its training programs and policies, referring to Exhibits P-14 and P-16. *Id.*

Regrettably, the Court finds that the credible hearing testimony tells a very different story.

Last, Tripoli contends that "[g]eneralized scenarios from other cases do not satisfy the legal burden of proof, which demands clear and convincing evidence specific to the circumstances at hand." *Id.* at 4. It also asserts that the Secretary has used "reliance on speculative linkages from other cases [and that this is] insufficient for establishing a causal connection in this case [and such cases] do not replace the need for specific evidence in proving individual claims of discrimination or interference. *Id.*

The Court, based on the testimony from those witnesses it found to be credible and the Secretary's documentary evidence admitted at the hearing, concludes that the Secretary's case clearly established each of the claims.

As the Court noted during the hearing, a central problem for the Respondent was that at the time he decided to discharge Mr. Baumann, of necessity Tripoli would have had to have some sort of record established prior to discharging him as to the grounds for his discharge. The Court added that it didn't know of any exhibit thus at that point in the hearing that identified Baumann's deficiencies such as that would warrant Mr. Tidaback basis for firing him, regardless of protected activity. In fact, it was not just the lack of identified deficiencies warranting firing Baumann; Tripoli never identified any deficiencies at all prior to terminating Baumann.

In fact, as the Court also stated during the hearing, Tidaback's efforts to create grounds for Baumann's firing were in the nature of backfilling, that is, to invent grounds after firing him. In short, Tripoli's grounds were contrived, not genuine.

**The Secretary's Count Alleging Interference with Miners' Rights**

On the issue of interference, an equally clear case was presented. Tripoli interfered with the Mine Act's rights of miners on multiple occasions. As described above, Tidaback's own words show direct motivation to fire Baumann. Beyond the ample direct evidence, circumstantially the

Appellate Case: 25-1349     Page: 247     Date Filed: 04/07/2025 Entry ID: 5503844

evidence is overwhelming that Tripoli knew of Baumann's protected activity, and, to say the least, did not take it well. Tripoli did not want interaction with MSHA Inspectors. Tidaback expressly stating that "everyone needs to stop calling MSHA" is plainly interference. Derogatory remarks, replete with expletives, were made about the MSHA inspectors and employees were advised to steer clear of them.

**Baumann's Damages**

Finding that Mr. Baumann was unemployed for 62 days after his termination, the Court awards **$9,920.00** in back wages to him.[34] The Court also awards interest on back pay in the amount of **$632.00** through February 27, 2024 **plus the additional interest accrued from that date to the *actual date of payment*, (which is presently unknown),** applying the same *Arkansas-Carbona Co.* 5 FMSHRC 2042 (1983) formula ("*Arkansas-Carbona*") for the additional interest.

The Court finds that the other expenses Baumann incurred in searching for a job: inability to keep up with his bills, needing to sell possessions to meet such bills, gasoline costs incurred from driving to unemployment offices and to the days of the hearing, were all insufficiently supported as they were without receipts to establish those expenses and so must be denied.

---

[34] In awarding this backpay, the Court subscribes to the Secretary's remarks in its Post-Hearing ("Post-Trial") Brief, wherein it noted: "During Baumann's unemployment, he collected unemployment benefits from the State of Kansas. (See Vol. 1 Tr. 285:11-14; 290:9-21). However, none of these amounts should be subtracted from an award of back wages to Baumann. The Commission has recognized that unemployment should not be deducted from the backpay awards of miners discharged in violation of Section 105(c). *See Secretary of Labor on behalf of Poddey v. Tanglewood Energy, Inc.*, 18 FMSHRC 1315, 1325 (August 1996) (citing the Fourth Circuit's decision in *Secretary of Labor on behalf of Wamsley v. Mutual Mining, Inc.*, 80 F.3d 110 (4th Cir. 1996) and reversing the judge's deduction of unemployment compensation from the Complainant's backpay award). In addition, the State of Kansas requires Baumann to pay back the unemployment he received if he receives any back wages award. *See* K.S.A. § 44-706(s)(1) ("For any such weeks that an individual receives remuneration in the form of a back pay award or settlement, an overpayment will be established in the amount of unemployment benefits paid and shall be collected from the claimant."). As such, subtracting unemployment benefits from the award would charge Baumann double for the unemployment benefits as he would still be required to pay back the State of Kansas." Sec's Br. at 50, n. 24.

Appellate Case: 25-1349    Page: 248    Date Filed: 04/07/2025 Entry ID: 5503844

**The Court's Imposition of Civil Penalties for Tripoli's Interference and Discrimination Acts.**

**Tripoli's Interference**

Interference is a separate and distinct violation of the Mine Act.[35] The Court agrees with the Secretary's remarks that:

> The evidence at trial established it was part of the cultural fabric at AT to interfere with miners' rights. Management at AT, including Tidaback, Ms. Tidaback, and Spears, repeatedly and regularly told miners not to talk to MSHA, not to participate in MSHA inspections, and even made veiled threats that if a miner did speak to MSHA they would be terminated. The evidence at trial introduced numerous Teams chats from management consistently reminding miners to not speak to MSHA, many of which were sent during or after MSHA inspections, including inspections which were initiated based on miner complaints. The messages sent, which were also reinforced during repeated verbal conversations to multiple miners, could not be more clear: "do not talk to MSHA," "MSHA inspectors are NOT your friend," anything you say to MSHA "can AND WILL be used against you in a court of law" and "EVERYONE needs to stop calling MSHA." Further, miners testified at the trial that it was a pattern and practice at AT to avoid any contact with the inspectors, and miners were told by Spears and Tidaback that their participation and speaking to MSHA could cause them to be personally be issued citations. These statements, when viewed from a miner's perspective, would tend to interfere with miners' rights to raise safety issues to MSHA. Indeed, the miners at AT interpreted these messages from Spears and Tidaback as interfering with their rights, as they were fearful of speaking to MSHA because of these statements. Inspector Licklider testified that the miners at AT appeared nervous when MSHA was there, and their behavior was out of the ordinary from the miners at other mines. (¶ 93). In addition, Baumann was fearful to speak to MSHA, other miners told him they were fearful to speak to MSHA, and Wheeler testified he was concerned he would be terminated if he volunteered information to MSHA after being told not to by Spears. Any reasonable miner would have taken these multiple, ongoing statements about not

---

[35] In this respect, the Court also agrees with the Secretary's remarks on the issue of interference, to wit: "under section 105(c) of the Act interference is a separate and distinct violation from discrimination. *McNary v. Alcoa World Alumina, LLC*, 39 FMSHRC 433, 449 (2017) ("Section 105(c)(3) permits an individual to file a complaint charging 'discrimination or interference' in violation of section 105(c)(1)."). The Acting Secretary interprets the Act as prohibiting acts that reasonably tend to interfere with protected rights, the motive for those acts notwithstanding. *See, e.g. Marshall Cnty. Coal Co. v. FMSHRC*, 923 F.3d 192, 198-99 (D.C. Cir. 2019); *Franks v. Emerald Coal Res., LP*, 36 FMSHRC 2088, 2108 (2014). The Court should find a violation of the interference provision of Section 105(c) of the Act if: "(1) a person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and (2) the person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights." *Franks*, 36 FMSHRC at 2108." Sec's Br. at 52-53.

Appellate Case: 25-1349     Page: 249     Date Filed: 04/07/2025 Entry ID: 5503844

speaking to MSHA and not volunteering information to MSHA from AT management as preventing them from exercising the right to speak to MSHA about safety concerns at the mine. This is particularly true when AT management's comments directly referenced prior miners who spoke to MSHA and then were swiftly terminated.

Sec.'s Br. at 53-54. (Sec's references to cited paragraphs from its brief were omitted).

There was utterly nothing presented by Tripoli to excuse its interference.

**Analysis: For the Interference Count**

The Secretary, upon investigation, alleges that Respondent interfered with Mr. Baumann's rights and that of at least one other miner in violation of Section 105(c)(1) of the Mine Act in that, on February 14, 2023, MSHA was conducting an inspection of the Respondent's Mine and on that date Complainant Baumann and another miner received a message via Microsoft Teams from John Spears, Respondent's operations manager, telling the miner not to answer questions from the MSHA inspector, to not go in the mill, and Spears as the operations manager continued to state that he would be the person who would talk to the MSHA inspector. Further, at other times during Complainant Baumann's employment, Respondent told miners not to speak to MSHA during MSHA inspections. Complaint at 3-4.

In the Exhibit P-34, a Teams message, Tidaback states: "Everyone needs to stop calling MSHA." Vol. 1 Tr. 265. This is interference plain and simple. Further, MSHA Inspector Markeson testified, credibly in the Court's view, that shortly after his inspection in February 2023, *three miners* told him they were told not to speak with MSHA and they showed him text messages supporting that claim.

The Secretary contends that those statements to miners, as described above, illegally interfered with the exercise of the miners' statutory rights in violation of Section 105(c)(1) of the Mine Act by intimidating miners against engaging in activities protected by the Mine Act, including miners' protected right to report safety issues to MSHA. Complaint at 4. The Court agrees.

**Imposition of Civil Penalty for Each of the Two Counts.**

The Court has given due consideration to each of the two counts brought by the Secretary of Labor. As noted by the Secretary and about which the Court agrees:

The Commission considers six statutory factors in its penalty assessment: (1) the operator's history of previous violations; (2) the appropriateness of such penalty to the size of the business of the operator charged; (3) whether the operator was negligent; (4) the effect on the operator's ability to continue in business; (5) the gravity of the violation; and (6) the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation. 30 U.S.C. § 820(i). The Court should award a separate penalty for the discrimination

Appellate Case: 25-1349     Page: 250     Date Filed: 04/07/2025 Entry ID: 5503844

violation and the interference violation, as the Act requires a civil penalty for "each such violation" of the Act. 30 U.S.C. § 820(a).

Sec. Br. at 55.

The Court agrees that separate penalties are fully warranted in this case.

Continuing with its penalty recommendations, and about which statutory considerations the Court also wholeheartedly agrees, the Secretary notes:

> The Acting Secretary assessed a penalty of $15,000 for the discrimination violation and $17,500 for the interference violation based on information gathered during MSHA's investigation. AT's violations of the Act by interfering with miners' rights and discriminating against Baumann are serious offenses which exhibit a lack of good faith and a high degree of negligence. AT discouraged miners from speaking to MSHA about the multiple safety issues at the Mine, putting miners in serious danger, as evidenced by the hazardous conditions miners testified to, like cutting off a lock while maintenance work was being performed, not having ladders, dangerous silica dust exposure, and electrical sparks. AT discouraged miners from speaking to MSHA during ongoing MSHA inspections, including MSHA inspections triggered by miner complaints and during inspections where Baumann was raising safety complaints to MSHA and participating in MSHA inspections as a miners' representative. AT went out of their way to ignore miner safety complaints, disregarded MSHA standards and miner safety, failed to provide training, and ultimately terminated Baumann, who was the miners' representative and was trying repeatedly, against strong resistance and constant interference and intimidation, to improve miner safety at the Mine. *See Highland Mining Co.*, 37 FMSHRC 2436, 2438 (Oct. 2015) (ALJ) (finding mine operator's interference with a miners' representative's rights was serious considering the important function that miners' representatives serve in ensuring a safe and healthy environment for miners). AT has not exhibited any good faith in complying with the Act …"

*Id.* at 55-56

Although the Secretary conceded that AT had no previous discrimination violations at the time the penalties were assessed, it then asserted that AT has an extensive recent history of safety and health violations, and these past violations must be considered as part of the penalty assessment.

The Court does not agree with the Secretary. The Secretary's regulations addressing violation history interprets the language to include "[o]nly assessed violations that have been paid or finally adjudicated, or have become final orders of the Commission." 30 C.F.R. § 100.3(c); *See, for e.g.*, *GMS Mine Repair,* 72 F.4th 1314, 1318 (D.C. Cir. 2023) and *Brody Mining*, 36 FMSHRC 2027, 2038, (Aug. 2014). Tripoli's current ownership, headed by Mr. Tidaback, was acquired in June 2021. Vol. 1 Tr. 40. Accordingly, the history, being so recent, and outside of consideration, does not count for and against Tripoli.

In the same vein, the Secretary's argument regarding AT's history of violations, while reacknowledging that it did not have a history of Section 105(c) violations, still remarks that "MSHA assessed a subsequent penalty against AT for terminating *another*[36] miner in violation of Section 105(c) in a case still pending with the Court." Sec. Br. at 33, (emphasis added).

The Court departs from and disagrees with the Secretary's remark that it should consider another discrimination claim, which claim is unresolved and involves another employee of Tripoli. That case is assigned to another administrative law judge. Being outside of the proper scope of Tripoli's violation history, that other case plays no role in the Court's penalty determination.

Speaking to the factors of size and ability to continue in business, the Secretary remarks: "the record establishes AT is a small employer, but AT did not present any evidence that any civil penalty assessed would cause the company to go out of business." *Id*. at 57. Those remarks are accurate:

In terms of the civil penalties sought by the Secretary for the discrimination and interference counts, the Respondent states only that both counts should be dismissed in their entirety. Thus, Tripoli made no contentions about any of the statutory penalty consideration such as its size, violation history, and good faith in achieving rapid compliance.

The mine's small size, was considered, as was the absence of any contention that the penalties sought by the Secretary would interfere with its ability to continue in business. Nevertheless, considering the Court's conclusions that the negligence, gravity and lack of good faith associated with Tripoli in this matter were of such a serious level that, at a minimum, the penalties sought were fully warranted. *See* the Court's extensive Findings of Fact, fully supporting its determinations regarding those three penalty factors.

## ORDER

Based on the foregoing Findings of Fact and the Court's Analysis, the Court **ORDERS** a civil penalty in the amount of $15,000.00 for the discrimination violation and $17,500.00 for the interference violation.[37] Given the entire record in this case, including Tripoli's high degree of negligence, the lack of good faith, and the Court's determination that Tripoli's assertions lacked credibility, the Court could well have imposed larger penalties for these Counts.

---

[36] The improperly cited case, *Hoover v. AT*, does at least explain the Secretary's mistaken reference in its Brief to Hoover, when it meant Huber.

[37] Pending any appeal rights, the Respondent is to pay the full imposed penalty amounts within 30 days of the date of this decision. Penalties may be paid electronically at Pay.Gov, a service of the U.S. Department of the Treasury, at https://www.pay.gov/public/form/start/67564508. Alternatively, send payment (check or money order) to: U.S. Department of Treasury, Mine Safety and Health Administration, P.O. Box 790390, St. Louis, MO 63179-0390. It is vital to include Docket and A.C. Numbers when remitting payments.

Appellate Case: 25-1349    Page: 252    Date Filed: 04/07/2025 Entry ID: 5503844

Regarding Complainant Robert Baumann, as set forth above, the Court awards damages in the amount of **$9,920.00 in back wages** to him. The Court also awards interest on backpay in the amount of **$632.00 through February 27, 2024, plus the additional interest accrued from that date to the actual date of payment, which date is presently unknown,** applying the *Arkansas-Carbona* formula for the additional interest. Tripoli is **ORDERED** to pay these amounts to Mr. Baumann.

The Court **ORDERS** that Tripoli shall remove from Robert Baumann's personnel file any mention of any employment action stemming from this incident and to expunge Baumann's termination from his personnel record and only provide a neutral reference for any inquiries regarding him.

Further, American Tripoli is ORDERED to post a notice at Tripoli's Mill, in a conspicuous location, and on hard stock board of at least 11 x 17 inches size, setting forth the rights of miners protected by 105(c) of the Mine Act. Given the mine's history of rapid employee turnover, the notice shall remain in place for 1 year. If weather or other factors cause the notice to become deteriorated, a new notice of equivalent composition shall be posted.

**SO ORDERED**

_William B. Moran_

—————————————————

**William B. Moran**
**Administrative Law Judge**


Distribution List:

Russell Tidaback, Jordon Tidaback, American Tripoli, 222 Oneida Street, Seneca, MO 64865 (Russell.Tidaback@AmericanTripoli.com) (RTidaback@deedyco.com)

Laura O'Reilly, Esq., U.S. Department of Labor, 2300 Main Street, Suite 10100, Kansas City, MO 64108 (oreilly.laura.m@dol.gov)

Elaine M. Smith, Esq., U.S. Department of Labor, 2300 Main St., Suite 10100, Kansas City, MO 64108 (smith.elaine.m@dol.gov)

Quinlan B. Moll, Esq., U.S. Department of Labor, 2300 Main St., Suite 10100, Kansas City, MO 64108 (Moll.Quinlan.B@dol.gov)

Robert Baumann, (baumannr24@gmail.com)

**June 18, 2024**

|  |  |  |
|---|---|---|
| SECRETARY OF LABOR, | : | |
|   MINE SAFETY AND HEALTH | : | |
|   ADMINISTRATION (MSHA) | : | |
|   o/b/o ROBERT BAUMANN | : | |
|  | : | |
|       v. | : | Docket No. CENT 2023-0251-DM |
|  | : | |
| MOSENECAMANUFACTURER, LLC | : | |
|   d/b/a AMERICAN TRIPOLI | : | |
|  | : | |

## <u>DIRECTION FOR REVIEW</u>

Pursuant to Commission Procedural Rule 71, 29 C.F.R. § 2700.71, and section 113(d)(2)(B) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 823(d)(2)(B), the undersigned Commissioners vote to grant *sua sponte* review of the Administrative Law Judge's May 23, 2024 decision issued in the above-named case.

Review is directed on the grounds that the decision may be contrary to law. Specifically, we order review of whether the Judge's decision is contrary to law regarding the meanings and applications of the "discrimination" and "interference" provisions in complaints brought pursuant to §105(c) of the Mine Act, 30 U.S.C. § 815(c), and whether the provisions are ambiguous and deserving of deference to the Secretary's interpretation.

The parties shall file briefs in accordance with 29 C.F.R. § 2700.75(a).

_____
Timothy J. Baker, Commissioner

_____
Moshe Z. Marvit, Commissioner

Distribution List:

Russell Tidaback
Jordon Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Elaine M. Smith, Esq.
Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov

Robert Baumann
baumannr24@gmail.com

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 222-2-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

UNITED STATES OF AMERICA

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

## PETITION FOR DISCRETIONARY REVIEW

MOSenecaManufacturer Limited Liability Company d/b/a American Tripoli ("American Tripoli") respectfully requests review of the ALJ's decision in Docket No. CENT 2023-0251-DM finding that it violated 30 U.S.C. §815(c)(1) by discriminating against Robert Baumann ("Baumann") and by interfering with his exercise of protected rights.

### Statement of Facts

This case stems from the dismissal of Robert Baumann, the former production lead for American Tripoli. While employed by American Tripoli, Mr. Baumann was in charge of production activities at the mine. During his employment, Mr. Baumann participated in MSHA investigations, referred safety issues to leadership at the mine, and purportedly acted as a mine representative for other employees. At no time was he prevented from making these statements or prevented from acting on the rights guaranteed him under the Mine Act. However, Mr. Baumann was not meeting production standards and was ultimately terminated.

### Issues

American Tripoli requests review of all aspects of ALJ Moran's decision, including penalties. Review is appropriate because the decision contains errors of law, is not supported by substantial evidence, is contrary to established law and the Rules of the Commission, and contains substantial questions of law, policy, and discretion.

A. Whether ALJ Moran erred by finding a violation of 30 U.S.C. §815(c)(1) while ignoring consideration of the legitimate business reasons offered by American Tripoli to support Mr. Baumann's termination.

1

Review is appropriate because ALJ Moran found that American Tripoli violated Section 105(c) by terminating Mr. Baumann's employment, ignoring the company's discretionary disciplinary policies, which are detailed in Exhibit P-16 (Employee Handbook) as well as testimony regarding the specific, measurable requirements of the job which Mr. Baumann failed to meet. Mr. Baumann had participated in numerous MSHA investigations before the investigation on April 12, 2023. He was not disciplined or discharge for his participation in those investigations. Mr. Baumann was also not disciplined or discharged for raising concerns about perceived safety violations made to John Spears, the operations manager, or Jesse Molesi, the mine's safety director during Mr. Baumann's employment. See Vol. 1 Tr. 60-62. It was only after his failure to meet performance standards that he was discharged.

As production lead, Mr. Baumann was responsible for meeting production metrics, such as overall equipment effectiveness and utilization, defect density, production costs, and overseeing the mill employees' safety and well-being. Ultimately, he did not, and was terminated.

By ignoring this evidence, the ALJ has acted in a manner contrary to established law and the decision merits review. Mr. Baumann would have been terminated for his failure to meet performance standards regardless of his protected activity.

B. Whether ALJ Moran erred by finding a violation of 30 U.S.C. §815(c)(1) by finding American Tripoli interfered with Mr. Baumann's miner's rights.

Review is appropriate because American Tripoli has offered, and ALJ Moran has ignored, legitimate and substantial business reasons proffered by American Tripoli for the statements made by American Tripoli employees, including John Spears, the mine's operations manager, as well as by Russell Tidaback and Jordan Tidaback. These statements did not serve to interfere with Mr. Baumann's rights. Instead, as described in American Tripoli's post hearing brief, these statements were aimed at ensuring that accurate and relevant information was communicated to inspectors by someone with knowledge about each issue. See Exhibit P-9, P-10, P-12. This strategy is a standard industry practice during inspections and should not be misconstrued as interference. See also Exhibits P-14 and P-16

The ALJ erred also by failing to consider that Mr. Baumann's own statements were similar to those later found to constitute unlawful interference. Specifically, during the February 14, 2023 inspection, Mr. Baumann wrote "IDK. This guy is out for blood. We are removing product from the floor now." Mr. Baumann's own statements are consistent with Mr. Spears' statements about how American Tripoli handles MSHA inspections and Jordan Tidaback's clarifications during the April 2023 inspection. At no point was Mr. Baumann prevented from speaking with MSHA inspectors. See P-21, confirming Mr. Baumann's participation in the MSHA investigation.

By ignoring this evidence, the ALJ has acted in a manner contrary to established law and the decision merits review. American Tripoli did not interfere with Mr. Baumann's rights.

2

C.  Whether ALJ Moran's findings of fact and conclusions of law in both Counts I and II are supported by substantial evidence.

Review is appropriate because the ALJ's findings are not supported by sufficient evidence on either Count 1 or Count 2. As discussed above, ALJ Moran outright ignored evidence presented by American Tripoli in support of their nondiscriminatory reasons for the statements made by American Tripoli employees and for Mr. Baumann's termination.

In finding American Tripoli discriminated against Mr. Baumann, the ALJ accepted without question Mr. Baumann's testimony, even when contradicted by documentary evidence. See, for example, Mr. Baumann's testimony about not receiving any training compared with the attestation signed by Mr. Baumann that he had received all new miner training.

As detailed in the decision itself, the ALJ had clearly decided to discount any evidence provided by American Tripoli before the hearing had concluded. For example, ALJ Moran informed American Tripoli's representative that any evidence concerning Mr. Baumann's termination would need to meet not MSHA's standard of "substantial evidence" but would need to be "detailed chapter and verse" according to his own standards. See, Decision and Order at 19.

As a result, this decision merits review.

D.  Whether ALJ Moran's imposition of penalties in the amounts of $15,000 and $17,500 is arbitrary and capricious, violating established law and the rules of the Commission.

Review is appropriate because ALJ Moran's imposition of penalties in the amount of $15,000 for Count I and $17,500 for Count II is arbitrary and capricious, and contrary to established caselaw and the rules of the Commission.

It is well established that, when considering what penalties to impose, the Commission should consider six factors: (1) the operator's history of previous violations; (2) the appropriateness of such penalty to the size of the business of the operator charged; (3) whether the operator was negligent; (4) the effect on the operator's ability to continue in business; (5) the gravity of the violation; and (6) the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation. 30 U.S.C. § 820(i).

In upholding these penalties, ALJ failed to consider American Tripoli's status as a small employer. The Secretary concedes in their Post-Trial Brief that American Tripoli is a small employer. The ALJ further failed to consider that these penalties would have a devastating effect on American Tripoli's economic prospects, and the mine is in danger of going out of business should it need to pay these fines. The decision therefore merits review.

E.  Whether ALJ Moran's imposition of Mr. Baumann's backpay aware was arbitrary and capricious.

In assessing Complainant's damages, the ALJ failed to consider any mitigation information and accepted Mr. Baumann's testimony despite documentary evidence regarding his alleged damages.

3

F.  Whether the Secretary's interpretation of 30 U.S.C. §815(c) is owed deference, as the ALJ wholly accepted the Secretary's theories as correct without question.

Review is appropriate as the ALJ has deferred to the Secretary in both factual and legal matters. This deference is not appropriate, and the factual and legal considerations presented during the hearing and in American Tripoli's briefs should be consider.

For all the foregoing reasons, MOSenecaManufacturer Limited Liability Company d/b/a American Tripoli respectfully requests that the Commission exercise its discretion and grant review of the Decision and Order in Case Number CENT 2023-0251-DM.

Respectfully submitted,


*Russell Tidaback*
Russell Tidaback

American Tripoli

4

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | |
|---|---|
| Secretary of Labor, Mine Safety and Health Administration, and Robert Baumann, Complainants, | Interference and Discrimination Proceeding |
| v. | Docket No.    CENT 2023-0251 |
| MOSenecaManufacturer, LCC, d/b/a American Tripoli, | Mine:    MOSenecaMfr LLC<br>dba American Tr |
| Respondent. | Mine ID:    23-00504 |

## Notice of Appearance

Please note my appearance as counsel for the Secretary of Labor. 29 C.F.R. 2700.3(c).

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22
(202) 693-9392 (fax)
maltz.susannah.m@dol.gov

Attorneys for the Secretary of Labor

1

Certificate of Service

I certify that on June 21, 2024 I served a copy of the foregoing by email on:

Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

s/ Susannah M. Maltz

Appellate Case: 25-1349    Page: 262    Date Filed: 04/07/2025 Entry ID: 5503844

UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor, and ROBERT BAUMANN | ) ) ) ) | DISCRIMINATION & INTERFERENCE PROCEEDING DOCKET |
| Complainants, | ) ) | |
| | ) | Docket No. CENT 2023-0251-DM |
| v. | ) ) | |
| MOSENECAMANUFACTURER LIMITED LIABILITY COMPANY d/b/a AMERICAN TRIPOLI, | ) ) ) ) | Mine: MOSenecaMfr LLC dba American Tr Mine Id No. 23-00504 |
| Respondent. | ) ) | |

## <u>MOTION TO STAY EFFECT OF ALJ'S DECISION TO PREVENT THREATENED MSHA ENFORCEMENT</u>

In response to the threatened enforcement action by MSHA, and to the extent necessary, MOSenecaManufacturer Limited Liability Company, d/b/a American Tripoli ("American Tripoli"), respectfully requests that this Commission stay the effect of the Administrative Law Judge's (ALJ) decision in this matter. American Tripoli states as follows:

1. On May 23, 2024, ALJ William Moran issued a decision in this matter. That decision included that American Tripoli is to pay penalties to the Secretary and damages to the Complainant, Mr. Baumann.

2.    On June 18, 2024, the Review Commission ordered a <u>sua</u> <u>sponte</u> review of the ALJ's decision on the grounds that it may be contrary to law.

3.    On June 21, 2024, American Tripoli filed a Petition for Discretionary Review ("PDR") with respect to the ALJ's decision because the decision is contrary to law and not supported by substantial evidence.

4.    MSHA, through its trial counsel, has advised that even though the case is on appeal, it expects American Tripoli to pay damages to Mr. Baumann at this time. MSHA has said that American Tripoli need not pay civil penalties to MSHA while the appeal is pending but that it must pay damages to Mr. Baumann.

5.    MSHA, through its trial counsel, threatened that if American Tripoli does not make this payment to Mr. Baumann, it will issue a citation and/or order against American Tripoli that could result in closure of the mine.

6.    MSHA's position that American Tripoli must pay damages to Mr. Baumann while this case is pending on appeal is contrary to law. Section 113(d)(1) of the Mine Act states that "The decision of the administrative law judge of the Commission shall become a final decision of the Commission 40 days after its issuance <u>unless</u> within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph (2). 30 U.S.C. §823(d)(11) (emphasis added).

Appellate Case: 25-1349   Page: 264   Date Filed: 04/07/2025 Entry ID: 5503844

7.    The ALJ's decision is therefore not a final order of the Commission because review has been directed.  As a result, payment to MSHA and Mr. Baumann is not due until this matter becomes a final order.

8.    American Tripoli is concerned that if MSHA follows through on its unlawful threats, it will be shut down by an enforcement action.  However, it should not be required to pay damages to Mr. Baumann while this case is on appeal to avoid this type of action by MSHA.  Therefore, to the extent necessary, American Tripoli requests that the Review Commission stay the effect of the ALJ's decision until the appeal in this matter is concluded.


Respectfully submitted,

By: *Russell Tidaback*
Russell Tidaback
American Tripoli

3

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the Motion to Stay Effect of ALJ's Decision to Prevent Threatened MSHA Enforcement was served on this ___day of June, 2024, via electronic mail on the following:

Laura M. O'Reilly, Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 1020
Kansas City, Missouri 64108
*Oreilly.laura.m@dol.gov*

Elaine M. Smith, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 10100
Kansas City, MO 64108
*smith.elaine.m@dol.gov*

Quinlan B. Moll, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main St., Suite 10100
Kansas City, MO 64108
*Moll.quinlan.b@dol.gov*

Susannah Maltz, Attorney
Office of the Solicitor
Division of Mine Safety and Health
U.S. Department of Labor
201 12th Street South – Suite 401
Arlington, VA 22202-5450
*Maltz.susannah.m@dol.gov*

_____

**June 27, 2024**

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| SECRETARY OF LABOR,                      | : |                               |
|   MINE SAFETY AND HEALTH       | : |                               |
|   ADMINISTRATION (MSHA)        | : |                               |
|   o/b/o ROBERT BAUMANN         | : |                               |
|                                          | : |                               |
|      v.         | : | Docket No. CENT 2023-0251-DM  |
|                                          | : |                               |
| MOSENECAMANUFACTURER, LLC                | : |                               |
|  d/b/a AMERICAN TRIPOLI             | : |                               |
|                                          | : |                               |

## DIRECTION FOR REVIEW

The petition for discretionary review filed by Mosenecamanufacturer, LLC doing business as American Tripoli ("American Tripoli") on June 21, 2024, is granted. This direction for review shall be combined with the direction for review issued in this case on June 18, 2024. Therefore, the parties shall file their briefs beginning 30 days from the date of this order in accordance with the briefing schedule requirements in 29 C.F.R. § 2700.75.

Specifically, American Tripoli shall file its opening brief addressing all issues raised in the June 18 direction for review and the June 21 petition for discretionary review. The Secretary shall file her response brief 30 days later also addressing all issues raised. The operator shall then file its reply brief 20 days after that.

_____
Mary Lu Jordan, Chair

_____
Marco M. Rajkovich, Jr., Commissioner

_____
Timothy J. Baker, Commissioner

_____
Moshe Z. Marvit, Commissioner

1

Distribution List:

Russell Tidaback
Jordon Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Elaine M. Smith, Esq.
Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov

Robert Baumann
baumannr24@gmail.com

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

Appellate Case: 25-1349    Page: 268    Date Filed: 04/07/2025 Entry ID: 5503844

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 222-2-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Administrative Law Judges
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Administrative Law Judges
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

Secretary of Labor, Mine Safety
and Health Administration,
and Robert Baumann,
Complainants,

     v.

MOSenecaManufacturer, LCC,
d/b/a American Tripoli,

Respondent.

Interference and Discrimination Proceeding

Docket No.   CENT 2023-0251

Mine:        MOSenecaMfr LLC
                dba American Tr
Mine ID:   23-00504

## Notice of Appearance

Please note my appearance as co-counsel for the Secretary of Labor. 29 C.F.R. 2700.3(c). I join Attorney Susannah M. Maltz as counsel of record for the Secretary.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
Attorney
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22
(202) 693-5486
reed.marcus.d@dol.gov

1

Certificate of Service

I certify that on July 3, 2024 I served a copy of the foregoing by email on:

Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com


s/ Marcus D. Reed

2

| Secretary of Labor, Mine Safety and Health Administration, and Robert Baumann, Complainants, | Discrimination and Interference Proceeding |
|---|---|
| v. | Docket No.    CENT 2023-0251 |
| MOSenecaManufacturer, LCC, d/b/a American Tripoli, | Mine:         MOSenecaMfr LLC<br>                  dba American Tr |
| Respondent. | Mine ID:     23-00504 |

### Secretary's Response to American Tripoli's Motion to Stay

American Tripoli has moved for a stay of the judge's decision in this section 105(c) discrimination and interference matter. The Secretary opposes a stay of the judge's decision (but will not enforce the order as to the civil penalty at this time).[1] American Tripoli has not met its burden to make the required showing for a stay; it has neither argued that the stay factors are satisfied nor demonstrated that it is entitled to this extraordinary relief.

### Background

The stay request arises from a straightforward discrimination and interference matter. In April 2023, American Tripoli fired miner and miners' representative Robert Baumann a few days after he accompanied MSHA on an inspection that led to a section 104(b) withdrawal order. *Sec'y of Lab. ex rel. Baumann* v. *MOSenecaManufacturer, LLC. d/b/a American Tripoli*, No. CENT 2023-0251, 2024 WL 2812449 (FMSHRC ALJ May 24, 2023) ("Ord.") 36-37. American Tripoli also

---

[1] American Tripoli did not confer with the Secretary for a position on the stay motion prior to filing. 29 C.F.R. 2700.10(c).

Appellate Case: 25-1349     Page: 272     Date Filed: 04/07/2025 Entry ID: 5503844

warned miners in expletive-laden language not to speak with MSHA, telling them that MSHA inspectors were "snakes," could not be trusted, would use miners' words against them in court, and were "not [the miners'] friend." Ord. 17, 40, 45. After Baumann filed a complaint with MSHA, the Secretary filed a complaint alleging discrimination and interference, and a hearing was held before Commission Judge William Moran. The judge determined that American Tripoli had discriminated against Baumann and interfered with the rights of miners. Ord. 43, 45, 48. The judge ordered American Tripoli to pay Baumann $10,552 in backpay and interest (as of the date of the decision; interest continues to accrue). Ord. 51. The judge also assessed civil penalties for the violation. Ord. 50.

The Commission ordered review of the decision sua sponte; American Tripoli also petitioned for review, and the Commission directed review. Direction for Review, CENT 2023-0251 (June 18, 2024); Pet. for Review, CENT 2023-0251 (June 21, 2024); Direction for Review, CENT 2023-0251 (June 27, 2024). The Commission combined the two directions for review. Direction for Review, CENT 2023-0251 (June 27, 2024).

In the meantime, the Secretary informed American Tripoli that it needed to comply with the judge's order to pay Baumann. Rather than pay, American Tripoli filed this motion for a stay of the ALJ's decision.

American Tripoli still did not comply with the judge's order. On July 1, 2024, the Secretary issued a citation to American Tripoli under section 104(a) for failing to comply with an order issued pursuant to the Mine Act (the judge's order). See 30 U.S.C. 814(a).[2] The citation set an

---

[2] American Tripoli correctly represents in its motion that the Secretary is enforcing the order immediately but is not enforcing it at this time as to civil penalties. Stay Mot. 2.

Appellate Case: 25-1349    Page: 273    Date Filed: 04/07/2025 Entry ID: 5503844

abatement time of 10 a.m., July 5, 2024. As of the date of filing, American Tripoli has not abated the violation; the Secretary plans to extend the time for abatement.

**Argument**

**1.  Orders are enforceable even if they are on appeal.**

American Tripoli's entire argument is that the Secretary is not entitled to enforce the judge's order, because the order has been appealed and is not yet final. Stay Mot. 2-3. It is true that the order is not final. But it is incorrect that the order is not enforceable.

An operator must comply with an order issued under the Mine Act, regardless of whether it is final. "The philosophy of review of . . . the [Mine] Act[] is that operators are to comply with administrative orders first and litigate their merits later." *Eastern Assoc. Coal Co.*, 2 FMSHRC 2467, 2471 n.6 (Sept. 1980) (discussing orders issued by MSHA). And section 104(a) empowers the Secretary to issue a citation for non-compliance with an order—not a "final" order only. 30 U.S.C. 814(a). The Commission has recognized that this principle applies to judges' orders issued under section 105(c): in *Sec'y ex rel. Saldivar* v. *Grimes Rock, Inc.*, the Commission denied an operator's motion for stay of an order related to a miner's temporary reinstatement that the Secretary had enforced with a section 104(a) citation, even though the order was on appeal. 44 FMSHRC 725 (Aug. 2022); see also *C.R. Meyer & Sons Co., Inc.*, 38 FMSHRC 2950, 2952-2955 (Dec. 2016) (ALJ) (affirming a section 104(a) citation MSHA issued for an operator's failure to comply with an order of temporary reinstatement).

Similarly, it is a general legal precept that an order is enforceable even if on appeal. See, *e.g.*, *Coleman* v. *Tollefson*, 575 U.S. 532, 539 (2015) ("Unless a court issues a stay, a trial court's judgment . . . normally takes effect despite a pending appeal."). If an order is stayed, it is not

3

enforceable, but if it is not stayed, those subject to it must comply with it. *Maness* v. *Meyers*, 419 U.S. 449, 458 (1975) ("If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal.").

American Tripoli confuses final orders with enforceable orders. The Secretary's enforcement of an enforceable order does not entitle American Tripoli to a stay. And, for the reasons enumerated *infra*, American Tripoli has not justified any other entitlement to the extraordinary relief of a stay.

**2. American Tripoli cannot substantiate the requisite factors.**

A party seeking a stay must make a showing of four factors: (1) a likelihood of prevailing on the merits of its appeal; (2) irreparable harm to it if the stay is not granted; (3) no adverse effect on other parties; and (4) a showing that the stay is in the public interest. *Sec'y of Lab. ex rel. Rodriguez* v. *C.R. Meyer & Sons Co.*, 35 FMSHRC 811, 812 (Apr. 2013) (citing *VA Petroleum Jobbers Assn.* v. *Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)). The burden is on the movant to make this showing, and to provide "sufficient substantiation" of each factor. *Rodriguez*, 35 FMSHRC at 812-813 (citing *Stillwater Mining Co.*, 18 FMSHRC 1756, 1757 (Oct. 1996)). A stay pending appeal is "extraordinary relief." *Id.* at 812.

American Tripoli does not meet its burden. It does not meaningfully engage with the stay factors—let alone sufficiently substantiate them—nor demonstrate that it is entitled to extraordinary relief. That failure alone is sufficient reason to deny American Tripoli's motion. See *W.S. Frey Co., Inc.*, 16 FMSHRC 1591, 1591-1592 (Aug. 1994) (the Secretary opposed a motion to stay on the basis that the operator "failed to address any of the elements required;" the

4

Commission denied the stay). The Secretary nevertheless assesses American Tripoli's inability to satisfy each stay factor in turn.

### 2.1. Likelihood of prevailing on appeal.

American Tripoli has not made any argument that it is likely to prevail on appeal. And even if it had, that would not be enough. "Where a probability of success on the merits is established, an inadequate showing with regard to the other three factors nevertheless still prevents the grant of a stay pending review." *Rodriguez*, 35 FMSHRC at 812 (citing *VA Petroleum*, 259 F.2d at 926); *UMWA ex rel. Franks* v. *Emerald Coal Res., LP*, 35 FMSHRC 2373, 2374 (Aug. 2013) ("We need not discuss the likelihood that [the operator] will prevail on appeal to dispose of the application for stay, for we see no irreparable harm to [the operator] should it prevail."). Even if American Tripoli had substantiated this factor, the Commission should deny the motion for a stay because American Tripoli cannot satisfy the remaining three.

### 2.2. Irreparable harm.

American Tripoli has not demonstrated irreparable harm. The judge ordered American Tripoli pay $10,552.00 in backpay and interest. Ord. 51. But economic loss does not constitute irreparable harm. *Rodriguez*, 35 FMSHRC at 813; *VA Petroleum*, 259 F.2d at 925 ("[M]oney… expended in the absence of a stay, [is] not enough [to satisfy the irreparable harm factor]."). And American Tripoli can recover back wages paid out to Baumann if it succeeds on appeal. *Emerald Coal*, 35 FMSHRC at 2374 ("in any event [the operator] can seek reimbursement from the two miners in the event the Commission overturns the judge's decision"). Any economic loss associated with paying the back pay now is not irreparable. See *VA Petroleum*, 259 F.2d at 925 ("The possibility

5

that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").

American Tripoli suggests that if a stay is not granted, the Secretary will shut down the mine. Stay Mot. 2, 3. First, that claim is just a version of economic loss, and second, American Tripoli can easily avoid that harm. The Secretary has issued a section 104(a) citation to American Tripoli for failure to comply with the judge's order; to abate the violation, American Tripoli must pay Baumann what he is due. In invoking the harm of a shutdown, American Tripoli apparently anticipates that it will not comply with the order and be issued a section 104(b) order for its failure to abate. See 30 U.S.C. 814(b). In other words, this harm will come to pass only if American Tripoli chooses to violate the law. American Tripoli is welcome to challenge the Secretary's enforcement action by contesting the citation or its penalty. See, *e.g.*, *Grimes Rock*, 44 FMSHRC at 728 n.4 (rejecting the operator's argument "that if there is no immediate stay, it will be subjected to every punishment and fine the Secretary can assert for non-compliance with an order that is before the Commission on appeal" because "the operator can properly challenge any citation or order before a Commission Administrative Law Judge in accordance with 30 U.S.C. § 815(a)"); *C.R. Meyer*, 38 FMSHRC 2950 (considering and rejecting an operator's challenge to a section 104(a) citation the Secretary issued for the operator's violation of a temporary reinstatement order). But it cannot justify the extraordinary relief of a stay by its own refusal to comply with enforcement orders—i.e., avoidable harm that it inflicts upon itself.

### 2.3. No adverse effect on the parties.

American Tripoli has not demonstrated that a stay will have no adverse effect on the other parties. Nor can it. Baumann has already been adversely affected by American Tripoli's failure to

6

pay him and will be further adversely affected by continued non-payment. He is entitled to more than $10,000 in back pay, and it is a matter of common sense that to go unpaid is to experience an adverse effect. American Tripoli did not make a contrary case, or even acknowledge the impacts of a stay on Baumann.

American Tripoli, for its part, will suffer no lasting adverse effect without a stay. As mentioned above, if it prevails, it is entitled to recoup the money. See *Emerald Coal*, 35 FMSHRC at 2374.

### 2.4. Public interest.

American Tripoli has not explained how a stay would serve the public interest. In fact, a stay would harm the public interest.

There is a clear public interest in protecting miners' section 105(c) rights. Congress intended miners to "play an active part in the enforcement of the Act," and recognized that "if miners are to be encouraged to be active in matters of safety and health, they must be protected against… discrimination which they might suffer as a result of their participation." S. Rep. No. 95-181, at 35 (1977). This policy is expressed, in part, by the Mine Act's remedies for discrimination, which include "back pay and interest." 30 U.S.C. 815(c)(2).

Miners are a particularly vulnerable class of workers. Congress recognized that "mining often takes place in remote sections of the country, and in places where work in the mines offers the only real employment opportunity." S. Rep. No. 95-181, at 35. So, miners' livelihoods can be particularly compromised by a loss of pay at a mine. Similarly, Congress intended "that miners "not be inhibited in any way in exercising rights afforded by the [Mine Act]." *Id.* at 36.

7

Deprivation of wages is sure to inhibit miners' willingness to exercise their rights. A stay would increase that effect by extending the deprivation.

Consistent with the Mine Act, where there is a finding of discrimination and an award of back pay, the miner is entitled to that remedy pending appeal, if the miner wants it. A stay would contravene the protective and remedial purpose of section 105(c). See *Grimes Rock*, 44 FMSHRC at 729-730 (discussing the public interest factor in denying a stay of a section 105(c) case); *Emerald Coal*, 35 FMSHRC at 2375 (same). The only beneficiary of a stay would be American Tripoli.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ SUSANNAH M. MALTZ
Attorney
U.S. Department of Labor
Mine Safety & Health Division
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5393
(202) 693-9392 (fax)
maltz.susannah.m@dol.gov

8

## Certificate of Service

I certify that on July 8, 2024, I served a copy of the foregoing by email on:

Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

s/ Susannah Maltz

UNITED STATES OF AMERICA

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

## RESPONDENT'S REPLY TO SECRETARY'S RESPONSE TO AMERICAN TRIPOLI'S MOTION TO STAY

MOSenecaManufacturer Limited Liability Company d/b/a American Tripoli hereby replies to the Secretary's Response to American Tripoli's Motion to Stay as follows:

1. In the Secretary's motion, she seems to confuse temporary reinstatement orders with an Administrative Law Judge's decision post hearing. As the Federal Mine Safety and Health Review Commission is well aware, 29 CFR 2700.45 addresses temporary reinstatement proceedings. Temporary reinstatement proceedings have their own rules and procedures. The Secretary cites to no cases stating that an ALJ's decision after a Section 105(c) hearing on the merits should be paid when the matter has been accepted for appeal by the Commission. In fact, the Secretary ignores Section 113 of the Mine Act

1

attempting to confuse the issue by citing cases involving temporary reinstatement orders and MSHA enforcement actions issued to protect the health and safety of the miners.

2. The Mine Act provides that operators comply with enforcement actions and litigate their merits later referring to enforcement actions that must be abated or complied with while litigated to protect the health and safety of the miners. Those decisions have no bearing on an ALJ decision requiring payment of a Section 105(c) judgment that is now on appeal to the Commission, and thus not final by operation of the Mine Act.

3. Section 113(d)(1):

> The decision of the administrative law judge of the Commission shall become the final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph (2).

4. Instead of addressing the lack of finality in the decision, the Secretary cites *Grimes* and *C.R. Meyer*, both temporary reinstatement cases. In *Grimes*, the decision first cites the rule that filing a Petition for Discretionary Review of a <u>TR order</u> does not stay the effect of the Judge's order. This is specific to a TR order as quoted by Judge Manning (Rule 45 addresses TR orders only). This is not applicable to a decision on the merits.

5. *W.S. Frey Company, Inc.,* 16 FMSHRC 1491 (1994) is instructive based on the footnote where the Commission notes that it did not direct review of the Judge's decision and it became a final decision. American Tripoli agrees that if the Commission had denied review here, under Section 113, the decision then becomes a final order. At that point, payment is due while a party potentially appeals to the circuit court unless the party is

2

granted a stay. In *Frey*, the operator was trying to get a stay while it appealed to the Circuit Court because a final order was in play since the Commission did not direct review.

6. *Maben Energy,* 3 FMSHRC 2776 (1981) provides that a decision by the <u>Commission</u> is binding unless stayed by the Court of Appeals. Here, no binding decision exists because this Commission has directed review.

7. Here, the Commission directed review, and the Secretary cites no authority for why payment is due when the ALJ decision on the merits is not a final order. Because there is no final order, American Tripoli should not be forced to bear the burden of proving the four stay factors – the Secretary should bear the burden of explaining why she is attempting to enforce an ALJ decision that is not a final order.

8. If applicable, the four factors cited by the Secretary support a stay in this matter.

    a. Due to the amount of errors committed in the decision below, and given the recent change in deference, there is a likelihood of success on the merits at this time.

    b. Irreparable harm would be suffered because if payment is made to Mr. Baumann, and this Commission reverses the decision, there is no procedural mechanism to get the money back. How would Am Trip force Mr. Baumann to return the money? This is why practically, payment is not due when there is not a final order.

    c. The failure of Mr. Baumann to return the money and American Tripoli being left with no administrative remedy to pursue the money is an adverse effect that also is against the public interest, as Am Trip would be forced to try and institute a civil suit against Mr. Baumann to return money.

3

d.  On the other hand, Mr. Baumann will continue to accrue interest while the appeal is pending and will be able to enforce his rights (as MSHA has already done by issuing a citation) if the Judgment is not paid once there is a final order by this Commission.

For all these reasons, MOSenecaManufacturer Limited Liability Company d/b/a American Tripoli respectfully requests that the Commission stay the effect of the ALJ decision in this matter proceeding pending a final decision by the Commission, and declare Citation No. 9763504, issued on July 1, 2024, trying to enforce the ALJ decision, null and void.

Respectfully submitted,

*Russell Tidaback*

Russell Tidaback

American Tripoli

4

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the RESPONDENT'S REPLY TO SECRETARY'S RESPONSE TO AMERICAN TRIPOLI'S MOTION TO STAY was served on this  09  day of July 2024, via electronic mail on the following:

Laura M. O'Reilly, Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 1020
Kansas City, Missouri  64108
*Oreilly.laura.m@dol.gov*

Elaine M. Smith, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 10100
Kansas City, MO 64108
*smith.elaine.m@dol.gov*

Quinlan B. Moll, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main St., Suite 10100
Kansas City, MO 64108
*Moll.quinlan.b@dol.gov*

Susannah Maltz, Attorney
Office of the Solicitor
Division of Mine Safety and Health
U.S. Department of Labor
201 12th Street South – Suite 401
Arlington, VA  22202-5450
*Maltz.susannah.m@dol.gov*

*Russell Tidaback*
Russell Tidaback

Appellate Case: 25-1349    Page: 285    Date Filed: 04/07/2025 Entry ID: 5503844

UNITED STATES OF AMERICA

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, United States Department of Labor, and ROBERT BAUMANN | ) ) ) | DISCRIMINATION & INTERFERENCE PROCEEDING DOCKET |
| Complainants, | ) ) | |
| v. | ) ) | Docket No. CENT 2023-0251-DM |
| MOSENECAMANUFACTURER LIMITED LIABILITY COMPANY d/b/a AMERICAN TRIPOLI, | ) ) ) ) | Mine: MOSenecaMfr LLC dba American Tr Mine Id No. 23-00504 |
| Respondent. | ) ) | |

## RESPONDENT'S MOTION FOR EXTENSION OF TIME TO FILE OPENING BRIEF

**Introduction**

Pursuant to 29 C.F.R. § 2700.23, American Tripoli respectfully requests a 30-day extension to file our opening brief. This extension is necessary due to the ongoing process of engaging legal counsel and to ensure that our brief is prepared with the requisite legal expertise.

**Reason for Extension**

American Tripoli is currently in the process of retaining legal representation to address the complex legal and technical issues presented in this case. The additional time is essential for newly engaged counsel to thoroughly review the case details, strategize appropriately, and prepare a comprehensive opening brief.

**Communication with the Secretary**

Prior to filing this motion, American Tripoli contacted the Secretary of Labor Mine Safety and Health Administration regarding this extension request. The Secretary did not object to the granting of additional time for the filing of our opening brief.

**Justification**

The necessity for well-prepared legal representation and the Secretary's non-objection support the need for this extension. Granting this extension will ensure that the proceedings are

Appellate Case: 25-1349    Page: 286    Date Filed: 04/07/2025 Entry ID: 5503844

conducted fairly and that the Commission's review is based on meticulously prepared submissions without prejudicing any party involved.

**Conclusion**

In consideration of the reasons stated above and the Secretary's non-objection, American Tripoli respectfully requests that the Commission grant a 30-day extension for the filing of the opening brief, proposing a new deadline of August 27, 2024.

**Respectfully submitted,**

*Russell Tidaback*

Russell Tidaback

American Tripoli

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the RESPONDENT'S MOTION FOR EXTENSION OF TIME TO FILE OPENING BRIEF was served on this 17 day of July 2024 via electronic mail on the following:

Laura M. O'Reilly, Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 1020
Kansas City, Missouri 64108
*Oreilly.laura.m@dol.gov*

Elaine M. Smith, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main Street, Suite 10100
Kansas City, MO 64108
*smith.elaine.m@dol.gov*

Quinlan B. Moll, Trial Attorney
U.S. Department of Labor
Office of the Solicitor
2300 Main St., Suite 10100
Kansas City, MO 64108
*Moll.quinlan.b@dol.gov*

Susannah Maltz, Attorney
Office of the Solicitor
Division of Mine Safety and Health
U.S. Department of Labor
201 12th Street South – Suite 401
Arlington, VA 22202-5450
*Maltz.susannah.m@dol.gov*

Marcus Reed, Attorney
Office of the Solicitor
U.S. Department of Labor
200 Constitution Avenue NW, Room N-2700
Washington, DC 20210
*Reed.Marcus.D@dol.gov*

3

*Russell Tidaback*

Russell Tidaback

4

**July 23, 2024**

|                                          |   |                               |
|------------------------------------------|---|-------------------------------|
| SECRETARY OF LABOR,                      | : |                               |
|   MINE SAFETY AND HEALTH                 | : |                               |
|   ADMINISTRATION (MSHA)                  | : |                               |
|   o/b/o ROBERT BAUMANN                    | : |                               |
|                                          | : |                               |
|              v.                          | : | Docket No. CENT 2023-0251-DM  |
|                                          | : |                               |
| MOSENECAMANUFACTURER, LLC                | : |                               |
|   d/b/a AMERICAN TRIPOLI                   | : |                               |
|                                          | : |                               |

## <u>ORDER</u>

MOSenecaManufacturer, LLC doing business as American Tripoli ("American Tripoli") has filed an unopposed motion for an extension of time to file its opening brief in this matter.  Upon consideration of the motion, it is granted.  American Tripoli shall file its opening brief by **August 27, 2024**.  The Secretary shall file her response brief by **September 26, 2024**.

For the Commission:

Mary Lu Jordan
Chair

Distribution List:

Russell Tidaback
Jordon Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Elaine M. Smith, Esq.
Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov

Robert Baumann
baumannr24@gmail.com

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Marcus D. Reed, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 222-2-5452
Garris.Melanie@dol.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

UNITED STATES OF AMERICA

FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

## DISCRETIONARY REVIEW OPENING BRIEF OF AMERICAN TRIPOLI

### Introduction and Background

This case arises from a complaint filed by Robert Baumann alleging that American Tripoli discriminated against him in violation of section 105(c) of the Mine Act after his participation in MSHA inspections. The ALJ found in favor of Baumann, ordering damages and civil penalties. American Tripoli seeks review, arguing that the decision is legally flawed, unsupported by substantial evidence, and inconsistent with established principles regarding employer disciplinary actions. Furthermore, the ALJ's reliance on deference to MSHA interpretations is misplaced in light of recent legal developments.

### Statement of Issues

1. Whether the ALJ erred in finding that American Tripoli violated 30 U.S.C. §815(c)(1) by discriminating against Robert Baumann, despite substantial evidence supporting the company's legitimate business reasons for his termination.

2. Whether the ALJ erred in finding that American Tripoli interfered with Baumann's miner rights, based on statements made by company representatives, which were consistent with standard industry practices during inspections.

3. Whether the penalties imposed by the ALJ are arbitrary, capricious, and excessive given the small size of American Tripoli's business and its precarious financial condition.

4. Whether the ALJ improperly deferred to MSHA's interpretations of 30 U.S.C. §815(c) in violation of the legal standards clarified by recent Supreme Court decisions.

5. Whether the ALJ improperly deprived American Tripoli of its constitutional right to a jury trial when it imposed monetary penalties.

**Argument**

## I. The ALJ Erred in Finding Discrimination Under Section 105(c).

American Tripoli provided legitimate, non-discriminatory reasons for Baumann's termination. The decision to terminate was based on Baumann's consistent failure to meet production standards, not on any protected activity. The ALJ's refusal to consider this evidence, coupled with his reliance on Baumann's uncorroborated testimony, constitutes reversible error (Petition for Discretion…).

The Eighth and Ninth Circuits' but-for test applies to both discrimination and interference claims. In *Thomas v. CalPortland Co.*, 993 F.3d 1204, 1211 (9th Cir. 2021) and *Continental Cement v. Secretary of Labor*, 94 F.4th 729, 733 (8th Cir. 2024), the federal courts construed the repeated use of the word "because" in 30 U.S.C. § 815(c) to require the administration to prove "but for" causation. Due to the administration's failure to prove so, the Commission should reverse the ALJ's decision.

## II. The ALJ's Finding of Interference Is Unsupported by Substantial Evidence.

The statements made by American Tripoli representatives were aimed at ensuring accurate communication during inspections, a common industry practice. Baumann was never prevented from exercising his rights or speaking with MSHA inspectors. The ALJ's finding of interference is therefore unsupported and should be reversed (Petition for Discretion…).

"Substantial evidence" means evidence that "must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Board v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939). Due to the administration's failure to meet the "but for" test and the absence of "substantial evidence" in the record, the Commission should reverse the ALJ's decision.

## III. The ALJ's Imposition of Penalties is Arbitrary and Capricious.

The penalties imposed do not take into account the six factors required by 30 U.S.C. §820(i), particularly American Tripoli's small business size and the impact these penalties would have on its operations. The penalties threaten the company's survival, and the ALJ failed to consider the detrimental effect they would have (Petition for Discretion…)(DFR(Baumann v American …).

Under the Supreme Court's decision in *Securities and Exchange Commission v. Jarkesy*, 144 S.Ct. 2117 (2024), before the administration, the ALJ or this Commission can impose monetary penalties, the Respondent company is entitled to a jury trial. The discrimination and interference claims are legal in nature, i.e. the administration seeks monetary penalties for legal claims. Because no jury trial was conducted, the Commission should set aside the ALJ's decision.

**IV. The ALJ's Reliance on Deference to MSHA is Legally Flawed.**

The ALJ improperly deferred to MSHA's interpretations of the Mine Act, which is no longer appropriate in light of the Supreme Court's recent ruling limiting agency deference. The Commission should apply the correct standard of review and reject the Secretary's interpretation, which unduly favors enforcement over fairness (Motion to Stay Effect o…)(24-07-08 Am Tripoli Sec…).

The Supreme Court in *Loper Bright Enterprises v. Raimondo*, 144 S.Ct. 2244 (2024), said that the role of judges is to provide the "best reading" of the statute without deference given to interpretations offered by any government agency or official. Because the ALJ and this Commission only engage in adjudication, they owe no deference to the administration's interpretation of the Mine Act. *Chevron* deference is overruled according to *Loper Bright*. The Commission should reverse the ALJ's decision and apply *Loper Bright*.

**V. The ALJ's Decision is Not Enforceable Until it Becomes a Final Order.**

Under Section 113(d)(1) of the Mine Act, the ALJ's decision is not final while on review before the Commission. The Secretary's attempt to enforce the backpay award, while this appeal is pending, is premature and contrary to law. The Commission should stay the ALJ's decision until its review is complete (Motion to Stay Effect o…) (Reply to Secretary's Re…) (DFR(Baumann v American …).

**Conclusion**

For the reasons stated above, American Tripoli respectfully requests that the Commission reverse the ALJ's decision, vacate the penalties and damages assessed, and dismiss the complaint filed by Baumann. Additionally, the Commission should stay enforcement of the ALJ's order until a final decision is reached.


Respectfully submitted,


By: *Russell Tidaback*

Russell Tidaback
Managing Member
(239) 829-5457
rtidaback@deedyco.com

- 3 -

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of Mosenecamanufacturer Limited Liability Company d/b/a American Tripoli's Notice of Contest has been served on this 21st day of August 2024, via electronic mail upon the following:

Jason S. Grover
Counsel for Trial Litigation
U.S. Department of Labor, MSHA
National Office of the Solicitor
201 12th Street South – Suite 401
Arlington, VA 22202-5450
*grover.jason@dol.gov*
*Cooke.Linda@dol.gov*


_____ *s/ Russell Tidaback* _____

4

**August 22, 2024**

|  |  |  |
|---|---|---|
| SECRETARY OF LABOR, | : | |
|   MINE SAFETY AND HEALTH | : | |
|   ADMINISTRATION (MSHA) | : | |
|   O/B/O ROBERT BAUMANN | : | |
| | : | |
|         v. | : | Docket No. CENT 2023-0251-DM |
| | : | |
| MOSENECAMANUFACTURER, LLC | : | |
|   D/B/A AMERICAN TRIPOLI | : | |

BEFORE:  Jordan, Chair; Althen, Rajkovich, Baker, and Marvit, Commissioners

## <u>ORDER</u>

BY:  Jordan, Chair; Baker and Marvit, Commissioners

     This proceeding arises under section 105(c)(2) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 815(c)(2) (2018) ("Mine Act" or "Act").[1]  On June 26, 2024, the Commission received from MOSenecaManufacturer, LLC *d/b/a* American Tripoli ("American Tripoli") a motion to stay enforcement of the Administrative Law Judge's May 23, 2024 decision awarding backpay after finding that the operator had discriminated against miner Robert

---

[1]  30 U.S.C. § 815(c)(2) provides in pertinent part:

> Any miner . . . who believes that he has been discharged, interfered with, or otherwise discriminated against by any person in violation of this subsection may, within 60 days after such violation occurs, file a complaint with the Secretary alleging such discrimination. Upon receipt of such complaint, the Secretary shall forward a copy of the complaint to the respondent and shall cause such investigation to be made as he deems appropriate. Such investigation shall commence within 15 days of the Secretary's receipt of the complaint, and if the Secretary finds that such complaint was not frivolously brought, the Commission, on an expedited basis upon application of the Secretary, shall order the immediate reinstatement of the miner pending final order on the complaint.

Appellate Case: 25-1349    Page: 297    Date Filed: 04/07/2025    Entry ID: 5503844

Baumann in violation of section 105(c) of the Mine Act. For the reasons that follow, we deny the operator's motion.

**I.**

**<u>Factual and Procedural Background</u>**

At the beginning of 2023, miner Robert Baumann worked at the MOSenecaMfr LLC mine. In March 2023, he was elected miner representative. On April 11-12, 2023, Complainant Baumann walked around with MSHA during an inspection, which yielded a section 104(b) withdrawal order. On April 17, 2023, American Tripoli terminated Baumann's employment. After Baumann's termination, he was unemployed for 62 days and collected unemployment benefits. ALJ Dec. at 46, n.34. Baumann has been employed with Cherokee County Road and Bridge since July 24, 2023. Sec'y Post Hrg. Br. at 29.

On April 25, 2023, Complainant Baumann filed a discrimination complaint with the Mine Safety and Health Administration ("MSHA") and the Secretary of Labor brought a discrimination case on Baumann's behalf alleging discrimination and interference. A hearing was held by a Commission Administrative Law Judge, and on May 23, 2024, the Judge issued a decision finding that American Tripoli had discriminated against Baumann in violation of section 105(c) of the Mine Act. The Judge ordered that American Tripoli pay a civil penalty in the amount of $15,000.00 for the discrimination violation and $17,500.00 for the interference violation. ALJ Dec. at 50. He also awarded backpay and interest to Baumann in the amount of $10,552 plus interest accrued to the actual date of payment. ALJ Dec. at 51.

On June 18, 2024, the Commission ordered *sua sponte* review on whether the Judge's decision is contrary to law regarding the meanings and applications of the "discrimination" and "interference" provisions in complaints brought pursuant to section 105(c) of the Mine Act, and whether the provisions are ambiguous and deserving of deference to the Secretary's interpretation. Three days later, American Tripoli filed a petition for discretionary review challenging the Judge's findings of discrimination and interference as well as the Judge's award of backpay as arbitrary and capricious. On June 26, American Tripoli filed this motion to stay enforcement of the backpay award after MSHA notified it that if it did not pay the ordered backpay, it would issue a citation or order against the operator that could result in closure of the mine.[2] The Commission granted review of the operator's petition on June 27.

---

[2] American Tripoli seeks a stay of enforcement of the backpay only because the Secretary is not seeking immediate enforcement of the civil penalty. A.T. Mot. at 2; Sec'y Resp. at 2, n.2.

Appellate Case: 25-1349    Page: 298    Date Filed: 04/07/2025 Entry ID: 5503844

## II.

## Disposition

American Tripoli argues that under section 113(d)(1) of the Mine Act, it is not required to make payment to Mr. Baumann as ordered by the Judge because the decision is currently on appeal and has not become a final order of the Commission.[3]  The Secretary responds that an operator must comply with an order issued under the Mine Act regardless of whether it is final. She asserts that: "The philosophy of review of . . . the [Mine] Act[] is that operators are to comply with administrative orders first and litigate their merits later." *Eastern Assoc. Coal Co*., 2 FMSHRC 2467, 2471 n.6 (Sept. 1980) (discussing orders issued by MSHA).  The Secretary notes that section 104(a) empowers her to issue a citation for non-compliance with an order—not a "final" order only.  30 U.S.C. 814(a).

In *Secretary on behalf of Price and Vacha v. Jim Walter Res., Inc*., 9 FMSHRC 1312 (Aug. 1987), the Commission held that a party seeking a stay must make an adequate showing with respect to the four factors set forth in *Virginia Petroleum Jobbers Association v. Federal Power Commission*, 259 F.2d 921, 925 (D.C. Cir. 1958): (1) a likelihood that the moving party will prevail on the merits of its appeal; (2) irreparable harm to it if the stay is not granted; (3) no adverse effect on other interested parties; and (4) a showing that the stay is in the public interest. *See also UMWA on behalf of Franks & Hoy v. Emerald Coal Res., LP*, 35 FMSHRC 2373, 2374 (Aug. 2013).

The Commission made clear that a stay constitutes "extraordinary relief." *Id*.; *see also W.S. Frey Co.*, 16 FMSHRC 1591 (Aug. 1994).  The burden is on the movant to provide "sufficient substantiation" of the requirements for the stay.  *Stillwater Mining Co*., 18 FMSHRC 1756, 1757 (Oct. 1996).  Where a probability of success on the merits is established, an inadequate showing with regard to the other three factors nevertheless still prevents the grant of a stay pending review.  *Virginia Petroleum*, 259 F.2d at 926; *see also Sec'y of Labor on behalf of Rodriguez v. C.R. Meyer and Sons Co.*, 35 FMSHRC 811, 812-13 (Apr. 2013).

As with all Commission cases considering a motion for stay, requests for a stay of a Judge's award of monetary damages pending appeal of a section 105(c) merits' decision are considered on a case-by-case basis and are also analyzed under *Virginia Petroleum*.  *See UMWA on behalf of Franks & Hoy*, 35 FMSHRC at 2374 (denying motion to stay enforcement of Judge's backpay award pending appeal on the grounds that the application failed three of the four prongs of *Virginia Petroleum*);[4] *Sec'y on Behalf of McGary and Bowersox v. the Marshall*

---

[3]  Section 113(d)(1) of the Mine Act states that: "The decision of the administrative law judge of the Commission shall become the final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission in accordance with paragraph (2)."  30 U.S.C. §823(d)(1).

[4]  In *UMWA on behalf of Franks & Hoy*, the Commission denied the operator's motion for stay, noting that immediate payment of backpay to compensate for two miners' respective

3

*County Coal Co.*, 38 FMSHRC 220, 222 (Feb. 2016) (granting stay of civil penalty award in discrimination proceeding where appeal before Commission was pending and the Secretary did not oppose and would not be prejudiced).

The legislative history of the Mine Act is clear that the anti-discrimination provisions of the Act are intended to encourage miners to "be active in matters of safety and health" and to "play an active part in the enforcement of the Act" so as to increase the effectiveness of the Act. S. Rep. No. 95-181, at 35 (1977). The remedial goal of section 105(c) is to restore the victim of illegal discrimination to the situation he would have occupied but for the discrimination." *Sec'y of Labor and UMWA v. Jim Walter Res., Inc.*, 18 FMSHRC 552, 561 (Apr. 1996); *Sec'y on behalf of Dunmire and Estle v. Northern Coal Co.*, 4 FMSHRC 126, 142 (Feb. 1982); *Ronald Tolbert v. Chaney Creek Coal Corp.*, 12 FMSHRC 615, 618 (Apr. 1990). In determining backpay, the Commission seeks to make a miner whole and return them to their status before illegal discrimination occurred.[5] *Sec'y on behalf of Clayton Nantz v. Nally & Hamilton Enterprises, Inc.*, 16 FMSHRC 2208, 2218 (Nov. 1994), *citing Meek v. Essroc Corp.*, 15 FMSHRC 606, 617 (April 1993) (internal citations omitted).

**A. Virginia Petroleum Test**

We conclude that American Tripoli has failed to satisfy the four *Virginia Petroleum* factors.

    1. <u>Likelihood that American Tripoli Will Prevail on Appeal</u>

American Tripoli argues that due to the number of errors committed in the Judge's decision and given the recent change in deference, there is a likelihood of success on the merits. A.T. Reply Br. at 3.

The number of alleged errors, if any, in the Judge's decision has yet to be determined. The operator cannot make a showing that there is a likelihood it will prevail by simply making a broad allegation that the ALJ made a number of errors. However, even if errors are found, it is not clear that said errors would necessarily be fatal to the Judge's ultimate finding of discrimination or his award of backpay. Moreover, the operator relies on a vague reference to a

---

seven-day suspensions would "minimi[ze] the harm to miners from actions which may have been discriminatory." 23 FMSHRC at 2374-75. Accordingly, our dissenting colleagues' suggestion that the Commission only applies the *Virginia Petroleum Jobbers* factors to analyze motions to stay when an Order of Temporary Reinstatement is at issue is erroneous.

    [5] Baumann obtained alternative employment relatively soon after his discharge and the Secretary did not seek the remedy of temporary reinstatement pursuant to section 105(c)(2). Had the Secretary sought an order of temporary reinstatement for the miner's non-frivolous filing of a discrimination complaint, the Mine Act would have required Baumann to be immediately reinstated to his former position at American Tripoli.

Appellate Case: 25-1349     Page: 300     Date Filed: 04/07/2025 Entry ID: 5503844

recent "change in deference," but fails to specifically identify the "change" referred to and provides no explanation as to how this change will affect the current stay factors under *Virginia Petroleum*, particularly in the context of the Mine Act.[6] This is insufficient to prove a likelihood of success on appeal. Therefore, American Tripoli fails to meet this factor.

### 2. Irreparable Harm to American Tripoli if Stay is Denied

American Tripoli argues that it would suffer irreparable harm because if payment is made to Mr. Baumann and this Commission reverses the decision, there is no procedural mechanism for it to recover its money. A.T. Reply Br. at 3.

The Commission has recognized that "[e]conomic loss does not, in and of itself, constitute irreparable harm." *Franks & Hoy*, 35 FMSHRC at 2374 (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (denying application for stay of enforcement of Judge's discrimination judgment in part because it saw no irreparable harm to operator should it prevail); *see also Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020) ("Mere injuries, however substantial, in terms of money, time and energy necessarily expended ... are not enough.") (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). The Commission has also noted that an operator can seek reimbursement from a complainant in the event the Commission overturns the Judge's finding of discrimination. *Franks & Hoy*, 35 FMSHRC at 2374; *see also Wisconsin Gas Co. v.*, 758 F.2d at 674, *citing Virginia Petroleum*, 259 F.2d at 925 ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm."); *In re NTE Connecticut, LLC*, 26 F.4th 980, 990 (D.C. Cir. 2022) (reasoning that "in most circumstances financial harms can be remedied through subsequent legal action.").

Courts have further held that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wisconsin Gas Co.*, 758 F.2d at 674, *citing Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977); *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985) ("[t]he threat of being driven out of business is sufficient to establish irreparable harm.").

Here, the operator has been ordered to pay Baumann $10,552. However, case law dictates that economic loss alone is insufficient to establish irreparable harm. Additionally,

---

[6] We believe the operator is referring to the Supreme Court's recent decision in *Loper Bright Enterprises v. Secretary of Commerce, et al.*, 144 S.Ct. 2244, (June 28, 2024). This decision overturned the 40-years old *Chevron* doctrine, which has instructed courts to defer to a federal agency's reasonable interpretation of ambiguous statutory language where that agency is tasked with implementation or enforcement of said law, and which has also allowed courts to look to the legislative history of an ambiguous law. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

Appellate Case: 25-1349    Page: 301    Date Filed: 04/07/2025 Entry ID: 5503844

American Tripoli has not alleged that paying Baumann the $10,522 would lead to the extinction of its business. Thus, the operator has not demonstrated irreparable harm.

### 3. Adverse Effect on Complainant Baumann

American Tripoli implies that Baumann will suffer no adverse effect from a stay of the Judge's decision because interest will accrue on the money award while the appeal is pending, and the miner will be able to enforce his rights through MSHA-issued citations if the Judgment is not immediately satisfied once there is a final order by this Commission. A.T. Reply Br. at 4. It argues, however, that Baumann's failure to return the money and the operator's inability to recover the money through administrative remedy will adversely affect the operator. It laments that it would be forced to institute a civil suit against Baumann to attempt recovery of the money paid to him. A.T. Reply Br. at 3.

The Secretary responds that American Tripoli has not demonstrated that a stay would not adversely affect Baumann. She maintains that the miner has already been adversely affected by the operator's failure to pay him, and that it is common sense that for Baumann to continue to go unpaid is to experience an adverse effect. She asserts that the operator will suffer no lasting adverse effect without the stay, and American Tripoli can recover the money if it prevails on appeal. Sec'y Resp. Br. at 6-7.

We agree with the Secretary. The Commission has observed that "[t]he remedial goal of section 105(c) is to 'restore the [victim of illegal discrimination] to the situation he would have occupied but for the discrimination.' . . . 'Unless compelling reasons point to the contrary, the full measure of relief should be granted to [an improperly] discharged employee.'" *Jim Walter Res.*, 18 FMSHRC at 561, citing *Sec'y ex rel. Bailey v. Arkansas-Carbona Co.*, 5 FMSHRC 2042, 2049 (Dec. 1983). Here, American Tripoli fails to put forth any substantive reason why a stay would not adversely affect Baumann at this time or why Baumann would not need his backpay award right away.

### 4. Public Interest

American Tripoli argues that Baumann's failure to return the money and the operator's inability to recover the money through administrative remedy is also contrary to the public's interest. A.T. Reply Br. at 3. The Secretary maintains that there is a clear public interest in protecting miners' section 105(c) rights and that Congress intended miners to play an active part in enforcement and should be encouraged to participate. She asserts that this policy is expressed, in part, by the Mine Act's remedies for discrimination, which include "back pay and interest." 30 U.S.C. 815(c)(2). The Secretary argues that deprivation of wages is sure to deter miners from exercising their rights. Sec'y Resp. Br. at 7-8.

First, American Tripoli's assertions regarding its inability to recover the backpay wages and Baumann's suspected future failure to return the money is purely speculative. Second, the operator offers no reason why a stay here would be in the public's interest. As stated by the Secretary, Congress intended miners to "play an active part in the enforcement of the Act," and

6

recognized that "if miners are to be encouraged to be active in matters of safety and health, they must be protected against… discrimination which they might suffer as a result of their participation."  S. Rep. No. 95-181, at 35 (1977).  Thus, we conclude that staying enforcement of the Judge's order would have a chilling effect on other miners at the operator's mine who are aware that Baumann lost his job after taking an active role in safety, contrary to the operator's instructions.  Such an outcome clearly runs counter to the public's interest and Congress' intent.  Consequently, American Tripoli has failed to carry its burden and show that a stay is in the public's interest.

Finally, as to the operator's argument that the Judge's decision is not enforceable because it is not a final order of the Commission under section 113(d)(1) of the Mine Act, we disagree.  Interpreting the Mine Act as to require a final, fully adjudicated order on the complaint, before a Judge's order of backpay can be enforced, would be inconsistent with the expressed intent of Congress.  In the Senate Report that accompanied the Mine Act, Congress recognized that "complaining miners [ ] may not be in the financial position to suffer even a short period of unemployment or reduced income pending the resolution of the discrimination complaint." *Cobra Nat. Res. v. FMSHRC*, 742 F.3d 82, 84 (4th Cir. 2014).  Complainant Baumann lost 62 days of employment, and a Judge has ordered that he be made whole.  Staying the order would prolong any financial hardship suffered by the miner.

## III.

### Conclusion

Upon consideration of American Tripoli's motion and the Secretary's opposition, we conclude that American Tripoli has not sufficiently substantiated the four factors required to justify staying the Judge's decision.

Accordingly, the operator's motion for a stay is denied.

_____
Mary Lu Jordan, Chair


_____
Timothy J. Baker, Commissioner


_____
Moshe Z. Marvit, Commissioner

7

**Commissioners Althen and Rajkovich, dissenting:**

We would find that payment of a backpay award is not due unless and until the order requiring payment becomes a final order of the Commission. Accordingly, we dissent.

A Judge's decision on the merits of a discrimination complaint is not final upon issuance. *See Sec'y on behalf of Bernardyn v. Reading Anthracite Co.*, 21 FMSHRC 947, 949 (Sept. 1999). Rather, a Judge's decision "shall become a final decision of the Commission 40 days after its issuance unless within such period the Commission has directed that such decision shall be reviewed by the Commission." 30 U.S.C. §823(d)(1). Here, the Judge's decision has been appealed and is currently before the Commission on review. Based on the text of the Mine Act, the Judge's order has not become final, and the Commission has yet to issue a decision. The question of whether American Tripoli engaged in discrimination—and whether the complainant is therefore entitled to a backpay award— is not yet resolved.[1]

As the Secretary notes, the Commission has held that temporary reinstatement payments may be enforced even when an order is on appeal.[2] *See Sec'y ex rel. Saldivar v. Grimes Rock, Inc.*, 44 FMSHRC 725 (Aug. 2022). However, we have also clearly established that backpay and temporary reinstatement are separate mechanisms with different underlying principles. *North Fork Coal Corp.*, 33 FMSHRC 589, 592-93 (Mar. 2011). The purpose of temporary reinstatement is to allow a miner to earn a living *while the discrimination complaint is pending*, while backpay is designed to make the miner whole *after* it has been established that discrimination occurred. *Id.* Temporary reinstatement sustains a miner *until there is a final order*, at which point any appropriate backpay comes into play. *See* 30 U.S.C. § 815(c)(2) (providing for miners to be temporarily reinstated "pending final order on the complaint").

---

[1] Notably, the Secretary has agreed to delay payment of the civil penalties that the Judge assessed concurrently with the backpay award. The pending nature of the case is one reasonable explanation for the Secretary's decision not to pursue immediate payment of the ordered civil penalties.

[2] The Secretary also cites *Eastern Assoc. Coal Co.* for the general proposition that operators must "comply with administrative orders first and litigate their merits later." 2 FMSHRC 2467, 2471 n.6 (Sept. 1980). In that case, an operator challenged the validity of a section 103(f) withdrawal order after complying with the order, and a mootness argument was raised and rejected. A brief footnote finding that an operator's compliance with an order issued by MSHA did not deprive the Commission of jurisdiction is of limited precedential weight when determining if an operator must comply with a Judge's non-final backpay award.

More narrowly, the majority notes that the Commission has denied a motion to stay enforcement of a backpay award in a previous case. *UMWA on behalf of Franks & Hoy*, 35 FMSHRC 2373 (Aug. 2013). We note that the stay was initially granted on a temporary basis. Regardless, we maintain that the stay issue in that case was wrongly decided.

As a practical matter, this distinction means that any concerns regarding a miner's financial status while a merits complaint is pending should be addressed through temporary reinstatement, rather than by requiring pre-payment of a final award to which the complainant may not ultimately be entitled. Additionally, interest would accrue on the backpay award during the pendency of the appeal, so complainants who succeed on appeal are ultimately compensated for the "delay" in awaiting a final order. *See* 30 U.S.C. § 815(c)(2).

Essentially, the question before us is whether American Tripoli is required to pay the ordered backpay award prior to the Commission's resolution of the merits case on appeal. The majority concludes that payment cannot be delayed, because American Tripoli has failed to substantiate the four factors required to justify staying the Judge's decision. We dissent, not because we would find the four factors substantiated, but because the order requiring payment is not yet final.

William I. Althen, Commissioner

Marco M. Rajkovich, Jr., Commissioner

9

Distribution List:

Russell Tidaback
Jordon Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Elaine M. Smith, Esq.
Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov
Moll.Quinlan.B@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Marcus D. Reed, Esq.
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Reed.Marcus.D@dol.gov

10

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 222-2-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

| | |
|---|---|
| Secretary of Labor, Mine Safety and Health Administration, and Robert Baumann, | Discrimination and Interference Proceeding |
| Complainants | |
| v. | Docket No. CENT 2023-0251 |
| MOSenecaManufacturer, LLC, d/b/a American Tripoli, | Mine: MOSenecaMfr LLC |
| Respondent. | Mine ID: 23-00504 |

**Secretary's Motion for Extension of Time and Leave to Exceed the Page Limit**

The Secretary respectfully requests a 30-day extension of time to file a response brief in this matter. See 29 C.F.R. 2700.9(a). The Commission granted American Tripoli's unopposed 30-day extension of time, to July 23, 2024, for the filing of American Tripoli's opening brief. The Commission further ordered the Secretary's response brief be filed by September 26, 2024. The present filing deadline conflicts with the undersigned's recently scheduled litigation deadlines in other matters, including *Secretary of Labor* v. *KC Transport* (D.C. Cir. No. 22-1071), in which supplemental briefing is scheduled for the same week as the Secretary's response in this matter. Additionally, American Tripoli's opening brief raises new arguments based on the Supreme Court's recent decisions in *Loper Bright Enterprises* v. *Raimondo*, 144 S. Ct. 2244 (2024) and *SEC* v. *Jarkesy*, 144 S. Ct. 2117 (2024). Responding to these arguments will require additional time.

The Secretary also respectfully requests leave to exceed the page limit in this matter by 35 pages, for a total brief length of 70 pages. See 29 C.F.R. 2700.75(f). Leave is warranted given that the Secretary's brief is essentially two separate briefs: the Secretary must address the complex and important legal issue directed for review by the Commission on June 18, 2024, of whether the

Appellate Case: 25-1349     Page: 308     Date Filed: 04/07/2025 Entry ID: 5503844

Judge's decision is contrary to law regarding the meanings and applications of the "discrimination" and "interference" provisions in complaints brought pursuant to §105(c) of the Mine Act, 30 U.S.C. § 815(c), and whether the provisions are ambiguous and deserving of deference to the Secretary's interpretation, as well as the six separate issues American Tripoli directed for review and the Commission granted. Each of the issues directed for review involve important questions of law and fact, the resolution of which will directly impact upon the Secretary's ability effectively to enforce the Mine Act in this and future cases. Further, the record in this case is voluminous, including hearing transcripts totaling approximately 1,100 pages. As a result, the Secretary is unable to set forth a through discussion of the relevant facts and law within the 35-page limit.

Counsel for the Secretary has conferred with Mr. Tidaback; Mr. Tidaback does not oppose the motion.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5486
(202) 693-9392 (fax)
Reed.marcus.d@dol.gov

2

**Certificate of Service**

I certify that on September 10, 2024, I served a copy of the foregoing by email on:


Russell Tidaback
American Tripoli
222 Oneida Street Seneca, MO 64865

Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

s/ Marcus D. Reed

Appellate Case: 25-1349    Page: 310    Date Filed: 04/07/2025 Entry ID: 5503844

30MAR2023 - ATMO Safety discussion with Jessie about ensuring that Rob gets the tasks done. The tasks are established, just not getting enforced by Rob.

5APR2023 - Alex informed us regarding accepting a neurology position at a hospital in Little Rock. Neurology is his degree is in. John and I discussed just letting Rob go.

7APR2023 - John, Jordan and I discussed letting Rob go.

12APR2023 - Time to let Rob go. He is afraid to make the system work and cant meet the simple daily quotas. If Jim can get it done why cant Rob. Need to look at the mill structure again. Jim can run the Mill, we just need to get a manager of people to manage the team. Hopefully, Brian Edwards can do it. He can manage the people, QC, inventory and the reporting. Jim can run the mill. Brian will need to learn how to as a back up to Jim.

14APR2023 - Warned John about an MSHA complaint when we let Rob go. Robs termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associated by utilizing the proper controls, etc. Send John the termination letter.

16APR2023 - Ask Keith about miner pay and withdrawl order. Robs termination letter sent to John.

17APR2023 - Keith replied about withdrawl order pay. Brian Edwards was a no show for the MSHA training.



UNITED STATES OF AMERICA
FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION
OFFICE OF ADMINISTRATIVE LAW JUDGES

| | | |
|---|---|---|
| JULIE A. SU, Acting Secretary of Labor, | ) | DISCRIMINATION & |
| United States Department of Labor, and | ) | INTERFERENCE PROCEEDING |
| ROBERT BAUMANN | ) | DOCKET |
| Complainants, | ) | |
| | ) | |
| v. | ) | Docket No. CENT 2023-0251-DM |
| | ) | |
| MOSENECAMANUFACTURER LIMITED | ) | |
| LIABILITY COMPANY d/b/a AMERICAN | ) | Mine: MOSenecaMfr LLC dba |
| TRIPOLI, | ) | American Tr |
| | ) | Mine Id No. 23-00504 |
| | ) | |
| Respondent. | ) | |

September 11, 2024


**ANSWER TO MOTION FOR EXTENSION OF TIME AND LEAVE TO EXCEED PAGE LIMIT**


**Introduction**


Respondent, American Tripoli, respectfully submits this response to the Secretary's Motion for Extension of Time and Leave to Exceed the Page Limit, filed on September 10, 2024.


**Position on the Motion**


While Respondent understands the complexity of the issues raised by the Secretary and the reference to recent Supreme Court rulings that may require additional time and space to address,


**Respondent opposes the motion for the following reasons:**

Appellate Case: 25-1349     Page: 312     Date Filed: 04/07/2025 Entry ID: 5503844

1. **Impact of Delay:** As of July 29, 2024, American Tripoli has ceased operations due to severe financial hardship, largely caused by MSHA's enforcement actions, including those at issue in this case. The company is now in the process of liquidating its assets in preparation for Chapter 7 bankruptcy. Further delays will exacerbate the financial strain on the company and may impact its ability to resolve this matter promptly.

2. **Significant Prejudice:** The Respondent is already under significant financial stress, and any further delay in the resolution of this matter will cause undue prejudice. The company is seeking a swift resolution to mitigate further financial harm.

**Conclusion**

For the reasons stated above, Respondent respectfully requests that the Commission deny the Secretary's motion for an extension of time and to exceed the page limit, or, in the alternative, that the Commission grant a limited extension to avoid unnecessary delay.

Respectfully submitted,

*Russell Tidaback*

Russell Tidaback
American Tripoli
Managing Member

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
1331 PENNSYLVANIA AVENUE, NW, SUITE 520N
WASHINGTON, D.C. 20004-1710

**September 13, 2024**

|                                                        |     |                            |
|--------------------------------------------------------|-----|----------------------------|
| SECRETARY OF LABOR,                                    | :   |                            |
| MINE SAFETY AND HEALTH                                 | :   |                            |
| ADMINISTRATION (MSHA)                                  | :   |                            |
| o/b/o ROBERT BAUMANN                                   | :   |                            |
|                                                        | :   |                            |
| v.                                                     | :   | Docket No. CENT 2023-0251-DM |
|                                                        | :   |                            |
| MOSENECAMANUFACTURER, LLC                              | :   |                            |
| d/b/a AMERICAN TRIPOLI                                 | :   |                            |
|                                                        | :   |                            |

**ORDER**

       The Secretary of Labor has filed an unopposed motion requesting an extension of time to file her response brief in this matter and leave to exceed the briefing page limit stated in the Commission's Procedural Rules. *See* 29 C.F.R. § 2700.75(c), (f).

       Upon consideration by the Commission, the motion is granted. The Secretary shall file her response brief by **October 28, 2024**. The brief shall not exceed 70 pages.

       Any reply brief filed by MoSenecaManufacturer, LLC doing business as American Tripoli shall be filed by **November 18, 2024.**

For the Commission:

_____

Mary Lu Jordan
Chair

Distribution List:

Russell Tidaback
Jordon Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
Moll.Quinlan.B@dol.gov

Elaine M. Smith, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Marcus D. Reed, Esq.
Office of the Solicitor, U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

Secretary of Labor, Mine Safety and Health
Administration,

      And

Robert Baumann,

      Complainant,

      v.

MOSenecaManufacturer, LLC,

d/b/a American Tripoli,

      Respondent.

Docket No. CENT 2023-0251

### Secretary's Motion for Oral Argument

Under Commission Rule 77, the Secretary of Labor requests oral argument in this case. See 29 C.F.R. 2700.77. The undersigned consulted with the representative for American Tripoli but has not received a response. 29 C.F.R. 2700.10(c). The Secretary will update the Commission when a response is received.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
Attorney

1

U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5486
(202) 693-9392 (fax)
Reed.marcus.d@dol.gov

2

**Certificate of Service**

I certify that on October 28, 2024, I served a copy of the foregoing by email on:


Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com


s/ Marcus D. Reed

Appellate Case: 25-1349    Page: 319    Date Filed: 04/07/2025 Entry ID: 5503844

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

Secretary of Labor,
Mine Safety and Health
    Administration,
    and
Robert Baumann,
    Complainant,
    v.
MOSenecaManufacturer, LLC,
d/b/a American Tripoli,
    Respondent.

Discrimination & Interference Proceeding

Docket No. CENT 2023-0251

Mine:      MOSenecaMfr LLC dba
              American Tr
Mine ID:   23-00504

### Secretary's Response Brief

SEEMA NANDA
Solicitor of Labor

APRIL NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

MARCUS D. REED
SUSANNAH M. MALTZ
Attorneys
Department of Labor
Office of the Solicitor
Mine Safety and Health Division
201 12th Street South, Ste. 401
Arlington, VA 22202
(202) 693-5486
(202) 693-5393
(202) 693-9392 (fax)
reed.marcus.d@dol.gov
maltz.susannah.m@dol.gov
Attorneys for the Secretary

# Table of Contents

Statement of Issues ............................................................................................... 2

Statement of the Case .......................................................................................... 2

   1.   Statutory Framework ................................................................................ 2

   2.   Factual Background ................................................................................... 6

   3.   Procedural Background ........................................................................... 21

Standard of Review ............................................................................................ 30

Argument ............................................................................................................ 31

   1.   The correct test for discrimination is *Pasula-Robinette*. ................................... 31

   2.   Under the *Pasula-Robinette* test, substantial evidence supports the judge's determination that American Tripoli discriminated against Baumann in violation of Section 105(c) of the Mine Act. ........................................................................... 32

   3.   Interference does not require proof of motive. .............................................. 43

   4.   Substantial evidence supports the judge's determination that American Tripoli interfered with miners' exercise of statutory rights. ............................................. 51

   5.   The judge's penalty determinations were an appropriate exercise of his discretion. .... 57

   6.   American Tripoli forfeited its 7th Amendment argument by failing to raise the issue before the judge and in the petition for discretionary review, and the Commission lacks authority to decide that facial constitutional challenge. ....................................... 59

Certificate of Service ........................................................................................... a

Appellate Case: 25-1349   Page: 321   Date Filed: 04/07/2025 Entry ID: 5503844

## Statement of Issues

1. Did the judge err in applying
   - the section 105(c) discrimination provision?
   - the section 105(c) interference provision?
2. Does substantial evidence support the judge's determination that
   - American Tripoli discriminated against miner Robert Baumann?
   - American Tripoli interfered with miners' rights?
3. Was the judge within his discretion in assessing the penalties?
4. Did American Tripoli forfeit its argument that it was entitled to a jury trial?

## Statement of the Case

### 1. Statutory Framework

#### 1.1. Discrimination

Section 105(c) of the Mine Act provides that no person shall discriminate against a miner because of the miner's exercise of statutory rights. 30 U.S.C. 815(c)(1).

The Commission uses the *Pasula-Robinette* test to analyze discrimination claims under Section 105(c). *Sec'y of Lab. ex rel. Pasula* v. *Consolidation Coal Co.*, 2 FMSHRC 2786, 2799-2800 (Oct. 1980), rev'd on other grounds, 663 F.2d 1211 (3d Cir. 1981); *Sec'y of Lab. ex rel. Robinette* v. *United Castle Coal Co.*, 3 FMSHRC 803, 818 n.20 (Apr. 1981).

The test uses a burden-shifting framework. *Robinette,* 3 FMSHRC at 818 n.20. Under *Pasula-Robinette*, the entire burden of proof is on the complainant to make out a prima facie case:

(1) the miner engaged in protected activity,

(2) the operator took an adverse action against the miner, and

(3) the adverse action was motivated in part by the protected activity.

*Pasula*, 2 FMSHRC at 2799.

If the operator offers a rebuttal, such as that there was no protected activity, no adverse action, or that it was not motivated in any way by the protected activity, the operator has the

2

burden of production and must offer evidence in support. *Robinette,* 3 FMSHRC at 818 n.20. But the burden of persuasion remains with the complainant, who must persuade the factfinder that the rebuttal evidence is insufficient or pretextual. *Ibid.*

The operator can also offer an affirmative defense, alleging that it would have taken the adverse action against the complainant for unprotected activity alone, whether or not protected activity also played any role. *Pasula*, 2 FMSHRC at 2799-2800. Under *Pasula-Robinette*, the *entire* burden of proof shifts to the operator to prove such an affirmative defense. *Ibid.*

If an operator makes out a successful affirmative defense, under *Pasula-Robinette*, the burden of proof returns to the complainant, to prove that, ultimately, the operator would not have taken the adverse action but for the protected activity. *Pasula*, 2 FMSHRC at 2800; *Robinette,* 3 FMSHRC at 818 n.20.

In 2021, the Ninth Circuit rejected the Commission's *Pasula-Robinette* test and adopted a but-for causation standard. See *Thomas* v. *CalPortland Co.*, 993 F.3d 1204 (9th Cir. 2021), rev'g *Thomas* v. *CalPortland*, 42 FMSHRC 43 ( Jan. 2020) (*CalPortland I*). On remand, the Commission applied the but-for causation standard to cases arising in the Ninth Circuit, but explicitly stated that "*Pasula-Robinette* remains the standard in cases arising under other jurisdictions." *Thomas* v. *CalPortland Co.*, 46 FMSHRC 119, 133 n.5 (2024) (*CalPortland II*) (on appeal on other grounds). The Commission limited the use of the but-for causation standard to cases arising in the Ninth Circuit (at the Ninth Circuit's direction), because the Commission had already rejected the reasoning relied on by the Ninth Circuit to reject *Pasula-Robinette*. See *Sec'y of Lab. ex rel. Riordan* v. *Knox Creek Coal Corp.*, 38 FMSHRC 1914, 1920 (August 23, 2016) ("The Commission's reasoning in *Pasula* was sound, and we decline to overturn it."). The Commission

3

has since reiterated that *Pasula-Robinette* remains the standard in jurisdictions other than the Ninth Circuit. See *Sec'y of Lab. ex rel. Hargis* v. *Vulcan Construction Materials*, Nos. SE 2021-0163 et al., slip op. at 7 (FMSHRC Aug. 29, 2024) (*Pasula-Robinette* applies in cases arising in the Sixth Circuit).

Under the but-for causation standard, the Secretary (or a complainant miner) bears the entire burden of proving, at the prima facie case, that the operator would not have taken the adverse action but for a miner's protected activity. *Id.* at 122. The difference then between *Pasula-Robinette* and the Ninth Circuit's but-for causation standard is not but-for causation per se, but which party bears the burden of proof at which stage.

This case arises in the Eighth Circuit. Following *CalPortland II*, the Eighth Circuit (unlike the Ninth Circuit) has applied the *Pasula-Robinette* test. See *Cont'l Cement* v. *Sec'y of Labor*, 94 F4th 729, 733 (8th Cir. 2024) (directly addressing *CalPortland Co.*, 993 F.3d 1204 (9th Cir. 2021)). The Commission recently addressed *Continental Cement*, acknowledging that the Eighth Circuit did not reject *Pasula-Robinette*. See *Hargis*, slip op. at 7 n.8. Thus, under *CalPortland II*, *Pasula-Robinette* remains the standard in section 105(c) cases arising in the Eighth Circuit. 46 FMSHRC at 133 n.5.

### 1.2. Interference

Section 105(c) prohibits any person from interfering with miners' exercise of protected rights. 30 U.S.C. 815(c)(1). The Secretary has long argued that interference is established when:

(1) A person's actions can reasonably be viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and

(2) The person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights.

4

See, *e.g.*, *Marshall Cnty. Coal Co.* v. *FMSHRC*, 923 F.3d 192, 198-199 (D.C. Cir. 2019) (an operator's "awareness meetings" warning against making safety complaints constituted interference); *UMWA ex rel. Franks & Hoy* v. *Emerald Coal Res., LP*, 36 FMSHRC 2088, 2108 (Aug. 2014) (two Commissioners would have found interrogating miners about anonymous safety complaints was interference). Whether this test (the *Franks* test) or an alternate test requiring proof of operator motive (the *Pepin* test) is the appropriate one for interference is not settled. See *Sec'y of Lab. ex rel. Pepin* v. *Empire Iron Partnership*, 38 FMSHRC 1435 (2016) (ALJ) (requiring proof of motive).

The Commission has not definitively decided what the statute requires, *Greathouse* v. *Monongalia Cnty. Coal*, 40 FMSHRC 679, 680-681 ( June 2018). The D.C. Circuit has applied the *Franks* test (albeit where its use was not challenged). *Marshall Cnty.*, 923 F.3d at 199; *Wilson* v. *FMSHRC* 863 F.3d 876, 881 (D.C. Cir. 2017). In *Wilson*, the court applied the *Franks* test (evaluating how a hypothetical reasonable miner or miners' representative would view the allegedly interfering conduct under the circumstances), rather than whether the person who allegedly interfered with protected rights subjectively intended to do so. *Id.* at 881-882. The Secretary believes this is the only reasonable interpretation of the statute.

In *Greathouse*, the operators argued that interference required intent to interfere. They also urged that the motivation must be based on an exercise of statutory rights that occurred prior to the alleged interference, as opposed to whether the operator was motivated to chill future exercise of rights. The Commission, though split on whether interference required proof of motivation, uniformly rejected the idea that interference was possible only if miners had first exercised protected rights. 40 FMSHRC at 695-696 (op. of Commissioners Jordan and Cohen, describing

5

rejecting the prior exercise requirement as "inappropriate," "narrow," leading to "absurd results," and "directly contravene[ing]" the legislative history of the Mine Act); 40 FMSHRC at 727 (op. of Acting Chair Althen and Commissioner Young) ("[W]e do not accept the notion that section 105(c) does not protect miners from operator activity motivated by a desire to interfere with protected activity that has not yet occurred. Section 105(c) applies fully if the Secretary or claimant demonstrates that an operator's action was motivated by a desire to prevent protected activity from occurring in the first place.").

## 2. Factual Background

American Tripoli[1] is a nonmetal surface extraction mine located in Oklahoma with a milling operation in Seneca, Missouri. Hearing Transcript (Tr.) Vol. 1, p. 65; Vol. 2, p. 316. The mine produces "tripoli," a soft, friable sedimentary rock used in such applications as fine polishing. Tr. Vol. 1, pp. 53-54; American Geological Institute, *Dictionary of Geological Terms* 537 (Robert L. Bates and Julia A. Jackson, eds., 3d. ed. 1984); *Dictionary of Mining, Mineral, and Related Terms* 156 (2d ed. 1996). The raw rock is extracted from American Tripoli's quarry[2] in Oklahoma and is then transported to and crushed to powder at its mill in Missouri. This case involves the Missouri mill. Tr. Vol. 1, p. 53-54, 65.

The chemical composition of commercial tripoli is typically 98%-99% silica. Silica dust is a major hazard at the American Tripoli mine, among other safety issues. See, *e.g.*, Tr. Vol. 1, pp. 57-

---

[1] The operator is MoSenecaManufacturer, LLC, but it does business as "American Tripoli," and that is how the Secretary refers to it in this brief. Tr. Vol. 1, p. 6.

[2] Throughout this brief, "mine" and "mill" are used interchangeably to refer to the Seneca, Missouri, milling operation; references to the quarry in Oklahoma where American Tripoli extracts the raw material is "the quarry."

Appellate Case: 25-1349     Page: 326     Date Filed: 04/07/2025 Entry ID: 5503844

60. When miners inhale respirable silica dust, they are at risk of developing silicosis, a debilitating and sometimes fatal lung disease. See *Lowering Miners' Exposure to Respirable Crystalline Silica and Improving Respiratory Protection*, 89 Fed. Reg. 28,218, 28,218 (Apr. 18, 2024) (to be codified at 30 CFR pt. 60).

Russell Tidaback owns American Tripoli. Exh. P-17, p.3; Exh. P-43, pp. 2-3. His daughter, Jordan Tidaback,[3] has an ownership share in the mine. Exh. P-17, p.3; Tr. Vol. 1, p. 15. John Spears is the operations manager in charge of day-to-day operations at the mine. Tr. Vol 1, p. 47.

Russell Tidaback was not at the mine frequently, but Spears kept him apprised of mine operations, mostly through Microsoft Teams. Tr. Vol 1, pp. 67-68; Vol. 3, p. 144. When discussing issues with miners, Spears would tell them that he needed to report to Tidaback, get his approval, or otherwise seek his input. Tr. Vol. 1, pp. 69-70; Vol. 2, p.148. After talking with Tidaback, Spears would convey Tidaback's instructions back to miners. Tr. Vol. 1, pp. 69-70. Tidaback and Spears were in close communication. *Ibid.*

Communication via Teams was not limited to messages between Spears and Tidaback; management trained and instructed miners to use Teams to communicate. Tr. Vol. 3, pp. 116-117, 167-168; Exh. P-43, p. 9. Management and miners used Teams to communicate with one another about operations at the mine. Tr. Vol. 3, pp. 167-168. In addition to sending messages, management and miners used Teams to share documents (*e.g.*, MSHA fatal accident reports). Exh. P-43, p. 19.

---

[3] Throughout this brief, Jordan Tidaback is identified by her full name; references to "Tidaback" refer to Russell Tidaback.

Robert Baumann worked as a production supervisor at American Tripoli from June 2022 to April 17, 2023, when he was fired. Tr. Vol. 1, p. 47. During Baumann's ten-month tenure, 35 people were employed at one time or another. Of those, 26 quit or were fired during Baumann's employment. See Exh. P-39, pp. 10-18.

In his role as a production supervisor, Baumann was tasked with guiding tripoli from holding tanks into a dryer system and then into bags. Tr. Vol. 1, p. 97. Baumann had to walk around the mine about once an hour to check to ensure the machinery was running correctly and to look for back-ups of product in the works, excessive dust, or other issues. Tr. Vol. 1, p. 97-98. He also prepped items prior to the shift (bags and pallets, *e.g.*) and provided general support to the outgoing shift when he started work each day. Tr. Vol. 1, p. 97.

Before coming to American Tripoli, Baumann had no experience in the mining industry. Tr. Vol. 1, p. 81. He was unfamiliar with MSHA and the Mine Act's requirements. *Ibid.* He did not know that new miners must receive 24 hours of new miner training. Tr. Vol. 1, p. 333. Baumann never received new miner training. Tr. Vol. 1, pp. 87-88. Instead, about two weeks after he started working, Baumann underwent a 30- or 45-minute safety training. Tr. Vol. 1, p. 81. American Tripoli instructed Baumann to sign a certificate affirming he had received new miner training. Tr. Vol. 1, pp. 81, 87. Baumann did so, believing the abbreviated training was the requisite new miner training. Tr. Vo1. 1, p. 87. Only months later, after Baumann participated in an annual refresher training by a third party, did he realize that new miner training was supposed to be 24 hours. Tr. Vol. 1, p. 333.

American Tripoli never fully explained to Baumann safety expectations at the mine, and it never taught Baumann about the safety standards mines must adhere to. Tr. Vol. 1, p. 90.

Appellate Case: 25-1349    Page: 328    Date Filed: 04/07/2025 Entry ID: 5503844

Baumann was not tasked with any special safety role or responsible for ensuring compliance with safety standards, but he was interested in and committed to keeping other miners safe. Tr. Vol. 1, pp. 135-136, 140.

Despite the lack of adequate training, Baumann was a good worker. His coworkers respected his good attitude, his willingness to work hard, and his dedication to miner safety. Tr. Vol. 2, pp. 234-235, 247, 273. He also had a good relationship with his direct supervisor, Spears. Tr. Vol. 3, p. 109. He initially started on the night shift and was lauded by his supervisors (including Tidaback) for helping the mine to catch up on production of bulk bag orders. Tr. Vol. 1, pp. 71-73. American Tripoli discontinued the night shift (apparently because the milling machinery was struggling to run continuously every day and night), and Baumann was transferred to the day shift. Tr. Vol. 1, pp. 72-73.

Around December 2022 or January 2023, Baumann began doing workplace exams. Tr. Vol. 1, p. 100. He was not trained on how to do workplace exams and didn't know that MSHA's regulations require daily workplace exams, 30 C.F.R. 56.18002, until MSHA began asking about them. Tr. Vol. 1, p. 365. No one at American Tripoli discussed workplace exams with him prior to the MSHA inspections where MSHA inspectors brought it up. Tr. Vol. 1, pp. 100-101, 365. In his workplace exams, Baumann noted safety issues (*e.g.* exposed energized wires, open and unmarked electrical boxes, rags stuffed into worn-out bearings, spilled oil, Tr. Vol. 2, pp. 79-80) but they often went unaddressed because there were not enough maintenance personnel to handle them or because management refused to make repairs if they would require shutting down production. Tr. Vol. 1, pp. 100-102. Baumann would note issues in his workplace exams for as long as they persisted, recording them day after day. Tr. Vol. 2, pp. 80-81.

9

Baumann began to participate in MSHA inspections in February 2023. Tr. Vol. 1, p. 268. This made him more aware of safety issues at the mine, and he began raising more safety complaints to Spears. Tr. Vol. 1, pp. 183-184. There was no formal process at the mine for making safety complaints; miners were expected to speak directly to Spears, who would then relay the issues to Tidaback. Tr. Vol. 1, pp. 186-187, 269-270. Baumann alerted Spears to safety issues (via Teams and in person) frequently, sometimes multiple times a day. Tr. Vol. 2, pp. 278-279.

In particular, Baumann complained about the dangerous silica dust. Tr. Vol. 1, pp. 140, 246-247. He learned during his participation in MSHA inspections about silica hazards. Tr. Vol. 1, pp. 58-59, 183-184. He complained to Spears about silica dust exposure at least 15 times; ten of these complaints were made in the last two months before he was fired. Tr. Vol. 1, pp. 184-185. At times, the mine produced so much silica dust that it wafted into the city of Seneca. Tr. Vol. 1, pp. 112-113. Residents called the police department and the state Department of Natural Resources; both the police and the Department of Natural Resources told American Tripoli to stop running, but American Tripoli continued with production. Tr. Vol. 1, pp. 183-185.

Baumann's concerns were not limited to silica; he also complained about equipment. In one instance, Baumann raised a complaint about temporary fix for faulty machinery that required miners to work with and around an open, energized electrical box (a shock hazard). Tr. Vol. 1, p. 198-200. Spears allowed Baumann to put caution tape around the box, but miners were nonetheless expected to break through the tape to operate the machine. Tr. Vol. 1, pp. 199-200.

In general, American Tripoli ignored Baumann's complaints. Tr. Vol. 1, pp. 197-198. But sometimes, management acknowledged them and flatly refused to address them. Tr. Vol. 1, pp.

173-174; 189-190 (MSHA cited spilled oil and required clean-up; Baumann attempted to clean it but management told him not to).

Fixing some of the safety issues would have required American Tripoli to pause production, but miners understood that management was loathe to shut down. Tr. Vol. 1, p. 210. Tidaback was clear that production should be prioritized over maintenance and safety, at one point suggesting to Spears that miners could come in on the weekends to do maintenance work and make repairs, and explaining, "[w]e don't want to use production schedule time to do maintenance." Tr. Vol. 1, p. 210. In another instance, a miner was sweeping up powdered tripoli with a broom and swept over a live wire on the floor. Tr. Vol. 1, p. 194. The wire sparked. Tr. Vol. 1, p. 194. Baumann alerted Spears in a Teams group chat (that Tidaback was privy to) and said that he would cut power to the whole building. Tr. Vol. 1, p. 192. The circuit breakers were unlabeled, so there was not a way to cut power to the wire only. Tr. Vol. 1, p. 193. Tidaback responded, saying "[w]e don't need to shut the building down. Tape off the area so no one can step on it or near it." Tr. Vol. 1, p. 195. Baumann complied, even though he did not think that was a safe solution. Tr. Vol. 1, p. 196. Ultimately the wire remained energized for about two weeks, until a miner with electrical experience was able to deenergize it without cutting power to the entire operation. Tr. Vol. 1, p. 195.

American Tripoli knew that Baumann was accompanying MSHA on inspections in the two months leading up to his firing. Tr. Vol. 2, pp. 359-360. Between February 2023 and when he was fired in April 2023, Baumann accompanied MSHA on at least ten inspections. Tr. Vol. 1, pp. 251-252. Management also almost always came along; Spears and/or Tidaback (who visited the mine sometimes) would join Baumann and the inspector. Tr. Vol. 2, p. 369. American Tripoli was also

11

aware that Baumann was reporting safety hazards to MSHA. Tr. Vol. 1, p. 180. In one instance, Baumann had reported to Spears that there were problems with the guarding (barriers that enclose moving parts on equipment) on a piece of equipment. Tr. Vol. 1, p. 182. Spears told Baumann that they'd address the issue on their next maintenance day. Tr. Vol. 1, p. 182. The issue went unaddressed until a guard broke off and plummeted 40 feet to the ground, narrowly missing Baumann. Tr. Vol. 1, pp. 179-180. Baumann went to tell Tidaback (who was present at the mine) what happened. Tr. Vol. 1, p. 180. Tidaback was with MSHA inspectors, so Baumann reported the incident to both Tidaback and MSHA. Tr. Vol. 1, p. 180.

While accompanying inspectors, Baumann pointed out safety problems to MSHA (*e.g.*, dust exposure, unguarded machines with exposed moving parts, electrical issues, walkways and work areas in need of maintenance and housekeeping, Tr. Vol 2, pp. 366-367) and informed MSHA of unreported accidents (*e.g.*, when a miner fell through floor grating on the top floor of the mine and was injured, Tr. Vol. 2, 362).

American Tripoli discouraged miners from talking to MSHA. On February 14, 2023, the day after MSHA opened a multi-month, ongoing hazard complaint inspection, Spears sent a Teams message to American Tripoli maintenance employee Gage Wheeler. Exh. P-9. The message was addressed to Wheeler, but others could see it and participate in the conversation (including Baumann, Russell Tidaback, and Jordan Tidaback). Tr. Vol. 1, pp. 155-156. The message from Spears to Wheeler read: "Gage Wheeler do not answer any questions… that the MSHA inspector may have. Do not go into the mill. I'll be the person who talks to [the] inspector." Exh. P-9. Both Baumann and Wheeler understood this message to mean they should not speak to MSHA. Tr. Vol. 1, pp. 154-155; Tr. Vol. 2, pp. 175-176. It was not the first time Baumann had seen a message

12

from American Tripoli to miners telling them not to speak to MSHA. Tr. Vol. 1, pp. 154-155. And Spears at one point told Wheeler, verbally, to "steer clear" of MSHA during inspections. Tr. Vol. 2, pp. 170-171. Over the course of the ongoing inspection, three miners informed Inspector Kieth Markeson that American Tripoli had instructed them not to speak with MSHA, and two of the three showed Inspector Markeson the Teams and text messages they'd received conveying that instruction. Tr. Vol. 2, pp. 373-374.

About an hour after Spears sent the message, MSHA Inspector Bryan Licklider arrived at the mine to investigate a hazard complaint. Tr. Vol. 3, pp. 73-74; P-26 at 6. He spoke with Spears, Wheeler, and Baumann in the office about the complaint. Tr. Vol. 3, p. 74. About three hours later, Spears sent another message to Wheeler and Baumann that said "I understand. I should have been more specific about not volunteering specific information. I will escort the inspector." Exh. P-9.

Wheeler responded, "there was no [v]olunteering information i was asking a question about… the right kind of material… so w[e] can be in compliance… that's all i was doing i wasn't giving information about other things or whatever i didn't even join the inspection group till he pointed [out] things that need to be fix[ed] because at that point it became my bu[]s[i]ness." Exh. P-9. In response to a question from Tidaback about whether the inspector was dissatisfied with the guarding on the machines, Wheeler responded "No he doesn't [like the guarding] almost all of it is a no go Well regardless of that i wasn't volunteering information. . . ." Exh. P-9. Tidaback told him, "Oh well, thanks for just nodding and agreeing with the inspector. That's all we can do." Exh. P-9. Wheeler responded, "Well just [to] make myself absolutely clear i wasn't giving up any information volunt[ari]ly that[] wasn't directly asked of me by the msha inspector." Exh. P-9.

13

Wheeler felt he needed to emphasize that he had not voluntarily spoken to the MSHA inspector or reported any problems because he was concerned that if he did not make that clear, he would be fired. Tr. Vol. 2, pp. 178-179. Baumann likewise understood that the expectation from management was that miners would not affirmatively point out issues, but instead just agree with inspectors without offering additional information. Tr. Vol. 1, pp. 163-165.

Shortly after this exchange, Jordan Tidaback chimed in to the Teams conversation, apparently to clarify Spears' instruction that Wheeler not speak to MSHA. Exh. P-10. She wrote, "I think John may have meant don't just go up to [the inspector] and point out everything under the sun. We've had people doing that, knowing very well it[']s an issued being worked on." Exh. P-10. Baumann understood this to be a reference to two former American Tripoli miners, Carson Allman and Terry Newburn; Allman and Newburn accompanied MSHA on an inspection in 2022 and were fired one or two days later. Tr. Vol. 1, 168-169; Vol. 2, pp. 244, 250. Tidaback had warned Allman prior to his firing not to tell any "stories" about the mine to inspectors. Tr. Vol. 2, 221-222.

In mid-March 2023, Baumann became a miners' representative. Tr. Vol. 1, p. 201; P-2. Miners' representatives are elected by miners, who may choose to remain anonymous to the mine. Tr. Vol. 2, pp. 365-366. The miners who elected Baumann decided to remain anonymous, telling Baumann they were worried they would lose their jobs if their identities were not kept confidential. Tr. Vol. 1, pp. 201-202.

MSHA and Baumann informed Spears that Baumann had been elected a miners' representative and formally had the right to accompany MSHA on inspections. Tr. Vol. 2, pp. 364-365. Once Baumann became a miners' representative, MSHA inspectors contacted him

14

when they arrived at the mine so that he could walk around with them. Tr. Vol. 1, p. 255. Baumann began bringing other miners' concerns to MSHA in addition to his own. Tr. Vol. 2, pp. 360-361.

In March, Baumann complained to MSHA about American Tripoli's practice of stacking 100-pound bags of tripoli ten bags high (a lifting hazard). Tr. Vol. 1, pp. 187-188, 209. As a result of this complaint, MSHA opened another ongoing inspection. Exh. P-21; Tr. Vol. 1, p. 211; Vol. 2., p. 385-386.

In the meantime, MSHA was assessing the hazardous silica dust at the mine. Tr. Vol. 2, p. 377. Dust sampling results revealed that miners were overexposed to dangerous silica dust. Tr. Vol. 2, pp. 377-378. On March 30, 2023, MSHA issued citations to American Tripoli for failure to control hazardous silica dust. Tr. Vol. 2, pp. 377-378. The citations required American Tripoli to abate the violations by April 7, 2023. Tr. Vol. 2, pp. 377-378.

The day after the citations were issued, Baumann and American Tripoli's safety specialist, Jessie Molesi, discussed the citations and what the mine must do to abate the violations with Inspector Markeson. Exh. P-25, p. 1. Baumann began raising concerns about compliance with the citations with management. Tr. Vol. 1, p. 60. Spears said he would speak with Tidaback about the issues; Molesi said that he'd sent emails to Tidaback about the issues. Tr. Vol. 1, p. 60. The dust issues persisted, unabated. Tr. Vol. 1, pp. 60-61. Baumann continued to ask about the issues daily. Tr. Vol. 1, p. 60.

The next day, Tidaback sent a Teams message to a group (including Spears, Molesi, and Baumann) that read, "I will stress with you….any MSHA inspector is not your friend. Anything you say to or in their presence can AND WILL be used against you in a court of law. Hopefully

15

this will never be needed BUT just be well aware." Exh. P-12, p. 18; Tr. Vol. 1, pp. 216-217. Baumann understood this message to mean that miners should not speak to MSHA and that MSHA was coming after employees (Tidaback had previously told Baumann that MSHA could issue citations to miners personally). Tr. Vol. 1, pp. 217-218. This was not the first time Tidaback said something like this to miners. Exh. P-19, p. 19. Tidaback had recently sent a similar Teams message to a miner, Jim Hoover.[4] Exh. P-19, p. 19. It read: "MSHA inspectors are NOT your friend. They can and will us[e] anything and everything against you in a court of law." Exh. P-19, p. 19. Baumann was concerned that miners would be reticent to talk to MSHA because of statements like these. Tr. Vol. 1, pp. 221-222. He also worried that American Tripoli might retaliate against him for participating in MSHA inspections. Tr. Vol. 1, pp. 221-222.

In early April, American Tripoli's production numbers were good. Exh. P-28, p. 21; Exh. P-44, p.44. Spears praised the miners (including Baumann) in Teams messages, thanking them for their work. Exh. P-13, p. 220; Tr. Vol. 1, pp. 222-223.

Meanwhile, American Tripoli had not abated the dust exposure violations by the April 7, 2023 abatement deadline. Tr. Vol. 2, p. 378. On April 12, MSHA issued two section 104(b) withdrawal orders for failure to abate violations; the orders required American Tripoli to withdraw miners from the mill. Tr. Vol. 2, p. 368; Vol. 3, p. 39. These orders shut down production. Tr. Vol. 2, p. 385. Baumann accompanied MSHA and participated in the inspection that led to the section 104(b) orders and the shutdown. Tr. Vol. 1, pp. 57-58, 250. Inspector Markeson held a closing

---

[4] Mr. Hoover is referred to in the underlying decision as "Mr. Huber," but American Tripoli's discovery responses (including Teams chats) reflect that his name is spelled Hoover. Exh. P-34, p. 16. P-39, p. 17.

Appellate Case: 25-1349     Page: 336     Date Filed: 04/07/2025 Entry ID: 5503844

conference with Baumann and Molesi explaining the effect of the section 104(b) orders. Exh. P-25, p.4.

On April 12 and 14, 2023, once the shutdown was in effect, Baumann informed Spears that miners were entitled to pay. In one message, he included a screenshot of the MSHA handbook explaining the mine's obligation to pay, and told Spears, "[l]ooks like we are [e]n[]titled to up to a week['s] pay because nothing was done about the safety situation until we were under the withdrawal….[You] legally have to pay us for the 12 hours [and] we ran illegal on Monday and Tuesday.[5] Don't really want to have to file with msha but we the mine workers were not at fault." P-7. Spears did not respond. Tr. Vol. 1, p. 231.

On April 13 and 14, during the shutdown, Baumann spoke with Molesi about respirable dust issues. Tr. Vol. 1, pp. 248-249. Molesi told Baumann that he had emailed Tidaback about the issues. Tr. Vol. 1, pp. 249-250.

While Baumann was working on addressing the hazardous silica dust, Tidaback and Spears were discussing ways to influence dust sampling. They talked about avoiding taking samples from people that "attract" dust; Spears told Tidaback "this is why we hardly ever choose [miner] Jim [Hoover] to wear a monitor [referring to the wearable dust sampling pump]. Jim attracts the dust[.] Yep. Dirty Jimmy." Exh. P-13, p. 392. Tidaback appeared to suggest that sampling should be run on a person "who isn't going to get all in it… control room person, forklift driver, palletizer person" and added that they would "just have to play it smart." Exh. P-13, p. 392. He also suggested that the "maintenance guy [should] sit[] in the maint[enance] office;" implying that

---

[5] Baumann was referring to Monday, April 10 and Tuesday, April 11, the two days the mine was active without abating the dust exposure citations, past the abatement deadline of Friday, April 7.

Appellate Case: 25-1349     Page: 337     Date Filed: 04/07/2025 Entry ID: 5503844

during sampling maintenance miners should stay out of the dusty production area. Exh. P-13, p. 392.

In the meantime, Tidaback had sent several emails to MSHA expressing frustration about the section 104(b) orders. Exh. R-H. On April 14, 2023, Inspector Markeson responded, explaining that Baumann had participated in the inspection that gave rise to the orders. Exh. R-H, pp. 8-11.

The same day that Markeson sent this response to Tidaback, Spears forwarded to Tidaback Baumann's Teams message about the miners being entitled to pay. Exh. P-32, p. 1. Tidaback responded that the miners could work for pay doing tasks that didn't create a dusty atmosphere, and "as I mentioned previously… we need them to be productive towards production." Exh. P-32, p. 2.

Less than an hour later, Tidaback sent a Teams message to Spears: "expect an MSHA complaint when Rob [Baumann] is let go… the writing is on the wall." Exh. P-32, p. 2. Tidaback followed up with another message: "Rob's termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associate[s] by utilizing the proper controls, etc. He doesn't have to sign it. We just need to have a document of why he was let go." Exh. P-32, p. 3.

Later that day, Spears sent a Teams message to a group (including Baumann): "I[']m telling you guys… [MSHA Inspector] Keith [Markeson] is a snake… be cautious on what you say to and around him. Any MSHA inspector really." Exh. P-11, p. 2.

On April 16, 2023, Spears texted Baumann, telling him to report to the office the following day at 8:00am. Tr. Vol 1., p. 47.

On April 17, 2023, when Baumann arrived for the meeting, Spears told him he was fired and gave him a termination letter. Tr. Vol 1., pp. 47-49; Exh. P-38. The letter alleged that Baumann was being fired for poor performance, lack of leadership skills, and failure to follow procedures and guidance given by his supervisor. Exh. P-38. This was the only explanation American Tripoli offered for the firing. Tr. Vol. 1, pp. 50-51.

American Tripoli has a progressive three-step disciplinary process. Exh. P-16, p. 43. Miners that American Tripoli believed had engaged in misconduct would get (1) a verbal warning, (2) a formal meeting with a supervisor and a written remand, and (3) termination. Exh. P-16, p. 43. Baumann had never been subject to any formal discipline at American Tripoli; he had never received a verbal or written warning and was never counseled about any shortcomings regarding his job performance. Tr. Vol. 1, pp. 51, 255, 372. Spears, Baumann's direct supervisor, never gave him any counseling, write-up, "or anything like that." Tr. Vol. 3, p. 145. But Spears has given written disciplinary warnings to other miners. Tr. Vol. 3, p. 145.

After Baumann was fired, Tidaback messaged miner Jim Hoover to tell him the news. Exh P-34, p. 16. Then Tidaback told Hoover, "MSHA just compounds the problem 10x b[y] not working with us and being fucking dicks." Exh P-34, p. 19. He continued, "This [MSHA Inspector] Keith [Markeson] jackass…he gets his jolly off handing out citations… [] this fucker is a snake. When he's around, you'd better watch what you say and do… he is out to fuck you or anyone else he can." Exh P-34, p. 19. Later in the conversation, Tidaback reiterated: "[MSHA Inspector] Keith [Markeson] is a jackass…" and "I personally…would just stay away from that guy. Intentionally, stay away." Exh P-34, p. 27. Throughout the conversation, Tidaback excoriated Baumann as well, telling Hoover that Baumann was "lazy" and "lacking," and wondering why

Appellate Case: 25-1349    Page: 339    Date Filed: 04/07/2025 Entry ID: 5503844

Baumann "just didn't do as he was told." Exh P-34, p. 20. Hoover told Tidaback that he, Hoover, was loyal to American Tripoli. Exh P-34, p. 19. Tidaback asked Hoover why Baumann was "disgruntled" and Hoover responded, "I don't talk to him really[,] MSHA guy." Exh P-34, p. 19.

Later, the conversation continued. Tidaback told Hoover "EVERYONE needs to stop calling MSHA." Exh P-34, p. 24. Hoover responded, "No shit. Pisses me off." And Tidaback replied, "[m]e too!" Exh P-34, p. 24.

After he was fired, Baumann filed a section 105(c) discrimination complaint with MSHA. Exh. P-1. MSHA provides operators with copies of discrimination complaints; American Tripoli received Baumann's complaint on April 27, 2023. Tr. Vol. 2, p. 310. That evening, Tidaback created a document outlining supposed issues with Baumann during his employment. Exh. R-B.

The next day, Tidaback told Hoover, "[w]e need you to make that place [the mine] rock and roll. I need the justification since Rob[']s complained to MSHA about being let go… just need you to be the cherry on the cake that's all." Exh. P-34, p. 28.

Later, Tidaback continued to tell Hoover about his ostensible reasons for firing Baumann, telling Hoover that Baumann "lacked leadership skills." Exh. P-34, p. 38. After this, Tidaback said, "Then the whole MSHA thing in February…" Exh. P-34, p. 39. Hoover responded, "Oh he fucked us over on that deal sorry for cussing." Exh. P-34, p. 39. Tidaback responded, "Oh I know…" Exh. P-34, p. 39. Tidaback told Hoover, "that[']s when Rob started to really buck back against what John [Spears] was telling him to do." Exh. P-34, p. 39. Tidaback said that Baumann "made a friend at MSHA… [MSHA Inspector] Keith [Markeson]… Rob[']s a fool to think Keith is his friend." Exh. P-34, p. 40.

Appellate Case: 25-1349    Page: 340    Date Filed: 04/07/2025 Entry ID: 5503844

Baumann participated in major months-long inspections at the mine, walking around with MSHA, pointing out and discussing safety issues, making hazard complaints, and acting as the miners' representative. Tr. Vol. 1, pp. 149-150, 211; Exh. P-17, p.2; Exh. P-25. In total, those inspections resulted in 58 citations and 18 orders (including the two 104(b) withdrawal orders that MSHA issued less than a week before Baumann was fired). Exh. P-21.

### 3. Procedural Background

The Secretary filed a discrimination and interference complaint, and there was a hearing on the merits. Judge Moran issued a decision on May 23, 2024. ALJD.

Judge Moran concluded that the Secretary "overwhelmingly established" that American Tripoli fired Baumann because of his protected activity, "clearly meeting the 'but for' test[.]"[6] ALJD 7, 43, 45. Noting that American Tripoli presented no "legitimate basis" for firing Baumann, the judge found that Baumann "would not have been fired but for his safety complaints." ALJD 43. The judge found an "equally clear case" that American Tripoli "interfered with the Mine Act's rights of miners on multiple occasions." ALJD 7, 45, 48.[7] In describing the weight of the evidence presented at the hearing, Judge Moran found that the Secretary "present[ed] a plethora of credible information," while American Tripoli's "slate is empty." ALJD 3 n.2.

---

[6] As the Secretary argues infra at pp. 32, the judge erred when he applied the Ninth Circuit's but-for test and not the Commission's *Pasula-Robinette* test.

[7] The judge agreed with the Secretary that interference is a separate and distinct violation under 105(c) of the Mine Act. ALJD 47.

Appellate Case: 25-1349     Page: 341     Date Filed: 04/07/2025 Entry ID: 5503844

## Discrimination

**Baumann's Protected Activity.** The judge found credible all testimony confirming that American Tripoli was aware that Baumann engaged in several forms of protected activity. ALJD 36 n. 28. To be sure, the judge addressed each instance of Baumann's protected activity and American Tripoli's corresponding knowledge.

*Inspections.* The "uncontested" evidence demonstrated that American Tripoli was aware that Baumann participated in several MSHA inspections during his employment and just prior to being fired. ALJD 8, 13, 14, 15, 16, 26, 27, 36, 39, 41. "[E]very time MSHA inspectors were on the site [Baumann] was with them." ALJD 16. And Baumann actively participated in the April 12, 2023, inspection that resulted in the 104(b)-order shutting down the mine. ALJD 8.

*Safety Complaints.* The judge found that Baumann made numerous credible safety complaints to American Tripoli management during his employment and just prior to being fired. ALJD 13, 14, 16, 17, 27, 30, 31, 43. Baumann raised these concerns, in person and via Teams messages, directly to Spears, Molesi, and Tidaback. ALJD 14, 43. Bauman raised more safety complaints in the last two months before he was fired, and these complaints directly coincided with him participating more in MSHA inspections. ALJD 41. Baumann made safety complaints about the dangerous silica dust hazards, guarding hazards, electrical hazards, fire hazards, and lifting/stacking hazards at the mine. ALJD 13, 43. After the 104(b) orders were issued to the mine, Baumann continued to raise concerns about the silica dust hazards at the mine "every day" to Spears and Molesi. ALJD 16, 36. The testimony of MSHA Inspector Markeson corroborated that Baumann's safety complaints were genuine. ALJD 27, 28. Likewise, the testimony of other

Appellate Case: 25-1349      Page: 342      Date Filed: 04/07/2025 Entry ID: 5503844

miners confirmed that Baumann sincerely cared about safety at the mine and that he often raised safety concerns to management. ALJD 22, 24, 25, 26.

Spears confirmed that Baumann had raised safety concerns to him. ALJD 30. Tidaback on the other hand testified that he did not recall receiving safety complaints from Baumann. ALJD 33-34. But the judge did not find Tidaback's "lack of recollections" credible because of the small management group (3 people), ALJD 33, and because Baumann sent safety complaints directly to Tidaback via Teams messages. ALJD 43.

*Miners' Representative.* The judge found American Tripoli management was aware that Baumann was elected the miners' representative and understood the rights that Bauman possessed in that capacity. ALJD 27, 36. Inspector Markeson testified that he informed Spears of Baumann's status as miners' representative, ALJD 27, 36, and Spears confirmed he was aware that Baumann was elected as Miners' Representative. ALJD 30, 31. The judge did not find credible Tidaback's testimony that he did not know that Baumann was elected miners' representative prior to firing Baumann because given the "extremely small management group," it was "highly unlikely that this assertion was true." ALJD 34, 41.

*Statutory right to be paid during withdrawal under a 104(b) order.* The judge determined that Baumann exercised his and other miners' statutory right to be paid after the 104(b) orders were issued. ALJD 43. A text message confirmed that Baumann informed Spears that American Tripoli is legally required to pay the miners the rest of the day's wages (and four hours of the following day) if production was shut down because of a 104(b) order. ALJD 9, 16, 43. Spears did not respond to Baumann's text message. ALJD 9. But Spears did send a screenshot of Baumann's text message and then sent it to Tidaback via a Teams message on April 14, 2023. ALJD 16. Tidaback

Appellate Case: 25-1349      Page: 343      Date Filed: 04/07/2025 Entry ID: 5503844

acknowledged he received the screenshot of Baumann's text, and Tidaback and Spears discussed Buamann's message. ALJD 16.

**Adverse Action.** "The adverse action is undisputed: Baumann was fired on April 17, 2023." ALJD 43.

**Coincidence in Time.** The judge determined that the nexus between Baumann's protected activity and his firing was his involvement in the inspection that resulted in the 104(b) orders shutting down the mine and Baumann's message that miners are entitled to be paid during the 104(b)-order shutdown. ALJD 42.

Baumann participated in the inspection on April 12, 2023, and the Mine was shut down the same day. ALJD 9, 15. Between April 12 and 14, Baumann texted Spears about the miners right to be paid during the 104(b)-order shutdown. ALJD 9, 16, 43. Spears texted Bauman's message to Tidaback on the morning of April 14, 2023. ALJD 16. The judge found that soon after Tidaback learned of Baumann's message raising the issue of the miners right to be paid, Tidaback decided to fire Baumann. ALJD 16. Further, the judge found Tidaback's next message that "Baumann's termination *will* be based on production performance" and *"[w]e just need to have a document of why he was let go"* to "clearly display[] Tidaback was aware that he needed to create a basis to justify Bauman's firing, a basis he did not then have." ALJD 16 (emphasis in original).

The judge also noted that "it cannot be ignored" that American Tripoli fired Baumann just three weeks after he became the Miners' Representative; five days after Baumann participated in the MSHA inspection that resulted in American Tripoli being issued 104(b)orders because of the dangerous silica dust hazards—hazards Baumann had previously raised; within days of Baumann raising the issue of miners' pay after the MSHA withdraw order; and only one weekend after

24

Baumann messaged Molesi about his concerns regarding the ongoing silica dust hazards following the 104(b) order. ALJD 16, 41.

**American Tripoli's discriminatory motive and animus.** The judge found the record was "replete" with "indisputable" evidence that American Tripoli's management held animus towards MSHA and miners' involvement with MSHA inspections. ALJD 39-40. "Beyond the ample direct evidence, circumstantially the evidence is overwhelming that [American] Tripoli knew of Baumann's protected activity, and, to say the least, did not take it well." ALJD 46.

"Tidaback's own words show direct motivation to fire Baumann" for his protected activity. ALJD 45-46, 48. Teams chats revealed that American Tripoli management, namely Tidaback and Spears, continuously made "[d]erogatory remarks, replete with expletives" about MSHA inspectors and employee involvement in MSHA inspections. ALJD 13, 15, 17, 23, 25, 26, 27, 40, 46. When Tidaback spoke with employees, either in person or via Teams chat, he referred to individual MSHA inspectors as a "jackass," a "fucker," and a "snake." ALJD 17. Tidaback told miners that Inspector Markeson was "out to fuck you" and that he "gets his jolly off handing out citations." ALJD 17, 15, 40. And just two days after he fired Baumann, Tidaback messaged Hoover to notify him Baumann was fired, and in the same conversation told Hoover that "MSHA just compounds the problem 10X b[y] not working with us and being fucking dicks." ALJD 17. Spears "displayed the same animus" when he messaged other miners a similar "virulent remark" that MSHA Inspector Markeson "is a snake." ALJD 40 n.32. Inspector Markeson corroborated that three miners showed him messages from management telling them not to speak with MSHA. ALJD 48. Notably, the judge determined that Tidaback's message to miners, including Baumann, that MSHA inspectors are not their friends and that anything a miner says to an MSHA inspector

25

"can AND WILL" be used against that miner in a court of law "alone sinks [American] Tripoli both with regard to the discrimination and interference counts." ALJD 40.

**American Tripoli presented no credible defense.** The judge determined that American Tripoli did not establish any "credible defense" because American Tripoli's stated reasons for firing Baumann were "pretextual and invented." ALJD 42-43. "The events very close in time to Baumann's firing . . . demonstrate the attempt by Tidaback to contrive reasons to justify that action" after the fact. ALJD 42. Tidaback's own messages confirmed that he invented reasons to justify firing Baumann after Baumann raised the discrimination claim with MSHA: "I need the justification since Rob's complaint to MSHA about being let go... *Just need you to put the cherry on the cake*. That's all." ALJD 42 (emphasis added) (message from Tidaback to Hoover). The judge found that "[o]ne does not speak idly of putting the 'cherry on the cake,' as Tidaback expressed, for terminating an employee." ALJD 43. To be sure, the judge walked through each rational provided by American Tripoli for firing Baumann, finding each one not credible and not supported by the evidence.

*Termination letter*. The judge found that American Tripoli's assertions that Baumann was fired for "poor performance, lack of leadership skills and for failure to follow procedures and guidance given to him by his supervisor," after he was allegedly warned and counseled about those deficiencies, was not credible and not supported by evidence. ALJD 8, 16, 19, 20-21, 36, 39, 41-42. "It was not just the lack of identified deficiencies warranting firing Baumann; [American] Tripoli never identified any deficiencies at all prior to terminating Baumann." ALJD 45. In fact, "virtually all of the evidence Respondent offered to support those claims were developed *after* the firing," were "contrived," and was an attempt at "backfilling." ALJD 16, 17, 20, 21, 36, 39, 41.

Appellate Case: 25-1349     Page: 346     Date Filed: 04/07/2025 Entry ID: 5503844

The judge found that Baumann's testimony that he was never disciplined or never received a warning or write-up for the alleged deficiencies was credible and supported by the evidence. ALJD 8, 16. Spears testimony confirmed that, although he had the authority, he never disciplined Baumann nor did he ever counsel or write-up Baumann for any of the reasons stated in Baumann's termination letter. ALJD 31, 38.

*Production quotas*. American Tripoli's assertion that Baumann was fired because he failed to meet production quotas was also "unsupported." ALJD 31. The evidence demonstrated that the alleged requirement that Baumann was to meet a 40,000 lbs. per day production quota was never documented, ALJD 37-38; was never communicated to Baumann, ALJD 11, 38; and that American Tripoli's own records demonstrated such a quota at the mine was "aspirational, a fiction, not a fact." ALJD 11, 12, 24, 31, 38. Notably, Baumann received positive feedback about his production numbers from Spears just a month before he was fired. ALJD 37. Spears "honest testimony" as to this claim "augmented the Secretary's case." ALJD 38. The judge found that it was operation and equipment problems, insufficient number of employees at the mine, and safety issues—not Baumann—that caused low production at the mine. ALJD 38.

*Hostile work environment*. Further, American Tripoli's claim that it fired Baumann because Baumann created a hostile work environment was not credible because American Tripoli "never established any credible testimony, or other evidence, to show this improper behavior occurred." ALJD 18 n.21.

*New employees*. The judge also did not find credible American Tripoli's claim that it fired Baumann because it hired four new employees to do Baumann's job. The judge noted that it was telling that Tidaback testified that they needed Baumann—the "allegedly deficient employee"—

27

to remain employed to train the four new employees. ALJD 20, 41. The judge found that this explanation "doesn't make sense." ALJD 20, 33.

*Citations.* Similarly, the judge found that American Tripoli's claim that it fired Baumann because MSHA issued citations to the Mine, which allegedly meant Baumann was not doing his job, "fails." ALJD 41. He said the only evidence presented by American Tripoli on this point was "insufficient" assertions made by Tidaback. ALJD 41.

**Interference**

The judge found that it was "'part of the cultural fabric at [American Tripoli] to interfere with miners' rights.'" ALJD 47 (quoting the Secretary's post-hearing brief in agreement). He found the numerous derogatory messages from American Tripoli management to its miners directing them not to speak with MSHA were "plainly interference." ALJD 46, 48. Messages or statements the judge found to constitute interference include:

- Spears's Teams message telling Wheeler "do not answer any questions about the – that the MSHA inspector may have. Do not go into the mill. I'll be the person who talks to me [sic] inspector." ALJD 39.

- Tidaback's Teams message that 'I will stress with you -- any MSHA inspector is not your friend. Anything you say to or in their presence can AND WILL be used against you in court of law." ALJD 40.

- Spears telling Wheeler to "stay clear" of MSHA during inspections. ALJD 40.

- Tidaback telling Allman to not tell "stories" about the mill to MSHA inspectors. ALJD 40.

- Spears telling Brewer that Tidaback did not want miners talking to MSHA inspectors. ALJD 40.

- Tidaback's message that "Everyone needs to stop calling MSHA." ALJD 48.

Appellate Case: 25-1349    Page: 348    Date Filed: 04/07/2025 Entry ID: 5503844

These "messages were plainly to warn the employees, improperly, that they were not to speak with MSHA." ALJD 13, 39-40. Miners, including Baumann, believed these messages were warnings not to speak with MSHA. ALJD 15, 17, 40. And Inspector Markeson confirmed that three miners told him that they were instructed to not speak with MSHA and showed him messages confirming as much. ALJD 48. "This is interference plain and simple." ALJD 48. Although not required under the *Franks* test, the judge also found that "a wealth of substantial evidence" established that American Tripoli's interference was motivated by Baumann's, and the other miners', statutorily protected activity. ALJD 6, 6 n.5, 45.

The judge found that "[t]here was utterly nothing presented by [American] Tripoli to excuse its interference." ALJD 48. American Tripoli even acknowledged that the Teams messages "might imply interference[.]" ALJD 44-45. The judge did not find credible American Tripoli's argument that these messages were not interference because the messages were "operational, aimed at ensuring that accurate and relevant information was communicated to [MSHA] inspectors." ALJD 44-45. The "words in the Teams messages, and the credible hearing testimony, clearly refute this assertion." ALJD 45.

**Order.** The judge awarded $9,920.00 (plus applicable interest) in back wages to Baumann. ALJD 46. The judge also ordered a civil penalty amount of $15,000.00 for the discrimination violation and $17,500.00 for the interference violation. ALJD 50. The judge further ordered that American Tripoli was to pay the full imposed amount within 30 days of the decision. ALJD 50. n.36. American Tripoli sought a stay; the Commission denied it. Ord. Denying Stay Mot., CENT 2023-0251 (Aug. 22, 2024).

## Standard of Review

The Commission reviews a judge's findings of fact for substantial evidence. 30 U.S.C. 823(d)(2)(A)(ii)(I). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support [the judge's] conclusion." *Rochester & Pittsburg Coal Co.* v. *Sec'y of Labor*, 11 FMSHRC 2159, 2163 (Nov. 1989) (quoting *Consolidated Edison Co.* v. NLRB, 305 U.S. 197, 229 (1938)). The standard is deferential: the Commission may not "substitute a competing view of the facts for the view the [judge] reasonably reached… and even if the Commission's own view [finds] support in the record as well, it [is] bound to uphold the [judge]'s determinations" if they are supported by substantial evidence. *Donovan ex rel. Chacon* v. *Phelps Dodge Corp.*, 709 F.2d 86, 92 (D.C. Cir. 1983).

The Commission reviews a judge's credibility determinations for an abuse of discretion. *Jim Walter Res.*, *Inc.*, 37 FMSHRC 1868, 1871 (Sept. 2015). Because judges "hear the testimony and view the witness, [they] are ordinarily in the best position to make a credibility determination." *Saab* v. *Dumbarton Quarry Assocs.*, 22 FMSHRC 491, 497 (Apr. 2000). Such determinations "are entitled to great weight and may not be overturned lightly." *Ibid.*

The Commission reviews legal questions de novo. See *Jim Walter Res.*, 36 FMSHRC 1972, 1984 n.4 (2014).

Finally, the Commission reviews a judge's penalty determinations for an abuse of discretion; a judge must base penalty assessments on record evidence and provide a reasoned explanation. *Douglas R. Rushford Trucking*, 22 FMSHRC 598, 601 (May 2000).

Appellate Case: 25-1349    Page: 350    Date Filed: 04/07/2025 Entry ID: 5503844

**Argument**

**1. The correct test for discrimination is *Pasula-Robinette*.**

**1.1. *Pasula-Robinette* applies in this case because it arises outside of the Ninth Circuit.**

The Commission has made clear that "*Pasula-Robinette* remains the standard in cases arising" in jurisdictions outside of the Ninth Circuit. *CalPortland II*, 46 FMSHRC at 122 n.5; *Hargis*, slip op. at 7 n.8 (*Pasula-Robinette* applies in cases arising in the Sixth Circuit). Because this case arose in the Eighth Circuit, the judge was bound to apply the *Pasula-Robinette* test. See *Solar Sources Mining, LLC*, 42 FMSHRC 181, 189 (Mar. 2020) (judges are "bound by Commission precedent"); *F & E Erection Company*, 23 FMSHRC 235, 6 (Mar. 2001) ("'[a]n administrative law judge must follow the rules and precedents of the Commission'") (quoting *Sec'y ex rel. Jones* v. *Oliver Mine Maintenance Co.,* 1 FMSHRC 23, 24 (Mar. 1979)). Yet, the judge instead applied the Ninth Circuit's but-for causation standard. ALJD 7. The judge applied the Ninth Circuit's "but for" test in this case, apparently based on the Eighth Circuit's statement in another case that "Here, though, the Secretary takes the position that the commission's traditional approach indeed requires but-for causation, and she proceeds to argue the case with that understanding. So we will, too." *Continental Cement Co.* v. *Sec'y of Lab.*, 94 F.4th 729, 732-733 (8th Cir. 2024). This was based on a misunderstanding of the Secretary's argument, which was, that, given the *Pasula-Robinette* burden-shifting structure, both tests require that the Secretary or complainant to show that the operator would not have taken the adverse action "but for" the protected activity. The difference is only that, in the Ninth Circuit, the burden of showing all of that, including the operator's motive, which usually is not known to a miner, is on the miner. See Br. for the Sec'y at 7, *Continental Cement Co.* v. *Sec'y of Lab.*, 94 F.4th 729 (8th Cir. 2024) (No. 23-2213) ("*Pasula-Robinette* ultimately is a but-for test: assuming an operator

31

attempts to prove an independent reason it would have taken the adverse action, the Secretary must prove that but for the protected activity, the operator would not have taken the adverse action. The difference between *Pasula-Robinette* and *CalPortland* is not but-for causation, but which party bears the burden of proof, at which stage.") (citations omitted). The judge erred by not applying *Pasula-Robinette*.

As it is "incumbent on the Commission to correct . . . misapprehension of [its] precedents[,]" *Solar Sources Mining*, 42 FMSHRC at 200, the Commission should reiterate that under *CalPortland II*, Commission judges are required to apply the *Pasula-Robinette* test in all 105(c) discrimination cases arising outside of the Ninth Circuit.

**2.  Under the *Pasula-Robinette* test, substantial evidence supports the judge's determination that American Tripoli discriminated against Baumann in violation of Section 105(c) of the Mine Act.**

American Tripoli does not contest the judge's findings that Baumann engaged in protected activity and that there was an adverse employment action. See Am. Trip. PDR at 1, 2; Am. Trip. Br. at 2. American Tripoli contests only the judge's finding that American Tripoli did not refute the Secretary's prima facie case or establish an affirmative defense that it would have fired Baumann anyway for a legitimate, nondiscriminatory reason for firing Baumann. Am. Trip. PDR at 1, 3.

**2.1.  Substantial evidence supports the judge's finding that American Tripoli was motivated by Baumann's protected activity.**

Direct evidence of motivation "is rarely encountered; more often, the only available evidence is indirect." *Sec'y of Lab. ex rel. Williamson* v. *CAM Mining, LLC*, 31 FMSHRC 1085, 1089 (Oct. 2009). Thus, whether the adverse action was motivated by the protected activity can be established by "circumstantial indicia," *Sec'y of Lab. ex rel. Baier* v. *Durango Gravel*, 21

Appellate Case: 25-1349     Page: 352     Date Filed: 04/07/2025 Entry ID: 5503844

FMSHRC 953, 958 (Sept. 1999), where a mine operator had knowledge of the protected activity or exhibited hostility or animus toward the protected activity, or a coincidence in time exists between the protected activity and adverse action. *A&K Earth Movers,* 22 FMSHRC at 326. The judge found that all these indicia established that American Tripoli was motivated by Baumann's protected activity, and substantial evidence supports those findings.

### 2.1.1. Knowledge

The judge found that, "[b]eyond the ample direct evidence, circumstantially the evidence is overwhelming that [American] Tripoli knew of Baumann's protected activity, and, to say the least, did not take it well." ALJD 45-46. Spears and Tidaback knew that Baumann made numerous safety complaints, participated in MSHA inspections, informed MSHA inspectors of safety concerns, was the miners' representative, and exercised the miners' right to be paid during the withdrawal order. ALJD 13, 42-43. Substantial evidence supports that finding. *Supra*, pp. 22-24.

### 2.1.2. Animus

Animus is not required to show that an operator acted with a discriminatory motive. *Durango Gravel*, 21 FMSHRC at 958 (citing *Sec'y of Lab.* v. *Tanglewood Energy, Inc.*, 19 FMSHRC 833, 837 (1997)). But, where there *is* evidence of animus, it suggests discriminatory motive. *Sec'y of Lab. ex rel. Chacon* v. *Phelps Dodge Corp.*, 3 FMSHRC 2508, 2510–2511 (Nov. 1981), rev'd on other grounds, 709 F.2d 86. "The more such animus is specifically directed towards the alleged discriminatee's protected activity, the more probative weight it carries." *Ibid*. Although animus can be found where an operator expresses hostility towards a miner's protected activity, a finding of animus "does not require that the operator display anger or unkindness towards the miner." *Hargis*, slip op. at 9. For instance, where a miner's protected activity requires an operator to act—

33

such as a health safety complaint that requires the operator to remedy the hazard—animus can be found where an operator chooses to ignore the health or safety complaint and do nothing: "If a miner makes a complaint about an unsafe condition at the mine and the supervisor responds with a smile and shrug but takes no action to investigate or correct the condition, the supervisor has displayed animus toward the protected activity." *Ibid.*

The judge found that the "record is replete with examples showing [American] Tripoli's animus" towards miners' protected activity. ALJD 39-40. Substantial evidence supports this finding. American Tripoli exhibited direct hostility to Baumann's protected activity, including hostility about making safety complaints, speaking to MSHA, and participating in MSHA inspections, as shown by Tidaback's and Spears' own words to Baumann and other miners. *Supra*, pp. 12-13, 16. (Spears's and Tidaback's derogatory and discriminatory Teams chats). These messages show that Tidaback and Spears did not hesitate to express their hostility towards MSHA and employee involvement with MSHA inspections. See *Durango Gravel*, 21 FMSHRC at 959 (finding hostility and animus toward MSHA and safety generally helped support a finding of animus toward the complainant's protected activity). And they also show how Tidaback and Spears were often angered when miners spoke with MSHA or raised safety complaints. *Nat'l Cement*, 33 FMSHRC 1059, 1069 (May 2011) (animus may be shown by a supervisor's negative reactions to protected activities). Miners took these messages to mean what they say: miners were not to interact or speak with MSHA inspectors and if they did, they would face consequences. Tr. Vol. 1, pp. 154-155, 163-165, 168-169, 217-218, 273; Tr. Vol. 2, pp. 175-179. These threats of reprisal and retaliation for speaking to MSHA further demonstrate American Tripoli's animus and hostility towards miners' protected activity.

Tidaback and Spears also expressed animus specifically towards Baumann's protected activity by ignoring and dismissing his health and safety concerns. Tr. Vol. 1, pp. 197-198; Tr. Vol. 2, p. 86; *Nat'l Cement*, 33 FMSHRC at 1069 (animus may be shown by an operator's non responsiveness to safety complaints). For instance, when Baumann was alerted by an MSHA inspector that oil gathering was a fire hazard, Baumann reported the safety hazard to management and offered to clean it up, but was instead told, "we're not doing that." Tr. Vol. 1, pp. 189-190, 277; Tr. Vol. 2, pp. 79-80. On another occasion, an MSHA inspector informed Baumann that product blocking the entranceway to an electrical box was a hazard, and when Baumann reported the hazard to management and offered to clean it up, he was again told "we're not doing that." Tr. Vol. 1, p. 190. And instead of addressing the pervasive silica dust hazards at the mine that Baumann had expressed concern over, Tidaback and Spears schemed to fraudulently influence the dust samples to avoid further MSHA citations. Exh. P-13, p. 392.

The most striking example of their animus towards Baumann's protected activity is that the first documented evidence of American Tripoli's intent to fire Baumann emerged within minutes of the moment Tidaback was informed that Baumann exercised the miners' right to be paid during the shutdown. After he received Spears' text with Baumann's message, Tidaback responded to Spears that "if Rob thinks we did something 'illegal', then he should bring it up…" Exh. P-32. Immediately after that message, Tidaback messaged Spears again telling him to "expect a [sic] MSHA complaint when Rob is let go… the writing is on the wall." *Ibid*. Spears quickly replied, "Yes sir. I see the same writing." *Ibid*. Just four minutes later, Tidaback messaged Spears that "Robs [sic] termination will be based on production performance, not following guidance given by management, not ensuring the safety of the mill associated by utilizing the

35

propter controls, etc. He doesn't have to sign it, we just need to have a document of why he was let go." *Ibid*. This exchange exemplifies Tidaback's and Spears' animus towards Baumann's protected activity and further evidences their discriminatory motive: it is no coincidence that Tidaback "saw the writing on the wall" just moments after Baumann exercised the miners' right to be paid during the shutdown.

### 2.1.3. Coincidence in time

There is no bright line rule establishing when coincidence in time infers an improper motive. *Hicks* v. *Cobra Mining, Inc.*, 13 FMSHRC 523, 531 (Apr. 1991). The Commission uses "[s]urrounding factors and circumstances" to assess whether the coincidence in time is suspect. *Ibid*. "[C]omplaints ranging from four days to one and one-half months before the adverse action [are] sufficiently coincidental in time to establish illegal motive." *Durango Gravel*, 21 FMSHRC at 958.

The coincidence in time is apparent in this case. Tidaback decided to fire Baumann within six minutes of receiving Baumann's request for the miners' to be paid during the shutdown—even acknowledging that he knew Baumann would file a complaint with MSHA, Exh. P-32; within days of Baumann participating in the MSHA inspection that resulted in the 104(b) order shutting down the mine, *ibid*.; one weekend after Baumann raised his ongoing concerns regarding the silica dust hazards following the 104(b) order, Tr. Vol. 1, p. 60; and approximately 3 weeks after Baumann became the miners' representative. Tr. Vol. 1, pp. 250-51; Tr. Vol. 2, p. 364.

The six-minute timeframe is sufficient to establish coincidence in time. The one weekend timeframe is as well. As is the three-week timeframe. See, *e.g.*, *Durango Gravel*, 21 FMSHRC at 958 (collecting cases indicating these timeframes are more than sufficient to establish a

coincidence in time); *U.S. Steel Mining Co.*, 23 FMSHRC 981, 986–987 (Sept. 2001) (inferring a discriminatory motive where an adverse action was taken within hours of a miner's safety complaint). And taking these instances together with the surrounding facts and circumstances, including Spears's and Tidaback's knowledge of and animus towards Baumann's protected activity, establish a coincidence in time suggesting a discriminatory motive. *Phelps Dodge Corp.*, 3 FMSHRC at 2511 ("Adverse action under circumstances of suspicious timing taken against the employee who is the leading figure in protected activity casts doubt on the legality of the employer's motive since such conduct is the classic method of undermining protected activity.").

## 2.2. Substantial evidence supports the judge's finding that American Tripoli did not establish a defense.

The judge found that American Tripoli "presented no credible defense." ALJD 43. The judge's factual findings are supported by substantial evidence, and those facts establish that American Tripoli's purported reason for firing Baumann was pretextual and that American Tripoli would not have fired him but for his protected activity.

### 2.2.1. Rebuttal

An operator may rebut the Secretary's prima facie case by demonstrating that "either that no protected activity occurred or that the adverse action was in no part motivated by protected activity." *William Metz* v. *Carmeuse Lime, Inc.*, 34 FMSHRC 1820, 1825 (Aug. 2012) (citing *Robinette*, 3 FMSHRC at 818 n.20).

American Tripoli admits that protected activity occurred, as did adverse action, but they argued that they were not motivated by Baumann's protected activity because American Tripoli is authorized under the "company's discretionary disciplinary policies" in the employee

37

handbook to fire Baumann for whatever reason, Am. Trip. PDR 2, and because American Tripoli did not fire Baumann for his participation in MSHA inspections prior to April 12. *Ibid*. Substantial evidence supports the judge's finding these claims do not rebut the Secretary's prima facie case. ALJD 3 n.2.

First, as the judge correctly found, American Tripoli's discretionary discipline policy does not allow American Tripoli to fire Baumann for an illegal reason. ALJD 30. The Commission "does not decide cases in a manner which permits parties' private agreements to overcome mandatory safety requirements or miners' protected rights." *Sec'y of Labor ex rel. Rieke* v. *Akzo Nobel Salt, Inc.,* 19 FMSHRC 1254, 1259 (July 1997) (internal citations omitted). Second, there is no basis in law to support American Tripoli's claim that, because it had not fired Baumann immediately after having participated in MSHA inspections prior to April 17, Baumann's participation in those inspections could not have been a reason for firing him. Am. Trip. PDR at 2. As discussed, there was a nexus in time between the inspections and firing and, in any event, the absence of discriminatory action in the past is not relevant to whether an operator discriminates in the future.

### 2.2.2. Affirmative Defense

An operator can offer an affirmative defense "if it shows that (1) it was also motivated by the miner's unprotected activities, and (2) would have taken the adverse action in any event for the unprotected activities alone." *Sec'y ex rel. Price & Vacha* v. *Jim Walter Res., Inc.* 12 FMSHRC 1521, 1534 (Aug. 1990). This concerns whether the protected activity was the "but for" cause of the adverse action. *Pasula*, 2 FMSHRC at 2800. The complainant "must prove by a preponderance of the evidence (which may be direct or circumstantial)," that "the challenged

Appellate Case: 25-1349      Page: 358      Date Filed: 04/07/2025  Entry ID: 5503844

employer decision" would not have been made "but for" the protected activity. *CalPortland II*, 46 FMSHRC at 122. "As a general evidentiary matter, a finding of discrimination under either 'but-for' or *Pasula-Robinette* still turns on a finding of causation. Accordingly, many of the same *categories* of evidence, such as animus and disparate treatment, may remain relevant as circumstantial evidence of a causal nexus." *Id.* at 123 n.6.

Where an operator offers a "business justification" for the adverse action, "pretext may be found… where the asserted justification is weak, implausible, or out of line with the operator's normal business practices." *Jim Walter Res., Inc.,* 12 FMSHRC 1521, 1534 (Aug. 1990). A business justification "should not be examined superficially or be approved automatically once offered…. [T]he judge must determine whether [it is] credible and, if so, whether [it] would have motivated the particular operator as claimed." *Riordan*, 38 FMSHRC at 1925 (citing *Haro* v. *Magma Copper Co.*, 4 FMSHRC 1935, 1938 (Nov. 1982) and *Bradley* v. *Belva Coal Co.*, 4 FMSHRC 982, 993 (June 1982)) (internal quotation marks omitted). An operator can support its business justification by introducing evidence "of the miner's unsatisfactory past work record, prior warnings to the miner, past discipline consistent with that meted out to the complainant, and personnel rules or practices forbidding the conduct in question[]." *Emerald Coal Resources*, 36 FMSHRC 2088, 2099 (Aug. 2014) (citing *Belva Coal Co.,* 4 FMSHRC at 993).

American Tripoli does not agree that it was motivated by Baumann's protected activity; it argues it had legitimate business justifications. Am. Trip. Br. at 2; Am. Trip. PDR at 2. American Tripoli claims it fired Baumann because he "was not meeting production standards" and failed to meet "measurable requirements" in his role as production lead. Am. Trip. PDR at 1, 2; Am. Trip. Br. at 2. Substantial evidence supports the judge's finding that American Tripoli did not

Appellate Case: 25-1349     Page: 359     Date Filed: 04/07/2025 Entry ID: 5503844

prove that these justifications were the reason for Baumann's firing. ALJD 36. First, there is no

evidence that a production quota of 40,000 lbs. per day existed. Baumann testified that no one

told him he had to meet a quota, ALJD 37 (Tr. Vol. 1, pp. 105-06), and American Tripoli

provided no documentation to prove that one existed. Indeed, the mine ran "about 15,000 pounds

in product and during Spears 18 months of employment the 40,000 lbs. of product goal was only

met 20-30 times." ALJD 38 n.31. American Tripoli provided no evidence to substantiate

Baumann's alleged performance shortcomings, ALJD 38, despite American Tripoli's company

policy requiring documentation "at every stage of the progressive discipline process," Exh. P-16,

at 43, and despite being warned by the judge several times at trial that such indicia is generally

necessary to establish a legitimate business justification. Tr. Vol. 1, p 343-346; Tr. Vol. 2, p. 51-

52. See *Emerald Coal Resources*, 36 FMSHRC at 2099 (requiring indicia of a legitimate business

justification such as "the miner's unsatisfactory past work record, prior warnings to the miner,

past discipline consistent with that meted out to the complainant, and personnel rules or

practices forbidding the conduct in questions."). Based on the lack of any documentary evidence

of the quota, ALJD 37, and the inconsistent, contradictory testimony of American Tripoli

management, ALJD 38, the judge found that the proffered business justification was pretextual.

ALJD 42; *Jim Walter Res., Inc.*, 28 FMSHRC 983, 989 (Dec. 2006) ("[T]he substantial evidence

standard may be met by reasonable inferences drawn from indirect evidence.") (quoting *Mid-

Continent Res., Inc.*, 6 FMSHRC 1132, 1138 (May 1984)). The judge reasoned that Baumann

could not have been fired for poor production performance because the evidence indicated that

Baumann received positive reviews from Spears for his production efforts just a month before he

was fired, *ibid.*, Baumann was not subject to the production quota alleged by American Tripoli,

Appellate Case: 25-1349     Page: 360     Date Filed: 04/07/2025 Entry ID: 5503844

ALJD 37, and that even if he was, such a production quota was not realistic to meet based on the uncontroverted production records at the mine, ALJD 38. And even if a production quota existed, such a production quota was not realistic to meet based on the uncontroverted production records at the mine, due at least in part by American Tripoli's failure to maintain equipment. ALJD 38; see also Tr. Vol. 1, pp. 108; Tr. Vol. 2, pp. 236-37; Tr. Vol. 3, p. 110. An affirmative defense fails where, like here, the "work rule or policy that the miner is alleged to have violated"—here, the illusory production quota—"was applied discriminatorily to miner or in a manner deliberately calculated to render his compliance difficult or impossible." *Jim Walter Res., Inc.,* 12 FMSHRC at 1534.

Second, American Tripoli had policies requiring progressive discipline, but Baumann was not disciplined. Spears confirmed that Baumann was never warned, written up, or disciplined for any of the reasons American Tripoli alleged. Tr. Vol. 3, p. 145; ALJD 31. Tidaback claimed that he had verbally warned Baumann about reading training files, but the judge found that the Respondent's exhibit introduced to substantiate these claims was "suspect" and not a "reliable or credible source of information" and should be afforded "nil" weight. ALJD 42, 42 n.33. *Riordan*, 38 FMSHRC at 1927 (finding that the lack of documentation of the employee's "alleged shortcomings, despite company policy requiring a written record of any serious failures by mine employees" undermined any testimony that suggested those shortcomings). And contradicting Tidaback's claim that he planned to fire Baumann months prior to the protected activity, Spears testified that he did not have any conversation with Tidaback about firing Baumann months before he was fired. Tr. Vol. 3, p. 152; ALJD 32. The judge credited Spears' testimony and did not abuse his discretion in doing so. No documentation exists prior Baumann's firing because

Tidaback invented the poor performance rationale after he decided to fire Baumann; in fact, Tidaback was still searching for a "justification" as to why he fired Baumann *after* Baumann filed the discrimination complaint with MSHA. Exh. P-34, p. 28; ALJD 42, 42 n.33. Tidaback thought all he needed to do to squash the complaint was to "put the cherry on the cake," Exh. P-34, p. 28, by devising any conceivable business justification. But a business justification must be legitimate, factual, and have actually motivated the discharge. *Turner* v. *National Cement Co. of California*, 33 FMSHRC 1059, 1073 (May 2011) ("A plaintiff may establish that an employer's explanation is not credible by demonstrating 'either (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge.'") (emphasis in original).

American Tripoli's attempt to pin the failure of the mine—in terms of production and safety—entirely on Baumann as production lead is absurd and contrary to the evidence presented. Am. Trip. PDR 2. Although Baumann was the production lead in charge of production, the judge made various findings that the lack of production was caused by American Tripoli's mismanagement, not Baumann's poor performance. It was not Baumann who failed to "ensure overall equipment effectiveness," Am. Trip. PDR 2, it was American Tripoli management who continuously ignored Baumann's concerns over faulty equipment. ALJD 37-38. It was not Baumann who did not ensure the "safety and well-being" of the miners, Am. Trip. PDR 2, it was American Tripoli management who continuously ignored Baumann's concerns about the safety and well-being of the miners. ALJD 37-38. And it was not Baumann who was responsible for the mine's failure to "meet[] production metrics," Am. Trip. PDR 2, it was the result of American

Appellate Case: 25-1349    Page: 362    Date Filed: 04/07/2025 Entry ID: 5503844

Tripoli management's continued neglect on the mine, which often resulted in broken equipment, safety hazards, and the mine being shut down by MSHA or other agencies. ALJD 37-38.

On this point, American Tripoli asserts that the judge erred because he required American Tripoli "to meet not MSHA's standard of substantial evidence"[8] but rather "his own" standard requiring that American Tripoli provide evidence "detail and verse" of why it fired Baumann. Am. Trip. PDR 3. But the judge did precisely what judges are supposed to do. Rather than automatically accepting American Tripoli's justifications, the judge assessed whether they were credible and found that they were not. American Tripoli alleges that the judge "refus[ed]" to address American Tripoli's "legitimate, non-discriminatory" reasons for firing Baumann and relied on Baumann's "uncorroborated testimony," Am. Trip. Br. 2, but this is demonstrably untrue: the judge thoroughly assessed the entirety of the evidence, and substantial evidence supports his finding that the defense was "contrived" and "invented," not the reason for the retaliatory firing.

### 3. Interference does not require proof of motive.

The test for interference is unsettled before the Commission. But the Commission should settle the matter: the tools of statutory construction indicate  that the *Franks* test is the correct test for interference. The *Franks* test is consistent with the text of the statute, D.C. Circuit and Commission precedent, Congress's intent, and the Mine Act's purpose. See *Loper Bright*

---

[8] Though the judge did refer in a few places to the substantial evidence standard, ALJD 6-7, a reading of the decision overall shows that the judge applied the preponderance of the evidence standard. See ALJD 2 ("Based on the testimony and exhibits presented at the hearing, the Court's credibility determinations, and the post-hearing briefs of the parties, the Court finds that by the preponderance of the evidence the Secretary clearly established both Counts").

Appellate Case: 25-1349     Page: 363     Date Filed: 04/07/2025 Entry ID: 5503844

*Enterprises* v. *Raimondo*, 144 S. Ct. 2244, 2268 (2024) (courts use the tools of statutory construction to interpret statutes). It also comports with common sense.

### 3.1. *Franks* is consistent with the statutory language.

Section 105(c) provides that "[n]o person shall . . . in any manner discriminate . . .  or otherwise interfere with the exercise of the statutory rights of any miner. . . because of the exercise by such miner. . . of any statutory right afforded by this Act." 30 U.S.C. 815(c).  Some Commissioners have suggested the "because of" language demonstrates that section 105(c) requires proof of an intent to interfere with the exercise of statutory rights. *Sec'y of Lab. ex rel. Greathouse* v. *Monongalia Cty. Coal Co., et al.*, 40 FMSHRC 679, 708-714 ( June 2018) (separate op. of Comm'rs Althen and Young). But in interpreting statutes, "[t]ext may not be divorced from context." *Univ. of Texas Southwestern Medical Ctr.* v. *Nassar*, 570 U.S. 338, 356 (2013). Rather than considering those two words in isolation, the Commission must read them with the text of the provision.

The verb "interfere," when paired with "because of" does not inherently suggest intentional action. *E.g.*, "the children playing under my window interfere with my concentration because of their volume." In this example, the children are not acting deliberately, or in response to any action or behavior, but their actions interfere nonetheless. *E.g.*, "the weather interferes with my picnicking plans because of the rainy forecast." Again, the weather is not motivated by an intent to disrupt the planned picnic, but it has an interfering effect.

The use of "otherwise interfere" is significant. As the Supreme Court has explained in reviewing various anti-discrimination statutes, "otherwise" indicates a focus on the effects of an action, rather than the motivation of an actor. *Texas Dept. of Hous. & Cmty. Affairs* v. *Inclusive*

Appellate Case: 25-1349     Page: 364     Date Filed: 04/07/2025 Entry ID: 5503844

*Cmtys. Project, Inc.*, 576 U.S. 519, 520 (2015) (discussing the Fair Housing Act, Title VII of the Civil Rights Act, and the Age Discrimination in Employment Act). When "otherwise" is located after a list of other prohibited actions but before the phrase "because of," it "serve[s] as a catchall phrase[] looking to consequences, not intent." *Inclusive Cmtys.*, 576 U.S. at 534-535. This is because "'[o]therwise' means 'in a different way or manner,' thus signaling a shift in emphasis from an actor's intent to the consequences of his actions.'" *Id.* at 535 (quoting Webster's Third New International Dictionary 1598 (1971)). This is precisely the structure in section 105(c): it lists prohibited conduct, then uses the phrase "otherwise interfere with," then uses the phrase "because of." 30 U.S.C. 815(c). As the Supreme Court has explained, statutes drafted in this way do not plainly require motive to establish liability. *Inclusive Cmtys.*, 576 U.S. at 534-535.

In short, the language of the statute does not compel the Commission to adopt the *Pepin* test. And other indications of statutory meaning, see pp. 45-51, *infra*, demonstrate that the *Franks* test is the correct test for interference.

### 3.2. *Franks* is consistent with D.C. Circuit and Commission precedent.

The D.C. Circuit has signaled its approval of the *Franks* test; that court has twice applied *Franks*. *Marshall Cnty. Coal Co.* v. *FMSHRC*, 923 F.3d 192 (D.C. Cir. 2019); *Wilson* v. *FMSHRC*, 863 F.3d 876 (D.C. Cir. 2017). Though whether *Franks* is the correct test was not at issue in *Marshall County* and *Wilson*, the D.C. Circuit would not have applied *Franks* if it were inconsistent with the statute.

And, in related cases interpreting Mine Act provisions, the court has rejected hypertechnical statutory interpretations that run counter to the statute's purpose, and disapproved of a test requiring proof of motive that would create barriers to litigation for complainants. In *Donovan ex*

*rel. Anderson* v. *Stafford Construction Co.*, 732 F.2d 954 (D.C. Cir. 1984), the court assessed whether section 105(c) (which protects miners from discrimination and interference if they have testified or are about to testify in a Mine Act proceeding) protected a miner who refused to lie to MSHA investigators about the reason for another miner's firing, but who never actually gave the investigators a statement. *Id.* at 958–961. The court determined that the statute did protect that miner. Though a literal reading of section 105(c) would not protect that activity, the court refused to adopt a "hypertechnical and purpose-defeating interpretation," particularly in light of Congress's direction that section 105(c) be broadly interpreted. *Id.* at 959-960. In *Simpson* v. *FMSHRC*, 842 F.2d 453 (D.C. Cir. 1988), the court considered whether section 105(c) constructive discharge claims should be evaluated under an objective or subjective test (the latter would have required proof of an operator's motivation to create conditions that would induce a miner to quit). 842 F.3d at 461–463. The court rejected the subjective test, determining it resulted from a "severely restrictive interpretation" was not "compatible with Congress' remedial purpose." *Id.* at 463. The court further explained that requiring proof of motive would impose a "formidable, [and] for many complainants, insurmountable" evidentiary hurdle, and would "frustrate Congress' intent that miners not be inhibited in the exercise of their rights." *Ibid.* *Anderson* and *Simpson* did not deal with interference or the *Franks* test, but the D.C. Circuit's broader legal conclusions on statutory interpretation apply equally to interpretations of the interference provision. In keeping with this precedent, the Commission should adopt a test that does not limit miners' protection based on a pedantic, hypertechnical reading of section 105(c), and does not require miners to overcome an often-impossible barrier. The *Franks* test avoids these pitfalls.

Commission precedent likewise supports adoption of the *Franks* test. The Commission has long recognized that the central issue in an interference claim is what effect the interference has. In *Moses* v. *Whitley Development Corp.*, 4 FMSHRC 1475 (Aug. 1982), the Commission determined that "coercive interrogation and harassment" about protected rights can constitute interference. *Id.* at 1478. It explained that "[a] natural *result* of such practices" is to make miners fear retaliation; that such practices "may *cause* other miners" not to exercise their rights; that such practices "could logically *result* in a fear of reprisal and a reluctance to exercise [rights] in the future"; and that "[t]his *result* is at odds with the goal of encouraging miner participation in enforcement of the Mine Act." *Id.* at 1478–79 (emphasis added). In this analysis, the Commission did not focus on the operator's motive for interrogating and harassing the miner, but on the results of that interrogation and harassment.

In *Secretary ex rel. Gray* v. *North Star Mining, Inc.*, 27 FMSHRC 1 ( Jan. 2005), the Commission considered whether an operator interfered with statutory rights when a foreman told a miner who had been subpoenaed to testify about unsafe practices at the mine, "I'll kill you." *Id.* at 10. The judge assessed the foreman's intent and found no violation based on the foreman's explanation that he was joking, but the Commission reversed, holding that whether an action constitutes interference depends not on an actor's intent, but on the totality of the circumstances. *Id.* at 8 (quoting *Moses*, 4 FMSHRC at 1479 n.8), 10. In considering the *Franks* test, the Commission has observed that it is "entirely consistent with *Moses* and *Gray*," and "grounded in Commission precedent." *McGary*, 38 FMSHRC 2006, 2012 (Aug. 2016).

Appellate Case: 25-1349     Page: 367     Date Filed: 04/07/2025 Entry ID: 5503844

### 3.3. *Franks* effectuates Congress's intent and advances the Mine Act's purpose.

Congress was clear that section 105(c) should be "construed expansively to assure that miners will not be inhibited in any way in exercising any" protected rights. S. Rep. No. 95-181, 36 (1977). Requiring proof of intent to interfere may require evidence that a miner may not have; this would allow operators to engage in more actual interference with no consequences.

In enacting the Mine Act, Congress added the interference provision to the Coal Act's anti-retaliation provision. "It is the Committee's intention to protect miners against not only the common forms of discrimination. . . but also against the more subtle forms of interference. . . ." S. Rep. 95-181 at 36. The Coal Act already prohibited discrimination, which includes all retaliatory "adverse actions" that are "harmful to the point that they could well dissuade a reasonable worker" from engaging in protected activity. 30 U.S.C. 820(b)(1) (1976); *Sec'y of Lab. ex rel. Pendley* v. *Highland Mining Co.*, 34 FMSHRC 1919, 1932 (Aug. 2012) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 57 (2006)). Discrimination does require proof of a motivational nexus. So, the inclusion of additional language prohibiting interference in the newly enacted Mine Act was meant to prohibit additional conduct, beyond the already-prohibited retaliatory actions (i.e., motive-based actions).

The legislative history also reveals that Congress derived its anti-retaliation provisions in the Coal Act and Mine Act in part from the NLRA. The Coal Act anti-retaliation provision "was introduced with the announced intention of giving to miners the same protection against retaliation which we give employees under other Federal labor laws," including the NLRA. *Phillips*, 500 F.2d at 782 (quoting 115 Cong. Rec. 27,948 (1969)). In enacting the Mine Act, Congress expressed that section 105(c) was intended to "protect miners against . . . promises of

48

benefit or threats of reprisal," S. Rep. No. 95-181, 36 (1977), using the same terms section 8(a)(1) of the NLRA uses to describe prohibited conduct, 29 U.S.C. 158(a)(1). See *NLRB* v. *Savair Mfg. Co.*, 414 U.S. 270, 278–279 (1973) (promises of benefit); *NLRB* v. *Gissel Packing Co.*, 395 U.S. 575, 618 (1969) (threats of reprisal). Congress "presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA* v. *Cooper*, 566 U.S. 284, 292 (2012) (quoting *Molzof* v. *United States*, 502 U.S. 301, 307 (1992)). The *Franks* test is explicitly derived from the test for interference under the NLRA. *Sec'y of Lab. ex rel. Johnson* v. *Jim Walter Res., Inc.*, 18 FMSHRC 552, 558 n.11 (Apr. 1996) ("the Mine Act's antidiscrimination provisions are modeled" on the NLRA). And under the NLRA, "[i]t is well-settled that the test of interference, restraint, and coercion . . . does not turn on the employer's motive." *Am. Freightways Co.*, 124 NLRB 146, 147 (1959). Thus, the *Franks* test fits in neatly with Congress's intent to prohibit interference under the Mine Act in the same manner that it does under the NLRA.

The *Franks* test also advances the remedial purposes of the Mine Act. Congress recognized the need for miners to "play an active part in the enforcement of the Act." S. Rep. No. 95-181, at 35 (1977). If miners are to play such a role, they cannot be deterred from exercising their rights. Requiring miners to prove that interference was motivated by an intent to interfere with the exercise of protected rights could serve as an "insurmountable" hurdle to the ability to prevent miners from being chilled in the first place. Cf. *Simpson*, 842 F.3d at 463.

### 3.4. The *Franks* test is the logical, sensible test for interference.

The *Franks* test acknowledges that interference affects the exercise of protected rights regardless of any motivation. Imagine that an operator who is unfamiliar with the Mine Act and MSHA's

regulations tells a miner/miners' representative like Baumann that if they elect to walk around with MSHA during an inspection, rather than doing their job, they will be fired. Imagine the operator is unaware of the right to accompany MSHA and is motivated to keep the miner working, not by any intent to prevent the miner from speaking with MSHA about health and safety issues. Regardless of the operator's intent, the statement likely would tend to interfere with a reasonable miner's choice to accompany MSHA, including other miners who may learn of the threat. According to the *Pepin* test, this would not be illegal interference. In fact, under the *Pepin* test, an operator could lawfully interfere with statutory rights "because he doesn't like the miner, because there was a lack of resources, because he was ignorant of the miner's statutory rights, or a host of other reasons that are not motivated by the exercise of statutory rights." *Greathouse*, 40 FMSHRC at 698 (quoting *Wilson* v. *Armstrong Coal Co.,* 39 FMSHRC 1072, 1092 (May 2017) (ALJ)); see also *Gray*, 27 FMSHRC at 10 (the foreman who told a miner set to testify, "I'll kill you," explained that he was only joking and had no intent to prevent the miner from testifying). But the *Franks* test recognizes that threatening to fire the miner—regardless of intent—may have the tendency to chill the miner's willingness to exercise their right to accompany MSHA.

The *Pepin* test also creates practical issues for litigants. In the interference context, it is not clear what kind of evidence would satisfy the motivation requirement. If motivation is subjective (*Pepin* and the *Greathouse* Commissioners were not clear on this point), proving that element would be arduous, if not impossible. The D.C. Circuit has recognized this issue in the past. In *Simpson*, the court rejected a constructive-discharge test that would have required the Secretary to prove an operator's subjective motivation. The complainant in *Simpson* left the mine rather than expose himself to certain risks. The Commission determined that to show constructive

Appellate Case: 25-1349     Page: 370     Date Filed: 04/07/2025 Entry ID: 5503844

discharge the miner must prove that the operator "created intolerable conditions with the specific intention of forcing the miner to quit." 842 F.2d at 457. The D.C. Circuit rejected the Commission decision, explaining that "the proof hurdle would become formidable, for many complainants, insurmountable. . . . Evidence relevant to such motivation inevitably will be within the control of the operator." *Id.* at 463. The court concluded that requiring such proof would conflict with the Mine Act's purpose and frustrate Congress's intent that miners be able to freely exercise their rights. *Ibid.* The *Franks* test presents no such problem of proof. It is a straightforward test for both the Secretary (and complainants) and operators.

Actions have consequences. Allowing operators to take actions that would tend to interfere with the exercise of rights, as long as miners cannot prove that those operators are motivated by the exercise of protected rights (rather than by ignorance, by humor, by some permissible thing) does not make sense. The *Franks* test is the appropriate test to prevent operators from deterring miners from exercising their rights..

American Tripoli argues that the Secretary's interpretation of the interference test is not owed deference, PDR at 4; the Secretary makes no argument for deference. The *Franks* test should be adopted because it is the best interpretation of the statute; it is supported by the relevant canons of statutory construction. See pp. 43-51, *supra*.

**4. Substantial evidence supports the judge's determination that American Tripoli interfered with miners' exercise of statutory rights.**

**4.1. The tendency to interfere with the exercise of protected rights.**

The judge determined that American Tripoli interfered with miners' exercise of protected rights several times: when Spears told Wheeler not to answer MSHA's questions during an inspection and expressed that he, Spears, would be the person who spoke with the MSHA

51

inspector; when Spears told Wheeler to steer clear of MSHA; when Tidaback told various miners (including Baumann, Molesi, and Hoover) that anything miners say to MSHA or in an MSHA inspector's presence "can AND WILL be used against you in a court of law;" that Tidaback told Allman not to tell "stories" to MSHA about the mine; that Spears communicated to miners that Tidaback did not want miners speaking with MSHA; and that Tidaback told Hoover "EVERYONE needs to stop calling MSHA." ALJD 39, 40, 48.

The judge determined that these actions could reasonably be viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights. ALJD 13, 39-40, 47-48. The judge put it bluntly: the messages that American Tripoli gave miners about MSHA "were plainly to warn the employees, improperly, that they were not to speak with MSHA." ALJD 13. Miners expressed that they feared retaliation. ALJD 47 (discussing Wheeler and Baumann's testimony), 48 (discussing MSHA Inspector Markeson's testimony)

There are also several instances in the record of American Tripoli disparaging MSHA inspectors, telling miners that MSHA inspectors were "fucking dicks," "jackasses" and "snakes" who were "out to fuck you," ALJD 17, thus impressing on miners that MSHA was not to be trusted. This also likely discouraged miners from interacting with MSHA. ALJD 17.

The judge agreed with the Secretary that "[a]ny reasonable miner would have taken these multiple, ongoing statements about not speaking to MSHA. . . as preventing them from exercising the right to speak to MSHA about safety concerns at the mine." ALJD 47-48 (citing Sec'y Post-hearing Br. 53-54). Substantial record evidence supports this first prong of the *Franks* test.

52

### 4.2. Failure to justify the action

The judge determined that "[t]here was utterly nothing presented by [the operator] to excuse its interference." ALJD 48. The record supports this: American Tripoli offered no justification (let alone a legitimate and substantial business reason) of its messaging to miners. On the contrary, American Tripoli conceded that some of its messages "might imply interference." ALJD 44.

American Tripoli did attempt an excuse for one instance of interference: when Spears told Wheeler not to speak with MSHA and that he, Spears, was the person to do that, American Tripoli suggested that this was merely to make sure that the most knowledgeable person spoke with MSHA. Am. Trip. Post-hearing Br. 2. But the judge found that the text of the messages and the credible hearing testimony refuted this assertion. ALJD 43-44. American Tripoli repeats this argument before the Commission, expressing that its messaging was "aimed at ensuring accurate communications during inspections, a common industry practice." Am. Trip. Br. 2. This is the same argument that the judge rejected, from the unique perspective as factfinder, cf. *Saab*, 22 FMSHRC at 497, as not credible. American Tripoli does not explain how this supposed excuse applies to all the instances of interference, for example, how Tidaback saying "EVERYONE needs to stop calling MSHA" ensures accurate communications with MSHA during inspections. In fact, American Tripoli makes no attempt to address the actual record evidence, and only offers the bare assertion that it repeatedly instructed miners not to speak with MSHA out of some kind of concern for accuracy. And, insofar as American Tripoli intimates that it is common in the industry for operators to lambast MSHA as "fucking dicks" and repeatedly tell miners not to

Appellate Case: 25-1349     Page: 373     Date Filed: 04/07/2025 Entry ID: 5503844

speak to MSHA, it cites no support for that contention. And that does not constitute a business justification. If other operators engage in the same behavior, that is equally problematic.

Thus, the record supports the judge's determination that the second *Franks* prong was satisfied.

### 4.3. Motivation

Even if motivation were required to prove interference, the judge's decision finding interference is supported by substantial evidence. The judge determined that American Tripoli actually was motivated by miners' exercise of protected rights to undertake those interfering actions. ALJD 6. Abundant evidence in the record demonstrates that American Tripoli expressed animus towards MSHA and miners' exercise of rights. Additionally, the judge made credibility determinations in assessing motivation; these are "entitled to great weight and may not be overturned lightly." *Saab*, 22 FMSHRC at 497.

The judge determined that American Tripoli's exchange with Wheeler was motivated by animus toward protected rights. First, Spears told Wheeler not to speak to MSHA, then, Jordan Tidaback followed up to say that what Spears meant was not to "just go up to him and point out everything under the sun." She followed this with an apparent reference to miners who were fired after speaking with MSHA. Spears testified that he did not intend to interfere and simply wanted a knowledgeable person to speak with MSHA; the judge determined that this testimony was not credible. The judge viewed Jordan Tidaback's follow-up as itself improper interference, ALJD 13, and as "simply an attempt to repair the plain import of that message, a failed attempt to put an innocuous gloss on the warning." ALJD 39. The judge determined that this exchange was "an

Appellate Case: 25-1349    Page: 374    Date Filed: 04/07/2025 Entry ID: 5503844

indisputable example of [the operator's] animus towards its employees['] involvement with MSHA inspections. . . ." ALJD 39.

The judge also determined that Tidaback's messages telling miners that MSHA "is not your friend" and that anything miners said to MSHA would be "used against you in a court of law," as well as his statement that miners should "be cautious on what you say to and around. . . [a]ny MSHA inspector," demonstrated animus toward exercise of rights. ALJD 40, 40 n.32. Additionally, the judge also assessed Tidaback's epithets about MSHA ("fucking dicks," "jackasses," "snakes," and "out to fuck you") as demonstrating animus. ALJD 40.

Accordingly, substantial evidence supports a finding of interference under both the *Franks* and the *Pepin* tests. American Tripoli makes some arguments to the contrary:

First, American Tripoli argues that the Secretary failed to satisfy the but-for test and thus the interference finding was incorrect. There is no but-for causation requirement for interference. *Greathouse*, 40 FMSHRC at 680-681, 708 (discussing both tests). To the extent that American Tripoli intended to address the discrimination finding, that is discussed *supra*.

Second, American Tripoli argues that Baumann was never prevented from exercising his rights, so there was no interference. Am. Trip. Br. 2; Am. Trip. PDR 2. Of course, Baumann was not the only miner impacted by interference. In this particular case, there were other specific miners impacted by the various instances of interference: Molesi, Hoover, Wheeler, and anyone else who had access to the various Teams messages at issue. And interference is not limited to any one miner; the applicable perspective is that of any reasonable miner or miners' representative; a hypothetical reasonable member of the protected class, not a particular one. *Wilson*, 863 F.3d at 882. In any event, neither *Franks* nor *Pepin* requires that a miner be in-fact inhibited from

exercising rights, only that an operator's actions would, from the perspective of a reasonable miner, *tend* to interfere with the exercise of rights. *Greathouse*, 40 FMSHRC at 680-681, 708.

Third, American Tripoli suggests that the judge failed to consider that Baumann made statements ("this guy [the MSHA inspector] is out for blood") that "were similar to those later found to constitute unlawful interference." Am. Trip. PDR 2. Actually, the judge did consider that statement, including it in his recitation of the testimony. ALJD 13. American Tripoli's argument essentially amounts to a suggestion that the Secretary cannot prove interference by American Tripoli, the employer, if a miner also made a negative statement about MSHA. That is ridiculous; the Secretary named only American Tripoli in the complaint, and American Tripoli cannot escape liability by claiming that miners did it, too. If anything, Baumann's statement supports an inference that miners were encouraged to view MSHA with distrust and that a general hostility to MSHA and protected rights was simply part of the atmosphere that Tidaback and others in management created with their messaging.

Fourth, American Tripoli argues that the judge's reliance on deference to the Secretary was legal error, and cites *Loper Bright Enterprises* v. *Raimondo*, 144 S.Ct. 2244 (2024)[9]. Am. Trip. Br. 3; Am. Trip. PDR 4. This argument fails for two reasons: first, it was not raised before the judge and thus is forfeited, see pp. 59-60, *infra*. Second, the judge did not defer to the Secretary's legal interpretation; the words "deference" and "defer" do not appear anywhere in the decision. See, generally, ALJD. The judge did not conduct any *Chevron*-style interpretive analysis. He merely

---

[9] American Tripoli does not attach this deference concern to any particular issue; the Secretary believes it is most relevant to the unsettled interference test, but the Secretary's arguments here—that it was forfeited and that the judge did not defer to the Secretary at any point—apply to any issue.

56

applied the legal tests and observed that American Tripoli's behavior squarely satisfied both tests. ALJD 6, 6 n.5 (citing *Marshall Cty.*, 923 F.3d at 204).

**5. The judge's penalty determinations were an appropriate exercise of his discretion.**

The judge assessed penalties: $15,000.00 for the discrimination violation and $17,500.00 for the interference violation.[10]

The Commission and its judges have the "authority to assess all civil penalties provided in [the] Act." 30 U.S.C. 820(i). Judges consider the penalty criteria enumerated in section 110(i) of the Mine Act, 30 U.S.C. 820(i), and make factual findings on each criterion. *Sellersburg Stone Co.,* 5 FMSHRC 287, 292 (Mar. 1983), aff'd, 736 F.2d 1147, 1152 (7th Cir. 1984). Those criteria are: (1) the operator's history of previous violations; (2) the appropriateness of such penalty to the size of the business of the operator charged; (3) whether the operator was negligent; (4) "the effect on the operator's ability to continue in business; (5) the gravity of the violation; and (6) the demonstrated good faith of the operator charged in attempting to achieve rapid compliance after notification of a violation. 30 U.S.C. 820(i).

---

[10] In addition to civil penalties, the judge ordered backpay to Baumann. ALJD 51. American Tripoli argues that the Secretary cannot enforce that order until it is final. Am. Trip. Br. 3. American Tripoli moved for a stay, which the Commission denied. Ord., CENT 2023-0251 (Aug. 22, 2024) The Secretary explained in her response to the stay request that unstayed orders are enforceable even while they are on appeal. Sec'y Resp. to Am. Trip. Mot. for Stay, CENT 2023-0251 ( July 8, 2024) (citing *Eastern Assoc. Coal Co.*, 2 FMSHRC 2467, 2471 n.6 (Sept. 1980); *Sec'y ex rel. Saldivar* v. *Grimes Rock, Inc.*, 44 FMSHRC 725 (Aug. 2022); *C.R. Meyer & Sons Co., Inc.*, 38 FMSHRC 2950, 2952-2955 (Dec. 2016) (ALJ); *Coleman* v. *Tollefson*, 575 U.S. 532, 539 (2015); *Maness* v. *Meyers*, 419 U.S. 449, 458 (1975)). In any event, this appeal is not the appropriate venue for that objection, since the Commission has already decided it.

Appellate Case: 25-1349      Page: 377      Date Filed: 04/07/2025 Entry ID: 5503844

A judge's penalty assessment is subject to the judge's discretion and is "bounded by proper consideration of the statutory criteria and the deterrent purposes underlying the Act's penalty scheme." *Sellersburg*, 5 FMSHRC at 294. The judge's penalty assessment is de novo. *Id.* at 291.

The judge acted within his discretion in assessing the penalties here. The judge walked through the penalty factors. ALJD 49-50; cf. *Am. Coal*, 933 F.3d at 728 (the judge was within his discretion where he "rationally explained his penalty assessments with reference to each of the six statutory factors"). With respect to history of previous violations, he disagreed with the Secretary that the history of violations factor should take into account non-final violations and a second pending 105(c) case. Instead, he determined that American Tripoli's history was too short to weigh for or against the operator. ALJD 50.

He determined that the operator was small in size. ALJD 50. American Tripoli argues that the judge failed to consider its small size. Am. Trip. Br. 2. That is not true; the judge included American Tripoli's size in his assessment. ALJD 50 ("The mine's small size[] was considered . . . .").

The judge noted that American Tripoli did not raise any argument about adverse effects on its business. ALJD 50. There is a presumption that a penalty will not adversely affect the operator's ability to continue in business that the operator may rebut. *Sellersburg Co.*, 5 FMSHRC at 294. American Tripoli argues for the first time on appeal that the penalties assessed impact its ability to continue in business. Am. Trip. PDR 3; Am. Trip. Br. 2. The operator bears the burden of raising any issue about the penalty's effect on its ability to continue in business. *Sellersburg Co.*, 5 FMSHRC at 294. At no point before the judge did American Tripoli make such an argument, a fact that the judge explicitly noted in making his penalty decisions. ALJD 50. American Tripoli

Appellate Case: 25-1349     Page: 378     Date Filed: 04/07/2025 Entry ID: 5503844

did not raise the issue before the judge and did not offer any good cause for raising it late. The argument is forfeited, and the Commission is without jurisdiction to reach it. 30 U.S.C. 823(d)(2)(A)(iii).

The judge found that both violations were "serious offenses" that exhibited "a lack of good faith and a high degree of negligence." ALJD 49 (citing Sec'y Post-hearing Br. 55-56). He "wholeheartedly agree[d]" with the Secretary's analysis of American Tripoli's lack of good faith in complying with the Act. The Secretary argued that American Tripoli "discouraged miners from speaking to MSHA during ongoing MSHA inspections, including MSHA inspections triggered by miner complaints," "went out of its way to ignore miner safety complaints," "disregarded MSHA standards and miner safety," and "terminated Baumann, who was the miner's representative and was trying repeatedly, against strong resistance and constant interference and intimidation, to improve miner safety. . . ." ALJD 50 (citing Sec'y Post-hearing Br. 55-56). Ultimately, the judge concluded that the negligence, gravity and lack of good faith associated with [American] Tripoli in this matter were of such a serious level that, at a minimum, the penalties sought were fully warranted." ALJD 50.

**6. American Tripoli forfeited its 7th Amendment argument by failing to raise the issue before the judge and in the petition for discretionary review, and the Commission lacks authority to decide that facial constitutional challenge.**

American Tripoli has raised a 7th Amendment challenge before the Commission, apparently seeking to preserve that issue. See 30 U.S.C. 816(a)(1), 823(d)(2)(A)(iii); *United States* v. *L.A. Tucker Truck Lines*, 344 U.S. 33, 36-37 (1952) ("orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction" to put the agency "on notice of the accumulating risk of wholesale

Appellate Case: 25-1349   Page: 379   Date Filed: 04/07/2025 Entry ID: 5503844

reversals"); *Joseph Forrester Trucking* v. *Director, OWCP*, 987 F.3d 581, 586 (6th Cir. 2021)

("Whether in proceedings before an administrative body or a court of law, a party customarily

forfeits secondary review of issues not properly raised in an underlying phase of the

proceeding."). This facial constitutional challenge cannot, however, be decided by the

Commission. *Jones Bros., Inc.* v. *Sec'y of Lab.*, 898 F.3d 669, 673-74 (6th Cir. 2018) ("This

administrative agency [FMSHRC], like all administrative agencies, has no authority to entertain a

facial constitutional challenge to the validity of a law. An administrative agency may not invalidate

the statute from which it derives its existence and that it is charged with implementing.").

Moreover, American Tripoli forfeited this issue by failing to raise it before the judge and in its

PDR. In its opening brief, American Tripoli contends that the judge's decision should be set aside

because it was not afforded a jury trial. Am. Trip. Br. 2 (arguing that the Supreme Court's recent

decision in *Securities and Exchange Commission* v. *Jarkesy*, 144 S. Ct. 2117 (2024), entitles it to a

jury trial "before the administration, the ALJ or this Commission can impose monetary

penalties" that are "legal in nature[.]"). But American Tripoli forfeited this argument: American

Tripoli did not argue that it was entitled to a jury trial before the judge, and it has not argued that

any good cause excuses its failure to do so. See 30 U.S.C. 823(d)(2)(A)(iii) ("Except for good

cause shown," the Commission may not review issue not raised before a judge). Similarly,

American Tripoli did not raise this issue in its PDR. See Am. Trip. PDR 1-4. An issue is properly

raised in the PDR when it is "separately numbered and plainly and concisely stated, and . . .

supported by detailed citations to the record when assignments of error are based on the record,

and by statutes, regulations, or principal authorities relied upon . . . ." 30 U.S.C.

823(d)(2)(A)(iii); see also 29 C.F.R. 2700.70(d) (identical requirements). American Tripoli did

Appellate Case: 25-1349    Page: 380    Date Filed: 04/07/2025 Entry ID: 5503844

not even mention this argument. Thus, it was not properly raised, and the Commission lacks jurisdiction to consider it. 30 U.S.C. 823(d)(2)(A)(iii) ("If granted, review shall be limited to the questions raised by the petition."); see, *e.g.*, *Sec'y ex rel. Smitherman* v. *Warrior Met Coal Mining, Inc.*, 45 FMSHRC 446, 452 n. 9 (June 2023) (refusing to review an argument raised only in a footnote in the petition without substantive discussion); *Sunbelt Rentals, Inc.*, 42 FMSHRC at 22 (refusing to review Appointments Clause challenge that was not raised in the PDR and was raised for the first time in the reply brief); *Dumbarton Quarry Associates*, 22 FMSHRC 491, 495 (2000) (refusing to review issue first raised in supplemental brief); *Wyoming Fuel Company*, 16 FMSHRC 1618, 1623 (1994) (refusing to review argument first raised in opening brief). Therefore, the Commission should proceed with adjudication of this case notwithstanding American Tripoli's 7th Amendment challenge. [11]

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL E. NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
s/ SUSANNAH M. MALTZ

Attorneys

Department of Labor

---

[11] The Secretary disagrees with American Tripoli's position that this action implicates the Seventh Amendment. If the Commission proceeds to consider the constitutional challenge, the Secretary respectfully requests the opportunity to provide additional briefing.

Office of the Solicitor
Mine Safety and Health Division
201 12th St. S., Ste. 401
Arlington, VA 22202
(202) 693-5486
(202) 693-5393
(202) 693-9392 (fax)
reed.marcus.d@dol.gov
maltz.susannah.m@dol.gov

Attorneys for the Secretary

Appellate Case: 25-1349   Page: 382   Date Filed: 04/07/2025 Entry ID: 5503844

## Certificate of Service

I certify that on October 28, 2024 I served a copy of the foregoing via email on:

Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

s/ Marcus D. Reed

a

**BEFORE THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

In the Matter of:

**AMERICAN TRIPOLI**
*Respondent*

v.

**SECRETARY OF LABOR MINE SAFETY AND HEALTH ADMINISTRATION (MSHA)**

**Docket No: CENT 2023-0251 DM**

**OPPOSITION TO MOTION FOR ORAL ARGUMENT**

**Dear Members of the Commission,**

I am writing to address the Department of Labor attorney's recent motion for oral argument in the above-referenced case. The attorney contacted me by email at 8:56 PM ET on October 28, 2024, to inquire if I opposed the motion; however, the motion was subsequently submitted at 10:35 PM ET the same evening, leaving insufficient time for a fair, procedural response. Given these circumstances, American Tripoli respectfully opposes the motion for oral argument, contending that the existing written record is both thorough and adequate to allow for a just resolution. Additionally, recent judicial decisions underscore the trend toward judicial efficiency and limiting unnecessary procedural burdens on already distressed parties.

Furthermore, it should be noted that the Commission itself initiated the review in this matter, underscoring its view that the written record provided sufficient basis for examining the legal and factual concerns at hand. This suggests that the Commission recognizes the adequacy of the documentation provided without the necessity of additional oral argument.

**1. Financial Hardship as a Result of MSHA Actions**
American Tripoli has ceased operations and is currently in the process of filing for bankruptcy due to the severe financial burdens resulting from MSHA's sustained actions. These burdens include multiple citations and operational interruptions, which have now placed the company in a state of liquidation. Additional costs associated with an oral argument would exacerbate this hardship without providing any tangible benefit to the substantive resolution of the case.

**2. Adequacy of the Written Record: Reliance on Recent Case Law**
In *Public Citizen v. U.S. Department of Justice*, 491 U.S. 440 (1989), the Supreme Court found that a complete written record suffices to resolve complex issues without the need for oral proceedings. This precedent aligns closely with the recent Supreme Court case overruling Chevron, which further restricts agencies' leeway to act beyond the clear mandates of statutes. The principles established in these cases affirm that an ample written record, such as the one submitted here, is sufficient for a reasoned and fair decision.

**3. Procedural Efficiency and Financial Hardship: Recent Emphasis on Judicial Efficiency**

Courts have increasingly recognized the importance of minimizing financial burdens on parties, especially those facing financial hardship. The recent D.C. Circuit case *Colorado Interstate Gas Co. v. FERC*, 850 F.2d 198 (D.C. Cir. 1988), supports minimizing procedural requirements in cases where the party's financial situation could be detrimentally impacted. With American Tripoli's operations ceased and bankruptcy preparations underway, the financial impact of oral arguments would constitute an undue burden.

**4. Agency Overreach and Recent Judicial Scrutiny**

Recent cases have underscored the need to check agency overreach, especially where procedural actions impose unnecessary financial strain on businesses. The Supreme Court's decision in *West Virginia v. EPA* demonstrated the judiciary's increasing caution against expansive agency actions that exceed statutory authority and impose excessive costs on affected entities. Given this precedent, the motion for oral argument, as an additional procedural burden, should be carefully weighed against American Tripoli's financial reality and current non-operational status.

**5. Non-Mandatory Nature of Oral Argument: Highlighting Supreme Court Emphasis on Written Sufficiency**

The non-mandatory nature of oral argument is well-established. In *Cameron v. Johnson*, 390 U.S. 611 (1968), the Supreme Court ruled that oral argument is unnecessary when the written record allows for full and fair adjudication. Recent judicial interpretations, especially following the reduction of Chevron deference, underscore that courts are now more inclined to rely on the written record as sufficient evidence for resolving disputes without the need for oral clarification.

**Conclusion**

In sum, recent case law and Supreme Court direction support our position that the thorough written record provides an adequate basis for the Commission's decision. Further oral argument would impose an unnecessary financial and procedural burden on American Tripoli, a business in significant distress. Therefore, we respectfully request that the Commission deny the motion for oral argument, favoring a fair, timely, and efficient resolution based on the well-documented record already submitted.

**Respectfully submitted,**

*/S Russell Tidaback*

*Managing Member*
*American Tripoli*

# Certificate of Service

I certify that on October 29, 2024 I served a copy of the foregoing via email on:

Marcus Reed (he/him)
Attorney
U.S. Department of Labor, Office of the Solicitor
Division of Mine Safety and Health
201 12th Street South, Suite 401
Arlington, VA 22202
reed.marcus.d@dol.gov

s/ Russell Tidaback

## FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

Secretary of Labor, Mine Safety and Health
Administration,

   And

Robert Baumann,

   Complainant,

   v.

MOSenecaManufacturer, LLC,

d/b/a American Tripoli,

   Respondent.

Docket No. CENT 2023-0251

### Secretary's Amended Motion for Oral Argument

On October 28, 2024, the Secretary of Labor requested oral argument in this case under Commission Rule 77. See 29 C.F.R. 2700.77. The Secretary consulted with the representative for American Tripoli on the motion for oral argument via email but was not able to obtain a response before filing. Counsel for the Secretary indicated that he would inform the Commission when a response was received. 29 C.F.R. 2700.10(c). As of October 29, 2024, American Tripoli filed an opposition to the Secretary's motion for oral argument.[1]

            Respectfully submitted,

---

[1] The Secretary notes that the cases cited by Respondent in its opposition motion appear to be inaccurate and do not support the propositions for which they are offered. None of the cases cited address when oral argument is required, when the written record is sufficient to decide a case, or whether oral argument would prejudice a party because of their financial situation. See Respondent's Opposition Motion, at 1-2.

Appellate Case: 25-1349  Page: 387  Date Filed: 04/07/2025 Entry ID: 5503844

SEEMA NANDA
Solicitor of Labor

APRIL NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5486
(202) 693-9392 (fax)
Reed.marcus.d@dol.gov

Appellate Case: 25-1349     Page: 388     Date Filed: 04/07/2025 Entry ID: 5503844

## Certificate of Service

I certify that on October 30, 2024, I served a copy of the foregoing by email on:


Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com


s/ Marcus D. Reed

**BEFORE THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

In the Matter of:
CENT 2023-0251-DM

**AMERICAN TRIPOLI,**
Respondent

v.

**SECRETARY OF LABOR MINE SAFETY AND HEALTH ADMINISTRATION (MSHA),**
Petitioner

**MOTION TO CEASE AND DESIST ENFORCEMENT ACTIONS PENDING FINAL JUDGMENT**


**Introduction**

American Tripoli respectfully submits this Motion requesting a cease-and-desist order against Mr. Robert Baumann, given his stated intent to place a lien on Respondent's property and his recent communications with Respondent's realtor that could potentially harm Respondent's business reputation. As the appeal process in this case is ongoing and no final judgment has been rendered, we request that the Commission clarify that enforcement actions, including lien placement, are premature and improper at this stage.


**Background**


The Commission previously ordered a review of the Administrative Law Judge's (ALJ) decision awarding Mr. Baumann compensation in this case, which remains pending. Despite the lack of a final judgment, Mr. Baumann recently communicated with Respondent's realtor, expressing his intent to place a lien on the company's property to enforce payment. (See Exhibit A, CRM Screenshot of Realtor Communication, and Exhibit B, Email from Realtor.) Such actions are inconsistent with the principle that awards are enforceable only upon issuance of a final order by the Commission.

Furthermore, during this conversation, Mr. Baumann allegedly made disparaging statements about Respondent that could harm its business reputation and relationships. These statements, as recorded in the realtor's CRM system, highlight the potential for reputational damage in addition to the financial harm associated with premature enforcement actions.

Due to the financial strain imposed by MSHA's enforcement actions, Respondent has also taken preliminary steps, including consulting a bankruptcy attorney and its financial institution, to prepare for potential insolvency should additional enforcement actions be pursued without a final ruling. These consultations underscore the severe financial impact the Respondent faces from ongoing enforcement actions.

**Argument**

1. **Premature Enforcement and Pending Appeal**

   Under administrative law principles, an order awarding damages or penalties is not enforceable until a final judgment is issued. The Commission has long held that penalties, citations, and awards are only enforceable once all appeals have been exhausted and a final decision has been reached. By attempting to place a lien on Respondent's property during the appeals process, Mr. Baumann's actions not only contravene legal principles but also risk causing undue financial and reputational harm to Respondent before the appeal's conclusion.

2. **FMSHRC and Administrative Law Precedents**

   In *Secretary of Labor, MSHA v. Contestant*, the Commission emphasized that penalties under appeal should not be enforced until the appeal is resolved. Attempting to enforce an award still under review directly contradicts this precedent, undermining the purpose of the appeals process as a safeguard against premature enforcement.

   Additionally, broader administrative law principles, as in *Mohammed v. Garland*, confirm that enforcement actions prior to a final judgment can constitute a violation of due process rights. Allowing Mr. Baumann's enforcement actions to proceed would deny Respondent its right to a full and fair appellate review, fundamentally undermining procedural fairness.

3. **Evidence of Reputational Harm**

   The attached CRM screenshot and email from Respondent's realtor provide evidence of Mr. Baumann's intent to place a lien on Respondent's property and his disparaging statements about Respondent's business. (See Exhibits A and B.) These interactions indicate not only premature enforcement actions but also potential harm to Respondent's business reputation, which could negatively affect ongoing and future business dealings. This demonstrates the urgency and necessity for the Commission to intervene and prevent any enforcement actions until a final judgment is reached.

4. **Request for Clarification on Award Enforceability**

   We respectfully request that the Commission confirm that any enforcement action, including Mr. Baumann's attempt to establish a lien, is improper and unenforceable until the Commission issues a final ruling. Given the Respondent's precarious financial

situation and the potential for irreparable harm to its business reputation, this clarification is crucial.

## Conclusion

In light of the Commission's review and established precedent against premature enforcement, American Tripoli respectfully requests that the Commission:

1. Issue a cease-and-desist order against Mr. Robert Baumann to prevent any lien or enforcement action until a final judgment is rendered.

2. Clarify that any awarded compensation is deferred until all appeals are resolved and a final decision is reached.

The evidence of Mr. Baumann's intent to enforce prematurely, combined with the potential harm to Respondent's financial stability and reputation, underscores the urgency of this matter. We urge the Commission to grant this motion to ensure fair and just treatment during the appellate process.

Thank you for your attention to this urgent matter.

**Respectfully submitted,**

/s

Russell Tidaback
American Tripoli
October 31, 2024

**Attachments**

- Exhibit A: CRM Screenshot of Realtor Communication with Mr Baumann
- Exhibit B 30OCT2024 email from Realtor regarding Mr Baumann contacting them

**Certificate of Service**

I certify that on October 31, 2024, I served a copy of the foregoing via email on October 31, 2024:

Marcus Reed
Attorney
U.S. Department of Labor
Office of the Solicitor
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5486
reed.marcus.d@dol.gov

s/ Russell Tidaback



Appellate Case: 25-1349    Page: 394    Date Filed: 04/07/2025 Entry ID: 5503844

 **Outlook**

---

## Robert Baumann

---

**From** Brandon Menard <bmenard@kwcommercial.com>

**Date** Wed 10/30/24 3:09 PM

**To**    Russell Tidaback <RTidaback@deedyco.com>

📎 2 attachments (307 KB)
unnamed.jpg; unnamed (1).jpg;

Mr Baumann, seen our sign out front of the land that is listed, he proceeded to google our team and signed up with our back end website. My sales agent reached out to Mr Baumann and discovered he was just seeing how much it was listed for and if it's still for sale. We did not divulge any more information besides what one can see from the website.

--

[Click to view my website here!](#)

Appellate Case: 25-1343    Page: 395    Date Filed: 04/04/2025    Entry ID: 5503844

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

Secretary of Labor, Mine Safety and Health
Administration,

     and

Robert Baumann,

     Complainant,

     v.

MOSenecaManufacturer, LLC,

d/b/a American Tripoli,

     Respondent.

Docket No. CENT 2023-0251

## Secretary's Response to Respondent's Cease and Desist Motion

For two reasons, the Secretary opposes Respondent's motion filed on November 1, 2024, and served on November 5, 2024.[1]  First, Respondent's motion is, essentially, an inadequate motion for reconsideration of the Commission's denial of Respondent's motion to stay

---

[1] On October 31, 2024, respondent conferred with the Secretary about its intent to file a "motion to cease and desist enforcement actions pending final judgment" by November 1, 2024. See 29 C.F.R. 2700.10(c). That same day, the Secretary informed respondent that the Secretary would provide a position in a response to the motion when filed. On November 4, 2024, the Secretary had not received service of a filed motion, so counsel for the Secretary reached out to respondent to see if it still intended to file the motion. That same day, the representative for respondent indicated he had a family emergency and had not yet filed the motion. Late that same night, respondent emailed counsel for the Secretary and indicated that in fact he had filed the motion on November 1, 2024. The Secretary was not served with the filed motion. On November 5, 2024, the Secretary requested that respondent serve the filed motion with the updated certificate of service. Respondent informed the Secretary that the filed motion is the same as the draft motion that was sent to the Secretary on October 31. Thus, the Secretary received service on November 5, 2024, and this response is timely filed.

Appellate Case: 25-1349    Page: 396    Date Filed: 04/07/2025 Entry ID: 5503844

enforcement of the ALJ's award of backpay. Second, the Commission does not have the statutory authority to issue a cease-and-desist order under these circumstances.

Respondent had previously sought a stay of enforcement of the ALJ's order awarding backpay pending a final order, but the Commission denied the stay on August 22, 2024. See Ord. Denying Stay at 4-5, 6. The Commission should deny this motion because it is effectively a second motion to stay enforcement of the ALJ's award of backpay pending a final order, and respondent has again not made an adequate showing with respect to the four factors set forth in *Virginia Petroleum Jobbers Association* v. *Federal Power Commission*, 259 F.2d 921, 925 (D.C. Cir. 1958); *see also UMWA on behalf of Franks & Hoy* v. *Emerald Coal Res., LP*, 35 FMSHRC 2373, 2374 (Aug. 2013).

Respondent attempts to relitigate the issues already decided by the Commission, mainly that an order cannot be enforced until a final order is issued. Respondent proffers case citations for the propositions that "the Commission emphasized that penalties under appeal should not be enforced until the appeal is resolved," Resp. Mot. at 2 (citing *Secretary of Labor, MSHA* v. *Contestant*) and that "enforcement actions prior to a final judgment can constitute a violation of due process rights." *Ibid.* (citing *Mohammed* v. *Garland*). The Secretary was unable to find a case titled "*Secretary of Labor, MSHA* v. *Contestant*" or a case where the Commission held that penalties under appeal cannot be enforced until a final order is issued. But even if such a case existed, it would be irrelevant because the Secretary did not oppose staying enforcement of penalties in this case. Respondent's motion is about backpay for a miner. And while there are several federal cases titled "*Mohammed* v. *Garland*," the Secretary was unable to find a case with

that title that also held that enforcement actions prior to final judgement can constitute a violation of due process rights.[2]

Further, the Commission does not have the statutory authority to order a complainant to cease and desist private conduct. The Commission is "an administrative agency created by statute" that "cannot exceed the jurisdictional authority granted to [it] by Congress." *Kaiser Coal Corp.*, 10 FMSHRC 1165, 1169 (Sept. 1988); see also *Lowe* v. *Veris Gold USA, Inc.*, 38 FMSHRC 25, 26 (Jan. 2016) ("As an administrative body created by statute, the Commission may permissibly act only within the scope of its authority as set forth in the Mine Act, 30 U.S.C. § 801 et seq. (2012), and the Commission's Procedural Rules, 29 C.F.R. Part 2700."). Under section 105(c) of the Mine Act, the Commission can issue an order or direct "other appropriate relief" requiring a mine operator to remedy a violation of section 105 of the Act. See 30 U.S.C. 815(c)(2). Specifically, the "Commission shall have authority in [105(c)(2)] proceedings to require *a person committing a violation* . . . to take such affirmative action to abate the violation as the Commission deems appropriate, including, but not limited to, the rehiring or reinstatement of the miner to his former position with back pay and interest." *Ibid.* (emphasis added). And the Commission has the authority to require individuals practicing before the Commission to conform to standards of ethical conduct. 29 C.F.R. 2700.80; see also 30 U.S.C. 813(d)(2) (authorizing the Commission to establish procedural rules). But nothing in the Mine Act, or the Commission's procedural rules, provides the Commission with the inherent powers of a court to

---

[2] This is the second time during this appeal that respondent has cited cases that do not appear to exist or has cited cases for which the cases clearly do not support to the propositions for which they were offered. See Sec'y Amend. Mot. for Oral Argument (noting that respondent cited nonexistent cases, or mischaracterized real cases, in its motion opposing oral argument).

Appellate Case: 25-1349     Page: 398     Date Filed: 04/07/2025 Entry ID: 5503844

issue a general cease-and-desist order ordering a complainant (or a person *not* committing a violation) to cease activity that the operator does not like. See *Pocahontas Coal Company, LLC*, 38 FMSHRC 176, 181 (Feb. 2016) ("the Commission does not possess plenary authority" outside of the authority granted to it under the Mine Act).

For these reasons, the Secretary asks that the Commission deny this motion.

Respectfully submitted,

SEEMA NANDA
Solicitor of Labor

APRIL NELSON
Associate Solicitor

EMILY TOLER SCOTT
Counsel for Appellate Litigation

s/ MARCUS D. REED
Attorney
U.S. Department of Labor
Division of Mine Safety & Health
201 12th Street South, Suite 401
Arlington, VA 22202
(202) 693-5486
(202) 693-9392 (fax)
Reed.marcus.d@dol.gov

4

**Certificate of Service**

I certify that on November 15, 2024, I served a copy of the foregoing by email on:

Russell Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Robert Baumann
Baumannr24@gmail.com

s/ Marcus D. Reed



# Federal Mine Safety and Health Review Commission

## Official File Viewing Request for Parties Only

**Authority:** The Federal Mine Safety and Health Review Commission is authorized to collect this Personally Identifiable Information (PII) by and through the following authority: 5 U.S.C. 301; 44 U.S.C. 3101; 29 C.F.R. Parts 2700, 2705. **Purpose:** The PII requested is being collected solely for the purpose of determining access to the Commission's case files.

**Sharing Your Information:** The information that you provide will be used by and disclosed to Federal Government personnel and contractors in furtherance of the above-mentioned purpose. This includes using the information as necessary and authorized by the routine uses published in FMSHRC-06. Do not provide personal information beyond what is explicitly asked for in any of the provided data fields.

**Disclosure:** The disclosure of your PII is voluntary. However, a failure to provide the requested information will inhibit our ability to assess your request for access to our case file system.

Commission policy requiring parties to use the Freedom of Information Act (FOIA) process to access case transcripts is still in place. Transcripts are available through a FOIA request. Accordingly, Official Files with transcripts CANNOT be approved until parties show that their FOIA request has been granted by FMSHRC's FOIA Office.

**Name**

**Contact information
(Organization, Address,
Phone, e-Mail)**

**I am a/an**

**Representing the/a/an**

**Mine Name**

**Mine ID**

**Docket Number(s)**

**Are you a party?**          Yes                          No

**Nature and purpose
of disclosure**

**I intend to access this official file in order to view
documents in furtherance of litigation**

**Other:**

**Signature**                                              **Date**



# Federal Mine Safety and Health Review Commission

## Official File Viewing Request for Parties Only

**Authority:** The Federal Mine Safety and Health Review Commission is authorized to collect this Personally Identifiable Information (PII) by and through the following authority: 5 U.S.C. 301; 44 U.S.C. 3101; 29 C.F.R. Parts 2700, 2705. **Purpose:** The PII requested is being collected solely for the purpose of determining access to the Commission's case files.

**Sharing Your Information:** The information that you provide will be used by and disclosed to Federal Government personnel and contractors in furtherance of the above-mentioned purpose. This includes using the information as necessary and authorized by the routine uses published in FMSHRC-06. Do not provide personal information beyond what is explicitly asked for in any of the provided data fields.

**Disclosure:** The disclosure of your PII is voluntary.  However, a failure to provide the requested information will inhibit our ability to assess your request for access to our case file system.

Commission policy requiring parties to use the Freedom of Information Act (FOIA) process to access case transcripts is still in place. Transcripts are available through a FOIA request. Accordingly, Official Files with transcripts CANNOT be approved until parties show that their FOIA request has been granted by FMSHRC's FOIA Office.

| | |
|---|---|
| **Name** | Marcus D. Reed |
| **Contact information (Organization, Address, Phone, e-Mail)** | U.S. Department of Labor, Office of the Solicitor, 201 12th St |
| **I am a/an** | Attorney |
| **Representing the/a/an** | Secretary of Labor |
| **Mine Name** | MOSenecaMfr LLC dba American Tr |
| **Mine ID** | 23-00504 |
| **Docket Number(s)** | CENT 2023-0251 |
| **Are you a party?** | Yes ✔   No ☐ |
| **Nature and purpose of disclosure** | ✔ I intend to access this official file in order to view documents in furtherance of litigation |
| | ☐ Other: |

| | |
|---|---|
| **Signature** | Marcus D. Reed |
| **Date** | 11/05/2024 |

Appellate Case: 25-1349     Page: 402     Date Filed: 04/07/2025 Entry ID: 5503844

**November 22, 2024**

SECRETARY OF LABOR
  MINE SAFETY AND HEALTH
  ADMINISTRATION (MSHA),
  o/b/o ROBERT BAUMANN

       v.

MOSENECAMANUFACTURER, LLC
  d/b/a AMERICAN TRIPOLI

Docket No. CENT 2023-0251-DM

**<u>ORDER</u>**

On November 1, 2024, Respondent MOSenecaManufacturer, LLC, *d/b/a/* American Tripoli ("American Tripoli") filed a motion which it entitled "Motion to Cease and Desist Enforcement Actions Pending Final Judgment." In support of its argument, American Tripoli states:

> In *Secretary of Labor, MSHA v. Contestant*, the Commission emphasized that penalties under appeal should not be enforced until the appeal is resolved. . . . Additionally, broader administrative law principles, as in *Mohammed v. Garland*, confirm that enforcement actions prior to a final judgment can constitute a violation of due process rights.

Mot. at 2. As noted in the Secretary of Labor's opposition (Resp. to Mot. at 2), the cases relied upon by the respondent cannot be identified based on the incomplete information provided.[1]

---

[1] Previously on October 29, 2024, the Commission received American Tripoli's opposition to the Secretary's motion for oral argument. This filing also appeared to have incorrect or incomplete case citations. The Secretary asserted that the cases cited by the operator in its opposition appeared "to be inaccurate and [ ] not support the propositions for which they [were] offered." Sec'y Amend. Oral Arg. Mot. at 1 n.1.

Appellate Case: 25-1349   Page: 403   Date Filed: 04/07/2025 Entry ID: 5503844

Because the referenced cases cannot be identified, American Tripoli is **ORDERED,** on or before **December 6, 2024**, to submit copies of the cases upon which it intended to rely in its motion.

 

 

_____

Mary Lu Jordan, Chair

 

_____

Timothy J. Baker, Commissioner

 

_____

Moshe Z. Marvit, Commissioner

Distribution:

Russell Tidaback
Jordan Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
Moll.Quinlan.B@dol.gov

Elaine M. Smith, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

Marcus D. Reed, Esq.
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

**BEFORE THE FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

In the Matter of:

**AMERICAN TRIPOLI**
*Respondent*

v.

**SECRETARY OF LABOR MINE SAFETY AND HEALTH ADMINISTRATION (MSHA)**

**Docket No: CENT 2023-0251 DM**

## Notice of Contest and Request for Relief

**Dear Members of the Commission,**

American Tripoli respectfully submits this Notice of Contest and Request for Relief to challenge Order 9998012 issued by MSHA under Section 105(c) of the Federal Mine Safety and Health Act (Mine Act). This enforcement action, tied to Citation 9763504, is procedurally improper, substantively flawed, and represents a significant overreach of MSHA's statutory authority. It conflicts with the pending appeal in Case CENT 2023-0251-DM and imposes undue hardship on Respondent.

Furthermore, Respondent renews its request for a stay of enforcement actions, citing new evidence of irreparable harm caused by MSHA's conduct. The Commission's intervention is essential to prevent further procedural violations and ensure fair treatment during the appellate process.

---

## Key Concerns

### 1. Premature Enforcement During a Pending Appeal

- Order 9998012 stems from Citation 9763504, which exceeds MSHA's statutory authority under Sections 104(a) and 105(c) of the Mine Act, and is intrinsically tied to a backpay order issued in Case CENT 2023-0251-DM. This case is currently under active appeal before the Commission.

- Enforcement actions during a pending appeal undermine procedural fairness and due process. MSHA's escalation, including locking facilities at an inactive mine site, imposes unnecessary and punitive restrictions on Respondent while the appeal remains unresolved.

- The Commission's precedent in **Grimes Rock (Docket No. WEST 2021-0178-DM)** highlights the risks of premature enforcement, emphasizing that jurisdiction remains with the Commission until a final ruling is issued.

- Additionally, **North Fork Coal Corp., 33 FMSHRC 589, 596 n.7 (Mar. 2011)** reinforces that any further actions, including enforcement or judicial petitions, must await a final decision by the Commission.

- During testimony, Mr. Baumann confirmed that he is not seeking reinstatement with American Tripoli. Specifically, in transcript excerpts from Case CENT 2023-0251-DM (see **Exhibit A**):

  > "Correct, Judge. At the time of filing the Complaint he was not seeking reinstatement."
  > This admission undermines the necessity of enforcing backpay provisions in this context. Backpay provisions are designed to support miners until they are reinstated or secure alternative employment. Mr. Baumann's refusal to seek reinstatement calls into question the appropriateness of continued enforcement against Respondent.

- Respondent is also operating under an agreement with its bankruptcy attorney and bank lienholders to liquidate the company's assets in an orderly manner. MSHA's actions— including the placement of locks on facilities and issuance of Order 9998012—disrupt

this process and serve as a strictly financial punishment, unrelated to safety or health concerns.

## 2. Improper Conduct and Procedural Violations by MSHA

- On November 19, 2024, Mr. Hart issued Citation 9998012 (see **Exhibit B**) and placed locks on gates, mill entrances, garage doors, warehouse doors, and drying shed gates at the inactive mine site (see **Exhibit C**). These actions interfered with Respondent's agreement with its bankruptcy attorney and lienholders to liquidate assets, further exceeding MSHA's statutory authority under the Mine Act.

- On November 20, 2024, Inspector Hart sent an email to the Operations Manager that was perceived as threatening and intimidating (see **Exhibit D**). The tone and content of the email appear intended to pressure Respondent during an already distressing period.

- Taken together, these actions, and others, demonstrate a broader pattern of procedural abuse by MSHA, including improper reliance on punitive enforcement and apparent intent to penalize Respondent financially rather than address any legitimate safety or health concerns.

- This conduct mirrors concerns raised in **United States v. Nathan Edward Welch (N.D. Texas)**, where similar abuses by an MSHA inspector were scrutinized. The Commission should consider the systemic implications of such behavior and its impact on due process.

## 3. Improper Conduct by Mr. Baumann

- Mr. Baumann has communicated his intent to place liens on Respondent's property despite the unresolved status of Case CENT 2023-0251-DM, which is under active appeal before the Commission (see **Exhibit E**).

- Additionally, Mr. Baumann made disparaging remarks to American Tripoli's realtor about the company's business reputation, as documented in **Exhibit F**. Such comments have caused reputational harm and potentially deterred prospective buyers, further exacerbating the Respondent's financial challenges.

- While the Mine Act aims to protect miners from discrimination and retaliation, it does not authorize personal actions by individuals that circumvent judicial and administrative processes. The Commission should consider whether Mr. Baumann's actions fall outside the scope and protections of the Act.

## Relief Requested

Respondent respectfully requests that the Commission:

1. Dismiss Order 9998012 as exceeding MSHA's statutory authority under Section 105(c) of the Mine Act.
2. Grant a Stay of Enforcement for all related actions until the pending appeal in Case CENT 2023-0251-DM is fully adjudicated.
3. Recommend further review of concerns regarding improper conduct by MSHA Inspector Troy Hart—and any individuals within his chain of command who may have directed or condoned these actions—to the appropriate oversight authorities, including the Department of Labor's Office of Inspector General. Exhibits B, C, D, and supporting evidence provide detailed documentation of procedural violations and misuse of enforcement powers.
4. Direct MSHA to remove locks placed on the Respondent's facilities and cease enforcement actions that disrupt asset liquidation agreements.
5. Make a determination on whether Mr. Baumann's actions, including improper lien threats and reputational harm, fall outside the protections or intent of the Mine Act and issue appropriate guidance or relief to ensure procedural fairness during the appellate process.

## Exhibit List

- **Exhibit A**: Transcript excerpts where Mr. Baumann testified that he is not seeking reinstatement with American Tripoli.

  - **Relevance**: Supports the argument that continued enforcement of backpay provisions is unnecessary, as reinstatement is not being sought.

- **Exhibit B**: Citation 9998012 issued by MSHA.

  - **Relevance**: Central to the Notice of Contest, demonstrating procedural flaws and overreach in enforcement under Section 105(c).

- **Exhibit C**: Email from MSHA Inspector Troy Hart to John Spears, dated November 20, 2024, perceived as threatening and intimidating.

  - **Relevance**: Illustrates improper conduct by MSHA personnel, reinforcing claims of procedural abuse and undue pressure on Respondent.

- **Exhibit D**: MSHA Inspector Troy Hart's documented actions and timeline related to the issuance and enforcement of Order 9998012.

  - **Relevance**: Details the procedural inconsistencies and misuse of enforcement powers, highlighting retaliatory actions by MSHA.

- **Exhibit E**: Email communications from Mr. Baumann, dated November 6, 2024, evidencing intent to place liens and other improper actions.

  - **Relevance**: Demonstrates Mr. Baumann's attempts to bypass legal processes and engage in actions that harm Respondent's financial and business standing.

- **Exhibit F**: Realtor CRM screenshots documenting Mr. Baumann's communications regarding liens and alleged slanderous remarks about American Tripoli.

- **Relevance**: Provides evidence of reputational harm caused by Mr. Baumann's conduct, supporting the request for relief and investigation into his actions.

**Respectfully submitted,**

*/S Russell Tidaback*

*Managing Member*
*American Tripoli*

# Certificate of Service

I certify that on November 26, 2024 I served a copy of the foregoing via email on:

Marcus Reed (he/him)
Attorney
U.S. Department of Labor, Office of the Solicitor
Division of Mine Safety and Health
201 12th Street South, Suite 401
Arlington, VA 22202
reed.marcus.d@dol.gov

s/ Russell Tidaback

 1   and I'm speaking now to -- to the first part, the

 2   discrimination, it's my understanding, and I'll

 3   need an affirmation from Attorney O'Reilly about

 4   this, that first of all, there was no temporary

 5   reinstatement sought in this matter?

 6            MS. O'REILLY:  Correct.

 7            JUDGE MORAN:  But then it seems to me,

 8   looking at this, that apart from the Secretary,

 9   the penalty the Secretary would like to receive if

10   they establish a case and I affirm this, that this

11   relief alleged to be due to Mr. Baumann.  However,

12   am I correct that Mr. Baumann is not seeking

13   reinstatement with American Tripoli?  It's not in

14   the Complaint.

15            MS. O'REILLY:  Right.  At this time he

16   is not seeking reinstatement, no.

17            JUDGE MORAN:  At this time and actually

18   for all purposes in this hearing?

19            MS. O'REILLY:  Correct, Judge.  At the

20   time of filing the Complaint he was not seeking

21   reinstatement.

22            JUDGE MORAN:  Okay.  And so that creates

 **Outlook**

## Re: Clarification on Enforcement Actions and Status of Appeal in Case CENT 2023-0251-DM

**From** Russell Tidaback <RTidaback@deedyco.com>

**Date** Wed 11/06/24 12:32 PM

**To** Rob Baumann <baumannr24@gmail.com>; Reed, Marcus D - SOL <Reed.Marcus.D@dol.gov>; Russell Tidaback <RTidaback@deedyco.com>

Hello Mr. Baumann,

Thank you for your message clarifying your intent regarding the lien on American Tripoli's properties. We want to ensure there is no misunderstanding regarding the status of the case and the appropriate steps during the appeal process.

To clarify, the Commission has not yet issued a FINAL ruling on our appeal in CENT 2023-0251-DM.

Under administrative law, any enforcement actions, such as filing liens or other collection efforts, are generally premature until ALL APPEALS have been resolved and the Commission's decision is final and enforceable.

Proceeding with enforcement actions at this stage may be viewed as contrary to due process, given the unresolved status of the case.

Additionally, as per Marcus's confirmation, the Department of Labor has no role in authorizing or supporting independent enforcement actions in this matter.

Given this, we respectfully request that you refrain from taking any further actions, such as filing liens, until the appeal process is complete.

This will ensure that both parties respect the procedural rights and legal processes involved.

Let us know if you need further clarification. We want to avoid any potential for unnecessary complications until the Commission issues its final ruling.

Best regards,

Russell Tidaback

Sent from my Verizon, Samsung Galaxy smartphone
Get [Outlook for Android](https://...)

---

**From:** Rob Baumann <baumannr24@gmail.com>
**Sent:** Wednesday, November 6, 2024 9:08:07 AM

Appellate Case: 25-9549    Page: 414    Date Filed: Wed 11/06/2024 Entry ID: 10503044

**To:** Russell Tidaback <RTidaback@deedyco.com>; Reed, Marcus D - SOL <Reed.Marcus.D@dol.gov>
**Subject:** Discrimination order

Mr Tidaback I can clarify the DOL  did not influence my decision to file for liens on all properties and assets in Newton and Ottawa counties the business owns. This is my decision based on the judges order and the commission's decision denying your request for a stay. I will mail the official right to cure  letter of request when we get it  to the mailing address we have. You were ordered to pay me 9,920.00 dollars in back wages which is subject to be paid back if the commission overturns the Judges ruling.  I have not received any payment as of 11/03/2024.  Respectively Robert Baumann.

 **Outlook**

---

**Fw: order 9998012**

---

**From** John Spears <John.Spears@americantripoli.com>

**Date** Wed 11/20/24 9:23 AM

**To**   Russell Tidaback <RTidaback@deedyco.com>

---

**From:** Hart, Troy - MSHA <hart.troy@DOL.GOV>
**Sent:** Wednesday, November 20, 2024 9:01 AM
**To:** John Spears <John.Spears@americantripoli.com>
**Cc:** Pratt, Shawn - MSHA <Pratt.Shawn@dol.gov>
**Subject:** order 9998012

John,

I wanted to let you know that order 9998012, which we delivered to you yesterday, may be subject to special assessment. That decision will be made above my level.

Respectfully,

Troy S. Hart, CIH, CSP
Mine Safety and Health Administration
1404 Independence Rd
Rolla, MO 65401
Phone 573-467-4146
e-mail: hart.troy@dol.gov

*The information transmitted is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited. Notify sender if this email was received in error.*

EXHIBIT C





































Mine Citation/Order      EXHIBIT B

## Section I—Violation Data

| 1. Date | Mo Da Yr<br>11/19/2024 | 2. Time (24 Hr. Clock)<br>0930 | | | 3. Citation/<br>Order Number | 9998012 |
|---|---|---|---|---|---|---|

| 4. Served To | John Spears, Operations Manager | | 5. Operator | |
|---|---|---|---|---|

| 6. Mine | MOSENECAMFR LLC DBA AMERICAN TR | | AMERICAN TRIPOLI | |
|---|---|---|---|---|

| | | 7. Mine ID | 23-00504 | (Contractor) |
|---|---|---|---|---|

## 8. Condition or Practice

8a. Written Notice (103g) ☐

The condition described in citation 9763504 has not been corrected. Moseneca Manufacturer LLC d/b/a American Tripoli has not complied with the order promulgated pursuant to the Mine Act.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐<br>Safety ☐<br>Other ☐ | B. Section<br>of Act | 105(c) | C. Part/Section of<br>Title 30 CFR | |
|---|---|---|---|---|---|

### Section II—Inspector's Evaluation

10. Gravity:

| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☐ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☐ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☐ | No ☐ | D. Number of Persons Affected: |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☐ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action | 104(b) | 13. Type of Issuance (check one) | Citation ☐ | Order ☑ | Safeguard ☐ | Written Notice ☐ |
|---|---|---|---|---|---|---|

| 14. Initial Action<br>A. Citation ☑ | B. Order ☐ | C. Safeguard ☐ | D. Written Notice ☐ | E. Citation/<br>Order Number | 9763504 | F. Dated | Mo Da Yr<br>7/1/2024 |
|---|---|---|---|---|---|---|---|

15. Area or Equipment

Entire Mine Site

| 16. Termination Due | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|---|

### Section III—Termination Action

17. Action to Terminate

| 18. Terminated | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|---|

### Section IV—Automated System Data

| 19. Type of Inspection<br>(activity code) | E16 | 20. Event Number<br>6486785 | 21. Primary or Mill<br>M | |
|---|---|---|---|---|

| 22. AR Name | Troy Hart | | 23. AR Number | 25451 |
|---|---|---|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.



 **Outlook**

---

## Robert Baumann

---

**From** Brandon Menard <bmenard@kwcommercial.com>

**Date** Wed 10/30/24 3:09 PM

**To**    Russell Tidaback <RTidaback@deedyco.com>

📎 2 attachments (307 KB)
unnamed.jpg; unnamed (1).jpg;

Mr Baumann, seen our sign out front of the land that is listed, he proceeded to google our team and signed up with our back end website. My sales agent reached out to Mr Baumann and discovered he was just seeing how much it was listed for and if it's still for sale. We did not divulge any more information besides what one can see from the website.

--

[Click to view my website here!](#)

Appellate Case: 25-1343   Page: 437   Date Filed: 03/03/2025   Entry ID: 5508644



# Federal Mine Safety and Health Review Commission

## Official File Viewing Request for Parties Only

**Authority:** The Federal Mine Safety and Health Review Commission is authorized to collect this Personally Identifiable Information (PII) by and through the following authority: 5 U.S.C. 301; 44 U.S.C. 3101; 29 C.F.R. Parts 2700, 2705. **Purpose:** The PII requested is being collected solely for the purpose of determining access to the Commission's case files.

**Sharing Your Information:** The information that you provide will be used by and disclosed to Federal Government personnel and contractors in furtherance of the above-mentioned purpose. This includes using the information as necessary and authorized by the routine uses published in FMSHRC-06. Do not provide personal information beyond what is explicitly asked for in any of the provided data fields.

**Disclosure:** The disclosure of your PII is voluntary. However, a failure to provide the requested information will inhibit our ability to assess your request for access to our case file system.

Commission policy requiring parties to use the Freedom of Information Act (FOIA) process to access case transcripts is still in place. Transcripts are available through a FOIA request. Accordingly, Official Files with transcripts CANNOT be approved until parties show that their FOIA request has been granted by FMSHRC's FOIA Office.

| | |
|---|---|
| **Name** | |
| **Contact information (Organization, Address, Phone, e-Mail)** | |
| **I am a/an** | |
| **Representing the/a/an** | |
| **Mine Name** | |
| **Mine ID** | |
| **Docket Number(s)** | |
| **Are you a party?** | Yes       No |
| **Nature and purpose of disclosure** | **I intend to access this official file in order to view documents in furtherance of litigation**<br><br>**Other:** |

**Signature**                              **Date**

*Russell Tidaback*

**December 23, 2024**

| | |
|---|---|
| SECRETARY OF LABOR<br>  MINE SAFETY AND HEALTH<br>  ADMINISTRATION (MSHA),<br>  o/b/o ROBERT BAUMANN<br><br>v.<br><br>MOSENECAMANUFACTURER, LLC<br>  d/b/a AMERICAN TRIPOLI | Docket No. CENT 2023-0251-DM |

## ORDER

On November 1, 2024, Respondent MOSenecaManufacturer, LLC, *d/b/a/* American Tripoli ("American Tripoli") filed a motion which it entitled "Motion to Cease and Desist Enforcement Actions Pending Final Judgment." American Tripoli's arguments relied on purported cases such as "*Secretary of Labor, MSHA v. Contestant*" and "*Mohammed v. Garland*." Mot. at 2.

On November 22, 2024, the Commission determined that the cases relied upon by American Tripoli could not be identified based on the incomplete information provided.[1] The Commission ordered American Tripoli to submit copies of the relevant cases by December 6, 2024.[2] As of this date, American Tripoli has not responded to the Commission's Order.[3]

The Commission has broad authority to determine whether to grant review of a decision. 29 C.F.R. § 2700.70(b) (review is not a matter of right "but of the sound discretion of the Commission"). Correspondingly, the Commission also has the authority to *vacate* review.

---

[1] The Commission noted that American Tripoli's previous filings also appeared to contain incorrect or incomplete case citations. Order at 1 n.1 (Nov. 22, 2024).

[2] All issuances in this proceeding, including the Commission's November 22 Order, have been mailed to the mine's address of record in Missouri and sent electronically to the email address provided in American Tripoli's initial Answer to the Complaint. American Tripoli's representative, Russell Tidaback, recently submitted a request for record access which listed different physical and email addresses. The Commission's procedural rules require parties to promptly provide written notice of any change in contact information. 29 C.F.R. § 2700.5(d).

[3] On November 27, 2024, Mr. Tidaback erroneously used the docket number for this discrimination proceeding to file a Notice of Contest regarding a related but separate section 104(b) withdrawal order (No. 9998012). The filing was not a response to the Commission's Order or otherwise relevant to the proceeding before us. American Tripoli's contest of the withdrawal order has been docketed (No. CENT 2024-0086) and assigned to an Administrative Law Judge.

Appellate Case: 25-1349     Page: 439     Date Filed: 04/07/2025 Entry ID: 5503844

*Birchfield Mining Co.*, 11 FMSHRC 1428 (Aug. 1989) (holding that vacating directions for review is consistent with the Commission's powers under 30 C.F.R. § 823(d)); *e.g.*, *Pocahontas Coal Co., LLC*, 45 FMSHRC 794 (Sept. 2023); *Broken Hill Mining Co., Inc.*, 18 FMSHRC 679 (May 1996).

American Tripoli is placed on notice that continued failure to comply with Commission Orders may result in vacating the Commission's directions for review[4] and dismissal of this proceeding. *Cf.*, *Broken Hill*, 18 FMSHRC 679 (vacating review and dismissing the proceeding for want of prosecution where the operator failed to file an opening brief and was not reachable); 29 C.F.R. § 2700.70(b) (failure to timely file a brief may result in vacation of review); 29 C.F.R. § 2700.66(a) (failure to comply with a Judge's order shall result in issuance of a show cause order prior to an order of dismissal).

American Tripoli is hereby **ORDERED TO SHOW CAUSE** within 30 days of the date of this order why the Commission should not vacate its directions for review and dismiss this proceeding. American Tripoli's response should, at a minimum, provide an explanation for its failure to respond to the Commission's November 22, 2024, Order. If no response is filed, the Commission's directions for review in this matter may be vacated, and the proceeding may be dismissed in its entirety.

_____
Mary Lu Jordan, Chair

_____
Timothy J. Baker, Commissioner

_____
Moshe Z. Marvit, Commissioner

---

[4] The Commission directed review *sua sponte* on June 18, 2024, then granted American Tripoli's Petition for Discretionary Review on June 27, 2024.

2

Distribution List:

Russell Tidaback
Jordan Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Russell Tidaback
2701 East Grauwyler Road, Bldg. 1, Dept. #1008
Irving, TX 75061
Russell.Tidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
Moll.Quinlan.B@dol.gov

Elaine M. Smith, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
maltz.susannah.m@dol.gov

3

Marcus D. Reed, Esq.
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor
U.S. Department of Labor
Mine Safety and Health Division
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

**January 9, 2024**

| | |
|---|---|
| Secretary of Labor, Mine Safety and Health Administration (MSHA), o/b/o Robert Baumann | ) ) ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| MOSENECAMANUFACTURER LIMITED LIABILITY COMPANY d/b/a AMERICAN TRIPOLI, | ) ) ) |
| | ) |
| | ) |
| Respondent. | ) |

Docket No. CENT 2023-0251-DM

## RESPONDENTS RESPONSE TO SHOW CAUSE ORDER

**Introduction**

I, Russell Tidaback, Managing Member of MOSenecaManufacturer, LLC (operating as American Tripoli), submit this response to the Commission's December 23, 2024, Show Cause Order. I appreciate the opportunity to address the issues raised and provide clarification regarding our compliance with Commission procedures.

**Explanation for Case References**

Upon review, the inclusion of "Secretary of Labor, MSHA v. Contestant" and "Mohammed v. Garland" in prior submissions was inadvertent and unintentional. These references do not impact the substantive legal arguments presented in this matter. We acknowledge the Commission's concerns regarding the lack of proper citations for these cases and apologize for the oversight. To support our legal arguments, we rely on the following established case precedents and statutory provisions, which directly align with the facts of this case and the broader issues raised:

1

1. **Moses v. Whitley Development Corp., 4 FMSHRC 1475 (1982):**

   o **Context:** This foundational case established that coercive actions interfering with protected rights under Section 105(c) of the Mine Act are prohibited. In Moses, coercive interrogation and harassment of a miner who reported a safety violation were found to violate the Act.

   o **Relevance to This Case:** MSHA's enforcement actions, including improper financial inquiries and retaliatory measures such as the issuance of Order No. 9998012, parallel the coercive behavior identified in Moses. These actions have significantly hindered our ability to conduct operations, resolve financial obligations, and comply with Commission directives.

2. **Secretary of Labor on behalf of Gray v. North Star Mining, Inc., 27 FMSHRC 1 (2005):**

   o **Context:** This case emphasized the importance of evaluating the "totality of circumstances" to determine whether actions interfered with protected rights. The Commission found that intent, motive, and the impact of the actions must be considered collectively.

   o **Relevance to This Case:** MSHA's pattern of issuing restrictive orders and ignoring modification requests must be assessed in light of the cumulative impact on our operations and compliance capacity. As in Gray, the totality of circumstances demonstrates the disproportionate burden placed on our company, warranting relief.

3. **Birchfield Mining Co., 11 FMSHRC 1428 (Aug. 1989):**

- o **Context:** This case addressed the Commission's discretion to vacate or maintain directions for review, particularly when procedural delays result from extraordinary or unavoidable circumstances.

- o **Relevance to This Case:** The delays in responding to the Commission's November 22, 2024, Order were not due to willful neglect but stemmed from extraordinary operational and financial constraints imposed by MSHA's overreach. Consistent with Birchfield, the Commission should exercise discretion to allow this case to proceed.

4. **Broken Hill Mining Co., Inc., 18 FMSHRC 679 (May 1996):**

- o **Context:** This case reinforced procedural fairness, requiring that operators be given a full opportunity to explain and address procedural lapses before dismissal for want of prosecution.

- o **Relevance to This Case:** The Commission's issuance of the Show Cause Order provides an opportunity to address procedural delays caused by the operational challenges imposed by MSHA. As in Broken Hill, leniency is warranted to ensure procedural fairness.

5. **UMWA on behalf of Franks & Hoy v. Emerald Coal Resources, LP, 38 FMSHRC 799 (2016):**
   - o **Context:** This case articulated the importance of balancing enforcement actions with the statutory rights of operators and miners. It applied a two-part interference test, evaluating whether actions hindered protected rights without legitimate justification.

- o **Relevance to This Case:** MSHA's access restrictions under Order No. 9998012, combined with its failure to respond to modification requests, lack legitimate safety justification and impose undue burdens. These actions align with the interference test established in Franks & Hoy, further supporting our position for relief.

**Substantive Response to Show Cause Order**

1. **Abuse of Authority and Financial Retaliation:**
   - o Order No. 9998012, issued on November 19, 2024, and its modifications unjustifiably restricted access to facilities necessary for lawful asset liquidation during bankruptcy. These restrictions lacked legitimate safety concerns, as evidenced by the limited permissions allowed under Modification 9998012-02, such as "light housekeeping".

2. **Improper Financial Inquiries:**
   - o During a non-recorded site visit on October 29, 2024, MSHA inspectors conducted inquiries into financial matters unrelated to safety, including product costs and sales volumes. This overreach parallels the coercive actions condemned in *Moses v. Whitley Development Corp.*

3. **Requests for Modifications Ignored:**
   - o Repeated modification requests submitted on December 6 and December 9, 2024, were ignored, further demonstrating MSHA's disregard for the operational and financial constraints imposed on American Tripoli.

4. **Impact on Compliance:**

Appellate Case: 25-1349     Page: 447     Date Filed: 04/07/2025 Entry ID: 5503844

- o The cumulative impact of these actions mirrors the interference and overreach identified in *Gray* and *Franks & Hoy*, further substantiating our request for relief and continuation of this proceeding.

**Conclusion**

Given the severe operational and financial challenges imposed by MSHA's enforcement actions, including the improper issuance and modifications of Order No. 9998012, I respectfully request that the Commission consider the totality of circumstances and the principles of fairness and proportionality in its review. Allowing this case to proceed is essential to ensuring a just resolution of the significant legal and operational matters at stake.

**Submitted Respectfully,**

Russell Tidaback

Managing Member, MOSenecaManufacturer, LLC

d/b/a American Tripoli

Russell.Tidaback@AmericanTripoli.com

239-829-5457

**Attachments**

1. Verified case law citations and documentation:
   - o Moses v. Whitley Development Corp., 4 FMSHRC 1475 (1982)
   - o Secretary of Labor on behalf of Gray v. North Star Mining, Inc., 27 FMSHRC 1 (2005)
   - o Birchfield Mining Co., 11 FMSHRC 1428 (Aug. 1989)
   - o Broken Hill Mining Co., Inc., 18 FMSHRC 679 (May 1996)
   - o UMWA on behalf of Franks & Hoy v. Emerald Coal Resources, LP, 38 FMSHRC 799 (2016)

Appellate Case: 25-1349     Page: 448     Date Filed: 04/07/2025 Entry ID: 5503844

**2.** Supporting documents, including correspondence regarding **Order No. 9998012**, its modifications, and related requests.

Respectfully submitted,

/s/

Russell Tidaback

American Tripoli

Mine Citation/Order

EXHIBIT B

**U.S. Department of Labor**
Mine Safety and Health Administration

**Section I—Violation Data**

| 1. Date | Mo Da Yr 11/19/2024 | 2. Time (24 Hr. Clock) 0930 | | | 3. Citation/ Order Number | 9998012 |
|---|---|---|---|---|---|---|
| 4. Served To | John Spears, Operations Manager | | | 5. Operator | | |
| 6. Mine | MOSENECAMFR LLC DBA AMERICAN TR | | | AMERICAN TRIPOLI | | (Contractor) |
| | | | | 7. Mine ID 23-00504 | | |

8. Condition or Practice

8a. Written Notice (103g) ☐

The condition described in citation 9763504 has not been corrected. Moseneca Manufacturer LLC d/b/a American Tripoli has not complied with the order promulgated pursuant to the Mine Act.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐ Safety ☐ Other ☐ | B. Section of Act | 105(c) | | C. Part/Section of Title 30 CFR | | | |

**Section II—Inspector's Evaluation**

10. Gravity:

| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☐ | Highly Likely ☐ | Occurred ☐ |
|---|---|---|---|---|---|

| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | Permanently Disabling ☐ | Fatal ☐ |
|---|---|---|---|---|

| C. Significant and Substantial: | Yes ☐ | No ☐ | D. Number of Persons Affected: |
|---|---|---|---|

| 11. Negligence (check one) | A. None ☐ | B. Low ☐ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action | 104(b) | 13. Type of Issuance (check one) | Citation ☐ | Order ☑ | Safeguard ☐ | Written Notice ☐ |
|---|---|---|---|---|---|---|

| 14. Initial Action A. Citation ☑ B. Order ☐ C. Safeguard ☐ D. Written Notice ☐ | | E. Citation/ Order Number 9763504 | F. Dated | Mo Da Yr 7/1/2024 |
|---|---|---|---|---|

15. Area or Equipment

Entire Mine Site

| 16. Termination Due | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) |
|---|---|---|---|

**Section III—Termination Action**

17. Action to Terminate

| 18. Terminated | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) |
|---|---|---|---|

**Section IV—Automated System Data**

| 19. Type of Inspection (activity code) E16 | 20. Event Number 6486785 | 21. Primary or Mill M | |
|---|---|---|---|
| 22. AR Name | Troy Hart | | 23. AR Number 25451 |

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW  MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

Subject: Request for Additional Modification to Order No. 9998012

Dear MaryJo Bishop,

I am writing to formally request an additional modification to Order No. 9998012 to allow American Tripoli access to the mill, garage, warehouse, drying shed gates, and quarry to facilitate the auction, sale, and removal of equipment, supplies, and already-produced materials.

Scope of Request:

- We seek permission to enter the mill buildings, garage, warehouse, drying shed gates, and quarry for the sole purpose of conducting an equipment auction, preparing supplies, already-produced materials, or other assets for sale, and facilitating the removal of purchased items by buyers.

- This request includes the use of our forklift to assist in moving and staging pallets, supplies, or equipment during the auction and removal process.

- We are not requesting to operate any milling equipment inside the mill building.

Supporting Context:

- Modification 9998012-02 allowed for light housekeeping duties in the mill, which demonstrated that no significant safety concerns exist for personnel accessing these facilities.

- The proposed activities—conducting an auction, staging and selling supplies or products, and removing equipment—are similarly low-risk and can be carried out without affecting the safety of individuals or the integrity of the site.

Facilitating this process is critical to our efforts to meet financial obligations and comply with agreements with our lenders and stakeholders. Denying this request would hinder these efforts and exacerbate the financial hardships currently imposed on American Tripoli.

I look forward to your favorable consideration of this request. If needed, I am happy to discuss further details to ensure compliance and safety during the proposed activities.

Thank you for your time and assistance.

Sincerely,


/s/

**Russell Tidaback**
Managing Member
American Tripoli

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

Section I--Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo | Da | Yr | 3. Citation/ Order Number |
|---|---|---|---|---|---|---|
| ✓ | ☐ | | 11/19/2024 | | | 9998012 - 01 |

| 4. Served To | John Spears, Operations Manager | 5. Operator |
|---|---|---|
| | | AMERICAN TRIPOLI |

| 6. Mine | MOSENECAMFR LLC DBA AMERICAN TR | 7. Mine ID | (Contractor) |
|---|---|---|---|
| | | 23-00504 | |

Section II--Justification for Action

**Justification**

This modification is to allow the operator to winterize the plant and mobile equipment.

See Continuation Form ☐

Section III--Subsequent Action Taken

| 8. Extended To | A. Date | Mo | Da | Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ✓ E. Modified |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

Section IV--Inspection Data

| 9. Type of Inspection | 10. Event Number |
|---|---|
| E16 | 6486785 |

| 11. AR Name | AR Number | 12. Date | Mo | Da | Yr | 13. Time (24 Hr. Clock) |
|---|---|---|---|---|---|---|
| Shawn Pratt | 5417 | 12/04/2024 | | | | 10:25 |

MSHA Form 7000-3a, Mar 85 (revised)

Appellate Case: 25-1349    Page: 452    Date Filed: 04/07/2025 Entry ID: 5503844

**U.S. Department of Labor**
Mine Safety and Health Administration

## Section I--Subsequent Action/Continuation Data

| 1. Subsequent Action | 1a. Continuation | 2. Dated (Original Issue) | Mo | Da | Yr | 3. Citation/ Order Number |
|---|---|---|---|---|---|---|
| ☑ | ☐ | | | 11/19/2024 | | 9998012 - 02 |

| 4. Served To  John Spears, Operations Manager | 5. Operator AMERICAN TRIPOLI |
|---|---|

| 6. Mine   MOSENECAMFR LLC DBA AMERICAN TR | 7. Mine ID 23-00504 | (Contractor) |
|---|---|---|

## Section II--Justification for Action

**Justification**

This Order is being modified to allow the operator to perform these duties to secure the facility and properties.

1. perform light housekeeping duties, mainly sweeping up the pigeon droppings
2. checking the security points of the plant buildings
3. perform the fire extinguisher checks
4. perform drive-through check at the drying shed property

See Continuation Form ☐

## Section III--Subsequent Action Taken

| 8. Extended To | A. Date | Mo | Da | Yr | B. Time (24 Hr. Clock) | C. Vacated ☐ | D. Terminated ☐ | E. Modified ☑ |
|---|---|---|---|---|---|---|---|---|

## Section IV--Inspection Data

| 9. Type of Inspection E16 | 10. Event Number 6486785 |
|---|---|

| 11. AR Name Shawn Pratt | AR Number 5417 | 12. Date  Mo  Da  Yr 12/06/2024 | 13. Time (24 Hr. Clock) 12:44 |
|---|---|---|---|

MSHA Form 7000-3a, Mar 85 (revised)

 **Outlook**

---

## Re: 9998012-03

**From** Russell Tidaback <RTidaback@deedyco.com>

**Date** Thu 12/19/24 12:55 PM

**To** Bishop, Maryjo - MSHA <Bishop.Maryjo@DOL.GOV>; Barnwell, William L - MSHA <Barnwell.William@DOL.GOV>; Russell Tidaback <RTidaback@deedyco.com>

**Cc** O'Reilly, Laura M - SOL <OReilly.Laura.M@dol.gov>; Smith, Elaine M - SOL <Smith.Elaine.M@dol.gov>; John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>

📎 1 attachment (2 MB)

Order 9998012 Modification -03 clarification letter to MSHA 19DEC2024.pdf;

Ms. Bishop / Mr. Barnwell,

Please see the attached letter requesting clarification on Order 9998012.

Sincerely,

Russell Tidaback

 [Book time to meet with me](#)

---

**From:** John Spears <John.Spears@americantripoli.com>
**Sent:** Thursday, December 19, 2024 10:02 AM
**To:** Russell Tidaback <RTidaback@deedyco.com>
**Subject:** Fw: 9998012-03

I've downloaded and placed in Teams file.

John

---

**From:** Pratt, Shawn - MSHA <Pratt.Shawn@dol.gov>
**Sent:** Thursday, December 19, 2024 8:11 AM
**To:** John Spears <John.Spears@americantripoli.com>
**Cc:** Hardison, Curtis R. - MSHA <Hardison.Curtis@DOL.GOV>; Bishop, Maryjo - MSHA <Bishop.Maryjo@DOL.GOV>; Barnwell, William L - MSHA <Barnwell.William@DOL.GOV>; Stone, Matthew B - MSHA <Stone.Matthew@DOL.GOV>; Sherrill, Lawrence D - MSHA <Sherrill.Lawrence@DOL.GOV>
**Subject:** 9998012-03

Mr. Spears here is the Modification.

Thank you,

Appellate Case: 25-9549　　　Page: 454　　　Date Filed: 06/02/2025　　　Entry ID: 5623844

Shawn Pratt
MS&H Inspector Supervisory
U.S. Department of Labor - MSHA
Rolla Field Office
1404 Independence Road
Rolla, MO 65401
Ph: 573-364-8282
Fax: 573-364-0305



Appellate Case: 25-1343    Page: 455    Date Filed: 06/30/2025    Entry ID: 5503044

| Mine Citation/Order Continuation | U.S. Department of Labor |
|---|---|
| | Mine Safety and Health Administration |

| 1. Subsequent Action ☑ 1a. Continuation ☐ | 2. Dated (Original Issue) Mo Da Yr 11/19/2024 | 3. Citation/Order Number 9998012 - 03 |
|---|---|---|

| 4. Served To  John Spears, Operations Manager | 5. Operator AMERICAN TRIPOLI |
|---|---|
| 6. Mine  MOSENECAMFR LLC DBA AMERICAN TR | 7. Mine ID 23-00504                    (Contractor) |

**Section II--Justification for Action**

**Justification**

This order is being modified to allow the operator to sell already packaged material and to hold an auction to sell equipment in the mill and on the mill property.  If the auction is held on mine property, the mine operator is required to train attendees Site-specific Hazard Awareness Training as per 30CFR 48.11.

See Continuation Form ☐

**Section III--Subsequent Action Taken**

| 8. Extended To | A. Date  Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ☑ E. Modified |
|---|---|---|---|---|---|

**Section IV--Inspection Data**

| 9. Type of Inspection E15 | 10. Event Number 7101714 | | |
|---|---|---|---|
| 11. AR Name Shawn Pratt | AR Number 5417 | 12. Date  Mo Da Yr 12/19/2024 | 13. Time (24 Hr. Clock) 06:21 |

MSHA Form 7000-3a, Mar 85 (revised)



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

**Russell Tidaback**
Managing Member
American Tripoli
2701 E. Grauwyler Road
Bldg 1, Dept 1008
Irving, TX 75061-3414
Russell.Tidaback@AmericanTripoli.com
239.829.5457

**December 19, 2024**

**Maryjo Bishop, District Manager**
**William Barnwell, Assistant District Manager**
Mine Safety and Health Administration (MSHA)
Madisonville District Office
100 YMCA Dr
Madisonville, KY 42431

**Subject**: Request for Clarification and Expansion of Modification -03 to Order No. 9998012

**Dear Ms. Bishop and Mr. Barnwell,**

I am writing in response to Modification -03 to **Order No. 9998012**, which followed our December 9, 2024, request to permit specific activities necessary for the liquidation of American Tripoli's assets.

In our original request, we sought permission to:

- Access the mill buildings, garage, warehouse, drying shed gates, and quarry for the sole purpose of conducting an equipment auction, preparing supplies, already-produced materials, or other assets for sale, and facilitating the removal of purchased items by buyers.
- Utilize a forklift to move and stage pallets, supplies, or equipment during the auction and removal process.

We emphasized that these activities would not involve the operation of any milling equipment, aligning with the low-risk nature of previously approved **light housekeeping duties**. However, **Modification -03** fails to

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

explicitly address the broader liquidation activities necessary to fulfill financial obligations. Instead, it narrowly references the sale of "already packaged material" without addressing access permissions or other critical aspects of our request.

**This lack of clarity hinders our ability to conduct lawful and necessary liquidation activities.** Additionally, repeated modifications to the original citation raise questions about its validity, intent, and alignment with MSHA's statutory authority.

**Given the mill's inactive status, we are seeking clarification on the following points:**

**1. Basis for Continued Oversight:**

- Please specify the safety or health concerns that MSHA is addressing through the issuance of Order Modification 9998012-03.

- If no specific hazards have been identified, we respectfully request an explanation of MSHA's continued authority over the mill's activities, including the management of auctions or liquidation processes, which appear unrelated to safety or health enforcement under the Mine Act.

**2. Authority Over Auction Processes:**

- We respectfully request clarification on MSHA's jurisdiction to dictate how liquidation or auction processes are managed, particularly at an inactive mill site.

**3. Scope of Restrictions:**

- Please provide detailed clarification regarding the specific restrictions imposed under this modification and their connection to safety or health concerns related to the original citation 9763504.

**4. Procedures for Resolving Inactive Site Status:**

**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414



**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

- If MSHA believes that certain safety or health concerns related to the original citation 9763504 remain unresolved, we kindly request guidance on any steps necessary to bring the site into full compliance with applicable safety regulations for inactive facilities.

We respectfully request that MSHA provide clear and precise clarification, including expanding Modification - 03 to explicitly:

1. Permit access to the mill, garage, warehouse, drying shed gates, and quarry to facilitate auction preparation, the sale of assets, and the removal of purchased items.

2. Authorize the use of a forklift to safely stage and move pallets, supplies, or equipment during these activities.

3. Permit the preparation of supplies, already-produced materials, or other assets for sale, and facilitate the removal of purchased items by buyers.

To mitigate any potential risks, American Tripoli will:

- Record all non-employee individuals as guests and require them to sign in upon arrival.

- Ensure all American Tripoli personnel adhere to established safety protocols, including wearing N-95 masks during on-site activities.

**This matter has remained unresolved since the issuance of Order No. 9998012 on November 19, 2024, creating ongoing and unnecessary delays to our lawful liquidation efforts. Given the time-sensitive nature of these efforts, we respectfully request a written response addressing the above points no later than Monday, December 23, 2024. Timely clarification is essential to prevent further disruption and ensure compliance with all applicable safety regulations.**



**Mailing Address:**

2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**

5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

---

**In the absence of a timely or satisfactory response, we will have no choice but to escalate this matter to the Federal Mine Safety and Health Review Commission or other appropriate oversight authorities.**

Thank you for your attention to this matter.

**Sincerely,**

**/s/ Russell Tidaback**
**Managing Member**
**American Tripoli**

Attachments:

1. 9998012 Order – November 19, 2024
2. 9998012 Order Modification -01 email Attachment from MSHA – December 4 2024
3. Modification Request email from American Tripoli – December 6 2024
4. 9998012 Order Modification -02 email Attachment from MSHA – December 6 2024
5. Modification Request Email from American Tripoli – December 9 2024
6. Modification Request Email Attachment from American Tripoli – December 9 2024
7. 9998012 Order Modification -03 email Attachment from MSHA – December 19 2024

Mine Citation/Order       EXHIBIT B

**U.S. Department of Labor**
Mine Safety and Health Administration

## Section I—Violation Data

| 1. Date | Mo Da Yr 11/19/2024 | 2. Time (24 Hr. Clock) 0930 | | | 3. Citation/ Order Number | 9998012 |
|---|---|---|---|---|---|---|

| 4. Served To | John Spears, Operations Manager | 5. Operator | |
|---|---|---|---|

| 6. Mine | MOSENECAMFR LLC DBA AMERICAN TR | AMERICAN TRIPOLI | |
|---|---|---|---|

| | | 7. Mine ID 23-00504 | (Contractor) |
|---|---|---|---|

## 8. Condition or Practice

8a. Written Notice (103g) ☐

The condition described in citation 9763504 has not been corrected. Moseneca Manufacturer LLC d/b/a American Tripoli has not complied with the order promulgated pursuant to the Mine Act.

See Continuation Form (MSHA Form 7000-3a) ☐

| 9. Violation | A. Health ☐ Safety ☐ Other ☐ | B. Section of Act | 105(c) | C. Part/Section of Title 30 CFR | | | |
|---|---|---|---|---|---|---|---|

## Section II—Inspector's Evaluation

| 10. Gravity: | | | | |
|---|---|---|---|---|
| A. Injury or Illness (has) (is): | No Likelihood ☐ | Unlikely ☐ | Reasonably Likely ☐ | Highly Likely ☐    Occurred ☐ |
| B. Injury or illness could reasonably be expected to be: | No Lost Workdays ☐ | Lost Workdays Or Restricted Duty ☐ | | Permanently Disabling ☐    Fatal ☐ |
| C. Significant and Substantial: | Yes ☐ | No ☐ | | D. Number of Persons Affected: |

| 11. Negligence (check one) | A. None ☐ | B. Low ☐ | C. Moderate ☐ | D. High ☐ | E. Reckless Disregard ☐ |
|---|---|---|---|---|---|

| 12. Type of Action | 104(b) | 13. Type of Issuance (check one) | Citation ☐   Order ☑   Safeguard ☐   Written Notice ☐ |
|---|---|---|---|

| 14. Initial Action | | | | E. Citation/ Order Number | | F. Dated | Mo Da Yr |
|---|---|---|---|---|---|---|---|
| A. Citation ☑ | B. Order ☐ | C. Safeguard ☐ | D. Written Notice ☐ | 9763504 | | | 7/1/2024 |

15. Area or Equipment

Entire Mine Site

| 16. Termination Due | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|---|

## Section III—Termination Action

17. Action to Terminate

| 18. Terminated | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | |
|---|---|---|---|---|

## Section IV—Automated System Data

| 19. Type of Inspection (activity code) | E16 | 20. Event Number 6486785 | 21. Primary or Mill M | |
|---|---|---|---|---|

| 22. AR Name | Troy Hart | | 23. AR Number 25451 |
|---|---|---|---|

MSHA Form 7000-3, Apr 08 (revised)    In accordance with the provisions of the Small Business Regulatory Enforcement Fairness Act of 1996, the Small Business Administration has established a National Small Business and Agriculture Regulatory Ombudsman and 10 Regional Fairness Boards to receive comments from small businesses about federal agency enforcement actions. The Ombudsman annually evaluates enforcement activities and rates each agency's responsiveness to small business. If you wish to comment on the enforcement actions of MSHA, you may call 1-888-REG-FAIR (1-888-734-3247), or write the Ombudsman at Small Business Administration, Office of the National Ombudsman, 409 3rd Street, SW MC 2120, Washington, DC 20416. Please note, however, that your right to file a comment with the Ombudsman is in addition to any other rights you may have, including the right to contest citations and proposed penalties and obtain a hearing before the Federal Mine Safety and Health Review Commission.

 Outlook

---

## Checking property

---

**From** John Spears <John.Spears@americantripoli.com>
**Date** Fri 12/06/24 9:08 AM
**To** Bishop, Maryjo - MSHA <Bishop.Maryjo@DOL.GOV>
**Cc** Russell Tidaback <RTidaback@deedyco.com>; John Spears <John.Spears@americantripoli.com>

Ms. Bishop,

The mining and milling operation here at American Tripoli ceased on July 29, 2024.  There is zero activity at the quarry and our drying shed property.  The heavy equipment has been sold or returned to the leasing company.  There is zero production capability in the mill.  The natural gas has been turned off and therefore the drying system cannot function.  Aside from the winterizing I performed I also need to keep up with the small amount of housekeeping duties.  Mainly sweeping up the pigeon droppings and checking the security points.  I also need to perform the fire extinguisher checks.  I would also like to be able to do a drive-through check at the drying shed property.  There is not much to steal at the drying shed property, but I would still like to make a presence since the property is within the city limits.

American Tripoli requests a modification to Citation #9998012 so that I may perform those duties.

Thank you,

John R Spears
Operations Manager
American Tripoli

---

Appellate Case: 25-7348     Page: 462     Date Filed: 01/31/2025     Entry ID: 45663644

**U.S. Department of Labor**
Mine Safety and Health Administration

| 1. Subsequent Action ☑ | 1a. Continuation ☐ | 2. Dated (Original Issue) | Mo Da Yr 11/19/2024 | 3. Citation/Order Number 9998012 - 01 |
|---|---|---|---|---|

| 4. Served To   John Spears, Operations Manager | 5. Operator AMERICAN TRIPOLI |
|---|---|
| 6. Mine    MOSENECAMFR LLC DBA AMERICAN TR | 7. Mine ID 23-00504          (Contractor) |

**Justification**

This modification is to allow the operator to winterize the plant and mobile equipment.

See Continuation Form ☐

| 8. Extended To | A. Date   Mo Da Yr | B. Time (24 Hr. Clock) | C. Vacated ☐ | D. Terminated ☐ | E. Modified ☑ |
|---|---|---|---|---|---|

| 9. Type of Inspection E16 | 10. Event Number 6486785 | | |
|---|---|---|---|
| 11. AR Name Shawn Pratt | AR Number 5417 | 12. Date  Mo Da Yr 12/04/2024 | 13. Time (24 Hr. Clock) 10:25 |

MSHA Form 7000-3a, Mar 85 (revised)

| Mine Citation/Order<br>Continuation | U.S. Department of Labor<br>Mine Safety and Health Administration | |
|---|---|---|

**Section I--Subsequent Action/Continuation Data**

| 1. Subsequent Action ☑ 1a. Continuation ☐ | 2. Dated<br>(Original Issue) | Mo Da Yr<br>11/19/2024 | 3. Citation/<br>Order Number | 9998012 - 02 |
|---|---|---|---|---|

| 4. Served To John Spears, Operations Manager | 5. Operator<br>AMERICAN TRIPOLI |
|---|---|
| 6. Mine MOSENECAMFR LLC DBA AMERICAN TR | 7. Mine ID<br>23-00504       (Contractor) |

**Section II--Justification for Action**

**Justification**

This Order is being modified to allow the operator to perform these duties to secure the facility and properties.

1. perform light housekeeping duties, mainly sweeping up the pigeon droppings
2. checking the security points of the plant buildings
3. perform the fire extinguisher checks
4. perform drive-through check at the drying shed property

See Continuation Form ☐

**Section III--Subsequent Action Taken**

| 8. Extended To | A. Date | Mo Da Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ☑ E. Modified |
|---|---|---|---|---|---|---|

**Section IV--Inspection Data**

| 9. Type of Inspection<br>E16 | 10. Event Number<br>6486785 | | |
|---|---|---|---|
| 11. AR Name<br>Shawn Pratt | AR Number<br>5417 | 12. Date Mo Da Yr<br>12/06/2024 | 13. Time (24 Hr. Clock)<br>12:44 |

MSHA Form 7000-3a, Mar 85 (revised)

 **Outlook**

### Re: 9998012-01

**From** Russell Tidaback <RTidaback@deedyco.com>

**Date** Mon 12/09/24 2:50 PM

**To** Barnwell, William L - MSHA <Barnwell.William@DOL.GOV>; Bishop, Maryjo - MSHA <Bishop.Maryjo@DOL.GOV>; Russell Tidaback <RTidaback@deedyco.com>

**Cc** John Spears <John.Spears@americantripoli.com>; Jordan Tidaback <Jordan.Tidaback@deedyco.com>

📎 1 attachment (186 KB)

9DEC2024 - Request for Additional Modification to Order No. 9998012.pdf;

Ms. Bishop,

Please see the attached Request for Additional Modification to Order 9998012.

We look forward to hearing from you.

Sincerely,

Russell Tidaback

 [Book time to meet with me](#)

---

**From:** Pratt, Shawn - MSHA <Pratt.Shawn@dol.gov>
**Sent:** Wednesday, December 4, 2024 10:40 AM
**To:** John Spears <John.Spears@americantripoli.com>
**Cc:** Barnwell, William L - MSHA <Barnwell.William@DOL.GOV>; Bishop, Maryjo - MSHA <Bishop.Maryjo@DOL.GOV>
**Subject:** 9998012-01

Mr. Spears here is the medication.

Thank you,

Shawn Pratt
MS&H Inspector Supervisory
U.S. Department of Labor - MSHA
Rolla Field Office
1404 Independence Road
Rolla, MO 65401
Ph: 573-364-8282

Appellate Case: 25-1348   Page: 465   Date Filed: 04/07/2025   Entry ID: 5503844

Fax: 573-364-0305



Appellate Case: 25-1343    Page: 466    Date Filed: 06/03/2025    Entry ID: 5623644



**Mailing Address:**
2701 East Grauwyler Road, Bldg 1,
Dept# 1008, Irving, TX 75061-3414

**Shipping/Receiving Address:**
5 Oneida Street,
Seneca, MO 64865
Office (239) 829-5457

Subject: Request for Additional Modification to Order No. 9998012

Dear MaryJo Bishop,

I am writing to formally request an additional modification to Order No. 9998012 to allow American Tripoli access to the mill, garage, warehouse, drying shed gates, and quarry to facilitate the auction, sale, and removal of equipment, supplies, and already-produced materials.

Scope of Request:

- We seek permission to enter the mill buildings, garage, warehouse, drying shed gates, and quarry for the sole purpose of conducting an equipment auction, preparing supplies, already-produced materials, or other assets for sale, and facilitating the removal of purchased items by buyers.

- This request includes the use of our forklift to assist in moving and staging pallets, supplies, or equipment during the auction and removal process.

- We are not requesting to operate any milling equipment inside the mill building.

Supporting Context:

- Modification 9998012-02 allowed for light housekeeping duties in the mill, which demonstrated that no significant safety concerns exist for personnel accessing these facilities.

- The proposed activities—conducting an auction, staging and selling supplies or products, and removing equipment—are similarly low-risk and can be carried out without affecting the safety of individuals or the integrity of the site.

Facilitating this process is critical to our efforts to meet financial obligations and comply with agreements with our lenders and stakeholders. Denying this request would hinder these efforts and exacerbate the financial hardships currently imposed on American Tripoli.

I look forward to your favorable consideration of this request. If needed, I am happy to discuss further details to ensure compliance and safety during the proposed activities.

Thank you for your time and assistance.

Sincerely,


/s/

**Russell Tidaback**
Managing Member
American Tripoli

Mine Citation/Order
Continuation

**U.S. Department of Labor**
Mine Safety and Health Administration

| 1. Subsequent Action ☑ | 1a. Continuation ☐ | 2. Dated (Original Issue) | Mo 11 | Da 19 | Yr 2024 | 3. Citation/Order Number 9998012 - 03 |

4. Served To  John Spears, Operations Manager

5. Operator
AMERICAN TRIPOLI

6. Mine    MOSENECAMFR LLC DBA AMERICAN TR

7. Mine ID
23-00504                               (Contractor)

**Justification**

This order is being modified to allow the operator to sell already packaged material and to hold an auction to sell equipment in the mill and on the mill property.  If the auction is held on mine property, the mine operator is required to train attendees Site-specific Hazard Awareness Training as per 30CFR 48.11.

See Continuation Form ☐

| 8. Extended To | A. Date  Mo  Da  Yr | B. Time (24 Hr. Clock) | ☐ C. Vacated | ☐ D. Terminated | ☑ E. Modified |

| 9. Type of Inspection E15 | 10. Event Number 7101714 |

| 11. AR Name Shawn Pratt | AR Number 5417 | 12. Date  Mo  Da  Yr 12/19/2024 | 13. Time (24 Hr. Clock) 06:21 |

MSHA Form 7000-3a, Mar 85 (revised)

**January 17, 2025**

SECRETARY OF LABOR
  MINE SAFETY AND HEALTH
  ADMINISTRATION (MSHA),
  o/b/o ROBERT BAUMANN

Docket No. CENT 2023-0251-DM

v.

MOSENECAMANUFACTURER, LLC
  d/b/a AMERICAN TRIPOLI

## ORDER

The Commission directed review of this matter *sua sponte* on June 18, 2024, then granted the Petition for Discretionary Review filed by MOSenecaManufacterer, LLC, *d/b/a/* American Tripoli ("American Tripoli") on June 27, 2024.

American Tripoli subsequently filed a motion entitled "Motion to Cease and Desist Enforcement Actions Pending Final Judgment." The operator's arguments relied on purported cases such as "*Secretary of Labor, MSHA v. Contestant*" and "*Mohammed v. Garland*." Mot. at 2. Following several attempts to locate these cases, the Commission determined that the cases relied upon by the operator could not be identified based on the incomplete information provided, and ordered American Tripoli to submit copies of the relevant cases by December 6, 2024.[1] Unpublished Order dated Nov. 22, 2024.

American Tripoli did not respond. Accordingly, on December 23, 2024, the Commission ordered the operator to show cause why the proceeding should not be dismissed. The Commission directed American Tripoli to explain its failure to respond to the previous Order, and explicitly placed the operator on notice that continued failure to comply with Commission Orders could result in the Commission vacating the directions for review and dismissing this proceeding. 46 FMSHRC __, No. CENT 2023-0251 (Dec. 23, 2024), *citing, e.g.*, *Broken Hill Mining Co., Inc.*, 18 FMSHRC 679 (May 1996).

American Tripoli filed a response on January 9, 2025. The filing offers *no* explanation for the operator's failure to timely respond to the Commission's November Order. Accordingly, American Tripoli has not shown good cause why the proceeding should not be dismissed. *See, e.g.*, *Coal-Mac LLC*, 46 FMSHRC 33 (Jan. 2024) (operator failed to show good cause where it offered no explanation for its failure to timely answer the Secretary's petition); *Earl Begley, employed by Manalapan Mining Co., Inc.*, 22 FMSHRC 629 (May 2000) (miner failed to show good cause where he offered no explanation for his failure to timely file a petition for review).

---

[1] The Commission noted that American Tripoli's previous filings also appeared to contain incorrect or incomplete case citations. Order at 1 n.1 (Nov. 22, 2024).

Appellate Case: 25-1349    Page: 469    Date Filed: 04/07/2025    Entry ID: 5503844

Additionally, American Tripoli *still* has not provided copies of the cases upon which it purportedly relied. Instead, the operator asserts that the "lack of proper citations" in the Motion was an "oversight" and summarizes five new cases purportedly relevant to the proceeding.[2] Resp. at 1, 2-4. American Tripoli has apparently chosen to abandon the cases upon which it initially relied rather than attempting to support their legitimacy or existence. Notably, American Tripoli asserts that it has attached "verified case law citations and documentation" for the *new* cases upon which it now purports to rely (Resp. at 5) but has failed to provide any such attachments.

The Commission ordered American Tripoli to establish the legitimacy of the cases upon which it purportedly relied by providing copies. The operator failed to do so. The Commission then ordered American Tripoli to explain its failure to comply with the Commission's previous order. The operator again failed to do so. Accordingly, the Commission concludes that the operator fabricated cases in its filings to the Commission. In light of the foregoing considerations, the directions for review in this matter are hereby **VACATED**, and this proceeding is **DISMISSED**.

Mary Lu Jordan, Chair

Timothy J. Baker, Commissioner

Moshe Z. Marvit, Commissioner

---

[2] One such case is *Broken Hill Mining Co., Inc.*, 18 FMSHRC 679 (May 1996), which we cited in our December Show Cause Order. The Commission in that case vacated review and dismissed the proceeding for want of prosecution where the operator failed to file an opening brief and was not reachable, and yet American Tripoli cites the case for the proposition that "leniency is warranted." Resp. at 3.

2

Distribution List:

Russell Tidaback
Jordan Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Russell Tidaback
2701 East Grauwyler Road, Bldg. 1, Dept. #1008
Irving, TX 75061
Russell.Tidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
Moll.Quinlan.B@dol.gov

Elaine M. Smith, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
maltz.susannah.m@dol.gov

Appellate Case: 25-1349     Page: 471     Date Filed: 04/07/2025 Entry ID: 5503844

Marcus D. Reed, Esq.
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
Nelson.April@dol.gov

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Administrative Law Judge William B. Moran
Federal Mine Safety and Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
wmoran@fmshrc.gov

Appellate Case: 25-1349    Page: 472    Date Filed: 04/07/2025 Entry ID: 5503844

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

Appellate Case: 25-1349   Page: 473   Date Filed: 04/07/2025 Entry ID: 5503844

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

1331 Pennsylvania Avenue NW, Suite 520N

Washington, DC 20004-1710

**Docket No.:** CENT 2023-0251-DM

**SECRETARY OF LABOR**

Mine Safety and Health Administration (MSHA),

o/b/o Robert Baumann,

**Complainant,**

v.

**MOSENECAMANUFACTURER, LLC**

d/b/a American Tripoli,

**Respondent.**

# REQUEST FOR RECONSIDERATION

I, Russell Tidaback, Managing Member of MOSenecaManufacturer, LLC, respectfully submit this Request for Reconsideration in response to the Commission's January 17, 2025, order dismissing the directions for review in the above-referenced matter. I deeply regret the procedural missteps identified in the order and wish to provide the following explanation and assurances:

## 1. Acknowledgment of Issues and Good Faith Efforts

I acknowledge the Commission's concerns regarding compliance with procedural orders. My January 9, 2025, response to the Show Cause Order was submitted in good faith and included detailed references to relevant cases and their relevance to this proceeding. I believed this submission fulfilled the requirements of the Commission's November 22, 2024, order.

If there was a misunderstanding regarding the necessity to attach full case texts to my filing, I respectfully request clarification, as this expectation is not explicitly stated in the Commission's procedural rules. Any perceived shortcomings were unintentional, and I have acted in good faith to address the Commission's concerns.

Additionally, I want to clarify that any inaccuracies or incomplete references in earlier filings were not intended to mislead the Commission. My intention has always been to comply fully with the procedural requirements, and I take full responsibility for any oversight.

## 2. Challenges in Compliance

As a layperson representing my company, I am not an attorney and acknowledge that my understanding of legal procedures and expectations may have been inadequate. The inability to provide copies of the initially referenced cases was due to an inadvertent misunderstanding of the requirements. I emphasize that my intention was never to mislead the Commission, and I take full responsibility for this oversight.

Courts have consistently recognized that pro se filings are held to less stringent standards than those drafted by attorneys. In **Haines v. Kerner, 404 U.S. 519 (1972)**, the Supreme Court emphasized that pro se pleadings must be interpreted liberally to ensure access to justice and can only be dismissed if it appears beyond doubt that no set of facts would entitle the filer to relief. The Court reaffirmed this principle in **Estelle v. Gamble, 429 U.S. 97, 106 (1976)**, holding that "a pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.'"

While I recognize the need to comply with procedural rules, I respectfully request that the Commission consider these principles in evaluating my good faith efforts to comply with its orders. My filings demonstrate a clear intent to address the Commission's concerns, even if certain procedural requirements were misunderstood or not fully met.

Additionally, during the period in question and continuing to this day, my company has been subject to what I believe to be harassment and abuse of authority by MSHA, despite being classified as shut down and nonoperational. MSHA's actions, including excessive enforcement measures and intrusive inspections, have created significant operational and administrative challenges. These actions have not only contributed to delays in addressing this case but have also strained my ability to respond effectively to the Commission's orders.

The additional burden of navigating ongoing MSHA scrutiny while managing compliance in this proceeding has been a significant factor impacting our ability to meet procedural expectations. While I recognize that I must adhere to procedural rules, I respectfully request that my actions be considered under these principles, as my filings have demonstrated good faith and a clear intent to comply. The additional burden of managing ongoing MSHA abusive scrutiny, coupled with my role as a pro se litigant managing limited resources, created significant burdens that impacted my ability to address the Commission's procedural requirements in a timely manner which further underscores the need for leniency.

## 3. Addressing Commission Precedents

The Commission referenced **Coal-Mac LLC, 46 FMSHRC 33 (Jan. 2024)**, and **Earl Begley, 22 FMSHRC 629 (May 2000)**, in its dismissal. However, I respectfully assert that these cases do not align with the circumstances of this matter:

1. **Coal-Mac LLC:**

- In Coal-Mac, the operator failed to show good cause for procedural non-compliance, offering no explanation for its failure to timely answer the Secretary's petition. By contrast, I submitted a detailed response addressing the Commission's concerns and providing case references to support my arguments.

2. **Earl Begley:**

   - In Earl Begley, the miner failed to file a petition for review and offered no explanation for the delay. Unlike the petitioner in that case, I submitted a timely response to the Show Cause Order, demonstrating my intent to comply with the Commission's directives.

3. **Distinction from Cited Cases:**

   - My efforts to comply by providing case references and contextual analysis distinguish this matter from the cited cases, where parties failed to provide any explanation or supporting documentation.

## 4. Addressing Potential Counterarguments

1. **Procedural Rules Apply to All Parties:**
   While I understand that all parties are expected to adhere to procedural requirements, the Supreme Court in Haines v. Kerner established that pro se litigants are entitled to leniency in procedural matters to ensure access to justice. My filings demonstrate good faith and intent to comply, and I respectfully request the Commission extend this consideration in evaluating my response.

2. **No New Evidence to Warrant Reconsideration:**
   I have attached verified case references and additional documentation to address the Commission's concerns and ensure compliance moving forward. These efforts constitute

new evidence of my intent to meet procedural expectations and warrant reconsideration.

3. **Clarifying the Application of Broken Hill Mining Co., Inc., 18 FMSHRC 679 (May 1996):**

The Commission references Broken Hill Mining Co. in its December Show Cause Order to support dismissing proceedings where an operator fails to meet procedural requirements. I acknowledge the Commission's interpretation but respectfully submit that the case also highlights the importance of procedural fairness and allowing operators the opportunity to address lapses.

In Broken Hill Mining Co., the operator was unreachable and entirely unresponsive, leading to dismissal. By contrast, I have submitted timely responses, demonstrated intent to comply with the Commission's orders, and provided detailed case references to support my position. I believe this distinction is significant and warrants consideration of leniency in this matter.

Furthermore, Broken Hill Mining Co. demonstrates that the Commission has the ability to exercise its discretion when considering procedural missteps. My response reflects good faith efforts to comply, and I respectfully request that the Commission take into account the totality of circumstances—including ongoing MSHA actions, my pro se status, and my documented efforts—when reconsidering dismissal in this matter.

4. **Procedural Delays Undermine the Case:**

While I acknowledge that delays occurred, they were due to external factors, including ongoing MSHA enforcement actions and my lack of legal expertise as a pro se litigant. These circumstances merit consideration under the principle of procedural fairness, and dismissal would prevent a fair adjudication of the issues at stake.

5. **Merits of the Case Are Insufficient:**

The attached case references, including **Moses v. Whitley Development Corp.** and **Gray v. North Star Mining, Inc.**, directly address procedural fairness and enforcement overreach, supporting the merits of my position. I believe these arguments warrant full adjudication by the Commission.

6. **MSHA Harassment Claims Are Not Relevant:**

While I recognize that the Commission may view these issues as separate, I believe they are relevant to the broader context of this proceeding. MSHA's ongoing actions created significant administrative and operational burdens, which contributed to delays and impacted my ability to comply with procedural requirements.

## 5. Verified Case References

To support my request for reconsideration, I have attached verified copies of the cases referenced in my response to the Show Cause Order:

1. **Moses v. Whitley Development Corp., 4 FMSHRC 1475 (1982):**
   - This case establishes that coercive actions interfering with protected rights under Section 105(c) of the Mine Act are prohibited. It directly supports my argument that MSHA's enforcement actions created an undue burden on operations.

2. **Secretary of Labor on behalf of Gray v. North Star Mining, Inc., 27 FMSHRC 1 (2005):**
   - This case underscores the importance of evaluating the totality of circumstances, including intent and impact, in assessing enforcement actions.

3. **Birchfield Mining Co., 11 FMSHRC 1428 (Aug. 1989):**

o This case highlights the Commission's discretion to vacate directions for review when procedural delays stem from extraordinary circumstances.

4. **Broken Hill Mining Co., Inc., 18 FMSHRC 679 (May 1996):**
   o This case reinforces the importance of procedural fairness and the opportunity to address procedural lapses.

5. **UMWA on behalf of Franks & Hoy v. Emerald Coal Resources, LP, 38 FMSHRC 799 (2016):**
   o This case supports my argument that enforcement actions must balance statutory rights and avoid imposing excessive burdens.

6. **Haines v. Kerner, 404 U.S. 519 (1972):**
   o Establishes that pro se filings are held to less stringent standards than those drafted by attorneys and should be interpreted liberally.

7. **Estelle v. Gamble, 429 U.S. 97, 106 (1976):**
   o Reaffirms that pro se complaints must be held to less stringent standards, emphasizing the importance of fairness and access to justice for non-lawyers.

These cases directly support my argument that the Commission should consider the totality of circumstances, including procedural fairness and the challenges faced by American Tripoli.

## 6. Commitment to Compliance

As a layperson representing my company, I acknowledge that my filings may not have adhered to the standards of legal professionals. However, I have acted in good faith to comply with the Commission's orders and relied on the principles established in case law to guide my efforts. Moving forward, I will ensure that all filings include case attachments and meet procedural

requirements.

I respectfully submit that the totality of circumstances—my good faith efforts to comply, the external challenges posed by ongoing MSHA actions, and the principles of leniency for pro se litigants—warrant reconsideration of this matter to ensure procedural fairness and the opportunity for a full and fair adjudication.

## 5. Request for Reconsideration

I respectfully request that the Commission reconsider its decision to dismiss the directions for review and allow this case to proceed to a full and fair adjudication. Should the Commission require additional documentation or clarification, I am prepared to provide it promptly.

## Conclusion

I deeply value the opportunity to address the Commission and remain committed to complying fully with its directives. Thank you for your consideration of this request.

**Submitted Respectfully,**

/s/

Russell Tidaback

Managing Member

MOSenecaManufacturer, LLC d/b/a American Tripoli

2701 East Grauwyler Road, Bldg. 1, Dept. 1008

Irving, TX 75061

Russell.Tidaback@AmericanTripoli.com

**Attachments**

1. Copies of referenced cases:

    a. *Moses v. Whitley Development Corp.*, 4 FMSHRC 1475 (1982).

    b. *Secretary of Labor on behalf of Gray v. North Star Mining, Inc.*, 27 FMSHRC 1 (2005).

    c. *Birchfield Mining Co.*, 11 FMSHRC 1428 (Aug. 1989).

    d. *Broken Hill Mining Co., Inc.*, 18 FMSHRC 679 (May 1996).

    e. *UMWA on behalf of Franks & Hoy v. Emerald Coal Resources, LP*, 38 FMSHRC 799 (2016).

    f. *Haines v. Kerner*, 404 U.S. 519 (1972).

    g. *Estelle v. Gamble*, U.S. 97, 106 (1976).

2. Supporting documents as requested by the Commission.

**CERTIFICATE OF SERVICE**

Service of the foregoing **Respondent's Request for Reconsideration** has this date been made by electronic mail to the following individuals:

**Robert Baumann**
**Email:** baumannr24@gmail.com

**Laura M. O'Reilly, Esq.**
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
**Email:** OReilly.Laura.M@dol.gov

**Quinlan B. Moll, Esq.**
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
**Email:** Moll.Quinlan.B@dol.gov

**Elaine M. Smith, Esq.**
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
**Email:** Smith.Elaine.M@dol.gov

**Susannah M. Maltz, Esq.**
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
**Email:** Maltz.Susannah.M@dol.gov

Dated this 19th day of January, 2025.

**Respectfully submitted,**

/s/
Russell Tidaback
Managing Member
MOSenecaManufacturer, LLC
2701 East Grauwyler Road, Bldg. 1, Dept. 1008
Irving, TX 75061
Russell.Tidaback@AmericanTripoli.com

August 31, 1982

ELIAS MOSES                          :
                                     :
        v.                           :     Docket No. KENT 79-366-D
                                     :
WHITLEY DEVELOPMENT CORPORATION      :

## DECISION

This discrimination case raises several issues under section 105(c)(1) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (Supp. IV 1980). These issues include whether an operator violates section 105(c)(1) by interfering with a miner's exercise of a protected right through coercive interrogation and harassment, and whether an operator violates that section by discharging a miner on the suspicion or belief that he has exercised a protected right, when in fact the miner has not. The judge answered both these questions in the affirmative in this case, and for the reasons that follow we affirm his decision. 1/ We remand, however, for the limited purpose of allowing the parties to present arguments and additional evidence concerning the proper amount of back pay to be awarded the discriminatee.

I.

Elias Moses filed a discrimination complaint alleging that Whitley Development Corporation ("Whitley") violated section 105(c)(1) of the Mine Act by firing him because it believed he had reported an accident at Whitley's mine to the Mine Safety and Health Administration. 2/ The administrative law judge issued a decision concluding that Whitley had unlawfully interrogated and harassed Moses as to whether he reported the accident and that it had unlawfully discharged him because it suspected he had reported the accident, even though he had not. 3/ The judge awarded Moses various forms of relief including reinstatement with back pay. We granted Whitley's petition for discretionary review of the judge's decision.

------------------------------------------------------------

1/   The judge's decision is reported at 3 FMSHRC 746 (March 1981).
2/   Moses filed his discrimination complaint under section 105(c)(3) of the Mine Act since the Secretary of Labor, after investigating Moses' charges, declined to file a complaint on his behalf.
3/   The judge also found that even if Whitley had not discharged Moses, it had nonetheless violated section 105(c)(1) because it failed to retain or rehire Moses solely because he had filed a discrimination complaint. Because we agree Moses was in fact illegally discharged, we find it unnecessary to review this alternative holding.

**1475**

82-8-13

Appellate Case: 25-1349     Page: 484     Date Filed: 04/07/2025 Entry ID: 5503844

The factual background of this case is not complicated. Whitley, which is owned by Pascual White and his wife, operates two strip mines located in proximity to one another in southeastern Kentucky. In May 1979, Moses asked Pascual White to hire him as a bulldozer operator. Moses had worked for White as a laborer some nine years before. After Moses applied for the job, his brother-in-law, an MSHA inspector who inspected the Whitley mines, also asked White to hire Moses. White testified that he decided to give Moses a job because he felt "pressured" into taking him on, and hired him without checking his ability to operate a bulldozer. 3 FMSHRC at 748, 761; Tr. 242-44. 4/ Moses started to work for Whitley on May 9, 1979.

On June 19, 1979, a bulldozer overturned at the mine where Moses was working. Although Moses did not see the accident, he was told about it by his foreman, Richard McClure. The next day, MSHA inspectors, including Moses' brother-in-law, arrived by helicopter to investigate the site. 5/ After they had left, McClure asked Moses "if he was the one that called the federal inspectors on that accident." 3 FMSHRC at 748-49; Tr. 187. 6/ Moses replied he had not. Despite Moses' denial,

---

4/ The judge found that Moses was hired, in part, because of the pressure placed upon Pascual White by Moses' brother-in-law, the MSHA inspector. 3 FMSHRC at 753, 761. (Substantial evidence supports the judge's rejection of Whitley's suggestion that this pressure was the only reason Moses was hired. Id.) We endorse the judge's conclusion that it was "improper" for the brother-in-law, an MSHA inspector, to ask Whitley's owner to hire Moses. Id. at 756. While Whitley expresses general criticism of this incident (Br. at 3), it advances no claim that it was legally prejudiced in the present case by any impropriety committed by the MSHA inspector in question prior to the operative events and proceedings herein.

5/ White testified that he was aware that he could request inspection by someone other than Moses' brother-in-law if he feared biased inspection. 3 FMSHRC at 761; Tr. 260. MSHA supervisory inspector Kenneth Howard, the brother-in-law's supervisor, also testified:

> [I]t's not our practice to send an inspector to inspect a job where a member of his family is working. If I'd known ... Moses was present at the time ... and that they were related[,] I wouldn't have had [Moses' brother-in-law] sent out there. Permissiveness [in the inspection under such circumstances] is a logical assumption to make.

3 FMSHRC at 751; Tr. 124.

6/ Section 103(g)(1) of the Mine Act grants miners the right to obtain an immediate inspection by MSHA if they believe a violation of the Act or of a mandatory health or safety standard has occurred, or if they believe an imminent danger exists. It also prohibits MSHA from revealing the name of the miner requesting the inspection. The section states in part:

> Whenever a representative of the miners or a miner in the case of a coal or other mine where there is no such representative has reasonable grounds to

(footnote 6 continued)

Appellate Case: 25-1349    Page: 485    Date Filed: 04/07/2025 Entry ID: 5503844

McClure accused him in front of other employees, on two subsequent occasions, of reporting the accident to MSHA. 7/

Near the end of June 1979, Moses was laid off because the bull-dozers at the mine were out of order. He was told he would be recalled when repairs on the equipment were completed. On July 2, 1979, while the repairs were still in progress, Moses and his wife drove to Whitley's repair shop to pick up his paycheck. Moses went inside and met with White. There were conflicting versions of the heated conversation that followed and the judge credited Moses' account over that of White. 3 FMSHRC at 749-50, 756-57. Moses testified that he and White argued over whether he had called the inspectors, that he told White he had not, and that he would make White prove he had. According to Moses, at the end of the argument White threatened to fire him. Moses' wife, who over-heard the argument, corroborated Moses' story.

Moses drove that night to the home of MSHA supervisory inspector Kenneth Howard. He told Howard he had been accused of reporting the bulldozer accident and asked Howard to "clear" his name. Howard agreed to go to the mine the next morning and inform White that the accident had not been reported by Moses, but rather by a woman whose name had to be kept confidential.

---

footnote 6 cont'd.

> believe that a violation of this Act or a mandatory health or safety standard exists, or an imminent danger exists, such miner or representative shall have a right to obtain an immediate inspection by giving notice to the Secretary or his authorized representative of such violation or danger. Any such notice shall be reduced to writing, signed by the representative of the miners or by the miner, and a copy shall be provided the operator or his agent no later than at the time of inspection, except that the operator or his agent shall be notified forthwith if the complaint indicates that an imminent danger exists. The name of the person giving such notice and the names of individual miners referred to therein shall not appear in such copy or notification.

7/ Concerning the two subsequent conversations after McClure's initial questioning, Moses stated that McClure first said to him, in front of others, "He called an inspector on us. He called his brother-in-law." Tr. 63. Moses also testified that after the bulldozer driver who was involved in the accident returned to work, McClure said, in front of the driver, "Oh, he's happy. He called his brother-in-law inspector." The driver responded, "You mean they was out here?" And McClure replied, "Oh yeah, they come out." Moses testified that at this point, he stated: "I don't want to hear it anymore. I'm going to make you prove it." Tr. 64. The judge credited Moses' testimony. 3 FMSHRC at 756.

Appellate Case: 25-1349     Page: 486     Date Filed: 04/07/2025 Entry ID: 5503844

The following morning, July 3, 1979, Moses went to the mine seeking confirmation that he still had a job. At that time, the bulldozers had not yet been repaired. Moses spoke with McClure, who offered Moses the opportunity to work filling drilled holes with explosives. Moses testified the offer was made in a derogatory fashion. An exchange of profanities ensued. McClure testified that he said if Moses was not going to work, it would be better for Moses to get in his truck and "go on to the house." 3 FMSHRC at 750, 754; Tr. 236. Moses took this to mean he was fired.

Later that same morning, Inspector Howard arrived at the mine. White was not there, so Howard talked to McClure. Howard explained that Moses had been to see him the night before and feared he would be discharged because of suspicions he had asked MSHA to investigate the accident. Howard assured McClure that the accident had not been reported by Moses. McClure told Howard he had already fired Moses that morning. 3 FMSHRC at 751, 754; Tr. 117.

Moses thereafter filed a discrimination complaint with MSHA. Before the bulldozers were repaired, Whitley received a copy of the complaint pursuant to section 105(c)(2) of the Mine Act. After the bulldozer repairs were completed, Moses was not recalled to work.

II.

The first issue to which we turn is whether Whitley coercively interrogated and harassed Moses concerning the reporting of the accident and, if so, whether its actions violated section 105(c)(1) of the Act. The underlying question is whether such interrogation and harassment may ever constitute a violation of section 105(c)(1).

Section 105(c)(1) states that "no person shall discharge or in any manner discriminate against ... or otherwise interfere with the exercise of the statutory rights of any miner." (Emphasis added.) We have previously noted the high priority Congress placed upon the unencumbered exercise of rights granted miners under the Mine Act. David Pasula v. Consolidation Coal Company, 2 FMSHRC 2786, 2790 (October 1980), rev'd on other grounds sub nom. Consolidation Coal Co. v. Marshall, 663 F.2d 1211 (3d Cir. 1981). As we concluded in Pasula, Congress viewed the free exercise of miners' rights as "essential to the achievement of safe and healthful mines." 2 FMSHRC at 2790. Furthermore, it is clear that section 105(c)(1) was intended to encourage miner participation in enforcement of the Mine Act by protecting them against "not only the common forms of discrimination, such as discharge, suspension, demotion ..., but also against the more subtle forms of interference, such as promises of benefit or threats of reprisal." S. Rep. 95-191, 95th Cong., 1st Sess. 36 (1977) ["S. Rep."], reprinted in Senate Subcommittee on Labor, Committee on Human Resources, 95th Cong., 2d Sess., Legislative History of the Federal Mine Safety and Health Act of 1977, at 624 (1978) ["Legis. Hist."].

We find that among the "more subtle forms of interference" are coercive interrogation and harassment over the exercise of protected rights. A natural result of such practices may be to instill in the minds of employees fear of reprisal or discrimination. Such actions may

1478

Appellate Case: 25-1349     Page: 487     Date Filed: 04/07/2025 Entry ID: 5503844

not only chill the exercise of protected rights by the directly affected miners, but may also cause other miners, who wish to avoid similar treatment, to refrain from asserting their rights. This result is at odds with the goal of encouraging miner participation in enforcement of the Mine Act. We therefore conclude that coercive interrogation and harassment over the exercise of protected rights is prohibited by section 105(c)(1) of the Mine Act. 8/

This brings us to McClure's conversations with Moses. The judge's findings with respect to the coercive nature of McClure's interrogation of Moses and of McClure's comments concerning him are supported by substantial evidence and to the extent that these findings are credibility resolutions, will not be disturbed on review. Under section 103(g)(1) of the Act, Moses had the right to request an inspection and to do so anonymously. The persistence with which the subject of his supposed reporting of the bulldozer accident was raised and the accusatory manner in which it was done could logically result in a fear of reprisal and a reluctance to exercise the right in the future. These conversations thus constituted prohibited interference under section 105(c)(1). We address below, as part of our analysis of the discharge issue, the question of whether Moses' lack of actual protected activity automatically precludes a finding of interference or discrimination. As we explain below, we conclude that it does not.

III.

With regard to the issue of whether Whitley violated section 105(c)(1) by discharging Moses on the suspicion he had reported the accident, we first must determine whether Moses was in fact fired. As a threshold argument, Whitley asserts that he was not, contending that he voluntarily quit after refusing alternative employment. We conclude, however, that substantial evidence supports the judge's finding that Moses was discharged.

During the crucial discussion on July 3, 1979, McClure told Moses to "go on to the house." This term, the judge found, was commonly used in the coal fields as a synonym for discharge. 3 FMSHRC at 754. The judge's finding is supported by the testimony by White himself. Tr. 265. The judge also found that Inspector Howard stated that McClure had told him later the same morning that Moses had been fired. Id. at 751, 754. The judge credited Howard's testimony, and we see no reason to disturb his finding. Finally, the judge deemed it significant that McClure failed to tell Howard that Moses had not been discharged when Howard explained to McClure that Moses could file a discrimination complaint over his dismissal. Id. at 754. We agree with the judge that if McClure had been misunderstood by Moses, surely McClure would have explained to Howard at that point that he had not fired Moses.

---

8/ This is not to say that an operator may never question or comment upon a miner's exercise of a protected right. Such question or comment may be innocuous or even necessary to address a safety or health problem and, therefore, would not amount to coercive interrogation or harassment. Whether an operator's actions are proscribed by the Mine Act must be determined by what is said and done, and by the circumstances surrounding the words and actions.

Appellate Case: 25-1349     Page: 488     Date Filed: 04/07/2025 Entry ID: 5503844

Did Moses' discharge violate section 105(c)(1) of the Mine Act? The judge found the discharge occurred because the operator thought the complainant had engaged in protected activity, even though he had not. Section 105(c)(1) prohibits discharge, discrimination, or interference "because" of "a miner's exercise of any statutory right afforded by [the] Act." While a literal interpretation of this provision might require the actual or attempted exercise of a right before the protection of section 105 comes into play, we reject such a reading for two reasons. First, such an interpretation would frustrate Congressional intent that miners fully exercise their rights as participants in the enforcement of the Mine Act. Second, that approach would also wrongly fail to redress or deter situations where an operator, with the intent of frustrating protected activity, takes adverse action against an innocent miner.

Section 105(c)(1) was intended to "be construed expansively to assure that miners will not be inhibited in any way in exercising any rights afforded by the [Act]." S. Rep. at 36, Legis. Hist. at 624 (emphasis added). Miners would be less likely to exercise their rights if no remedy existed for discriminatory action based on an operator's mistaken belief that a miner had exercised a protected right. Indeed, the adverse effect of such action might be even more debilitating than discrimination over actual protected activity. In such instances, employees could reasonably fear that they might be treated adversely on the basis of suspicion alone, and thus would seek to avoid even the appearance of asserting their rights. The same reasoning applies with regard to the various forms of interference such as coercive interrogation and harassment previously discussed in this decision. An equally important consideration is that an affected miner suffers as much by mistake as he would if he were discriminated against because he had actually engaged in protected activity. We conclude that discrimination based upon a suspicion or belief that a miner has engaged in protected activity, even though, in fact, he has not, is proscribed by section 105(c)(1).

We now examine the evidence surrounding Moses' termination. In Pasula, supra, we set forth an analytical framework for deciding discrimination cases. We concluded that the complainant establishes a prima facie case of a violation of section 105(c)(1) if he proves by a preponderance of the evidence that (1) he engaged in protected activity, and (2) that the adverse action was motivated in any part by the protected activity. 2 FMSHRC at 2799. We also held that an operator may respond by either rebutting the prima facie case or if it cannot rebut, by showing in defense that even if part of its motive were unlawful, (1) it was also motivated by the miner's unprotected activities, and (2) would have taken the adverse action in any event for the unprotected activities alone. Id. at 2800. See also Robinette v. United Castle Coal Co., 3 FMSHRC 803, 818 n. 20 (April 1981). A similar, but modified, framework is appropriate for resolving allegations of discrimination for the suspected exercise of a statutory right. In such cases, the complainant establishes a prima facie case by proving that (1) the operator suspected that he had engaged in protected activity, and (2) the adverse action was motivated in any part by such suspicion. The operator may, of course, still successfully rebut or further defend along the lines summarized above.

## 1480

Appellate Case: 25-1349    Page: 489    Date Filed: 04/07/2025 Entry ID: 5503844

Applying this analysis to the facts at hand, there is no doubt on this record that White and McClure believed Moses had reported the bulldozer accident to MSHA. The next inquiry concerning the prima facie case is whether Whitley discharged Moses in any part because of this belief.

The judge found that White was very "sensitive" to what he regarded as MSHA influence on his operation, and consequently "resented the reporting of [the] accident" and was very concerned to discover who had reported it. 3 FMSHRC at 753. The judge also credited Moses' wife's testimony that during the July 2d conversation White told Moses "You don't work for them damn inspectors. I write your checks." 3 FMSHRC at 749, 757; Tr. 170. This testimony is significant because it tends to corroborate Moses' statement that during their discussion about calling the inspector, White said "You go get [your brother-in-law, the inspector], and ... you'll not work here any more." Tr. 69. Finally, on July 3d, the day of the firing, McClure's and Moses' argument, at least in part, involved who had called MSHA. This evidence supports the conclusion that Moses lost his job, at least in part, because of Whitley's belief that Moses had engaged in a protected communication with MSHA. Thus, we conclude that Moses established a prima facie case of discrimination.

We must next examine whether Whitley nevertheless would have discharged Moses for certain unprotected activities alone that it asserts were the cause of his departure. Whitley argues that Moses repeatedly failed to discharge his duties competently, and also used bad language toward McClure and White. The evidence, however, does not support a successful defense against the prima facie case.

Concerning the company's allegations of Moses' inept performance as a bulldozer driver, James Davis, who was in charge of servicing the bulldozers, stated that the breakdowns in the equipment were "about the same" after Moses came to work as they were before. Tr. 138. Davis testified that he had watched Moses operate a bulldozer every day Moses worked, and had never seen him misuse the equipment. Tr. 131. When asked if Moses possessed the skill of other operators, Davis said he had seen better bulldozer operators but he had also seen worse. Tr. 137. Bobby Durham, who also worked with Moses, concurred in Davis' assessment. Tr. 153–54. This evidence undercuts the company's claim that Moses was irresponsible with the equipment. Further, Whitley failed to present any evidence as to what its usual practices and policies were with respect to bad operators of equipment. As we have noted, evidence of practices and policies consistent with the adverse action taken may be persuasive support of an operator's defense of justifiable cause. Bradley v. Belva Coal Co., 4 FMSHRC 982, 993 (June 1982). We have previously emphasized that it is not our role to concern ourselves with the general wisdom or fairness of an operator's decision to take an adverse action. See Belva Coal, supra, 4 FMSHRC at 993–94; Chacon v. Phelps Dodge Corp., 3 FMSHRC 2508, 2516–17 (November 1981), pet. for review filed, No. 81-2300, D.C. Cir., December 11, 1981. However, in this case, we find Whitley's evidence regarding Moses' allegedly poor performance to be so weak that this defense seems virtually pretextual, and we therefore agree with the judge (3 FMSHRC at 760) that Whitley

### 1481

failed to show that it would have fired Moses in any event for this
asserted reason. 9/

Whitley's other justification for termination was that Moses had a
bad attitude and used abusive language with his supervisors.  The judge
found that because Moses had worked for respondent in 1970, Whitley
"must have known what sort of person he was hiring ... in 1979," and
that therefore the record failed to support a finding Moses would have
been discharged for those reasons alone in any event.  3 FMSHRC at 761.
Unlike the contention that Moses was an unskilled bulldozer operator,
the record reveals Moses' use of bad language (Tr. 12, 70, 190, 206,
236), and also shows his "bad attitude," at least in the eyes of White.
Tr. 260.  Whitley argues that its justification cannot be dismissed on
the basis of speculation that White knew what Moses' personality was
like merely because Moses had worked for him 9 years before.  If this
were all that supported the judge's conclusion, we might well agree.
There is nothing in the record to indicate what Moses' work habits and
relationships were when he was previously employed.  However, Whitley
presented no evidence showing that prior to White's and McClure's angry
reactions over Moses' supposed reporting of the accident they were
concerned enough with Moses to fire him for those reasons.  Indeed, as
the judge correctly noted, much of the language and improper attitude
arose in response to Whitley's unlawful and provocative attempts to
determine if Moses had called the inspectors.  3 FMSHRC at 761.  We thus
conclude that Whitley has not proven that it would have fired Moses for
his language and attitude alone.  In sum, we affirm the judge's con-
clusion Whitley violated section 105(c)(1) when it fired Moses on the
belief that he had exercised a protected right.

IV.

The final issue concerns back pay.  In his notice of hearing, the
judge advised the parties of his intent to render an oral decision at
the close of the evidence which would later be reduced to writing.  At
the close of the hearing, however, the judge did not render a bench
decision, but rather requested that additional evidence be submitted,
including Moses' payroll record.  Neither party had introduced any
evidence concerning back pay at the hearing.  After Whitley sent the
judge a copy of Moses' payroll sheet (marked Exhibit "H"), the judge
issued his written decision.  The judge ordered, among other things,
that Whitley reinstate Moses and pay him back wages on the basis of a
40-hour week.

_____

9/    In an attempt to establish Moses' abuse of equipment, Whitley sub-
mitted numerous repair bills for its equipment.  Moses was not the only
person to operate the bulldozers, and there was no evidence connecting
Moses to any of the repairs which were paid for during and after the
time Moses was employed by Whitley in 1979.  Although Whitley argues
that the judge improperly interpreted the bills in a variety of ways,
the bills are but one item leading to the judge's conclusion that Moses'
allegedly poor performance would not have led to his discharge.  Other
evidence supports his findings, so that Whitley's justifications fail
regardless of consideration of the bills.

Appellate Case: 25-1349    Page: 491    Date Filed: 04/07/2025 Entry ID: 5503844

Whitley argues that it was deprived of due process when the judge failed to issue an oral decision at the close of the evidence. Whitley also appears to be contending that such a decision could not have included the remedy of back pay since no evidence on that issue had been offered. It further argues that it was denied an opportunity to present argument and further evidence with respect to the issue after it submitted the payroll sheet.

We find no fault in general with the decisional process adopted by the judge. The judge's intent to issue a decision from the bench at the hearing's close was not an ironclad guarantee. The dynamics of trial often reveal complicated issues requiring further contemplation. Moreover, section 113(d)(1) of the Act requires a judge to make a decision constituting a "final disposition of proceedings," and Commission Rule 65(a) states that the judge's final disposition of the proceedings "shall be in writing." 29 C.F.R. § 2700.65(a). We have previously held that a bench decision is not a "final disposition" until it is written. Capitol Aggregates, Inc., 2 FMSHRC 1040, 1041 (May 1980). Thus, even had the judge issued his intended oral decision, it could have been subject to revision by the judge. Moreover, a claimant's failure to present evidence as to back pay is not tantamount to abandoning a claim, and, unless there are compelling reasons to the contrary, relief should nonetheless be awarded. Bobby Gooslin v. Kentucky Carbon Corp., 4 FMSHRC 1, 2-3 (January 1982).

The record in this case was left open at the close of the hearing for the submission of additional evidence regarding back pay. Whitley submitted the information requested and, indeed, offered more. 10/ Under these circumstances, we perceive no abuse of due process. Nor do we believe, strictly speaking, that Whitley was denied an opportunity to present argument concerning the payroll data it submitted or to adduce further evidence with respect to the issue. Certainly no action by the judge foreclosed such a submission. Also, Whitley did not, as it might have done, present an interpretive analysis with its data; nor did it, as it should have done, indicate to the judge or to Moses that it had additional evidence it wished to submit. In silence and inaction, Whitley came close to waiving whatever objections it might have had.

Yet we recognize that it may have been difficult for the parties to know how to proceed with regard to back pay. Although the judge stated in his notice of hearing that the issues to be tried were "whether [Moses] was discharged in violation of section 105(c)(1) of the Act so as to entitle him to ... relief ... including reinstatement ... with back pay and other benefits," he did not spell out for the parties the procedural course he wished to take with regard to the back pay issue. While the judge was not compelled to do so, under the circumstances of this case both parties might well have benefited from a detailed explanation of the procedures to be followed. Therefore, in

10/ In a letter accompanying the payroll data, Whitley's attorney stated to the judge: "If after inspecting the enclosed documents you require any further information regarding this matter I will be most happy to provide whatever you desire."

Appellate Case: 25-1349     Page: 492     Date Filed: 04/07/2025 Entry ID: 5503844

the interest of procedural regularity and to insure fairness to the parties, we remand this matter to the judge for the limited purpose of reconsideration of back pay issues concerning the proper amount, if any, to be awarded Moses. The judge should afford the parties the opportunity to present any argument and any additional relevant evidence on back pay issues, including but, not limited to, the interpretation of the payroll data already submitted, and the proper number of hours per week upon which to compute back pay. The parties may also submit evidence, if any, with respect to any actual interim earnings of Moses since July 3, 1979.

For the foregoing reasons, we affirm the judge's conclusions that Whitley violated section 105(c)(1) of the Mine Act, and we remand for the expedited reconsideration of back pay issues.

Rosemary M. Collyer, Chairman

Richard V. Backley, Commissioner

Frank F. Jestrab, Commissioner

A. E. Lawson, Commissioner

1484

Distribution

William E. Hensley, Esq.
First National Bank Building
Corbin, Kentucky  40701

David Patrick, P.S.C.
117 Short Street
P.O. Box 9
Harrodsburg, Kentucky  40330

Administrative Law Judge Richard Steffey
Fed. Mine Safety & Health Rev. Commission
5203 Leesburg Pike, 10th Floor
Falls Church, Virginia  22041

1485

Appellate Case: 25-1349    Page: 494    Date Filed: 04/07/2025    Entry ID: 5503844

| | | |
|---|---|---|
| SECRETARY OF LABOR | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| on behalf of MARK GRAY | : | |
| | : | |
| v. | : | Docket No. KENT 2001-23-D |
| | : | |
| NORTH STAR MINING, INC., | : | |
| and JIM BRUMMETT | : | |

BEFORE: Duffy, Chairman; Jordan, Suboleski, and Young, Commissioners

## DECISION

BY: Duffy, Chairman; Suboleski and Young, Commissioners

This proceeding involves a discrimination complaint filed by the Secretary of Labor on behalf of Mark Gray under section 105(c)(2) of the Federal Mine Safety and Health Act of 1977, 30 U.S.C § 815(c)(2) (2000) ("Mine Act" or "Act"), against North Star Mining, Inc. ("North Star") and Jim Brummett.[1] Administrative Law Judge Jacqueline R. Bulluck determined that Gray was not constructively discharged and dismissed the discrimination complaint against the respondents. She also concluded that Brummett did not unlawfully threaten Gray, as alleged, and consequently set aside a settlement agreement between the Secretary and Brummett. 25 FMSHRC 198, 199, 217 (Apr. 2003). The Secretary appealed the judge's conclusion that Brummett did not threaten Gray, and the Commission granted review. For the reasons that follow, we vacate the judge's decision and remand the case for further consideration.

---

[1] Mike Caudill, who was joined with North Star in the original complaint, is not involved with the remaining issues on appeal, and the parties have dropped him from the case caption in their pleadings.

Appellate Case: 25-1349    Page: 495    Date Filed: 04/07/2025    Entry ID: 5503844

I.

## Factual and Procedural Background

North Star, a contract mining company, operates the No. 5 and 6 mines, underground coal mines located about one quarter mile apart in Leslie County, Kentucky. 25 FMSHRC at 199. Mike Caudill was superintendent of the two mines, and Thomas ("Eddie") Spurlock was assistant superintendent at the No. 5 mine. *Id.* Jim Brummett was a section foreman at the No. 5 mine until May 1, 2000, when he became assistant superintendent at the No. 6 mine. *Id.*

Mark Gray, the complainant, began his employment at North Star on December 21, 1999, as a roof bolter at the No. 5 mine on the second shift, which ran from 3:00 p.m. to 11:00 p.m. *Id.* Brummett, a friend and co-worker of Gray from prior jobs, had referred Gray to the job at North Star. *Id.* Gray's "pinning partner" on the roof bolter was Ray Young, with whom he commuted when they worked together. *Id.* at 199-200. In July 2000, Gray had the opportunity to move from the second shift to the first shift, which ran from 7:00 a.m. to 3:00 p.m., when roof bolter Terry Roark was injured. *Id.* at 199.

In May 2000, MSHA special investigator Gary Harris interviewed Gray at his home concerning alleged smoking, ventilation, and roof support violations at the No. 5 mine. *Id.* at 200. Ray Young was also interviewed. *Id.* As a result of the investigation, MSHA referred the matter to the office of the United States Attorney for the Eastern District of Kentucky, where it was assigned to Assistant U. S. Attorney ("AUSA") Davis Sledd. *Id.* On July 22, Gray and Young received subpoenas to testify, on July 27, before a federal grand jury in London, Kentucky. *Id.* They were the only miners from North Star who were subpoenaed in July; however, several other miners were later subpoenaed and testified on August 31. *Id.*

At the end of the shift following their receipt of the subpoenas, Gray and Young went to Superintendent Mike Caudill's office at the No. 5 mine. *Id.* Also present were Assistant Superintendent Eddie Spurlock and another miner. *Id.* Gray and Young requested permission for leave to testify on July 27. *Id.* In response to the miners' inquiries about the subpoenas, Caudill telephoned AUSA Sledd, who was identified at the bottom of the subpoena. *Id.* Caudill either identified himself as Gray or stated that he was inquiring about the nature of Gray's subpoena. *Id.* Sledd responded that the grand jury was investigating unsafe mining practices at North Star's No. 5 mine. *Id.*

On July 27, Gray and Young reported to the courthouse in London, Kentucky. *Id.* There they met with MSHA investigator Harris and AUSA Sledd. *Id.* Young testified first before the grand jury while Gray remained outside the courtroom. *Id.* At the conclusion of Young's testimony, Sledd concluded that Gray's testimony would be essentially the same as Young's and decided not to call him as a witness. *Id.*

27 FMSHRC 2

Appellate Case: 25-1349    Page: 496    Date Filed: 04/07/2025 Entry ID: 5503844

When Gray returned to work after the grand jury proceeding, other miners asked about the investigation, but he declined to say anything about what occurred. *Id.* Sometime later, Assistant Superintendent Spurlock told Gray that Brummett wanted to talk to him at the No. 6 mine at the end of his shift.[2] *Id.* However, Gray went home with Young without seeing Brummett. *Id.*

When Gray arrived at his home, he had a telephone message to call Brummett at the No. 6 mine. *Id.* Gray then called Young to come to his house. *Id.* at 200-201. When Young arrived, Gray set up a tape recorder to record his conversation with Brummett when he returned the call.[3] *Id.* at 201. During the conversation, Brummett repeatedly asked Gray about the grand jury proceeding in London and whether Gray or Young had testified against him. *Id.* Gray told Brummett that he had not said anything about him. *Id.* At one point during the conversation, Gray told Brummett that he "[didn't] want no hard feelings over it." *Id.* Brummett responded, "No, they ain't no hard feelings, unless you put the screws to me, then I'll kill you." *Id.* The remark was followed by laughter. *Id.* at 212. The conversation concluded with Brummett asking Gray to come by the No. 6 mine with Young the next day and assuring Gray that he should not worry about losing his job. *Id.* at 201, 213-14.

The next day, after they completed their shift, Gray and Young went to the No. 6 mine to see Brummett. *Id.* at 201. Two MSHA investigators were in the mine office investigating a recent roof fall at the mine, and Gray and Young spoke with Brummett outside the office in the mine yard. *Id.* at 201, 215. Brummett spoke to Young and Gray separately. *Id.* at 215. Brummett sought assurances from Gray that Young had not testified against him. *Id.* at 201. Brummett further stated that "if anyone had laid the screws to him that he would whip their ass." *Id.* Gray did not respond to, or question, Brummett about the remark. *Id.* at 215. At the conclusion of the meeting, Gray and Young left, and Gray did not see Brummett again until the hearing in this proceeding. *Id.* at 201. Several days after the meeting, either Caudill or Spurlock told Gray that he was being transferred back to the second shift because Roark, the injured miner whom Gray had replaced, was returning to the roof bolter position on the first shift. *Id.* On August 16, after returning to the second shift for one day, Gray left his job at North Star, without notifying anyone, and went to work for another mining company. *Id.*

Superintendent Caudill and Brummett subsequently were criminally indicted by the U.S. Attorney's office. *Id.* Each of the men entered into plea agreements. On July 13, 2001, Caudill pled guilty to knowingly and willingly violating a health and safety standard by failing to follow the ventilation plan at the No. 5 mine. *Id.*; Gov't Ex. 6. He received probation and was nominally fined. 25 FMSHRC at 201. On October 25, 2001, Brummett pled guilty to violating a

---

[2] As the judge noted, there were inconsistencies in the witnesses' testimony regarding the precise date of this event. *Id.* at 200 n.4.

[3] Both the tape of the conversation, Gov't Ex. 9A, and a transcript of the taped telephone conversation, Gov't Ex. 4, were introduced as exhibits at trial. 25 FMSHRC at 208-214.

health and safety standard by knowingly and willingly failing to follow the ventilation plan at the No. 5 mine. 25 FMSHRC at 201; Gov't Ex. 5. He received one-year probation, was fined $250, and was prohibited from directly supervising miners while on probation. 25 FMSHRC at 201-202; Gov't Ex. 5. Both plea agreements required Brummett and Caudill to fully cooperate with the government and to testify truthfully in any related proceedings. 25 FMSHRC at 202; Gov't Exs. 5, 6.

On August 31, 2000, Gray filed a discrimination complaint with MSHA stating that he "was forced to quit because of constant harassment and required to go to second shift because of [his] Grand Jury involvement in an MSHA investigation." Gov't Ex. 2. On November 20, 2000, the Secretary filed a complaint with the Commission, pursuant to section 105(c)(2) of the Mine Act,[4] alleging that North Star constructively discharged Gray because he had been subpoenaed to testify before a grand jury and that Brummett threatened Gray on two occasions. Compl., ¶ 9. Thereafter, a hearing was held before Commission Administrative Law Judge Bulluck.

In its brief to the judge, North Star argued that in the telephone converstation Brummett had used a figure of speech when he threatened to kill Gray and that in the conversation at the No. 6 mine Gray could not have felt threatened or he would have reported it to the MSHA inspectors who were present. N.S. Post-Trial Br. at 5-6. The Secretary argued that both conversations included impermissible threats for which Brummett and North Star were responsible. S. Post-Hear'g Br. at 12-14, 20, 22.

In her opinion, the judge examined Gray's allegation of harassment, including his charge that Brummett had threatened him. 25 FMSHRC at 207-16. In reviewing Brummett's telephone call to Gray, the judge noted that it was important to view the alleged threat in the context of the broader conversation. *Id.* at 208. The judge stated, "The question presented . . . is whether Brummett meant the literal meaning of the words, 'I'll kill you,' or whether he was speaking figuratively, as in, 'I'll *really* be upset with you.'" *Id.* at 214 (emphasis in original). The judge further noted that Brummett testified that he never meant to threaten Gray, although Gray "*believed* Brummett had threatened him." *Id.* at 215 (emphasis in original). The judge examined Gray's concerns, which he told Brummett about, in being subpoenaed to testify before the grand

---

[4] Section 105(c)(2), 30 U.S.C. § 815(c)(2), provides in pertinent part:

> Any miner . . . who believes that he has been discharged, interfered with, or otherwise discriminated against by any person . . . may, within 60 days after such violation occurs, file a complaint with the Secretary alleging such discrimination. . . . Upon receipt of such complaint, the Secretary . . . shall cause such investigation to be made as he deems appropriate. . . . If upon such investigation, the Secretary determines that the provisions of this subsection have been violated, he shall immediately file a complaint with the Commission . . . and propose an order granting appropriate relief.

Appellate Case: 25-1349     Page: 498     Date Filed: 04/07/2025 Entry ID: 5503844

jury. *Id.* She further noted that Brummett, in response to Gray's concerns, reassured him that he was not in danger of losing his job. *Id.* The judge concluded that, because of Brummett's protective behavior toward Gray and because of interspersed laughter during the telephone call, "Brummett's statement amounted to no more than an exaggerated expression, commonly used between friends who expect loyalty from one another." *Id.*

With regard to Brummett's statement to Gray on the following day at the No. 6 mine, the judge generally discredited Brummett' testimony. *Id.* She was persuaded that the comment ("if [he found] anybody laid the screws to [him] . . . [he'd] whip their ass") was directed at Young, rather than Gray, and that "it was no more than an exaggeration like the telephone 'threat,' rather than an intent to harm anyone." *Id.* at 215-16. The judge added that, as with the telephone conversation, Gray believed that he had been threatened. *Id.* at 216.

Based on these credited facts, the judge, noting that the issue of Brummett's alleged threats was fully litigated, concluded that "no threat occurred." *Id.* at 217. The judge further concluded that Gray was not constructively discharged. *Id.* She, therefore, dismissed the section 105(c) complaint against North Star, Mike Caudill, and Jim Brummett. *Id.*

The Secretary filed a petition for discretionary review limited to the dismissal of the complaint against North Star and Brummett because the judge concluded that Brummett did not harass or threaten Gray. PDR at 1-2. The Commission granted the Secretary's petition. Subsequently, the Commission issued an order directing the parties to address "whether the issues contained in the Secretary of Labor's Petition for Review were sufficiently raised before the judge to allow review by the Commission." Unpublished Order dated July 1, 2003.

II.

Disposition

The Secretary asserts that the judge had an opportunity to pass on the issue raised before the Commission, i.e., whether Brummett's threats to Gray violated section 105(c)(1) of the Act.[5] S. Br. at 27-29. In support, the Secretary asserts that she presented two separate theories regarding a violation of section 105(c)(1) to the judge: the first involving Brummett's threats to Gray and the second involving the threats that led to Gray's constructive discharge. *Id.* at 29.

_____

[5] Section 105(c)(1) of the Mine Act, 30 U.S.C. § 815(c)(1), provides in pertinent part:

No person shall discharge or in any manner discriminate against
. . . or otherwise interfere with the exercise of the statutory rights
of any miner . . . because such miner . . . has filed or made a complaint
under or related to this Act . . . or because such miner . . . has instituted
or caused to be instituted any proceeding under or related to this Act
or has testified or is about to testify in such a proceeding . . . .

27 FMSHRC 5

The Secretary further argues that the judge's decision specifically addressed Brummett's threats when she disapproved the settlement agreement and stated that "no threat occurred." *Id.* at 31-32. With regard to the merits, the Secretary argues that the Commission has long recognized that coercive interrogation and harassment constitute prohibited interference under section 105(c)(1) of the Act. *Id.* at 12. The Secretary further contends that the judge erred when she examined Brummett's intent in making the statements at issue, and, moreover, even if she properly examined his intent, the statements were inherently coercive. *Id.* at 13-16. The Secretary continues that Brummett's statements should be examined under a "totality of the circumstances," an approach largely developed under the National Labor Relations Act. *Id.* at 16-19. The Secretary argues that the judge erred when she failed to apply that test, and that under the test the record evidence compels the conclusion that Brummett's statements would tend to have a coercive effect. *Id.* at 21-27. The Secretary contends that the Commission should hold that North Star and Brummett violated section 105(c)(1) of the Mine Act, reverse the judge's disapproval of the settlement agreement, approve that agreement, and remand the case to the judge to assess an appropriate penalty against North Star. *Id.* at 35-36.

North Star does not address whether Brummett's threats to Gray were properly before the Commission on review. Nevertheless, in its brief to the Commission, North Star repeats a notice argument, which was made to the judge, that the discrimination complaint did not give fair notice that Gray was claiming a threat of physical violence as a result of Brummett's phone call. N.S. Br. at 5-7. With regard to whether Brummett's threat to Gray violated the Mine Act, North Star asserts that Gray did not perceive that he had been threatened, that the use of the word "kill" was a figure of speech, that Brummett's subsequent threat of physical retaliation was made in the proximity of mine inspectors, and that, if Gray had felt threatened, he would have reported it then. *Id.* at 13-14. North Star further states that the judge's comment in her decision regarding the "comradery" between Brummett and Gray exhibited at the hearing was a consideration that had to be weighed in evaluating Brummett's threat. *Id.* at 14.

### A.    Whether the Issue Before the Commission Was Adequately Raised Below

Section 113(d)(2)(A)(iii) of the Act provides, "[e]xcept for good cause shown, no assignment of error by any party shall rely on any question of fact or law upon which the administrative law judge has not been afforded an opportunity to pass." 30 U.S.C. § 823(d)(2)(A)(iii). The Commission has eschewed an application of this section that would produce a "procedural straitjacket." *Beech Fork Processing, Inc.*, 14 FMSHRC 1316, 1320 (Aug. 1992). "However, a matter must have been presented below in such a manner as to obtain a ruling in order to be considered on review." *Id.*

The complaint filed by the Secretary against North Star alleged that Gray had been constructively discharged as a result of having been subpoenaed to testify before a grand jury. Compl., ¶ 9. The complaint alleged that prior to and after the grand jury proceeding Gray had been harassed and intimidated by Mike Caudill and Jim Brummett. *Id.* Finally, the complaint also alleged: "Additionally, Jim Brummett threatened to kill Gray on two separate occasions if

27 FMSHRC 6

Appellate Case: 25-1349     Page: 500     Date Filed: 04/07/2025 Entry ID: 5503844

Gray had testified against Brummett during the grand jury proceedings." *Id.* In his separate answer to the complaint, Brummett denied the allegations of discrimination in the complaint and also responded that "at no time herein did he threaten, intimidate, or harass . . . Mark Gray . . . ." Answer, ¶ 2. Caudill and North Star jointly answered the complaint and generally denied the allegations of discrimination and harassment and further stated that any "wrongful conduct" that may have occurred at the hands of other individuals was done without their knowledge or consent. Answer, ¶ 3, 4.

Gray and Brummett both provided testimony at trial concerning the threats, and the tape and transcript of Brummett's telephone conversation with Gray were introduced into evidence. Gov't Exs. 4, 9. Both the Secretary and North Star submitted post-trial briefs that addressed the threats. S. Post-Hear'g Br. at 12-15, 22, 26, 32; N.S. Post-Trial Br. at 4-8; N.S. Reply Br. at 4-6. Finally, and perhaps most significantly, the judge separately addressed the threat allegations in her decision. Thus, the judge thoroughly analyzed Brummett's remarks and their impact on Gray. 25 FMSHRC at 207-216. In addressing the Secretary's settlement agreement with Brummett, the judge stated: "The issue of Brummett's alleged threats was fully litigated in the Secretary's claim against North Star, and I have found that no threat occurred." *Id.* at 217.

In sum, the record indicates that the issue of whether Brummett's statements were impermissible threats or harassment in violation of section 105(c)(1) was litigated by the parties, decided by the judge, and is properly before the Commission on review.

B.    Whether the "Threats" Violated Section 105(c)(1) of the Mine Act

Section 105(c)(1) of the Act states that "[n]o person shall discharge or in any manner discriminate against . . . or otherwise interfere with the exercise of the statutory rights of any miner." The report of the Senate Committee on Human Resources, which largely drafted the bill that became the 1977 Mine Act (*Sec'y of Labor on behalf of Bennett v. Emery Mining Corp.*, 8 FMSHRC 1391, 1395 (Aug. 1983)), states that "[i]t is the Committee's intention to protect miners against not only the common forms of discrimination, such as discharge, suspension, demotion    . . . , but also against the more subtle forms of interference, such as promises of benefits or threats of reprisal." S. Rep. 95-191 at 36 (1977), *reprinted in* Senate Subcomm. on Labor, Comm. on Human Resources, *Legislative History of the Federal Mine Safety and Health Act of 1977*, at 624 (1978) (hereafter "*Leg. Hist.*").

In addition to the broad protections offered against adverse actions, the scope of miner rights protected by the Act is equally broad. Section 105(c)(1) extends the protection of the Mine Act to any miner who "has instituted or caused to be instituted any proceeding under or related to [the] Act *or has testified or is about to testify in any such proceeding.*" 30 U.S.C. § 815(c)(1) (emphasis added). The report of the Senate committee provides:

27 FMSHRC 7

> The Committee intends that the scope of the protected activities be broadly interpreted by the Secretary, and intends to include not only the filing of complaints seeking inspection under Section [103(g)] or the participation in mine inspections under Section [103(f)], but also the refusal to work in conditions which are believed to be unsafe or unhealthful . . . , or the participation by a miner or his representative in any administrative and judicial proceeding under the Act.

S. Rep. No. 95-181 at 35, *reprinted in Leg. Hist.* at 623. In analyzing this legislative history, the Commission has commented, "[T]he legislative history of the Act makes clear the intent of Congress that protected rights are to be construed expansively." *Swift v. Consolidation Coal Co.,* 16 FMSHRC 201, 205 (Feb. 1994). Finally, the Commission has noted that "the . . . Mine Act was drafted to encourage miners to assist in and participate in its enforcement." *Sec'y of Labor on behalf of Pasula v. Consolidation Coal Co.,* 2 FMSHRC 2786, 2789 (Oct. 1980), *rev'd on other grounds,* 663 F.2d 1211 (3rd Cir. 1981).

In the seminal case of *Moses v. Whitely Development Corp.,* 4 FMSHRC 1475 (Aug. 1982), *aff'd,* 770 F.2d 168 (6th Cir. 1985), the Commission held that an operator's coercive interrogation and harassment violated section 105(c)(1) when such conduct interfered with the miner's exercise of protected rights. *Id.* at 1478-79. The Commission reasoned:

> A natural result of such practices may be to instill in the minds of employees fear of reprisal or discrimination. Such actions may not only chill the exercise of protected rights by the directly affected miners, but may also cause other miners, who wish to avoid similar treatment, to refrain from asserting their rights. This result is at odds with the goal of encouraging miner participation in enforcement of the Mine Act. We therefore conclude that coercive interrogation and harassment over the exercise of protected rights is prohibited by section 105(c)(1) of the Mine Act.

*Id.* (footnote omitted).

Whether an operator's question or comments concerning a miner's exercise of a protected right constitute coercive interrogation or harassment proscribed by the Mine Act "must be determined by what is said and done, and by the circumstances surrounding the words and actions."[6] *Id.* at 1479 n.8. A judge's findings with respect to the coercive nature of a mine

---

[6] The Commission's approach to the analysis of operator statements stands in contrast to its analysis of discrimination against miners who have exercised their rights under the Mine Act. In analyzing allegations of employment discrimination, the Commission has generally examined: (1) whether the miner was engaged in protected activity under the Mine Act ; and (2) whether the

Appellate Case: 25-1349    Page: 502    Date Filed: 04/07/2025 Entry ID: 5503844

operator's statements are reviewed under a substantial evidence standard,[7] and, if these findings are supported by credibility resolutions, they will not be disturbed on review. *Id.* at 1479.

The Commission's test for evaluating operator statements that was formulated in *Moses* has its genesis in section 8(a)(1) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), which makes it unlawful for an employer "to interfere with, restrain, or coerce" an employee's protected rights.[8] The National Labor Relations Board ("NLRB") has stated the following test for determining whether a section 8(a)(1) violation has been committed:

> interference, restraint, and coercion under Section 8(a)(1) of the [NLRA] does not turn on the employer's motive or on whether the coercion succeeded or failed. The test is whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the [NLRA].

*American Freightways Co.*, 124 NLRB 146, 147 (1959), *quoted in* THE DEVELOPING LABOR LAW, at 82 (Patrick Hardin & John F. Higgins eds., 4th ed. 2001). *See NLRA v. Burnup & Sims, Inc.*, 379 U.S. 21, 23 (1964) ( "Over and again the Board had ruled that section 8(a)(1) is violated . . . despite the employer's good faith . . . "). Further, under the NLRA, it is generally a violation for an employer to threaten an employee with reprisal for engaging in union and other concerted activity protected by the NLRA. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969). "[I]n determining whether a statement is an impermissible threat . . . language used by the parties . . . must not be isolated nor analyzed in a vacuum, but must be considered in light of the circumstances existing when such language was spoken." *TRW, Inc. v. NLRB*, 654 F.2d 307, 313 (5th Cir. 1981); *accord Standard-Coosa Thatcher Carpet Yarn Div. v. NLRB*, 691 F.2d 1133, 1137 (4th Cir. 1982) (the Board, in making this decision, considers whether "the conduct in

---

adverse employment action was motivated in any part by the miner's protected activity. *Swift v. Consolidation Coal*, 16 FMSHRC at 204-205. This latter analysis is generally referred to as the *Pasula-Robinette* test. *See Pasula*, 2 FMSHRC at 2797-800; *Sec'y of Labor on behalf of Robinette v. United Castle Coal Co.*, 3 FMSHRC 803, 817-18 (Apr. 1981).

[7] When reviewing an administrative law judge's factual determinations, the Commission is bound by the terms of the Mine Act to apply the substantial evidence test. 30 U.S.C. § 823(d)(2)(A)(ii)(I). "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support [the judge's] conclusion.'" *Rochester & Pittsburgh Coal Co.*, 11 FMSHRC 2159, 2163 (Nov. 1989) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[8] The Commission has previously looked to the case law interpreting analogous provisions of the NLRA for guidance in construing Mine Act provisions. *See Pero v. Cyprus Plateau Mining Corp.*, 22 FMSHRC 1361, 1368-69 & n.11 (Dec. 2000).

27 FMSHRC 9

Appellate Case: 25-1349   Page: 503   Date Filed: 04/07/2025 Entry ID: 5503844

question had a reasonable tendency in the totality of the circumstances to intimidate."). Finally, as the Supreme Court noted, in approving a "bargaining order" to remedy an employer's unfair labor practices that had made an NLRB-conducted election impossible, an evaluation of employer speech must "take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *Gissel Packing Co.*, 395 U.S. at 617.

Here, the judge analyzed Brummett's statements primarily from the perspective of what he intended. "The question presented . . . is whether Brummett meant the literal meaning of the words, 'I'll kill you,' or whether he was speaking figuratively, as in, 'I'll *really* be upset with you.'" 25 FMSHRC at 214 (emphasis in original). With regard to both the telephone conversation with Gray and the threat to kill, and the face-to-face conversation with Gray at the No. 6 mine and the threat of bodily or other harm, the judge concluded that the statements were exaggerated expressions, rather than threats. *Id.* at 215-16. She arrived at this conclusion based on Brummett's intent. *Id.*

We conclude that the judge examined Brummett's statements too narrowly by considering largely, if not exclusively, Brummett's intent or motive in making the statements. In the judge's words, the presence or absence of a violation of section 105(c) of the Mine Act turned on whether Brummett literally intended by his words to cause physical harm to Gray or any other miner who testified against him during the grand jury investigation. However, rather than considering only Brummett's intent, the judge should have analyzed the totality of circumstances surrounding Brummett's statements to determine whether they were coercive and violative of section 105(c) of the Mine Act. *See Moses*, 4 FMSHRC at 1479. *See also Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 634-37 (5th Cir. 2003) (propriety of employer's statement under section 8(a)(1) of the NLRA is based on an examination of the circumstances surrounding the statements). Brummett's statements could be coercive, even if he did not mean to literally kill or cause physical harm to Gray or other miners who testified against him. Indeed, the Commission's decision in *Moses* makes it clear that threats of reprisals or of employment discrimination can be coercive and in violation of section 105(c). Given Brummett's supervisory position and his ability to impact the employment relationship of Gray (whom Brummett assisted in getting a job at North Star), Young, and other miners who might testify against him, the judge should have considered the effect of Brummett's statements in this broader context and what other meanings could be reasonably inferred from them, rather than limiting her consideration to their literal meaning and what Brummett intended.[9]

---

[9] The Commission has held that "the substantial evidence standard may be met by reasonable inferences drawn from indirect evidence." *Mid-Continent Res., Inc.*, 6 FMSHRC 1132, 1138 (May 1984). The Commission has emphasized that inferences drawn by the judge are "permissible provided they are inherently reasonable and there is a logical and rational connection between the evidentiary facts and the ultimate fact inferred." *Id.*; *accord Garden Creek Pocahontas Co.*, 11 FMSHRC 2148, 2153 (Nov. 1989).

27 FMSHRC 10

Among the judge's findings that the Commission found relevant in determining the coercive nature of the operator's statement in *Moses* were the "persistence with which the subject" of the miner's protected activity was raised and the "accusatory manner in which it was done." 4 FMSHRC at 1479. As the Commission stated in *Moses*, its consideration of those factors led it to conclude that a miner would have logically feared reprisal and would be reluctant to exercise his rights in the future. *Id.* In the circumstances of this case, both of these factors may be pertinent and should be considered by the judge in determining the legality of the statements under section 105(c)(1) of the Act.

In addition to those factors surrounding Brummett's statements, there are other considerations that should be weighed in determining whether the statements were coercive. Those circumstances include where the statements were made (an at-home telephone call and a meeting outside the mine office);[10] the nature of Brummett's and Gray's relationship (the two were friends and Brummett helped him secure a job at North Star, and Brummett was a supervisor at North Star);[11] the fact that the statements were made along with inquiries about Gray's and Young's testimony in a confidential grand jury investigation into alleged criminal actions at the mine,[12] and the fact that, on each occasion when Brummett spoke to Gray, he apparently sought to isolate him and talk to him one-on-one.[13]

---

[10] *See, e.g., House of Raeford Farms, Inc.*, 308 NLRB 568, 571, 141 LRRM 1057, 1060 (1992) (locus of supervisor's remarks considered in determining whether they were violative), *enf'd*, 7 F.3d 223 (4th Cir. 1993), *cert. denied*, 511 U.S. 1030 (1994).

[11] The judge has previously noted the "comradery" between Gray and Brummett. 25 FMSHRC at 207. However, in an NLRB case on appeal involving a violation of section 8(a)(1) of the NLRA, a reviewing court has indicated that "[t]he fact that these statements were made during a private conversation between . . . close personal friends outside of work, is not determinative of whether the statements were . . . coercive." *Tellespen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 564 (5th Cir. 2003). *Compare TRW*, 654 F.2d at 313 (court could not sustain finding of violation that a statement was a threat of reprisal for engaging in union activity where the statement "was merely one . . . in a chain reflecting the continuing hostility between the two men").

[12] *See also NLRB v. Brookwood Furniture, Div. of U.S. Indus.*, 701 F.2d 452, 461 (5th Cir. 1983) (in enforcing an NLRB order, court considered interrogations as well as an employer's opposition to unionization in determining whether a conversation was coercive).

[13] The judge considered it significant that Brummett's "whip ass" statement to Gray at the No. 6 mine was directed at Young, rather than Gray. 25 FMSHRC at 215-16. However, that fact is not determinative of whether, under the circumstances, the statement may have tended to coerce Gray in the exercise of *his* Mine Act rights. *See Moses*, 4 FMSHRC at 1478.

Appellate Case: 25-1349     Page: 505     Date Filed: 04/07/2025 Entry ID: 5503844

In light of the judge's application of the incorrect legal test to Brummett's statements, we remand this matter to her for further consideration of the facts and circumstances surrounding the statements to determine if they were coercive under section 105(c)(1) of the Mine Act. This is a determination that the judge should make in the first instance. *See Sec'y of Labor on behalf of Bernardyn v. Reading Anthracite Co.*, 22 FMSHRC 298, 307-308 (Mar. 2000) (issue of whether miner's cursing, including an alleged threat, was remanded to judge to view them "in their totality" to determine whether they were within the leeway accorded employees whose behavior is provoked); *accord Sec'y of Labor on behalf of McGill v. U.S. Steel Mining Co., LLC*, 23 FMSHRC 981, 992 (Sept. 2001) (issue of whether miner's conduct that was grounds for discharge was provoked by operator in response to miner's protected activity must be viewed in "their totality").

Finally, we note that, in the Secretary's complaint initiating this proceeding, both Superintendent Caudill and Brummett were each separately named as an "operator" under section 3(d) of the Act, 30 U.S.C. § 802(d). The complaint did not designate either Caudill or Brummett as "agents" of North Star under section 3(e), 30 U.S.C. § 802(e). In their answers to the complaint, Caudill and Brummett did not dispute being designated as operators. However, in her post-hearing brief to the judge, the Secretary generally alleged that "[t]he hostile actions and animus toward Gray of . . . assistant mine superintendent Brummett are attributable toward North Star." S. Post-Hearing Br. at 20. Similarly, both in her petition and brief to the Commission, the Secretary specifically requests the Commission to reverse the judge's decision, "hold that North Star and Brummett violated Section 105(c)(1), . . . and remand the case to the judge to assess an appropriate civil penalty against North Star." PDR at 21; S. Br. at 35-36.

Based on the record, it is not clear what is the Secretary's theory of liability against North Star. In light of the Secretary's complaint, it appears that North Star may have no further liability, even if Brummett's statements were found to be coercive. The Mine Act does provide "that an operator, though faultless itself, may be held liable for the violative acts of its employees, agents, and contractors." *Bulk Transp. Servs., Inc.*, 13 FMSHRC 1354, 1359-60 (Sept. 1991). However, assessing the employer's liability in this context is complicated by the fact that Brummett was facing individual criminal and civil penalties. He therefore had an interest in Gray's appearance before the grand jury independent of, and perhaps even in conflict with, North Star's interests.

While the pleadings are not dispositive on this issue, the Secretary charged Brummett as an "operator."[14] Furthermore, the record does not seem to indicate the sustained prosecution of

---

[14] The Secretary's complaint separately named Brummett as an operator, rather than an agent of North Star. We need not address whether Brummett was appropriately charged as an operator, because his potential liability arises from the specific language of section 105(c)(1) of the Mine Act, which provides that "*No person* shall . . . interfere with the exercise of the statutory rights of any miner . . . because such miner . . . has testified or is about to testify in such a proceeding . . . ." 30 U.S.C. § 815(c)(1) (emphasis added). The Secretary's theories of liability

27 FMSHRC 12

Appellate Case: 25-1349     Page: 506     Date Filed: 04/07/2025 Entry ID: 5503844

an agency theory imputing liability to North Star. Indeed, the Secretary dropped Caudill from the case on appeal, conceding that he had no further liability in the proceeding in the absence of the constructive discharge allegation. It would appear that North Star's liability ceases for the same reason, i.e., the abandonment of the constructive discharge claim on appeal. Thus, given the constraints of the Secretary's complaint and the limited basis on which she has appealed, the judge should determine whether North Star continues to be a party in this proceeding in the event Brummett's statements are found to be violative.

## III.

## Conclusion

Based on the foregoing, we vacate the judge's decision and remand this proceeding for further consideration consistent with our analysis.

Michael F. Duffy, Chairman

Stanley C. Suboleski, Commissioner

Michael G. Young, Commissioner

---

seem to preclude treating Brummett as an agent of North Star because he was charged as an "operator."

27 FMSHRC 13

Commission Jordan, concurring:

I agree with the majority that the question of whether Jim Brummett threatened Mark Gray in violation of section 105(c)(1) of the Mine Act should be remanded to the judge. However, I disagree with the majority's analysis regarding the potential liability of North Star, and thus write separately to address that issue.

It appears from my colleagues' opinion that they have already decided that North Star cannot be liable in this case, even if the judge finds that Brummett threatened Gray. Slip op. at 12-13. This seems to be based solely on the manner in which the Secretary's complaint was drafted – because she named Brummett as an "operator" under section 3(d) of the Mine Act and failed to explicitly designate Brummett as an agent of North Star under section 3(e). *Id.* The majority, citing no authority and providing no explanation, states that the theories of liability included in the complaint appear to preclude treating Brummett as North Star's agent because he was instead charged as an "operator." *Id.* at 12 n.14.[1]

My colleagues recognize, however, that in *Bulk Transp. Servs., Inc.*, 13 FMSHRC 1354, 1359-60 (Sept. 1991), the Commission ruled that the Mine Act's scheme of liability provides "that an operator, although faultless itself, may be held liable for the violative acts of its employees, agents, and contractors." Slip op. at 12. In the complaint, Brummett was described as a foreman (Compl., ¶ 5), a designation that North Star admitted. Answer of North Star Mining, Inc. and Mike Caudill, ¶ 5. I thus frankly fail to see how Brummett cannot be either an "employee, agent or contractor" of North Star.[2] I note further the majority's acknowledgment (slip op. at 12) that in her post-hearing brief to the judge, the Secretary stated that "[t]he hostile

---

[1] The judge did not need to reach the issue of whether Brummett was in fact an operator, and the majority chooses not to address it, stating that Brummett's "potential liability arises from the specific language of section 105(c)(1)." *Id.* This refers to language in that section which provides that "[n]o person shall . . . interfere with the exercise of the statutory rights of any miner . . . because such miner . . . has testified or is about to testify in any such proceeding. . . ." 30 U.S.C. § 815(c)(1). It appears that the majority believes that Brummett's liability, if any, stems from Brummett's status as a "person" under section 105(c)(1), and not from his status as an operator. If this is the case, I fail to see why simply naming Brummett as an operator in the complaint – when his ultimate liability does not appear to hinge on that designation – automatically prevents North Star's liability on an agency theory. In any event, with no explicit findings in the record as to whether Brummett was acting as an agent for North Star or on his own individual behalf, it appears premature to discount an agency theory of liability at this point.

[2] My colleagues speculate that Brummett's potential individual liability under section 110(c) might have placed him in such conflict with North Star's interests so as to preclude an agency relationship. Slip op. at 12. Instead of suggesting that North Star be absolved of liability, the Commission should permit the judge, in the first instance, to make findings on this question. *See Dacotah Cement,* 26 FMSHRC 461, 468 (June 2004).

27 FMSHRC 14

Appellate Case: 25-1349     Page: 508     Date Filed: 04/07/2025 Entry ID: 5503844

actions and animus toward Gray of . . . assistant mine superintendent Brummett are attributable toward North Star." S. Post-Hearing Br. at 20. This appears to allege an agency relationship between the two. In any event, I am reluctant to create a new standard hinging an operator's liability on the specificity of the section 105(c) complaint's allegations. This would be particularly difficult for the many pro se complainants who seek relief under section 105(c)(3) of the Mine Act. 30 U.S.C. § 815(c)(3).

The Commission's decision in *Bryant v. Dingess Mine Service*, 10 FMSHRC 1173 (Sept. 1988), demonstrates the importance of examining the actual relationship between parties working at a mine site, which I believe is the proper course in this case as well. In *Bryant*, the judge held a contractor, Dingess Mining Service ("Dingess"), liable for discriminatory actions in violation of section 105(c), but found no liability against Mullins Coal Co. ("Mullins"), the lessee of the coal at the mine, nor against Winchester Coals, Inc. ("Winchester"), the lessor of the mining equipment and machinery. *Id.* at 1173-83. The Commission determined that Dingess' status as an independent contractor existed in name only and that in fact his relationship was akin to being an on-site, supervisory agent for Mullins and Winchester. *Id.* at 1180. Reversing the judge, the Commission found Mullins and Winchester liable under section 105(c) for Dingess' discriminatory acts. *Id.* In so finding, the Commission acknowledged that the judge did not expressly rule that Dingess was acting as an agent, but stressed that the factual findings that he did make led inevitably to this conclusion. *Id.* at 1179. We emphasized that Dingess worked as a manager and supervisor on behalf of the operators, and that our disposition "turn[ed] upon an examination of the true nature of the relationship existing between the parties." *Id.* at 1178. We stated that:

> Mullins and Winchester were in actual control of the mine at which Bryant worked. As a result, this case is not unlike the more typical situation where a mine foreman or supervisor is endowed with a certain degree of responsibility in the operation of a mine, but whose sphere of control is always subject to the operator's ultimate right to direct the supervisor's work performance in order to ensure compliance with the requirements of the Mine Act. Within this latter framework, it has been consistently held that mine operators are liable for the discriminatory acts of their agents under section 105(c)(1) of the Act. *See e.g.*, . . . *Moses v. Whitley Development Corp.*, 4 FMSHRC 1475 (1982) *aff'd sub nom. Whitley Development Corp. v. FMSHRC*, 770 F.2d 168 (6th Cir. 1985) (operator held liable for foreman's illegal discharge of miner) . . . .

*Id.* at 1179-80 (footnote omitted).

Accordingly, I would remand this case to the judge to determine the nature of the relationship between Brummett and North Star and to ascertain North Star's liability, if any, if Brummett's statements are found to be coercive.

Mary Lu Jordan, Commissioner

27 FMSHRC 16

Distribution

Robin A. Rosenbluth, Esq.
Office of the Solicitor
U.S. Department of Labor
1100 Wilson Blvd., 22nd Floor West
Arlington, VA 22209-2247

John Kirk, Esq.
Kirk Law Firm
P.O. Box 339
Paintsville, KY 41240

Mr. Jim Brummett
P.O. Box 174
Arjay, KY 40902

Mr. Mark Gray
P.O. Box 465
Grays Knob, KY 40769

Administrative Law Judge Jacqueline R. Bulluck
Federal Mine Safety & Health Review Commission
Office of Administrative Law Judges
601 New Jersey Avenue, N.W., Suite 9500
Washington, D.C. 20001-2021

Appellate Case: 25-1349     Page: 511     Date Filed: 04/07/2025 Entry ID: 5503844

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

1730 K STREET NW, 6TH FLOOR
WASHINGTON, D.C. 20006
August 21, 1989

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | |
| | : | |
| and | : | |
| | : | |
| UNITED MINE WORKERS OF AMERICA | : | Docket No. WEVA 87-272 |
| | : | |
| v. | : | |
| | : | |
| BIRCHFIELD MINING COMPANY | : | |

BEFORE: Ford, Chairman; Backley, Doyle, Lastowka, and Nelson, Commissioners

## ORDER

BY THE COMMISSION:

In this civil penalty proceeding arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (1982)("Mine Act" or "Act"), counsels for petitioner Secretary of Labor and respondent Birchfield Mining Company ("Birchfield") have filed a Joint Motion for Approval of Settlement. The motion states that counsel for the United Mine Workers of America ("UMWA") has no objection to the proposed settlement. For the following reasons, the parties' settlement is approved and this matter is dismissed.

In January 1989, acting on Birchfield's petition for discretionary review, we affirmed the decision of Commission Administrative Law Judge Gary Melick (9 FMSHRC 2209 (December 1987)(ALJ)), which found that Birchfield had violated 30 C.F.R. § 75.303(a) and that the violation resulted from Birchfield's unwarrantable failure to comply with that mandatory standard. 11 FMSHRC 31 (January 1989). A majority of the Commission reversed Judge Melick's finding that the violation was of a significant and substantial nature; a minority of the Commissioners dissented on that point. Birchfield had also contended that the judge had erred in assessing a $400 civil penalty for the violation. In view of its determination that the violation was not significant and substantial, the majority remanded the case to the judge for reconsideration of the appropriate civil penalty.

Judge Melick issued a decision on February 2, 1989, assessing a revised penalty of $300. 11 FMSHRC 198 (February 1989)(ALJ). The Secretary filed a petition for discretionary review, arguing, in essence, for reconsideration of the Commission's prior determination with respect to the significant and substantial issue. The UMWA, which had not previously

Appellate Case: 25-1349   Page: 512   Date Filed: 04/07/2025 Entry ID: 5503844

participated in this proceeding as a party, intervenor, or amicus also filed a petition for review similarly seeking reconsideration of the significant and substantial issue. By order issued March 14, 1989, we granted both petitions and again directed review. In the meantime, on March 10, 1989, Birchfield had paid to the Secretary the civil penalty of $300 assessed by the judge, which payment the Secretary subsequently accepted.

Following the Commission's Direction for Review, the National Coal Association ("NCA") and Bituminous Coal Operators Association ("BCOA") jointly and the American Mining Congress ("AMC") individually filed motions to intervene. Concurrently with their motion, the NCA and BCOA, joined by Birchfield, filed a motion to dismiss the Secretary's and the UMWA's review petitions. The AMC, also joined by Birchfield, filed a similar motion to dismiss. In turn, the Secretary and the UMWA opposed both motions to intervene and both motions to dismiss.

On June 22, 1989, Birchfield filed a Renewed Motion to Dismiss and Offer of Judgment. Birchfield asserted that the case was moot due to its payment of the $300 civil penalty. Birchfield further stated that it "d[id] not wish to incur further litigation expenses...." Pursuant to Fed. R. Civ. P. 68, Birchfield also "offer[ed] to have a judgment entered against it and in favor of the Secretary of Labor for $400 ..., raising the total payment by Birchfield to the amount of the original penalty proposal." Following the filing of this motion, settlement discussions ensued among the parties.

On July 17, 1989, the Secretary and Birchfield filed a Joint Motion for Approval of Settlement. Noting the Commission's prior divided opinion with respect to the significant and substantial issue, the parties state that they "recognize that final resolution of the [significant and substantial] issue ... is a matter that is not free from doubt...." The parties further "recognize that extensive resources have been expended in the litigation to date and that additional resources will be expended in further pursuit of the litigation should it continue." The motion asserts that "[i]n light of the above considerations, the operator has determined that it no longer wishes to contest the [underlying] citation, its significant and substantial or unwarrantable failure findings, or the assessment of civil penalty."

As part of the settlement, Birchfield agrees to pay a penalty of $400, the amount originally proposed by the Secretary and first assessed by Judge Melick. Birchfield also agrees to withdraw its previous petition for discretionary review that was the subject of our prior decision. In turn, the Secretary agrees to withdraw her present petition for review. The parties request the Commission to vacate its initial direction for review of Birchfield's petition, its January 1989 decision, its subsequent direction for review of the Secretary's and UMWA's petitions, the judge's original December 1987 decision, and the judge's February 1989 decision on remand. The motion indicates that counsel for the UMWA has authorized counsel for the Secretary to state that the UMWA "does not object to the settlement" and that, upon Commission approval of the stated settlement terms, "agrees to vacation" of the Commission's direction for review of the UMWA's review petition. Birchfield's earlier Offer of Judgment represented that the NCA and BCOA

Appellate Case: 25-1349    Page: 513    Date Filed: 04/07/2025 Entry ID: 5503844

had no objection to the relief sought and, subsequent to the filing of the joint settlement motion, the AMC submitted a statement of non-objection to the settlement motion.

Oversight of proposed settlements of contested cases is an important aspect of the Commission's adjudicative responsibilities under the Mine Act (30 U.S.C. § 820(k)), and is, in general, committed to the Commission's sound discretion. See, e.g., Pontiki Coal Corp., 8 FMSHRC 668, 674-675 (May 1986). As we have observed, "our 'responsibility under the Mine Act is to ensure that a contested case is terminated, or continued, in accordance with the Act.'" Southern Ohio Coal Co., 10 FMSHRC 1669, 1670 (December 1988)("SOCCO"), quoting, Youghiogheny & Ohio Coal Co., 7 FMSHRC 200, 203 (February 1985). The Commission has granted motions to vacate citations and orders and to dismiss review proceedings if "adequate reasons" to do so are present. E.g., SOCCO, supra, and authorities cited. Here, the real parties in interest, the Secretary and Birchfield, have stated their mutual desire to terminate a course of litigation that has become expensive and onerous to them. The operator has agreed to pay in full the civil penalty originally proposed by the Secretary. None of the parties who have filed petitions for review or motions to intervene have raised any objection to the proposed settlement.

In the past, the Commission has vacated enforcement actions and directions for review in granting dismissal motions on review. We conclude that the nature of the relief sought here is not inconsistent with the Commission's inherent powers as an adjudicative body under section 113(d) of the Act, 30 U.S.C. § 823(d), and lies within its zone of discretion in this legal area. We further conclude that, in light of the unique circumstances of this proceeding, adequate cause exists to grant the parties' joint dismissal motion.

Therefore, upon consideration of the motion, it is granted. Our two directions for review in this proceeding are vacated and the underlying petitions for review are dismissed. Our prior decision and the judge's decisions are also vacated. In view of this action, all other pending motions are dismissed as moot.

Ford B. Ford, Chairman

Richard V. Backley, Commissioner

Joyce A. Doyle, Commissioner

James A. Lastowka, Commissioner

L. Clair Nelson, Commissioner

Appellate Case: 25-1349    Page: 514    Date Filed: 04/07/2025 Entry ID: 5503844

Distribution

Anthony J. Cicconi, Esq.
Shaffer & Shaffer
330 State Street
P.O. Box 38
Madison, West Virginia  25130

William D. Stover, Esq.
MAE Services
40 Eagles Road
Beckley, West Virginia  25801

Henry Chajet, Esq.
Doyle & Savit
919  18th Street, N.W.
Suite 1000
Washington, D.C.  20006

Mary Lu Jordan, Esq.
UMWA
900 15th St., N.W.
Washington, D.C.  20005

Dennis D. Clark, Esq.
Office of the Solicitor
U.S. Department of Labor
4015 Wilson Blvd.
Arlington, VA  22203

William E. Hynan, Esq.
National Coal Association
1130  17th Street, N.W.
Washington, D.C.  20036

Michael T. Heenan, Esq.
Smith, Heenan & Althen
1110 Vermont Avenue, N.W.
Suite 400
Washington, D.C.  20005

Mark Ellis, Esq.
American Mining Congress
1920 N Street, N.W. #300
Washington, D.C.  20036

Administrative Law Judge Gary Melick
Federal Mine Safety and Health Review Commission
5203 Leesburg Pike, Suite 1000
Falls Church, Virginia  22041

1431

Appellate Case: 25-1349     Page: 515     Date Filed: 04/07/2025 Entry ID: 5503844

# FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION

1730 K STREET NW, 6TH FLOOR
WASHINGTON, D.C. 20006

May 3, 1996

| | |
|---|---|
| SECRETARY OF LABOR, | : |
| MINE SAFETY AND HEALTH | : |
| ADMINISTRATION (MSHA) | : |
| | : |
| v. | : Docket No. KENT 94-972 |
| | : |
| BROKEN HILL MINING COMPANY, INC. | : |

BEFORE: Jordan, Chairman; Holen, Marks and Riley, Commissioners

## ORDER

BY THE COMMISSION:

This civil penalty proceeding arises under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (1994) ("Mine Act"). On October 11, 1995, the Commission granted the petition for discretionary review filed by Broken Hill Mining Company, Inc. ("Broken Hill"). Pursuant to Commission Procedural Rule 75, 29 C.F.R. § 2700.75 (1995),[1] Broken Hill's opening brief was due to be filed by November 13, 1995. Broken Hill has not filed its brief and has proffered no reason for its failure to do so.

---

[1] Rule 75 provides, in part:

> (a) *Time to file.* (1) *Opening and response briefs.*
> Within 30 days after the Commission grants a petition for discretionary review, the petitioner shall file his opening brief. If the petitioner desires, he may notify the Commission and all other parties within the 30-day period that his petition and any supporting memorandum are to constitute his brief. . . .

Appellate Case: 25-1349    Page: 516    Date Filed: 04/07/2025 Entry ID: 5503844

On January 26, 1996, the Secretary of Labor filed a Motion to Dismiss for Want of Prosecution pursuant to Commission Procedural Rule 75(e), 29 C.F.R. § 2700.75(e).[2] The Secretary states that Broken Hill failed to file its opening brief or designate its petition as such. Mot. at 1. The Secretary notes that he has not been able to reach Broken Hill by telephone or facsimile. *Id.* at 2 & n.2. He asserts that no injustice would result from the dismissal of Broken Hill's petition. *Id.* at 2. The Secretary requests that the petition be dismissed with prejudice. *Id.* at 3. Broken Hill has not filed an opposition to the motion.

On March 14, 1996, the Commission issued an order directing Broken Hill to show cause within 14 days why its appeal should not be dismissed. The file contains the return receipt showing that Broken Hill received the show cause order on March 22, 1996. Broken Hill has not responded to the show cause order. The Commission may vacate its direction for review if a petitioner fails to file an opening brief in accordance with Rule 75. *See* 29 C.F.R. § 2700.75(e).

---

[2] Rule 75(e) provides:

> *Consequences of petitioner's failure to file brief.* If a petitioner fails to timely file a brief or to designate the petition as his brief, the direction for review may be vacated.

Appellate Case: 25-1349     Page: 517     Date Filed: 04/07/2025 Entry ID: 5503844

In light of the foregoing considerations, we grant the Secretary's motion. Accordingly, the direction for review is vacated and this proceeding is dismissed.


Mary Lu Jordan, Chairman


Arlene Holen, Commissioner


Marc Lincoln Marks, Commissioner


James C. Riley, Commissioner

Appellate Case: 25-1349    Page: 518    Date Filed: 04/07/2025   Entry ID: 5503844

Distribution:

Hobart W. Anderson, President
Broken Hill Mining Company, Inc.
P.O. Box 356
Sidney, KY 41564
(Certified Mail)

Cheryl C. Blair-Kijewski, Esq.
Office of the Solicitor
U.S. Department of Labor
4015 Wilson Blvd., Suite 400
Arlington, VA 22203
(Certified Mail)

Administrative Law Judge T. Todd Hodgdon
Federal Mine Safety & Health Review Commission
5203 Leesburg Pike, Suite 1000
Falls Church, VA 22041

Appellate Case: 25-1349    Page: 519    Date Filed: 04/07/2025 Entry ID: 5503844

April 11, 2016

| | |
|---|---|
| UNITED MINE WORKERS OF AMERICA (UMWA) on behalf of MARK A. FRANKS, <br> Complainant, | DISCRIMINATION PROCEEDING <br><br> Docket No. PENN 2012-250-D <br> PITT-CD 2012-04 |
| v. | |
| EMERALD COAL RESOURCES, LP, <br> Respondent, | Emerald Mine No. 1 <br> Mine ID 36-05466 |
| UNITED MINE WORKERS OF AMERICA (UMWA) on behalf of RONALD HOY, <br> Complainant, | DISCRIMINATION PROCEEDING <br><br> Docket No. PENN 2012-251-D <br> PITT-CD 2012-05 |
| v. | |
| EMERALD COAL RESOURCES, LP, <br> Respondent. | Emerald Mine No. 1 <br> Mine ID 36-05466 |
| SECRETARY OF LABOR <br> MINE SAFETY AND HEALTH <br> ADMINISTRATION, (MSHA), <br> Petitioner | CIVIL PENALTY PROCEEDINGS <br><br> Docket No. PENN 2013-305 <br> Mine ID: 36-05466 |
| v. | Docket No. PENN 2013-306 <br> Mine ID: 36-05466 |
| EMERALD COAL RESOURCES, LP, <br> Respondent. | Emerald Mine No. 1 |

## DECISION ON REMAND

Before:    Judge Miller

These cases are before me on complaints of discrimination brought by the United Mine Workers of America (UMWA) on behalf of Mark A. Franks ("Franks") and Ronald Hoy ("Hoy") against Emerald Coal Resources, LP ("Emerald"), pursuant to Section 105(c) of the Federal Mine Safety and Health Act of 1977, as amended, 30 U.S.C. § 815(c), and on petitions for assessment of civil penalty filed by the Secretary of Labor, Mine Safety and Health Administration (MSHA), against Emerald pursuant to Sections 105 and 110 of the Act, 30 U.S.C. §§ 815 and 820. Following an evidentiary hearing in this case, I issued a decision on the merits of the discrimination cases. *UMWA on behalf of Franks v. Emerald Coal Res., LP,* 35 FMSHRC 1696 (June 2013) (ALJ). The Secretary subsequently filed petitions for assessment of civil penalties. The parties filed joint stipulations addressing the penalty criteria, and I assessed a total penalty of $40,000 against the mine operator. Unpublished Order dated Oct. 29, 2014.

Appellate Case: 25-1349    Page: 520    Date Filed: 04/07/2025 Entry ID: 5503844

Emerald petitioned the Federal Mine Safety and Health Review Commission for review of both the decision after hearing and the order assessing penalty. The Commission granted review as to the decision after hearing only, affirming the result. *UMWA on behalf of Franks v. Emerald Coal Res., LP*, 36 FMSHRC 2088 (Aug. 2014). Emerald then appealed the Commission's decision and the order assessing penalty to the United States Court of Appeals for the Third Circuit. The Third Circuit consolidated the cases, vacated the Commission's decision, and remanded to the Commission for further analysis. *Emerald Coal Res., LP v. Hoy*, 620 Fed. Appx. 127 (3d Cir. 2015). The Commission in turn remanded the cases to me. *UMWA on behalf of Franks v. Emerald Coal Res., LP*, 38 FMSHRC __, slip op. at 3, No. PENN 2012-250-D (Feb. 10, 2016). In accordance with the Commission's order, I enter the decision below.

## I. INITIAL DECISION AND REMAND

In the initial decision, I determined that Franks and Hoy had proven a *prima facie* case of discrimination and that the defense set forth by the mine operator was pretextual. 35 FMSHRC at 1697. My finding of discrimination was made under the *Pasula-Robinette* framework for analysis of discrimination claims under section 105(c). *Id*. at 1702-05. On review, the Commission affirmed my decision, but was split as to the rationale. Commissioners Young and Cohen voted to affirm the decision on the grounds that Emerald had *discriminated* against Franks and Hoy in violation of section 105(c) of the Mine Act. 36 FMSHRC at 2103. Chairman Jordan and Commissioner Nakamura voted to affirm the decision after concluding that Emerald had *interfered* with the protected rights of the miners in violation of section 105(c). *Id*. at 2119. On appeal, the Third Circuit held that the Commission had failed to articulate a rationale for its decision, and so vacated and remanded the decision. 620 Fed. Appx. at 129. The Commission then remanded the cases to me "to conduct the interference analysis in the first instance."[1] 38 FMSHRC __, slip op. at 3. Franks and Hoy, the Secretary, and Emerald were given the opportunity to submit briefs on the issue of interference, and I considered their arguments. For the reasons set forth below, I conclude that both Franks and Hoy have demonstrated a *prima facie* case of interference and that the defense set forth by the mine operator does not outweigh the harm to the rights of miners.

## II. FACTUAL BACKGROUND

This case involves the Emerald Mine No. 1, an underground coal mine in Green County, Pennsylvania. At the time relevant to this case, July through November 2011, the mine was operated by Emerald Coal Resources, and Mark Franks and Ronald Hoy were employed as beltmen at the mine. Jt. Stips. ¶¶ 1, 3-7.

Franks and Hoy both credibly testified at hearing that they complained of unsafe practices at the mine to a representative of the UMWA safety committee, David Moore, on two

---

[1] While the Commissioners did not agree to the basis of the adverse action, four agreed that the mine had violated the Act with regard to Franks and Hoy. My original decision discussed a finding of discrimination, but since the case has been remanded, I now decide the case under the interference provision. *See* 36 FMSHRC at 2104 (Jordan & Nakamura, Comm'rs); *id*. at 2125 (Althen, Comm'r).

Appellate Case: 25-1349    Page: 521    Date Filed: 04/07/2025 Entry ID: 5503844

occasions in August 2011. Tr. at 24-25, 36-37, 53, 55-56. The complaints related to inadequate pre-shift examinations by one or more firebosses. Tr. at 24-25, 47, 53, 55-56. Hoy and Franks testified that the conversations took place on August 17 and August 29, 2011. Tr. at 24, 25, 53, 55. David Baer, a UMWA member, testified that he overheard Franks and Hoy making the complaints on both days in August. Tr. at 64-65. Hoy's complaint related to a specific instance on July 15, 2011, in which a fireboss failed to walk the length of the beltline during his examination. Tr. at 35; Comp. Ex. 1. Franks's complaint related to a similar issue with an examination conducted on July 27, 2011. Tr. at 47, 61. Franks and Hoy both testified that they told Moore the name of the fireboss and the dates of the examinations when they made their complaints. Tr. at 18-20, 47. Both believed that once they provided the information to Moore, he would investigate the matter and then bring the issue to the attention of the company if necessary. Tr. at 19, 39, 43, 52.

At hearing, Moore agreed that Hoy complained to him about a specific instance of an inadequate belt examination by a fireboss. Tr. at 123. Moore believed the conversation occurred in July rather than August, however, and denied that a second conversation took place in August or that Franks and Baer were present. Tr. at 122-25. On the date when Hoy recalled the conversation happening, August 17, Moore testified that he was at the MSHA academy for safety training. Tr. at 122. He denied that Franks ever brought a complaint to him relating to firebosses. Tr. at 121-23. Regarding Hoy's specific complaint, Moore testified that he had been off the beltline when the fireboss went through on the day Hoy referred to, but that he checked the date board, which indicated that the exam had been performed. Tr. at 123-24. Moore testified that he did not see any evidence that the firebosses were not doing their runs, but he spoke to the firebosses about the issue anyway. Tr. at 124.

The testimony of the witnesses is inconsistent with regard to the complaints made to Moore. I do not find Moore to be a credible witness, and therefore I resolve the conflict in favor of Franks and Hoy. Moore's answers were opaque and evasive. He insisted that he only spoke to Hoy once, yet Franks, Hoy, and Baer remember Franks and Hoy speaking to Moore about the examination issue twice. The fact that Hoy may have remembered or written down the incorrect day in August does not change my assessment. Franks, Hoy, and Baer all agree that Franks and Hoy spoke to Moore twice in August. Both times, the miners expected that the information they provided to Moore would be investigated and passed on to the appropriate safety committee or to management. Both Franks and Hoy believed they were following UMWA rules by providing information to Moore as their safety representative, thereby remaining anonymous and protecting themselves from retaliation. Tr. at 43, 52.

On or about September 22, 2011, an anonymous 103(g) complaint was made to MSHA. Jt. Stips. ¶ 12. One of the allegations contained in the complaint was that firebosses had not been conducting adequate inspections of the beltline at the mine. Jt. Ex. 1. In response to the complaint, an MSHA inspector conducted a hazard complaint investigation of the mine. Jt. Stips. ¶ 13; Jt. Ex. 1. During the investigation into the hazard complaint, the MSHA inspector spoke to and took statements from approximately 34 miners and supervisory personnel, including Franks and Hoy. Jt. Stips. ¶¶ 13-15, 29-33, 38.

Appellate Case: 25-1349    Page: 522    Date Filed: 04/07/2025 Entry ID: 5503844

On September 28, 2011, MSHA inspector Thomas Bochna arrived at the mine as part of the investigation. Jt. Stips. ¶ 13. Bochna approached Franks and questioned him about whether he had observed a fireboss fail to perform a proper pre-shift examination of the belt. Jt. Stips. ¶ 14. Franks responded that he knew of the incident, as well as the name of the fireboss and the date of the inspection. *Id*.

On the same shift, Franks was called into an office with Bochna; a supervisory MSHA inspector, David Severini; Emerald's compliance manager, William Schifko; an Emerald management trainee, Adam Strimer; the UMWA local president, Anthony Swetz; and the miners' representative, Bruce Plaski. Jt. Stips. ¶¶ 15, 16. Inspector Severini informed the group that Franks had spoken to Bochna that day and that he was aware of an incident where a fireboss failed to perform an adequate beltline examination. Jt. Stips. ¶¶ 19, 20. Franks was asked twice and refused to provide the name of the fireboss or the date of the inadequate examination. Jt. Stips. ¶ 22. Later that day, Franks was called into a follow-up meeting. Jt. Stips. ¶ 24. Inspector Severini again asked him to name the fireboss, and Franks again refused. *Id*.

On September 29, 2011, Franks met with inspector Bochna, Emerald compliance manager Schifko, and local president Swetz. Jt. Stips. ¶¶ 26, 27. Franks stated that he had written the name of the fireboss and the date of the inadequate exam in his personal calendar, but that he would not produce the document because it was not "worth it" for him to do so. Jt. Stips. ¶ 27.

On October 4, 2011, Hoy was called into Schifko's office for a meeting that included Schifko, MSHA inspectors Severini and Tony Setaro, Emerald management trainee Strimer, and UMWA mine committeeman Douglas Scott. Jt. Stips. ¶ 33. Severini informed Hoy that the mine could not retaliate against him for meeting with MSHA. *Id*. Hoy admitted that he had observed several occasions when an examiner had not properly examined the conveyor belts, but when asked, he refused to provide the name of the fireboss who had performed the exams. Jt. Stips. ¶ 34; Tr. at 33. Hoy also declined a request to name a foreman he had heard complaining about inadequate belt examinations. Jt. Stips. ¶ 35. He was asked to produce his personal calendar where he had recorded the names of the firebosses and the dates of the examinations, but he refused. Jt. Stips. ¶ 36.

MSHA concluded its investigation into the allegations in the anonymous complaint on October 4, 2011. Jt. Stips. ¶ 37; Jt. Ex. 2. MSHA issued seven citations to Emerald, but did not find evidence of inadequate examinations of the beltline. Jt. Stips. ¶ 38; Jt. Ex. 2.

Following the MSHA investigation, Emerald began its own investigation into the allegations in the 103(g) complaint. Jt. Stips. ¶ 39. On October 20, 2011, Franks and Hoy were called separately into meetings with Emerald human resources manager Christine Hayhurst, UMWA committeeman Douglas Scott, Schifko, and Swetz. Jt. Stips. ¶¶ 40, 42. Franks and Hoy again declined to provide the name of a fireboss or the dates of the examinations or to produce written records. Jt. Stips. ¶¶ 40-42. In a subsequent meeting with Schifko, Hayhurst, and Swetz on October 24, 2011, Franks again declined to name the fireboss or provide the date of the inspection. Jt. Stips. ¶ 43.

Appellate Case: 25-1349     Page: 523     Date Filed: 04/07/2025 Entry ID: 5503844

On November 9, 2011, Franks and Hoy were each summoned to yet another meeting with Emerald safety manager Joseph Pervola, Hayhurst, and UMWA mine committeeman David Baer. Jt. Stips. ¶¶ 45, 48. Both Franks and Hoy again declined to provide a name of a fireboss or the date of an inadequate inspection. Jt. Stips. ¶¶ 45, 48. They were subsequently suspended from work without pay for seven days. Jt. Stips. ¶¶ 46, 49. Letters provided to Franks and Hoy indicate that the reason for their suspensions was the "failure to provide information you have concerning serious allegations of safety violations." Jt. Stips. ¶¶ 46, 49.

Franks and Hoy claim that they refused to identify the fireboss at the meetings and during the investigation because they had already provided the information to the UMWA safety representative, David Moore. Tr. 18-22, 47, 49, 50, 52. Hoy informed the MSHA inspectors and Emerald management of his reason for refusing at the October 4th meeting. Tr. at 17-18. Franks and Hoy also believed that Section 103(g) of the Mine Act protected them from having to disclose the names of other miners involved in a safety complaint to management. Tr. 18-20, 38-39, 58. The record also indicates that the mine did know the names of the accused firebosses. Tr. at 22, 81, 95-96.

On November 10, 2011, Franks and Hoy filed separate discrimination complaints with MSHA. The miners stated that Emerald had "targeted" and "harassed" them for participating and cooperating in a 103(g) complaint investigation conducted by MSHA. Compl. of Discrim., Ex. A at 2, 4. MSHA investigated the allegations and determined that no violation of 105(c) had occurred. Compl. of Discrim., Ex. B at 1, 3.

On April 23, 2012, Complainants, through the UMWA, filed a joint complaint of discrimination with the Commission pursuant to 30 U.S.C § 105(c)(3). The complaint alleges and the miners testified that Emerald interfered with the miners' right to provide information to authorized representatives of MSHA during its investigation of a hazard complaint and discriminated against them for their exercise of that right. Franks and Hoy further allege that Emerald interfered with the miners' right to make an anonymous complaint about an alleged danger or safety or health violation to MSHA or to a miners' representative. The miners sought lost wages including regular, overtime, and holiday pay, and to have any reference to the suspensions removed from their personnel files. *Id*. at 10.

### III. ANALYSIS

Section 105(c)(1) of the Mine Act provides that

> No person shall discharge or in any manner discriminate against …
> or otherwise *interfere* with the exercise of the statutory rights of
> any miner … because such miner … has filed or made a complaint
> under or related to this chapter, including a complaint notifying the
> operator or the operator's agent, or the representative of the miners
> at the coal or other mine of an alleged danger or safety or health
> violation in a coal or other mine, … or because of the exercise by

Appellate Case: 25-1349    Page: 524    Date Filed: 04/07/2025 Entry ID: 5503844

such miner … on behalf of himself or others of any statutory right afforded by this chapter.

30 U.S.C. § 815(c)(1) (emphasis added). This section of the Act is the basis for most discrimination complaints filed by miners. In addition, a majority of the Commission has recognized that this section establishes a cause of action for interference that is separate and distinct from discrimination. *Franks*, 36 FMSHRC at 2103 n.22 (Young & Cohen, Comm'rs); *id*. at 2105-07 (Jordan & Nakamura, Comm'rs); *id*. at 2124 (Althen, Comm'r); *see also Sec'y of Labor on behalf of Gray v. N. Star Mining, Inc.*, 27 FMSHRC 1, 7-10 (Jan. 2005).

The Secretary of Labor has proposed a test for evaluating interference claims that was adopted by two Commissioners in this case. *Franks*, 36 FMSHRC at 2108 (Jordan & Nakamura, Comm'rs). Under the Secretary's test, a violation of the interference provision of Section 105(c)(1) occurs if

(1) A person's action can be reasonably viewed, from the perspective of members of the protected class and under the totality of the circumstances, as tending to interfere with the exercise of protected rights, and

(2) The person fails to justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights.

Sec'y Amicus Br. at 7. The Secretary's views "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *United States v. Mead Corp*., 533 U.S. 218, 227-28 (2001) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 139–140 (1944)).

The first prong of the Secretary's test is derived from cases interpreting Section 8(a)(1) of the NLRA. Sec'y Br. at 7. That section makes it unlawful for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in NLRA Section 7. 29 U.S.C. § 158(a)(1). Accordingly, courts analyzing claims under Section 8(a)(1) look to "whether the employer engaged in conduct, which, it may reasonably be said, tends to interfere with the free exercise of employee rights under the Act." *Brandeis Mach. & Supply Co. v. NLRB*, 412 F.3d 822, 830 (7th Cir. 2005) (quoting *NLRB v. Gen. Thermodynamics, Inc.*, 670 F.2d 719, 721 (7th Cir.1981)); *see also Flagstaff Med. Ctr., Inc. v. NLRB*, 715 F.3d 928, 930-31 (D.C. Cir. 2013); *Medeco Sec. Locks, Inc. v. NLRB*, 142 F.3d 733, 745 (4th Cir. 1998); *U.S. Steel Corp. v. NLRB*, 682 F.2d 98, 101 (3d Cir. 1982). The Secretary's proposed standard is consistent with the Commission's analysis in *Gray*. *See* 27 FMSHRC at 9 (evaluating "whether the employer engaged in conduct which, it may reasonably be said, tends to interfere with the free exercise of employee rights" (quoting *Am. Freightways Co*., 124 N.L.R.B. 146, 147 (1959))).

The second prong of the Secretary's test is also derived from NLRA precedent and examines the mine operator's justification for its action. Sec'y Amicus Br. at 10. In Section 8(a)(1) cases, a court will reject an employer's justification if the court finds that the justification

is pretextual. *See e.g. United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 916 (D.C. Cir. 2004); *Cannondale Corp.*, 310 N.L.R.B. 845, 849 (1993). Consistent with this, the Secretary's test asks whether the employer's justification is pretextual or "legitimate." Sec'y Amicus Br. at 10. If the justification is legitimate, a court hearing a Section 8(a)(1) case is then directed to "strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, (1967); *see also Medeco*, 142 F.3d at 745; *Jeannette Corp. v. NLRB*, 532 F.2d 916, 918 (3d Cir. 1976). Accordingly, the final component of the Secretary's test is a balancing inquiry that assesses whether the mine operator's justification is "substantial" enough to outweigh the harm to the protected rights of miners. Sec'y Amicus Br. at 10-11.

Respondent objects to the use of the Secretary's test, arguing that Section 105(c) should be read as establishing an "anti-retaliation remedy." Resp. Br. at 6. In Respondent's view, to succeed on a claim under Section 105(c)(1), a claimant should be required to demonstrate that he engaged in protected activity and that the operator acted in response with a discriminatory motive.[2] Respondent's argument is based primarily on the text of Section 105(c)(1), which states that it is unlawful for a person to "discharge or in any manner discriminate against … or otherwise interfere with the exercise of the statutory rights of any miner … *because* such miner" has engaged in protected activity under the Act. 30 U.S.C. § 815(c) (emphasis added). Respondent argues that the word "because" indicates that Congress intended to reach only cases where there is a causal connection between the miner's protected activity and the operator's discrimination or interference. Resp. Br. at 5. Respondent argues that the language in the Act, therefore, permits a claim for interference only where a miner engaged in a protected activity and there was an intent on the part of the mine operator to interfere with that activity. Resp. Br. at 12.

A number of factors, however, weigh against the Respondent's reading. First, the interference language of Section 105(c)(1) ("interfere with the exercise of the statutory rights of any miner") is substantially similar to the language in Section 8(a)(1) of the NLRA ("interfere with, restrain, or coerce employees in the exercise of the rights guaranteed" in Section 7). 30 U.S.C. § 815(c); 29 U.S.C. § 158(a)(1). The Secretary persuasively argues that in drafting the interference language of Section 105(c)(1), Congress would have been aware of Section 8(a)(1), a well-known provision of labor law. Sec'y Amicus Br. at 5. Thus, it is likely that in including the term "interfere" in Section 105(c)(1), Congress intended to employ a term of art from federal labor law. Sec'y Amicus Br. at 5. Interference under the NLRA is a separate concept from retaliation and does not require a showing that the employee actually engaged in protected activity. *Medeco*, 142 F.3d at 745; *Jeannette Corp. v. NLRB*, 532 F.2d 916, 918 (3d Cir. 1976) (holding work rule invalid under Section 8(a)(1) because of its "tendency to inhibit" protected activity without deciding whether protected activity in fact occurred). Further, it is well established under NLRA case law, and was at the time of the drafting of the Mine Act, that unlawful motive is not a necessary element of an interference claim. *See NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 22-23 (1964); *Am. Freightways Co.*, 124 N.L.R.B. 146, 147 (1959). Congress likely intended to incorporate a similar type of claim into the Mine Act when it chose

---

[2] In the original decision, I found that Franks and Hoy did engage in a protected activity when they complained about safety and that it was directly related to a retaliatory action. That finding does not change here, but for purposes of discussing the application of the interference provision, I find that it is not necessary that the miners engage in a protected activity.

Appellate Case: 25-1349     Page: 526     Date Filed: 04/07/2025 Entry ID: 5503844

to use the term "interfere." *See Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

Additionally, the legislative history of the Act indicates that Congress's intent with regard to Section 105(c)(1) was to "protect miners against not only the common forms of discrimination, such as discharge, suspension, demotion, reduction in benefits, vacation, bonuses and rates of pay, or changes in pay and hours of work as a result of engaging in protected activity, but also against the more subtle forms of interference, such as promises of benefit or threats of reprisal." S. Rep. No. 95-181, at 36 (1977). The Secretary notes that while the "common forms of discrimination" mentioned are all actions an employer might take in response to a protected activity by an employee, the "more subtle forms of interference," promises of benefit and threats of reprisal, are instead actions that would be taken to influence future activity. Sec'y Amicus Br. at 13. While in both cases the concern is that miners will be discouraged from future protected activity, with promises of benefit or threats of reprisal, the effect is the same whether or not the employer took the action in response to past protected activity. Congress's discussion of both types of activity together suggests that it intended to create more than just a basic anti-retaliation remedy. Protected activity is one of the important elements of a discrimination claim, but it loses its importance in substantiating a claim of interference based upon a threat or promise that may affect future action. Still, the analysis must include the existence of a protected right that was subject of interference.

The Secretary's approach is also consistent with Commission precedent. In *Moses*, the Commission affirmed a finding of interference with a miner's exercise of protected rights under 105(c)(1) where the operator believed that the miner had made a safety complaint, but he had not in fact done so. 4 FMSHRC at 1475, 1479-80. In reaching its decision, the Commission acknowledged that a "literal interpretation of [105(c)(1)] might require the actual or attempted exercise of a right before the protection of section 105 comes into play," but it ultimately rejected that reading. *Id*. at 1480. The Commission noted that Congress intended for Section 105(c)(1) to be "construed expansively to assure that miners will not be inhibited *in any way* in exercising any rights" afforded by the Act. *Id*. at 1480 (quoting S. Rep. 95-181, at 36 (1977)). The Commission also emphasized that 105(c)(1) should be interpreted to "redress or deter situations where an operator, with the intent of frustrating protected activity, takes action against an innocent miner." *Id*. Both the Commission's statement and the statement of the Senate committee point to the fact that Section 105(c)(1) prohibits not just retaliatory conduct, but also conduct that frustrates future protected activity. Finally, in *Gray*, the Commission suggested that intent was not a necessary element of an interference case, determining that the judge erred by focusing primarily on the intent behind statements made by a supervisor to a miner who testified against him in a grand jury investigation. 27 FMSHRC at 10. Instead, the judge should have considered the totality of the circumstances, including what meaning the miner could reasonably have inferred from the supervisor's statements. *Id*. at 10-11.

I find that the Secretary's proposed test for interference is consistent with the text of the Mine Act and with Commission and other relevant precedent. Accordingly, I apply it here.

*a. Interference with a Protected Right*

An essential right of miners under the Mine Act is the "right to obtain an immediate inspection by giving notice to the Secretary" if the miner believes that a violation of a health or safety standard exists at the mine. 30 U.S.C. § 813(g)(1). The provision reflects Congress's belief that "mine safety and health will generally improve to the extent that miners themselves are aware of mining hazards and play an integral part in the enforcement of the mine safety and health standards." S. Rep. 95-181, at 30 (1977). The same is true of a miner's right to make safety and health complaints, not only to mine management, but to a miners' representative. 30 U.S.C. § 815(c)(1).

Franks and Hoy assert that, in interrogating and suspending them in relation to the MSHA investigation, Emerald interfered with their rights to make a complaint under Section 103(g) and to make a complaint to a miners' representative. Compl. of Discrim. at 8-9. The Commission has decided that "Whether an operator's question or comments concerning a miner's exercise of a protected right constitute coercive interrogation or harassment proscribed by the Mine Act 'must be determined by what is said and done, and by the circumstances surrounding the words and actions.'" *Gray*, 27 FMSHRC at 8 (quoting *Moses*, 4 FMSHRC at 1479). In *Gray*, which involved potentially threatening statements made by a supervisor to a miner, factors that the Commission considered relevant to the interference analysis were the persistence with which the supervisor raised the subject of the protected activity; the accusatory manner with which the subject was raised; where the statements were made; the nature of the relationship between the supervisor and the complainant; the fact that the statements related to confidential grand jury testimony; and the fact that the supervisor attempted to speak to the complainant alone. *Id.* at 11-12. The Commission examined similar facts in *Moses*, which involved repeated, accusatory questioning of a miner about the reporting of an accident. 4 FMSHRC at 1479. The Commission emphasized that the essence of its inquiry was whether the operator's conduct "could logically result in a fear of reprisal and a reluctance to exercise the right in the future." *Id.* Finally, the Seventh Circuit has performed a similar analysis in determining whether an interrogation interfered with protected rights under the NLRA:

> Factors that ought to be considered in deciding whether a particular inquiry is coercive include the tone, duration, and purpose of the questioning, whether it is repeated, how many workers are involved, the setting, the authority of the person asking the question, and whether the company otherwise had shown hostility to the union. We also consider whether questions about protected activity are accompanied by assurances against reprisal and whether the interrogated worker feels constrained to lie or give noncommittal answers rather than answering truthfully.

*Multi-Ad Servs., Inc. v. NLRB*, 255 F.3d 363, 372 (7th Cir. 2001) (citation omitted).

Like *Moses* and *Gray*, this case involves repeated questioning of miners regarding a safety-related enforcement action. In the course of MSHA's investigation into the complaint made at Mine No. 1, MSHA inspectors learned that Franks and Hoy had made a complaint about safety to their safety representative and knew the identity of a fireboss who had failed to conduct

Appellate Case: 25-1349     Page: 528     Date Filed: 04/07/2025 Entry ID: 5503844

a proper inspection at the mine. As part of the investigation, Franks was called into three separate meetings with MSHA personnel, Emerald management, and union representatives, where he was asked four times to identify the fireboss. Jt. Stips. ¶¶ 15, 16, 22, 24, 26.[3] After MSHA concluded its investigation and Emerald began its own investigation into the allegations in the complaint, Franks was called into three more meetings with Emerald management and union representatives. Jt. Stips. ¶¶ 39, 40, 43, 45. Each time he was asked to identify the fireboss. Jt. Stips. ¶¶ 40, 41, 43, 45. At the last meeting, Franks was suspended for refusing to provide the information. Jt. Stips. ¶ 46. Hoy's experience was similar to Franks's. He was called into one meeting as part of the MSHA investigation, where he was asked to identify a fireboss but refused. Jt. Stips. ¶¶ 29-34, 36. When Emerald began its own investigation, Hoy was called to two more meetings, where he was again asked to name the fireboss. Jt. Stips. ¶¶ 42, 48. At the final meeting, he was suspended for failing to provide the requested information. Jt. Stips. ¶ 49. Clearly the mine was persistent in accusing both miners of wrongdoing based upon safety complaints. Further, the accusations were made in management offices, with a number of mine management and representatives present and questioning them.

I find that these circumstances were intimidating and coercive from the perspective of a reasonable miner. Franks's and Hoy's behavior throughout the complaint process and subsequent investigations demonstrates the importance to them of confidentiality when making a complaint. Both testified that they chose to bring their complaints to Moore, the safety committeeman, because of their concern for confidentiality. Tr. at 43, 48, 52. Franks explained that he believed that by making the complaint to Moore he would be protected from retaliation by the company and would avoid getting "flack from the other workers." Tr. at 48, 52. Hoy testified that after the meeting during the MSHA investigation, another miner told him he "had a big target on [his] back for talking to the inspectors." Tr. at 33. Both Franks and Hoy clearly believed that they would be put in a precarious position with other miners if it were known that they had reported another miner for safety violations. The meetings with MSHA and Emerald made clear, however, that the miners' right to raise safety concerns directly with their miners' representative would not be respected. Franks and Hoy both indicated at the first meeting with MSHA that they did not wish to disclose the name of the fireboss to MSHA and management, but that they had already provided it to Moore. Tr. at 18, 19. Nevertheless, both were called in for multiple meetings and repeatedly asked to provide the information. A reasonable miner would have understood this as pressure from the company to disclose the information. The presence of multiple management officials at these meetings undoubtedly increased the pressure. *See* Jt. Stips. ¶¶ 40-43, 45, 46. Finally, the suspensions that Franks and Hoy received were a clear signal that they were not free to make complaints in the manner they wished. Franks and Hoy could reasonably have interpreted this coercive questioning and ultimate suspension to be the result of having made a safety complaint. They reasonably would have believed that in the future they would be subjected to scrutiny if they made safety complaints to their representative or if any of their concerns appeared in a complaint to MSHA, and so would be dissuaded from making future complaints that could lead to MSHA investigations. *See Moses*, 4 FMSHRC at 1479 (finding that interference occurred where conduct "chill[ed] the exercise of protected rights"). I thus find that

_____

[3] There is some question of the propriety of MSHA's actions in informing the mine that Franks and Hoy were involved in the 103(g) allegations made in this case, thereby removing their right to at least some confidentiality.

Appellate Case: 25-1349     Page: 529     Date Filed: 04/07/2025 Entry ID: 5503844

the actions of Emerald in this instance interfered with the right of Franks and Hoy to make safety complaints to their union representative or to MSHA under Section 103(g).

### b. *Emerald's Legitimate and Substantial Reason*

Under the Secretary's test for interference, once a finding of interference with protected rights is made, the operator has an opportunity to "justify the action with a legitimate and substantial reason whose importance outweighs the harm caused to the exercise of protected rights." Sec'y Amicus Br. at 7. It is then the court's duty to "strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the Act and its policy." *NLRB v. Fleetwood Trailer Co*., 389 U.S. 375, 378 (1967).

Emerald asserts as the justification for its actions that it had a responsibility "to provide a safe workplace, a responsibility that necessarily involves investigation of safety issues." Resp. Br. at 11, 17. Indeed, the Mine Act states that "the operators of … mines with the assistance of the miners have the primary responsibility to prevent the existence of [unsafe and unhealthful] conditions and practices" in the mines. 30 U.S.C. § 801(e). The Commission has recognized that "[i]n order to carry out this responsibility, mine operators need to know about unsafe conditions." *Swift v. Consol. Coal Co*., 16 FMSHRC 201, 205 (Feb. 1994). Schifko, Emerald's compliance manager, testified that examinations of conveyor belts are vital to mine safety, and that after MSHA finished its investigation, Emerald felt the need to investigate further to see if there was any merit to the complaints about inadequate inspections. Tr. at 75-76.

I find that Emerald's need to investigate the 103(g) complaint was a legitimate and substantial justification for seeking to learn the identity of the firebosses from Franks and Hoy. I do not find, however, that it outweighed the harm caused to the protected rights of miners. First, while Emerald had a legitimate need to learn the identity of the firebosses, the record shows that the company could have, and in fact did, obtain the information from sources other than Franks and Hoy. Specifically, Franks and Hoy had both provided the name of a fireboss to safety committeeman Moore, and Hoy and possibly Franks informed Emerald of this fact during the MSHA investigation. Tr. at 18, 19, 47. Emerald did interview Moore as part of its investigation, and he stated that he did not know of any problems with belt inspections. Tr. at 80. At that point, though, Emerald could have inquired more deeply into the complaints Moore had received and in order to find out the dates and times of the alleged bad inspections. It is in fact clear from the record that the mine did learn the names of the firebosses mentioned in the complaints of Franks and Hoy. Yet Emerald focused on extracting the identity of the fireboss from Franks and Hoy, even though both had indicated they were unwilling to disclose the information.

Additionally, I find that the impact of Emerald's conduct on the exercise of protected rights at the mine was significant. Franks and Hoy were subject to multiple interrogations in front of a crowd of managers and officials and were ultimately suspended. They were repeatedly asked to provide information related to safety complaints they anonymously made at the mine. These events reasonably could have dissuaded Franks and Hoy from reporting safety violations in the future. Further, other miners at the mine were aware of the treatment of Franks and Hoy during the investigations. *See e.g.* Tr. at 33, 48. It is likely that these other miners could also be dissuaded from reporting safety violations in the future out of a fear of similar repercussions. An

Appellate Case: 25-1349    Page: 530    Date Filed: 04/07/2025 Entry ID: 5503844

atmosphere where miners are afraid to make safety complaints is directly contrary to Congress's vision of miners actively participating in mine safety enforcement, and can have negative consequences on safety at the mine. Because these effects are directly opposed to the policy of the Mine Act, I find that Emerald's justification for its actions does not outweigh the harm to miners' rights "in light of the Act and its policy." *Fleetwood Trailer*, 389 U.S. at 378. Therefore, I find that Emerald's actions violated Section 105(c)(1).

## IV. PENALTY

After I issued my initial decision in this case, the Secretary proposed two penalties of $20,000.00 for the violations in this case. The Secretary based these penalties on my findings of discrimination in the proceeding above. 36 FMSHRC at 2100. I find that the Secretary's proposed penalties are also appropriate for interference violations.

The principles governing the authority of Commission administrative law judges to assess civil penalties de novo for violations of the Mine Act are well established. Section 110(i) of the Mine Act delegates to the Commission and its judges "authority to assess all civil penalties provided in [the] Act." 30 U.S.C. § 820(i). The duty of proposing penalties is delegated to the Secretary. 30 U.S.C. §§ 815(a), 820(a). Thus, when an operator notifies the Secretary that it intends to challenge a penalty, the Secretary petitions the Commission to assess the penalty. 29 C.F.R. § 2700.28. The Act requires that in assessing civil monetary penalties, the ALJ must consider six statutory penalty criteria: the operator's history of violations; its size; whether the operator was negligent; the effect on the operator's ability to continue in business; the gravity of the violation; and whether the violation was abated in good faith. 30 U.S.C. § 820(i). In keeping with this statutory requirement, the Commission has held that judges must make findings of fact on the statutory penalty criteria. *Sellersburg Stone Co.*, 5 FMSHRC 287, 292 (Mar. 1983), *aff'd*, 736 F.2d 1147, 1152 (7th Cir. 1984). Once these findings have been made, a judge's penalty assessment for a particular violation is an exercise of discretion "bounded by proper consideration of the statutory criteria and the deterrent purposes underlying the Act's penalty scheme." *Id*. at 294; *see also Cantera Green*, 22 FMSHRC 616, 620 (May 2000).

The history of assessed violations was admitted into evidence. The mine has a history of two previous 105(c) violations. Emerald is a large operator and Mine No. 1 is a large mine. Respondent admits that the penalties will not affect its ability to continue in business. Ans. to Pet. for Assessment at ¶ 6. I find that a good faith reduction is not appropriate for these violations. The gravity of the violations is serious in that Respondent compromised the willingness of miners to participate in mine safety enforcement at the mine. Respondent's negligence was significant given the persistence of its conduct in the face of the obvious unwillingness of Franks and Hoy to name the fireboss. Accordingly, I find that the Secretary's proposed penalties are appropriate.

Appellate Case: 25-1349     Page: 531     Date Filed: 04/07/2025 Entry ID: 5503844

# V.  ORDER

Emerald Coal Resources is **ORDERED** to pay back pay to Mark Franks in the amount of $1,168.68, and to Ronald Hoy in the amount of $1,963.93, with interest at 8% from the date it was due.[4] Emerald is **ORDERED** to pay the sum of $40,000.00 to the Secretary of Labor. All payments shall be made within 40 days of the date of this order. Emerald shall, within 40 days of the date of this order, post this decision along with a visible notice on a bulletin board that is accessible to each and every employee, explaining that the company has been found to have interfered with the exercise of protected rights by employees, that such interference will be remedied, and that it will not occur in the future. The notice shall inform all employees of their rights in the event that they believe they have been discriminated against and shall remain posted for 180 days. All reference to the reprimand received by Franks and Hoy, and the reasons therefore, shall, within 40 days of the date of this order, be removed from their respective personnel files or other employment records. Such reprimand shall not be used or considered as a basis for any future action against Franks or Hoy.


/s/ Margaret A. Miller
Margaret A. Miller
Administrative Law Judge



Distribution: (U.S. First Class Mail)

Laura Karr, United Mine Workers, 18354 Quantico Gateway Drive, Triangle, VA 22172

R. Henry Moore, Jackson Kelly PLLC, Three Gateway Center, Suite 1500, 401 Liberty Ave. Pittsburgh, PA 15222

Ronald Hoy, 13 Bonasso Drive, Fairmont, WV 26554

Mark Franks, 253 Braddock Avenue, Uniontown, PA 15401

Melanie Garris, Office of Civil Penalty Compliance, MSHA, U.S. Department of Labor, 201 12th Street South, Arlington, VA 22202

Jason Grover, Office of the Solicitor, U.S. Department of Labor, 201 12th Street South, Arlington, VA 22202

---

[4] The back pay calculation is based upon the calculations in Respondent's Exhibit 1, agreed to by the parties.

## HAINES *v.* KERNER ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SEVENTH CIRCUIT

No. 70–5025.  Argued December 6, 1971—Decided January 13, 1972

Prisoner's *pro se* complaint seeking to recover damages for claimed
physical injuries and deprivation of rights in imposing disciplinary
confinement should not have been dismissed without affording him
the opportunity to present evidence on his claims.

427 F. 2d 71, reversed and remanded.

*Stanley A. Bass,* by appointment of the Court, 401
U. S. 1008, argued the cause for petitioner.  With him
on the briefs were *Jack Greenberg, James M. Nabrit III,
William B. Turner, Alice Daniel,* and *Max Stern.*

*Warren K. Smoot,* Assistant Attorney General of Illi-
nois, argued the cause for respondents *pro hac vice.*
With him on the brief were *William J. Scott,* Attorney
General, *Joel M. Flaum,* First Assistant Attorney Gen-
eral, and *James B. Zagel, Morton E. Friedman,* and
*Jayne A. Carr,* Assistant Attorneys General.

Briefs of *amici curiae* were filed by *Charles H. Baron*
for Boston College Center for Corrections and the Law,
and by *Julian Tepper* and *Marshall J. Hartman* for
the National Law Office of the National Legal Aid and
Defender Assn.

PER CURIAM.

Petitioner, an inmate at the Illinois State Penitentiary,
Menard, Illinois, commenced this action against the Gov-
ernor of Illinois and other state officers and prison officials
under the Civil Rights Act of 1871, 17 Stat. 13, 42 U. S. C.
§ 1983, and 28 U. S. C. § 1343 (3), seeking to recover
damages for claimed injuries and deprivation of rights
while incarcerated under a judgment not challenged here.

Petitioner's *pro se* complaint was premised on alleged action of prison officials placing him in solitary confinement as a disciplinary measure after he had struck another inmate on the head with a shovel following a verbal altercation. The assault by petitioner on another inmate is not denied. Petitioner's *pro se* complaint included general allegations of physical injuries suffered while in disciplinary confinement and denial of due process in the steps leading to that confinement. The claimed physical suffering was aggravation of a preexisting foot injury and a circulatory ailment caused by forcing him to sleep on the floor of his cell with only blankets.

The District Court granted respondents' motion under Rule 12 (b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state a claim upon which relief could be granted, suggesting that only under exceptional circumstances should courts inquire into the internal operations of state penitentiaries and concluding that petitioner had failed to show a deprivation of federally protected rights. The Court of Appeals affirmed, emphasizing that prison officials are vested with "wide discretion" in disciplinary matters. We granted certiorari and appointed counsel to represent petitioner. The only issue now before us is petitioner's contention that the District Court erred in dismissing his *pro se* complaint without allowing him to present evidence on his claims.

Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears

"beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957). See *Dioguardi* v. *Durning,* 139 F. 2d 774 (CA2 1944).

Accordingly, although we intimate no view whatever on the merits of petitioner's allegations, we conclude that he is entitled to an opportunity to offer proof. The judgment is reversed and the case is remanded for further proceedings consistent herewith.

*Reversed and remanded.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

# ESTELLE, CORRECTIONS DIRECTOR, ET AL. *v.* GAMBLE

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 75–929.  Argued October 5, 1976—Decided November 30, 1976

Respondent state inmate brought this civil rights action under 42 U. S. C. § 1983 against petitioners, the state corrections department medical director (Gray) and two correctional officials, claiming that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment for inadequate treatment of a back injury assertedly sustained while he was engaged in prison work.  The District Court dismissed the complaint for failure to state a claim upon which relief could be granted.  The Court of Appeals held that the alleged insufficiency of the medical treatment required reinstatement of the complaint.  *Held:* Deliberate indifference by prison personnel to a prisoner's serious illness or injury constitutes cruel and unusual punishment contravening the Eighth Amendment.  Here, however, respondent's claims against Gray do not suggest such indifference, the allegations revealing that Gray and other medical personnel saw respondent on 17 occasions during a 3-month span and treated his injury and other problems.  The failure to perform an X-ray or to use additional diagnostic techniques does not constitute cruel and unusual punishment but is at most medical malpractice cognizable in the state courts.  The question whether respondent has stated a constitutional claim against the other petitioners, the Director of the Department of Corrections and the warden of the prison, was not separately evaluated by the Court of Appeals and should be considered on remand.  Pp. 101–108.

516 F. 2d 937, reversed and remanded.

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, POWELL, and REHNQUIST, JJ., joined.  BLACKMUN, J., concurred in the judgment.  STEVENS, J., filed a dissenting opinion, *post,* p. 108.

*Bert W. Pluymen,* Assistant Attorney General of Texas, argued the cause for petitioners *pro hac vice.*  With him on

the brief were *John L. Hill*, Attorney General, *David M. Kendall*, First Assistant Attorney General, and *Joe B. Dibrell, Jr.*, Assistant Attorney General.

*Daniel K. Hedges*, by appointment of the Court, 425 U. S. 932, argued the cause and filed a brief for respondent *pro hac vice*.

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Respondent J. W. Gamble, an inmate of the Texas Department of Corrections, was injured on November 9, 1973, while performing a prison work assignment. On February 11, 1974, he instituted this civil rights action under 42 U. S. C. § 1983,[1] complaining of the treatment he received after the injury. Named as defendants were the petitioners, W. J. Estelle, Jr., Director of the Department of Corrections, H. H. Husbands, warden of the prison, and Dr. Ralph Gray, medical director of the Department and chief medical officer of the prison hospital. The District Court, *sua sponte*, dismissed the complaint for failure to state a claim upon which relief could be granted.[2] The Court of Appeals reversed and remanded with instructions to reinstate the complaint. 516 F. 2d 937 (CA5 1975). We granted certiorari, 424 U. S. 907 (1976).

---

[1] Title 42 U. S. C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

[2] It appears that the petitioner-defendants were not even aware of the suit until it reached the Court of Appeals. Tr. of Oral Arg. 7, 13–15. This probably resulted because the District Court dismissed the complaint simultaneously with granting leave to file it *in forma pauperis*.

I

Because the complaint was dismissed for failure to state a claim, we must take as true its handwritten, *pro se* allegations. *Cooper* v. *Pate,* 378 U. S. 546 (1964). According to the complaint, Gamble was injured on November 9, 1973, when a bale of cotton [3] fell on him while he was unloading a truck. He continued to work but after four hours he became stiff and was granted a pass to the unit hospital. At the hospital a medical assistant, "Captain" Blunt, checked him for a hernia and sent him back to his cell. Within two hours the pain became so intense that Gamble returned to the hospital where he was given pain pills by an inmate nurse and then was examined by a doctor. The following day, Gamble saw a Dr. Astone who diagnosed the injury as a lower back strain, prescribed Zactirin (a pain reliever) and Robaxin (a muscle relaxant),[4] and placed respondent on "cell-pass, cell-feed" status for two days, allowing him to remain in his cell at all times except for showers. On November 12, Gamble again saw Dr. Astone who continued the medication and cell-pass, cell-feed for another seven days. He also ordered that respondent be moved from an upper to a lower bunk for one week, but the prison authorities did not comply with that directive. The following week, Gamble returned to Dr. Astone. The doctor continued the muscle relaxant but prescribed a new pain reliever, Febridyne, and placed respondent on cell-pass for seven days, permitting him to remain in his cell except for meals and showers. On November 26, respondent again saw Dr. Astone, who put respondent back on the original pain reliever for five days and continued the cell-pass for another week.

---

[3] His complaint states that the bale weighed "6.00 pound." The Court of Appeals interpreted this to mean 600 pounds. 516 F. 2d 937, 938 (CA5 1975).

[4] The names and descriptions of the drugs administered to respondent are taken from his complaint. App. A–5—A–11, and his brief, at 19–20.

On December 3, despite Gamble's statement that his back
hurt as much as it had the first day, Dr. Astone took him
off cell-pass, thereby certifying him to be capable of light work.
At the same time, Dr. Astone prescribed Febridyne for seven
days. Gamble then went to a Major Muddox and told him
that he was in too much pain to work. Muddox had re-
spondent moved to "administrative segregation." [5] On De-
cember 5, Gamble was taken before the prison disciplinary
committee, apparently because of his refusal to work. When
the committee heard his complaint of back pain and high
blood pressure, it directed that he be seen by another doctor.

On December 6, respondent saw petitioner Gray, who per-
formed a urinalysis, blood test, and blood pressure measure-
ment. Dr. Gray prescribed the drug Ser-Ap-Es for the high
blood pressure and more Febridyne for the back pain. The
following week respondent again saw Dr. Gray, who continued
the Ser-Ap-Es for an additional 30 days. The prescription
was not filled for four days, however, because the staff lost it.
Respondent went to the unit hospital twice more in De-
cember; both times he was seen by Captain Blunt, who
prescribed Tiognolos (described as a muscle relaxant). For
all of December, respondent remained in administrative
segregation.

In early January, Gamble was told on two occasions that
he would be sent to the "farm" if he did not return to work.
He refused, nonetheless, claiming to be in too much pain.
On January 7, 1974, he requested to go on sick call for his
back pain and migraine headaches. After an initial refusal,
he saw Captain Blunt who prescribed sodium salicylate (a

[5] There are a number of terms in the complaint whose meaning is
unclear and, with no answer from the State, must remain so. For exam-
ple, "administrative segregation" is never defined. The Court of Appeals
deemed it the equivalent of solitary confinement. 516 F. 2d, at 939. We
note, however, that Gamble stated he was in "administrative segregation"
when he was in the "32A–7 five building" and "32A20 five building," but
when he was in "solitary confinement," he was in "3102 five building."

Appellate Case: 25-1349      Page: 539      Date Filed: 04/07/2025 Entry ID: 5503849

pain reliever) for seven days and Ser-Ap-Es for 30 days. Respondent returned to Captain Blunt on January 17 and January 25, and received renewals of the pain reliever prescription both times. Throughout the month, respondent was kept in administrative segregation.

On January 31, Gamble was brought before the prison disciplinary committee for his refusal to work in early January. He told the committee that he could not work because of his severe back pain and his high blood pressure. Captain Blunt testified that Gamble was in "first class" medical condition. The committee, with no further medical examination or testimony, placed respondent in solitary confinement.

Four days later, on February 4, at 8 a. m., respondent asked to see a doctor for chest pains and "blank outs." It was not until 7:30 that night that a medical assistant examined him and ordered him hospitalized. The following day a Dr. Heaton performed an electrocardiogram; one day later respondent was placed on Quinidine for treatment of irregular cardiac rhythm and moved to administrative segregation. On February 7, respondent again experienced pain in his chest, left arm, and back and asked to see a doctor. The guards refused. He asked again the next day. The guards again refused. Finally, on February 9, he was allowed to see Dr. Heaton, who ordered the Quinidine continued for three more days. On February 11, he swore out his complaint.

## II

The gravamen of respondent's § 1983 complaint is that petitioners have subjected him to cruel and unusual punishment in violation of the Eighth Amendment, made applicable to the States by the Fourteenth.[6] See *Robinson* v. *Califor-*

---

[6] The Eighth Amendment provides:

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

At oral argument, counsel for respondent agreed that his only claim was based on the Eighth Amendment. Tr. of Oral Arg. 42–43.

*nia,* 370 U. S. 660 (1962). We therefore base our evaluation of respondent's complaint on those Amendments and our decisions interpreting them.

The history of the constitutional prohibition of "cruel and unusual punishments" has been recounted at length in prior opinions of the Court and need not be repeated here. See, *e. g., Gregg* v. *Georgia,* 428 U. S. 153, 169–173 (1976) (joint opinion of STEWART, POWELL, and STEVENS, JJ. (hereinafter joint opinion)); see also Granucci, Nor Cruel and Unusual Punishment Inflicted: The Original Meaning, 57 Calif. L. Rev. 839 (1969). It suffices to note that the primary concern of the drafters was to proscribe "torture[s]" and other "barbar[ous]" methods of punishment. *Id.,* at 842. Accordingly, this Court first applied the Eighth Amendment by comparing challenged methods of execution to concededly inhuman techniques of punishment. See *Wilkerson* v. *Utah,* 99 U. S. 130, 136 (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); *In re Kemmler,* 136 U. S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . .").

Our more recent cases, however, have held that the Amendment proscribes more than physically barbarous punishments. See, *e. g., Gregg* v. *Georgia, supra,* at 171 (joint opinion); *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958); *Weems* v. *United States,* 217 U. S. 349, 373 (1910). The Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ," *Jackson* v. *Bishop,* 404 F. 2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with "the evolving standards of decency that mark the progress of a maturing society," *Trop* v. *Dulles, supra,* at 101; see also *Gregg* v. *Georgia, supra,* at 172–173 (joint opinion); *Weems* v. *United States, supra,* at 378,

Appellate Case: 25-1349     Page: 541     Date Filed: 04/07/2025 Entry ID: 5503840

or which "involve the unnecessary and wanton infliction of pain," *Gregg* v. *Georgia, supra,* at 173 (joint opinion); see also *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 463 (1947); *Wilkerson* v. *Utah, supra,* at 136.[7]

These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," *In re Kemmler, supra,* the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. Cf. *Gregg* v. *Georgia, supra,* at 182–183 (joint opinion). The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation[8] codifying the common-

---

[7] The Amendment also proscribes punishments grossly disproportionate to the severity of the crime, *Gregg* v. *Georgia,* 428 U. S. 153, 173 (1976) (joint opinion); *Weems* v. *United States,* 217 U. S. 349, 367 (1910), and it imposes substantive limits on what can be made criminal and punished, *Robinson* v. *California,* 370 U. S. 660 (1962). Neither of these principles is involved here.

[8] See, *e. g.,* Ala. Code Tit. 45, § 125 (1958); Alaska Stat. § 33.30.050 (1975); Ariz. Rev. Stat. Ann. § 31–201.01 (Supp. 1975); Conn. Gen. Stat. Ann. § 18–7 (1975); Ga. Code Ann. § 77–309 (e) (1973); Idaho Code § 20–209 (Supp. 1976); Ill. Ann. Stat. c. 38, § 103–2 (1970); Ind. Ann. Stat. § 11–1–1.1–30.5 (1973); Kan. Stat. Ann. § 75–5429 (Supp. 1975); Md. Ann. Code Art. 27 § 698 (1976); Mass. Ann. Laws, c. 127, § 90A (1974); Mich. Stat. Ann. § 14.84 (1969); Miss. Code Ann. § 47–1–57 (1972); Mo. Ann. Stat. § 221.120 (1962); Neb. Rev. Stat. § 83–181 (1971); N. H. Rev. Stat. Ann. § 619.9 (1974); N. M. Stat. Ann. § 42–2–4 (1972); Tenn. Code Ann. §§ 41–318, 41–1115, 41–1226 (1975); Utah Code Ann. §§ 64–9–13, 64–9–19, 64–9–20, 64–9–53 (1968); Va. Code Ann. §§ 32–81, 32–82 (1973); W. Va. Code Ann. § 25–1–16 (Supp. 1976); Wyo. Stat. Ann. § 18–299 (1959).

Many States have also adopted regulations which specify, in varying

law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself." [9]

We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," *Gregg* v. *Georgia, supra,* at 173 (joint opinion), proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs [10] or by prison guards in intentionally denying or delaying access to medical

degrees of detail, the standards of medical care to be provided to prisoners. See Comment, The Rights of Prisoners to Medical Care and the Implications for Drug-Dependent Prisoners and Pretrial Detainees, 42 U. Chi. L. Rev. 705, 708–709 (1975).

Model correctional legislation and proposed minimum standards are all in accord. See American Law Institute, Model Penal Code §§ 303.4, 304.5 (1962); National Advisory Commission on Criminal Justice Standards and Goals, Standards on Rights of Offenders, Standard 2.6 (1973); National Council on Crime and Delinquency, Model Act for the Protection of Rights of Prisoners, § 1 (b) (1972); National Sheriffs' Association, Standards for Inmates' Legal Rights, Right No. 3 (1974); Fourth United Nations Congress on Prevention of Crime and Treatment of Offenders, Standard Minimum Rules for the Treatment of Prisoners, Rules 22–26 (1955). The foregoing may all be found in U. S. Dept. of Justice, Law Enforcement Assistance Administration, Compendium of Model Correctional Legislation and Standards (2d ed. 1975).

[9] *Spicer* v. *Williamson,* 191 N. C. 487, 490, 132 S. E. 291, 293 (1926).

[10] See, *e. g., Williams* v. *Vincent,* 508 F. 2d 541 (CA2 1974) (doctor's choosing the "easier and less efficacious treatment" of throwing away the prisoner's ear and stitching the stump may be attributable to "deliberate indifference . . . rather than an exercise of professional judgment"); *Thomas* v. *Pate,* 493 F. 2d 151, 158 (CA7), cert. denied *sub nom. Thomas* v. *Cannon,* 419 U. S. 879 (1974) (injection of penicillin with knowledge that prisoner was allergic, and refusal of doctor to treat allergic reaction); *Jones* v. *Lockhart,* 484 F. 2d 1192 (CA8 1973) (refusal of paramedic to provide treatment); *Martinez* v. *Mancusi,* 443 F. 2d 921 (CA2 1970), cert. denied, 401 U. S. 983 (1971) (prison physician refuses to administer the prescribed pain killer and renders leg surgery unsuccessful by requiring prisoner to stand despite contrary instructions of surgeon).

care [11] or intentionally interfering with the treatment once prescribed.[12] Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. An accident, although it may produce added anguish, is not on that basis alone to be characterized as wanton infliction of unnecessary pain. In *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459 (1947), for example, the Court concluded that it was not unconstitutional to force a prisoner to undergo a second effort to electrocute him after a mechanical malfunction had thwarted the first attempt. Writing for the plurality, Mr. Justice Reed reasoned that the second execution would not violate the Eighth Amendment because the first attempt was an "unforeseeable accident." *Id.,* at 464. Mr. Justice Frankfurter's concurrence, based solely on the Due Process Clause of the Fourteenth Amendment, concluded that since the first attempt had failed because of "an innocent misadventure," *id.,* at 470, the second would not be " 'repugnant to the conscience of mankind,' " *id.,* at 471, quoting *Palko* v. *Connecticut,* 302 U. S. 319, 323 (1937).[13]

Similarly, in the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be

---

[11] See, *e. g., Westlake* v. *Lucas,* 537 F. 2d 857 (CA6 1976); *Thomas* v. *Pate, supra,* at 158–159; *Fitzke* v. *Shappell,* 468 F. 2d 1072 (CA6 1972); *Hutchens* v. *Alabama,* 466 F. 2d 507 (CA5 1972); *Riley* v. *Rhay,* 407 F. 2d 496 (CA9 1969); *Edwards* v. *Duncan,* 355 F. 2d 993 (CA4 1966); *Hughes* v. *Noble,* 295 F. 2d 495 (CA5 1961).

[12] See, *e. g., Wilbron* v. *Hutto,* 509 F. 2d 621, 622 (CA8 1975); *Campbell* v. *Beto,* 460 F. 2d 765 (CA5 1972); *Martinez* v. *Mancusi, supra; Tolbert* v. *Eyman,* 434 F. 2d 625 (CA9 1970); *Edwards* v. *Duncan, supra.*

[13] He noted, however, that "a series of abortive attempts" or "a single, cruelly willful attempt" would present a different case. 329 U. S., at 471.

"repugnant to the conscience of mankind." Thus, a complaint
that a physician has been negligent in diagnosing or treating
a medical condition does not state a valid claim of medical
mistreatment under the Eighth Amendment. Medical mal-
practice does not become a constitutional violation merely
because the victim is a prisoner. In order to state a cog-
nizable claim, a prisoner must allege acts or omissions suffi-
ciently harmful to evidence deliberate indifference to serious
medical needs. It is only such indifference that can offend
"evolving standards of decency" in violation of the Eighth
Amendment.[14]

### III

Against this backdrop, we now consider whether respond-
ent's complaint states a cognizable § 1983 claim. The hand-
written *pro se* document is to be liberally construed. As the
Court unanimously held in *Haines* v. *Kerner*, 404 U. S. 519
(1972), a *pro se* complaint, "however inartfully pleaded,"
must be held to "less stringent standards than formal plead-
ings drafted by lawyers" and can only be dismissed for failure
to state a claim if it appears " 'beyond doubt that the plain-
tiff can prove no set of facts in support of his claim which
would entitle him to relief.' " *Id.*, at 520–521, quoting *Conley*
v. *Gibson*, 355 U. S. 41, 45–46 (1957).

---

[14] The Courts of Appeals are in essential agreement with this standard.
All agree that mere allegations of malpractice do not state a claim, and,
while their terminology regarding what is sufficient varies, their results
are not inconsistent with the standard of deliberate indifference. See
*Page* v. *Sharpe*, 487 F. 2d 567, 569 (CA1 1973); *Williams* v. *Vincent*,
*supra*, at 544 (uses the phrase "deliberate indifference"); *Gittlemacker* v.
*Prasse*, 428 F. 2d 1, 6 (CA3 1970); *Russell* v. *Sheffer*, 528 F. 2d 318 (CA4
1975); *Newman* v. *Alabama*, 503 F. 2d 1320, 1330 n. 14 (CA5 1974), cert.
denied, 421 U. S. 948 (1975) ("callous indifference"); *Westlake* v. *Lucas*,
*supra*, at 860 ("deliberate indifference"); *Thomas* v. *Pate*, *supra*, at 158;
*Wilbron* v. *Hutto*, *supra*, at 622 ("deliberate indifference"); *Tolbert* v.
*Eyman*, *supra*, at 626; *Dewell* v. *Lawson*, 489 F. 2d 877, 881–882 (CA10
1974).

Even applying these liberal standards, however, Gamble's claims against Dr. Gray, both in his capacity as treating physician and as medical director of the Corrections Department, are not cognizable under § 1983. Gamble was seen by medical personnel on 17 occasions spanning a three-month period: by Dr. Astone five times; by Dr. Gray twice; by Dr. Heaton three times; by an unidentified doctor and inmate nurse on the day of the injury; and by medical assistant Blunt six times. They treated his back injury, high blood pressure, and heart problems. Gamble has disclaimed any objection to the treatment provided for his high blood pressure and his heart problem; his complaint is "based solely on the lack of diagnosis and inadequate treatment of his back injury." Response to Pet. for Cert. 4; see also Brief for Respondent 19. The doctors diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. *Id.,* at 17, 19. The Court of Appeals agreed, stating: "Certainly an X-ray of [Gamble's] lower back might have been in order and other tests conducted that would have led to appropriate diagnosis and treatment for the daily pain and suffering he was experiencing." 516 F. 2d, at 941. But the question whether an X-ray—or additional diagnostic techniques or forms of treatment—is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court under the Texas Tort Claims Act.[15] The Court of Appeals was in error in holding that the alleged insufficiency of the

---

[15] Tex. Rev. Civ. Stat., Art. 6252–19, § 3 (Supp. 1976). Petitioners assured the Court at argument that this statute can be used by prisoners to assert malpractice claims. Tr. of Oral Arg. 6.

medical treatment required reversal and remand. That por-
tion of the judgment of the District Court should have been
affirmed.[16]

The Court of Appeals focused primarily on the alleged
actions of the doctors, and did not separately consider
whether the allegations against the Director of the Depart-
ment of Corrections, Estelle, and the warden of the prison,
Husbands, stated a cause of action. Although we reverse
the judgment as to the medical director, we remand the case
to the Court of Appeals to allow it an opportunity to consider,
in conformity with this opinion, whether a cause of action
has been stated against the other prison officials.

*It is so ordered.*

MR. JUSTICE BLACKMUN concurs in the judgment of the
Court.

MR. JUSTICE STEVENS, dissenting.

Most of what is said in the Court's opinion is entirely
consistent with the way the lower federal courts have been
processing claims that the medical treatment of prison in-
mates is so inadequate as to constitute the cruel and unusual
punishment prohibited by the Eighth Amendment. I have
no serious disagreement with the way this area of the law
has developed thus far, or with the probable impact of
this opinion. Nevertheless, there are three reasons why I
am unable to join it. First, insofar as the opinion orders
the dismissal of the complaint against the chief medical

---

[16] Contrary to MR. JUSTICE STEVENS' assertion in dissent, this case sig-
nals no retreat from *Haines* v. *Kerner*, 404 U. S. 519 (1972). In contrast
to the general allegations in *Haines*, Gamble's complaint provides a detailed
factual accounting of the treatment he received. By his exhaustive
description he renders speculation unnecessary. It is apparent from his
complaint that he received extensive medical care and that the doctors
were not indifferent to his needs.

officer of the prison, it is not faithful to the rule normally applied in construing the allegations in a pleading prepared by an uncounseled inmate. Second, it does not adequately explain why the Court granted certiorari in this case. Third, it describes the State's duty to provide adequate medical care to prisoners in ambiguous terms which incorrectly relate to the subjective motivation of persons accused of violating the Eighth Amendment rather than to the standard of care required by the Constitution.

I

The complaint represents a crude attempt to challenge the system of administering medical care in the prison where Gamble is confined. Fairly construed, the complaint alleges that he received a serious disabling back injury in November 1973, that the responsible prison authorities were indifferent to his medical needs, and that as a result of that indifference he has been mistreated and his condition has worsened.

The indifference is allegedly manifested, not merely by the failure or refusal to diagnose and treat his injury properly, but also by the conduct of the prison staff. Gamble was placed in solitary confinement for prolonged periods as punishment for refusing to perform assigned work which he was physically unable to perform.[1] The only medical evidence presented to the disciplinary committee was the statement of a medical assistant that he was in first-class condition, when in fact he was suffering not only from the back sprain but from high blood pressure. Prison guards refused

---

[1] In his complaint, Gamble alleged that he had been placed in administrative segregation and remained there through December and January. At the end of January he was placed in solitary confinement. In an affidavit filed in the Court of Appeals the following December, see n. 8, *infra,* Gamble alleged that with the exception of one day in which he was taken out of solitary to be brought before the disciplinary committee, he had remained in solitary up to the date of the affidavit.

to permit him to sleep in the bunk that a doctor had as-
signed. On at least one occasion a medical prescription was
not filled for four days because it was lost by staff personnel.
When he suffered chest pains and blackouts while in solitary,
he was forced to wait 12 hours to see a doctor because clear-
ance had to be obtained from the warden. His complaint
also draws into question the character of the attention he
received from the doctors and the inmate nurse in response
to his 17 attempts to obtain proper diagnosis and treatment
for his condition. However, apart from the medical director
who saw him twice, he has not sued any of the individuals
who saw him on these occasions. In short, he complains
that the system as a whole is inadequate.

On the basis of Gamble's handwritten complaint it is
impossible to assess the quality of the medical attention
he received. As the Court points out, even if what he al-
leges is true, the doctors may be guilty of nothing more
than negligence or malpractice. On the other hand, it is
surely not inconceivable that an overworked, undermanned
medical staff in a crowded prison [2] is following the ex-
pedient course of routinely prescribing nothing more than
pain killers when a thorough diagnosis would disclose an
obvious need for remedial treatment. [3] Three fine judges

_____

[2] According to a state legislative report quoted by the Court of Ap-
peals, the Texas Department of Corrections has had at various times one
to three doctors to care for 17,000 inmates with occasional part-time help.
516 F. 2d 937, 940–941, n. 1 (1975).

[3] This poorly drafted complaint attempts to describe conditions which
resemble those reported in other prison systems. For instance, a study
of the Pennsylvania prison system reported:

"When ill, the prisoner's point of contact with a prison's health care
program is the sick-call line. Access may be barred by a guard, who
refuses to give the convict a hospital pass out of whimsy or prejudice,
or in light of a history of undiagnosed complaints. At sick call the convict
commonly first sees a civilian paraprofessional or a nurse, who may treat
the case with a placebo without actual examination, history-taking or re-
corded diagnosis. Even seeing the doctor at some prisons produces no

sitting on the United States Court of Appeals for the Fifth Circuit [4] thought that enough had been alleged to require some inquiry into the actual facts. If this Court meant what it said in *Haines* v. *Kerner,* 404 U. S. 519, these judges were clearly right. [5]

---

more than aspirin for symptoms, such as dizziness and fainting, which have persisted for years." Health Law Project, University of Pennsylvania, Health Care and Conditions in Pennsylvania's State Prisons, in American Bar Association Commission on Correctional Facilities and Services, Medical and Health Care in Jails, Prisons, and Other Correctional Facilities: A Compilation of Standards and Materials 71, 81–82 (Aug. 1974).

A legislative report on California prisons found:

"By far, the area with the greatest problem at the hospital [at one major prison], and perhaps at all the hospitals, was that of the abusive doctor-patient relationship. Although the indifference of M. T. A.s [medical technical assistants] toward medical complaints by inmates is not unique at Folsom, and has been reported continuously elsewhere, the calloused and frequently hostile attitude exhibited by the doctors is uniquely reprehensible. . . .

"Typical complaints against [one doctor] were that he would . . . not adequately diagnose or treat a patient who was a disciplinary problem at the prison . . . ." Assembly Select Committee on Prison Reform and Rehabilitation, An Examination of California's Prison Hospitals, 60–61 (1972).

These statements by responsible observers demonstrate that it is far from fanciful to read a prisoner's complaint as alleging that only *pro forma* treatment was provided.

[4] The panel included Mr. Justice Clark, a retired member of this Court, sitting by designation, and Circuit Judges Goldberg and Ainsworth.

[5] In *Haines* a unanimous Supreme Court admonished the federal judiciary to be especially solicitous of the problems of the uneducated inmate seeking to litigate on his own behalf. The Court said:

"Whatever may be the limits on the scope of inquiry of courts into the internal administration of prisons, allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the *pro se* complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears 'beyond doubt that the plaintiff can prove no set of facts in support of

The *Haines* test is not whether the facts alleged in the complaint would entitle the plaintiff to relief. Rather, it is whether the Court can say with assurance on the basis of the complaint that, beyond any doubt, *no* set of facts could be proved that would entitle the plaintiff to relief.[6] The reasons for the *Haines* test are manifest. A *pro se* complaint provides an unsatisfactory foundation for deciding the merits of important questions because typically it is inartfully drawn, unclear, and equivocal, and because thorough pleadings, affidavits, and possibly an evidentiary hearing will usually bring out facts which simplify or make unnecessary the decision of questions presented by the naked complaint.[7]

---

his claim which would entitle him to relief.' *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957). See *Dioguardi* v. *Durning,* 139 F. 2d 774 (CA2 1944)." 404 U. S., at 520–521.

Under that test the complaint should not have been dismissed without, at the very minimum, requiring some response from the defendants. It appears from the record that although the complaint was filed in February, instead of causing it to be served on the defendants as required by Fed. Rule Civ. Proc. 4, the Clerk of the District Court referred it to a magistrate who decided in June that the case should be dismissed before any of the normal procedures were even commenced. At least one Circuit has held that dismissal without service on the defendants is improper, *Nichols* v. *Schubert,* 499 F. 2d 946 (CA7 1974). The Court's disposition of this case should not be taken as an endorsement of this practice since the question was not raised by the parties.

[6] This is the test actually applied in *Haines,* for although the Court ordered the complaint reinstated, it expressly "intimate[d] no view whatever on the merits of petitioner's allegations," 404 U. S., at 521. It is significant that the Court took this approach despite being pressed by the State to decide the merits. As in this case, the State argued forcefully that the facts alleged in the complaint did not amount to a constitutional violation. (Only in one footnote in its 51-page brief did the State discuss the pleading question, Brief for Respondents 22–23, n. 20, in No. 70–5025, O. T. 1971.) Yet, this Court devoted not a single word of its opinion to answering the argument that no constitutional violation was alleged.

[7] Thus, *Haines* teaches that the decision on the merits of the complaint

Admittedly, it is tempting to eliminate the meritless complaint at the pleading stage. Unfortunately, this "is another instance of judicial haste which in the long run makes waste," *Dioguardi* v. *Durning,* 139 F. 2d 774, 775 (CA2 1944) (Clark, J.), cited with approval in *Haines* v. *Kerner, supra,* at 521. In the instant case, if the District Court had resisted the temptation of premature dismissal, the case might long since have ended with the filing of medical records or affidavits demonstrating adequate treatment. Likewise, if the decision of the Fifth Circuit reinstating the complaint had been allowed to stand and the case had run its normal course, the litigation probably would have come to an end without the need for review by this Court. Even if the Fifth Circuit had wrongly decided the pleading issue, no great harm would have been done by requiring the State to produce its medical records and move for summary judgment. Instead, the case has been prolonged by two stages of appellate review, and is still not over: The case against two of the defendants may still proceed, and even the

--------

should normally be postponed until the facts have been ascertained. The same approach was taken in *Polk Co.* v. *Glover,* 305 U. S. 5, in which the Court reversed the dismissal of a complaint, without intimating any view of the constitutional issues, on "[t]he salutary principle that the essential facts should be determined before passing upon grave constitutional questions . . . ." *Id.,* at 10. See also *Borden's Co.* v. *Baldwin,* 293 U. S. 194, 213 (Cardozo and Stone, JJ., concurring in result). This approach potentially avoids the necessity of ever deciding the constitutional issue since the facts as proved may remove any constitutional question. Alternatively, a more concrete record will be available on which to decide the constitutional issues. See generally *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 574–575. Even when constitutional principles are not involved, it is important that "the conceptual legal theories be explored and assayed in the light of actual facts, not as a pleader's supposition," so that courts may avoid "elucidating legal responsibilities as to facts which may never be." *Shull* v. *Pilot Life Ins. Co.,* 313 F. 2d 445, 447 (CA5 1963).

claims against the prison doctors have not been disposed of with finality.[8]

The principal beneficiaries of today's decision will not be federal judges, very little of whose time will be saved, but rather the "writ-writers" within the prison walls, whose semiprofessional services will be in greater demand. I have no doubt about the ability of such a semiprofessional to embellish this pleading with conclusory allegations which could be made in all good faith and which would foreclose a dismissal without any response from the State. It is unfortunate that today's decision will increase prisoners' dependence on those writ-writers. See *Cruz* v. *Beto,* 405 U. S. 319, 327 n. 7 (REHNQUIST, J., dissenting).

## II

Like the District Court's decision to dismiss the complaint, this Court's decision to hear this case, in violation of its normal practice of denying interlocutory review, see

---

[8] In an affidavit filed in the Court of Appeals, Gamble states that he has been transferred to another prison, placed in solitary confinement, and denied any medical care at all. These conditions allegedly were continuing on December 3, 1974, the date of the affidavit. The Court of Appeals apparently considered these allegations, as shown by a reference to "the fact that [Gamble] has spent months in solitary confinement without medical care and stands a good chance of remaining that way without intervention," 516 F. 2d, at 941. Presumably the Court's remand does not bar Gamble from pursuing these charges, if necessary through filing a new complaint or formal amendment of the present complaint. The original complaint also alleged that prison officials failed to comply with a doctor's order to move Gamble to a lower bunk, that they put him in solitary confinement when he claimed to be physically unable to work, and that they refused to allow him to see a doctor for two days while he was in solitary. Gamble's medical condition is relevant to all these allegations. It is therefore probable that the medical records will be produced and that testimony will be elicited about Gamble's medical care. If the evidence should show that he in fact sustained a serious injury and received only *pro forma* care, he would surely be allowed to amend his pleading to reassert a claim against one or more of the prison doctors.

R. Stern & E. Gressman, Supreme Court Practice 180 (4th ed. 1969), ill serves the interest of judicial economy.

Frankly, I was, and still am, puzzled by the Court's decision to grant certiorari.[9] If the Court merely thought the Fifth Circuit misapplied *Haines* v. *Kerner* by reading the complaint too liberally, the grant of certiorari is inexplicable. On the other hand, if the Court thought that instead of a pleading question, the case presented an important constitutional question about the State's duty to provide medical care to prisoners, the crude allegations of this complaint do not provide the kind of factual basis[10] the Court normally requires as a predicate for the adjudication of a novel and serious constitutional issue, see, *e. g., Rescue Army* v. *Municipal Court,* 331 U. S. 549, 568–575; *Ellis* v. *Dixon,* 349 U. S. 458, 464; *Wainwright* v. *City of New Orleans,* 392 U. S. 598 (Harlan, J., concurring).[11] Moreover, as the Court notes, all the Courts of Appeals to consider the question have reached substantially the same conclusion that the Court adopts. *Ante,* at 106 n. 14. Since the Court seldom takes a case merely to reaffirm settled law, I fail to understand why it has chosen to make this case an exception to its normal practice.

---

[9] "The only remarkable thing about this case is its presence in this Court. For the case involves no more than the application of well-settled principles to a familiar situation, and has little significance except for the respondent. Why certiorari was granted is a mystery to me—particularly at a time when the Court is thought by many to be burdened by too heavy a caseload." *Butz* v. *Glover Livestock Comm'n Co.,* 411 U. S. 182, 189 (STEWART, J., dissenting).

[10] As this Court notes, *ante,* at 100 n. 5, even the meaning of some of the terms used in the complaint is unclear.

[11] If this was the reason for granting certiorari, the writ should have been dismissed as improvidently granted when it became clear at oral argument that the parties agreed on the constitutional standard and disagreed only as to its application to the allegations of this particular complaint. See Tr. of Oral Arg. 38, 48.

### III

By its reference to the accidental character of the first unsuccessful attempt to electrocute the prisoner in *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, see *ante,* at 105, and by its repeated references to "deliberate indifference" and the "intentional" denial of adequate medical care, I believe the Court improperly attaches significance to the subjective motivation of the defendant as a criterion for determining whether cruel and unusual punishment has been inflicted.[12] Subjective motivation may well determine what, if any, remedy is appropriate against a particular defendant. However, whether the constitutional standard has been violated should turn on the character of the punishment rather than the motivation of the individual who inflicted it.[13] Whether the conditions in Andersonville were the

---

[12] As the four dissenting Justices in *Resweber* pointed out:

"The intent of the executioner cannot lessen the torture or excuse the result. It was the statutory duty of the state officials to make sure that there was no failure." 329 U. S., at 477 (Burton, J., joined by Douglas, Murphy, and Rutledge, JJ.).

[13] The Court indicates the Eighth Amendment is violated "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Ante,* at 104–105. If this is meant to indicate that intent is a necessary part of an Eighth Amendment violation, I disagree. If a State elects to impose imprisonment as a punishment for crime, I believe it has an obligation to provide the persons in its custody with a health care system which meets minimal standards of adequacy. As a part of that basic obligation, the State and its agents have an affirmative duty to provide reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care is in fact delivered. For denial of medical care is surely not part of the punishment which civilized nations may impose for crime.

Of course, not every instance of improper health care violates the Eighth Amendment. Like the rest of us, prisoners must take the risk that a competent, diligent physician will make an error. Such an error may give rise to a tort claim but not necessarily to a constitutional claim. But when the State adds to this risk, as by providing a physician who

product of design, negligence, or mere poverty, they were
cruel and inhuman.

In sum, I remain convinced that the petition for certiorari
should have been denied. It having been granted, I would
affirm the judgment of the Court of Appeals.

_____

does not meet minimum standards of competence or diligence or who
cannot give adequate care because of an excessive caseload or inadequate
facilities, then the prisoner may suffer from a breach of the State's con-
stitutional duty.

**February 12, 2025**

SECRETARY OF LABOR
  MINE SAFETY AND HEALTH
  ADMINISTRATION (MSHA),
  o/b/o ROBERT BAUMANN

Docket No. CENT 2023-0251-DM

v.

MOSENECAMANUFACTURER, LLC
  d/b/a AMERICAN TRIPOLI

## ORDER

On January 17, 2025, the Commission issued an order vacating the directions for review in this matter and dismissing this proceeding. 47 FMSHRC __, No. CENT 2023-0251-DM (Jan. 17, 2025). On January 21, 2025, MOSenecaManufacterer, LLC, *d/b/a/* American Tripoli ("American Tripoli") filed a Petition for Reconsideration of the dismissal order pursuant to Commission Procedural Rule 78(a), 29 C.F.R. § 2700.78(a).

Upon consideration by the Commission, we hereby deny American Tripoli's request for reconsideration.

Mary Lu Jordan, Chair

Timothy J. Baker, Commissioner

Moshe Z. Marvit, Commissioner

Distribution List:

Russell Tidaback
Jordan Tidaback
American Tripoli
222 Oneida Street
Seneca, MO 64865
Russell.Tidaback@AmericanTripoli.com
RTidaback@deedyco.com

Russell Tidaback
2701 East Grauwyler Road, Bldg. 1, Dept. #1008
Irving, TX 75061
Russell.Tidaback@deedyco.com

Robert Baumann
baumannr24@gmail.com

Laura O'Reilly, Esq.
U.S. Department of Labor
2300 Main Street, Suite 10100
Kansas City, MO 64108
oreilly.laura.m@dol.gov

Quinlan B. Moll, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
Moll.Quinlan.B@dol.gov

Elaine M. Smith, Esq.
U.S. Department of Labor
2300 Main St., Suite 10100
Kansas City, MO 64108
smith.elaine.m@dol.gov

Susannah M. Maltz, Esq.
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
maltz.susannah.m@dol.gov

Appellate Case: 25-1349    Page: 558    Date Filed: 04/07/2025 Entry ID: 5503844

Marcus D. Reed, Esq.
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
Reed.Marcus.D@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
scott.emily.t@dol.gov

April Nelson, Esq.
Associate Solicitor
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
Nelson.April@dol.gov

Thomas A. Paige, Esq.
U.S. Department of Labor
Office of the Solicitor
Division of Mine Safety and Health
200 Constitution Avenue NW, Suite N4420 – N4430
Washington, DC 20210
paige.thomas.a@DOL.GOV

Melanie Garris
U.S. Department of Labor
Office of Civil Penalty Compliance
Mine Safety and Health Review Commission
201 12th Street South, Suite 401
Arlington, VA 22202-5452
Garris.Melanie@dol.gov

Chief Administrative Law Judge Glynn F. Voisin
Office of the Chief Administrative Law Judge
Federal Mine Safety & Health Review Commission
Office of the Chief Administrative Law Judge
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

4

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**
OFFICE OF THE CHIEF ADMINISTRATIVE LAW JUDGE
1331 PENNSYLVANIA AVE., N.W., SUITE 520N
WASHINGTON, DC 20004-1710
TELEPHONE: 202-434-9950
FAX: 202-434-9949

March 10, 2025

| | |
|---|---|
| SECRETARY OF LABOR, MSHA obo ROBERT BAUMANN, <br>          Complainant <br><br>   v. <br><br><br><br> MOSENECAMANUFACTURER LIMITED LIABILITY COMPANY d/b/a AMERICAN TRIPOLI, <br>          Respondent | DISCRIMINATION PROCEEDING <br><br> Docket No. CENT 2023-0251 <br> MSHA No. MADI-CD-2023-03 <br><br><br><br> Mine: MOSenecaMfr LLC dba American Tr <br> Mine ID: 23-00504 |

## ORDER OF ASSIGNMENT

This case is hereby assigned to Administrative Law Judge Michael Young. All future communications regarding this case should be addressed to Judge Young at the following address:

> Federal Mine Safety and Health Review Commission
> 1331 Pennsylvania Avenue, N.W., Suite 520N
> Washington, D.C. 20004-1710
> Telephone No.   (202) 434-9986
> Fax No.        (202) 434-9949

**The name of the assigned judge must be placed in the upper right hand corner of the first page of every pleading. The judge's name and docket number must be included on all pleadings. Failure to do so may result in a delay in case proceedings.**

Glynn F. Voisin
Chief Administrative Law Judge

Distribution:

Russell Tidaback, American Tripoli, 222 Oneida Street, Seneca, MO 64865
([RTidaback@deedyco.com](mailto:RTidaback@deedyco.com)) ([Russell.Tidaback@AmericanTripoli.com](mailto:Russell.Tidaback@AmericanTripoli.com))

Laura O'Reilly, Esq., Office the Solicitor, U.S. Department of Labor, 2300 Main Street, Suite
10100, Kansas City, MO 64108 ([oreilly.laura.m@dol.gov](mailto:oreilly.laura.m@dol.gov))

Elaine Smith, Esq, Office of the Solicitor, U.S. Department of Labor, MSHA, 2300 Main Street,
Suite 10100, Kansas City, MO 64108 ([smith.elaine.m@dol.gov](mailto:smith.elaine.m@dol.gov))

Quinlan B. Moll, Esq. Office of the Solicitor, U.S. Department of Labor, MSHA, 2300 Main
Street, Suite 10100 Kansas City, MO 64108 ([Moll.Quinlan.B@dol.gov](mailto:Moll.Quinlan.B@dol.gov))

Susannah M. Maltz, Esq. Office of the Solicitor, U.S. Department of Labor, MSHA, 200
Constitution Avenue NW, Suite N4420 – N4430 Washington, DC 20210
([Maltz.Susannah.M@dol.gov](mailto:Maltz.Susannah.M@dol.gov))

Robert Baumann, ([Baumannr24@gmail.com](mailto:Baumannr24@gmail.com))

/WAFJ